```
             IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF IOWA
                     WESTERN DIVISION

RONALD KUIPER and                    No. C06-4009-MWB
CONLEY KUIPER,

        Plaintiffs,                  Sioux City, Iowa
                                     February 17, 2009
     vs.                             8:01 a.m.

GIVAUDAN FLAVORS CORP.,              VOLUME 1 OF 12

        Defendant.
_____/



                  TRANSCRIPT OF TRIAL
          BEFORE THE HONORABLE MARK W. BENNETT
          UNITED STATES DISTRICT JUDGE, and a jury.
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ Document 403 Filed 06/09/09 Page 1 of 223
To purchase a complete copy of the transcript.

APPEARANCES:

For the Plaintiffs: KENNETH BLAIR MCCLAIN, ESQ.
 STEVEN EDWARD CRICK, ESQ.
 SCOTT A. BRITTON-MEHLISCH, ESQ.
 Humphrey, Farrington & McClain
 Suite 400
 221 West Lexington
 Independence, MO  64050

 DENNIS M. MCELWAIN, ESQ.
 Smith & McElwain
 Suite 530
 505 Fifth Street
 Sioux City, IA  51101

For the Defendant: JAMES D. PAGLIARO, ESQ.
 KEVIN M. DONOVAN, ESQ.
 THOMAS J. SULLIVAN, ESQ.
 Morgan, Lewis & Bockius
 1701 Market Street
 Philadelphia, PA  19103-2921

 V. THOMAS MEADOR, ESQ.
 Morgan, Lewis & Bockius
 Suite 2200
 300 South Grand Avenue
 Los Angeles, CA  90071-3132

 STEPHEN J. HOLTMAN, ESQ.
 Simmons Perrine
 Suite 1200
 115 Third Street Southeast
 Cedar Rapids, IA  52401-1266

Court Reporter: Shelly Semmler, RMR, CRR
 320 Sixth Street
 Sioux City, IA  51101
 (712) 233-3846

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ Document 403 Filed 06/09/09 Page 2 of 223

1     (Proceedings convened outside the presence of the jury

2  venire.)

3     THE COURT:  Good morning.  I'm Mark Bennett.  I have

4  two of my law clerks, Roger and Nick.  Roger's my point person

5  on jury instructions, and Nick will be in the courtroom

6  throughout the trial.  He'll be the keeper of the exhibits, so

7  if you have any questions about whether something's been

8  admitted or not, you can check with Nick.  He's the final --

9  almost final authority on what's been admitted and what hasn't.

10     I'm still waiting for an answer from my Friday e-mail

11  from you all as to how long you expect this trial to last in

12  terms of trial days because I'd like to tell the prospective

13  jurors that to find out if it's going to be an undue burden or

14  hardship, so do you have an answer?

15     MR. MCCLAIN:  Yes.  Mr. Meador and I consulted

16  yesterday about it, and we thought word had come to the Court,

17  but I'm sorry that it hadn't.

18     THE COURT:  Well, what was it?  By carrier pigeon?

19     MR. MCCLAIN:  No, we had a young lady here that spoke

20  to your clerk about the issue.

21     THE COURT:  Well, I'm the one that sent you the

22  e-mail.  I would expect a response to me.  Is that unreasonable?

23     MR. MCCLAIN:  No, sir.

24     THE COURT:  Okay.  So tell me now.

25     MR. MCCLAIN:  Eleven days -- ten days of evidence but

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ Document 403 Filed 06/09/09 Page 3 of 223
To purchase a complete copy of the transcript.

 1   a half a day to pick a jury and a half a day for closing is what
 2   we kind of thought.
 3          THE COURT:  So you want me to waive our local rule on
 4   length of closing arguments?
 5          MR. MCCLAIN:  No, sir.  I just thought --
 6          THE COURT:  Well, then why would it be half a day?
 7   Have you read our local rule?
 8          MR. MCCLAIN:  Sure.  I have.
 9          THE COURT:  What is it?
10          MR. MCCLAIN:  That --
11          THE COURT:  How long are closing arguments?
12          MR. MCCLAIN:  A half hour.
13          THE COURT:  That's opening statements.  Opening
14   statements are 15 minutes.  I think you're right.  So if we're
15   going to have half-an-hour closing arguments, why would we need
16   half a day?
17          MR. MCCLAIN:  Well --
18          THE COURT:  My math isn't very good, but I don't quite
19   understand why that would be half a day.
20          MR. MCCLAIN:  Well, we anticipated that the -- that
21   the jury selection would be half a day.  We didn't know what
22   would be entailed in closing argument, whether or not you would
23   read the instructions again at that point in time, but if you
24   did, given the fact that we both had another hour --
25          THE COURT:  Yeah, well, I don't read the instructions

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ  Document 403  Filed 06/09/09  Page 4 of 223
To purchase a complete copy of the transcript.

1    twice.

2         MR. MCCLAIN:  Okay.  That's why -- that's why we --

3    without any knowledge, but that was our best estimate.  But ten

4    trial days of evidence is what we were totaling up between us.

5         THE COURT:  Okay.  And so because we're going to go

6    four days this week, three days next week, then that means

7    probably it will go to the jury on Wednesday or Thursday of the

8    third week.

9         MR. MCCLAIN:  That's what we thought.

10        THE COURT:  Okay.  And I'll be glad to waive the time

11   frame for closing arguments, but you have to ask.  I've waived

12   them in every case for 15 years but . . .

13        MR. MCCLAIN:  And we may do that.  We really hadn't

14   gotten that far in our planning, but I did see that it was -- I

15   think it says half an hour.

16        THE COURT:  Okay.  Now, let's just go through and see

17   who's who.  And, Mr. McClain, are you kind of lead counsel?

18        MR. MCCLAIN:  Yes, sir.

19        THE COURT:  Okay.  So if I address a question to the

20   plaintiffs, that would be to you?

21        MR. MCCLAIN:  Generally, yes.

22        THE COURT:  Okay.  And, Mr. Holtman, are you lead

23   counsel?

24        MR. HOLTMAN:  No.  Mr. Pagliaro is, Your Honor.

25        THE COURT:  Okay.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 5 of 223

1          MR. PAGLIARO:  Good morning, Your Honor.

2          THE COURT:  Good morning.  Nice to see you.

3          MR. PAGLIARO:  Nice to see you, sir.

4          THE COURT:  Have any problem getting from

5    Philadelphia?

6          MR. PAGLIARO:  I did not, sir.

7          THE COURT:  Good, good.  And then in between we

8    have -- between Mr. Holtman?

9          MR. MEADOR:  Tom Meador, Your Honor.  Good morning.

10          THE COURT:  Good morning.

11          MR. MEADOR:  And I didn't have any trouble getting

12   here from L.A.

13          THE COURT:  Really.  What were you doing in L.A.?

14          MR. MEADOR:  That's where I live, in Pasadena.

15          THE COURT:  Oh.  Well, we have nice weather for you,

16   just like back home.

17          What do we need to take up this morning?  Let's talk

18   about the jury instructions.  I know people aren't happy with

19   the fact that I instruct at the beginning of the trial, but I've

20   done it in every trial.  I've done it in death penalty cases,

21   every type of civil and criminal case imaginable.  I've never

22   had a problem with it.

23          My philosophy is kind of to submit the claims of the

24   parties anyway and then worry about it on post-trial motions.

25   But, you know, if I conclude that there's absolutely no evidence

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
for purchase of complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ Document 403 Filed 06/09/09 Page 6 of 223

1   on a claim or defense, then I'll just withdraw it.  I have a

2   standard withdrawal instruction.  I've used it very, very

3   seldom.  In the event we need a supplemental instruction which

4   happens less than 1 out of 20 trials, then I'll give a

5   supplemental instruction.

6           But I know you're not all very concerned about the

7   jury because your pretrial order wouldn't have looked like it

8   did if you were, but I am concerned about the jury.  And I think

9   it's ridiculous to wait till the end of the case to give

10  instructions on the claims and defenses because it makes it

11  impossible for the jurors to track the evidence even in a simple

12  case let alone a complex case.  So I'm a huge believer in

13  instructing at the beginning of the case.

14          And had I had more cooperation of counsel, we would

15  have had the instructions done a lot earlier, and I think they

16  would have been a lot more agreed to, but that didn't happen,

17  and that's fine.

18          So you've all filed your objections to the

19  instructions, and I don't know that you need to make any more

20  record on them, but I've gotta give you an opportunity to make

21  any additional record.  And I'm happy to do that.  I think

22  you'll find that I'll give you all the opportunity you'll ever

23  need to make a record on anything you want to make a record on.

24          So let's talk about the instructions now.  Do the

25  plaintiffs have any additional objections?  I think you just

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 7 of 223

1 filed something this morning or last night or whenever.

2         MR. MCCLAIN:  We did.  And it's adequate for our

3 purposes.

4         THE COURT:  Okay.  Anything else you want -- any other

5 record you want to make on the instructions?

6         MR. MCCLAIN:  No, sir.

7         THE COURT:  Okay.  Thanks.  How about from the

8 defense?

9         MR. PAGLIARO:  Good morning, Your Honor.  We submitted

10 ours as well, and we'll rest on the papers that we submitted.

11         THE COURT:  Okay.  Great.  This is keeping my

12 tradition of having the average instruction conference last ten

13 seconds or less, so I appreciate that.

14         I don't have a whole lot on my agenda.  I think I

15 explained in a pretty detailed e-mail on Friday night or

16 Saturday morning how I do jury selection, but I'd be glad to go

17 over it again.  You want me to kind of run through it again?  I

18 see a couple of nods.  Okay.

19         I don't know if you've been told yet or not from the

20 clerk's office who the 14 are, but our computer preselects 14

21 people at random out of the pool.  We'll seat 14 in the jury

22 box.  And the reason why it's 14 is each side at the end of jury

23 selection will exercise three peremptory challenges.  We'll

24 start with the plaintiff first.

25         Nick will take a clipboard with the names of all the

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 8 of 223

1    jurors on it.  You'll just draw a line through the first one you

2    strike and put plaintiff's 1.  Then it will be passed to the

3    defense, defendant's 1.  We do that 3 times.  And then Nick will

4    read the list of the names of jurors who have not been struck

5    because each of you strike 3 for a total of 6.  6 from 14 is 8.

6    I use 8 trial jurors, nothing magical about 8.  It's just a

7    number I've always used.  I don't believe anybody asked me to

8    use more.  And so we'll be using 8 trial jurors.

9            Once we seat the 14, I'm going to do a real

10   abbreviated selection because in cases where the lawyers have

11   put together a pretrial questionnaire like you do -- I have not

12   reviewed the questionnaire answers of the jurors, so I'm going

13   to do a pretty abbreviated selection process.  I'll deal with

14   the "would it be a severe or extraordinary hardship for people

15   to serve for the three weeks" and, once I'm done with my

16   questions, turn it over to the plaintiffs.  You can ask

17   questions.  And then turn it over to the defense, and then

18   exercise your peremptory challenges.

19           It's really pretty simple.  I don't have a lot of

20   rules on what you can ask and don't ask, but, you know, if you

21   want to -- I've had people ask -- I had one big case against

22   Enron where they had a high-powered jury consultant, and they

23   wanted me to ask if the jurors believed in extraterrestrial life

24   here on earth with a bunch of follow-up questions, and I said

25   I'd be happy to ask it but I couldn't do it with a straight

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 9 of 223

1    face, so I let the lawyers ask those questions.

2           But, you know, if you want to ask about their bumper

3    stickers and magazines and what TV shows they -- whatever, feel

4    free to do that.  So any questions on jury selection?  Anything

5    you want me to go back over or explain in more detail?

6           MR. MCCLAIN:  Could you -- Judge, you mentioned and we

7    saw in the writing that challenges for cause are done in front

8    of the jury.

9           THE COURT:  Yep.

10          MR. MCCLAIN:  Can you give us some direction as to --

11   a how-to about how you would like that done?

12          THE COURT:  Yeah.  Here's what's probably going to

13   happen.  Let's just say -- let's say we have a juror that says,

14   "I love microwave popcorn, and I have eight bags a day, and I

15   love the scent so much that when I open the bag I stick my head

16   in and I sniff it until I almost pass out because I just love

17   it, and I just live every day to do that."  I don't think that's

18   a juror that I probably want to leave on the jury.

19          And so I would just turn to the lawyers and say, "Do

20   you have any objection if we excuse Mrs. Jones?"  And if you

21   have an objection, you can say yes, and then I won't excuse her

22   and you can keep questioning her.  And then I might call you up

23   to sidebar.  But usually challenges for cause I think are quite

24   obvious.  And generally what I do is I'd say, "Now, Mrs. Jones,

25   because you're such an avid popcorn lover, do you think this

1  might not be the appropriate case for you to serve on, and would

2  you rather serve on another case?"  I don't like to embarrass

3  them or anything, so I try and gently suggest that maybe this is

4  not the case that they'd like to serve on.

5      And then I turn to the lawyers -- I just think that 99

6  percent of the time we're just going to be in agreement on a

7  challenge for cause that this is not a good juror for anybody.

8      Now, in my last trial -- I think you all know I just

9  finished on Friday a ten-day patent jury trial involving a

10  business method, and it involved a method for computing

11  annuities.  And sure enough, one of the jurors owned an annuity

12  with the defendant that was absolutely covered by the patent.

13  So not only did she own a product that was covered by the

14  patent, she had a financial interest in the company.

15      But the lawyers were so contentious, so rather than

16  just excusing her, I brought them up to sidebar which you know I

17  hate to have, and I said she has a financial interest in one of

18  the companies covered by the patent.  It's obviously a challenge

19  for cause.  And the defense lawyer said, "Well, no, it's not.

20  We want her on."  And I said, "Well, fine, I'm excusing her for

21  cause anyway," and he said, "We object."  I said, "Fine, you can

22  object all you want but --" so that's kind of how it's going to

23  work.  I just do it on the fly.  I'm not calling you up to

24  sidebar to exercise challenges for cause.  You know, if you're

25  skillful, you can challenge a juror for cause and not offend

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 11 of 223
To purchase a complete copy of the transcript

1    anybody.  And so I just -- it's just a waste of time to have

2    sidebars, so that's kind of my philosophy.

3            Most of the challenges for cause are just blatantly

4    obvious or they have such a good excuse to be -- you know, in

5    that trial which we knew was going to be a two-week trial we had

6    a waitress whose income depended on tips.  Obviously ten-day

7    trial is burdensome, and I don't care what the lawyers say, I

8    was going to let her go, so I just excused her.  So that's kind

9    of how I do it.

10            Mr. McClain, does that help satisfy you?

11            MR. MCCLAIN:  It does, Your Honor.

12            THE COURT:  Yeah.  And, of course, if -- you know, if

13    there's something that would be maybe really dicey and you

14    request a sidebar, I may make an exception.  I may not.  It just

15    all depends.  But I generally just expect you to do it right in

16    front of the jurors.  It's good practice to be, you know,

17    skillful and not offend the rest of the jurors.

18            Mr. McClain, any other questions on jury selection?

19            MR. MCCLAIN:  No, sir.

20            THE COURT:  How about on the defense?

21            MR. PAGLIARO:  Your explanation was clear, Your Honor.

22    Thank you.

23            THE COURT:  Okay.  Are you happy with the fact that

24    I'm giving you wide latitude because of your questionnaire to

25    ask a lot of questions rather than have me doing it?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 12 of 223
To purchase a complete copy of the transcript.

```
 1              MR. MCCLAIN:  Yes, sir.

 2              MR. PAGLIARO:  Works for me, Your Honor.  Thank you.

 3              THE COURT:  Is there anything that you think that I

 4      should be the one asking?  You know, is there anything a little

 5      tricky or something that you would rather have me ask than have

 6      the lawyers ask, either side?

 7              MR. MCCLAIN:  No.  I think that everything can be --

 8      the only thing I wondered about was the -- several expressed

 9      dislike for lawyers, but we can --

10              THE COURT:  That's your problem.

11              MR. MCCLAIN:  -- handle that.

12              THE COURT:  But you know what?  I'll tell them how

13      much I love all the lawyers, particularly in this case, so maybe

14      they'll feel the love from me.

15              MR. MCCLAIN:  We would appreciate that.

16              MR. PAGLIARO:  That would be much appreciated from the

17      Philadelphia lawyer present, sir.

18              THE COURT:  Now, what do you want me to say about --

19      if anything about the fact that you're from out of town?  You

20      going to shy away from it, or when you introduce yourself, are

21      you going to say that you're from Philadelphia?  I had a lot

22      of -- I think we had something like 12, 16 lawyers in that

23      patent case, and all but 2 were from out of town, and the 2

24      local counsel did not participate in any way in the trial.

25              So what we agreed upon ahead of time, that I would
```

1   tell the jurors that we had a lot of out-of-town lawyers but we

2   had a couple of Iowa lawyers and, you know, they should treat

3   everybody the same way.

4           MR. PAGLIARO:  That would be really a nice thing to

5   do, Your Honor.  We're all from out of town including

6   Mr. McClain.  Our Iowa person's from out of town too.

7           THE COURT:  He is.  That's right.  But I did slip a

8   couple of times when -- after I told them that they were just

9   from out of town.  One of the lawyers was doing something very

10  weird, and I said, "Well, you may do that in New York City that

11  way, but in Iowa we don't."  So, you know, I don't think you

12  ought to hide from the fact that you're from a Philadelphia law

13  firm, but that's really up to you.

14          MR. PAGLIARO:  Okay, Your Honor.  Thank you.

15          THE COURT:  And what I'm going to tell them is it's

16  very routine in substantial cases to have out-of-state counsel.

17  We have out-of-state counsel all the time in cases.

18          MR. PAGLIARO:  That would be great, Your Honor.

19          THE COURT:  I'm used to it.  I think, you know -- and

20  so I'll do everything I can to lessen -- I personally don't

21  think Iowa jurors would hold it against the fact -- particularly

22  when they're from both sides -- I think it's a little more

23  problematic when all of the out-of-town lawyers are on one side

24  versus the other, but I will kind of cover that and do what I

25  can.

1          MR. PAGLIARO:  And I'll try to remember I'm a guest,

2     Your Honor.

3          THE COURT:  Okay.  Well, but you're admitted just like

4     the Iowa lawyers are.  Once you're admitted pro hac vice, I

5     guess you're technically a guest, but I hope you'll be treated

6     the same by everyone.

7          Anything else about jury selection that you can think

8     of?  What else?  I don't really have a big agenda.  Are there

9     other loose ends?

10          MR. MCCLAIN:  Did you grant us a half hour apiece for

11     opening statement in this case?  We thought that you had, but we

12     wanted to confirm that.

13          THE COURT:  How much time would you like?

14          MR. MCCLAIN:  A half hour would be fine.

15          MR. PAGLIARO:  That would work for us as well, Your

16     Honor.  We would request that as well.

17          THE COURT:  Sure.  You can have a little longer if you

18     want.  Why don't we do this, only if you want to.  I mean, I'll

19     basically let you go kind of as long as you want.  I think if

20     you go much beyond a half an hour, it becomes counterproductive.

21     Would you like to just have a friendly reminder and maybe at 30

22     minutes for me to say 30 minutes, not say 30 minutes and you

23     have to stop?  Or would you like -- you know, we do have

24     available the electronic bracelets that we put on defendants.

25     And we can put an ankle bracelet on, and at 30 minutes I could

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 15 of 223

1    zap you at about half the voltage.

2              MR. PAGLIARO:  Thank you, Your Honor.

3              MR. MEADOR:  I think that's a good idea, Your Honor.

4              MR. MCCLAIN:  Well, I'm glad they like it.  I'll just

5    take the verbal warning.

6              THE COURT:  Okay.  No bracelet?

7              MR. MCCLAIN:  They can have the bracelet.

8              THE COURT:  See, the bad news with the bracelet is

9    once we put it on we can't take it off until the end of the

10   trial, so you run some substantial risk here.  But we'll go with

11   no bracelets and just the 30-minute kind of gentle, and I'll

12   just say we're at the 30-minute mark or 30 minutes.  And you can

13   keep going, but that will just kind of give you a guideline.

14             MR. PAGLIARO:  That's perfect, Your Honor.  Thank you.

15             THE COURT:  Okay.  What else?

16             MR. MCCLAIN:  I did forget one question.  Are you

17   going to give us time to confer following the voir dire before

18   we make our strikes?

19             THE COURT:  Yes, I will.  And what will happen is I'll

20   say, you know, Nick's now going to bring you the clipboard,

21   something like that.  But I'm going to leave all the jurors

22   here.  It's not like we're going to send them out because I

23   think it's nice to be able to see them.  And I'll just tell them

24   at this point you'll just have to patiently wait while the

25   lawyers exercise their strikes.  And they'll just be sitting

```
 1    there waiting.  And you can all huddle up.  I don't remember if
 2    you have consultants and all, and you can huddle up with your
 3    consultants and your coin-flipping machines and how ever you're
 4    going to do it and take your time in exercising the strikes.
 5              MR. MCCLAIN:  Thank you.
 6              THE COURT:  Anything else?
 7              MR. MEADOR:  Yes, Your Honor, a few housekeeping
 8    matters.
 9              THE COURT:  Sure.
10              MR. MEADOR:  Judge Zoss said we could raise this one
11    issue with you.  You have the local rule that doesn't allow the
12    parties to talk to witnesses about what transpires during the
13    trial.  And we talked to Judge Zoss and I've talked to
14    Mr. McClain about that we could talk to our experts about what
15    the witnesses testify to at trial.
16              THE COURT:  And you've all agreed -- anything you
17    agree on is in all likelihood going to be fine with me.
18              MR. MEADOR:  We haven't agreed they can sit here in
19    trial but that we can talk to them about what the testimony was.
20              MR. MCCLAIN:  I don't object to them sitting here at
21    trial if they want to.  But we have agreed -- we have agreed
22    that you can talk to your witness about anything as far as I'm
23    concerned.
24              MR. MEADOR:  You mean experts.
25              MR. MCCLAIN:  Yeah.
```

```
1          THE COURT:  Experts.

2          MR. MCCLAIN:  Yeah.

3          MR. MEADOR:  But we would object to them being here.

4          THE COURT:  Okay.  Well, in the absence -- in the

5   patent case they agreed, and all the experts sat in, but, you

6   know, that was their agreement, and I honored it.  You can't

7   agree, so that's fine.  In the absence of agreement, I'm going

8   to rely on Rule 615.  Everybody's sequestered, but you can talk

9   to your experts about the trial testimony.

10         MR. MEADOR:  Thank you, Your Honor.

11         MR. MCCLAIN:  Okay.

12         MR. MEADOR:  I got two more.

13         THE COURT:  Sure.

14         MR. MEADOR:  The -- as you know, we had a motion in

15  limine about our Carthage plant in Cincinnati and how much of

16  that evidence could come in.  You overruled our motion in

17  limine, and a lot of the documents in this case relate to not

18  where the plaintiff worked but the Cincinnati plant.

19         We obviously object to those category of documents.

20  What I'm wondering is how you -- we don't want to object every

21  time they pull out Tastemaker documents related to the

22  plaintiffs in Cincinnati.  Do we have a continuing objection?

23  The documents are obviously in evidence because you've overruled

24  our objections.  We don't want to jump up all the time -- he's

25  got a lot of documents related to our plant -- and object on the
```

1    same grounds you've already overruled.

2              THE COURT:  Well, I am not in a position to advise a

3    party on what you need to do to make your record.  I think

4    that's kind of an inappropriate role for me.  I'd be willing to

5    say for my purposes I've already ruled and my understanding is

6    from a relatively recent amendment -- I believe it's in Rule

7    104, but I may be wrong about that -- that you don't have to do

8    anything further.  But I'm just saying that's my understanding.

9              I think it's Rule 103.  And I'm looking at Rule

10   103(a)(2), the last paragraph.  Once the Court makes a

11   definitive ruling on the record admitting or excluding evidence

12   either at or before trial, a party need not renew an objection

13   or offer proof to preserve a claim of error for appeal.

14             Now, you need to decide whether my motion in limine

15   ruling qualifies under that.  So you can either object every

16   time, not object every time.  I'll be glad to give you a

17   continuing objection to all of those exhibits.  But what I can't

18   do is give you some kind of judicial guarantee about what you

19   need to do to make your record because it's not my role, it's

20   not my job, and I don't want to be responsible for it.

21             But I can certainly say for my purposes of conducting

22   the trial and the major reason why you need to make a record is

23   to put the trial judge on notice so that they can make their

24   rulings and also to preserve error on appeal.  But my motion and

25   ruling suffices for any trial purposes that I need.  So I have

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 19 of 223

1  no need for you to make any further record on it to assist me in

2  making correct evidentiary rulings.  I don't know if that helps

3  you or not.

4          MR. MEADOR:  Well, could we have a continuing

5  objection to the Tastemaker and Givaudan documents relating to

6  the Carthage plant?

7          THE COURT:  Sure.  You can have a continuing objection

8  for whatever value you may think a continuing objection has.

9          MR. MEADOR:  Thank you, Your Honor.

10         The last point, are we going to talk again before the

11  first witness is called because you said you like to get a

12  heads-up if we have any particular problems with any specific

13  witness.

14         THE COURT:  Nope.  Give me a heads-up now.

15         MR. MEADOR:  The heads-up now, since we stipulated to

16  most of the evidence going in and we're probably most --

17         THE COURT:  Well, that's not exactly true.  There's

18  a -- you know, I just briefly looked through the revised --

19  well, I had so many different exhibit lists, it was hard to keep

20  track of.  They were coming as -- I mean, they were just -- you

21  know, it seemed like every day there were new ones coming.  But

22  the last round that I looked through, the plaintiffs didn't have

23  hardly any objections to your exhibits, but you still had a lot

24  of B objections to their exhibits.

25         MR. MEADOR:  And that just relates to the last point I

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 20 of 223

1   just made.  We kept the B because we didn't want to have the

2   record saying that we stipulated to the Tastemaker, Givaudan --

3           THE COURT:  Oh, I see.  Were the B objections mostly

4   to those exhibits from the motion in limine ruling?

5           MR. MEADOR:  Yes, Your Honor.

6           THE COURT:  Oh, I see.  Okay.  So what percentage of

7   the other exhibits that were not subject to the motion in limine

8   rulings is there now a dispute between the parties?  Very

9   little?

10          MR. MEADOR:  Very little.  There may be none.

11          THE COURT:  May be none, okay.  Okay.  Great.  Thanks

12  for pointing that out.  Okay.  So let's get back to the first

13  witness now.  What's the problem or the heads-up?

14          MR. MEADOR:  Well, the bad luck we have -- I mean, the

15  first witness in this case is Dr. Egilman, and as you recall, we

16  had motions in limine against him that were too general in

17  nature, and we're going to just have a lot of specific

18  objections.  I tell you this because the rest of the case I

19  don't see us making any objections.  I didn't want you to think

20  that here we are, here the guy's going to make a bunch of

21  objections to every witness testifying.  But we will have some

22  with Dr. Egilman because he gives legal opinions about corporate

23  ethics.  He gives legal opinions as to motivations as to people.

24  He testifies about --

25          THE COURT:  Do you think maybe he might want to read

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 21 of 223
To purchase a complete copy of the transcript

 1  the instructions for me because they're pretty long?

 2           MR. MEADOR:  Dr. Egilman will be pleased to do that.

 3  He also testified -- he testified about facts that aren't in

 4  evidence.  I mean, our documents are in, but it's kind of -- you

 5  know, usually you have factual witnesses testify first, but

 6  Dr. Egilman's going to come in, and he's going to testify pretty

 7  much on every issue in the case.  They also like to --

 8           THE COURT:  And a lot of issues that probably aren't

 9  in the case; right?

10           MR. MEADOR:  Yes, yes, he will.  He'll talk --

11           THE COURT:  At least from your perspective they're

12  not; right?

13           MR. MEADOR:  He'll try to talk about asbestos,

14  benzene, anything else he can work into this case, even though

15  it has nothing to do with this case.  We've reviewed some of the

16  prior transcripts.  They also like to just kind of point him to

17  a PowerPoint, and then he gives a lecture for, you know, 20

18  minutes, so we're going to have those types of objections.

19  Anyway, I just wanted to give you a heads-up.

20           THE COURT:  I appreciate that.  And I know in an ideal

21  world, I mean, you actually wanted to have a Daubert hearing as

22  I recall.  Am I right about that?

23           MR. MEADOR:  That's right, Your Honor.

24           THE COURT:  Yeah.  And one of my many idiosyncrasies

25  but I don't believe I've ever had a Daubert hearing.  I might

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 22 of 223

         1    have had one or two, didn't like them.  I just like to take them

         2    up at trial.  It's a little bit easier given my schedule to do

         3    it that way.  So I fully understand why you're going to be

         4    making objections, and I just encourage you to make all the

         5    objections you can.

         6            And you'll notice in my instructions I tell the jurors

         7    that the lawyers have a duty to make objections and that they

         8    can't hold it against a lawyer in any way because they make

         9    objections because that's what lawyers are supposed to do.

        10    So . . .

        11            MR. MEADOR:  Thank you, Your Honor.  That's it.

        12            THE COURT:  Okay.  Great.  Thank you.  Anything else

        13    you can think of?

        14            MR. PAGLIARO:  Nothing from our side, Your Honor.

        15    Thank you.

        16            THE COURT:  Okay.  We have a substantial disagreement

        17    in my chambers as to the correct pronunciation of your client.

        18    So I'm the world's worst at pronunciation, so can you say it

        19    very slowly and a couple times for me, and I'll try and do it

        20    phonetically and see if I can get it right in front of the jury?

        21            MR. PAGLIARO:  And I'll be candid with you.  When you

        22    started saying that, I thought you were going to say my last

        23    name.

        24            THE COURT:  No, I think I can handle that.

        25            MR. PAGLIARO:  Givaudan.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 23 of 223

1          THE COURT:  Givaudan.

2          MR. PAGLIARO:  Givaudan.

3          THE COURT:  Givaudan.  If I say it fast enough,

4    Givaudan, is that good enough?

5          MR. PAGLIARO:  Yeah.

6          THE COURT:  Great.  Well, I won't tell you some of the

7    pronunciations we came up with, but they weren't really close to

8    Givaudan, so we'll do our best.

9          Okay.  We'll see you back here at nine o'clock for

10   jury selection.  Thank you very much.

11         (Recess at 8:29 a.m.)

12         (The jury venire entered the courtroom.)

13         THE COURT:  Good morning, everybody.  Would you all

14   raise your right hand, all the potential jurors, and I'm going

15   to swear you in.

16         (The jury venire was sworn.)

17         THE COURT:  Thank you.  Good morning.  Please be

18   seated.

19         We have a fascinating case, I think one of the most

20   interesting cases that is going to be tried in the 15 years I've

21   been a United States District Court judge.  And so you don't

22   realize it, but you're awfully lucky to be selected to be in

23   this panel.

24         And here's what we're going to do now.  My law clerk

25   Nick is going to read the names of the 14 individuals that our

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 24 of 223

1   computer has randomly selected, and we're going to take those 14

2   and seat them in the jury box.  And then we're going to start

3   with the 14.  But we're probably going to lose some of those

4   people.  So if you're not initially called to be in the 14, I

5   know you'll be incredibly disappointed.  But there's still a

6   substantial opportunity that you'll be called.  And then once we

7   get the 14 selected, then I'll explain what we're going to do

8   next.

9          But, Nick, would you read the names of the 14

10  potential jurors that have been randomly selected by our

11  computer.

12          THE CLERK:  Yes, Your Honor.  Lyle Woodward.

13          THE COURT:  If you'd just please come forward, and our

14  court security officer will seat you.

15          THE CLERK:  Lindy Jessen, James Bravo, Norman

16  Thoreson, Janice Henningsen, Sally Jo Ross, Paula Meinen, David

17  Jensen, Sandra Wienhold, Karen Rens, Roseanna Green, Lawrence

18  Haak, Stacy Bezoni.

19          THE COURT:  We're down to our 14th juror.  It's kind

20  of like winning the Powerball.  It gets pretty exciting to see

21  who's going to be our 14th one here.

22          THE CLERK:  And the winner is Sandra Andersen.

23          THE COURT:  Is Sandra Andersen hiding?  Nobody claims

24  to be Sandra Andersen?  You know, I've been waiting for this day

25  for 15 years where somebody doesn't want to win the Powerball.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 25 of 223

1  We've got the big check right in back here waiting for you, but
2  I don't know what happened.  Third call for Sandra Andersen.  We
3  know you're out there somewhere.

4          Okay.  Why don't you just skip it and go to the next
5  one.

6          THE CLERK:  Cleo Welch.

7          THE COURT:  I wanted to welcome everybody.  And for
8  those of you who are potential jurors who didn't make it into
9  the top 14, I actually did see this wave of disappointment come
10 across your face when we called the 14th name.  But there's
11 still a substantial likelihood that we're going to lose 1 or
12 more of the 14 for a variety of reasons during the questioning
13 process this morning.  So you still have a chance to make it on
14 the jury.

15         Because I'm going to flash a lot of my questions up on
16 the screen, those of you folks who are on this side might want
17 to slide down.  It doesn't look like there's a whole lot of
18 room, but if you can fill in down on this side of the courtroom,
19 you'll be able to see the screen a little bit easier.

20         I'm Mark Bennett.  And I'm in my 15th year as a United
21 States District Court judge.  And I'm really serious.  We have a
22 very fascinating case.

23         How many of you in the 14 here have been called to
24 jury duty in this courtroom before?  And were you in jury
25 selection on the patent case that was two weeks ago?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 26 of 223

1          PROSPECTIVE JUROR WELCH:  No.

2          THE COURT:  No.  Was it earlier this year?

3          PROSPECTIVE JUROR WELCH:  No, it was several years

4   ago.

5          THE COURT:  Several years ago, okay.  So all of you

6   are new.  We have a new jury pool as of January 1, but we've had

7   quite a few trials since January 1.  So I thought maybe that was

8   one that you were in.

9          So I wanted to obviously welcome you.  The name of the

10  case is Ronald Kuiper and Conley Kuiper versus -- it's called

11  Givaudan, Givaudan -- I mispronounced it for a while, but I

12  think that's the correct pronunciation -- Givaudan Flavors

13  Corporation.  And I want you to meet the lawyers.  You'll notice

14  we do have quite a few lawyers in the case.  And I'm just going

15  to have them stand up and just say their name, and then you're

16  going to have an opportunity to meet them and learn a little bit

17  more about them in a few minutes.  So why don't we start with

18  the plaintiffs.  Mr. McClain?

19         MR. MCCLAIN:  Yes, Your Honor.  My name is Kenneth

20  McClain.

21         MR. CRICK:  My name is Steven Crick.

22         MR. BRITTON-MEHLISCH:  My name is Scott

23  Britton-Mehlisch.

24         MR. MCELWAIN:  My name is Dennis McElwain.

25         THE COURT:  Thank you.  And then on the defense.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 27 of 223

1          MR. PAGLIARO:  Good morning.  My name is Jim Pagliaro.

2          MR. MEADOR:  Good morning.  My name's Tom Meador.

3          MR. HOLTMAN:  I'm Steve Holtman.

4          MR. DONOVAN:  Good morning.  My name's Kevin Donovan.

5          THE COURT:  And you'll get to know them better as the

6    trial proceeds.

7          As I indicated, most of the lawyers are from out of

8    state.  Each side has one lawyer from Iowa.  That's not unusual.

9    In most of my civil cases, a very high percentage of them, we

10   have out-of-state lawyers.  And I think it's always a pleasure

11   to have out-of-state lawyers.  And I try and treat them as well

12   as I would an Iowa lawyer, and I'm sure that you all will extend

13   them that same courtesy too.

14         I wanted to tell you a little bit about the federal

15   courts.  There are actually 94 different federal courts.  Iowa

16   has the Northern District and the Southern District.  And it's

17   roughly Highway 30 kind of going all across the state.

18         And in our district, the Northern District, we have

19   two full-time district court judges.  We're very lucky to have

20   senior judges.  Not every district has senior judges.  They're

21   judges who are semi-retired but still keep working.  And then we

22   have two what are called United States magistrate judges.  And I

23   wanted you to meet our judges because we're a small court.  And

24   I think it's important to remember that federal court doesn't

25   belong to me or the judges.  It belongs to all of you, the

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 28 of 223

```
 1   citizens.  So I'd like you to get to know our judges.
 2            This is one of our senior judges.  We're very lucky to
 3   have a senior judge, Donald O'Brien.  Judge O'Brien just turned
 4   85 years old.  When he turned 65 20 years ago, he could have
 5   quit and drawn full pay for life.  But he's continued to work.
 6   He takes a reduced caseload but a very significant caseload,
 7   doesn't get a penny for working.  He could be laying on the
 8   beach in Hawaii drawing full pay for life, but he's continued to
 9   work.  He's a very hard worker.
10            A few years ago I was coming into the courthouse
11   pretty late on a Saturday night between 10:30 and 11 because I
12   wanted to pick up some files to work with at home on Sunday
13   morning because we had some out-of-town guests.  Normally I
14   would come in early Sunday morning.  But I wanted to work at
15   home.
16            And when I went into my chambers, I noticed there was
17   a light on down at the end of the hall, and I went down to shut
18   it off, and it was coming out of Judge O'Brien's chambers.  And
19   I was startled because there was Judge O'Brien, 10:30 on a
20   Saturday night, working.  And he was getting ready to go up to
21   federal court in Minnesota because they had a shortage of judges
22   and help them out.
23            This is our chief magistrate judge, Paul Zoss.  Judge
24   Zoss did a lot of work on this case in the pretrial proceeding
25   stages.  And our magistrate judges do a lot of work on both
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 29 of 223

1  civil and criminal cases, and we're very lucky to have very

2  talented United States magistrate judges.

3          This is Judge Edward McManus.  Judge McManus is, I

4  believe, 88 or 89 years old.  And he's over in Cedar Rapids.  He

5  was appointed a United States District Court judge on July 17,

6  1962.  I was 12 years old when Judge McManus became a district

7  court judge.  And just like Judge O'Brien, he could have retired

8  at age 65, drawn full pay for life, but he continues to take a

9  active caseload.  And we're obviously deeply indebted that both

10 our senior judges continue to work so hard.

11         This is our chief judge, Judge Linda Reade.  I've

12 actually known Chief Judge Reade since before she went to law

13 school.  And so we have a 30-plus-year friendship.  And she was

14 appointed about five years ago.  And she's our resident judge in

15 Cedar Rapids, although she comes over here, and I also go to

16 Cedar Rapids.

17         And this is our newest judge, Magistrate Judge Scoles,

18 John Scoles.  He's over in Cedar Rapids.  And he was a state

19 court judge in the Mason City area for 20 years before we were

20 fortunate enough to hire him when our magistrate judge at the

21 time, Judge Jarvey, was appointed by President Bush as a United

22 States District Court judge in the Southern District.

23         And interestingly enough, Judge Jarvey is here today

24 trying a criminal case for me in our downstairs courtroom.  So

25 if you see other jurors, that's why.  We've got a criminal case.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 30 of 223
To purchase a complete copy of the transcript

1  And so far I haven't been able to clone myself.  So when I'm in

2  a longer civil trial or a longer criminal trial -- we have a lot

3  of criminal cases.  So we get our friends to come in and help

4  out.

5          We hold court in Sioux City and Cedar Rapids, and kind

6  of all of us go both directions.  I usually travel a little bit

7  more than the other judges.  And so I do know what it's like to

8  take you away from your family and your jobs and your friends

9  for a long trial.  And in a minute I'm going to tell you how

10 long I think this trial is going to be, but I did want to tell

11 you that a few years back I tried an 11-week trial in Cedar

12 Rapids.  And I guess it was quite a while ago because my

13 daughter was much younger.

14          And about the fifth or sixth week -- I would get back

15 late, late Friday night and then leave Saturday (sic) afternoon

16 because it's 330 miles one way.  And about the fifth or sixth

17 week I was running errands on a Saturday, and I had my daughter

18 with me, and she's a very sweet child, and she looked up at me

19 with her big brown eyes, and she goes, "Daddy, can I ask you a

20 question?"  I go, "Sure, Sweetie.  What is it?"  And she goes,

21 "Have you moved to Cedar Rapids?"  I said, "No, Honey, it's

22 just -- it's going to be another month or so, and I'll be back

23 home."

24          And so I do know what it's like, and it is a

25 sacrifice, and we appreciate the sacrifice that the jurors are

1    going to make who get selected to serve.

2              I wanted to kind of tell you who everybody is in the

3    courtroom.  This is my law clerk Nick.  Nick is in his first

4    year of a two-year clerkship.  Federal judges are privileged to

5    be able to hire the brightest law students from law schools

6    around the country as law clerks.  And they usually work with us

7    for a couple of years and then go on to another position.  And

8    Nick comes from -- to Sioux City.  He was originally raised in

9    this area, and he's a graduate of the University of Iowa College

10   of Law.

11             My court reporter Shelly is in front of me.  I think

12   she has the hardest job in the courtroom.  While most trials are

13   interesting most of the time, no trial is interesting all of the

14   time.

15             So, for example, I've been looking at this ceiling of

16   this courtroom for 14 1/2 years.  And I can always find

17   something new in it.  Shelly, on the other hand, she doesn't get

18   to daydream.  She's gotta take down every single word that

19   everybody says.  She can never take a mental lapse.  It is a

20   very difficult job.  She is an absolutely outstanding court

21   reporter.  She's in her 12th year, and we were able to lure her

22   to the warm, balmy Iowa climate from Florida.  And so we're very

23   lucky to have Shelly.

24             We have what we call court security officers.  We call

25   them CSOs.  And they're in the courtroom whenever one of our

1  judges are in the courtroom.  And we have Gene and Bill in here

2  right now.  And they'll be trading off.  They're really easy to

3  spot because they have the blue blazers.  They have the fancy

4  badges, and then they have that earpiece.  It's usually country

5  western in the morning, and they like talk radio in the

6  afternoon.  So if it gets too loud, just ask them to turn it

7  down.

8          I'm just kidding about that.  But we're very lucky to

9  have court security officers that are such high quality and so

10  experienced.  And they'll make sure the jurors get down to the

11  jury room and back and forth and take care of a lot of your

12  needs during the trial.  So they do a terrific job.

13          We have the jury and then the judge.  And I want to

14  talk about -- woops, and the lawyers.  I want to back up here

15  for a minute, and I want to talk about what I do, and then I'm

16  going to talk about what you do because what you do is a lot

17  more important so I should reverse the order.

18          I'm kind of the -- what would be a metaphor?  Maybe

19  the captain of the ship?  It's my obligation to give both sides

20  as fair a trial as I can.  And I also think it's my obligation

21  to make sure that we run a very efficient trial.  And I'm pretty

22  sure that you believe your time is as important to you as I

23  believe my time is to me.

24          And so I work very hard -- you can ask the lawyers.

25  Pretrial I was cracking the whip to try and make this as

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov

Case 5:06-cv-04009-MWB-RAZ  Document 403  Filed 06/09/09  Page 33 of 223
To purchase a complete copy of the transcript.

efficient a trial as possible. But I always have to balance fairness to the parties with efficiency. And that's not always an easy task to juggle.

But I think you'll find that we run a very efficient trial. For better or for worse, the Northern District of Iowa has led all 94 districts in 8 out of the last 10 years in numbers of trials per judge. And so we have lots of trials. I have had a lot of experience. Hopefully I've learned a lot from that experience, and hopefully you'll be the beneficiary of that experience.

Just to give you an example, they just came out with the statistics for 2008. The national average was 14 trials per judge. Judge Reade and I were credited with 70 trials. So you can get a sense of how busy our district is. We're supposed to get a third federal judge in our district, and there's been a bill in Congress for a decade now that's never passed. But if it gets passed, we'll get a third judge. And I'll be very happy about that.

So I've had a lot of obligations to rule on things pretrial. And then my job as judge is to try and make sure the trial runs efficiently and fairly. The lawyers are going to make objections during the trial, and that's their job. They have an absolute duty on behalf of their clients to make objections when they think evidence isn't being properly presented or it might violate one of the many Federal Rules of

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ Document 403 Filed 06/09/09 Page 34 of 223
To purchase a complete copy of the transcript

1  Evidence.  They would not be doing their job unless they make an

2  objection, so I'll probably have lots of objections to rule on.

3           There may be motions made during the trial either in

4  your presence or out of your presence.  I'll have to rule on

5  those.  One of my primary obligations is to do the jury

6  instructions in the case to tell you what all the claims of the

7  plaintiff are and what all the claims of the defendant -- what

8  those claims are.  And I do those in writing.

9           And I'm a little bit different than my colleagues.

10  Most judges wait till the end of the case to give you the jury

11  instructions.  And when I graduated from law school a long time

12  ago, 1975, that never made much sense to me.  To me it was like

13  telling you drive down to Albuquerque, but we won't give you a

14  map, and if you're lucky enough to find it, once you get there,

15  we'll give you a map as to what the best way to go was.  So I

16  like to give the instructions at the very beginning of the trial

17  so you know what to look for when you hear the evidence.

18           And I've done that.  It took a lot of work with the

19  lawyers and my staff and I, but we've got the instructions all

20  done.  And after we get the jury sworn in and some time this

21  afternoon even before you hear the opening statements of the

22  lawyers, I'm going to go through all the instructions with you

23  so you'll know exactly kind of what to look for in the case.  So

24  that's essentially my job.

25           Your job as the jury is you've got the toughest job in

1  the courtroom because you're the judges of the facts.  Notice I
2  didn't say anything about me judging the facts because I don't
3  really do that when there's a jury.  If it's a nonjury case,
4  then I have to listen to all the evidence and decide what
5  happened.  But because we have a jury trial here, you're the
6  judges of the facts.

7          There will be a lot of witnesses that will get in that
8  witness box and testify.  There will be direct examination, and
9  then the other side will do a cross-examination, and then there
10 will be a redirect examination.  There are lots of exhibits in
11 this case, documents.  The lawyers have an opportunity because
12 of our technology to put those documents up on the screen so
13 that you can see the document or exhibit that the witness is
14 talking about.  They may or may not do that, but I suspect that
15 they will most of the time.

16         So you're going to hear all of the evidence in the
17 case.  And then when we're done with all the evidence, you'll
18 have to decide what happened, what the facts are, and then
19 you'll apply those facts to the lengthy jury instructions that
20 I'll be giving you, and then you'll have to decide the ultimate
21 outcome of the case.  So that's essentially your job.

22         And then, of course, we have the lawyers and the
23 parties they represent, and I've already told you we have
24 excellent lawyers in this case.  I think you'll enjoy how
25 professional and exceptionally competent they are in presenting

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 36 of 223
To purchase a complete copy of the transcript.

1   this case.

2          I think there are three great civic responsibilities.

3   We have voting, paying taxes which is coming up not too far down

4   the road, and then jury duty.

5          I just want to see a show of the hands.  Of the 14 of

6   you, when you got your summons to serve on jury duty a while

7   back, how many of you when you opened it up were absolutely

8   thrilled?  You just -- you were so excited that you got the

9   summons?  Does that ring a bell with anybody?  Anybody, did you

10  just start doing jumping jacks you were so excited?

11         Well, how about last night when you went to bed?  Did

12  you have a hard time going to sleep because you were so excited

13  about what might happen this morning?  Anybody have that

14  experience?

15         Well, how about this?  How about when you got the

16  summons, awe, nuts, why did I have to get it?  I can't believe I

17  got it.  Of all the people in northern Iowa, why did they pick

18  on me?  Gee whiz, I've gotta go to Sioux City.  I don't want to

19  do it.  It's not something I care to do.  I'm going to try and

20  come up with some great excuses, see if I can con that judge

21  because I don't want to serve on a jury.  Anybody have any

22  reaction kind of similar to that?  Oh, I see a few people

23  smiling.

24         I just wanted to share with you my experience.  Most

25  people in our court when they get their notice, they're not very

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 37 of 223
To purchase a complete copy of the transcript

1   excited about coming to this third-floor courtroom.  However,

2   the vast, vast, vast majority of people who get selected to

3   serve as jurors find it to be one of the most interesting,

4   fulfilling, and rewarding experiences they've ever had.

5           Now, you're probably thinking, well, the judge just

6   says that.  Well, I know it's true because in every trial I've

7   ever had since my first trial in September of 1994, I use a

8   questionnaire afterwards.  I'll meet with the jury after your

9   verdict, and I'll hand you a questionnaire.  And you get to take

10  it home and fill it out.  And guess what?  You get to evaluate

11  each and every one of the lawyers.  You get to evaluate me,

12  whether I did a good job.  Was I fair to both sides?  Was I

13  conscientious?  Did I do a competent job in handling the trial?

14  You get to evaluate our CSOs.  Are they courteous?  Have they

15  been polite?  You get to evaluate a lot of things about the

16  trial process.  And I read every one of those questionnaires

17  because we've changed a lot of the way our court does business

18  based on the feedback that we've gotten from jurors.

19          So it's very important to me.  But one of the things

20  that I constantly see when you had a chance to write out some

21  answers is that people are actually shocked at how enjoyable

22  jury service is.  And we get a lot of people, like, can we come

23  in on the next case?  I mean, they really want to come back as

24  jurors.  So I hope you have a very positive experience.  I think

25  you will.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of this transcript
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 38 of 223

1    And I'd like you to look at it this way.  How many of

2  you have had relatives that have fought in either the World

3  War -- World War II or Vietnam War or some of the conflicts in

4  Iraq, Iraqi Freedom and the other conflicts the United States

5  has been in?  How many of you have had relatives of the 14?

6  Well, vir -- I think I see every hand go up.

7    My father passed away five years ago, but he was a

8  World War II veteran and fought in the Pacific Theater.  And

9  when I first became a federal district court judge in 1994, he

10  came and he watched several of my trials.  And we had some

11  really great discussions.  And one of the things he told me

12  was -- and I had never thought of it this way.  It really

13  changed the way I look at my job.  He said, you know, "When I

14  was in the Pacific Theater fighting to defend the Constitution

15  of the United States, one of the things I was fighting for was

16  the right to trial by jury."  And I never thought about it that

17  way.

18    And so I'd like to think that when I'm a trial judge

19  in a jury trial I not only honor my father but every man and

20  woman who fought to defend the freedoms of the United States and

21  will continue to do so.

22    We take jury trials for granted in this country.  But

23  when there are new democracies formed around the world, one of

24  the first things they do is they want the right to trial by jury

25  in their new Constitution.  And I have a lot of federal judge

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 39 of 223
To purchase a complete copy of the transcript

friends who travel overseas and help these new democracies draft
a new constitution.  And trial by jury, it is coveted in other
countries that haven't had it.  We kind of take it for granted.

Couple of months ago I was going down to give a speech
to a group of judges and lawyers on trial by jury in Texas.  And
whenever I travel to talk to judges or lawyers in another state,
I always like to research a little bit about that state.

And so because I was talking on the right to trial by
jury, I did some research on Texas.  And I had forgotten that
Texas actually succeeded from Mexico, and they had their own
declaration of independence when they succeeded from Mexico.
And in the very first paragraph of that declaration of
independence, one of the reasons why they succeeded from Mexico
was because Mexico did not have the right to trial by jury.  And
they wanted that trial by jury.  So I thought that was really
interesting.

I'm a history buff.  I'm not going to bore you, but
it's important to know the history and the tradition that
happens in this courtroom every time we have a jury trial.

Jury trials came here from England in 1066.  They're
mentioned in the Declaration of Independence.  They're so
important that they appear twice in the United States
Constitution:  In the Seventh Amendment for right to civil
trial -- I'm sorry, for a right to jury trial in civil cases
involving more than $20 -- and I'll give you the first clue;

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 40 of 223

1   this case involves more than $20 -- and in the Sixth Amendment

2   for right to trial by jury in criminal cases.

3           Jury trials replaced trial by ordeal and trial by

4   combat.  Trial by ordeal would be when in England they would put

5   a defendant in a big pot of boiling water.  And if he survived,

6   he was deemed not guilty.  If he perished, he was deemed guilty.

7           Trial by combat would be dueling and jousting and the

8   like.  And, of course, we've replaced all of that with trial by

9   jury.

10          Now, we're about to start what the lawyers often call

11  voir dire, voir dire.  It's pronounced differently.  It's a

12  French term, and it means to speak the truth.  And all of our

13  goals on the plaintiffs' side and the defense side, we're

14  looking for eight jurors who can be fair and impartial.

15          We're going to ask you a lot of questions.  How many

16  of you are nervous about the questions we're going to ask you?

17  Anybody a little bit anxious?  Okay.  I see a number of hands go

18  up.  You should be because we're gonna -- no, I'm just kidding

19  you.  There's no reason to be nervous.  We're not going to ask

20  you what I would consider to be deeply personal questions that

21  you would be embarrassed to answer in open court.  But we are

22  looking for attitudes and life experiences just to determine

23  whether we all think you can be fair and impartial in this case.

24          And actually what happens is once I'm done asking my

25  questions and then the lawyers, each side, are done asking their

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 41 of 223
To purchase a complete copy of the transcript

1   questions, we've still got 14 of you.  And we're going to use an

2   8-person jury because that's what I use in a civil case.  I use

3   12 in a criminal case.  And so each side will get to what we

4   call strike.  It sounds bad, doesn't it, strike?  There's

5   actually a big boxing glove that comes out of the wall, boom,

6   shoots you back to the back of the courtroom.  No, not really.

7   They just strike your name on a sheet, and then Nick announces

8   the name of the 8 who will actually serve as jurors.

9           So that's what's ultimately going to happen after all

10  the questions.  Under our system, the lawyers, each side, they

11  have to exercise 3 strikes each.  And that will eliminate 6 of

12  the 14, and then we'll have 8.

13          But for our justice system to work, you have to answer

14  openly and honestly.

15          We respect your privacy, so I don't think it will

16  happen in this case.  But if there's an answer to a question

17  that you just can't bring yourself to answer truthfully in front

18  of everybody, we can bring you up to what we call sidebar over

19  here.  I blast everybody with this very unpleasant noise so they

20  can't hear what we're saying.  A microphone gets activated here

21  at sidebar.  Shelly has a special set of headphones that she

22  puts on that's directly wired to the microphone, and then you

23  have to answer the question in front of the lawyers.

24          So you'll need to let us know if that happens.  And

25  we'll move you to sidebar to answer the question.  But probably

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 42 of 223
To purchase a complete copy of the transcript.

1 hasn't happened in the last 20 trials or so.

2          And sometimes you have a duty not to serve. I mean,

3 I'm very big on your duty to serve. But, for example, we found

4 out this morning that the first cousin of one of the people

5 involved in the trial was in the jury panel. So that wouldn't

6 be right. So everybody agreed that that person should be

7 eliminated, and we were able to send them home. So sometimes

8 you have a duty not to serve.

9          I was in a law firm in Des Moines for 17 years before

10 I became a federal judge. And even though it's been a long time

11 now and I could serve in their cases, I've decided I'll never

12 serve in my old law firm's cases. It's just something I

13 personally decided I think I have a duty not to serve. They're

14 still my best friends. And if I ruled against them, it's a

15 no-win deal. If I rule in their favor, then the other side

16 would think I'm ruling in their favor because it's my old law

17 firm. So I've just decided I have a duty not to serve. So that

18 would be an example.

19          If I own stock in any companies, I have a duty not to

20 serve. The last two weeks I spent in a very, very complex

21 patent trial. Had I been very bright, I would have gone out and

22 bought a single share of stock in each company, and then I

23 wouldn't have had to have been in the meat grinder for two

24 weeks. But I was just kidding about that.

25          Okay. I'm going to tell you a little bit about what

1    this case is about.  And I just have a written statement.  This

2    is not evidence, but it's just to give you a little bit of

3    summary.

4         Ronald Kuiper and Conley Kuiper versus Givaudan

5    Flavors Corporation, statement of the case.  The following brief

6    summary of the case is not to be considered evidence or proof of

7    any facts or events in the case.  It simply informs you of the

8    factual disputes between the parties.

9         This is a civil lawsuit by Plaintiffs Ronald Kuiper

10   and his wife Conley Kuiper against Defendant Givaudan Flavors

11   Corporation.  Although Givaudan Flavors Corporation was also

12   known at various times as Tastemaker and Fries & Fries, I will

13   call the defendant simply Givaudan.

14        The litigation involves the Kuipers' claims for a lung

15   injury to Ronald Kuiper allegedly caused by inhaling fumes from

16   butter flavorings made by Givaudan that were used by Kuiper's

17   employer, American Pop Corn Company, to make microwave popcorn.

18        The Kuipers claim that the butter flavoring sold by

19   Givaudan were defectively designed, that Givaudan failed to

20   provide adequate warnings of the hazardous health effects of its

21   butter flavorings, and that Givaudan failed to test its butter

22   flavorings for hazardous health effects when they were used in

23   foreseeable ways.

24        The Kuipers seek damages for the lung injury to Ronald

25   Kuiper and the injury to his relationship with his wife Conley

1  Kuiper allegedly caused by Givaudan's defective design, failure

2  to warn, and failure to test.

3       Givaudan denies the Kuipers' claims.  Givaudan also

4  contends that the Kuipers waited too long to file their claims,

5  that its butter flavorings met the state of the art at the time

6  they were sold, and that Ronald Kuiper and others were at fault

7  for his injuries.  You will be asked to resolve these disputes

8  among the parties.

9       So just to try and put this case in context because

10 federal court we hear so many kind of cases, the first big

11 divide would be between criminal and civil.  A criminal case

12 would be when the U.S. Attorney's Office and, more specifically,

13 the grand jury indicts someone for 1 of 6,800 different federal

14 crimes.  And I actually spend most of my time trying criminal

15 cases.

16      But then we also have a civil docket.  And the civil

17 docket can include any type of civil claim.  We have a lot of

18 civil rights cases, a lot of employment discrimination cases

19 where people lose a job and they sue because of age

20 discrimination or race discrimination.  We have a lot of just

21 general business litigation where there's a dispute among a

22 contract between two corporations or an individual and a

23 corporation.  We have securities violations of the securities

24 laws, all kinds of -- and this would be what we call a products

25 liability case where somebody's alleging that a product is

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 45 of 223

defective.  So if we had to put it in a class, this would be a

products case.  So that's essentially what the case is about.

          Now, I want you to meet the lawyers, and they're just

going to introduce themselves.  And then they're going to list

for you the potential witnesses that they're going to call.  And

I want you to listen very carefully to the names because we want

to find out if you know any of the potential witnesses.

          And it may or may not be a problem depending on how

well you know them if you know any of the potential witnesses.

          So Mr. McClain?

          MR. MCCLAIN:  Yes, Your Honor.  Your Honor, first of

all, I think that the lawyers have all been introduced?

          THE COURT:  Yes, that's fine.

          MR. MCCLAIN:  But I would like to introduce my client

Ronald Kuiper who is seated here, Your Honor, and his wife

Conley Kuiper who's seated here.

          THE COURT:  And I wanted to tell you something about

Mr. Kuiper.  He's been placed on some medication recently that's

called a diuretic, and that makes you have to go to the bathroom

fairly often.  And so Mr. Kuiper's going to be going in and out.

And I didn't want you to think he wasn't interested in his own

case, that he's going in and out because of the medication he's

taking and the medical condition.  And so that's why.

          MR. MCCLAIN:  And the witnesses, Your Honor?

          THE COURT:  Yes, please.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 46 of 223

 1          MR. MCCLAIN:  The witnesses are Ronald Kuiper and

 2   Conley Kuiper, Kevin Kuiper, Gladys Crawford, Nancy Lunda,

 3   Vickie Barnes, and Dale Hartshorn, Greg Hoffman, Kevin Remmes,

 4   David Bratton who is here for defendants.  And then we have a

 5   series of depositions of out-of-town witnesses.  Would you like

 6   me to read all of them?

 7          THE COURT:  Why don't you just read the names and

 8   we'll see.

 9          MR. MCCLAIN:  Okay.  Michael Davis, an employee of

10   Givaudan Flavors; Karen Duros; Nancy Higley; Dr. James Lockey;

11   Kathie Allison; Dr. David Egilman; Mr. William Ewing; Dr. Alan

12   Parmet; Mr. Mark Rigler; Dr. John Ward; Robert Burns; Mr. Ron

13   Feldkamp; John Hochstrasser; Roy McKay; Stephanie Thompson;

14   Stuart Brooks; John Hallagan.

15          And I think that's all the witnesses that potentially

16   could be called, Your Honor.

17          THE COURT:  Yes.  And I'm going to explain the

18   potential to them.  Thank you, Mr. McClain.

19          I'm a -- you know, I'm a real mean judge, so I make

20   them list all of the witnesses that they might call.  Chances

21   are they're not going to call all of those witnesses, but in

22   order for everybody to be prepared, I make the lawyers list in

23   their pretrial order everybody that might be called.  So we just

24   never know.  My experience is that in most civil cases they

25   don't call all of the listed witnesses.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 47 of 223

```
1          Do any of you think you know Mr. McClain, any of the
2    other attorneys?  Mr. McElwain is from Sioux City.  Why don't
3    you raise your hand again, Mr. McElwain, just so they remember
4    who you are.  Any of you think you know any of the lawyers or
5    any of the witnesses that Mr. McClain just listed?
6          Okay.  Now we're going to pass the microphones.  Rick,
7    do you have -- oh, there's the microphone.  And let's see.  One,
8    two, three -- Mr. Thoreson?
9          PROSPECTIVE JUROR THORESON:  Yes.
10         THE COURT:  Who do you think you know?
11         PROSPECTIVE JUROR THORESON:  I think I know Dale
12   Hartshorn.  Was he an employee at American Pop Corn Company?
13         MR. MCCLAIN:  Yes, sir.
14         PROSPECTIVE JUROR THORESON:  Yes.
15         THE COURT:  Okay.  And how well do you know him?
16         PROSPECTIVE JUROR THORESON:  I know Dale as
17   acquaintance, but my wife is really close friends with his wife.
18         THE COURT:  Okay.  Now, let me ask it this way.  I
19   forgot to tell you this too, so this is a good reminder.  I
20   apologize for that.  You know, I told you you have to decide
21   what the facts are.  That's one of the things the jurors do.
22         PROSPECTIVE JUROR THORESON:  Yeah.
23         THE COURT:  And does that make sense to you?
24         PROSPECTIVE JUROR THORESON:  Yes.
25         THE COURT:  Okay.  Well, as part of determining what
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 48 of 223

 1   the facts are, you have to determine what the lawyers and I call

 2   the credibility of the witnesses.  And what we mean by

 3   credibility is is the witness telling the whole truth, some of

 4   the truth, or none of the truth, and every juror gets to decide

 5   that.  That's your job as jurors.  Are the witnesses -- you

 6   know, if you had an auto intersection case where one side said

 7   it was green and one side said it was red, they both can't be

 8   right, so you have to decide was it green or red.  This is a

 9   little more complicated than a green or a red light auto

10   accident case.  But you have to do the same thing.  You have to

11   listen to all the witnesses and decide their credibility.

12          And here's my concern and I'm sure the concern of all

13   the lawyers.  Because you know a potential witness, are you

14   going to treat that witness differently in determining his

15   credibility than you would the other witnesses who you've never

16   met or known?

17          PROSPECTIVE JUROR THORESON:  No.

18          THE COURT:  You think you'd treat his credibility just

19   like you would any other witness?

20          PROSPECTIVE JUROR THORESON:  I believe so.

21          THE COURT:  Well, let me ask you this.  Because your

22   spouse and his spouse are really good friends, do you think that

23   would influence your view of his testimony in any way?

24          PROSPECTIVE JUROR THORESON:  I don't believe so.

25          THE COURT:  Okay.  Let's say, for example -- I have no

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 49 of 223
To purchase a complete copy of the transcript

1   idea what he's going to testify to, so I'm just talking very

2   hypothetical here.  Let's say that after you hear all of the

3   evidence including Dale's testimony you ultimately decide that

4   Givaudan didn't do anything wrong under my instructions and you

5   enter a verdict for Givaudan, for the defendant, which means

6   Mr. Kuiper doesn't recover -- and his spouse doesn't recover

7   anything.  Would you have any problem the next time you ran into

8   Dale, because in a sense you might be saying, you know, "I ruled

9   for the other side; maybe I didn't believe your testimony"?

10  Now, you could rule for the other side and probably believe his

11  testimony, but you might rule for the other side and not believe

12  his testimony.  And so would that be a problem the next time you

13  ran into him?

14          PROSPECTIVE JUROR THORESON:  No.

15          THE COURT:  Okay.  Do you think you're independent

16  minded enough that you can rule on the evidence in my jury

17  instructions regardless of the fact that you know this

18  particular witness?

19          PROSPECTIVE JUROR THORESON:  Yeah, I hope so.

20          THE COURT:  Okay.  Let me ask you this.  If you were

21  one of the lawyers for Givaudan sitting over there that you've

22  met, do you think they might have -- do you think -- if you were

23  them, do you think you'd be a little bit concerned about having

24  a juror like yourself who knows one of the witnesses sitting in

25  judgment on the case?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 50 of 223

 1          PROSPECTIVE JUROR THORESON:  I really can't say what

 2     they would do.

 3          THE COURT:  No, I'm asking what you would do.  I'm

 4     asking you to put yourself in their situation.

 5          PROSPECTIVE JUROR THORESON:  I don't know.

 6          THE COURT:  Okay.  I mean, I guess what I'm trying to

 7     ask is how comfortable are you that you could be totally fair

 8     and impartial in this case to both sides?

 9          PROSPECTIVE JUROR THORESON:  I think I can be fair and

10     impartial.

11          THE COURT:  Okay.  Thank you.  Did anybody else know

12     any of the potential witnesses or anybody?

13          Okay.  Great.  We're going to switch over now to --

14     oh, I'm sorry.  We already did that.  I already asked that.

15     Mr. Pagliaro?

16          MR. PAGLIARO:  Yes, Your Honor.

17          THE COURT:  And you don't have to reintroduce your

18     folks if you don't want to, but we would like you to list your

19     witnesses, and if you want to reintroduce them, that's fine too.

20          MR. PAGLIARO:  Your Honor, may I introduce my lead

21     co-counsel, Mr. Tom Meador, again?

22          THE COURT:  Yes.

23          MR. PAGLIARO:  And also from the company Dave Bratton

24     is here as well.  He'll be here at times during the trial as

25     well.  Mr. Bratton?  And also, Your Honor, my court tech person

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 51 of 223

1  who's helping me --

2          THE COURT:  Oh, sure.

3          MR. PAGLIARO:  -- his name happens to be Cort

4  conveniently, Cort Chase.

5          THE COURT:  Great name for your job.

6          MR. PAGLIARO:  Yes.  When I say Cort, Your Honor, he's

7  Mr. Chase.

8          THE COURT:  Well, good.  I'll let him rule on half of

9  the objections.  How's that?

10         MR. PAGLIARO:  Good morning, Your Honor.  I'd like to

11  read the witnesses that we might call in the case.

12         THE COURT:  Thank you.

13         MR. PAGLIARO:  Thank you, Your Honor.  Dan Wetzel,

14  David Sitzmann, Dale Hartshorn, David Bratton, Greg Hoffman,

15  Nancy Higley, Paul Farrell, Ed Steiger, Bob Pellegrino, Fred

16  Stults, Glenn Ingraham, Dr. Robert Baughman, Dr. Douglas Linz,

17  Dr. Ross Bacon, Dr. Craig Bainbridge, Dr. John Baller,

18  Dr. Curtiss Farrell.  Listed him twice, Your Honor.  Sorry.

19  Dr. James Oggel and then, Your Honor, also Dr. Lawrence Repsher,

20  Dr. James Stewart, David Weiner, Lisa Pollard, Dr. Randall

21  Hanson, and John McCarthy.

22         THE COURT:  Okay.  Thank you.

23         MR. PAGLIARO:  Thank you, Your Honor.

24         THE COURT:  Do any of the jurors know Mr. Pagliaro,

25  any of the other lawyers, or think they know any of the

1   witnesses?  Yes.  And can we pass that microphone down?  The

2   acoustics without the microphones are terrible.  With them

3   they're pretty good.  Would you like to answer some questions I

4   have, or should I put some karaoke music up there?

5           PROSPECTIVE JUROR RENS:  No, I can answer them.

6           THE COURT:  Really?  You look like the karaoke type to

7   me.

8           PROSPECTIVE JUROR RENS:  I don't sing well.

9           THE COURT:  Really.

10          PROSPECTIVE JUROR RENS:  No.

11          THE COURT:  You sure you don't want the karaoke, or

12  you want the questions?

13          PROSPECTIVE JUROR RENS:  I'll take the questions.

14          THE COURT:  Okay.  Who do you know?

15          PROSPECTIVE JUROR RENS:  I know the pulmonologist

16  group that he listed, Dr. Stewart, Dr. Bainbridge --

17          THE COURT:  Bainbridge.

18          PROSPECTIVE JUROR RENS:  -- Dr. Bacon.

19          THE COURT:  Okay.  And are you a patient of that

20  group?

21          PROSPECTIVE JUROR RENS:  No, I was a nurse under them.

22  I worked at the intensive care Mercy when they were

23  pulmonologists.

24          THE COURT:  And how closely did you work with them?

25          PROSPECTIVE JUROR RENS:  I just did rounds with them

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 53 of 223

1    in the morning.

2            THE COURT:  And how often per week would you do rounds

3    with them?  Most days?

4            PROSPECTIVE JUROR RENS:  Yeah, most days.

5            THE COURT:  And for what period of time did you work

6    with them?

7            PROSPECTIVE JUROR RENS:  Three years.

8            THE COURT:  How do you feel about being a juror in

9    this case?

10           PROSPECTIVE JUROR RENS:  Okay.

11           THE COURT:  Do you think that it's going to give

12   Givaudan an edge because you've worked with some of their

13   witnesses who are going to be testifying?

14           PROSPECTIVE JUROR RENS:  It could because I know them

15   very well.

16           THE COURT:  Okay.

17           PROSPECTIVE JUROR RENS:  The medical aspect very well.

18           THE COURT:  Sure, because you worked with them

19   professionally.

20           PROSPECTIVE JUROR RENS:  Uh-huh.

21           THE COURT:  And I don't want you to answer the

22   question about whether you think they're more believable or less

23   believable.  I don't want to get into that in front of the other

24   jurors.  But because you've worked with them so much, do you

25   think that you might treat their testimony differently than,

1  say, a pulmonologist from Spokane, Washington, who you'd never

2  met before and who you'd never worked with?

3          PROSPECTIVE JUROR RENS:  Yes.

4          THE COURT:  Would you feel more comfortable sitting in

5  a case that didn't involve medical testimony from doctors that

6  you worked with?

7          PROSPECTIVE JUROR RENS:  Yes.

8          THE COURT:  Okay.  Lawyers have any objection if I

9  excuse this juror?

10          MR. MCCLAIN:  No, Your Honor.

11          MR. PAGLIARO:  No, Your Honor.

12          THE COURT:  Okay.  Thank you very much.  Thank you for

13  being so candid.  I think you'd make a terrific juror.  And I'd

14  still like to hear you sing karaoke, so I hope we get you back

15  here on another case.  You're just free to leave.

16          And, Nick, would you call our next potential juror.

17          THE CLERK:   Yes, Your Honor.  Donald Loutsch.

18          THE COURT:  Good morning -- is it Mr. Loutsch?  Did I

19  pronounce that correctly?

20          PROSPECTIVE JUROR LOUTSCH:  Loutsch, sir.

21          THE COURT:  Loutsch, okay.  Do you know any of the

22  lawyers or witnesses that may be called in the case?

23          PROSPECTIVE JUROR LOUTSCH:  I probably know

24  Dr. Bainbridge.

25          THE COURT:  Okay.  And how do you know Dr. Bainbridge?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 55 of 223

1          PROSPECTIVE JUROR LOUTSCH:  I was a patient of his

2    some years back.

3          THE COURT:  Okay.  Do you think that might affect your

4    ability to fairly judge his credibility?

5          PROSPECTIVE JUROR LOUTSCH:  I don't believe so.

6          THE COURT:  How long were you a patient with the

7    doctor?

8          PROSPECTIVE JUROR LOUTSCH:  Over a period of -- I

9    don't know -- three, four weeks maybe.

10         THE COURT:  And how long ago was that?

11         PROSPECTIVE JUROR LOUTSCH:  1992.

12         THE COURT:  Okay.  So it's been quite a period of

13   time.

14         PROSPECTIVE JUROR LOUTSCH:  Yes, sir.

15         THE COURT:  Do you have any relationship with

16   Dr. Bainbridge outside of that brief period of time where you

17   were his patient?

18         PROSPECTIVE JUROR LOUTSCH:  No, sir.

19         THE COURT:  Okay.  And you're satisfied that you could

20   treat his testimony just like you would any other witness?

21         PROSPECTIVE JUROR LOUTSCH:  Yes, sir.

22         THE COURT:  Okay.  Anybody else know any of the

23   witnesses?  Yes.  Can we pass that microphone?  Oh, there's one

24   coming.  Stacy Bezoni?

25         PROSPECTIVE JUROR BEZONI:  Correct.  I recognize the

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 56 of 223

```
1    name -- I don't know if he's from Sioux City or not -- but John

2    McCarthy.

3              THE COURT:  Okay.  Let's find out.  Who listed John

4    McCarthy?

5              MR. PAGLIARO:  We did, Your Honor.

6              THE COURT:  Okay.  Thank you, Mr. Pagliaro.  Do you

7    know where he's from?

8              MR. PAGLIARO:  He's not from Sioux City, Your Honor.

9    He's from -- I think from New Jersey I think, not from Sioux

10   City.

11             THE COURT:  Okay.  Pretty common name, so that's good,

12   though.

13             PROSPECTIVE JUROR BEZONI:  Okay.

14             THE COURT:  That's why we like to check, you know.

15   That's right.  And that was the only one you thought you knew.

16             PROSPECTIVE JUROR BEZONI:  Yes.

17             THE COURT:  Okay.  Great.  Okay.  Thank you.  American

18   Pop Corn is not a party to this lawsuit.  In other words,

19   they're not a plaintiff.  They're not a defendant.  They're not

20   suing anybody.  They're not being sued.  But they were the

21   employer of Mr. Kuiper.  And I think most people know something

22   about American Pop Corn because it's right over there in Leeds.

23   I guess they have a couple different locations in town.  So we

24   want to know do any of you have any relationship with Givaudan

25   which is probably less likely but I still need to know or
```

1   American Pop Corn?  Okay.  We've got several, so let's start in

2   the back row.  Can we pass the microphone to the back row?  And

3   Miss Ross?

4           PROSPECTIVE JUROR ROSS:  Yes.

5           THE COURT:  Who do you know, how do you know, what do

6   you know?

7           PROSPECTIVE JUROR ROSS:  My husband has a niece that

8   has just started with Jolly Time -- or American Pop Corn, oh,

9   probably about eight months ago.

10          THE COURT:  Okay.  And what does she do there?

11          PROSPECTIVE JUROR ROSS:  I believe she is a

12  receptionist.  I'm not real sure what she does out there.  We

13  haven't really talked.

14          THE COURT:  And I'm sorry.  Was this a niece?

15          PROSPECTIVE JUROR ROSS:  Yes, my husband's niece.

16          THE COURT:  Your husband's niece, okay.  Does that

17  make it your niece too?

18          PROSPECTIVE JUROR ROSS:  Yeah.

19          THE COURT:  Okay.  Well, you know, I'm really bad on

20  like first cousins twice re -- I never understand that stuff.

21  So -- okay.  So it's your niece, but it's your husband's -- from

22  the husband's side of the family.

23          PROSPECTIVE JUROR ROSS:  Husband's side, right.

24          THE COURT:  How much contact do you have with your

25  niece?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 58 of 223

```
1              PROSPECTIVE JUROR ROSS:  We see them maybe two, maybe
2    three times a year at family gatherings.
3              THE COURT:  Okay.  When's the last time you've seen
4    your niece?
5              PROSPECTIVE JUROR ROSS:  Probably Thanksgiving.
6              THE COURT:  Okay.  When do you expect to see your
7    niece next?
8              PROSPECTIVE JUROR ROSS:  Easter.
9              THE COURT:  Okay.  If you were selected to serve as a
10   juror in this case, one of the things I'm going to tell you is
11   you can't talk to anybody about this case while you're a juror.
12   Once you reach a verdict and you're released, then you can talk
13   to anybody and everybody as much as you want about this case.
14   So I want to make sure that if you get selected to serve you
15   wouldn't be tempted to call your niece and ask her what she
16   knows about this case, if anything.
17             PROSPECTIVE JUROR ROSS:  I have no problems with that
18   because, like I said, I don't -- actually we don't have her
19   phone number anyway, but, I mean, we do get together at family,
20   so I have no intentions of saying anything.
21             THE COURT:  Okay.  Now, since your niece has started
22   working at American Pop Corn, have you been -- have you seen her
23   at any social functions or in any other way over the last eight
24   months?
25             PROSPECTIVE JUROR ROSS:  Just the one at Thanksgiving.
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 59 of 223

1          THE COURT:  Thanksgiving.

2          PROSPECTIVE JUROR ROSS:  Yeah.

3          THE COURT:  Yeah.  Did you discuss much about her job

4     at American Pop Corn?

5          PROSPECTIVE JUROR ROSS:  No, and actually when I went

6     and picked up popcorn for Western Iowa Tech here about the same

7     time, I seen her for a couple of minutes, but we didn't discuss

8     her job or anything, no.

9          THE COURT:  Okay.  So have you -- when you say you

10    picked up popcorn, have you been out to the American Pop Corn

11    plant or --

12         PROSPECTIVE JUROR ROSS:  Yes.

13         THE COURT:  Okay.  How many times have you been out to

14    the plant?

15         PROSPECTIVE JUROR ROSS:  Once.

16         THE COURT:  Okay.  Anything about the fact that you've

17    actually been there that would affect your ability to be fair

18    and impartial?

19         PROSPECTIVE JUROR ROSS:  No.

20         THE COURT:  I mean, I've driven by it hundreds of

21    times, and I know people that work there, but it wouldn't affect

22    my ability.  But everybody's different.  And we just want to

23    make sure that having your niece there wouldn't affect your

24    ability to be fair in any way.  Do you think it would?

25         PROSPECTIVE JUROR ROSS:  No.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 60 of 223

```
 1            THE COURT:  Okay.  Thank you.  Anybody else have any
 2   connection to American Pop Corn or Givaudan?
 3            PROSPECTIVE JUROR THORESON:  Yes.
 4            THE COURT:  Yes.
 5            PROSPECTIVE JUROR THORESON:  Back in the late '70s I
 6   raised popcorn for American Pop Corn as a farmer.  And my mother
 7   was employed there for probably 10 years.  My aunt was probably
 8   employed there for at least a dozen years, and a cousin retired
 9   out of there, and I have a cousin employed there right now.
10            THE COURT:  Boy, you have a big family.
11            PROSPECTIVE JUROR THORESON:  Well, they're all around.
12            THE COURT:  And a lot of them are connected to
13   popcorn; right?
14            PROSPECTIVE JUROR THORESON:  Yes.
15            THE COURT:  Yeah.  Well, how do you feel about that,
16   because, you know, there's going to be a lot of testimony, I
17   assume, about what went on at American Pop Corn and that type of
18   thing?  And, you know, you've got an obligation if you serve as
19   a juror to the Kuipers and to Givaudan to be totally neutral.
20   And I'm just wondering if all of these connections to American
21   Pop Corn, having raised popcorn for them, I mean, I understand
22   their business motto is they have a lot of farmers that, you
23   know, raise the corn for them.
24            PROSPECTIVE JUROR THORESON:  Yeah.  I -- it would be
25   hard for me to rule I think against American Pop Corn just
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 61 of 223

1    because so many family members work there and seem like they

2    were treated well there.

3                THE COURT:  Yeah.  Well, you're actually not going to

4    rule for or against American Pop Corn because they're not either

5    suing anybody or being sued.  But there's going to be a lot of

6    discussion about American Pop Corn.  So do you think you might

7    be better off serving in another case where you didn't have all

8    these family ties to -- not to a party in the case?  And by a

9    party I mean somebody who's either suing somebody or being sued.

10   Like in this case the plaintiffs would be the Kuipers, and

11   they're suing Givaudan.  They would be the defendants.  But

12   because a lot of the testimony is going to be about American Pop

13   Corn --

14               PROSPECTIVE JUROR THORESON:  Yeah, I think I'd be --

15   you know, I think I'd be less partial in a different jury.

16               THE COURT:  In a different jury.  And you know what?

17   The good news is we've got lots of trials coming up, so we won't

18   have a shortage of cases.  So if the lawyers don't have any

19   objection, I'm going to dismiss Mr. Thoreson.  I think he'd be a

20   great juror, but I think he'd be a little bit better on another

21   case.  Anybody have any objection?

22               MR. MCCLAIN:  No, Your Honor.

23               MR. PAGLIARO:  No objection.

24               THE COURT:  Okay.  Thank you.  You're excused.

25               Nick?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 62 of 223

```
 1              THE CLERK:  Jane Schieuer.

 2              THE COURT:  Thank you very much.

 3              Jane, could you grab that microphone and pronounce

 4   your last name for me, please?

 5              PROSPECTIVE JUROR SCHIEUER:  Schieuer.

 6              THE COURT:  Schieuer?

 7              PROSPECTIVE JUROR SCHIEUER:  Yes.

 8              THE COURT:  I usually have a pretty good eye for this

 9   stuff.  You definitely look like the karaoke type.

10              PROSPECTIVE JUROR SCHIEUER:  Definitely not.

11              THE COURT:  Definitely not.  I'm wrong, huh?  Okay.

12   Do you know any of the lawyers, any of the witnesses, know

13   anything about Givaudan, American Pop Corn?

14              PROSPECTIVE JUROR SCHIEUER:  The only thing that I can

15   relate to is Craig Bainbridge, Dr. Bainbridge, only because he's

16   from the area that I'm from.  But I don't have any personal

17   connections with him.

18              THE COURT:  Do you run into him in town very often?

19              PROSPECTIVE JUROR SCHIEUER:  No.

20              THE COURT:  Do you happen to know where he lives or

21   anything?

22              PROSPECTIVE JUROR SCHIEUER:  No.

23              THE COURT:  Okay.  Anything about the fact that you

24   both -- what community was it that you both --

25              PROSPECTIVE JUROR SCHIEUER:  He was raised in
```

1  Kingsley, and I was raised in Pierson.  They're just eight miles

2  apart.

3          THE COURT:  Yeah.  Right.  Could you pick him out of a

4  lineup do you think?

5          PROSPECTIVE JUROR SCHIEUER:  Possibly.

6          THE COURT:  How long has it been since you've seen him

7  do you think?

8          PROSPECTIVE JUROR SCHIEUER:  Oh, probably 15 years.

9          THE COURT:  Yeah.  Do you think that you're more

10  likely to give credibility to his testimony simply because he

11  came from the same --

12          PROSPECTIVE JUROR SCHIEUER:  No.

13          THE COURT:  No.  And could you judge his testimony

14  just like you would any other witness in the trial?

15          PROSPECTIVE JUROR SCHIEUER:  Yes.

16          THE COURT:  And, see, what we're looking for is jurors

17  who have no opinion one way or the other about the credibility

18  of any of the witnesses, that you don't have a preconceived

19  notion that just because he's a doctor he's going to be telling

20  the truth or just because he came from Kingsley or Pierson he's

21  going to be more truthful than another witness that came from

22  Saskatchewan or South Dakota or New Jersey.

23          And so the idea is we're looking for jurors who are

24  just totally neutral, and then they judge the credibility of

25  each witness based on what they observe in court and how

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 64 of 223

1   believable they think the testimony is and how it matches up

2   with other testimony.  And I'm actually going to give you a list

3   of factors when you judge the credibility of witnesses.

4          But the bottom line is I could never list all of the

5   factors.  And every juror gets to decide for herself or himself

6   whether they believe all of what a witness says, only part of

7   it, or none of it.  And I just want to make sure you can do that

8   fairly with all of the witnesses including Dr. Bainbridge --

9   Brain -- help me out.

10          PROSPECTIVE JUROR SCHIEUER:  Bainbridge.

11          THE COURT:  Bainbridge, thank you.  Could you do that?

12          PROSPECTIVE JUROR SCHIEUER:  Yes.

13          THE COURT:  Okay.  Do you know anybody else?

14          PROSPECTIVE JUROR SCHIEUER:  No.

15          THE COURT:  Okay.  Would you like to be a juror in

16   this case?

17          PROSPECTIVE JUROR SCHIEUER:  I -- it's okay.

18          THE COURT:  Yeah.  What do you think the qualities are

19   of a good juror?

20          PROSPECTIVE JUROR SCHIEUER:  Truthful, impartial, like

21   you say, open minded.

22          THE COURT:  Yeah.  Those are all great qualities.  Do

23   you think you'd be a good juror?  Do you think you have those

24   qualities?

25          PROSPECTIVE JUROR SCHIEUER:  I think so.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 65 of 223

```
 1              THE COURT:  Do you think it's important to keep an
 2    open mind until you've heard all of the evidence in the case?
 3              PROSPECTIVE JUROR SCHIEUER:  Yes.
 4              THE COURT:  Okay.  Now, in a civil case, the plaintiff
 5    which would be the Kuipers, they get to go first.  And then it's
 6    not till they're done with their testimony that Givaudan gets to
 7    go.  And so it's very important to keep an open mind until
 8    you've heard all of the evidence.  Do you think you'd be able to
 9    do that?
10              PROSPECTIVE JUROR SCHIEUER:  Yes.
11              THE COURT:  Do you think that's an easy thing or a
12    hard thing to do?
13              PROSPECTIVE JUROR SCHIEUER:  Hard.
14              THE COURT:  It is hard.
15              PROSPECTIVE JUROR SCHIEUER:  Yes.
16              THE COURT:  And I want to share an example with all of
17    you because this is a very important concept to keep an open
18    mind until you've heard all of the evidence.
19              We used to have until two years ago a courthouse in
20    Fort Dodge, Iowa.  And for cost reasons we gave it up which I
21    hated to do because I like trying cases in Fort Dodge.  And we
22    still use their county courthouse.
23              But I was driving over -- it was a number of years ago
24    now -- to try a civil case in Fort Dodge.  And I normally would
25    go over Sunday night, but I wanted to spend some extra time with
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 66 of 223

1  my family.  So I left really early Monday morning, but I kind of
2  made the mistake of coming to the courthouse here first, and I
3  got caught up in doing some stuff, so I was late.  I didn't want
4  to be late.  So I was going a little too fast.  And I was going
5  on Highway 20, and some of you know how hilly it is,
6  particularly right before Correctionville.
7          And I came across the top of a hill, and my pedal was
8  pretty far down.  And I looked down at the bottom of the hill,
9  and I saw a highway patrol car with the lights on pulled
10 somebody over.  So I immediately did what every good citizen
11 would do:  I slammed on my brakes, said a quick prayer, and
12 hoped that the highway patrol officer was preoccupied with
13 writing a ticket to the other driver and that I could, you know,
14 skate by.
15         And then as I got closer because that's a really long
16 hill, I observed something.  It wasn't a situation of writing a
17 ticket at all.  It was the individual had run out of gas, and
18 the highway patrol officer was assisting the citizen with
19 pouring gas in their gas tank.  And I really had this light bulb
20 go off.  I thought, Here I am a judge going over to judge a
21 case, and I always tell the jurors to keep an open mind until
22 they see all of the evidence.  And I immediately jumped to a
23 conclusion, and my conclusion was exactly wrong.
24         And it was really a good lesson for me that -- because
25 the thing is we always filter stuff through our life

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 67 of 223
To purchase a complete copy of the transcript

1   experiences.  And normally when you see the flashing lights and

2   the car pulled over, you think somebody was speeding and got a

3   ticket.  It wasn't the case at all.  So that was a good lesson

4   for me that it's really hard.  And I've worked extra hard since

5   to always keep an open mind.

6          Do all 14 of you think you'll be able to keep an open

7   mind until you've heard all of the evidence in the case?

8   Anybody have a problem with that?  Okay.  Good.

9          I think we've already kind of covered this, but I just

10  wanted to make sure.  Any of you do business or have any

11  connection with Givaudan or American Pop Corn?

12         How many of you -- I think the lawyers will get into

13  this, but let me just ask.  How many of you -- I know Jolly Time

14  is one of the brands.  How many of you buy Jolly Time Popcorn,

15  either microwave or the other kind?  Okay.  Yeah.  Looks like 13

16  of the 14 of you.  Anything about the fact that you use Jolly

17  Time Popcorn as a product that would have any impact on your

18  ability to be fair and impartial?

19         Okay.  Now, this is a case by -- actually that's not

20  correct.  I don't know how that got by me.  Just ignore the

21  first one.  It's not a claim by an individual against his former

22  employer because it's not a claim against American Pop Corn.  We

23  took that from a prior civil case, and that's actually wrong.

24  But I want to get to the bottom bullet point.

25         Can you give Givaudan the same fair treatment as you

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 68 of 223
To purchase a complete copy of the transcript

1  can give the Kuipers who are individuals?  In other words, we

2  have a case where two individuals are suing a corporation, and

3  it's important that you treat them both fairly.  Do any of you

4  think you'd have a problem giving -- woops -- giving the same

5  fair treatment to individuals as to a corporation?  Anybody?

6          Have any of you ever been to the United States Supreme

7  Court in Washington, D.C.?  Any of the 14 ever been there?

8  Okay.  It's a really impressive building, isn't it?  And I think

9  it was built in -- it started construction in 1932.  And on the

10  south wall of the Supreme Court -- I was very lucky.  The

11  very -- I started my own law firm out of law school, and the

12  very first case I filed went all the way to the United States

13  Supreme Court.  So just three years out of law school, I got to

14  argue it.

15          And I had visited the Supreme Court before.  And I

16  remember when you walk up the south steps of the U.S. Supreme

17  Court, in the granite at the top of the building is this phrase

18  Equal Justice Under Law, Equal Justice Under Law.  And I was so

19  impressed by that phrase that I researched it.  And it's

20  interesting that it's not a quote from a Supreme Court justice

21  like you might think it was.  It was a quote that the architect

22  who designed the building came up with, what we call a

23  layperson, not a lawyer.

24          And so that's always left a big impression on me, that

25  a layperson knew that the purpose of the Supreme Court was equal

1  justice under law.  I wish we had it right up here in big

2  letters.

3          And so it's very important to me that both sides be

4  treated fairly and that you can give Givaudan the same equal

5  justice that you can give the Kuipers because both sides to a

6  lawsuit, whether it's two Iowa small companies, whether it's

7  international corporations, whether it's an individual versus a

8  small company, a large company, they're entitled to the same

9  equal justice under the law.

10          Do any of you think based on what you -- the little

11  bit you know about the case so far that you'd have any problem

12  giving both sides equal justice?  Anybody have any problem with

13  that?  Okay.

14          Now, here is the deal on the length of the trial.

15  It's very hard to estimate -- I'm sorry.  It's very hard to

16  estimate the length of a trial, and the longer the trial is, the

17  harder it is to estimate the length.  I've talked to the lawyers

18  several times.  Our best judgment is that the evidence will take

19  ten trial days.

20          Now, yesterday we did not have court.  It was a

21  federal holiday, although all my staff were here.  Lot of these

22  lawyers were here.  So we're going to go four days this week.

23          Regrettably, next week, I have a longstanding

24  commitment to be out of town on Thursday, Friday, and Saturday.

25  So next week we're just going to go Monday, Tuesday, Wednesday.

1    So that gives us seven days.

2          What would now be the third week, I'm confident the

3    evidence will be done the third week and we'll get the case to

4    the jury and you'll probably have sufficient time to deliberate,

5    although I don't know how long you're going to deliberate.  I

6    never know how long you're going to deliberate.

7          The average civil case of duration like this

8    deliberations are probably a half a day to a day.  But in my

9    patent case, for example, that went ten days -- nine trial days,

10   the jury deliberated two hours and reached a verdict, and it was

11   a very complicated case.  And this is a complicated case.

12         So that's my best judgment.  We know for sure it's not

13   going to be over this week, it's not going to be over next week.

14   It's going to be into the third week.  Will it go into the

15   fourth week?  Possible but unlikely.  And that's the best I can

16   do.

17         Now, the question becomes is it a severe or

18   extraordinary hardship?  It's always a hardship to be taken away

19   from your jobs and your family.  I understand that.  But you

20   have a duty to serve your country as a juror if you can do so

21   without creating a severe or extraordinary hardship.

22         So I'm just asking the 14 of you, do any of you

23   believe that if you were to serve on this jury it would create

24   for you personally a severe or extraordinary hardship?  Anybody

25   raise your hand?  Okay.  We have two hands.  Let's pass the

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 71 of 223

1    microphone.

2            Mrs. Henningsen?

3            PROSPECTIVE JUROR HENNINGSEN:  Yes.

4            THE COURT:  Yes.  What would be the extreme or

5    extraordinary hardship?

6            PROSPECTIVE JUROR HENNINGSEN:  I do work for two CPAs,

7    and right now we are doing taxes for farmers which is due the

8    end of February.  And to get that all done, I am leaving both in

9    dire needs.

10           THE COURT:  How many other employees are there for the

11   CPAs?

12           PROSPECTIVE JUROR HENNINGSEN:  The one, only myself,

13   and the other one, another lady.

14           THE COURT:  And are farm tax returns a big chunk of

15   your work?

16           PROSPECTIVE JUROR HENNINGSEN:  Yes.

17           THE COURT:  Yeah.  Okay.  I'm not even --

18           PROSPECTIVE JUROR HENNINGSEN:  Not that I wouldn't

19   love to be on the case.

20           THE COURT:  I understand that, but, you know, if this

21   came -- if we started it the middle of March or better --

22           PROSPECTIVE JUROR HENNINGSEN:  Been a lot better.

23           THE COURT:  April 20 or something --

24           PROSPECTIVE JUROR HENNINGSEN:  Right.

25           THE COURT:  And I totally understand that, and that's

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 72 of 223

1    why we have exceptions.  I don't let people off jury duty very

2    easily.

3             PROSPECTIVE JUROR HENNINGSEN:  No, and I wouldn't have

4    asked if it wouldn't have been for that.

5             THE COURT:  And I totally understand, and I know the

6    lawyers aren't going to have any problem.  Are we?

7             MR. MCCLAIN:  No, Your Honor.

8             MR. PAGLIARO:  No, Your Honor.

9             THE COURT:  Okay.  So thank you.

10            PROSPECTIVE JUROR HENNINGSEN:  Thank you very much.

11            THE COURT:  Good luck doing all those farm returns.

12            PROSPECTIVE JUROR HENNINGSEN:  Oh, yes.

13            THE COURT:  I was lucky.  I practiced law for 17

14   years, and I never did a single tax return, so I have some

15   empathy for you.

16            PROSPECTIVE JUROR HENNINGSEN:  They're lots of fun.

17            THE COURT:  Thank you.

18            Can we call a new name, Nick?

19            THE CLERK:   Kevin Reiss.

20            THE COURT:  Good luck on all those tax returns.

21            PROSPECTIVE JUROR HENNINGSEN:  Thank you, Judge.

22            THE COURT:  Stacy Bezoni, I haven't forgotten about

23   you, but we're going to talk to Mr. Reiss first.

24            Am I pronouncing your name correctly?  Is it Reiss?

25            PROSPECTIVE JUROR REISS:  Yes.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 73 of 223

1          THE COURT:  Okay.  Do you know any of the lawyers or

2    witnesses in the case?

3          PROSPECTIVE JUROR REISS:  No, sir.

4          THE COURT:  Do you have any unusual connection to

5    Givaudan, the defendant, or American Pop Corn?

6          PROSPECTIVE JUROR REISS:  No.

7          THE COURT:  Would it be an undue or severe or

8    extraordinary hardship for you to serve as a juror in the case?

9          PROSPECTIVE JUROR REISS:  Probably not.

10         THE COURT:  Well, what are you thinking, because now's

11   your only chance?  It's too late once you get selected other

12   than you don't want to do it, right?

13         PROSPECTIVE JUROR REISS:  Well, yeah, I have a very

14   busy job.  It's not going to get done if I'm gone.  Two little

15   ones at home.  I -- that's pretty much it.

16         THE COURT:  Well, do you have -- so are you telling me

17   you don't have somebody to cover the daycare or it's going to be

18   a financial strain if you serve as a juror or both?  Or did I

19   miss the point completely which I may have?

20         PROSPECTIVE JUROR REISS:  No, daycare's fine other

21   than certain days when I pick up.  My wife has her own business.

22   She works late and would lose some clients.

23         THE COURT:  Well, you know, I forgot to tell you this

24   important point.  For the most part, most of the time we're

25   going to be in trial it's going to be 8:30 to 2:30.  And I'm

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 74 of 223

1    real good about at 2:30, it's like the old Gong Show.  I don't

2    know how many of you remember that.  Boy, it goes off.  At 2:30,

3    you're out of here.  And so would that help knowing that,

4    that -- now, like today we're going to go probably till 4:30 and

5    maybe a couple other days, but most of the days -- and I'll give

6    you a schedule pretty far in advance.  Most of the days we're

7    going to be done at 2:30.  You're from Holstein; is that

8    correct?

9             PROSPECTIVE JUROR REISS:   Correct.

10            THE COURT:  That's what?  About 45 minutes?

11            PROSPECTIVE JUROR REISS:  About an hour.

12            THE COURT:  Yeah.  45 minutes the way I drive, an hour

13    the way you drive; right?  Yeah.  About an hour.  So if you were

14    to be able to get home -- you know, by the time you get to your

15    car and all, you know, you're probably talking quarter to four,

16    four o'clock.  Would that help ease the burden a little bit

17    knowing that you'd get home then or not?

18            PROSPECTIVE JUROR REISS:  Yeah, as far as home life

19    goes, yes.

20            THE COURT:  Okay.  You know, we'd be here all week if

21    I asked every single question to figure out if it'd be a severe

22    or extraordinary hardship.  And I have great trust in the folks

23    that we bring in for jury duty, so I'm kind of leaving it up to

24    you.  Are you willing to step up to the plate and serve, or do

25    you think it'd be an extraordinary and severe hardship?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 75 of 223

```
1              PROSPECTIVE JUROR REISS:  Sure, I could do it.

2              THE COURT:  And, you know, there's a 6/14 chance that

3   you'll be eliminated anyway.  Okay.  I appreciate that.

4              Now back to Miss Bezoni.

5              PROSPECTIVE JUROR BEZONI:  Yes.  I have taught

6   special education for the last 22 years, and I'm currently under

7   a new position with Prairie Lakes Area Education Agency as a

8   special ed consultant.  And I had a parent sign for a full

9   consent for evaluation for their child.  And I am responsible

10  for completing that evaluation which needs to be, under the law,

11  completed within 60 days.  And we have that time line that I'm

12  working from, and that is due on March 3 as far as --

13             THE COURT:  How far is Aurelia from here?

14             PROSPECTIVE JUROR BEZONI:  A little over an hour.  And

15  my office is actually out of Storm Lake.

16             THE COURT:  Well, you know, one, I have the utmost

17  respect and appreciation for what you do.  My youngest brother

18  just passed away, but he was a special needs child, and I'm

19  particularly sensitive to that.  And so on a personal note I

20  greatly appreciate what you do.  And it's very important.  And I

21  don't want to interfere with what you do.

22             On the other hand, this is important too.  And here's

23  what I'm wondering.  And only you can decide this.  Next week

24  you'll have Thursday and Friday off.

25             PROSPECTIVE JUROR BEZONI:  Uh-huh.
```

 1          THE COURT:  You'll have the evenings.  I'm sure you

 2    have other things you'd rather be doing in the evenings.  You

 3    have the weekends.  Is it reasonable for you to use those two

 4    days next week and to use some of the other time?  Would you be

 5    able to get your work done or not?  Only you know the answer to

 6    that.

 7          PROSPECTIVE JUROR BEZONI:  And that's the part that's

 8    difficult because I need to work with the student who's a

 9    kindergartner in a school setting and meet with the teachers

10    and, you know, other personnel that are involved like the school

11    psychologist, the social worker.

12          THE COURT:  So it's dependent on a lot of other

13    people's schedules.

14          PROSPECTIVE JUROR BEZONI:  Yeah, it is.  And my mentor

15    for the year has been on bedrest, and she -- for pre-term

16    pregnancy, and she has not yet returned to the office.  And the

17    other partner in the office, she has a daughter-in-law that's

18    going through chemotherapy treatments, and then she's having hip

19    replacement.  So it just puts --

20          THE COURT:  So the Area Education Agency is spread a

21    little thin it sounds like.

22          PROSPECTIVE JUROR BEZONI:  Yes.

23          THE COURT:  And I suspect it might be awfully

24    stressful for you worrying about what's going on back at the

25    agency if you were in a long trial like this one.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 77 of 223

1          PROSPECTIVE JUROR BEZONI:  Yes.  If I knew it were

2    going to be completed in a shorter amount of time, I wouldn't

3    have a problem at all.  In fact, I'd, you know, very much like

4    to do it.  But, you know, given the ten days and your schedule

5    which I understand, but I'm also required by law to have this

6    completed.

7          THE COURT:  Yeah, and those are very important.

8          PROSPECTIVE JUROR BEZONI:  Yeah.

9          THE COURT:  I've actually been involved in a number of

10   federal cases involving that.

11         PROSPECTIVE JUROR BEZONI:  And since it's my first

12   year, I hate to say to the agency, "Sorry, I can't meet that

13   requirement."

14         THE COURT:  Right.  Yeah.  And -- yeah, I totally

15   understand.

16         Would the lawyers have any objection if I excused this

17   juror?

18         MR. MCCLAIN:  No, Your Honor.

19         MR. PAGLIARO:  No, Your Honor.

20         THE COURT:  Okay.  Thank you so much.  Good luck with

21   your work.

22         PROSPECTIVE JUROR BEZONI:  All right.

23         THE COURT:  And thank you so much for coming in.

24         Okay.  Nick, would you call a new juror, please.

25         THE CLERK:  Yes, Your Honor.  Richard Cork.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 78 of 223

```
 1              THE COURT:  Good morning.

 2              PROSPECTIVE JUROR CORK:  Good morning.

 3              THE COURT:  Mr. Cork, how you doing today?

 4              PROSPECTIVE JUROR CORK:  Doing fine.

 5              THE COURT:  Did you know any of the lawyers, any of

 6   the potential witnesses?

 7              PROSPECTIVE JUROR CORK:  No, I didn't.

 8              THE COURT:  Do you know anything about Givaudan, the

 9   defendant?

10              PROSPECTIVE JUROR CORK:  No.

11              THE COURT:  What about American Pop Corn?  They're

12   not -- like I said, they're not a party in the case, but they're

13   kind of indirectly involved because a lot of the testimony will

14   be, I assume, about what happened at American Pop Corn.

15              PROSPECTIVE JUROR CORK:  They are from Schaller where

16   I'm from.  That's all I know about them.

17              THE COURT:  Do they have a -- what do they have in

18   Schaller?  A popcorn plant?

19              PROSPECTIVE JUROR CORK:  Yes, yes.

20              THE COURT:  Do you know many of the people that work

21   there at the popcorn plant?

22              PROSPECTIVE JUROR CORK:  There's only two, and I know

23   both of them.

24              THE COURT:  Oh, okay.  And how long have you known

25   them?
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 79 of 223

1          PROSPECTIVE JUROR CORK:  Long time.

2          THE COURT:  And how often do you run into them?

3          PROSPECTIVE JUROR CORK:  Sundays.

4          THE COURT:  And have you ever talked to them about

5    anything that might have to do with this case do you think?

6          PROSPECTIVE JUROR CORK:  No, I haven't.

7          THE COURT:  Okay.  Do you think the fact -- well, how

8    do you think the fact that you know these two fellas that work

9    for American Pop Corn might affect your ability to be fair and

10   impartial?

11         PROSPECTIVE JUROR CORK:  I have no problem with it.

12         THE COURT:  Okay.  You think you can be fair to both

13   sides in the case?

14         PROSPECTIVE JUROR CORK:  Yes, I do.

15         THE COURT:  Do you think you'd be a good juror?

16         PROSPECTIVE JUROR CORK:  I hope so.

17         THE COURT:  Would it be an extreme or severe hardship

18   for you to serve?

19         PROSPECTIVE JUROR CORK:  No.

20         THE COURT:  Okay.  Great.  Thank you.  Anybody else?

21         PROSPECTIVE JUROR WELCH:  Can I ask a question?

22         THE COURT:  Absolutely.

23         PROSPECTIVE JUROR WELCH:   Dr. James Lockey I think he

24   said, could you spell the last name?

25         THE COURT:  Yeah.  Let's find out.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 80 of 223

 1              MR. PAGLIARO:  L-o-c-k-e-y.

 2              THE COURT:  And where is --

 3              PROSPECTIVE JUROR WELCH:  Okay.  It's not --

 4              THE COURT:  And where is the good doctor from?  Do you

 5      know?

 6              MR. MCCLAIN:  Cincinnati.

 7              THE COURT:  Cincinnati?

 8              PROSPECTIVE JUROR WELCH:  Okay.  Nope.  I do not know

 9      him.

10              THE COURT:  Okay.  Good.  Well, let's everybody stand

11      up and take a stretch break because we've been here for a while.

12              Okay.  Thank you.  Please be seated.  Do any of the 14

13      of you know each other or know any of the other potential jurors

14      in the back of the courtroom?  Do you see anybody you recognize?

15      Really.  I think this is the first trial in years where -- you

16      see somebody you recognize?

17              Okay.  Here's what I want to know.  If you wound up

18      with somebody -- is it in the back of the room -- can we pass

19      the microphone down, first of all?

20              Mr. Woodward, you definitely look like the karaoke

21      type.  Matter of fact, I think I've seen you singing at Lewis

22      Bowl.  Am I wrong about that?

23              PROSPECTIVE JUROR WOODWARD:  No, I don't sing.

24              THE COURT:  You don't sing.  Okay.  Do you know

25      somebody in the back of the courtroom or somebody in the 14 here

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov

Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 81 of 223
To purchase a complete copy of the transcript.

1   with you?

2           PROSPECTIVE JUROR WOODWARD:  Robert Rounds I believe.

3           THE COURT:  Okay.

4           PROSPECTIVE JUROR WOODWARD:  And then --

5           THE COURT:  Oh, more than one.

6           PROSPECTIVE JUROR WOODWARD:  Yeah, I believe McMillan,

7   or that's her maiden name.

8           THE COURT:  Okay.  Well, let's say you wound up on the

9   jury with either one or both of the people that you know.  Do

10  you think you would be unduly influenced by them in any way?

11          PROSPECTIVE JUROR WOODWARD:  No.

12          THE COURT:  Okay.  Because the point I'm trying to

13  make is each party, the Kuipers and Givaudan, they're entitled

14  to the independent judgment of each juror.  In other words, each

15  juror has to listen to the evidence, and then when you go back

16  in the jury room, you're entitled to have your own opinion.  And

17  you should listen to the opinion of other jurors, but ultimately

18  you can't vote just to go along with the other jurors.  You have

19  to vote what you think is the right thing to do in the case

20  after listening to your fellow jurors, giving them a chance to

21  persuade you to their way of thinking if their way of thinking

22  is different.  And I just want to make sure if you got on the

23  jury with somebody you knew you wouldn't go along with that

24  person or persons simply because you knew them.

25          PROSPECTIVE JUROR WOODWARD:  No.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 82 of 223

1          THE COURT:  Okay.  Thank you.  Anybody else think you

2     know anybody?  Okay.  Good.

3          Now, does anybody have a physical or mental injury,

4     disability, or condition affecting your ability to serve as

5     jurors?  Just raise your hand.  No?

6          Can we pass the microphone all the way down?  Do you

7     feel comfortable telling us --

8          PROSPECTIVE JUROR JENSEN:  It's not that serious of a

9     deal.  I've got a little bit of night blindness or whatever, so

10    sometimes this lighting and stuff like that -- now, if the

11    letters are all going to be -- which you've had so far, I'm all

12    right for reading it and whatever.  But I do have night

13    blindness, and with the glare of the lights and all that --

14         THE COURT:  Yeah.  Unfortunately, I'm pretty sure that

15    a lot of documents are not in this size type.  I wish they were.

16    It'd be easier for all of us to see.

17         PROSPECTIVE JUROR JENSEN:  But if you get little

18    letters and stuff like that, for me to -- even with this light

19    here off the screen is glaring at me or whatever for my night

20    blindness but . . .

21         THE COURT:  Okay.  Well, I appreciate you telling us

22    that.

23         PROSPECTIVE JUROR JENSEN:  I do have that on my

24    driver's license too, that I do have night blindness so . . .

25         THE COURT:  Okay.  Okay.  They do have the ability to

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 83 of 223

1    blow up the documents for the most part.  So hopefully that

2    won't be a problem, but I'm going to let the lawyers ask --

3            PROSPECTIVE JUROR JENSEN:  I just thought you should

4    know that.

5            THE COURT:  Absolutely.  Thank you so much.

6            PROSPECTIVE JUROR JENSEN:  I don't want to get in the

7    middle of the court here and all of a sudden I got fine letters

8    I'm trying to read up there and then tell you then, but I do

9    have a little bit of night blindness.

10           THE COURT:  Thank you, Mr. Jensen.  I really

11   appreciate that.  That's absolutely what we're looking for.  So

12   thank you so much for sharing that with us.

13           Okay.  Now, do any of you believe that just because

14   there's a lawsuit the defendant must be in the wrong?  In other

15   words, a plaintiff has a right to sue somebody which is the

16   defendant, but just because you sue somebody doesn't mean that

17   the defendant did anything wrong.  Matter of fact, that's

18   exactly why we're all going to be sharing the next three weeks

19   together, to find out if the plaintiff can prove -- if the

20   plaintiffs can prove their claims against Givaudan.  Anybody

21   have a problem with the fact that just because there's a lawsuit

22   it doesn't mean that the defendant did anything wrong?  Anybody

23   think that just because somebody gets sued it means you did

24   something wrong?  Anybody think that?  Okay.

25           Have you or any family member or close friends ever

1   been involved in a lawsuit against Givaudan or American Pop

2   Corn?  I doubt it, but we need to find out.  Okay.  Don't have

3   to spend much time on that one.

4           Do any of you have any personal, religious, or

5   philosophical problem with awarding -- and I'm going to have two

6   categories here -- what are called compensatory damages, and

7   that's -- there are different types, and I'm not going to get

8   into the details of it, but that's to compensate an individual

9   who's been injured.  So that would be compensatory damages.  And

10  then there's a second thing called punitive damages.  And

11  punitive damages never have to be awarded by a jury.  In certain

12  situations they can.  And you have to evaluate a bunch of

13  factors that I'm going to give you in the jury instructions, and

14  then there has to be evidence to support it.

15          But does anybody have a problem if the evidence and

16  the law justified it in awarding punitive damages?  Does anybody

17  have any problem with that, only if the evidence and the law

18  justify it?

19          For example, if you're a type of individual who

20  thought, I could never award punitive damages under any

21  circumstances, that's something we would need to know.  If

22  you're the type of individual, man, I can't wait to award

23  punitive damages against a corporation like Givaudan regardless

24  of what the evidence is, we need to know that too.

25          What we're looking for is eight jurors who can fairly

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 85 of 223
To purchase a complete copy of this transcript.

1  consider the evidence, fairly consider the instructions, and
2  make a decision about whether or not the plaintiff can prove
3  what we call liability, in other words, did Givaudan do
4  something they shouldn't have, and then if they prove that under
5  the instructions, did the Kuipers prove that they're entitled to
6  either compensatory damages or punitive damages? Anybody have a
7  problem with that?
8      I put the word excessive here. Do any of you think
9  that in general when you read in the paper about an award of
10  punitive damages you think that punitive damages are excessive?
11  It's okay to believe that. Okay. Yeah, we got a lot of hands
12  going up. Who's got the microphone that raised their hand?
13  Okay. Mr. Jensen, why don't you tell me about that. What do
14  you think?
15      PROSPECTIVE JUROR JENSEN: Well, some cases where they
16  bump their head or some darn thing, next thing you know they're
17  suing somebody because they pushed them up against and bumped
18  his head and they're getting millions of dollars for punitive
19  damage or something like -- something stupid is, you know -- I
20  can see some cases and, you know, that maybe it ain't enough,
21  but there's a lot of cases out there that's too much in my
22  opinion.
23      THE COURT: Okay. Sure. And you're entitled to that
24  opinion. Can I ask you this? Would you be willing to evaluate
25  the evidence and the law in my instructions and keep an open

1    mind and then make a decision based on the evidence and the

2    instructions?

3         PROSPECTIVE JUROR JENSEN:  Yeah, I could do that.

4    Like I said, some cases I disagree with what they get paid on.

5    I mean, I think they get way too much for their fees but . . .

6         THE COURT:  Okay.  Now, that raises a really --

7         PROSPECTIVE JUROR JENSEN:  I'm not for sure what this

8    case is really all going to involve, so I can't tell you --

9         THE COURT:  Yeah, and I'm not sure either.  We're

10   going to kind of find out together.  It's going to unfold in

11   front of our very eyes.  But, Mr. Jensen, I want to talk to you

12   about one thing that's kind of interesting that you raised.

13        When you read about a case in the paper, for example,

14   or hear about it on the TV, would you agree with me that you're

15   not in as good a position to make a judgment about that case as

16   the jurors who were in that case every day, listened to all the

17   evidence, heard the opening statements of the lawyers, received

18   the judge's instructions, listened to the closing arguments, had

19   a chance to review all the evidence and discuss it with your

20   fellow jurors?

21        PROSPECTIVE JUROR JENSEN:  Well, yeah, I agree.  Lot

22   of things you hear on TV aren't exactly what it really was, you

23   know.

24        THE COURT:  Right.  So, for example, sometimes when I

25   read a newspaper article about one of the cases I have, I just

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ  Document 403  Filed 06/09/09  Page 87 of 223

 1    chuckle because it doesn't remind me of the case I'm actually

 2    trying.  You know what I mean by that?  It's just not always

 3    very accurate.  And so I just want to make sure that whatever

 4    opinions you have about other cases --

 5              PROSPECTIVE JUROR JENSEN:  Well, I have had this in my

 6    experience.  When I was probably 19 or whatever, I bought me a

 7    brand new car at a Chevy dealer there.  At the time I was living

 8    in Ponca.

 9              THE COURT:  Uh-huh.

10              PROSPECTIVE JUROR JENSEN:  And sure, you got a new

11    car.  You're out driving late at night.  You're having a good

12    time.  You just got the car or whatever.  And next thing I know,

13    the next day they're coming up to me and saying, "You're

14    under a -- or you're under suspicion right now for breaking into

15    the Chevy dealer garage down there."

16              I said, "What?"

17              He said, "Yeah, just you and this other guy were

18    driving around late last -- at night."

19              So then he took my tire iron and said, "Yeah, that's

20    what I" -- I ended up going to take a lie detector test and all

21    the stuff to prove that I was innocent, I mean, just because I

22    was driving late at night because I just got that car the same

23    night.

24              THE COURT:  Yeah, and so people can jump to

25    conclusions.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 88 of 223

1          PROSPECTIVE JUROR JENSEN:  And people around town

2     thinking, Yeah, this guy did it; I know he did it.

3          THE COURT:  Yeah.  And isn't your point, Mr. Jensen,

4     that people can reach conclusions without knowing all the facts?

5          PROSPECTIVE JUROR JENSEN:  Right, definitely.

6          THE COURT:  And what I want to find out is if you're

7     the type of person that would before you make a judgment in this

8     case about whether -- who should win, who should lose, and if

9     the Kuipers win on liability, whether they're entitled to any

10    damages and, if so, how much, you'll base that decision based on

11    the evidence and the law in my instructions.

12         PROSPECTIVE JUROR JENSEN:  Yeah, yeah, definitely.

13         THE COURT:  Okay.  Who else had their hands up that

14    they thought they've read about cases where they thought there

15    were excessive punitive damages?  I think Mr. Loutsch?

16         PROSPECTIVE JUROR LOUTSCH:  Yes, sir.

17         THE COURT:  Can we pass that microphone right -- right

18    there.  Thank you.  Can you give us an example of a case that

19    you've read about, or do you just think it's in general from

20    your general reading?

21         PROSPECTIVE JUROR LOUTSCH:  Just from general reading.

22    No in particular case that I recall at the present.  It's

23    just --

24         THE COURT:  From general reading.  Yeah.

25         PROSPECTIVE JUROR LOUTSCH:  Yes, sir.

1          THE COURT:  Okay.  Well, do you have any religious or

2     philosophical problem with awarding damages in cases?

3          PROSPECTIVE JUROR LOUTSCH:  Not at all, sir.

4          THE COURT:  And do you think you could evaluate the

5     evidence fairly to determine whether any damages should be

6     awarded?

7          PROSPECTIVE JUROR LOUTSCH:  Yes, sir.

8          THE COURT:  Okay.  Thanks.

9          Who else had their hand up about excessive?  Okay.

10    Yes.  Mr. Bravo?

11         PROSPECTIVE JUROR BRAVO:  Yeah.  As far as excessive

12    damages being awarded, I always think about the case where the

13    woman spilled hot coffee on herself.

14         THE COURT:  The McDonald's coffee case, right.

15         PROSPECTIVE JUROR BRAVO:  Thinking of that and in

16    general, I don't know.  Just dealing with large corporations

17    and, of course, from the media or things that I believe in

18    general, think about the -- the peanut scare going on right now

19    where the company was -- had knowledge of the problem going on

20    but they allow it to continue for over a year.  In general I

21    feel that large companies aren't out of the question of doing

22    something like that.

23         THE COURT:  Okay.  Well, it's -- you know, the great

24    thing about America is we have a First Amendment right.  We can

25    believe whatever we want.  And I'm not here to judge any of your

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov

Case 5:06-cv-04009-MWB-RAZ   Document 403   Filed 06/09/09   Page 90 of 223
To purchase a complete copy of the transcript.

1    beliefs, and neither are the lawyers.  But what do you think
2    about your ability to fairly judge the evidence in this case?
3    Do you think you could do that?
4              PROSPECTIVE JUROR BRAVO:  Well, I'll try to keep an
5    open mind.
6              THE COURT:  Okay.  Now, you said you'd try and keep an
7    open mind.  Do you think maybe your mind is not as open as maybe
8    I'm hoping for in this case, because I'm hoping for eight people
9    who have a totally open mind?
10             PROSPECTIVE JUROR BRAVO:  Well, I'm kind of slanted in
11   a certain direction.  I will say that.
12             THE COURT:  Okay.  And just to try and make sure I
13   understand that, do you think you're slanted maybe a little bit
14   against the defendant because they are a large company?
15             PROSPECTIVE JUROR BRAVO:  I'm afraid so.
16             THE COURT:  Okay.  Do you think it would be difficult
17   for you to be fair to Givaudan in this case?
18             PROSPECTIVE JUROR BRAVO:  It would be difficult, but
19   if I were chosen to be on the jury, I would give it my full
20   effort.
21             THE COURT:  I'm just thinking, and I'm sorry.  I
22   appreciate the fact that you would give it your full effort.
23   How sure are you that you could be totally fair to Givaudan?
24             PROSPECTIVE JUROR BRAVO:  I guess I would be fair, but
25   I would see the evidence through my eyes.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ  Document 403  Filed 06/09/09  Page 91 of 223

1          THE COURT:  Well --

2          PROSPECTIVE JUROR BRAVO:  And that's what I'm trying

3   to say.

4          THE COURT:  Yeah, and we all see the evidence through

5   our own life experiences.  And one of the things I'm going to

6   tell you in the instructions are that you don't leave your

7   common sense and life experiences at the front door of the

8   courtroom.  You know, that's why we have juries because you all

9   have a unique set of life experiences.

10         But it's my job to kind of make sure that those life

11  experiences don't affect the even playing field because in this

12  case if my hands are the scales of justice, the parties have to

13  be treated exactly equally.  And the only decision you can make

14  is based on the evidence.  So it shouldn't make any difference

15  that Givaudan is a corporation or if it was Mr. Smith being sued

16  or Mrs. Smith, that we should treat all the parties the same

17  regardless of their standing in life or whether one's a

18  corporation or not.

19         And I'm having some trouble being convinced maybe that

20  you can do that.  And that's not -- it's not a good or a bad

21  thing.  You know, I'm not here to judge you and say your views

22  about large corporations are wrong or bad.  That's not my job,

23  nor would I ever do that.  We're all entitled to our own

24  beliefs.  But I just want to make sure we have a level playing

25  field.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ  Document 403  Filed 06/09/09  Page 92 of 223
To purchase a complete copy of the transcript.

1      Do you think if you were on the jury that there would
2 be a truly level playing field for the Kuipers and for Givaudan?
3      PROSPECTIVE JUROR BRAVO:  That's a pretty difficult
4 question.  I guess if I was chosen to be on the jury, it would
5 depend on what you saw in the trial as far as evidence.
6      THE COURT:  Oh, and that's a good thing, right,
7 because the evidence is the thing that you should make your
8 judgment on, the evidence and the law in my instructions.  But
9 what I'm trying to get at -- and I'm sorry if I'm being a pest
10 here, Mr. Bravo, but do you think your precon -- well, your
11 views -- let's just call them your views -- about large
12 corporations might affect your judgment in the case?
13      PROSPECTIVE JUROR BRAVO:  Yeah, there's a possibility
14 of that, absolutely.  I don't think you can clearly separate
15 yourself from your ideas.
16      THE COURT:  It's very hard to do.
17      PROSPECTIVE JUROR BRAVO:  Yeah.
18      THE COURT:  It's very hard to do.  If you were one of
19 the Givaudan lawyers, would you be pretty concerned about having
20 a juror like you sit on this jury?
21      PROSPECTIVE JUROR BRAVO:  I think so.
22      THE COURT:  And why would you be concerned?
23      PROSPECTIVE JUROR BRAVO:  Because of what I said.
24      THE COURT:  Okay.  Okay.  Could I see the lawyers up
25 at sidebar for just a second?  Why doesn't everybody take a

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 93 of 223
To purchase a complete copy of the transcript.

```
 1   stretch break.

 2            (At sidebar on the record.)

 3            THE COURT:  I think he's gone.

 4            MR. MCCLAIN:  Yeah.

 5            MR. PAGLIARO:  Probably so.

 6            THE COURT:  Okay.  Do you have any problem if I let

 7   him go?

 8            MR. PAGLIARO:  No.

 9            THE COURT:  I didn't think you'd have any problem

10   but . . .

11            MR. MCCLAIN:  Are we going to take a restroom break?

12            THE COURT:  Yeah, we'll take it now.  Thanks.  It's

13   all that coffee.

14            (The sidebar was concluded.)

15            THE COURT:  Okay.  Please be seated.

16            Mr. Bravo, I think you'd be a terrific juror but

17   probably not in this case.  I mean, you might be, and you were

18   super honest with us, and I really appreciate that.  But we're

19   going to let you go, and hopefully you'll be back on another

20   case; okay?

21            PROSPECTIVE JUROR BRAVO:  Okay.  Thank you, Your

22   Honor.

23            THE COURT:  Okay.  Thank you very much.  Why don't we

24   replace this juror, and then we're going to take a break.

25            THE CLERK:  Elaine Damstra.
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 94 of 223

                    THE COURT:  Have a good day, and thanks for coming in.

                    PROSPECTIVE JUROR BRAVO:  Thank you, Your Honor.

                    THE COURT:  Thank you.  Good morning.  Good morning.

                    PROSPECTIVE JUROR DAMSTRA:  Good morning.

                    THE COURT:  Okay.  As soon as we get Miss Damstra

seated, we're going to take a recess.

                    Now, I just want to give you a couple of guidelines to

follow.  You can't discuss this case among yourselves at all.

It would be inappropriate to talk about anything about this case

or any of the lawyers or participants.  You can talk about the

weather, sports, anything you want to.  But you can't talk about

this case.  Don't let anybody talk to you about the case.

                    Remember where you're all seated because it's now 20

to 11, and we're going to take a 20-minute recess until 11.  If

you could kind of check your clocks against this clock, this is

a very inexpensive but accurate atomic clock that sends out a

signal every minute or so to make sure it's exactly on time.

And so we're going to use the time of this clock.  And we'll

just see everybody back here at 11:00.  Thank you.

                    (The jury venire exited the courtroom.)

                    THE COURT:  Counsel, anything we need to take up at

this time?  Okay.  Thank you.

                    (Recess at 10:42 a.m.)

                    THE COURT:  Thank you.  Please be seated.  I'm just

going to have a couple of more questions for you, and then I'm

1    going to turn it over to the lawyers.

2         You have an obligation to follow the written

3    instructions -- oh, I'm sorry.  We forgot about Miss Damstra.

4    Can we pass her the microphone?  You have the microphone?

5         PROSPECTIVE JUROR DAMSTRA:  Yes, I do.

6         THE COURT:  Okay.  Do you know any of the lawyers or

7    potential witnesses in the case?

8         PROSPECTIVE JUROR DAMSTRA:  No, I do not.

9         THE COURT:  Do you have any connection to Givaudan or

10   American Pop Corn?

11        PROSPECTIVE JUROR DAMSTRA:  No, I don't.

12        THE COURT:  Do you think you'd be a fair and impartial

13   juror in the case?

14        PROSPECTIVE JUROR DAMSTRA:  I hope so.

15        THE COURT:  Do you have any reservations about your

16   ability to be a fair and impartial juror?

17        PROSPECTIVE JUROR DAMSTRA:  No, I don't.

18        THE COURT:  Do you think you'd be a good juror?

19        PROSPECTIVE JUROR DAMSTRA:  I would try my best.

20        THE COURT:  Okay.  And that's important.  Do you think

21   you'd be able to have a completely open mind about the case?

22        PROSPECTIVE JUROR DAMSTRA:  I believe so.

23        THE COURT:  Do you think you'd be able to make your

24   judgment based solely on the evidence that you hear in this

25   courtroom, my jury instructions, and the arguments of the

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 96 of 223

1    lawyers and, you know, based on everything that just happens in

2    here?

3              PROSPECTIVE JUROR DAMSTRA:  Yes.

4              THE COURT:  And what about the damages?  Do you have

5    any philosophical or religious problem with awarding different

6    types of damages under the instructions?

7              PROSPECTIVE JUROR DAMSTRA:  No, I don't.

8              THE COURT:  What's your general kind of gut reaction

9    when you hear the phrase punitive damages?

10             PROSPECTIVE JUROR DAMSTRA:  Probably what other people

11   have said.  Sometimes it seems kind of excessive, but in general

12   I think the court is generally fair.

13             THE COURT:  And do you understand that regardless of

14   what the evidence is in the case you're never required to award

15   punitive damages?

16             PROSPECTIVE JUROR DAMSTRA:  Correct.

17             THE COURT:  And you would just have to evaluate the

18   evidence and the jury instructions and make a judgment about

19   whether you thought punitive damages should be awarded and, if

20   so, what the amount would be.  Do you understand that?

21             PROSPECTIVE JUROR DAMSTRA:  Yes, I do.

22             THE COURT:  Okay.  Have you ever been a juror before?

23             PROSPECTIVE JUROR DAMSTRA:  No, I haven't.

24             THE COURT:  Would it be an undue burden or hardship

25   for you to serve?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 97 of 223

```
 1              PROSPECTIVE JUROR DAMSTRA:  No, it would not.

 2              THE COURT:  Okay.

 3              PROSPECTIVE JUROR DAMSTRA:  I should qualify that.  I

 4   have been called before, but I've never been on a jury before.

 5              THE COURT:  How many times have you been called just

 6   out of curiosity?

 7              PROSPECTIVE JUROR DAMSTRA:  Once to this court.

 8              THE COURT:  Okay.  How long ago was that?

 9              PROSPECTIVE JUROR DAMSTRA:  1982.

10              THE COURT:  Then I was not your judge.  It was

11   probably Judge O'Brien, though.

12              PROSPECTIVE JUROR DAMSTRA:  It was.

13              THE COURT:  Criminal case or civil case?  Do you

14   remember?  Probably so long ago.

15              PROSPECTIVE JUROR DAMSTRA:  I was called up three

16   different times, but I never was -- sat on the jury.

17              THE COURT:  Why do you think the jurors -- I'm sorry,

18   the lawyers weren't smart enough to pick you?

19              PROSPECTIVE JUROR DAMSTRA:  Because I was about seven

20   months pregnant.

21              THE COURT:  Okay.  Now, I'm going to give you a set of

22   jury instructions, and you have to follow the law in my

23   instructions whether you agree with it or not.  I don't imagine

24   that many of you stay awake at night kind of thinking about the

25   law of products liability.  And so I don't imagine that there
```

1    would be a problem with any of you following my instructions,

2    but that's kind of how the system works.  I'm charged with the

3    responsibility of telling you what the law is.  And then you

4    have to apply the law in my instructions even if it's different

5    than what you think the law might be.

6         Do you think that would be difficult for anybody?

7    Anybody think you'd have a problem with that?  Okay.  Good.

8         Is there anything about the nature of the case, it

9    being a products liability case, it being a husband and wife

10   suing a corporation, it being a product liability case -- I

11   think I said that -- or is there anything about you as a juror

12   that you think we need to know to determine whether or not you

13   can be fair and impartial?  Anybody have any comments?

14        Why don't we take -- who's got the microphone?  Let's

15   see who's got them.  Okay.  Could you -- Mrs. Damstra, could you

16   pass it down to Lindy Jessen right next to you on that side?

17   Good morning.

18        PROSPECTIVE JUROR JESSEN:  Hi.

19        THE COURT:  Hi.  How you doing?

20        PROSPECTIVE JUROR JESSEN:  Good.

21        THE COURT:  Good.  Do you think you'd be a good juror

22   in this case?

23        PROSPECTIVE JUROR JESSEN:  Yes.

24        THE COURT:  Is jury service something that you've ever

25   done before?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 99 of 223

1          PROSPECTIVE JUROR JESSEN:  Yes.

2          THE COURT:  And how long ago were you on a jury?

3          PROSPECTIVE JUROR JESSEN:  I think like four years

4  ago.

5          THE COURT:  Okay.  Could we get you to hold that

6  microphone a little closer?  And I promise I won't put up the

7  karaoke for you.

8          PROSPECTIVE JUROR JESSEN:  I don't have to sing?

9          THE COURT:  You don't have to sing.  Not yet.  Where

10  was that case?

11         PROSPECTIVE JUROR JESSEN:  It was over to the other

12  courthouse.

13         THE COURT:  Oh, just on the -- yeah, Woodbury County

14  Courthouse?

15         PROSPECTIVE JUROR JESSEN:  Yes.

16         THE COURT:  And did you actually serve as a juror?

17         PROSPECTIVE JUROR JESSEN:  Yes.

18         THE COURT:  Was it a criminal case or civil case?  Do

19  you remember?

20         PROSPECTIVE JUROR JESSEN:  It was about drugs,

21  criminal.

22         THE COURT:  Then it'd probably be a criminal case.  I

23  spend most of my time in drug criminal cases.  And that raises

24  an interesting point that I want to talk to you about.

25         I don't know if you remember it, but in that case --

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 100 of 223

1    and I know this without knowing anything about the case or which

2    case it was.  Because it was a criminal case, the state had to

3    prove its case beyond a reasonable doubt.  Does that ring a

4    bell?  Do you kind of remember that?

5             PROSPECTIVE JUROR JESSEN:  He was innocent until

6    proven guilty.

7             THE COURT:  Right.  And he was innocent -- so the

8    defendant had the presumption of innocence, and the state had to

9    prove its case beyond a reasonable doubt.  Does that ring a

10   bell?

11            PROSPECTIVE JUROR JESSEN:  Yes.

12            THE COURT:  And the reason why I knew that is in every

13   criminal case, whether it's in state court or federal court,

14   whether it's Alaska or Florida or Maine or -- we even have a

15   federal court in Guam -- the government always has to prove a

16   criminal case beyond a reasonable doubt.  And the presumption of

17   innocence means that the defendant's -- the parties don't start

18   exactly even.  If my hands are the scales of justice, because

19   the defendant's presumed innocent, he's up here, and the

20   government has to tip those scales quite a bit.

21            A civil case is very different.  There is no

22   presumption in the case.  There's no presumption of innocence.

23   And the plaintiff in the case does not have to prove their case

24   beyond a reasonable doubt because the parties start exactly

25   even.  And so the plaintiff in the case just has to prove it by

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 101 of 223

1   what we call the greater weight of the evidence.  So it just has

2   to shift the scales ever so slightly.

3          Sometimes in opening statements in a civil case, the

4   lawyers will talk about it in terms of sports analogies, and

5   they'll say we only have to win 7 to 6 like a football game or

6   89 to 88 in a basketball game.  You just have to tip the scales

7   ever so slightly.

8          Before today, did you understand there was a

9   difference between what we call the burden of proof in a

10  criminal case and in a civil case?

11         PROSPECTIVE JUROR JESSEN:  Not really.

12         THE COURT:  Okay.  And so one of the things I'm going

13  to tell you in the instructions is that -- the parties and what

14  their burdens of proofs are on the claims and on the defenses,

15  and that's by the greater weight of the evidence.  So this

16  concept proof beyond a reasonable doubt, that never comes into

17  play in a civil case like this.  Does that make sense?

18         PROSPECTIVE JUROR JESSEN:  Uh-huh.

19         THE COURT:  Okay.  And do you understand why there

20  might be a difference?  Why do you think we have a higher burden

21  of proof in a criminal case?  Why is it -- why do we make it

22  tougher on the government to prove somebody guilty than in a

23  civil case?

24         PROSPECTIVE JUROR JESSEN:  Well, I suppose if he's

25  innocent and he goes to jail.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 102 of 223

```
 1              THE COURT:  That's right.  You're --
 2              PROSPECTIVE JUROR JESSEN:  I mean, it would ruin his
 3    whole life or whatever so . . .
 4              THE COURT:  That's exactly right.  Because in a
 5    criminal case somebody's liberty is at stake.  In a civil case
 6    it's not always but almost always about money.  Plaintiff wants
 7    to win some money against the defendant.  That's what most civil
 8    cases are about.  And so because liberty isn't involved, we
 9    don't have that higher burden of proof.  Does that make sense to
10    you?
11              PROSPECTIVE JUROR JESSEN:  Yes.
12              THE COURT:  Yeah.  What qualities do you think you
13    would bring to this case as a juror?
14              PROSPECTIVE JUROR JESSEN:  Fairness.
15              THE COURT:  Does -- the fact that Givaudan is a
16    corporation, is that a problem for you?
17              PROSPECTIVE JUROR JESSEN:  No.
18              THE COURT:  Do you think you would be able to treat
19    Givaudan just as fairly as you would treat the Kuipers?
20              PROSPECTIVE JUROR JESSEN:  Yes.
21              THE COURT:  And the fact that the Kuipers are two
22    individuals, is that a problem for you?
23              PROSPECTIVE JUROR JESSEN:  No.
24              THE COURT:  Okay.  Good.  Thank you very much.
25              That's all the questions I have.  So Mr. McClain?
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 103 of 223

1          MR. MCCLAIN:  Thank you, Your Honor.  Is this on now?

2          THE COURT:  Yes, it is.  Thank you.

3          MR. MCCLAIN:  Good morning, ladies and gentlemen.

4    I've -- I know you've been sitting for a long time and answering

5    lots of questions, and I certainly am not going to repeat

6    anything that the judge asked.  But I do have a few things that

7    I'd like to ask you about that would help us in selecting the

8    jury.  And I'd just like to emphasize one thing.

9          There aren't any right answers, and I'm not looking

10   for this answer or that answer.  But I am trying to get your

11   opinions and your beliefs about various issues.  And this is

12   designed to allow us to be able to see who are the best people

13   to serve on this jury for both sides.

14         I couldn't tell for sure, but I thought -- and pardon

15   me again.  My name is Ken McClain in case any of you didn't get

16   my name the first time through.

17         I'm not sure whether or not all of you answered the

18   question that had raised your hand regarding excessive damages

19   or concerns about excessive damages.  Did all of you that had

20   raised your hand and the judge --

21         THE COURT:  No, I didn't call on all of them,

22   Mr. McClain.

23         MR. MCCLAIN:  Oh, okay.  All right.  Yeah.

24         THE COURT:  So you can certainly ask them to raise

25   their hands again or maybe ask the ones I didn't call on,  how

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 104 of 223

```
 1    ever you want to proceed.

 2              MR. MCCLAIN:  Thank you, Judge.  I wasn't sure I was

 3    right about that.

 4              THE COURT:  No, you're exactly right.

 5              MR. MCCLAIN:  Who else raised their hand about that

 6    issue?  Yes, Mr. Reiss?

 7              PROSPECTIVE JUROR REISS:  Correct.

 8              MR. MCCLAIN:  Is that right?

 9              PROSPECTIVE JUROR REISS:  Yes.

10              MR. MCCLAIN:  Mr. Reiss, you raised your hand about

11    it.  What questions about excessive damages or punitive damages

12    or whatever your concern was?

13              PROSPECTIVE JUROR REISS:  Mainly the word excessive,

14    personal opinion as being lawsuits need to be limited.

15              MR. MCCLAIN:  Okay.

16              PROSPECTIVE JUROR REISS:  Generally feel that whether

17    it be a doctor that's getting sued or a corporation, probably

18    didn't intend to set out for anyone to be injured or anything

19    like that, not that they shouldn't be held accountable for

20    anything that they may or may not be responsible for.

21              But where I'm employed, I just had a -- or we had a

22    long-time employee who was actually I think 66 or 67, was suing

23    our corporation, and I don't recall if he settled out of court

24    or if he won, but he was awarded about seven or eight years'

25    wages, and the supposed injury goes back to years, years
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 408   Filed 06/09/09   Page 105 of 223

1  previous to this lawsuit.  And that kind of puts a bad, you

2  know, opinion in my mind maybe.

3          MR. MCCLAIN:  Okay.  And so that kind of rubbed you

4  the wrong way when you saw that result in that particular case;

5  is that fair?

6          PROSPECTIVE JUROR REISS:  Sure.

7          MR. MCCLAIN:  And am I hearing you right that you

8  generally kind of think that there ought to be some cap to --

9          PROSPECTIVE JUROR REISS:  Limits, yes.

10          MR. MCCLAIN:  -- damages, that as you come into it

11  before you've heard any facts, that's just your natural reaction

12  to any lawsuit.

13          PROSPECTIVE JUROR REISS:  Sure.

14          MR. MCCLAIN:  And so is it fair to say that in a case

15  where damages are going to be claimed for an individual where

16  the injury occurred a few years ago that that is a concern that

17  you might have in terms of your service on the jury, that you'd

18  like to see limits on his damages?

19          PROSPECTIVE JUROR REISS:  Maybe.  I mean, every case

20  is different.

21          MR. MCCLAIN:  And so before you've ever heard what the

22  law is and before you've ever heard what the facts are, you

23  think that it ought to be limited.

24          PROSPECTIVE JUROR REISS:  Yes.

25          MR. MCCLAIN:  Okay.  And so as you come into it,

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 106 of 223

```
1    that's just your mind-set.

2              PROSPECTIVE JUROR REISS:  Correct.

3              MR. MCCLAIN:  And is it fair to say that currently it

4    would be very difficult for you to put that to one side?

5              PROSPECTIVE JUROR REISS:  As far as the money goes, I

6    wouldn't want to be involved with that knowing that -- I guess

7    it'd be hard to know -- if I had a ballpark figure of, you know,

8    what kind of money you're talking about, it would probably sway

9    me or possibly sway me I guess I would say.

10             MR. MCCLAIN:  Well, without saying any figure in mind,

11   you'd like to keep damages low if at all possible; fair?

12             PROSPECTIVE JUROR REISS:  Correct.

13             MR. MCCLAIN:  You already come in with that viewpoint.

14             PROSPECTIVE JUROR REISS:  Uh-huh.

15             MR. MCCLAIN:  And I guess if we were talking about

16   punitive damages, you're really pretty opposed to those too,

17   aren't you?

18             PROSPECTIVE JUROR REISS:  I guess define punitive, I

19   mean.  If you can show expenses, you know, medical expenses need

20   covered, loss of life or certain aspects of your life, I can

21   understand that.  I just think that sometimes it's excessive or

22   often excessive.

23             MR. MCCLAIN:  Often are excessive?  Is that your --

24   did I hear that right?

25             PROSPECTIVE JUROR REISS:  Yes.
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 107 of 223

1          MR. MCCLAIN:  I have -- because of the echo.

2          PROSPECTIVE JUROR REISS:  Often excessive.

3          MR. MCCLAIN:  Often excessive.  Here's the thing.

4    Punitive damages aren't for like medical expenses and for lost

5    wages.  They're to punish the defendant -- that's why they're

6    awarded -- and as the judge pointed out, only if there's a

7    sufficient factual showing.  But the law does provide them for a

8    specific reason, and that's to punish them.  And you have to

9    decide how much money it will take to punish a corporation with

10   all the evidence that you're going to hear about that in terms

11   of their financial resources, et cetera.

12          And from what I'm hearing about you, that kind of

13   damages is not something that you generally think should be

14   awarded in a case; is that right?

15          PROSPECTIVE JUROR REISS:  I guess it depends on the

16   case.  I mean, there should probably be some kind of standards

17   in place.

18          MR. MCCLAIN:  Okay.  But if the Court gives you

19   instructions on that issue and the standards are what you

20   believe, are you going to be in a position to award more than

21   just the medical expenses and the lost wages and those kind of

22   damages, or will that be difficult for you to do?

23          PROSPECTIVE JUROR REISS:  I've been injured on a job

24   myself.  I actually have loss of sensation slightly in one hand.

25   And I guess I personally never pursued that, and I've been told

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 108 of 223

1  that I could, and I got better things to do, so I guess it --

2  I've got some prejudice against punishing people who had one

3  goal and people get hurt sometimes.

4           MR. MCCLAIN:  Okay.  And I appreciate your candor.

5  And there's nothing wrong with that answer.  As the judge

6  pointed out, all of us have these different opinions.  That's

7  why our democracy works, and we have different opinions on

8  various things, and we go vote and do the things that we do.

9           But in this case where we're both coming in to this

10 case and wanting people that haven't made their minds up about

11 damages and punitive damages, you've pretty well kind of made

12 your mind up on those issues I hear you saying.  Am I right?

13          PROSPECTIVE JUROR REISS:  That'd be fair to say.

14          MR. MCCLAIN:  And so for me as a plaintiff, the judge

15 asked several of these people, you know, if the defendant -- if

16 you were standing in my shoes, I should worry about you as a

17 juror is what you're telling me.

18          PROSPECTIVE JUROR REISS:  I would.

19          MR. MCCLAIN:  Yeah.  You would.

20          PROSPECTIVE JUROR REISS:  Yeah.

21          THE COURT:  Mr. Reiss, I'm going to go ahead and

22 excuse you.  Thank you.  Thank you for your candor.

23          Can we call our next juror, please.

24          THE CLERK:  Larry Storm.

25          THE COURT:  Mr. McClain, you might want to sit down

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ  Document 402  Filed 06/09/09  Page 109 of 223

1  for a minute, and I'm going to ask Mr. Storm some questions.

2          MR. MCCLAIN:  Certainly.

3          THE COURT:  Mr. Storm, how you doing?

4          PROSPECTIVE JUROR STORM:  Good, Your Honor.  Thank

5  you.

6          THE COURT:  How you been?

7          PROSPECTIVE JUROR STORM:  I've been good.

8          THE COURT:  How'd you bowl last night?

9          PROSPECTIVE JUROR STORM:  Terrible.

10          THE COURT:  Well, I wasn't there so . . .

11          PROSPECTIVE JUROR STORM:  Yeah.  Don't embarrass me.

12          THE COURT:  Mr. Storm and I are in the same league,

13  bowling league, and -- let me ask you this.  Anything about the

14  fact that you're a lawyer that you think would affect your

15  ability to be fair and impartial?

16          PROSPECTIVE JUROR STORM:  No.

17          THE COURT:  What about it being a severe or undue

18  hardship for you to serve?

19          PROSPECTIVE JUROR STORM:  Well, I have clients and

20  hearings and so forth but . . .

21          THE COURT:  Are you willing to serve if you're

22  selected?

23          PROSPECTIVE JUROR STORM:  Sure.

24          THE COURT:  You would be the seventh lawyer I've had

25  sit on a jury if you were selected.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 110 of 223

```
 1              PROSPECTIVE JUROR STORM:  Oh.

 2              THE COURT:  Do you know any of the lawyers?  Well, I'm

 3    sure you do know Mr. McElwain for sure.

 4              PROSPECTIVE JUROR STORM:  Right.

 5              THE COURT:  Have you ever had cases with Mr. McElwain?

 6              PROSPECTIVE JUROR STORM:  I don't recall that I have.

 7    Other lawyers in my office may have.

 8              THE COURT:  Anything about the fact that other lawyers

 9    in your firm have had cases with Mr. McElwain that would affect

10    your ability to be fair and impartial?

11              PROSPECTIVE JUROR STORM:  I don't think so.

12              THE COURT:  Do you know any of the other witnesses

13    that the lawyers listed?  I'm sure you probably knew the

14    pulmonologists.

15              PROSPECTIVE JUROR STORM:  Yeah, and I think you

16    mentioned Curtiss Farrell maybe, Curtiss Farrell from here in

17    Sioux City?

18              THE COURT:  Did somebody mention Curtiss Farrell?  I

19    don't recall.

20              MR. MCCLAIN:  Yes.

21              MR. PAGLIARO:  We did, Your Honor.

22              THE COURT:  Let's start with the pulmonologists.

23    Which of the ones do you know?

24              PROSPECTIVE JUROR STORM:  Bainbridge.

25              THE COURT:  How well do you know him?
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 111 of 223

1    PROSPECTIVE JUROR STORM:  I know of him.  I think he

2  has done some doctoring for my father.

3    THE COURT:  Okay.  Anything about that experience

4  would affect your ability to be fair and impartial?

5    PROSPECTIVE JUROR STORM:  No.

6    THE COURT:  Could you evaluate his credibility just

7  like you would every other witness?

8    PROSPECTIVE JUROR STORM:  I think so.

9    THE COURT:  Okay.  And then what about the other

10  witness?  I'm sorry.  I already forgot that you --

11    PROSPECTIVE JUROR STORM:  Curtiss Farrell.  Our office

12  represents him.

13    THE COURT:  Okay.  How would that affect your ability

14  to be -- evaluate his credibility?

15    PROSPECTIVE JUROR STORM:  I've never done any work for

16  him, so I don't know the man personally.  I just am disclosing

17  that our office represents him.  I don't know that it would

18  affect my opinions.

19    THE COURT:  What does he -- what's your understanding

20  as to what he does for a living?

21    PROSPECTIVE JUROR STORM:  I think he's a general

22  medical doctor is my understanding.

23    THE COURT:  You indicated, Mr. Storm, you've actually

24  never met him?

25    PROSPECTIVE JUROR STORM:  I may have met him.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 408   Filed 06/09/09   Page 112 of 223

          1           THE COURT:  Okay.  But you don't have any personal

          2    relationship with him.

          3           PROSPECTIVE JUROR STORM:  No.  I know of him, and I

          4    know of things that our office has done for him and so forth, so

          5    I know quite a bit about him.

          6           THE COURT:  How would you feel about sitting on a

          7    jury?

          8           PROSPECTIVE JUROR STORM:  That's a tough question.

          9    You know, part of me would like to.  I used to try cases, and I

         10    always wondered what went on in the room back there.

         11           THE COURT:  We all do.

         12           PROSPECTIVE JUROR STORM:  So there's a little bit of

         13    me that says I'd like to go back and find out and be a part of

         14    it.  But as a lawyer, of course, you know, there's always a

         15    little trepidation too about whether I know too much maybe.  I

         16    don't know.  That kind of a -- whether I'd be too much of an

         17    influence.

         18           THE COURT:  I actually don't know a whole lot about

         19    your practice.  Have you ever done any products liability work?

         20           PROSPECTIVE JUROR STORM:  For the last 19 years, I've

         21    done principally estate planning and estate administration, but

         22    prior to that, yeah, I did litigation, primarily defense, and I

         23    think we did have some products cases.

         24           THE COURT:  Do you recall personally whether you

         25    worked on the products cases or not?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 113 of 223

```
 1          PROSPECTIVE JUROR STORM:  I think I did on one or two.
 2    I think we had a case involving maybe salmonella or something
 3    like that, and I worked on that case.
 4          THE COURT:  Would it be difficult for you to follow my
 5    instructions on products liability law and not try and rely on
 6    what you remember from way back when, Mr. Storm?
 7          PROSPECTIVE JUROR STORM:  I don't think so.  I think I
 8    would accept what you -- your view of the law is versus my
 9    recollections.  It's been a while.
10          THE COURT:  Maybe if we were in estate planning it
11    might be reversed; right?
12          PROSPECTIVE JUROR STORM:  I wouldn't even say that,
13    Judge, no.  I'd still follow your instructions on that.
14          THE COURT:  Okay.  Thank you.  That's all the
15    questions I have for you.
16          Mr. McClain, turn it back to you.
17          MR. MCCLAIN:  Let's pick up where we were talking with
18    Mr. Reiss.  First of all, welcome, Mr. Storm.  Appreciate --
19          PROSPECTIVE JUROR STORM:  Thank you.
20          MR. MCCLAIN:  Do you have any issues, Mr. Storm,
21    regarding damages, compensatory damages, excessive damages,
22    punitive damages, any of the questions that have been asked so
23    far?
24          PROSPECTIVE JUROR STORM:  No.
25          MR. MCCLAIN:  Thank you.  Who else had a hand up when
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 114 of 223

1  the judge was asking the question that hasn't been asked?

2          Okay.  Mr. Jensen, tell me about your opinions in

3  regard to that issue.

4          PROSPECTIVE JUROR JENSEN:  I guess I agree too.  I

5  think there's way, way too much money involved in a lot of this

6  stuff here.  Like you said about the coffee at McDonald's or

7  spilling coffee on her, I mean, the money they get for spilling

8  hot coffee on them to me is excessive.  There again, it goes by

9  case by case.

10          MR. MCCLAIN:  Okay.  Well, tell me a little bit more

11  about that in terms of what you mean by goes by case by case.

12  Do you come into this case now with a feeling that as a general

13  matter damages should be capped like Mr. Reiss was talking

14  about?

15          PROSPECTIVE JUROR JENSEN:  There again, like I say, it

16  goes case by case.  Like McDonald's case here with the coffee

17  spilled, I think there should have been a cap on that.  I don't

18  think there should have been such excessive thousands of dollars

19  for something that was actually her fault for spilling it on her

20  in the first place.  But . . .

21          MR. MCCLAIN:  But tell me -- tell me -- I understand

22  about the McDonald's case, and all kinds of things I think have

23  been written about that.  But in terms of this case, that

24  appears to be something that really bothers you about the whole

25  system; am I right?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 408   Filed 06/09/09   Page 115 of 223

1              PROSPECTIVE JUROR JENSEN:  Right.

2              MR. MCCLAIN:  So you come in thinking about this case

3     in terms of a McDonald's coffee case; right?

4              PROSPECTIVE JUROR JENSEN:  Well, that's just an

5     example, yeah.

6              MR. MCCLAIN:  Yeah, just an example of the way that

7     you think about the system.  And so when you're thinking about a

8     case when you come into it and the judge talked about this

9     weighing scales issue that we're all here to discuss in terms of

10    everybody coming into the court, on this damage issue, before

11    you ever heard the evidence, I kind of come in behind, don't I?

12             PROSPECTIVE JUROR JENSEN:  Well, to be truthful with

13    you, I get health insurance from my work and stuff, and I

14    also -- I always have and I probably always will blame that the

15    reason my health insurance is so high is because of all the

16    lawsuits and stuff like that that's been put up against it.  The

17    doctors have to have higher insurance.  Therefore, it passes it

18    on to me, and I just think there should be some cap on a lot of

19    that stuff.

20             MR. MCCLAIN:  Sure.  And I appreciate your candor.

21    That is a view that some people have and that affects them as

22    jurors even before they've ever heard the evidence or listened

23    to the law from the judge.

24             PROSPECTIVE JUROR JENSEN:  Yeah.  I want to be fair

25    with you because that's what I thought.  Like I said, that's why

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 116 of 223

```
 1    I think my health insurance and everybody's health insurance
 2    because there should be a cap somewhere, but you hear the
 3    million dollars and millions and millions.
 4          MR. MCCLAIN:  Thank you, Mr. Jensen, for being so
 5    candid, and it's difficult to do, and I appreciate it very much.
 6    But just coming back then to my question, I come in behind in
 7    this case on that damage question, don't I?
 8          PROSPECTIVE JUROR JENSEN:  There again, I don't know
 9    what you're asking for.
10          MR. MCCLAIN:  Well, what I'm asking for is this.
11          PROSPECTIVE JUROR JENSEN:  If you're asking for, like
12    I said, his insurance and stuff like that to pay everything he's
13    got and -- well, like I said, I don't know what the case
14    involves.  If he's still able to be able to work or whatever.
15    If he's not able to work, sure, there should be some
16    compensation for that for the rest of his life or et cetera, you
17    know, but I don't know what the case all involves.
18          MR. MCCLAIN:  Here's the question.  Are you going to
19    continue to think as you've told us, Hey, if I award a lot of
20    money in this case, it's going to affect my insurance rates?
21          PROSPECTIVE JUROR JENSEN:  Well, I don't know if this
22    one's going to.  Yeah, I -- like I said, that's what I always
23    believe.
24          MR. MCCLAIN:  It's in the back of your mind.
25          PROSPECTIVE JUROR JENSEN:  Right.
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 117 of 223

                    MR. MCCLAIN:  And in terms of damages, that would be a

1

2   factor that you would be thinking about.

3                   PROSPECTIVE JUROR JENSEN:  Yeah.

4                   MR. MCCLAIN:  And so in that sense on this damage

5   question, because I'm the guy asking for damages, I come in with

6   a burden to climb in your mind; am I right?

7                   PROSPECTIVE JUROR JENSEN:  Yeah.

8                   MR. MCCLAIN:  And so isn't it fair to say that because

9   of the kind of case this is you think it would be better for you

10  to sit on a different kind of case?

11                  PROSPECTIVE JUROR JENSEN:  Truthfully, yeah, with what

12  I think.  Like I said, I've always believed in that it should be

13  capped, it should somewhere somehow where eventually something's

14  going to get taken care of.

15                  MR. MCCLAIN:  Okay.

16                  THE COURT:  Mr. Jensen, I'm going to go ahead and

17  excuse you as a juror in the case.  Thank you for being so

18  candid with your opinions.

19                  Nick, can we call a new juror, please?

20                  THE CLERK:  Rebecca Beschorner.

21                  MR. MCCLAIN:  Spelling of the juror?

22                  THE COURT:  B-e-s-c-h --

23                  MR. MCCLAIN:  Oh, I'm sorry.

24                  THE COURT:  B-e-s-c-h-o-r-n-e-r.  And Mr. McClain?

25                  MR. MCCLAIN:  You want me to sit down?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 118 of 223

1          THE COURT:  Yeah.  There's actually a couple of things

2   I want to take up now.  And before we get to our newest juror,

3   you can keep the microphone.  Is it Mrs. Wienhold?

4          PROSPECTIVE JUROR WIENHOLD:  Wienhold.

5          THE COURT:  Wienhold.  Okay.  And you'll have to hold

6   that microphone up nice and close, and I promise I won't put any

7   karaoke up there.  And do you see the little light that goes on

8   that means it's on?

9          PROSPECTIVE JUROR WIENHOLD:  Yes.

10         THE COURT:  Okay.  I noticed when the last juror was

11  talking about the McDonald's case you were nodding your head,

12  and so do you have similar feelings about the McDonald's case?

13         PROSPECTIVE JUROR WIENHOLD:  I have very similar

14  feelings in general.  I worked for almost 20 years at St. Luke's

15  Hospital.  I worked in a position the last seven years that made

16  me directly have to choose and select the health insurance for

17  North Park.  I have strong feelings about what -- and I do.  I

18  believe excessive damages have done and do to -- whether it's

19  the health industry, whether it's insurance, and that passes

20  directly on to businesses because it has to be passed on.

21         So I believe that people have the right to be

22  compensated for out of pocket, for costs.  But I believe that

23  somewhere we need to come to a place where we can accept that --

24  and maybe also I am an eternal optimist, that corporations, I

25  don't always like them.  I had associations with one that I

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 119 of 223

1    don't like.  But -- for a short time but that they are

2    inherently good, they're not out to hurt people, and that yes,

3    they need to pay but we have to have caps on things so that a

4    business actually knows what maybe their liability is.

5              THE COURT:  What do you think a reasonable cap on

6    compensatory damages should be?  Do you understand what I mean

7    by compensatory?

8              PROSPECTIVE JUROR WIENHOLD:  Is that the out-of-pocket

9    expenses?

10              THE COURT:  Well, it includes the out-of-pocket

11    expenses, but it also includes emotional distress damages.

12              PROSPECTIVE JUROR WIENHOLD:  That is a hard one for

13    me, and you're also going to have a hard time maybe pinning me

14    down for that because I believe we have some own personal

15    responsibility in things.

16              You know, I was in a -- I had a car parked in a

17    parking lot here in town legally parked.  I was not in the car.

18    It wasn't parked on the end.  I came out and had ambulances,

19    fire trucks, police around my car.  A lady hit my car.  Now, she

20    had a heart attack, and she eventually died.  I was held

21    partially responsible for that, you know, and from their logic,

22    maybe we all have some responsibility in things.  So that's

23    where maybe we do have to come to some terms.

24              And I don't know what that is.  I wouldn't want to be

25    the person setting it but that it's not the sky's the limit.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 120 of 223

1   How we do that I don't know.  But I do believe that when we come

2   to the punitive part of it we've really gotten excessive in a

3   lot of cases.

4           THE COURT:  Now, do you remember when the prior juror

5   in talking about the McDonald's case said that, you know, it was

6   obviously the lady's fault for spilling the coffee?

7           PROSPECTIVE JUROR WIENHOLD:  I don't know that I --

8   okay.  You could take the devil's side of that.

9           THE COURT:  Which would be?

10          PROSPECTIVE JUROR WIENHOLD:  Which would be, okay.

11  Yeah, okay.  She spilled the coffee.  That is her part in that.

12  If there was the part that that coffee and -- was too hot,

13  that's where McDonald's should be in my mind responsible for

14  injuries.

15          THE COURT:  Okay.  Now let's just back up a minute.

16  The actual facts in the McDonald's case were that she took the

17  cup of coffee, put it between her legs after she bought it

18  through the drive-in window.  Do you think it's reasonably

19  foreseeable to a company like McDonald's that sells coffee

20  through a drive-in window that people are going to take the

21  coffee and maybe spill it?

22          PROSPECTIVE JUROR WIENHOLD:  No, and that --

23          THE COURT:  You don't think that's reasonably

24  foreseeable that people would spill coffee?

25          PROSPECTIVE JUROR WIENHOLD:  Oh, yes, it would, but I

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 121 of 223

1    don't -- in that case --

2          THE COURT:  Well, just a second.

3          PROSPECTIVE JUROR WIENHOLD:  That's her

4    responsibility.  Say it again.  Maybe I didn't hear.

5          THE COURT:  Okay.  I was only asking the question.  I

6    wasn't talking about responsibility.  I was saying is it

7    foreseeable to a company like McDonald's that sells coffee

8    through a drive-in window that a certain number of people are

9    going to take that coffee, put it between their legs or put it

10   somewhere else, the coffee will spill and could potentially

11   injure them?  Do you think that's reasonably foreseeable?

12         PROSPECTIVE JUROR WIENHOLD:  I don't know.  How many

13   cups of their coffee actually spill?  And of those that spill,

14   is it their responsibility?

15         THE COURT:  Well, that's a different question.  I

16   understand that.

17         PROSPECTIVE JUROR WIENHOLD:  I know.  But it's --

18         THE COURT:  So you don't think --

19         PROSPECTIVE JUROR WIENHOLD:  Are they supposed to

20   assume that so many cups of their coffee are going to spill?

21         THE COURT:  Absolutely, if that's what, in fact,

22   reality is.  And we all know people spill coffee.  Have you ever

23   been in a car where people spilled a beverage that they got from

24   a fast food establishment?  You ever had that happen?

25         PROSPECTIVE JUROR WIENHOLD:  I probably can't say

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 122 of 223

1   never, I mean.

2           THE COURT:  I think your experience would be very

3   unique if you've never had that happen.

4           PROSPECTIVE JUROR WIENHOLD:  That's what I mean.  I

5   can't give you a date.

6           THE COURT:  Maybe you've never spilled anything from a

7   fast food restaurant, but I know I have.

8           PROSPECTIVE JUROR WIENHOLD:  Yeah.

9           THE COURT:  But do you know how hot McDonald's heated

10  the coffee compared to the industry average?

11          PROSPECTIVE JUROR WIENHOLD:  No.

12          THE COURT:  Well, would that be an important fact to

13  know?

14          PROSPECTIVE JUROR WIENHOLD:  It would be an important

15  fact.  But would it change my mind that there still should be a

16  limit?  If they were negligent --

17          THE COURT:  I suspect there's not much that's going to

18  change your mind, and that's why I'm going to excuse you as a

19  juror.  Thank you.

20          PROSPECTIVE JUROR WIENHOLD:  All right.

21          THE COURT:  Thanks.  Could you call our next juror,

22  please?

23          THE CLERK:  Yes, Your Honor.  Mark -- Michael

24  Rickert.

25          THE COURT:  Thank you.  Have a good day.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 123 of 223

1          Good morning.

2          PROSPECTIVE JUROR RICKERT:  Hi.

3          THE COURT:  Okay.  We've got two new jurors, and

4    they're both seated next to each other.  So I'm going to ask you

5    both the following questions, and just raise your hand or

6    indicate -- grab the microphone and indicate if you have a yes

7    answer.  Do you know any of the lawyers or witnesses in the

8    case?  Either one of you know any of the lawyers or witnesses in

9    the case?  Anything about the length of the trial that would be

10   a severe or extraordinary hardship for you to serve?  We're

11   talking about now the rest of this week, next week, and probably

12   all of the following week.  Would that be a severe or

13   extraordinary hardship for either of you?  Nope?  Okay.  That's

14   good.

15         Mr. Rickert, I'll start with you.  Do you think you'd

16   be a good juror in the case?

17         PROSPECTIVE JUROR RICKERT:  I think so.

18         THE COURT:  Do you have any views on awarding damages,

19   either compensatory damages, the purpose of which is to

20   compensate the plaintiff for any damages they've proved, or

21   punitive damages?  The purpose is to punish the company for

22   their conduct.  Do you have any problem in awarding either type

23   of damages if the evidence in the case and the law in my

24   instructions support it?

25         PROSPECTIVE JUROR RICKERT:  No.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 124 of 223

```
1        THE COURT:  What about the prior juror who was, all

2   due respect, trying to blame all of the problems of rising

3   insurance on lawsuits?  The actual studies show it's got

4   virtually nothing to do with the cost of rising insurance.  But,

5   you know, everybody's entitled to their opinion whether it's

6   based on any facts or not.  That's the great thing about the

7   country.

8        But do you have any particular opinion about if all

9   the horrors of increased insurance are blamed on too many

10  lawsuits or anything like that?  I mean, you hear that a lot.

11  It just happens not to be true.  But, you know, people can

12  believe whatever they want.  But I'm just curious as to what you

13  believe.

14       PROSPECTIVE JUROR RICKERT:  I think like you pointed

15  out before, that would be one side of it, not knowing both sides

16  as to how that's arrived at or -- I think you're only hearing,

17  well, it's just because of the awards; that's why it's all going

18  up.  There's probably a lot more to it within the product or

19  something that makes it that way too.  So I would think there's

20  more to it than just easily saying it's --

21       THE COURT:  There's a lot more to it, and here's the

22  bottom line.  This case isn't going to solve that problem one

23  way or the other.  Do you appreciate that?

24       PROSPECTIVE JUROR RICKERT:  Yes.

25       THE COURT:  We're not going to solve the problem of
```

1  healthcare costs in this case.  That's not the purpose of the

2  case.  Regardless of what you do, it's going to have zero impact

3  on that issue.  Does that make sense?

4          PROSPECTIVE JUROR RICKERT:  Yes.

5          THE COURT:  And does it make sense to you that you

6  have to judge this case based on the facts and the law and not

7  be concerned about rising healthcare costs or doctors being sued

8  for malpractice which has absolutely nothing to do with this

9  case?

10          PROSPECTIVE JUROR RICKERT:  Yes.

11          THE COURT:  Okay.  Based on what you've heard so far,

12  do you think you could be fair to the Kuipers and fair to

13  Givaudan?

14          PROSPECTIVE JUROR RICKERT:  Yes, I do.

15          THE COURT:  Have you ever filed a lawsuit?

16          PROSPECTIVE JUROR RICKERT:  No.

17          THE COURT:  Now, with all due respect to the last

18  juror who I excused, she claimed she was in a situation where

19  she parked legally, somebody hit her car, and she was still held

20  responsible.  That's legally impossible because you have to be

21  negligent in order to be held responsible.  And if you're

22  legally parked somewhere, by definition you couldn't be

23  negligent.  So can you appreciate that while she had this very

24  strong opinion and view there are probably more facts than what

25  she let on to it?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ  Document 402  Filed 06/09/09  Page 126 of 223

```
 1              PROSPECTIVE JUROR RICKERT:  Yes.
 2              THE COURT:  And do you realize how important it is to
 3    know all of the facts before you reach a judgment in the case?
 4              PROSPECTIVE JUROR RICKERT:  Yes.
 5              THE COURT:  Can you pronounce your name for us, our
 6    last juror there sitting --
 7              PROSPECTIVE JUROR BESCHORNER:  Spell?
 8              THE COURT:  Can you pronounce it for me?
 9              PROSPECTIVE JUROR BESCHORNER:  Beschorner.
10              THE COURT:  Okay.  Can you hold that microphone up a
11    little higher?
12              PROSPECTIVE JUROR BESCHORNER:  Beschorner.
13              THE COURT:  Is it Miss or Mrs.?
14              PROSPECTIVE JUROR BESCHORNER:  Mrs.
15              THE COURT:  Okay.  Mrs. Beschorner, what are your
16    feelings in general about damages in civil cases?  Do you have
17    any general sense of it?
18              PROSPECTIVE JUROR BESCHORNER:  No.  I think the courts
19    are generally fair.
20              THE COURT:  Okay.  I'm not sure that microphone is on.
21    Can you check to see that light is on?  It's on?  Sometimes the
22    batteries run out.
23              PROSPECTIVE JUROR BESCHORNER:  No, I think the courts
24    are generally fair.
25              THE COURT:  Okay.  And do you think you could be fair
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov

Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 127 of 223
to purchase a complete copy of the transcript.

1   in this case to both sides?

2           PROSPECTIVE JUROR BESCHORNER:  I think so.

3           THE COURT:  Do you think you bring a view that favors

4   either the Kuipers or Givaudan, or do you think you come into

5   this case pretty even, pretty neutral?

6           PROSPECTIVE JUROR BESCHORNER:  Pretty even.

7           THE COURT:  And do you think you'd have a difficult

8   time basing your judgment solely on the evidence that's

9   presented in court and on my written jury instructions?

10          PROSPECTIVE JUROR BESCHORNER:  No.

11          THE COURT:  Okay.  Thank you.

12          Mr. McClain?

13          MR. MCCLAIN:  Yes, Your Honor.

14          Mr. Loutsch.

15          PROSPECTIVE JUROR LOUTSCH:  Loutsch.

16          MR. MCCLAIN:  Loutsch?

17          PROSPECTIVE JUROR LOUTSCH:  Yes, sir.

18          MR. MCCLAIN:  You had your hand up regarding the issue

19   regarding damages.  Is it -- tell me -- tell me why you had your

20   hand up.

21          PROSPECTIVE JUROR LOUTSCH:  In general, as I told the

22   judge earlier, that there's just instances that I thought they

23   were excessive and no in particular case or . . .

24          MR. MCCLAIN:  But do you -- recognizing that

25   particular cases have caught your attention without going into

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 128 of 223

1  all the details about the cases that we've talked about, do you

2  think that there should be some cap on damages?

3        PROSPECTIVE JUROR LOUTSCH:  I think you have to base

4  that on the case.

5        MR. MCCLAIN:  Okay.  And what do you mean by that?

6        PROSPECTIVE JUROR LOUTSCH:  As to what the evidence,

7  et cetera, is brought forth through the process of the trial.

8        MR. MCCLAIN:  Well, let me just test what you mean by

9  that if I can.  Could you in an appropriate case award millions

10  of dollars if the evidence and the law justified it?

11        PROSPECTIVE JUROR LOUTSCH:  If they justified it, yes.

12        MR. MCCLAIN:  Okay.  And is there something that you

13  come in with that -- say that a case involving personal injury

14  couldn't justify those kinds of damages?

15        PROSPECTIVE JUROR LOUTSCH:  Not without hearing as to

16  what is going to be brought.

17        MR. MCCLAIN:  So in your mind those could be awarded

18  by you in a case.

19        PROSPECTIVE JUROR LOUTSCH:  Depending upon the

20  evidence and the facts brought forward, yes.

21        MR. MCCLAIN:  Okay.  Fair.  What about the punitive

22  damage question?

23        PROSPECTIVE JUROR LOUTSCH:  Oh, basically the same

24  thing.  As to what evidence and -- is brought forward through

25  the process of the trial.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 129 of 223

 1          MR. MCCLAIN:  Well, the Court's going to tell you, you

 2    know, what the law is about who can get punitive damages and why

 3    they should be awarded and the purpose for them and a number of

 4    other things that you'll have to consider.  But the question I

 5    have is do you think that punitive damages serve a purpose in

 6    our society?

 7          PROSPECTIVE JUROR LOUTSCH:  Well, yeah.  It's a

 8    process as the judge was saying earlier to what -- what I guess

 9    responsibility they bear.

10          MR. MCCLAIN:  Sure.

11          PROSPECTIVE JUROR LOUTSCH:  In the process.

12          MR. MCCLAIN:  Sure.  We talk a lot about personal

13    responsibility, but do you believe that there is a corporate

14    responsibility, that corporations do have a responsibility to

15    act reasonably and for the good of all of us?

16          PROSPECTIVE JUROR LOUTSCH:  Yes, they do.

17          MR. MCCLAIN:  Okay.  And when they don't, do you

18    believe that punitive damages serve a valid purpose to make

19    companies do what they ought to do?

20          PROSPECTIVE JUROR LOUTSCH:  Yes, I do.

21          MR. MCCLAIN:  Okay.  That's all I had, Mr. Loutsch.  I

22    did have one other thing as long as I'm here, and that is what

23    did you go to Dr. Bainbridge about?

24          PROSPECTIVE JUROR LOUTSCH:  I had a farm accident, and

25    I had some surgery, et cetera, and I had some respiratory

1  problems.

2      MR. MCCLAIN:  I see.  Did you like the treatment and

3  care that Dr. Bainbridge gave you?  I mean, were you satisfied

4  with it?

5      PROSPECTIVE JUROR LOUTSCH:  Yes.

6      MR. MCCLAIN:  Okay.  Now -- so let me come back to

7  this.  And I'm pleased that it was good, and Dr. Bainbridge is a

8  fine fellow, no question about that.  But the question is -- and

9  I know it was a while ago.  But you kind of have a reservoir of

10  good feeling towards Dr. Bainbridge from what I'm hearing from

11  you.  Am I right?

12      PROSPECTIVE JUROR LOUTSCH:  No.

13      MR. MCCLAIN:  No?

14      PROSPECTIVE JUROR LOUTSCH:  As a doctor, that's all I

15  knew the man.

16      MR. MCCLAIN:  Okay.  And so when he comes, it's not

17  going to be a situation or if he comes -- I don't know whether

18  he'll come or not.  Maybe we'll call him.  But the question is

19  when he comes, no matter which side calls him in this case, if

20  any side calls him, because he was one of the treating

21  physicians that Mr. Kuiper saw in this case, are you going to be

22  able to set your experience to one side or the other, or do you

23  think that your experience will somehow come into play in terms

24  of judging what he says or what he doesn't say?

25      PROSPECTIVE JUROR LOUTSCH:  I don't think it will have

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 131 of 223

1    any effect on it at all.

2         MR. MCCLAIN:  All right.  Thank you very much.  I

3    appreciate it.

4         Was there anyone else who had their hand up on this

5    damage question who hasn't been asked a question yet?  Don't

6    be -- I know that we've had a lot of questions, but it really is

7    an important question in the case.  And so if someone's holding

8    back because you don't want to be grilled, I promise to be easy.

9    Anybody else?

10        All right.  Has anyone -- some of you -- I made some

11   kind of cryptic notes.  But has anyone become aware of lawsuits

12   or litigation that have involved butter flavor and injury to

13   lungs?  Mr. Storm, you have.  Anyone else on the panel?  Mr. --

14   I'm going to mess it up again.

15        PROSPECTIVE JUROR LOUTSCH:  Loutsch.

16        MR. MCCLAIN:  Loutsch.  I was going to say Loutsch

17   again.  I knew that was wrong.  Loutsch.  And I'm sorry.

18   You're --

19        PROSPECTIVE JUROR RICKERT:  Rickert.

20        MR. MCCLAIN:  -- Mr. Rickert.  Without really asking

21   you what you heard because we'll then be chasing down all that,

22   Mr. Rickert, how much or how many articles have you read on the

23   issue?

24        PROSPECTIVE JUROR RICKERT:  Just a couple.

25        MR. MCCLAIN:  Just a couple?  Anything that you read

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 132 of 223

1  in those articles, have they -- were they persuasive enough to

2  make you make your mind up about the whole issue of butter

3  flavor and what effect it has on lungs or Givaudan and what they

4  knew and when they knew it, those kind of issues that we're

5  going to discuss in this case?

6        PROSPECTIVE JUROR RICKERT:  No.

7        MR. MCCLAIN:  Do you think you can put aside whatever

8  it is you read in that article or couple articles and judge the

9  case based on the evidence that we bring you in the court from

10 the witness stand and the instructions that the Court gives you

11 about the law?

12       PROSPECTIVE JUROR RICKERT:  Sure.

13       MR. MCCLAIN:  You think you can do that?

14       PROSPECTIVE JUROR RICKERT:  Yes.

15       MR. MCCLAIN:  All right.  Thank you.

16       Mr. Loutsch?  How many articles have you read?

17       PROSPECTIVE JUROR LOUTSCH:  A couple.

18       MR. MCCLAIN:  And probably the same couple articles

19 that Mr. Rickert read.  Were they important enough to you that

20 you think that they have colored your view of this issue before

21 you come into the case, or do you think you can set those aside

22 and decide the case based on the evidence that you hear in the

23 case?

24       PROSPECTIVE JUROR LOUTSCH:  I think I can base it on

25 the evidence.  And the articles that I read I guess was out of

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 133 of 223

1    Jasper, Missouri, and I have no idea who the chemical was

2    supplied by.  And I do some trucking part time.

3          MR. MCCLAIN:  Trucking?

4          PROSPECTIVE JUROR LOUTSCH:  Yes, sir.

5          MR. MCCLAIN:  Yes.

6          PROSPECTIVE JUROR LOUTSCH:  And I had picked some

7    product up from that place is what caught my attention on it

8    actually.

9          MR. MCCLAIN:  Jasper Popcorn Company, you've had some

10   dealings with that company.

11         PROSPECTIVE JUROR LOUTSCH:  I have picked product up

12   at that one time I did, yes.

13         MR. MCCLAIN:  Did you know anybody from that microwave

14   popcorn plant?

15         PROSPECTIVE JUROR LOUTSCH:  I did not.

16         MR. MCCLAIN:  Did you know any of the workers that

17   were injured from that plant?

18         PROSPECTIVE JUROR LOUTSCH:  I did not.

19         MR. MCCLAIN:  Okay.  But you simply read the story

20   because you were familiar with where that was.  You'd picked

21   product up.

22         PROSPECTIVE JUROR LOUTSCH:  Yes, sir.

23         MR. MCCLAIN:  Okay.  Well, you're going to hear about

24   the Jasper Popcorn plant in this case, and I'm not going to go

25   into details, but it is an issue in the case in terms of

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 134 of 223

1  discovery of the illness, and some of the people that were

2  involved, in fact, are going to testify here.

3         Now, knowing that, do you think you can set aside

4  whatever it was you read about the Jasper Popcorn incident and

5  decide this case based on Mr. Kuiper's exposure at American Pop

6  Corn Company?

7         PROSPECTIVE JUROR LOUTSCH:  I think so.

8         MR. MCCLAIN:  Okay.  How strongly do you think so?

9         PROSPECTIVE JUROR LOUTSCH:  Quite strongly.

10        MR. MCCLAIN:  Okay.  Thank you.  Anything else from

11  the articles you read that you think might impact your ability

12  to be fair and impartial to both sides in the case?

13        PROSPECTIVE JUROR LOUTSCH:  I don't believe so.

14        MR. MCCLAIN:  Just to put a fine point on it if I can.

15        PROSPECTIVE JUROR LOUTSCH:  Yes, sir.

16        MR. MCCLAIN:  Sitting here right now, do I have

17  anything to worry about you being a juror in the case?

18        PROSPECTIVE JUROR LOUTSCH:  I would think not.

19        MR. MCCLAIN:  And does Mr. Pagliaro for the defendant

20  have anything to worry from you in terms of making your mind up

21  in this case?

22        PROSPECTIVE JUROR LOUTSCH:  I think not either.

23        MR. MCCLAIN:  Thank you, Mr. Loutsch.

24        Mr. Storm, you raised your hand regarding this issue.

25  How many articles -- how many articles did you read?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 135 of 223

```
 1          PROSPECTIVE JUROR STORM:  I don't even remember any
 2   articles or whether I heard it on the news.  I just remember
 3   having some general knowledge about this topic.
 4          MR. MCCLAIN:  Okay.  And do you think that whatever it
 5   was you've read or the general knowledge that you've had, do you
 6   think that you're in a -- you have the ability to set that aside
 7   and judge this case based upon the evidence that you hear in the
 8   court and the Court's instructions on the issues?
 9          PROSPECTIVE JUROR STORM:  Yes.
10          MR. MCCLAIN:  Anything that stands out in your mind
11   about that -- those articles or the general knowledge that you
12   read that you're going to have to fight against as you sit here?
13          PROSPECTIVE JUROR STORM:  No.
14          MR. MCCLAIN:  Okay.  Thank you.  Anybody else that has
15   had experience or some contact or exposure to stories about
16   microwave popcorn plants or butter flavor-related injuries?
17          The question that was raised when we had the juror
18   who -- Mr. Reiss I think was his name, anybody here who feels
19   like you had a lawsuit to bring and didn't bring it?  Is there
20   anyone here that feels like you have not brought a lawsuit that
21   you could have brought?  Nobody?  Nobody with that experience?
22          Is there anyone here who has, in fact, brought a civil
23   lawsuit for a personal injury?  Yes.  Ms. --
24          PROSPECTIVE JUROR ROSS:  Ross.
25          MR. MCCLAIN:  -- Ross, Sally Jo Ross, yes, ma'am.
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 136 of 223

1    Tell us about that.

2              PROSPECTIVE JUROR ROSS:  My son was hit by a car when

3    he was seven years old, and we took it to court and weren't real

4    happy with the settlement that he got out of the courts.  But I

5    look at it as, you know, a learning experience.  And then I've

6    also had a work comp. issue on myself.

7              MR. MCCLAIN:  Yes.  And from your questionnaire, I

8    take it that the whole experience regarding your child was

9    unsatisfactory to you?

10             PROSPECTIVE JUROR ROSS:  Yes, it was.

11             MR. MCCLAIN:  And your interaction with the lawyers

12   was bad too?

13             PROSPECTIVE JUROR ROSS:  Yeah, I think the lawyer was

14   the bigger issue in the law case, just the satisfaction, yes.

15             MR. MCCLAIN:  Okay.  Now, only you can answer this

16   issue because as I stand in front of you as a lawyer

17   representing a client, how do you feel about me?

18             PROSPECTIVE JUROR ROSS:  I know nothing about you, so

19   I have no feelings one way or another.

20             MR. MCCLAIN:  Or Mr. Storm who's sitting next to you.

21             PROSPECTIVE JUROR ROSS:  Same thing.

22             MR. MCCLAIN:  Do you think that you can -- you have

23   the ability to set aside the issue involving your own case, or

24   do you think it would be an issue for you in this case?

25             PROSPECTIVE JUROR ROSS:  No.  Actually I'm very open

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 408   Filed 06/09/09   Page 137 of 223

1    minded on this case.

2              MR. MCCLAIN:  Okay.  And does it sound interesting to

3    you?

4              PROSPECTIVE JUROR ROSS:  Yes, it does.

5              MR. MCCLAIN:  And it's something that you'd be willing

6    to sit and listen to and judge fairly on both sides?

7              PROSPECTIVE JUROR ROSS:  Yes.

8              MR. MCCLAIN:  Okay.  Thank you.  I appreciate it.

9              PROSPECTIVE JUROR ROSS:  You're more than welcome.

10             THE COURT:  Would now be a good time to take our noon

11   recess?

12             MR. MCCLAIN:  Sure, sure.

13             THE COURT:  Okay.  And while you have the microphone,

14   Miss Ross, I'm just going to ask you a couple of questions, and

15   then we'll take our recess.  We've heard from some other

16   potential jurors that they think oftentimes damages are too high

17   or excessive in cases that they read about.  Do you think

18   sometimes that settlements or jury awards and verdicts can be

19   too low?

20             PROSPECTIVE JUROR ROSS:  Yes, in some cases I do.  But

21   I think a lot of it has -- depends on -- well, actually not too

22   low.  I think the lawyer portion was too high out of my son's

23   case.

24             THE COURT:  Oh.  You're unhappy with how much money

25   the lawyer took.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 138 of 223

```
 1              PROSPECTIVE JUROR ROSS:  Right.
 2              THE COURT:  Okay.  But are you open to the possibility
 3    that sometimes awards might be too low?
 4              PROSPECTIVE JUROR ROSS:  Anything could happen because
 5    we're all human, so, I mean, it can go either way.  We're all --
 6    you know, we're all out to make errors.  We all make mistakes.
 7    And to say somebody got hurt bad enough, there's no way of
 8    putting a money value to that.
 9              THE COURT:  That's a hard thing to do, isn't it?
10              PROSPECTIVE JUROR ROSS:  It is.
11              THE COURT:  And would you agree that the best any
12    juror could do is listen to the evidence and then make the best
13    judgment they can based on the evidence in this particular case
14    and the law in my instructions?
15              PROSPECTIVE JUROR ROSS:  Yes.
16              THE COURT:  And whether some cases are too high or
17    some are too low, that really doesn't have any bearing on this
18    case, does it?
19              PROSPECTIVE JUROR ROSS:  No, it does not because every
20    case is different.  Everybody is different.  And everyone reacts
21    differently to different things.
22              THE COURT:  Yeah, that's an excellent point, great
23    place to stop.
24              We're going to take just a little over an hour recess.
25    It's almost noon now.  And we're going to come back at 1:10.
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 139 of 223
to purchase a complete copy of the transcript.

1   And everybody needs to remember where you're seated so --
2   particularly the 14 of you.  You need to come back.  The other
3   members of potential jurors, you can come back and basically sit
4   anywhere you want.  And remember not to talk among yourselves
5   about this case or let anybody talk to you about it.  And we'll
6   see you back here at 1:10.  And we'll keep going till we get our
7   jury selected.  Thank you.
8            (The jury venire exited the courtroom.)
9            THE COURT:  Counsel, anything -- I think all the
10  jurors are almost out now.  Anything we need to chat about?
11           MR. PAGLIARO:  I don't think so, Judge.
12           THE COURT:  Okay.  Thank you.  See you back at 1:10.
13           (Lunch recess at 11:58 a.m.)
14           THE COURT:  Thank you, Nick.
15           Everybody please be seated.
16           And, Mr. McClain, you may continue with your jury
17  selection questioning.
18           MR. MCCLAIN:  Good afternoon, ladies and gentlemen.
19  We'll pick up kind of where we were.  I have some specific
20  questions that I want to ask that came out of your
21  questionnaires, and I'll try to be very brief when I do it, but
22  I just needed some clarification on some of these points where
23  you answered the questions that probably didn't give you enough
24  room to answer.
25           Mr. Woodward, you work at Tyson; is that right?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 140 of 223

```
 1              THE COURT:  Can we pass the microphone all the way

 2   down to the end, please, in the back row?  Woop.  We don't have

 3   a CSO.  Oh, thank you so much.  We're going to get you one of

 4   those blue blazers and an earphone now.

 5              PROSPECTIVE JUROR MEINEN:  Good.

 6              THE COURT:  Thank you.

 7              PROSPECTIVE JUROR WOODWARD:  Yes, I do, sir.

 8              MR. MCCLAIN:  You mentioned some things about safety

 9   and your views on worker safety.  What do you think about

10   workers suing companies that supply chemicals to their places of

11   employment?  Do you have any thoughts about that?

12              PROSPECTIVE JUROR WOODWARD:  Not really I guess, I

13   mean.  We're basically trained through our MSDS sheets on how to

14   use them properly.

15              MR. MCCLAIN:  Right.  And that may be an issue in this

16   case regarding the MSDS sheets and whether the MSDS sheets

17   contained all the information that the company knew about,

18   Givaudan, that is, about the risks of this butter flavor and its

19   ingredients.  What has been your training in regards to MSDS

20   sheets?

21              PROSPECTIVE JUROR WOODWARD:  Basically we're trained

22   on their hazards, proper safety equipment to wear, medical

23   treatment if you're exposed to certain toxics or whatever.

24              MR. MCCLAIN:  And is all that stuff supposed to be on

25   the MSDS sheet?
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ  Document 400   Filed 06/09/09   Page 141 of 223

1          PROSPECTIVE JUROR WOODWARD:  Yes, sir.

2          MR. MCCLAIN:  And you follow those sheets?

3          PROSPECTIVE JUROR WOODWARD:  Yes.

4          MR. MCCLAIN:  Now, I suspect that Tyson has their own

5     safety department; is that right?

6          PROSPECTIVE JUROR WOODWARD:  Yes, they do.

7          MR. MCCLAIN:  But you still have to rely on what the

8     manufacturers of the chemicals tell you about those chemicals;

9     is that right?

10         PROSPECTIVE JUROR WOODWARD:  Yes.

11         MR. MCCLAIN:  At Tyson is that the way it works?

12         PROSPECTIVE JUROR WOODWARD:  Yes.

13         MR. MCCLAIN:  Okay.  You mentioned here some -- you

14    know, kind of the same idea that Ms. Ross expressed earlier

15    about the legal system and maybe lawyers end up with too much of

16    the settlements.  Does that impact your view of this case or

17    damages in this case at all?

18         PROSPECTIVE JUROR WOODWARD:  Not really, no.

19         MR. MCCLAIN:  Tell me more about what you were

20    thinking.

21         PROSPECTIVE JUROR WOODWARD:  Well, I've seen some

22    people that have been injured on the job, some of their

23    testimonies on different -- part of our Tyson safety program

24    stuff, and on certain cases the -- even though there's a large

25    settlement or whatever, the amount of money that the individual

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 142 of 223

1   does get on this one particular case was not sufficient or -- in

2   my mind was not sufficient or whatever.

3            MR. MCCLAIN:  What do you feel about damages?  Are you

4   concerned about damage caps or punitive damages at all?

5            PROSPECTIVE JUROR WOODWARD:  Not really, no.

6            MR. MCCLAIN:  You think you would be able to follow

7   the Court's instruction on those issues and award --

8            PROSPECTIVE JUROR WOODWARD:  Yes, sir.

9            MR. MCCLAIN:  -- an amount that was justified by the

10  evidence and the law in this case?

11           PROSPECTIVE JUROR WOODWARD:  Yes, sir.

12           MR. MCCLAIN: Okay.  All right.  Thank you.  I

13  appreciate it, Mr. Woodward.

14           Ms. Jensen -- Jessen, I'm sorry, a couple things I

15  wanted to ask you about.  You say you watch The O'Reilly Factor.

16  And sometimes I do too, you know, and it's very entertaining.

17  But sometimes he says a lot of things about lawsuits and the

18  legal system and judges and all kinds of things.  Tell me,

19  what -- how does -- how do those opinions strike you?  What do

20  you -- not to say there's anything wrong with the opinions, but

21  they're very strong opinions about the legal system and various

22  views that he expresses on that show.  What are your views on

23  that subject?

24           PROSPECTIVE JUROR JESSEN:  I don't think he really --

25  I think he's fair and balanced.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 143 of 223

1            THE COURT:  I don't think the microphone's on.  I'm

2    sorry.  It's hard to tell when you're speaking, but we can tell.

3            PROSPECTIVE JUROR JESSEN:  Okay.  Hello.

4            THE COURT:  Thank you.

5            PROSPECTIVE JUROR JESSEN:  You know, he has his views

6    like everybody else does or whatever, but I take it with a grain

7    of salt.

8            MR. MCCLAIN:  Well, you said you think he's fair and

9    balanced, and I guess that's the -- that's the catch phrase for

10   the show.  But, you know, he does have some pretty strong

11   opinions about judges and, you know, they follow judges around

12   and all kinds of things.  What do you think about all that?

13           PROSPECTIVE JUROR JESSEN:  Well, if -- you know, maybe

14   they should be followed around.  Maybe they didn't do what they

15   were supposed to do.

16           MR. MCCLAIN:  Tell me about that.  What do you mean?

17   Because it's a frequent thing.  It's kind of a feature on the

18   show when I've tuned in.  At least once a week they'll be

19   following a judge or someone around with a microphone.

20           PROSPECTIVE JUROR JESSEN:  Well, a lot of times it's

21   because, you know, a perpetrator of a child or something, they

22   let it go and not, you know, brought them up to charges or

23   whatever.

24           MR. MCCLAIN:  And also sometimes they'll be talking

25   about verdicts and he'll be taking off about a large verdict

1 somewhere involving a civil damage case. I've seen those. Have

2 you seen those?

3        PROSPECTIVE JUROR JESSEN: Not that I -- you know,

4 stays in my mind.

5        MR. MCCLAIN: Nothing stays in your mind on that?

6 Because you said here that damages are occasionally too large.

7 What did you mean by that?

8        PROSPECTIVE JUROR JESSEN: Well, I think just like how

9 everybody thinks. It's like millions of dollars is a lot of

10 money.

11        MR. MCCLAIN: Okay.

12        PROSPECTIVE JUROR JESSEN: And a lot of people do, you

13 know, get those kind of settlements.

14        MR. MCCLAIN: Well --

15        THE COURT: Mr. McClain, could I interrupt you for a

16 second?

17        MR. MCCLAIN: Yes.

18        THE COURT: It just dawned on me there's something I

19 wanted to ask some of the jurors. And, Miss Jessen, I'll pick

20 on you because you have the microphone.

21        MR. MCCLAIN: Do you want me to sit down?

22        THE COURT: No, no. It will just take a second. The

23 last two weeks I was in a patent trial between two large

24 corporations, major national insurance companies. And after

25 hearing all the evidence, the jury awarded 13 million dollars in

1  damages.  Was that too high or too low or just right?

2          PROSPECTIVE JUROR JESSEN:  Sounds like a lot of money

3  to me, but like I say, I don't know what all -- what all went on

4  either.

5          THE COURT:  So unless you heard all the evidence, you

6  really wouldn't be able to tell whether it was too high or too

7  low or just right.

8          PROSPECTIVE JUROR JESSEN:  Right.

9          THE COURT:  And it sounds like a lot of money.

10          PROSPECTIVE JUROR JESSEN:  Yeah.

11          THE COURT:  Right?

12          PROSPECTIVE JUROR JESSEN:  Uh-huh.

13          THE COURT:  But it might be less than the plaintiff

14  insurance company actually deserved; right?  Could be.

15          PROSPECTIVE JUROR JESSEN:  Yep.

16          THE COURT:  So would you agree with me that every case

17  is different and we have to base the judgment as jurors on the

18  facts presented in that particular case?

19          PROSPECTIVE JUROR JESSEN:  Right.

20          THE COURT:  And 13 million dollars is a lot of money,

21  but depending on the claims, it might not have been -- I'll tell

22  you this.  The defendant was disappointed, and so was the

23  plaintiff.

24          PROSPECTIVE JUROR JESSEN:  Okay.

25          THE COURT:  They went back to their respect -- the

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 146 of 223

1  lawyers all went back to their respective states, and they were

2  both disappointed.  The defendant was disappointed because they

3  lost.  The plaintiff was disappointed because they didn't win

4  nearly as much as they thought they would have.  So it's all a

5  relative concept, isn't it?

6          PROSPECTIVE JUROR JESSEN:  Right.

7          THE COURT:  Okay.  Thank you.  Excuse me.

8          MR. MCCLAIN:  Well, that was really helpful.  Thank

9  you, Judge.

10         But here's the question.  You know, you mention that

11 13 million sounded a lot to you.  Do you have a number in your

12 mind that you couldn't go above in a personal injury case?

13         PROSPECTIVE JUROR JESSEN:  No.

14         MR. MCCLAIN:  Or below.

15         PROSPECTIVE JUROR JESSEN:  No.

16         MR. MCCLAIN:  I mean --

17         PROSPECTIVE JUROR JESSEN:  Depending on what happened.

18         MR. MCCLAIN: Okay.  All right.  Or what about --

19         PROSPECTIVE JUROR JESSEN:  You know, or what their

20 future is.

21         MR. MCCLAIN:  Right.

22         PROSPECTIVE JUROR JESSEN:  How their life is going to

23 be after what happened or . . .

24         MR. MCCLAIN:  Sure.

25         PROSPECTIVE JUROR JESSEN:  You know, quality of life I

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 147 of 223

1   guess.

2          MR. MCCLAIN:  Tell me about your feelings about

3   punitive damages.  What -- do you have feelings about punitive

4   damages?

5          PROSPECTIVE JUROR JESSEN:  Sometimes they're

6   justified.

7          MR. MCCLAIN:  What would be instances where you would

8   think you were justified?

9          PROSPECTIVE JUROR JESSEN:  Well, maybe if there was a

10  death, I mean, you know, and you've lost a loved one or

11  something like that.  I know you never can replace that, but,

12  you know, a lot of times money does help you be able to go on.

13         MR. MCCLAIN:  Well, and maybe I'm not clear about

14  this, and I don't want to get too far into it.  I'm just trying

15  to probe whether you have fixed opinions on this.  As an

16  example, if the Court's instructions say that if a company

17  involves an intentional conduct, that is, they intentionally try

18  to do things that are wrong and that you can award punitive

19  damages to stop them from doing that in the future, is that

20  something that you would be willing to do in a case?

21         PROSPECTIVE JUROR JESSEN:  Yes.

22         MR. MCCLAIN:  Okay.

23         PROSPECTIVE JUROR JESSEN:  Yes.

24         MR. MCCLAIN:  All right.  Thank you.  I appreciate it.

25  That was helpful.  I'm sorry.  I didn't mean to put you on the

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ  Document 409  Filed 06/09/09  Page 148 of 223

1    spot.

2         Miss -- I can't say your name, Miss Schieuer.

3         PROSPECTIVE JUROR SCHIEUER:  Schieuer.

4         MR. MCCLAIN:  I'm going to write that so I don't do

5    that again in a while that I'll try to remember it.  What

6    accident -- what kind of an accident was your nephew in that --

7         PROSPECTIVE JUROR SCHIEUER:  It was a construction

8    accident where a beam fell on his back and broke his back.

9         MR. MCCLAIN:  And was there some litigation involved?

10        PROSPECTIVE JUROR SCHIEUER:  It's still an ongoing

11   thing.

12        MR. MCCLAIN:  I see.  I see.  And did you -- you

13   didn't raise your hand, I didn't think, about reading something

14   about butter flavor.  But in your questionnaire there seemed to

15   be an indication that you have read or heard something about

16   butter flavor and butter flavor lawsuits?

17        PROSPECTIVE JUROR SCHIEUER:  I just -- I don't even

18   know.  I just vaguely heard there was something with that in the

19   courts, but I didn't really read or comprehend what it was.

20        MR. MCCLAIN:  And so it's not an issue that's weighing

21   upon you currently.

22        PROSPECTIVE JUROR SCHIEUER:  Nope.

23        MR. MCCLAIN:  Okay.  What about this -- you stated

24   that in regard to litigation it has added too much additional

25   burden on small business owners?  What does that mean?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 149 of 223
to purchase a complete copy of the transcript.

1    PROSPECTIVE JUROR SCHIEUER:  I guess I was thinking of

2    because we did run and still do run a very small woodworking

3    business, of all the safety requirements that are -- that are

4    required of us, that a small business like ours, it's hard to

5    bring everything up to the code that they want.  It puts an

6    extra financial burden on us.

7         MR. MCCLAIN:  So that's what you had in mind?  Now,

8    you're going to be hearing in this case about regulations,

9    health and safety regulations, OSHA, NIOSH, that involve this

10   case.  What do you think about situations where a company is

11   manufacturing flavorings and they're being used in food and

12   other things?  Are you concerned that they are not regulated

13   enough, they are too regulated, or do you have any opinion at

14   all?

15        PROSPECTIVE JUROR SCHIEUER:  I don't have any opinion

16   on that because I don't know enough about it.

17        MR. MCCLAIN:  Now, are you concerned that litigation

18   like this that we're involved in where we have my client,

19   Mr. Kuiper, with a serious lung injury bringing suit against a

20   chemical manufacturer, is that a case that you think that you

21   would be interested in sitting on and you would be fair to both

22   sides?

23        PROSPECTIVE JUROR SCHIEUER:  I could be fair, yes.

24        MR. MCCLAIN:  And not worry about its impact in terms

25   of the business cycle or --

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 150 of 223

1                    PROSPECTIVE JUROR SCHIEUER:  No, no.

2                    MR. MCCLAIN:  Okay.  Thank you.  I appreciate it.

3                    Miss Meinen, did you have -- you have some geology

4        background; is that right?

5                    PROSPECTIVE JUROR MEINEN:  Yes, I do.

6                    MR. MCCLAIN:  And what -- did you ever work in that

7        field?

8                    PROSPECTIVE JUROR MEINEN:  No.

9                    MR. MCCLAIN:  What about your association with the

10       hospital, McKennan Hospital?

11                   PROSPECTIVE JUROR MEINEN:  Yes, I work at Avera

12       Behavioral Health Hospital in Sioux Falls.

13                   MR. MCCLAIN:  What is it that you do?

14                   PROSPECTIVE JUROR MEINEN:  I'm a behavioral health

15       technician.  I assist nurses in taking care of psychotic and

16       suicidal patients.

17                   MR. MCCLAIN:  I see.  What is a BHT?

18                   PROSPECTIVE JUROR MEINEN:  That's a behavioral health

19       technician.

20                   MR. MCCLAIN:  I see.  And was your -- your husband was

21       in that field?

22                   PROSPECTIVE JUROR MEINEN:  He was previously in social

23       work.

24                   MR. MCCLAIN:  What -- and now he's in the insurance

25       field.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 151 of 223

```
 1                PROSPECTIVE JUROR MEINEN:  Yes.

 2                MR. MCCLAIN:  What insurance company is he associated

 3     with?

 4                PROSPECTIVE JUROR MEINEN:  He sells home warranty

 5     insurance.

 6                MR. MCCLAIN:  Okay.

 7                PROSPECTIVE JUROR MEINEN:  Mostly to realtors.

 8                MR. MCCLAIN:  I see.  All right.  Thank you.  I

 9     appreciate it.

10                Ms. Beschorner, you work at Terra?

11                PROSPECTIVE JUROR BESCHORNER:  No, my husband.

12                MR. MCCLAIN:  Your husband works at Terra, okay.  And

13     every year out there he has a yearly breathing test for ammonia

14     work.  What does he do with ammonia at Terra?

15                PROSPECTIVE JUROR BESCHORNER:  Well, they make

16     ammonia.

17                MR. MCCLAIN:  Right.

18                PROSPECTIVE JUROR BESCHORNER:  He's a plant operator

19     and a tech 5.

20                MR. MCCLAIN:  Okay.  So he's actually exposed to

21     ammonia, and they have to test his blood every year to be sure

22     that he's --

23                PROSPECTIVE JUROR BESCHORNER:  Well, they have all

24     kinds of safety things.  I can't tell you exactly what.

25                MR. MCCLAIN:  All right.  And was there some kind of
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 152 of 223

1  an accident there in the last several years?

2          PROSPECTIVE JUROR BESCHORNER:  Not several.  I think

3  15 years ago it blew up.

4          MR. MCCLAIN:  And was your husband there at that time?

5          PROSPECTIVE JUROR BESCHORNER:  No.  He was supposed to

6  be, but they let him off that night.  He was in the next

7  morning.

8          MR. MCCLAIN:  That was fortunate.  Do you have any

9  feelings about a case against a chemical company like Givaudan

10  who sells butter flavors and other things to American Pop Corn?

11          PROSPECTIVE JUROR BESCHORNER:  No.

12          MR. MCCLAIN:  Because of your husband working with

13  chemicals?

14          PROSPECTIVE JUROR BESCHORNER:  No.

15          MR. MCCLAIN:  Do they have a whole safety procedure

16  out there?

17          PROSPECTIVE JUROR BESCHORNER:  Oh, yes.

18          MR. MCCLAIN:  At Terra?

19          PROSPECTIVE JUROR BESCHORNER:  Yes.

20          MR. MCCLAIN:  And does he receive training?

21          PROSPECTIVE JUROR BESCHORNER:  They're constantly I

22  think reworking that and rewriting it.

23          MR. MCCLAIN:  And they have their own safety

24  department there.

25          PROSPECTIVE JUROR BESCHORNER:  Yes.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ  Document 400  Filed 06/09/09  Page 153 of 223

                    MR. MCCLAIN:  Now, you mentioned -- and I can't

1  remember whether you raised your hand -- regarding newspaper

2  articles about butter flavor.  Did --

3                    PROSPECTIVE JUROR BESCHORNER:  It just seems two,

4  three years ago there was some -- something about it, but what I

5  couldn't tell you.

6                    MR. MCCLAIN:  Okay.

7                    PROSPECTIVE JUROR BESCHORNER:  Just kind of --

8                    MR. MCCLAIN:  Just kind of lingers back there.

9                    PROSPECTIVE JUROR BESCHORNER:  Yeah.

10                   MR. MCCLAIN:  Okay.  Thank you.  I appreciate it.

11                   Mr. Rickert, I had a question to follow up with you

12 on.  You know Gary Smith out at American Pop Corn?

13                   PROSPECTIVE JUROR RICKERT:  Yes.

14                   MR. MCCLAIN:  Have you ever talked to him about butter

15 flavor and injuries to his workers?

16                   PROSPECTIVE JUROR RICKERT:  No.

17                   MR. MCCLAIN:  When you were asked about litigation,

18 you said not all litigation is good.  Only real winners are the

19 lawyers.  Tell me what you were thinking about and what impact

20 that has on you in terms of your viewpoint.

21                   PROSPECTIVE JUROR RICKERT:  My thought process in that

22 was that it -- and it's kind of been voiced already.  It seems

23 like when -- again, you gotta hear the -- what framework that

24 most people hear settlements is in what comes out in the press

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 154 of 223

1    on the one side and the dollar amounts and so forth.  You don't

2    hear any of the background that went on within the court system

3    and the facts that came out and so forth.  So you get probably

4    an unfair predetermined opinion as to what was awarded.

5          But then you hear about the dollars that went to the

6    attorneys involved and what the -- either the plaintiff or what

7    they actually physically got as part of that settlement as being

8    a smaller part of that settlement, so that was kind of the

9    foundation of that comment.

10          MR. MCCLAIN:  Well, tell me how you feel about that

11   because I -- at some point if you're on this jury, you know,

12   you're going to be asked to award money or not.  And what will

13   you be thinking about at that time in terms of how it's going to

14   be divided up if it is divided up and what impact that will have

15   on your decision making?

16          PROSPECTIVE JUROR RICKERT:  I mean, I guess as a

17   potential juror, I would want to weigh all of the facts as to

18   how the numbers are arrived at and what is awarded.  You know, I

19   guess I don't know how to measure what's fair and for the

20   lawyers that brought that to them, whether they would have

21   received nothing had they not had that whereas the value that

22   they brought to the plaintiff.  I don't know how I would measure

23   that.  I guess if it would seem it was three-quarters of the

24   settlement in my mind I would say that's probably too high, that

25   the attorneys got three-quarters of the settlement based on what

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 155 of 223

```
 1   I heard.  The facts were that somebody was found guilty and they
 2   paid, but did the right people receive the benefit?
 3           MR. MCCLAIN:  And so that's going to be an issue that
 4   will -- is a lingering issue for you when you're thinking about
 5   lawsuits and what damages to award.  Is that -- is that a fair
 6   characterization?
 7           PROSPECTIVE JUROR RICKERT:  In my mind I just -- I
 8   just want it to seem fair.
 9           MR. MCCLAIN:  I understand.  But, you know, it's --
10   you may not get to decide that issue.  That may not be something
11   that the Court asks you to decide in terms of who gets what, in
12   terms of attorneys' fees or who -- splits of things.  That may
13   not be something that you're here to decide.  But that is going
14   to be something that you will want to know about; right?
15           PROSPECTIVE JUROR RICKERT:  I guess out of my own
16   cur -- I mean, if you want to know how -- if you say, okay,
17   we're going to award X amount of dollars whichever direction it
18   goes, out of my own curiosity, you know, how does that get
19   split?  How are these people being treated so I -- how does
20   it --
21           THE COURT:  Mr. McClain -- I'm sorry.  I thought you
22   were done.  I'm sorry.
23           PROSPECTIVE JUROR RICKERT:  No, that's fine.
24           THE COURT:  Can I jump in here?
25           MR. MCCLAIN:  Sure.
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 156 of 223

1          THE COURT:  Let me just tell you this.  Jurors never

2     in civil cases get involved in the relationship between the

3     clients and the attorney either on the plaintiff side or on the

4     defense side with regard to how they're being compensated, why,

5     or any of those details.  There are procedures in place in every

6     state, and there are ethical rules that spell out in great

7     detail what a reasonable fee is, and it's unethical for a lawyer

8     to charge a client more than a reasonable fee.

9          And there are mechanisms in place where if someone

10    were to believe that the fee that they were being charged by a

11    lawyer is too high, there's a method in every jurisdiction to

12    remedy that, and they're very effective methods from my

13    experience.

14         So I appreciate your curiosity.  I'm often curious

15    too.  But there are just some things that aren't really any of

16    your business, and it's not going to come out during the trial.

17    It never comes out during a trial, won't come out after the

18    trial.  Sometimes I get involved in setting what a reasonable

19    fee is, and sometimes I don't, depending upon the type of case.

20    And so that's about as much as I can tell you.

21         There's lots of things we'd like to know that just

22    don't come out based on the rules of evidence and the rules of

23    procedure.  And that's why I keep coming back to this point.

24    You have to make your judgment based on the evidence presented

25    and the law in my instructions.  It's okay to be curious about

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 157 of 223

1    other things.  But we can't let that enter our view of things.

2            For example, you can't say, Well, gee, I think we

3    ought to give the plaintiff a bunch of extra money because we

4    think the lawyers might be getting some of it.  That's not for

5    the jury to decide.  You can only award damages based on what I

6    award -- what I define in my instructions.

7            And on the other hand, you couldn't say, Well, I'm not

8    going to give the plaintiff some money because I'm afraid the

9    lawyers might take too much of it.  That's just the way the

10   system works.  There are lots of safeguards to make sure the

11   fees are reasonable.  And I can almost give you my personal

12   guarantee that if you heard that a lawyer took three-quarters of

13   the fee, that never happens.  Just doesn't happen.  That's part

14   of urban myth.  It really is.  It just -- I guarantee you that

15   doesn't happen.  It just doesn't.

16           PROSPECTIVE JUROR RICKERT:  Thank you.  Your comments

17   shed a lot of light on my concern so . . .

18           THE COURT:  Okay.

19           PROSPECTIVE JUROR RICKERT:  Yeah.

20           THE COURT:  Okay.  Thank you.

21           MR. MCCLAIN:  Thank you, Judge.

22           One other question, Mr. Rickert.  You say that

23   litigation may have caused our state -- cost our state good

24   business.  What did you mean by that?

25           PROSPECTIVE JUROR RICKERT:  I'm not sure at this

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ  Document 409  Filed 06/09/09  Page 158 of 223

1  point.  I don't know if it was questions leading up to that gave

2  me some framework for that answer.  I'm not really sure where I

3  come from on that.

4         MR. MCCLAIN:  Well, do you think that there's

5  something about this process that will damage the business

6  climate here in Sioux City or the surrounding area or Iowa in

7  general?  Is that a concern you have?

8         PROSPECTIVE JUROR RICKERT:  No.

9         MR. MCCLAIN:  Okay.  All right.  Thank you,

10  Mr. Rickert.  I appreciate it.

11        Ms. Green, I don't think we've heard from you yet.

12  But I had a couple questions that came off your questionnaire.

13  You wrote down that damages are often too large.  What did you

14  mean by that?

15        PROSPECTIVE JUROR GREEN:  I guess I was thinking about

16  the McDonald's coffee incident, that -- I guess that's what I

17  was thinking about.

18        MR. MCCLAIN:  Well, I understand.  And as we all have

19  heard, it's crept into our collective consciousness because it

20  received so much -- so much coverage in the media.  But do you

21  think that someone who has substantial lung injuries is entitled

22  to large money damages if the evidence supports that?

23        PROSPECTIVE JUROR GREEN:  If the evidence supported it

24  I suppose.

25        MR. MCCLAIN:  Okay.  You suppose.  Does that mean

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ  Document 402  Filed 06/09/09  Page 159 of 223

1  you're skeptical about it, or does it mean -- what does it mean?

2         PROSPECTIVE JUROR GREEN:  I guess -- I guess I don't

3  know.  I guess it would just have to depend on the evidence --

4         MR. MCCLAIN:  Sure, I understand.

5         PROSPECTIVE JUROR GREEN:  -- in the case.

6         MR. MCCLAIN:  I understand.  And I'm not -- and I know

7  that you can't say for sure.  But when you wrote down that

8  damages are often too large, are you thinking that there should

9  be some kind of caps on them?  Is that something that you

10  thought about and that you couldn't go above some number?

11         PROSPECTIVE JUROR GREEN:  No, I never thought of --

12  actually never thought about that, no, no.

13         MR. MCCLAIN:  The judge talked about this last case

14  that he had and the fact that -- you know, that 12 million

15  dollars sounded like a lot of money, but maybe it wasn't so much

16  money given the facts and circumstance of the case.  You know,

17  if the facts and the evidence and the law required it, could you

18  award money in that kind of range?

19         PROSPECTIVE JUROR GREEN:  If -- yes, I suppose.

20         MR. MCCLAIN:  Okay.  Okay.  You said I suppose.

21         PROSPECTIVE JUROR GREEN:  I mean, if -- if it was

22  warranted, yeah.

23         MR. MCCLAIN:  All right.  Thank you.  I appreciate it.

24  Now one last question, and this may be easier or it may not be

25  easier.  And if it's personal, tell me, and I won't follow up on

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 160 of 223

1    it.  But your daughter has a lung condition currently from your

2    questionnaire; is that correct?

3              PROSPECTIVE JUROR GREEN:  Yes.

4              MR. MCCLAIN:  How long has she had that condition?

5              PROSPECTIVE JUROR GREEN:  I'll say three years.

6              MR. MCCLAIN:  And what are they doing to treat it?

7              PROSPECTIVE JUROR GREEN:  She had a lung biopsy done,

8    and then she was on, I guess, a steroid to help build back up

9    her lungs.  Now she's not on anything, but she does have to see

10   the doctor once a year to make sure that nothing's come back or

11   bothering her.

12             MR. MCCLAIN:  Was it a fungal condition?  Is that --

13             PROSPECTIVE JUROR GREEN:  Yes.

14             MR. MCCLAIN:  It was.

15             PROSPECTIVE JUROR GREEN:  Yes.

16             MR. MCCLAIN:  And what -- did she go to a

17   pulmonologist?

18             PROSPECTIVE JUROR GREEN:  Yes.

19             MR. MCCLAIN:  Do you remember who it was?

20             PROSPECTIVE JUROR GREEN:  But I can't remember his

21   name.  He was from India or something.  I can't remember his

22   name.  I'm sorry.

23             MR. MCCLAIN:  Was it here locally?

24             PROSPECTIVE JUROR GREEN:  Yes, yes.

25             MR. MCCLAIN:  Okay.  And it wasn't one of the names

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 161 of 223

1    that we mentioned.

2            PROSPECTIVE JUROR GREEN:  No, no.

3            MR. MCCLAIN:  All right.  Now, you have a positive

4    opinion about American Pop Corn.  Do you think that this sounds

5    like an interesting case?

6            PROSPECTIVE JUROR GREEN:  Yes, yes.

7            MR. MCCLAIN:  And is it a case that you'd be willing

8    to sit on?

9            PROSPECTIVE JUROR GREEN:  Yes, yes.

10           MR. MCCLAIN:  Now, do you think that you could be fair

11   to Mr. Kuiper and our side and the defendant's side too?

12           PROSPECTIVE JUROR GREEN:  Yes, yes, I do.

13           MR. MCCLAIN:  Well, thank you for letting me ask you

14   those few questions, Ms. Green.  Appreciate it.

15           PROSPECTIVE JUROR GREEN:  Thank you.

16           MR. MCCLAIN:  Mr. Haak, you had -- now, you have a

17   hearing problem?

18           PROSPECTIVE JUROR HAAK:  It's okay with the

19   microphone.

20           MR. MCCLAIN:  You can hear us okay in this kind of

21   setting?

22           PROSPECTIVE JUROR HAAK:  Yes.

23           MR. MCCLAIN:  Okay.  The -- that's good.  I had some

24   questions that came up.  You put down that damages are often too

25   large.  What did you mean by that?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 408   Filed 06/09/09   Page 162 of 223

1        PROSPECTIVE JUROR HAAK:  Just that sounds like a lot

2   of money sometimes, but you don't know the case either, you

3   know.  So it depends on the case.

4        MR. MCCLAIN:  So asking you the same question that,

5   you know, I asked Ms. Green, you know, if the facts and the law

6   warrant it, you could see yourself in a case that would award 13

7   million dollars.

8        PROSPECTIVE JUROR HAAK:  Yes, if the evidence pointed,

9   you know, to that.

10       MR. MCCLAIN:  So that's not out of the realm of

11  possibility in your mind just sitting here now.

12       PROSPECTIVE JUROR HAAK:  No.

13       MR. MCCLAIN:  What did you mean -- you checked several

14  boxes in this, and you agreed with some questions.  And you said

15  that frequently people bring on their own misfortune.  What did

16  you mean by that?

17       PROSPECTIVE JUROR HAAK:  Just that sometimes we have

18  to be responsible for ourselves, you know.  We can't sue

19  companies or people for every little thing that happens.

20  Sometimes it's our own fault too.

21       MR. MCCLAIN:  Okay.  Can you tell me about that in

22  terms of the situation here where we have a worker who has a

23  severe lung injury?  Would you be thinking as we come in that

24  this is probably his fault?

25       PROSPECTIVE JUROR HAAK:  No.  I was thinking more on

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ  Document 402  Filed 06/09/09  Page 163 of 223
to purchase a complete copy of the transcript.

 1   the line of going back to the McDonald's with the hot coffee

 2   again, you know.  She should have been more careful I think, but

 3   that's what I meant by it, not by handling things that you maybe

 4   don't know about or something, you know.

 5          MR. MCCLAIN:  Okay.  Tell me about your thinking about

 6   how this works.  Do companies have any responsibility in your

 7   view of things?

 8          PROSPECTIVE JUROR HAAK:  You mean the manufacturers or

 9   who you work for?

10          MR. MCCLAIN:  Sure, yeah, the manufacturers, people

11   that make chemicals.

12          PROSPECTIVE JUROR HAAK:  They're responsible to tell

13   you the dangers of it, yes.

14          MR. MCCLAIN:  Okay.  And pass on everything they know.

15          PROSPECTIVE JUROR HAAK:  Yeah.

16          MR. MCCLAIN:  And do you think that if the law says so

17   that they ought to be responsible, use that term responsible,

18   when they don't do that?

19          PROSPECTIVE JUROR HAAK:  Well, I think so, yes.

20          MR. MCCLAIN:  And could you sit on a case in which you

21   were trying to decide whether a chemical company was responsible

22   by -- when they shared information with a company and whether

23   they were complete in terms of the information they shared?

24          PROSPECTIVE JUROR HAAK:  Yes.

25          MR. MCCLAIN:  And if they didn't and the law said that

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 164 of 223

1  they ought to be responsible and pay damages when that happened,

2  could you award damages in that circumstance?

3          PROSPECTIVE JUROR HAAK:  Yes, I could.

4          MR. MCCLAIN:  Even if they were large.

5          PROSPECTIVE JUROR HAAK:  The dollar amount wouldn't

6  matter so much I guess but more the responsibility.

7          MR. MCCLAIN:  What about this idea of punitive damages

8  on that point?  Is that something that you feel comfortable in

9  doing?

10         PROSPECTIVE JUROR HAAK:  Depends.  You know, maybe

11  that person can't work anymore.

12         MR. MCCLAIN:  Yes.

13         PROSPECTIVE JUROR HAAK:  Or has a lot of health

14  expense or something like that.

15         MR. MCCLAIN:  Yes.  And what about keeping the company

16  from ever doing this again?  Is that something that you're

17  capable of doing if the law and the facts would require it of

18  you?

19         PROSPECTIVE JUROR HAAK:  Yes.

20         MR. MCCLAIN:  Okay.  Thank you.  I appreciate -- I

21  appreciate your candor and getting a chance to ask you those few

22  questions.  Appreciate it.

23         Mr. Cork.

24         PROSPECTIVE JUROR CORK:  Yes, sir.

25         MR. MCCLAIN:  Now, do you know Mr. Woodward from

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 165 of 223

1  Tyson?

2          PROSPECTIVE JUROR CORK:  No.

3          MR. MCCLAIN:  Yeah, with over 3,000 employees I would

4  guess that it would probably be less likely that you would know

5  one another.  But you're a hog handler?

6          PROSPECTIVE JUROR CORK:  Yes.

7          MR. MCCLAIN:  How long have you done that?

8          PROSPECTIVE JUROR CORK:  Eight years.

9          MR. MCCLAIN:  And is there some safety training that

10  goes on at Tyson?

11          PROSPECTIVE JUROR CORK:   Every six months.

12          MR. MCCLAIN:  Tell me about that.

13          PROSPECTIVE JUROR CORK:  Every six months we go

14  through a hog handling film, and then we gotta fill out a bunch

15  of papers every two or three months.

16          MR. MCCLAIN:  What about breathing hazards --

17          PROSPECTIVE JUROR CORK:  Hazards too.

18          MR. MCCLAIN:  That happens.

19          PROSPECTIVE JUROR CORK:  Yes.

20          MR. MCCLAIN:  Now, do you ever come across what are

21  called MSDS sheets, material safety data sheets?

22          PROSPECTIVE JUROR CORK:  Yes, that's what we fill out.

23          MR. MCCLAIN:  You fill those out.

24          PROSPECTIVE JUROR CORK:  Yeah.

25          MR. MCCLAIN:  And what are they when you fill them

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 166 of 223
to purchase a complete copy of the transcript.

1  out?  We're talking about --

2          PROSPECTIVE JUROR CORK:  Questions you answer.

3          MR. MCCLAIN:  Like a test.

4          PROSPECTIVE JUROR CORK:  Right, right.

5          MR. MCCLAIN:  Like a test that you take.

6          PROSPECTIVE JUROR CORK:  Yes.

7          MR. MCCLAIN:  What I'm talking about is, you know,

8  sometimes when you get chemicals from a company, in fact, every

9  time you're supposed to.  Every time you get chemicals from a

10  company, it has a sheet that lists all of the hazards and all of

11  the dangers and all the protective equipment.  Do you ever see

12  anything like that in your work?

13          PROSPECTIVE JUROR CORK:  Oh, yeah, yeah.

14          MR. MCCLAIN:  And do you rely on what they tell you?

15          PROSPECTIVE JUROR CORK:  We read it.

16          MR. MCCLAIN:  And assume that they're telling you the

17  truth.

18          PROSPECTIVE JUROR CORK:  Right.

19          MR. MCCLAIN:  And not withholding anything.

20          PROSPECTIVE JUROR CORK:  Right.

21          MR. MCCLAIN:  You mentioned that you had a positive

22  opinion about American Pop Corn.  What is it that you've done

23  with American Pop Corn?

24          PROSPECTIVE JUROR CORK:  Just it's in the same town

25  I'm in.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 167 of 223

1          MR. MCCLAIN:  They're in the same town because -- and

2     the two fellas, do they go to church with you?

3          PROSPECTIVE JUROR CORK:  No, have kids in school at

4     the same time.

5          MR. MCCLAIN:  I see.  All right.  I appreciate it,

6     Mr. Cork.  Thank you.

7          Ms. Welch, you had a fairly strong opinion about

8     damages in the -- in your questionnaire.  Do you remember what

9     that was?  You said --

10         PROSPECTIVE JUROR WELCH:  You're going to have to

11    remind me.

12         MR. MCCLAIN:  You said sometimes they're too lax,

13    sometimes awards ridiculous amounts of money.

14         PROSPECTIVE JUROR WELCH:  Okay.  Yeah.

15         MR. MCCLAIN:  What did you mean?

16         PROSPECTIVE JUROR WELCH:  Well, I guess when I said

17    they were too lax, I really wasn't talking money.  I was just

18    thinking of, you know, people getting off, you know, that they

19    were responsible for a crime or . . .

20         MR. MCCLAIN:  You were thinking more in the criminal

21    sense.

22         PROSPECTIVE JUROR WELCH:  Right, yeah.

23         MR. MCCLAIN:  I see.  But what about awarding

24    ridiculous amounts of money?  What did you have in mind when you

25    wrote that down?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 168 of 223

```
 1            PROSPECTIVE JUROR WELCH:  Just vaguely reading, you
 2    know, different articles when there's, you know, millions and
 3    millions of dollars.  You know, it's hard for us to even think
 4    that large.
 5            MR. MCCLAIN:  Sure.
 6            PROSPECTIVE JUROR WELCH:  For me to think that large.
 7            MR. MCCLAIN:  Okay.  Well, what about this idea that
 8    Judge Bennett told us about about, you know, 13 million dollars
 9    and the jury awarding 13 million dollars?  Is that a sum of
10    money that you could award in an appropriate case?
11            PROSPECTIVE JUROR WELCH:  Yes.
12            MR. MCCLAIN:  And are personal injuries something that
13    you consider to be very serious?
14            PROSPECTIVE JUROR WELCH:  Yes.
15            MR. MCCLAIN:  So if someone is totally incapacitated
16    by a chemical exposure under the law that a company's
17    responsible for, is that something that you could award
18    substantial damages for?
19            PROSPECTIVE JUROR WELCH:  Yes.
20            MR. MCCLAIN:  And what about this idea of punitive
21    damages?
22            PROSPECTIVE JUROR WELCH:  Yeah, if it warrants.
23            MR. MCCLAIN:  Okay.  And what warrants it in your
24    mind?
25            PROSPECTIVE JUROR WELCH:  Well, if they knew of the
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 169 of 223

1    hazards and didn't let their employees know.

2              MR. MCCLAIN:  Right.

3              PROSPECTIVE JUROR WELCH:  And continued --

4              MR. MCCLAIN:  Or their customers.

5              PROSPECTIVE JUROR WELCH:  Right.

6              MR. MCCLAIN:  And in that kind of a situation you

7    could award punitive damages?

8              PROSPECTIVE JUROR WELCH:  Yes.

9              MR. MCCLAIN:  Okay.  Even if they were substantial.

10             PROSPECTIVE JUROR WELCH:  Yes, I believe so.

11             MR. MCCLAIN:  Thank you.  I appreciate your candor,

12   Ms. Welch.

13             Judge, that's all I have.

14             THE COURT:  Okay.  Before we get to the defense, I've

15   got a couple of questions, and then we're going to take a

16   stretch break.

17             Why don't I stick with you, Miss Welch.  As long as

18   somebody brought up the McDonald's coffee case -- I didn't bring

19   it up, but do you think you understand what the facts were in

20   the McDonald's case?

21             PROSPECTIVE JUROR WELCH:  Just the basics.

22             THE COURT:  What do you think they were?

23             PROSPECTIVE JUROR WELCH:  Well, the lady bought coffee

24   and put it between her legs and, you know, that's --

25             THE COURT:  Was she driving the car or not?  Do you

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 170 of 223

1    know?

2              PROSPECTIVE JUROR WELCH:  I think so.

3              THE COURT:  Yeah, everybody thinks she was driving the

4    car.  She wasn't.

5              PROSPECTIVE JUROR WELCH:  She wasn't?

6              THE COURT:  She was the passenger.  She was 79 years

7    old, and her grandson was driving the car.  And it actually

8    didn't spill while the car was moving.  He had pulled over right

9    after she got the coffee so that she could add the creamer and

10   sugar to it.  The car wasn't moving at all, and it happened to

11   spill.

12             Do you know how many days she was in the hospital or

13   if she was ever in the hospital?

14             PROSPECTIVE JUROR WELCH:  I have no idea.

15             THE COURT:  Would that make a difference to you?

16             PROSPECTIVE JUROR WELCH:  Sure.

17             THE COURT:  Do you think she was in the hospital?

18             PROSPECTIVE JUROR WELCH:  I don't remember.  I don't

19   think so.

20             THE COURT:  Would it make a difference if you knew she

21   was in the hospital for eight days?

22             PROSPECTIVE JUROR WELCH:  Yes.

23             THE COURT:  Would it make a difference if you knew

24   that she had to have a surgeon do extensive skin grafts on her

25   body?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 171 of 223

1          PROSPECTIVE JUROR WELCH:  Yes.

2          THE COURT:  Would it make a difference if you knew

3    that the industry average was 135 degrees to sell coffee and

4    that there were experts in the trial who testified that if

5    McDonald's had brewed the coffee at 135 to 140 degrees she

6    wouldn't have been injured?  Would that make a difference to

7    you?

8          PROSPECTIVE JUROR WELCH:  Yes.

9          THE COURT:  Would it make a difference if you knew

10   that McDonald's brewed it to 185 to 190 degrees because their

11   consultants said it would taste better and never looked at the

12   thermodynamics or the science of the heat that would be -- that

13   the damage could cause if they heated it to 185 to 190 degrees?

14   Would that make a difference?

15         PROSPECTIVE JUROR WELCH:  Yes, it would.

16         THE COURT:  What were the punitive damage awards that

17   were so high that everybody is talking about this case as being

18   so shocking?  Do you remember what they were?

19         PROSPECTIVE JUROR WELCH:  I don't remember.

20         THE COURT:  Okay.  Do you understand that the purpose

21   of punitive damages is to punish someone, either an individual

22   or a corporation?  Do you understand that's the purpose of it?

23         PROSPECTIVE JUROR WELCH:  Yes.

24         THE COURT:  Let me ask you this.  Do you think it

25   would take more money to punish McDonald's or to punish your

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 172 of 223

1  next-door neighbor for wrongful conduct?

2          PROSPECTIVE JUROR WELCH:  McDonald's.

3          THE COURT:  Okay.  And so would you want to evaluate

4  how much money McDonald's made to determine whether the punitive

5  damages were reasonable or not if you could consider that?

6  Would that be something you'd want to know?

7          PROSPECTIVE JUROR WELCH:  Yes.

8          THE COURT:  Okay.  Now, if I told you that the

9  punitive damages awarded in that case constituted exactly 2 days

10  worth of sales of McDonald's coffee, does that strike you as

11  outrageous?  Well, maybe it does.  That's fine.  But that's what

12  the punitive damage totaled, two days worth of coffee sales, not

13  sales of -- not all the burgers and French fries and malted

14  milks.  We're talking two days of coffee sales.

15          PROSPECTIVE JUROR WELCH:  That's not much at all.

16          THE COURT:  And do you think it might take that much

17  for a large corporation like McDonald's to take note of their

18  conduct?  I mean, do you think if they got a million dollars in

19  punitive damages that that would be sufficient for a company the

20  size of McDonald's?

21          PROSPECTIVE JUROR WELCH:  No, that would be a small

22  sum I would assume.

23          THE COURT:  Well, that might even be more than what

24  the -- McDonald's was ultimately ordered to pay in the case in

25  punitive damages.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 173 of 223

1      So my whole point is that I happen to know those

2  things about the case but -- because I've researched it.  But I

3  don't think the average member of the public knows all those

4  facts.  And if they knew all those facts, it may or may not

5  change their mind.  But my whole point is that that it's fine to

6  read things in the newspaper and have judgments about them.  And

7  we all do that.  I do it all the time.  We all do it.  But the

8  bottom line is unless you know all of the facts, our judgments

9  might not be very accurate.  Do you agree with me on that?

10      PROSPECTIVE JUROR WELCH:  Yes.

11      THE COURT:  Okay.  And in this trial we're looking for

12  jurors who are going to make accurate judgments based on the

13  facts in this case.  Does that make sense?

14      PROSPECTIVE JUROR WELCH:  Yes.

15      THE COURT:  And I don't have a position whether the

16  plaintiff should win or not win, whether Givaudan should win,

17  whether any damages should be awarded, whether some damages

18  should be awarded, whether no punitive damages awarded, whether

19  large punitive damages are awarded, because I haven't heard any

20  of the evidence in the case.  Does that make sense?

21      PROSPECTIVE JUROR WELCH:  Yes.

22      THE COURT:  And the bottom line is my opinion doesn't

23  count for much.  You know what counts?  Your opinion if you're

24  selected and the other seven people who are selected.  But I

25  want to make sure that whoever gets selected, they're going to

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ  Document 400  Filed 06/09/09  Page 174 of 223

1  make a pledge to the Kuipers and to Givaudan, to all the

2  lawyers, and to me that you're going to judge this case not

3  based on some other case you read about in the newspapers but on

4  the facts that come out of the witness box there and the

5  evidence that's introduced and my jury instructions.  Do you

6  think you can do that?

7          PROSPECTIVE JUROR WELCH:  Yes, I do.

8          THE COURT:  Okay.  Now, would you just pass it down to

9  Mr. Haak, and I don't want to pick on you too much.  But did you

10 know all of those facts that I told you about the McDonald's

11 case?

12         PROSPECTIVE JUROR HAAK:  No.  I was just using that as

13 an example that sometimes we have to be more responsible than we

14 are.

15         THE COURT:  Sure.  And, you know, that's a good point

16 that you raised.  Did you know that the jury in that case found

17 the plaintiff, the 79-year-old woman, partially responsible,

18 that they didn't put all the liability on McDonald's but that

19 they put some of the responsibility on the plaintiff and her

20 damages were reduced because of that?  Did you know that?

21         PROSPECTIVE JUROR HAAK:  No.

22         THE COURT:  Does that make it seem like maybe it's a

23 little bit more reasonable than what you got out of the

24 newspapers?

25         PROSPECTIVE JUROR HAAK:  Yeah.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 175 of 223

1    THE COURT:  Okay.  Well, that's a fact, and you can go

2  to the bank on that fact, that the jury found her partially

3  responsible.  But you know what?  I don't remember reading that

4  in very many newspaper articles about it because it doesn't sell

5  newspapers.  So that's why it's important to base the evidence

6  on the facts of the case.  Does that make sense to you?

7    PROSPECTIVE JUROR HAAK:  Yes.

8    THE COURT:  Okay.  And it's fine to have these

9  opinions.  You know, you all can have any opinions you want

10  about the McDonald's case or some other case, but it really

11  wouldn't be fair to the parties in this case to base your

12  judgment on those other cases that really, even though I've

13  researched it, I wasn't there.  I wasn't there.

14    And I just want to tell you something else because

15  it's very important that we get fair jurors in this case.

16    Maybe eight or nine years ago I had a very difficult

17  criminal trial.  And it lasted for three weeks.  And three

18  defendants were accused of murdering a 15-year-old boy in

19  Estherville, Iowa.  Some of you may recall the case.  Gregory

20  Sky Erickson was the 15-year-old that was murdered, and there

21  were 10 people charged with the case.  Some pled guilty.  Some

22  went to trial.

23    I sat through all of the evidence in the trial.  And

24  the jury came back with a verdict of guilty, but I didn't think

25  the evidence supported it.  So I set aside the jury verdict and

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov

Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 176 of 223
to purchase a complete copy of the transcript.

1    ordered a new trial which I have the power to do in criminal

2    cases.

3              And a lot of people on the street when I would walk to

4    lunch would come up to me and say something like, "How dare

5    you," you know, ba, ba, ba, ba, ba, ba, ba.  And I would listen

6    very patiently.  And then I would say, you know, "I appreciate

7    your opinion, but I don't actually remember you in the courtroom

8    sitting through all 3 weeks of the trial and hearing all of the

9    evidence that I heard.  But, gee, I'm really impressed that you

10   spent $15,000 and ordered a transcript and actually read about

11   the case before you shared your opinion with me."  And I said

12   that kind of tongue in cheek.  But do you get the point I'm

13   trying to make?

14             PROSPECTIVE JUROR HAAK:  Yes.

15             THE COURT:  Or not?

16             PROSPECTIVE JUROR HAAK:  Yes.

17             THE COURT:  That unless you actually sit in a trial

18   every day and pay attention and listen to all of the evidence,

19   it's fine to have an opinion.  But the opinion isn't worth very

20   much because you don't know all the facts.  Does that make sense

21   to you?

22             PROSPECTIVE JUROR HAAK:  Yes.

23             THE COURT:  And does it make sense to you that even in

24   a long, complicated case like this it might be one witness's

25   testimony about one fact that might sway your opinion one way or

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 177 of 223

1    the other?  I mean, it might not be, but it could be.  Are you

2    open to that possibility?

3           PROSPECTIVE JUROR HAAK:  Yes.

4           THE COURT:  And so if you just read an article in the

5    newspaper, you wouldn't even have any idea about what that

6    witness testified to or what that particular fact was and how

7    you would weigh that fact against all of the evidence in the

8    case, would you?

9           PROSPECTIVE JUROR HAAK:  No.

10          THE COURT:  So do you see where I keep coming back to

11   this point that in order for the system to work we have to base

12   the judgment on all of the evidence in the case?  Does that make

13   sense?

14          PROSPECTIVE JUROR HAAK:  Yes, it does.

15          THE COURT:  Okay.  Thank you.

16          Why doesn't everybody stand up and take a stretch

17   break.

18          Okay.  Thank you.

19          Mr. Pagliaro, you've been so patient waiting your

20   turn, so now's your chance to ask some questions.  Thank you.

21   You may proceed.

22          MR. PAGLIARO:  Thank you, Your Honor.

23          Good afternoon. I'm going to try not to plow over

24   ground that's already been plowed over several times, a farming

25   analogy.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 178 of 223

1          My name's Jim Pagliaro.  I represent Givaudan along

2     with the other lawyers at the table to my left.  Givaudan is a

3     flavor company, and I don't recall in your questionnaires.  Did

4     any of you indicate that any of you or family members work for

5     flavor companies or had any interaction with flavor companies?

6     No?

7          Now, some of you are in the food industry; right?

8     Mr. Cork, you're in the food industry; right?

9          PROSPECTIVE JUROR CORK:  Tyson.

10          MR. PAGLIARO:  Tyson; right?

11          Mr. Woodward, you work in the food industry; is that

12     correct?

13          Anybody else?  You do too as well?  And what industry

14     do you work in?  I'm sorry.

15          PROSPECTIVE JUROR GREEN:  Portionables.  We make

16     frozen sauces.

17          MR. PAGLIARO:  I do remember reading that in your

18     questionnaire.  You mix sauces together?

19          PROSPECTIVE JUROR GREEN:  Uh-huh, yes.

20          MR. PAGLIARO:  And when you do that work, do you have

21     any concern about your health or any exposure you have when

22     you're mixing those sauces?

23          PROSPECTIVE JUROR GREEN:  No, no, no concerns.

24          MR. PAGLIARO:  Thank you.  Appreciate that.  Those of

25     you that work in the food industry, I noticed also there's been

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 179 of 223

1  some press coverage lately.  Have any of you read about the

2  peanut company down in Georgia?  Any of you read about that

3  recently?  Do you have concerns -- any of you have concerns you

4  want to identify about food contaminants or issues relating to

5  the food supply in the country?  Any of you have concerns about

6  that because of what you saw in the news about the peanut

7  company down in Georgia?  No?

8          Some of you indicated in your questionnaires that -- I

9  think, Mr. Woodward, you did, for example, that you had heard

10  about flavorings of microwave popcorn.  You'd read about it in

11  the newspaper or heard about it.  Do you remember that?

12          PROSPECTIVE JUROR WOODWARD:  (Nodded head.)

13          MR. PAGLIARO:  And not to pick on you, and again,

14  there are no right or wrong answers.  Nothing you say can hurt

15  my feelings, trust me.

16          You want to give Mr. Woodward the microphone?

17          Mr. Woodward, what you read, did it -- do you recall

18  exactly what you read?  Did you see it in a newspaper, or did

19  you see it on TV?

20          PROSPECTIVE JUROR WOODWARD:  No.  All I remember is

21  something with fumes from microwave popcorn or something like

22  that.  That's all I remember.

23          MR. PAGLIARO:  Was it an article that made you feel

24  good about the fumes or bad about the fumes?

25          PROSPECTIVE JUROR WOODWARD:  Personally I don't like

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 180 of 223

1   microwave popcorn.

2           MR. PAGLIARO:  Oh, okay.  That's a different story.

3   But my question really is did you walk away from that article

4   thinking -- with some thought in your mind, Hey, this is bad?

5           PROSPECTIVE JUROR WOODWARD:  No.  It was a long time

6   ago.  All I remember is it was on the news.

7           MR. PAGLIARO:  Okay.  Anybody else see it on the news?

8           Yes, sir, Mr. Storm.  Did you see it on the news?

9           Can you pass Mr. Storm the microphone?

10          You're a lawyer; right, Mr. Storm?

11          PROSPECTIVE JUROR STORM:  Correct.

12          MR. PAGLIARO:  You're in the club; right?

13          PROSPECTIVE JUROR STORM:  Well, I'm in clubs, yeah.

14          MR. PAGLIARO:  Let me ask you the same question.  You

15  saw something in the newspaper.

16          PROSPECTIVE JUROR STORM:  Right.

17          MR. PAGLIARO:  Did you see it on TV too or just in the

18  newspaper?

19          PROSPECTIVE JUROR STORM:  I don't really recall.  I

20  think I might have read some things in maybe even bar magazines.

21          MR. PAGLIARO:  Did they talk about litigation relating

22  to popcorn?

23          PROSPECTIVE JUROR STORM:  Right.

24          MR. PAGLIARO:  Did you form any opinions about any of

25  the theories that were expressed in the articles or any of the

1  things you saw in the articles?

2        PROSPECTIVE JUROR STORM:  Not really.

3        MR. PAGLIARO:  Do any of you have a problem with the

4  concept that -- and I think the judge has made this point many

5  times.  But, for example, I watch Katie Couric every night.  Do

6  any of you watch Katie Couric?  Some people watch Katie Couric

7  and everything Katie Couric says is gospel.  You know, they hear

8  it on Katie Couric, and they say, "Well, I can take that to the

9  bank because Katie Couric said."  Any of you feel that way about

10  things you see in the media or television about any issue

11  relating to safety or companies?  Any of you feel that way?  No?

12        Miss Jessen, how about you?  You're sitting back there

13  looking a little sphinx like.

14        PROSPECTIVE JUROR JESSEN:  A lot of times, you know,

15  in the newspapers they put in there what they want to put in

16  there, not the whole -- you know, the whole thing on it, so it's

17  just their view that they're trying to get across.

18        MR. PAGLIARO:  So sometimes you think you're only

19  getting one point of view.  Is that fair?

20        PROSPECTIVE JUROR JESSEN:  Yeah.

21        MR. PAGLIARO:  You understand in litigation like this,

22  the reason why there are two sides is there are two points of

23  view.  I mean, you all understand that; right?  Any of you have

24  problems with the fact that they get to tell you their point of

25  view first and then my point of view comes second?  Anybody --

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 182 of 223

1   is that going to bother anybody?

2           Will you be able, all of you, to keep an open mind to

3   listen to the second half of the story?  I'm looking you all in

4   the eye.  Can you all tell me you can?  You're all shaking your

5   heads.

6           Anybody have any problem with that?  Anybody thinks

7   that when they hear one side of the story and Mr. McClain's very

8   persuasive, Wow, this is going to really convince me and I'm

9   going to shut out the rest of the case?  Anybody think that

10  they're going to do that or worry about that, think that maybe

11  they'll feel that way after hearing just one side?  You're all

12  feeling good about that; right?  Okay.  Fair enough.  I

13  appreciate it.

14          Now, talked a lot about damages.  I want to talk about

15  another concept.  I'm going to shift the concept.  The concept

16  for me, for the side of the case that I represent, is concern

17  about people's natural sympathy; all right?  Everybody's

18  sympathetic.

19          Miss Meinen, you work in a place where they service

20  people with psychotic disorders and they service folks who are

21  suicidal.  Is that right, ma'am?

22          PROSPECTIVE JUROR MEINEN:  Yes.

23          MR. PAGLIARO:  So obviously you develop a lot of

24  sympathy for those folks; isn't that true?

25          PROSPECTIVE JUROR MEINEN:  Empathy.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 183 of 223

```
 1            THE COURT:  Can we pass the microphone down?  Thank
 2  you.
 3            MR. PAGLIARO:  So you develop empathy for those folks.
 4            PROSPECTIVE JUROR MEINEN:  Yes.
 5            MR. PAGLIARO:  Yes.  Now, you know in this case you're
 6  going to see a plaintiff who claims he got sick as a result of
 7  an exposure.  You understand that.
 8            PROSPECTIVE JUROR MEINEN:  Yes.
 9            MR. PAGLIARO:  We've explained that.  In your job
10  because you are used to being empathetic towards people who have
11  problems, is that going to influence your ability to see this
12  case from both sides and to be fair with both sides, your
13  natural empathy for someone maybe who has a problem with their
14  health?
15            PROSPECTIVE JUROR MEINEN:  I don't -- I don't believe
16  it will be.
17            MR. PAGLIARO:  Can you set aside your personal
18  sympathies and listen to all the evidence and balance it out so
19  that you hear both sides and apply the law that the judge is
20  going to give you and come to a fair verdict even if it means
21  sending Mr. and Mrs. Kuiper away with no money at all?
22            PROSPECTIVE JUROR MEINEN:  If the facts of the case
23  lead to that conclusion, then, you know, I would have to.  I
24  would be following the judge's instruction, and I would be going
25  with the truth.
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ  Document 400  Filed 06/09/09  Page 184 of 223

1          MR. PAGLIARO:  Okay.  Fair enough.  I appreciate that.
2   Thank you.
3          Some of you have identified that you have family
4   members that have had breathing problems.  Do you recall that in
5   your questionnaire?  I don't want to embarrass anybody.  I see
6   Miss Ross?
7          PROSPECTIVE JUROR ROSS:  Yeah, I have two children
8   with cystic fibrosis which is a lung disease.
9          MR. PAGLIARO:  Yes.
10         PROSPECTIVE JUROR ROSS:  And that's hereditary.
11         MR. PAGLIARO:  Yes, yes.  Now, you're going to hear
12  testimony in this case about people who have difficulty
13  breathing.  Is that going to upset you or bother you or cause
14  you concern about your ability, again, to be fair to both sides
15  and give the company the same attention that you give the
16  Kuipers?
17         PROSPECTIVE JUROR ROSS:  I believe I can be fair to
18  both sides because you can't help if you're born with a disease.
19  And you learn to deal with the hardships as easy as you deal
20  with everyday life.
21         MR. PAGLIARO:  Yes.
22         PROSPECTIVE JUROR ROSS:  You know, you have to take
23  one day at a time no matter what life throws at you.  And you
24  have to be open minded to everything.  Otherwise you're not
25  going to make it through every day.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ  Document 400   Filed 06/09/09   Page 185 of 223

```
 1          MR. PAGLIARO:  And you feel that even though you're
 2    going to hear testimony about someone who's struggling at times
 3    with breathlessness or issues relating to lung conditions that
 4    you can keep that separate from your personal life and issues
 5    that affect you personally.
 6          PROSPECTIVE JUROR ROSS:  Yes, I can because my kids
 7    aren't to that severe point.
 8          MR. PAGLIARO:  Well, that's great.
 9          PROSPECTIVE JUROR ROSS:  And I've also done nurse aide
10    where I have helped severely handicapped people from car
11    accidents and everything else like this.  And yeah, you do feel
12    sorry for them and everything else.  But they still have to make
13    it, you know, like everyone else, a day at a time.  They have to
14    look at the positive as well as the negative side.
15          MR. PAGLIARO:  Now, you mentioned you did some work as
16    a nurse's aide; is that right, ma'am?
17          PROSPECTIVE JUROR ROSS:  Yes, I have.
18          MR. PAGLIARO:  Any of the other jurors in the box ever
19    do any medical work like work in a medical office or work in the
20    medical area?  Miss Jessen, did you?  What kind of work did you
21    do, ma'am?
22          PROSPECTIVE JUROR JESSEN:  I do medical records for
23    orthopedic surgeons.
24          MR. PAGLIARO:  Okay.  The medical knowledge that you
25    attained -- and I guess Ms. Meinen as well, you have some
```

1  medical knowledge too I guess from the work that you do; is that

2  right?

3         PROSPECTIVE JUROR MEINEN:  (Nodded head.)

4         MR. PAGLIARO:  Are you able to listen to the evidence

5  you're going to hear in this case and put aside anything you may

6  have heard in the office about medical issues or some knowledge

7  that you believe you gained from that job?  Are you going to be

8  able to put that aside and just pay attention to the evidence

9  that you hear in this case about the medical issues in this

10  case?  Miss Meinen you'd be okay with that?

11         PROSPECTIVE JUROR MEINEN:  (Nodded head.)

12         MR. PAGLIARO:  Miss Jessen?

13         PROSPECTIVE JUROR JESSEN:  Yes.

14         MR. PAGLIARO:  Okay.  I appreciate that.  Now, let's

15  say you found that Givaudan's conduct did not cause Mr. Kuiper's

16  injury.  Is it possible for you, all of you, to decide based on

17  the evidence that you heard that Mr. Kuiper gets nothing from

18  this case, the Kuipers walk away without a penny?  Is that

19  possible?  Can all of you feel comfortable doing that?  Yes?

20  You feel comfortable doing that?

21         THE COURT:  Can we pass the microphone down?  We

22  really have to wait for the microphone.  It's hard to get used

23  to that.  Thank you.

24         PROSPECTIVE JUROR SCHIEUER:  If the evidence warrants

25  it, yes, I could.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 187 of 223

1          MR. PAGLIARO:  Thank you.  Talk a little bit about

2   working in a situation where you're exposed to materials.

3   Mr. Woodward, I think -- I believe you indicated in your

4   questionnaire that you had chemicals in your workplace; is that

5   correct?

6          PROSPECTIVE JUROR WOODWARD:  Yes, it is.

7          MR. PAGLIARO:  Do you believe that it is only an

8   employer's responsibility to safeguard employees?

9          PROSPECTIVE JUROR WOODWARD:  It's not only the

10  employers but the employees themselves.  And we do special

11  training yearly on these chemicals.  Each employee has to read

12  the MSDS sheets and know what they do or can do if used

13  improperly.

14         MR. PAGLIARO:  And you indicated that you believe that

15  low level of chemical exposure can be harmful in your

16  questionnaire.  Do you recall that?

17         PROSPECTIVE JUROR WOODWARD:  I don't recall that.

18         MR. PAGLIARO:  Okay.  Do you believe that?

19         PROSPECTIVE JUROR WOODWARD:  Low levels of chemicals?

20         MR. PAGLIARO:  Yes, low level of exposure to

21  chemicals.  Do you believe that that can be harmful in every

22  circumstance?

23         PROSPECTIVE JUROR WOODWARD:  Not in every probably.

24         MR. PAGLIARO:  Okay.  So you believe that an employee

25  has some responsibility to safeguard their own health at work;

Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 188 of 223

1 is that true, sir?

2          PROSPECTIVE JUROR WOODWARD:  Yes, it is.

3          MR. PAGLIARO:  Is that fair?

4          PROSPECTIVE JUROR WOODWARD:  Yes.

5          MR. PAGLIARO:  Could you pass the microphone to Miss

6 Beschorner?  I saw you shaking your head here.  Do you have the

7 same view as Mr. Woodward?  Do you think that employees -- I

8 know your husband works at Terra; right?

9          PROSPECTIVE JUROR BESCHORNER:  Right.

10          MR. PAGLIARO:  Do I have that right?  Do you believe

11 that your husband has a responsibility at work to ensure his own

12 safety at work and to ensure that he follows the directions of

13 his employer about how to maintain a safe environment?

14          PROSPECTIVE JUROR BESCHORNER:  Yes, I do.

15          MR. PAGLIARO:  What would concern you about an

16 employer who possibly didn't give those instructions to an

17 employee?  Would that be a problem for you?

18          PROSPECTIVE JUROR BESCHORNER:  I guess so because I

19 believe that that's information the employee should have.

20          MR. PAGLIARO:  Okay.  And in the case of your husband,

21 you indicated that your husband gets a number of tests every

22 year, breathing tests; is that correct?

23          PROSPECTIVE JUROR BESCHORNER:  They actually have

24 breathing masks, and they have to have tests to see if they can

25 breathe through them properly.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 189 of 223

1    MR. PAGLIARO:  I see.  That's called -- I think you're

2  going to hear testimony about that in this case.  It's called

3  respirator fit testing.

4    PROSPECTIVE JUROR BESCHORNER:  And I think each person

5  on the job has one available to them.

6    MR. PAGLIARO:  Yes.  And does your husband avail

7  himself of that respirator when he works?  Does he use it?

8    PROSPECTIVE JUROR BESCHORNER:  Oh, no.  That would be

9  if there was an accident or something.

10    MR. PAGLIARO:  I see.  I see.  So he's not required to

11  use it routinely when he works; is that correct?

12    PROSPECTIVE JUROR BESCHORNER:  No.

13    MR. PAGLIARO:  Thank you.  Appreciate that.  Talk to

14  Mr. Cork a little bit too about his work.  What about you,

15  Mr. Cork?  You have -- I assume in the type of work you do, you

16  have safety rules that apply to you; is that correct, sir?

17    PROSPECTIVE JUROR CORK:  Definitely, yes.

18    MR. PAGLIARO:  Do you feel obligated to follow those

19  safety rules for yourself?

20    PROSPECTIVE JUROR CORK:  Yes.

21    MR. PAGLIARO:  Do you pay attention to them?

22    PROSPECTIVE JUROR CORK:  You bet.

23    MR. PAGLIARO:  Do you wear any personal protective

24  equipment when you work, Mr. Cork?

25    PROSPECTIVE JUROR CORK:  Yeah, we wear hard hat and

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 190 of 223

1  earplugs.

2  MR. PAGLIARO: And do you use them on a regular basis?

3  PROSPECTIVE JUROR CORK: Daily.

4  MR. PAGLIARO: Thank you. Appreciate that. And does

5  anybody think that a company has to guarantee that its products

6  are completely 100 percent safe? Does anybody feel that way,

7  that any product sold has to be completely 100 percent safe?

8  Miss Welch, let me ask you a question.

9  PROSPECTIVE JUROR WELCH: Sure.

10  MR. PAGLIARO: Do you use oven cleaner?

11  PROSPECTIVE JUROR WELCH: Yes.

12  MR. PAGLIARO: Do you read the warnings on the oven

13  cleaner?

14  PROSPECTIVE JUROR WELCH: Yes.

15  MR. PAGLIARO: Do you think it's important for you to

16  read those warnings in order to understand how the oven cleaner

17  works?

18  PROSPECTIVE JUROR WELCH: It is, yes.

19  MR. PAGLIARO: Do you have any safety regulations

20  where you work, Ms. Welch?

21  PROSPECTIVE JUROR WELCH: No. I work at a bank.

22  MR. PAGLIARO: Your job is to keep things safe.

23  PROSPECTIVE JUROR WELCH: There you go.

24  MR. MCCLAIN: Thank you very much.

25  Mr. Haak, how are you today?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 191 of 223

1          PROSPECTIVE JUROR HAAK:  Good.

2          MR. PAGLIARO:  Do you have any safety regulations

3    where you work, Mr. Haak?

4          PROSPECTIVE JUROR HAAK:  Yes.

5          MR. PAGLIARO:  And what do they apply to?  Personal

6    protection, how you operate?  Can you elaborate a little bit on

7    that?

8          PROSPECTIVE JUROR HAAK:  We have regular safety

9    meetings on different things whether it's electrical or -- but

10   yeah, it's mostly for personal safety.

11         MR. PAGLIARO:  Okay.  And do you attend those meetings

12   regularly?

13         PROSPECTIVE JUROR HAAK:  Every time we have one, yeah.

14         MR. PAGLIARO:  Okay.

15         PROSPECTIVE JUROR HAAK:  We're required to.

16         MR. PAGLIARO:  Yeah?  Do you have any problem with

17   your employers, Mr. Haak, in terms of how they apply the safety

18   regulations to you and the other workers in the plant?

19         PROSPECTIVE JUROR HAAK:  No.

20         MR. PAGLIARO:  Okay.  Pass the microphone to Mr. Cork

21   again.  What about you, Mr. Cork?  Do you have any problem in

22   your workplace with the way in which your employer applies

23   those?  Do you have any complaints about your employer?

24         PROSPECTIVE JUROR CORK:  No, not at all.

25         MR. PAGLIARO:  No?  Okay.  Fair enough.  Would you

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 192 of 223

1    pass it back again to Mr. Woodward?  It's like . . .

2           What about you, Mr. Woodward?  Any complaints?

3           PROSPECTIVE JUROR WOODWARD:  No.

4           MR. PAGLIARO:  Okay.  Thank you very much.

5    Mr. Woodward, you made a comment in your questionnaire about

6    corporations and something to the effect that some corporations

7    forget that employees made them and that they have excessive

8    perks and bonuses.  I guess you've been reading a lot and other

9    people read too about corporations that award a lot of bonuses

10   and whatnot to their employees.  Is that what you were referring

11   to, sir, Wall Street stuff?

12          PROSPECTIVE JUROR WOODWARD:  Probably at the time,

13   yeah.

14          MR. PAGLIARO:  Is that a concern to you?

15          PROSPECTIVE JUROR WOODWARD:  Well, I think -- if I

16   remember the question right -- and maybe -- I'm a rendering

17   foreman, so sometimes I have safety topics, so I can't remember

18   which topic I was talking about.  But the employees are our best

19   asset, so in order to keep our company strong, we gotta keep our

20   employees safe and strong.

21          MR. PAGLIARO:  Fair enough.  And you're not concerned

22   that you can't be fair to a company in a case like this because

23   of what you read in the newspaper or hear on television about

24   corporate conduct generally in the country.

25          PROSPECTIVE JUROR WOODWARD:  No.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 408   Filed 06/09/09   Page 193 of 223

```
1              MR. PAGLIARO:  Okay.  You feel you can put that aside.

2              PROSPECTIVE JUROR WOODWARD:  Yes.

3              MR. PAGLIARO:  And if you're looking at an individual

4   like Mr. Kuiper and Mrs. Kuiper who are plaintiffs in this case

5   and my client Givaudan, they start at exactly the same spot in

6   your mind in terms of --

7              PROSPECTIVE JUROR WOODWARD:  Yes, sir.

8              MR. PAGLIARO:  And you can be fair, as the judge said,

9   in that balancing, put them both in the same spot?

10             PROSPECTIVE JUROR WOODWARD:  Yes.

11             MR. PAGLIARO:  Miss Jessen, you feel that way as well?

12  You feel you can put both an individual and a company in the

13  same spot?

14             PROSPECTIVE JUROR JESSEN:  Yes.

15             MR. PAGLIARO:  You don't have any problem with that.

16             PROSPECTIVE JUROR JESSEN:  No.

17             MR. PAGLIARO:  You know that companies are made up of

18  people; is that right?  You understand that.  They're not

19  buildings.  They're folks like all of us.

20             PROSPECTIVE JUROR JESSEN:  I worked at Gateway for 16

21  years.

22             MR. PAGLIARO:  Yeah.

23             PROSPECTIVE JUROR JESSEN:  That was very large.

24             MR. PAGLIARO:  Big company; right?

25             PROSPECTIVE JUROR JESSEN:  Like he said, the employees
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 194 of 223

1  were -- you know, made it all what it was.

2          MR. PAGLIARO:  And if you felt that the company in

3  this case didn't do everything in every way exactly like you

4  would have done it but despite that you feel the evidence

5  doesn't support a verdict in favor of Mr. Kuiper, could you

6  award a verdict of no damages to the Kuipers?

7          PROSPECTIVE JUROR JESSEN:  Yes.

8          MR. PAGLIARO:  You feel that way?

9          PROSPECTIVE JUROR JESSEN:  Yep.

10          MR. PAGLIARO:  Would you pass that microphone to

11  Mr. -- let me ask you the same question.  I haven't heard from

12  you, have I?

13          PROSPECTIVE JUROR DAMSTRA:  Yes.

14          MR. PAGLIARO:  I forget your name.  I'm sorry.

15          PROSPECTIVE JUROR DAMSTRA:  Mrs. Damstra.

16          MR. PAGLIARO:  Mrs. Damstra.  How do you do?

17          PROSPECTIVE JUROR DAMSTRA:  Fine.

18          MR. PAGLIARO:  What about you?  Do you put -- a

19  company and an individual in your mind, they start at the same

20  spot in this case?

21          PROSPECTIVE JUROR DAMSTRA:  Yes, definitely.

22          MR. PAGLIARO:  If you were standing here where I am,

23  would you be worried about having Mrs. Damstra on the jury to

24  judge my client?  Would you worry about that?

25          PROSPECTIVE JUROR DAMSTRA:  I hope not.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 195 of 223

```
 1              MR. PAGLIARO:  Good.  Thanks.  Would you pass it to

 2    Mr. Loutsch?  I want to speak with him for a minute.

 3              Good afternoon, Mr. Loutsch.

 4              PROSPECTIVE JUROR LOUTSCH:  Good afternoon.

 5              MR. PAGLIARO:  How are you?

 6              PROSPECTIVE JUROR LOUTSCH:  Fine.  Thank you.

 7              MR. PAGLIARO:  Good.  You hear me talking about --

 8    you're a farmer; isn't that right?

 9              PROSPECTIVE JUROR LOUTSCH:  Yes, sir.

10              MR. PAGLIARO:  You farm?  You never worked for a big

11    company before; is that right?

12              PROSPECTIVE JUROR LOUTSCH:  Yes, sir, I did.

13              MR. PAGLIARO:  You did.

14              PROSPECTIVE JUROR LOUTSCH:  Yes.  I worked for UPS for

15    some years.

16              MR. PAGLIARO:  You did mention that.  I'm sorry.  You

17    mentioned that plant in Missouri, didn't you, where you picked

18    up something?

19              PROSPECTIVE JUROR LOUTSCH:  But that wasn't through

20    UPS.  I work part time, and if I got time, I'll go on long haul

21    with a truck.

22              MR. PAGLIARO:  Did you form any opinions about whether

23    big companies are good or bad in the course of your employment

24    for UPS, for example?

25              PROSPECTIVE JUROR LOUTSCH:  No, that was a good job.
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 196 of 223

1    They're a good employer, yeah.

2              MR. PAGLIARO:  The employer was good to you.

3              PROSPECTIVE JUROR LOUTSCH:  He w -- they were.

4              MR. PAGLIARO:  No problems.

5              PROSPECTIVE JUROR LOUTSCH:  None whatsoever.

6              MR. PAGLIARO:  Do you agree with the other folks that

7    have said that they think that part of the responsibility for

8    someone's safety in the working place rests with the person

9    who's actually doing the job?  You believe that?

10             PROSPECTIVE JUROR LOUTSCH:  I do.

11             MR. PAGLIARO:  Yeah.  And if you felt that the

12   evidence didn't support an award of damages at all to

13   Mr. Kuiper, could you walk into this courtroom and look

14   Mr. Kuiper in the eye and then sit in that box and say zero

15   damages?  Could you do that?

16             PROSPECTIVE JUROR LOUTSCH:  I could.

17             MR. PAGLIARO:  Thank you.  Appreciate that.

18             Any of you have any experience with regulatory

19   agencies?  You're going to hear testimony in this case about

20   OSHA, Occupational Safety and Health Administration, NIOSH,

21   National Institute of Occupational Safety and Health.  Any of

22   you have any interaction with those companies in your job?

23             Yes, sir, Mr. Storm, you have -- could you pass that

24   to Mr. Storm, please?  Thank you, Mr. Loutsch.

25             PROSPECTIVE JUROR STORM:  Early in my legal work I did

1    some work for IBP that involved working with IOSH and OSHA many

2    years ago.

3            MR. PAGLIARO:  So when you say working with, were

4    you --

5            PROSPECTIVE JUROR STORM:  I represented them.

6            MR. PAGLIARO:  You represented a company in a matter

7    involving OSHA.

8            PROSPECTIVE JUROR STORM:  Yes.

9            MR. PAGLIARO:  Okay.  I understand.  I understand.

10   Did you form any opinions about those agencies?

11           PROSPECTIVE JUROR STORM:  Oh, I have a lot of opinions

12   about them, yeah.

13           MR. PAGLIARO:  All right.  Where do we go from here?

14           PROSPECTIVE JUROR STORM:  Yeah.  Well, some good, some

15   bad.

16           MR. PAGLIARO:  Yeah.

17           PROSPECTIVE JUROR STORM:  Depended on the

18   circumstances.

19           MR. PAGLIARO:  Explain the bad opinions I guess.  If

20   you have negative views towards the agency, I'd be interested in

21   hearing those.  There's going to be a lot of testimony about

22   that.

23           PROSPECTIVE JUROR STORM:  Yeah.  On the one hand, I

24   guess there's a lot of -- there are a lot of regulations that

25   seem to be unnecessary and burdensome and so forth.  By the same

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 198 of 223

1  token, obviously they fulfill a purpose that we need.  So those

2  are the two sides I guess.

3          MR. PAGLIARO:  You don't have any feeling that they're

4  not doing their mission or not fulfilling what they're required

5  to do.

6          PROSPECTIVE JUROR STORM:  No, and I will have to tell

7  you, I haven't done any of that work recently.  This would have

8  been maybe 25, 30 years ago.

9          MR. PAGLIARO:  Mr. Storm, do you have any concern back

10  in the jury room about your particular training and knowledge in

11  the law influencing the way in which you view the evidence or

12  the way in which you view the charge that the judge gives you to

13  apply in this case?

14          PROSPECTIVE JUROR STORM:  Sure.

15          MR. PAGLIARO:  You do?

16          PROSPECTIVE JUROR STORM:  Well, I mean, I haven't done

17  this before, so I do have a little concern about it, yeah.

18          MR. PAGLIARO:  Do you think you can fairly evaluate

19  the evidence and apply the law as the judge gives it to you and

20  put aside any of your own preconceived ideas of the law when you

21  go back in that jury room?

22          PROSPECTIVE JUROR STORM:  Yes.

23          MR. PAGLIARO:  You do?

24          PROSPECTIVE JUROR STORM:  Well, I think I can.

25          MR. PAGLIARO:  Good.  Okay.  Thanks.  Appreciate that.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 199 of 223

1          Can I ask you another question, Miss Ross?

2          PROSPECTIVE JUROR ROSS:  Sure.

3          MR. PAGLIARO:  You also answered I think the

4     questionnaire about your views on low-level exposure to

5     chemicals.  Do you remember that?

6          PROSPECTIVE JUROR ROSS:  Yes.

7          MR. PAGLIARO:  Could you tell us what you feel about

8     that?

9          PROSPECTIVE JUROR ROSS:  Exposure to low-level

10    chemicals, it depends on -- well, like my kids with cystic

11    fibrosis, they have allergies that also goes with them.  So

12    sometimes being exposed to something with low-level chemicals

13    will set off their allergies which will cause a reaction, you

14    know, with their breathing sometimes.  So being exposed to some

15    low levels, it depends on your health.  It can cause damage,

16    yes.

17         MR. PAGLIARO:  Yes.  Do you believe that every

18    low-level exposure to chemicals is dangerous?

19         PROSPECTIVE JUROR ROSS:  No.

20         MR. PAGLIARO:  Your children obviously have a special

21    sensitivity.  Do I have that right?

22         PROSPECTIVE JUROR ROSS:  I don't understand you.

23         MR. PAGLIARO:  Are they especially sensitive to

24    chemicals because of their condition?

25         PROSPECTIVE JUROR ROSS:  To certain things, yes.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 200 of 223

 1         MR. PAGLIARO:  Okay.  That's what I was trying to get

 2    to.  Do you try to keep them out of those circumstances?  Is

 3    that part of what you try to do?

 4         PROSPECTIVE JUROR ROSS:  I check when I buy cleaning

 5    supplies whether they can use -- whether I can use it in the

 6    house or not or whether it will set them off or not.

 7         MR. PAGLIARO:  All right.  And do you start this case

 8    and your views of this case with a concern overall that

 9    low-level exposure to chemicals are generally dangerous?

10         PROSPECTIVE JUROR ROSS:  No.

11         MR. PAGLIARO:  Okay.  And you'd be fair in listening

12    to the evidence and evaluating for yourself in this case whether

13    the chemical exposures in this case were a problem.

14         PROSPECTIVE JUROR ROSS:  I believe I can be very fair

15    minded because, you know, this would also give, you know, a

16    learning experience to everyone out there on some of the things

17    we don't hear about from manufacturing companies.

18         So I look at it as a learning experience as well as

19    general information so when I go home, you know, I have a

20    clearer view on some of these lower chemicals if it gets brought

21    up in the case, if it don't.  But I am very open-minded person

22    because I'm one of these people I don't allow first impression

23    to judge me one way or another.  I have learned over many, many

24    years it takes a lot of time to make a decision on a lot of

25    different things.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 201 of 223

1      MR. PAGLIARO:  Fair enough.  I agree with that.  Thank
2  you.
3      PROSPECTIVE JUROR ROSS:  You're welcome.
4      MR. PAGLIARO:  Your Honor, I have nothing further.
5  Thank you.
6      THE COURT:  Okay.  Thank you very much.
7      MR. PAGLIARO:  Thank all of you.
8      THE COURT:  Thank you.  I just wanted to make one
9  thing clear.  I hope I have.  But it's just that it comes up in
10  every civil case, the McDonald's case.  I have no opinion about
11  what the jury did in the McDonald's case.
12      My only opinion is that other people have opinions
13  that aren't based on the facts of the case.  And while I think I
14  know more about the McDonald's case than most of the people in
15  the courtroom, I couldn't begin to know enough facts about that
16  case to have an opinion because I wasn't the judge in the case
17  and I didn't sit on the jury.  And I haven't obtained the record
18  and read it.  So I have no opinion about the McDonald's case.
19      My only opinion is that other people have opinions
20  about it, and it's fine to have the opinion.  I'm just trying to
21  point out it's not based on all the facts.
22      Let me give you another example.  Every time there's
23  somebody who's prominent that gets sentenced in federal court or
24  noteworthy -- they may not be prominent, but it may be
25  noteworthy -- my social friends always say because they know I

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 202 of 223

1  sentence a lot of people -- matter of fact, during the course of

2  this trial, one of the reasons we're going 8:30 to 2:30 is every

3  afternoon at 3 I'm going to be sentencing people.  I'll probably

4  sentence 20 people or so during the course of this trial.

5          So when my friends read about a sentencing in the

6  paper, they always say, "What would you have given the person?"

7  And I always say, "I have no idea; I wasn't the judge; I don't

8  know all the facts.  How would I know?"  Or they'd say, "Do you

9  think the judge was too lenient or too severe?"  How would I

10 know?  I didn't have an advantage to read what's called the

11 presentence report to learn as much as I can about the

12 defendant, to hear the arguments of the prosecutor, to hear the

13 arguments of the defense lawyer, to listen to both sides, to

14 weigh it, to think about it.  All I know is what I read in the

15 newspaper, and I know from experience that's not accurate.

16         So the only point I was trying to make about the

17 McDonald's case or anything else is coming back to -- I know I

18 sound like a broken record -- the parties depend and the justice

19 system depends on jurors making judgments based on the facts in

20 this case.  And I think that's what I know both lawyers were

21 asking about and wanting, and that's all we want, eight people

22 who can make their judgment based on the facts of this case,

23 whatever judgment that is.  Whatever judgment it is, that's your

24 best judgment.  That's all we can ask for.

25         So did any of the lawyers want to do any follow-up

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ Document 400 Filed 06/09/09 Page 203 of 223
to purchase a complete copy of the transcript

1    questions just based on my last comments?

2         MR. MCCLAIN:  No, sir.

3         MR. PAGLIARO:  No thank you, Your Honor.

4         THE COURT:  Okay.  Why don't you just sit patiently.

5    Everybody can stand and take a stretch break now.  And the

6    lawyers are going to take -- I promised them that they would

7    have some time to huddle up together and talk to their

8    colleagues, and then they're going to start exercising their

9    total of six strikes.  And in a little while we'll find out who

10   our jurors are.  But let's just all stand and take a stretch

11   break and be patient while the lawyers have an opportunity and

12   while we give them an opportunity to do their job.

13        Okay.  Would everybody please be seated.  The lawyers

14   have done their work, and here's what's going to happen.  Nick

15   is going to read the names of the eight individuals who have

16   been selected to serve as jurors in this case.  So let's wait

17   till he's done reading the names.  If your name is called, that

18   means you are going to be a juror, so just kind of stay put.

19   And if your name is not called, then we'll have everybody move

20   to the back of the courtroom.  And then I'll send everybody on

21   their way who's not one of the jurors.

22        So, Nick, would you please read the names of the eight

23   folks who have been selected.

24        THE CLERK:  Yes, Your Honor.  Lyle Woodward, Elaine

25   Damstra, Jane Schieuer, Larry Storm, Rebecca Beschorner, Michael

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 204 of 223

1  Rickert, Roseanna Green, and Richard Cork.

2          THE COURT:  Okay.  If your name was called, remain

3  seated.  If your name was not called, please move to the back of

4  the courtroom.

5          On behalf of all of the judges and employees of the

6  United States District Court for the Northern District of Iowa,

7  I wanted to thank all of you who came today to participate in

8  jury selection.  I wanted to thank you very much for your time.

9          Under our system the lawyers have to strike people,

10  but I think everybody would have made good jurors.  And you're

11  in our wheel for the next year or so.  We've got a lot of trials

12  coming up, so we'll see a lot of you back here in the future.

13  You're all free to leave, and thank you very much for coming

14  here today.

15          Now, with regard to the eight of you, the lawyers were

16  kind enough to strike you in such a pattern that we have four in

17  each row, so that always makes things a little bit easier.

18          Mr. Storm, if I could get you to move down I think one

19  chair, and then in the back row everybody slide down.  And,

20  Mr. Cork, if you would move down one chair this direction, and

21  then we'll have the other three jurors slide down.  Then we'll

22  have you kind of centered a little bit better in the courtroom.

23          And if you'd each stand, I'm going to swear you in

24  because we have a new oath.  And then I'll tell you what's going

25  to happen next.  Would you raise your right hand, please.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 205 of 223

1          (The jury was sworn.)

2          THE COURT:  Okay.  Thank you.  Please be seated.

3    Here's what we're going to do.  It is 20 minutes to 3.  We're

4    going to take a recess until three o'clock.  When you come back

5    at three o'clock, on your chairs will be a notebook and a pen

6    because you're allowed to take notes if you want to.  And I

7    actually have a jury instruction on that.

8          And then you'll have a set of the jury instructions,

9    and you'll have that set of jury instructions with you.  You can

10   take notes on it if you want.  And you'll be able to keep that

11   throughout the trial.  We ask that when you go home every day

12   you leave your notes and your jury instructions on your chair

13   and, when you go down to the jury room, you leave all that on

14   your chair.  Nobody will read them.  And then when you go down

15   to deliberate after we've heard all of the evidence, heard the

16   closing arguments of the lawyers, then you'll be able to bring

17   your notes and jury instructions down to the jury room to assist

18   you in your deliberations.  So we'll see you back here at three

19   o'clock to go over the instructions.  Thank you.

20         (The jury exited the courtroom.)

21         THE COURT:  Thank you.  Please be seated for a second.

22         You know, this is actually the longest set of civil

23   instructions I've ever had in my 15 years, and I'm estimating it

24   will probably take an hour and 20 minutes or so.  So my

25   suggestion -- well, yeah.  I guess it's a suggestion.  It's soon

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 403   Filed 06/09/09   Page 206 of 223

```
 1    to be my ruling I guess.  We're not going to have time for
 2    opening statements today.  And so do the lawyers have any
 3    problems if after we get through the instructions we save
 4    opening statements for 8:30 tomorrow morning?
 5              MR. MCCLAIN:  No.  In fact, we anticipated that this
 6    was likely, and we adjusted and let one witness go.  And so I
 7    think we were pretty well resigned to it.
 8              THE COURT:  Okay.  And, you know, it's the -- my
 9    longest jury selection is 15 days in a criminal case.  I've had
10    2 cases where it took 15 days.  This is my longest in a civil
11    case, but, you know, I'm a huge believer in having the lawyers
12    involved.  I think it was a much better process because the
13    lawyers were involved.  I appreciate your involvement.  And it
14    just kind of takes what it takes.
15              And, you know, we're all after trying to get a fair
16    trial.  So if it took a little longer than normal, that's fine
17    with me.  I kind of anticipated that, too, given the nature of
18    the case and the length of the trial and American Pop Corn is a
19    company here in town.  It just took a little longer than usual.
20              But I thought the lawyers were just terrific.  You
21    made very judicious use of your time, probably much more than I
22    did.  I kind of hogged my time.  But, you know, I'm real
23    satisfied with the process, so I hope the lawyers are too.
24              MR. PAGLIARO:  Thank you, Your Honor.
25              THE COURT:  Okay.  We'll see you back here at three
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 207 of 223

1    o'clock then.

2              MR. PAGLIARO:  Yes, Your Honor.

3              THE COURT:  Okay.  Thank you.

4              (Recess at 2:43 p.m.)

5              THE COURT:  I've got a proposition for you.  How about

6    we toss the jury instructions, I give them one oral instruction,

7    "Do the right thing," and that you all waive plain error.  Any

8    takers?  You ready to have the jurors brought in?

9              MR. PAGLIARO:  (Nodded head.)

10             THE COURT:  Thank you.

11             MR. PAGLIARO:  Thank you, Your Honor.

12             You have a sense of humor, Your Honor.

13             THE COURT:  You have to.

14             MR. MCCLAIN:  I was seriously considering it.

15             MR. PAGLIARO:  I'm sure you were.

16             (The jury entered the courtroom.)

17             THE COURT:  Thank you.  Please be seated.

18             Members of the jury, you should find on your chairs a

19   notebook and a pen and then something about the size of a phone

20   book, a small phone book, maybe a South Sioux City or North

21   Sioux City size phone book.  And that's entitled jury

22   instructions.  And it looks like this.

23             It's got a table of contents on it.  And what we're

24   going to do is it's my obligation under the law to actually go

25   through the jury instructions with you.  And that's going to

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 208 of 223

1     take a while because it's a long set of jury instructions.  It's

2     a long set of jury instructions because this is a very important

3     and complicated case.  And we worked hard with the lawyers to

4     get the jury instructions down to where we wanted them, and they

5     just came out a little bit longer, but that's nobody's fault.

6           When we get through the jury instructions, we're going

7     to send you home for the day, come back tomorrow morning for

8     opening statements because we're just not going to get to the

9     opening statements today.  And we'll take at least one break

10    during the jury instructions.

11          So if you would turn past the table of contents to the

12    instruction number 1 with a surprising title, introduction,

13    instruction number 1, introduction.

14          (The Court read instructions numbers 1 through  26 in

15    open court.)

16          THE COURT:  You'll notice there's one more

17    instruction, and then there's a verdict form.  And I'm going to

18    wait till the end of the trial when I go over the last verdict

19    form -- I'm sorry, when I go over the last instruction to go

20    over the verdict form.  Actually I'll probably go over the

21    verdict form right before closing arguments, then save the

22    instruction for last.

23          Well, those instructions were very long, and I

24    apologize for them, but you have them, you know, at the

25    beginning of the trial.  And the good news is that tomorrow

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 209 of 223

morning when we start at 8:30, even though the instructions were somewhat long and somewhat complicated, the lawyers are going to give their opening statement. And they're going to simplify it for you and make it very understandable for each of you. I'm confident of that.

It's been a long day, so we're going to call it quits now. I did want to remind you of a couple of things before I send you home.

It's very important that you not talk to anyone else about this case. And I know it's very tempting when you go home with your spouse or neighbors or loved ones or friends to say, "Hey, I'm in this case, and here's what it's about." And here's why it's not a good idea to do that. Matter of fact, it's a real bad idea.

You're going to be sitting through a long, complicated trial. You're going to be hearing from a lot of witnesses. You're going to get the insights from the lawyers about what they think the evidence will show and then at the end of the case what they think the evidence has established.

If you talk to your friend or neighbor or spouse or children or loved one, they haven't had that opportunity. And so your judgment could be affected by something somebody else told you. And it wouldn't be fair to the Kuipers and it wouldn't be fair to Givaudan if you were influenced by anything other than the evidence in the case.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 210 of 223

1    So I'm a realist.  I know when you get home people are

2  going to say, "Oh, I can tell you got stuck with jury duty

3  because you didn't get home early.  And what happened to telling

4  the judge you had nonrefundable tickets to Hawaii, and how come

5  you have to serve?"

6    So I understand there's going to be natural curiosity

7  about the fact that you're serving.  There's going to be natural

8  curiosity about the case.  I understand that.

9    I've been married 31 years.  I love my spouse dearly.

10  I never talk to her about the cases until they're over.  My

11  spouse is very opinionated, and I think if I told her about what

12  case I was trying or what was involved, she would blurt out an

13  opinion.  I don't always agree with my spouse.  Matter of fact,

14  we have probably more than our share of disagreements.  But I

15  wouldn't even want to take the chance of being influenced by

16  somebody else's opinion.  Even though I think I'm kind of immune

17  to it, I don't even want to put myself in that situation.  And I

18  don't want you to put yourselves in that situation because it's

19  kind of an awkward situation.  But I understand human nature.

20    So when you go home, you can tell somebody you're

21  involved in a complicated civil case and it's going to last, you

22  know, three weeks, and when it's all over and you reach a

23  verdict, you'll be glad to sit down with them and tell them

24  everything they ever wanted to know about what it's like to be a

25  juror in a civil case in the Northern District of Iowa.  So it's

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 211 of 223

1    real important that you not talk about the case.

2              Second, you'll notice right in front of each of you we

3    have cup holders.  And we just recently had those installed.

4    And that was actually an idea that I got from a juror in our

5    juror evaluation forms.  She said how come the lawyers are

6    drinking water, I'm drinking water, the witnesses are drinking

7    water, everybody's drinking but the jurors?  That was a great

8    idea.

9              So ever since that juror said that, I've allowed

10   jurors to bring in beverages, and then we had these cup holders

11   installed to make it easier -- I was going to crack a bad

12   joke -- so you don't spill your coffee and wind up suing our

13   court like the McDonald's case, but I was just kidding.  So now

14   you have these cup holders.

15             Here's the deal:  You can bring anything in you want

16   keeping in mind that it's gotta be nonalcoholic.  I was talking

17   to a judge in Washington, D.C.  Matter of fact, she's the head

18   of our Federal Judicial Center.  And we were talking about trial

19   innovations, and I was saying I let the jurors bring things in

20   to drink.  And she said, "You do what?"  And I explained to her.

21   And she said, "Well, aren't they smuggling in alcohol?"  And I

22   said, "No, I've never had a problem."  I said, "Besides, they

23   could have alcohol down in their purse or briefcase and take a

24   little swig when they're on break."

25             So, you know, you have to trust people, and in the

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 408   Filed 06/09/09   Page 212 of 223

1   midwest we trust our jurors, and we've never had a problem.  She

2   was just kind of shocked about that.  But it just goes to show

3   you some of the differences.  So you can bring beverages in, and

4   our agreement is you can do that as long as it's nonalcoholic.

5           Our schedule for the rest of this week and I think

6   probably the rest of the trial until maybe the very last day

7   will be we're going to go from 8:30 to 2:30.  We will take a

8   25-minute break somewhere between 10 and 10:15, and then we'll

9   take a second break somewhere between 12 and 12:15.  So one of

10  the judgments you have to make is, because we're really only

11  going to take two 25-minute breaks, is how much beverage intake

12  can my bladder handle without taking real frequent bathroom

13  breaks.  So that's a decision I leave to the sound discretion of

14  each juror.

15          I'm really pleased that the eight of you were selected

16  to serve.  You know, every case in federal court is an important

17  case, and it's important to the parties.  This case is very

18  important to the Kuipers.  It's equally important to Givaudan.

19  And both parties are entitled to eight jurors who will judge the

20  evidence fairly and impartially and then make the best judgment

21  they can make based on the facts and the law in my instructions.

22  And that's all we ask of you.

23          It's a big duty, and I just -- I'm sure you'll all

24  take it very seriously.  I know I take my job very seriously.

25  I've cracked some jokes and tried to have some fun because when

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 408   Filed 06/09/09   Page 213 of 223

1    I first started 15 years ago, a federal judge told me you

2    shouldn't lose your sense of humor or you'll go crazy in this

3    job.  And I think he's right.  So I've tried to keep a sense of

4    humor.

5             But if I crack a joke or we all have a laugh together,

6    that's okay.  But it never, never should detract from the

7    seriousness of our task.  And my task and your task is we need

8    to do justice in this case, and justice is listening to the

9    evidence and then giving it your best shot and doing the best

10   you can.  And that's all we ask.

11            So thank you very much.  You will find that I start

12   promptly for the most part.  I think in my last ten-day trial I

13   started on time every recess.  One time I was in discussions

14   with another federal judge about a matter that was important to

15   him, and I took an extra couple minutes.  But if you think I say

16   8:30 we're going to start at 9:00, not happening.

17            I make the lawyers get here real early.  The lawyers

18   are very hard working.  We're going to try and work out as many

19   problems as we can.  Occasionally there may be a problem and we

20   have to have a sidebar like we had when I turned on the noise,

21   or I might send you down to the jury room while we discuss

22   something.  But we're going to make our absolute best efforts to

23   keep that to a minimum.  So from 8:30 to 2:30, hopefully except

24   for the two 25-minute breaks, you'll be in the box, in the jury

25   box, listening to witness testimony and receiving evidence.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 214 of 223

1      Thank you very much.  Like you to get here a few

2  minutes before 8:30 tomorrow so at exactly 8:30 we can bring you

3  up and hear the riveting opening statements from the lawyers.

4  Thank you very much.  We'll see you tomorrow morning.

5      (The jury exited the courtroom.)

6      THE COURT:  Please be seated.  Well, I didn't put any

7  pressure on you for your opening statements, did I?  No.  Good.

8  I'm sure you'll rise to the occasion.

9      One thing we did not cover, I'm only going to allow

10  direct, cross, and redirect.  I'm not going to allow recross.

11  It just -- at that point the lawyers are almost always beating a

12  dead horse; I would need to call the Animal Rescue League.  And

13  the jurors just -- it's just -- you know, it's not going to be

14  in the cards.

15      Now, if there's some super-exceptional reason why you

16  need to do recross, it better be a blockbuster reason because I

17  have absolute authority under the rules to limit it to direct,

18  cross, and redirect.  And it goes both ways.  When the

19  plaintiffs are putting on their witnesses, they get the last

20  word on redirect.  When the defendants are putting on their

21  evidence, they get the last word on redirect.

22      But believe me, I've done many trials where I put --

23  didn't put limits on it, and we're doing re-, re-, re-, re-,

24  re-recross, and it's just unbelievably repetitive.  And the

25  number-one thing -- in the 15 years and the hundreds and

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 402   Filed 06/09/09   Page 215 of 223

1  hundreds and hundreds and hundreds of trials I've had, the

2  number-one critique of lawyers is we get it the first time and

3  that lawyers are way too repetitive.  And if all the lawyers in

4  this case can get out of this case with the evaluations not

5  saying you're repetitive, you get triple gold stars from me

6  because they almost always say that about the lawyers.

7          And by the way, just so you know, I talked in jury

8  selection about this juror evaluation form.  When we get those

9  back from the jurors, my secretary will copy that portion that

10 relates to the lawyers on one side and send it to all you.  I

11 just don't think it's fair to see what the jurors say about your

12 opponents.  You're out-of-state lawyers.  It probably wouldn't

13 make a big difference in this case.  But when I have Sioux City

14 lawyers, you know, I wouldn't be surprised that one put those

15 comments about the other lawyer in a marketing campaign or put

16 it on their wall in their office.  So to avoid those kind of

17 problems, we just let each side see your own stuff.

18         Would the defense want to give me any more of a

19 heads-up on the problem areas that you see with the expert

20 witness that's going to be the lead-off witness?  I know you've

21 been very kind to give me a heads-up on it, and you gave me some

22 examples.

23         Is he really going to like pontificate on corporate

24 ethics and stuff?

25             MR. MCCLAIN:  No.  And he's testified in 11 of these

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 216 of 223
to purchase a complete copy of the transcript.

1  cases now before 6 different judges and never had any of his

2  testimony excluded or any problems.  It just is, you know -- I

3  think --

4         THE COURT:  Well, there's a first time for everything,

5  isn't there?

6         MR. MCCLAIN:  Right.  I'm sure that there is.

7         THE COURT:  Yeah.

8         MR. MCCLAIN:  But no, I don't anticipate there will be

9  any problems with any of his testimony.  It's clearly within the

10 bounds of what he writes about and teaches about relating to

11 public health.  It all relates to being a public health

12 physician and investigating what causes disease and how disease

13 outbreaks can be prevented.

14        And he's, you know -- as I say, he's studied this more

15 than any other physician in the country and written an extensive

16 article about it that's been published in a peer review journal.

17 Almost all of the opinions that he'll express are contained in

18 that article, and they deal with Givaudan as being the test case

19 of what a company ought not do when confronted with a public

20 health emergency like they had with their employees.

21        They had nearly ten employees with bronchiolitis

22 obliterans, and the evidence that you'll hear tomorrow and

23 throughout the case is that Givaudan tried to cover that up

24 throughout the time period and not get to the bottom of what was

25 causing the disease, going to the very issues about testing and

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 217 of 223
to purchase a complete copy of the transcript.

1  other things that you've just instructed the jury on.

2        So Dr. Egilman will not be expressing legal opinions

3  in the least, simply medical and public health opinions.

4        THE COURT:  Okay.  Yes.

5        MR. MEADOR:  May I respond, Your Honor?

6        THE COURT:  You may.  Can you come to the microphone,

7  please?  It's a little easier from the podium.  Thank you.

8        MR. MEADOR:  I'm not used to be asked to speak up.  I

9  have a loud voice.

10       THE COURT:  It's a big courtroom.  Without the sound

11 system, it's tough, so thank you.

12       MR. MEADOR:  This is a punitive damage case.  An

13 expert can't opine as to parties' motivations and intent and

14 breach of corporate ethics.  I mean, that's within the province

15 of the jury.  I don't think Judge Egilman -- Judge Egilman.

16 You'll see him.  He'll be like a judge.  I don't think he's been

17 really attacked in some of the other state courts and other

18 jurisdictions on these points.  And he's going to -- wait till

19 you see him.  They point at a PowerPoint, and I've read the

20 transcripts.  And 20 minutes later he's on PowerPoint number 10.

21       THE COURT:  After just the one question, yeah.  Yeah.

22 Well, we're not doing it that way.  On the other hand, you know,

23 I give some leeway to experts on somewhat of a narrative answer,

24 but, you know, we're not just saying, "What's your opinion,

25 Doc.?" and have him off to the races and 20 minutes later he's

Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 218 of 223

1   ending -- coming up for air waiting for another question.

2           So, you know, I'll just exercise my best judgment on

3   whether it's unduly inappropriate narrative answer or not

4   so . . .

5           MR. MEADOR:  There's one other point is how -- there

6   may be certain areas he gets into that just completely lacks

7   foundation.  And we've stipulated to a lot of documents that

8   have gone in the record that have a lot of facts.  I mean, how

9   are we going to be able to communicate with you, because he may

10  be opining on some facts outside this case that will never come

11  in?

12          THE COURT:  Did you bring hand puppets?

13          MR. MEADOR:  I could bring them.

14          THE COURT:  Well, you know, how do you want to

15  communicate?  Every time we're getting into a problem you want

16  me to send the jury out?

17          MR. MEADOR:  No, of course not.

18          THE COURT:  You can -- here's what I suggest you do.

19  If you think -- you know, you can either object that there's no

20  foundation.  If you feel you need to ask him questions, then you

21  can ask permission to voir dire the witness and go ahead and ask

22  him some questions to further establish your view that there's

23  not a proper foundation or whatever your objection is.  And then

24  I'll just rule on it.

25          MR. MEADOR:  That will be fine, Your Honor.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 219 of 223

1          THE COURT:  I don't really know how else to do it.

2    You could hold up a flashcard saying, "Don't let him testify to

3    this."

4          MR. MEADOR:  They try these cases different than most

5    people because none of the facts come in first.  And Dr. Egilman

6    is actually going to opine almost on every issue in this case

7    before you hear from a witness.  So it makes -- but we'll work

8    through the problem.

9          THE COURT:  Okay.  You know, I want you to make a full

10   record, and I realize that's very important.  So you'll just be

11   objecting a lot I guess.  Hopefully if Mr. McClain is right

12   that -- have you put him on before in cases?

13         MR. MCCLAIN:  Oh, yes, Your Honor.  As I say, in these

14   cases I put him on 11 different times before 6 different judges.

15   I mean, several of these judges like in Joplin, Missouri, had

16   more than one case, and so he appeared before the same judge

17   more than once.  But he's appeared -- he just appeared in state

18   court in front of Judge Van Amburg who I think that -- perhaps

19   I'm wrong, but she had some contact with you or Dennis Egan in

20   regard to jury instructions.

21         THE COURT:  Oh, yeah, yeah.  I know Dennis Egan from

22   Kansas City, sure.

23         MR. MCCLAIN:  Right, and good friend of me, and he and

24   Judge Van Amburg are very good friends.  He just appeared in

25   front of Judge Van Amburg.  We had no problems at all,

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 220 of 223

1    completely different set of defendants than these but completely

2    different set of defendants than we had dealt with before.  So I

3    think that we'll help Mr. Meador to relieve his anxiety.  He

4    seems to be very concerned about this.  But it will not be

5    extraordinary.  It will be -- and it will help move the case

6    along.

7            THE COURT:  But I bet those very transcripts that

8    Mr. Meador reviewed are the ones where you put this witness on.

9            MR. MCCLAIN:  Yes.

10            THE COURT:  Yeah, right.  So, you know, like most

11    trials, advocates have a different view of the same set of facts

12    but -- and that's what the adversary system is all about.

13            We'll just -- I do appreciate the heads-up.  I'll be

14    giving it some thought, and we'll just, you know, muddle through

15    as best we can.  But, you know, if there's anything else you

16    need from me or want from me, let me know.

17            And, you know, I was only slightly hard on the lawyers

18    pretrial.  But, you know, I recognize that I've got excellent

19    lawyers in front of me.  It doesn't always happen that way.  And

20    if I or my staff can do something to make your job easier, you

21    don't like the way I do it, you've got a better mousetrap,

22    there's anything we can do, I mean, you know, I'm here to try

23    and help you, not to -- you know, and to be fair and impartial

24    and make all the rulings I have to make.

25            But I was a trial lawyer for 17 years before I was a

1 judge. And I know judges can make your life difficult or they

2 can make it easy. I don't have any interest in making your life

3 difficult. You have a very tough job. It's much tougher than

4 my job, and I understand that and appreciate it.

5 So if there's something that we can do to make your

6 next three weeks easier, don't be shy about letting us know. I

7 may not be able to do it, but if there's any way I can, I want

8 to. I want to make your job easier. Okay?

9 MR. MEADOR: Thank you, Your Honor.

10 THE COURT: Okay. And like I indicated in my e-mail I

11 think that I sent Friday night, I'll be meeting with you every

12 morning. And then, you know, at the end of every break when we

13 take a break some time between 10 and 10:15, I'll wait till the

14 jurors are out till the CSO closes the door, and then I'll say,

15 "Are there any things we need to discuss?" because I do like

16 heads-up. I'm not big on surprises. And so, you know, I think

17 if we can give everybody a heads-up on potential problems, we're

18 going to -- we're going to have a better trial.

19 I have never retried a case, knock on wood. But, you

20 know, there's always a first for everything. I hope it's a

21 two-day trial, not a three-week one, though, when my time comes.

22 Anything we need to take up at this point?

23 MR. MCCLAIN: No, Your Honor.

24 THE COURT: Okay. Thank you very much. We'll see you

25 tomorrow morning. Thanks. Why don't we meet at eight o'clock

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ Document 400 Filed 06/09/09 Page 222 of 223
to purchase a complete copy of the transcript.

1    just to see if there's anything cooking overnight.  Thank you.

2              (The foregoing trial was

3              adjourned at 4:35 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                        CERTIFICATE

21         I certify that the foregoing is a correct transcript

22    from the record of proceedings in the above-entitled matter.

23

24

25         s/ Shelly Semmler                    3-20-09
         Shelly Semmler, RMR, CRR                Date

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of this transcript.