IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

RONALD KUIPER and                          No. C06-4009-MWB
CONLEY KUIPER,

       Plaintiffs,                    Sioux City, Iowa
                                           February 19, 2009
   vs.                                    8:07 a.m.

GIVAUDAN FLAVORS CORP.,                     VOLUME 3 OF 12

       Defendant.
_____/


TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
UNITED STATES DISTRICT JUDGE, and a jury.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ Document 405 Filed 06/09/09 Page 1 of 99

```
APPEARANCES:

For the Plaintiffs:        KENNETH BLAIR MCCLAIN, ESQ.
                           STEVEN EDWARD CRICK, ESQ.
                           SCOTT A. BRITTON-MEHLISCH, ESQ.
                           Humphrey, Farrington & McClain
                           Suite 400
                           221 West Lexington
                           Independence, MO  64050

                           DENNIS M. MCELWAIN, ESQ.
                           Smith & McElwain
                           Suite 530
                           505 Fifth Street
                           Sioux City, IA  51101

For the Defendant:         JAMES D. PAGLIARO, ESQ.
                           KEVIN M. DONOVAN, ESQ.
                           THOMAS J. SULLIVAN, ESQ.
                           Morgan, Lewis & Bockius
                           1701 Market Street
                           Philadelphia, PA  19103-2921

                           V. THOMAS MEADOR, ESQ.
                           Morgan, Lewis & Bockius
                           Suite 2200
                           300 South Grand Avenue
                           Los Angeles, CA  90071-3132

                           STEPHEN J. HOLTMAN, ESQ.
                           Simmons Perrine
                           Suite 1200
                           115 Third Street Southeast
                           Cedar Rapids, IA  52401-1266

Court Reporter:            Shelly Semmler, RMR, CRR
                           320 Sixth Street
                           Sioux City, IA  51101
                           (712) 233-3846
```

1          (Proceedings reconvened outside the presence of the

2     jury.)

3          THE COURT:  Okay.  Good morning.  What do we have on

4     our agenda this morning?

5          MR. HOLTMAN:  Good morning, Judge.

6          THE COURT:  Good morning.

7          MR. HOLTMAN:  We had one issue having to do with

8     preserving our objections -- they're going to read or show

9     depositions today.

10         THE COURT:  Yes.

11         MR. HOLTMAN:  And several or many of the exhibits that

12    are going to be used by the deponent we had objected to on our

13    exhibit list and were part of the motion in limine.  And we

14    simply want to discuss with you the mechanism for preserving

15    those objections.  We don't expect you to go through and rule on

16    them, but they can be grouped.  For example, some of the

17    exhibits have to do with documents from the Givaudan plant in

18    Cincinnati.  And, you know, you have overruled our motion in

19    limine on that.  But we just want to make sure under 103(a)(2)

20    that we have a record on that.

21         I would like to introduce to you Mr. Tom Sullivan,

22    Judge.  He's the attorney from our side who has been talking to

23    the plaintiffs about this issue, and he can perhaps give you

24    more definitive information.

25         THE COURT:  Okay.  Thank you, Mr. Holtman.

Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 3 of 99

```
1          MR. HOLTMAN:  You're welcome.

2          THE COURT:  Thank you.  Mr. Sullivan, good morning.

3          MR. SULLIVAN:  Good morning, Your Honor.  As

4    Mr. Holtman was saying, we filed a motion in limine as Your

5    Honor knows.  I would say approximately 98 percent of the

6    documents that are within a designation that will be shown today

7    fall within the motion in limine that we filed with respect to

8    the Carthage investigation.  There are a couple that followed in

9    the motion in limine for the International Bakers litigation and

10   maybe one or two on the BASF issue that was part of our motion.

11         And we didn't want to trouble Your Honor with filing

12   objections to all those, but as Mr. Holtman mentioned, we'd just

13   like to preserve the record on those.  I have --

14         THE COURT:  And what would you like to do to make sure

15   you've preserved your record on it?

16         MR. SULLIVAN:  I don't know precisely which ones are

17   going to be played this morning, Your Honor, just given the time

18   frame, and also I haven't had the chance to review the very

19   final clips.

20         But one thing I might suggest is that when they get

21   played I can match them to the chart that I've made, and then if

22   it would help, I can send a list of the particular trial exhibit

23   numbers to your law clerk.  That might -- that might be one way

24   to do it.  And these are all designated within our exhibit list

25   as a B, and I think it's noted, you know, MIL, and then it might
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ Document 405 Filed 06/09/09 Page 4 of 99
To purchase a complete copy of the transcript

          1    say Carthage investigation or BASF.  These are described on that
          2    exhibit list, and I think if --
          3           THE COURT:  And you filed your exhibit list so that
          4    you've made the record in your exhibit list with regard to all
          5    the B objections; right?
          6           MR. SULLIVAN:  That's correct, Your Honor.
          7           THE COURT:  And then we can kind of incorporate by
          8    reference your objections in the exhibit list and give you a
          9    standing objection if you'd like it to any B exhibits used in
         10    the deposition or in any portion of the trial.
         11           MR. SULLIVAN:  That sounds -- sounds fine, Your Honor.
         12           THE COURT:  And that certainly puts me on notice that
         13    you've objected to it, I've overruled the objection per the
         14    in limine rulings.  And again, you know, I always hate to
         15    represent what it takes for a party to preserve their record.
         16    But since a large part of preserving the record is to give the
         17    trial court judge notice of what the objection is so that we can
         18    rule on it or reconsider it, I feel you've done everything you
         19    can to put me on notice as to what your objection is.
         20           And I'm fully satisfied that by lodging the objection
         21    in the pretrial order that you've preserved your record for my
         22    purposes and that by giving you a standing objection to it
         23    that's kind of a second line of defense to make doubly sure that
         24    you've preserved your record.  And it certainly satisfies any
         25    need that I have as a trial court judge.  If there's anything

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 5 of 99

 1   else I can do for you to help you preserve your record, I'd be

 2   glad to do it.

 3        MR. SULLIVAN:  Thank you, Your Honor.  That

 4   belts-and-suspenders approach works fine.

 5        THE COURT:  Okay.  Anything else you'd like to say,

 6   Mr. Sullivan, or any other problems you're foreseeing in this

 7   deposition?

 8        MR. SULLIVAN:  Not right now, Your Honor.  I just

 9   want -- the plaintiffs provided me with the very final clips.  I

10   just want to take a few minutes to review those before they're

11   actually played.

12        THE COURT:  Okay.  And are you going to have time to

13   be able to do that before 8:30?

14        MR. MCCLAIN:  It's not at 830.  Dr. Egilman is at

15   8:30.

16        THE COURT:  Oh, that's right.  Thank you.

17        MR. SULLIVAN:  I will take a look at them before 8:30

18   and during the breaks as well, Your Honor.

19        THE COURT:  Okay.  Great.  Thank you.

20        Mr. Meador, anything else?

21        MR. MEADOR:  No.  You called me my right name.

22        THE COURT:  Yep.  See, but you've been pronouncing

23   it -- how old are you?

24        MR. MEADOR:  I am 55.

25        THE COURT:  Oh, you've been pronouncing it wrong for

55 years.  You know, it looked to me like Mead, M-e-a-d, but the "a" is really silent.  Is that how to look at it, so it's Meador?

        MR. MEADOR:  Yeah, like med her.

        THE COURT:  But like the company Mead, for example, is M-e-a-d.

        MR. MEADOR:  If you want to order my name changed to a different pronunciation, that's okay.

        THE COURT:  I'm teasing you.  I'm sorry.  I apologize to you for mispronouncing it, and I'll do better.

        MR. MEADOR:  My second point is even more minor.  I'm a little high energy.  Can I walk over here to the side during cross-examination?

        THE COURT:  Absolutely.

        MR. MEADOR:  Like right here?

        THE COURT:  Oh, you can come up in -- you know, here's my deal.  I know I have a lot of crazy rules, but where you examine witnesses, as long as you've got a mike on, if you want to crawl underneath your table, you know, you can do it pretty much from everywhere but getting in the jury box.  That's the only thing that's out of bounds.

        MR. MEADOR:  I thought this might be electrified in here.

        THE COURT:  But no, anywhere in the well of the courtroom is fine, anywhere you want to walk or stand or if you

Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 7 of 99

1    want to walk up to the bench here or do it from the corner here.

2    You just can't do it up on the bench.

3              MR. MEADOR:  Thank you, Your Honor.

4              THE COURT:  I guess I could get a chair for you and

5    put it up here.  Anywhere you want to go is going to be fine.

6              MR. MEADOR:  I actually have a few rulings I'd like to

7    make this morning if it's okay with you.

8              THE COURT:  Well, it's your turn to have the

9    flashcards for me, so, you know, you just hold up whether you

10   want them overruled or sustained.

11             Mr. Meador, anything else?

12             MR. MEADOR:  No thanks.

13             THE COURT:  Okay.  Mr. McClain, do we have anything?

14             MR. MCCLAIN:  No, I don't think so.

15             THE COURT:  Okay.  Well, we'll see you back here at

16   8:30 then; okay?  Thank you.

17             (Recess at 8:14 a.m.)

18             THE COURT:  Mr. Meador, ready to have the jury brought

19   in?

20             MR. MEADOR:  Yes, Your Honor.

21             THE COURT:  Okay.  Thank you.

22             (The jury entered the courtroom.)

23             THE COURT:  Good morning.  Please be seated.  Thank

24   you.

25             You will recall that Mr. Meador is cross-examining

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ Document 405 Filed 06/09/09 Page 8 of 99
To purchase a complete copy of the transcript

1    Dr. Egilman, and you may continue with your cross-examination.

2              MR. MEADOR:  Thank you.  Good morning.

3         DAVID EGILMAN, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

4                   CONTINUED CROSS-EXAMINATION

5    BY MR. MEADOR:

6    Q.    Good morning, Dr. Egilman.

7    A.    Good morning.

8    Q.    Now, yesterday we were talking about some of the Tastemaker

9    products, and we talked about how they would buy pure product

10   from suppliers, and then the pure product would be delivered to

11   their plant.  And then at the Tastemaker plant, they would take

12   various chemicals from a formula and mix it together and get

13   butter flavoring; correct?

14   A.    That's correct.

15   Q.    And we talked a lot about diacetyl, but diacetyl is just

16   one of many ingredients in the butter flavoring; correct?

17   A.    That's correct.

18   Q.    It's the ingredient actually that gives the butter

19   flavoring of the popcorn, at least one of them; true?

20   A.    That's correct.

21   Q.    And you've looked at some of the formulas; right?

22   A.    That's correct.

23   Q.    And there are 15 to 20 approximately chemicals in some of

24   these butter flavorings; correct?

25   A.    Or more, that's correct.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 9 of 99

1    Q.    Or more, correct.  And when we talk about butter flavoring,

2    Tastemaker made different types of butter flavoring; true?

3    A.    That's correct.

4    Q.    And by that I mean they made a powder?

5    A.    That's correct.

6    Q.    They made a paste?

7    A.    That's correct.

8    Q.    And they made a liquid.

9    A.    That's correct.

10   Q.    Now, for the paste products, the amount of the diacetyl --

11   strike that.

12          For the powder products, the amount of diacetyl in the

13   powder was very small; is that right?

14   A.    I don't remember the exact percentages, and small is a

15   relative term.  So you've gotta give me a comparative to answer

16   that question.

17   Q.    Fair enough.  How about less than 3 percent in powders?

18   A.    I think that's probably generally true, but I honestly do

19   not remember the percentages in each product.

20          MR. MEADOR:  Final pretrial status order.

21   Q.    Now, in this case --

22          MR. MEADOR:  Go to page 5.

23   Q.    -- we've entered into certain stipulations between the

24   parties as to certain facts in this case.  And we've entered

25   into stipulation on Mr. Kuiper's work history at the plant.  And

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-BAZ   Document 405   Filed 06/09/09   Page 10 of 99

1  if you look at 46 -- wait.  Where's 45?  No, that's not it.

2  Okay.  Never mind.  He first started working at the plant

3  approximately 1986; is that right?

4  A.    That's correct.

5  Q.    And per the stip, his first position was in the corn

6  shelling area; is that right?

7  A.    That's correct.

8  Q.    And then he worked in the corn shelling area for

9  approximately five years; true?

10  A.    That's correct.

11  Q.    And then he worked as a janitor for approximately one year;

12  right?

13  A.    That's correct.

14  Q.    And then approximately one year after becoming a janitor,

15  that's when he came in the mixing room; correct?

16  A.    That's correct.

17  Q.    And it's fair to say that would have been sometime in 1992;

18  correct?

19  A.    That's correct.

20  Q.    Trial Exhibit 3124A.  Now, yesterday you established that

21  you were an expert in ice cream and library cards.  But is it

22  fair to say you're not an expert in corn shelling?

23  A.    In what?

24  Q.    Corn shelling operations.

25  A.    That's correct.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov

Case 5:06-cv-04009-MWB-PAZ   Document 405   Filed 06/09/09   Page 11 of 99
To purchase a complete copy of the transcript.

1  Q.   And do you recognize this as a map of the American Pop Corn

2  plant?

3  A.   Yes.

4  Q.   And do you see where it says microwave popcorn?

5  A.   Yes.

6  Q.   And is it your understanding that's where the mixing room

7  was?

8  A.   Yes.

9  Q.   And then outside the microwave popcorn plant, you got silos

10  and corn cribs.  I don't know.  There's nine corn cribs

11  approximately, or eight; is that right?

12  A.   That's correct.

13  Q.   And when Mr. Kuiper worked in the corn shelling operation,

14  he was working outside near the silos and the corn cribs; is

15  that right?

16  A.   Yeah, that's outside the building, correct.

17  Q.   Now, let's change subjects here.  Trial Exhibit 3031.  Now,

18  Dr. Curtiss Farrell is Mr. Kuiper's regular doctor; is that

19  true?

20  A.   That's correct.  Well, he was until January.

21  Q.   He saw him in Dunes, South Dakota?

22  A.   He just moved to Nebraska.

23  Q.   And he has been his regular treating doctor for over 20

24  years; right?

25  A.   He was until about the middle of last year, yes.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 12 of 99

1  Q.   But putting that aside, for the previous 20 years, he was

2  his doctor; true?

3  A.   He started in '92 and did the summer of last year, so it's

4  a little less than that, about 15, 16 years.

5  Q.   Now, you reviewed the medical records of Dr. Farrell;

6  right?

7  A.   Correct.

8  Q.   And in there if you look, there's an entry that says SOB.

9  That stands for shortness of breath; right?

10  A.   Correct.

11  Q.   And then there's another entry where it says, "Gets relief

12  from chest tightness with rest"; true?

13  A.   Right.   Can you get the date for this one?

14  Q.   I'll have to come back.

15  A.   It's a 1988 one now that I see it.   If you look at the

16  bottom of this record, you'll see it says, "See back," and on

17  the next page it says 1988 on the bottom I believe.   Right.

18  Q.   And at this time it's recommended that he go to the

19  hospital and get this thing worked up; right?

20  A.   That was part of what was recommended, correct.

21  Q.   And Mr. Kuiper decided that he would, in fact, wait and go

22  home; true?

23  A.   Correct.

24  Q.   And then in Trial Exhibit 3102, this is a note from

25  Dr. Farrell in December of '92; right?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-BAZ   Document 405   Filed 06/09/09   Page 13 of 99

1    A.    Correct.

2    Q.    Looks like December 8, 1992?

3    A.    It's cut off on mine.  Oh, I can't -- yes.  I can't see

4    that on mine, but yes.

5    Q.    And it says, "However, on exam, he doesn't move well.  He

6    said he tried to use the inhalers" --

7    A.    Can you just wait one second because it's -- mine is cut

8    off on the left, so I just want to be able to look?

9              THE COURT:  We're having some problems with some

10   monitors, and our tech people are having a hard time figuring

11   out why, so I apologize for that.  You can turn around and look

12   if that's what you need to do.

13             THE WITNESS:  It's being fixed as we speak.  It's fine

14   now.

15             THE COURT:  Okay.  Thanks.

16             THE WITNESS:  Thanks.

17   BY MR. MEADOR:

18   Q.    It says, "However, on exam he doesn't move his air well.

19   He tried using inhalers, but that caused him to cough so much he

20   quit using them"; true?

21   A.    Correct.

22   Q.    And he states he had this problem for maybe three years,

23   ever since he's worked in this area; right?

24   A.    Correct.

25   Q.    And that area is referring to the corn shelling operation;

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 405   Filed 06/09/09   Page 14 of 99

1  right?

2  A.   Well, no.  At this time he's working in the microwave area,

3  so it includes both.

4  Q.   However, I saw him back in August of 1988, and he had some

5  symptoms similar to this and was seen by Dr. Fell; right?

6  A.   You read that correctly.

7  Q.   Now, in the summer of '96 approximately, Mr. Kuiper began

8  to have some heart problems; is that right?

9  A.   What year was it that you said?  It's '88 is when he first

10  had heart problems, symptoms that they thought might be heart

11  problems.

12  Q.   Let's go to trial Exhibit 3225.  And anyway, he treated

13  with a heart specialist by the name of Dr. Zuehlke,

14  Z-u-e-h-i-l-k (sic)?

15  A.   That's correct.

16  Q.   And trial exhibit indicates that on July 11, '96, he went

17  to see Dr. -- I can't pronounce -- Zuehlke?

18  A.   I think so.

19  Q.   And Dr. Zuehlke took a history from Mr. Kuiper; right?

20  A.   That's correct.

21  Q.   And he took this history prior to 2001 when he had his

22  stroke; correct?

23  A.   That's correct.

24  Q.   And he told Dr. Zuehlke that he works for American Pop Corn

25  and there has been concern that he may have had exposure related

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov

Case 5:06-cv-04009-MWB-PAZ Document 405 Filed 06/09/09 Page 15 of 99
To purchase a complete copy of the transcript.

1  to his employment; true?

2  A.   Well, I can't -- I assume that's where the doctor got the

3  information.  He may have had other records too.

4  Q.   And then --

5  A.   That's certainly what the doctor's impression was, yes.

6  Q.   And then it says his symptoms stretch back to at least

7  1988; correct?

8  A.   That's correct.

9  Q.   Trial Exhibit 3235.  Now, Dr. Egilman, Mr. Kuiper was

10 referred to another heart specialist in 1996; right?

11 A.   That's correct.

12 Q.   And Dr. Baller took a history from Mr. Kuiper; right?

13 A.   That's correct.

14 Q.   And Mr. Kuiper told him that he has a chronic --

15 A.   No, no, no.  If -- this is a letter from Dr. Zuehlke to

16 Dr. Baller.  This is not Dr. Baller's note.

17 Q.   Thank you.  I stand corrected.

18       In the letter it says he has a chronic problem with

19 shortness of breath dating clear back to 1988; right?

20 A.   You read that correctly.

21 Q.   But he has noticed that going clear back to '89 or '90 when

22 he would go up an incline at work and exert, he would find it

23 very hard to breathe and have an oppressive breathlessness;

24 correct?

25 A.   Well, the rest of the sentence is "feeling in his chest,

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 16 of 99

1   nonradiating, not fairly specific chest pain," so the --

2   Q.   And you -- and you reviewed this document; right?

3          MR. MCCLAIN:  Your Honor, could the doctor be allowed

4   to answer the question?

5          MR. MEADOR:  I asked him a leading question.

6          THE COURT:  Well, just why don't you reask the

7   question.

8   BY MR. MEADOR:

9   Q.   You reviewed this record, didn't you, in forming your

10  opinions in this case?

11  A.   Yes.

12  Q.   Trial Exhibit 3271, this is a progress note from

13  Dr. Farrell dated February 10, 1997; true?

14  A.   Can you just give me a second to orient on that?

15  Q.   Sure.

16  A.   I think that's correct, yes.

17  Q.   And he says in this record, "Although I've seen him now for

18  maybe eight to ten years and his status probably hasn't changed

19  a whole lot in that ten years."  That's what he said at that

20  time; correct?

21  A.   That's correct.

22  Q.   And you reviewed this document in forming your opinions in

23  this case; true?

24  A.   That's correct.

25  Q.   Let's go to Trial Exhibit 3689.  Now, yesterday you talked

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 405   Filed 06/09/09   Page 17 of 99

1   about the NIOSH investigation out at the American Pop Corn

2   plant; right?

3   A.   That's correct.

4   Q.   And as part of the investigation, the employees filled out

5   a questionnaire for NIOSH; is that right?

6   A.   That's correct.

7   Q.   And in this --

8        MR. MEADOR:  Well, go back to the first page, please.

9   Q.   And this is a letter from Department of Health Services

10  indicating they were sending records pertaining to Ronald

11  Kuiper; true?

12  A.   Correct, to you, yes.

13  Q.   And let's go to page 3.  And it indicates there that

14  Mr. Kuiper changed his job duties in July of 1996; true?

15  A.   That's correct.

16  Q.   And at that point in time he moved out of the

17  mixer/blending room; right?

18  A.   That's correct.

19  Q.   And at the time he went to do some janitorial work,

20  cleaning in the microwave building; right?

21  A.   That's correct.

22  Q.   And they also asked him how often he uses his respirator.

23  What percentage of time did you wear a respirator while pouring

24  other ingredients into tanks in the mixing room?  And he

25  indicated 20 percent; isn't that right?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 405   Filed 06/09/09   Page 18 of 99

1    A.   I don't recall the -- is that on the right?  Yes, that's

2    correct.

3    Q.   And he was asked how many years he was exposed to grain

4    dusts at American Pop Corn, and he said eight; isn't that right?

5    A.   That's correct.

6    Q.   Now, you've reviewed Dr. Parmet's reports and deposition in

7    this case; right?

8    A.   That's correct.

9    Q.   And Dr. Parmet has indicated that Ron's -- that

10   Mr. Kuiper's lung function was stable between 1992 and 1996; is

11   that correct?

12   A.   I don't recall that exactly, no.

13   Q.   Now, Mr. Kuiper also treated with a local pulmonologist

14   here by the name of Dr. Craig Bainbridge; is that right?

15   A.   That's correct.

16   Q.   And Dr. Bainbridge is from the University of Iowa?

17   A.   I don't recall.

18   Q.   And he's a board-certified pulmonary -- pulmonologist?

19   A.   I believe that's correct.

20   Q.   And he's been treating Ron for his lung problems; right?

21   A.   On and off since '96 I think, yes.

22   Q.   Trial Exhibit 3626.

23   A.   '95, sorry.

24   Q.   This is a progress note dated September 12, 2005; right?

25   A.   That's correct.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 19 of 99

1  Q.   And Dr. Bainbridge stated, "I did do a CT scan, and he did

2  not have any mosaic pattern or anything suggestive of any

3  bronchiolitis."  Is that true?

4  A.   You read it correctly.

5  Q.   Now, when Mr. Kuiper worked as a janitor, he used some

6  chlorine-based cleaners, didn't he?

7  A.   From time to time, yes.

8  Q.   Trial Exhibit 3323.  This is another progress note from

9  Dr. Farrell; right?

10 A.   That's correct.

11 Q.   And it's dated 5-5-98?

12 A.   That's correct.

13 Q.   And he told Dr. Farrell that he was coughing up a lot of

14 clear, whitish sputum which had a chlorine taste; correct?

15 A.   That's what Dr. Farrell wrote, yes.

16 Q.   Trial Exhibit 3234.  Mr. Kuiper also saw Mr. Bacon who is

17 in the same office with Dr. Farrell; right?

18 A.   Dr. Bacon, yes.

19 Q.   He's in the same office; true?

20 A.   I think so.

21 Q.   And he gave him -- look down at the part where it says

22 tests.  He gave him a pulmonary function test; right?

23 A.   That's -- on this day, yes.

24 Q.   And the results of the test was there was --

25 A.   You know, I'm not sure about this record because it's --

Case 5:06-cv-04009-MWB-PAZ   Document 405   Filed 06/09/09   Page 20 of 99
To purchase a complete copy of the transcript.

 1  this is -- can you go to the bottom of this record because -- so

 2  I can just be sure whose it is?  It's on the other page.  This

 3  is a two-page document.  Okay.  So this is Dr. Bacon's note I

 4  guess.

 5  Q.   In the impression it says, He does have a good response to

 6  bronchodilators, so this would be consistent with a diagnosis of

 7  asthma; is that right?

 8  A.   That's part of what he said, yes.

 9  Q.   Let's go back to the first page, please.

10  A.   It's not -- it's not entirely what he said about the

11  diagnosis.

12  Q.   And he was given a pulmonary function test; true?

13  A.   That's correct.

14  Q.   And he was given the test we've talked about yesterday,

15  FEV1; correct?

16  A.   That's correct.

17  Q.   And FEC too?

18  A.   Correct.

19  Q.   Can you explain what the FEC is?

20  A.   That's the measure when I -- as I described yesterday, when

21  you take a deep breath in, it's a measurement of how much air

22  you can bring in to your lungs.  When it's abnormal, it

23  generally indicates that you cannot move your lungs as much as

24  you should be able to, and that's called restriction.  Basically

25  think about restriction to expanding your lungs.  And so it's

1  restrictive lung disease.

2  Q.   And the results of this tests was there was a 15 percent

3  improvement in his FEV1.  It says, "Plus bronchodilators."  I

4  assume that means post-bronchodilators.

5  A.   That's correct.

6  Q.   And 20 cent -- 20 percent improvement in his FEC; right?

7  A.   Yeah.  FEC is not FVC.  That's forced --

8  Q.   FEC.

9  A.   FEC which is what this is is forced expiratory capacity.

10  Q.   And the 15 percent improvement in the FEV1

11  post-bronchodilator, that would indicate reversibility, wouldn't

12  it, sir?

13  A.   Not when you see an improvement in the total volume because

14  that means it may be effort dependent because you're seeing

15  changes in two things, so that what's happened in the second

16  exam is he's clearly expanded his lungs more by 20 percent.  And

17  so it may be that his expiratory volume was improved because he

18  gave a better effort since he clearly had a better effort in

19  terms of how much air he got in.

20  Q.   Thank you.  Trial Exhibit 3707.  This is the results of a

21  high resolution CT scan of the chest; right?

22  A.   Correct.

23  Q.   And they have expiration view of the chest, true,

24  inspiration, expiration?

25  A.   That's correct.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 22 of 99

1   Q.   And the results of that test, some mild prominence of the

2   interstitial marking of lungs; right?

3   A.   That's correct.

4   Q.   This is nonspecific finding.  No alveolitis or areas of air

5   trapping are noticed; true?

6   A.   That's correct.  You read that correctly.

7   Q.   Let's go to 3603.  Yesterday you talked a bit about this

8   document; right?  It's a NIOSH health hazard evaluation report;

9   true?

10  A.   That's correct.

11  Q.   Before we get into the document, let me ask you a couple

12  questions here.  NIOSH came and investigated at the American Pop

13  Corn plant; right?

14  A.   That's correct.

15  Q.   And would you agree that going back to at least 1989 APC

16  had closed tanks in the mixing room?

17  A.   They had lids on them.  They didn't always keep them

18  closed.  Wasn't a closed -- it was not what one would consider a

19  closed process, so no.

20  Q.   And they had local exhaust on the tanks; true?

21  A.   No.  They had exhaust --

22  Q.   And going back to 1989, they had a mandatory respiratory

23  policy; right?

24  A.   Yes.

25  Q.   Now, you showed a little bit of this document yesterday.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 405   Filed 06/09/09   Page 23 of 99

1    Let's go and look at it a little bit more.  Now, in the summary

2    section -- we didn't look at that yesterday.  In the summary

3    section of the report, air sampling on the day they're there

4    showed that air concentrations of diacetyl, a predominant

5    butter-flavoring chemical, measured as a marker of

6    butter-flavoring exposure were very low compared to levels that

7    were associated with abnormal lung function at the Missouri

8    index plant.  The company reported that workers who handled

9    flavorings had used full face respirators with particulate

10   filters and organic vapor cartridges since shortly after the

11   microwave popcorn plant began operating in December of 1988.

12         THE COURT:  Was there a question there?

13   Q.   In forming your opinions in this case, Dr. Egilman, you

14   reviewed this document, this section, didn't you?

15   A.   Yes.

16   Q.   And then later in the report they report the results of

17   some of the levels of diacetyl they found in the plant; right?

18   A.   That's correct.

19   Q.   And let me ask you a question before we get more in the

20   document.  There's a difference between area samples and

21   personal samples; right?

22   A.   That's correct.

23   Q.   I mean, area samples are taken just like it sounds, of a

24   particular area in the plant; true?

25   A.   Yes.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ Document 405 Filed 06/09/09 Page 24 of 99
To purchase a complete copy of the transcript.

1   Q.   And when the sample's taken, the worker may or may not be

2   in that area when the sample's taken; correct?

3   A.   That's correct, although generally you do area samples in

4   an area where you think the workers are going to be.

5   Q.   I couldn't agree more with you.  And then there's personal

6   samples which means you -- like I have this microphone on me and

7   I'm -- so people can hear me in court.  The personal sample is

8   they put equipment on so they can take measurements of the

9   person during the workday; right?

10  A.   That's correct.

11  Q.   And so personal samples more accurately reflect an exposure

12  an individual might give -- might get on a particular day than

13  area samples; right?

14  A.   In general that's correct.

15  Q.   Now, they did take samples at American Pop Corn, and they

16  did record those samples results in a report; right?

17  A.   Yes.

18  Q.   And what they found that at American Pop Corn the area

19  diacetyl air concentrations in the mixing room were 0.57 parts

20  per million, ppm, parts air by volume when liquid and paste

21  flavorings were used on July 29 and were below the limit of

22  detection of the sampling method when powder flavorings were in

23  use on July 31 and August 1.

24       And in formulating your opinion on exposure levels in

25  this case, Dr. Egilman, you reviewed this part of the report,

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 405   Filed 06/09/09   Page 25 of 99
To purchase a complete copy of this transcript.

1  didn't you?

2  A.   I reviewed the whole report.  This is only --

3  Q.   Now --

4  A.   This is only part of what they found.

5  Q.   Now, it says that -- at least for powder, it says, "Were

6  below the limit of detection."  This may be obvious to everyone.

7  But when it says below the level of detection, that means they

8  didn't find any diacetyl in the air; is that right?

9  A.   That's correct.  There's a limit below which there may be

10 diacetyl in the air but the device used to test it can't find

11 it.  They never say it isn't there.  They just say it's below

12 our ability to measure it if it is there.

13 Q.   And then NIOSH goes on to say personal diacetyl exposures

14 for the mixers for the 3 days of sampling were 0.04, 0.004, and

15 0.005 ppm respectfully (sic).  Did I read that right?

16 A.   You read that part right, yes.

17 Q.   And in formulating your opinions in this case, you reviewed

18 this part of the report, didn't you?

19 A.   I reviewed this part and the entire report, yes.

20 Q.   Now, you indicated that you have reviewed Dr. Parmet's

21 report; is that right?

22 A.   That's correct.

23 Q.   And did you read the part where Mr. Kuiper told Dr. Parmet

24 that the powder flavors don't bother him much?

25 A.   I don't recall that language specifically.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ  Document 405  Filed 06/09/09  Page 26 of 99

1  Q.   And speaking of powders, most of the product that

2  Tastemaker provided to American Pop Corn, it was powder, wasn't

3  it?

4  A.   By volume or by percentage of diacetyl that went into the

5  plant?  It's different depending on which is the question.

6  Q.   I'm just -- I'm just talking by volume.

7  A.   Yes.

8  Q.   Now, yesterday -- and maybe I misunderstood you -- that

9  this whole thing -- strike that.

10        Yesterday you talked about Jasper, and that's the part

11 where NIOSH went in and first discovered this problem and

12 investigated.  And I thought you indicated yesterday that some

13 of the CT scans at Jasper were negative for the mosaic pattern.

14 A.   No.

15 Q.   Let's go to Exhibit 952, please.

16 A.   Can I just see the rest of this document?

17 Q.   Yeah, I was just saying that.

18 A.   I mean, if you're just going to ask me a reading question,

19 that's no problem.

20 Q.   No, no, I was going to . . .

21 A.   Okay.

22 Q.   NIOSH health hazard evaluation report, Jasper, Missouri,

23 January 2006; right?

24 A.   Right.  This is not the one I was referring to because --

25 Q.   Right.  I stand corrected.  This is a later report from

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 405   Filed 06/09/09   Page 27 of 99
To purchase a complete copy of the transcript.

1   NIOSH for the same facility; true?

2   A.   Correct.

3   Q.   And in this study at NIOSH, they found all high-resolution

4   chest computed tomography scans, HRCT, showed marked bronchial

5   wall thickening and mosaic attenuation with air trapping on the

6   expiratory view; right?

7   A.   Correct.  Well, if you could go up, I'm not sure -- they

8   didn't do the CAT scan, so it was whatever was done on the

9   workers they examined by their private doctors, so I need to see

10  if -- I forget the numbers above.  If you go back to the

11  original view, I think that that's -- you read it correctly if

12  that suffices.

13  Q.   Okay.  I'm moving on here.  Now, you reviewed all the

14  medical records; right?

15  A.   I reviewed all the ones I got.

16  Q.   And when you reviewed the medical records, there wasn't any

17  evidence in there that Mr. Kuiper had a short-term high-dose

18  exposure to any diacetyl; right?

19  A.   In the records, no.

20  Q.   Now, yesterday you talked about Tastemaker and what

21  happened at its plant in Carthage; right?

22  A.   In where?

23  Q.   Carthage which is outside Cincinnati.

24  A.   You said Tastemaker.

25  Q.   Yeah.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ Document 405 Filed 06/09/09 Page 28 of 99
To purchase a complete copy of the transcript.

1    A.    Okay.  Okay.  Yeah.

2              MR. MCCLAIN:  Your Honor, I don't know what

3    distinction's being made between Tastemaker and Givaudan.  I

4    object to that as long as -- I object to the question as

5    phrased.

6              THE COURT:  Overruled.

7    BY MR. MEADOR:

8    Q.    What I'm driving at -- I wasn't trying to make any

9    distinction.  But there was an investigation at the plant in

10   Cincinnati, Ohio; right?  You testified about that yesterday.

11   A.    Cinc -- originally you said Carthage, didn't you?

12   Q.    Yeah.

13   A.    Okay.  Well --

14   Q.    Oh, you don't know the plant is actually in Carthage --

15   A.    No, no, no, not --

16   Q.    -- not Cincinnati?

17   A.    There was -- the problem is there was another -- there was

18   another issue at Carthage in Joplin, so there's two Carthages,

19   so that's where I was confused.  Sorry.

20   Q.    But yesterday you were talking about --

21   A.    The Cincinnati plant, yes.

22   Q.    -- the Cincinnati plant, okay.  So I'd like to go through

23   in a more chronological order and talk about what happened at

24   that plant.

25             MR. MEADOR:  So if we could go to the final pretrial

1  order, please, page 4.

2  Q.   So in this order we stipulated to more facts.  And I think

3  you talked about this yesterday, but after the coroner reported

4  the problem and the death of Janice Irick, the plant personnel

5  formed a task force to investigate; right?

6  A.   That's correct.

7  Q.   And they had senior management on this task force; true?

8  A.   That's correct.

9  Q.   They had their regulatory tox person; right?

10  A.   Nancy Higley, that's correct.

11  Q.   And they had Industrial Hygienist John Hochstrasser; right?

12  A.   I'm not sure he's a certified hygienist.  He was certainly

13  the head of environmental health and safety, yes.

14  Q.   And he was in charge over time in terms of the industrial

15  hygiene of the plant; right?

16  A.   Correct.  He was an engineer.

17  Q.   And then in 1994 they hired Stuart Brooks, and we'll talk

18  about him in a minute.  And then in '95 they hired Dr. Roy

19  McKay, Dr. James Lockey, and Susan Pinney from the University of

20  Cincinnati; right?

21  A.   That's correct.

22  Q.   Now, when you were talking about American Pop Corn

23  yesterday, you testified about the difficulty sometimes of

24  identifying whether somebody has bronchiolitis, asthma, or some

25  other respiratory problem, right, back in the early '90s?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 30 of 99
To purchase a complete copy of the transcript.

1    A.    With respect to this product, the people exposed to

2    diacetyl can present as if they had asthma or restrictive

3    disease or some other lung disease.

4    Q.    And the doctors that were looking at the patients for

5    American Pop Corn, they had trouble diagnosing the diseases;

6    right?

7    A.    Not at Givaudan plant.  There were biopsies -- there were

8    biopsies and definitive diagnoses --

9    Q.    Okay.  Well, that's not my question.  I'll get to that in a

10   minute.  I was talking about the American Pop Corn plant.

11   A.    Oh, here?  For sure.

12   Q.    Now, you reviewed the records of Dr. Baughman, haven't you?

13   A.    Yes.

14   Q.    And Dr. Baughman had some trouble diagnosing what people

15   had, didn't he, at the Givaudan plant?

16   A.    Sometimes he made the diagnosis.  Sometimes he didn't.  I'm

17   not sure what you mean by trouble.

18   Q.    Well, sometimes in the early years he questioned whether it

19   was occupationally related or whether it was some other problem;

20   right?

21   A.    You know, I think he went back and forth on some of the

22   cases.  On other cases he was clear.  I think in general he

23   thought that none of the -- all of them had -- should be

24   restricted from exposure whether he made a diagnosis or not.

25   Q.    Now, yesterday you were shown a document by Mr. McClain,

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ Document 405 Filed 06/09/09 Page 31 of 99
To purchase a complete copy of the transcript

1    Trial Exhibit 103.  And the part in green is the part
2    Mr. McClain put up for you yesterday.  Do you recall that?
3    A.    Yes.
4    Q.    And above that it refers to Dr. Baughman; correct?
5    A.    Yes.
6    Q.    And it talks about Dr. Baughman's evaluation of Cliff
7    Walker; right?
8    A.    Yes.
9    Q.    And it says, "i.e., no work-related illness"; true?
10   A.    That's part of the sentence.
11   Q.    And then it says -- it looks like "Conclusion, work does
12   not cause illness"; right?
13   A.    Right.  That was what Dr. Baughman said, and the rest is --
14   says that Baughman hadn't made the diagnosis but that the
15   company people felt that their exposures were making Mr. Walker
16   worse.
17   Q.    Now, Trial Exhibit 111, this is a document that says,
18   "Occupational exposure investigation, liquids department,
19   Cincinnati, Ohio, September 9, 1993"; right?
20   A.    Correct.
21   Q.    And in 1993 --
22   A.    You know, just if I might ask, if you can pull them to the
23   right when you pull them up, then I won't have to keep turning
24   if you don't mind.  Thanks.
25   Q.    No problem.  And in 1993, Tastemaker was still

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ  Document 405  Filed 06/09/09  Page 32 of 99
To purchase a complete copy of the transcript

1   investigating the problem at the plant; right?

2   A.    That's correct.

3   Q.    And at least in September 1993 what they were saying is the

4   prognosis for identifying a single etiological agent is not

5   good.  Also, two or more chemicals could be acting

6   synergistically, or a chemical or combination of chemicals could

7   be acting as a promoter.  To make matters even more difficult,

8   single or multiple chemicals could be acting synergistically

9   with viral or bacterial diseases to effect a bronchitis or

10  bronchiolitis, or a chemical or chemicals could be invading the

11  respiratory tracts of employees weakened by an infectious

12  disease and/or could be interacting with antibodies formed by

13  recent diseases and/or exposures.

14          And in forming your opinions about Tastemaker in this

15  case, you reviewed this document, didn't you, sir?

16  A.    Yes, the whole document.

17  Q.    Now, it says the prognosis for identifying a single

18  etiological agent is not good.  And does etiological mean

19  looking for the cause?

20  A.    Yes.

21  Q.    Trial Exhibit 116.  This is a memo dated November 8, 1993,

22  Paul Farrell.  Paul Farrell was the safety director; right?

23  A.    That's correct, at the Givaudan plant in Cincinnati.

24  Q.    Yeah, with a copy to Nancy Higley; right?

25  A.    Correct.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
for purchase of complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 33 of 99

1    Q.    And Randy Schmelzel.  He was the plant manager; true?

2    A.    At this time I think that's correct.

3    Q.    And at that time they began initiating an industrial

4    hygiene sampling program; correct?

5    A.    No.

6    Q.    At this time they prioritized the list of chemicals for

7    which they needed to perform an industrial hygiene sampling

8    program; right?

9    A.    As soon as possible.  That's what they wrote down, yes, but

10   they didn't initiate it.

11   Q.    And the first six chemicals they were looking at were

12   dimethyl sulfate -- I may be mispronouncing these.  Allyl --

13   well, forget that one.  Ferrous sulfate, and the jury can read

14   it.  Anyway, none of these chemicals are PELs or TLVs; right?

15   A.    In the United States that's correct.

16   Q.    Now let's go to Trial Exhibit Number 129.  Yesterday you

17   talked about Stuart Brooks, and he was hired to help investigate

18   the problem at the Tastemaker plant; true?

19   A.    Correct.

20   Q.    And this -- this is a memo from John Hochstrasser, right,

21   dated June 2, 1994; true?

22   A.    That's correct.

23   Q.    And this is directed to Mike Davis, the president?

24   A.    That's correct.

25   Q.    And Bob Pellegrino.  He was an officer; true -- officer

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-BAZ   Document 405   Filed 06/09/09   Page 34 of 99

1  too?

2  A.    I don't remember who he was.

3  Q.    And Karen Duros was a lawyer.  And Ed Steiger headed up the

4  task force; right?

5  A.    I don't recall who was in charge of the -- I think it was

6  different peoples -- different people at different times.

7  Q.    Anyway, this is a memo recording the visit from Stuart

8  Brooks to the plant; right?

9  A.    That's correct.

10  Q.    And what Mr. Hochstrasser said on June 2, 1994, Dr. Brooks

11  could not identify if their conditions are occupationally

12  related and that they could be the result of bronchiolitis

13  obliterans with obstructive pneumonia, BOOP.  Further

14  investigation is needed to clarify this issue.  Dr. Brooks

15  stated that if these bronchiolitis obliterans are found to be

16  occupationally related, it would be associated with a previously

17  unidentified exposure.  In other words, it would be identified

18  as a new disease in the medical community because occupational

19  bronchiolitis obliterans has only been associated with exposure

20  to massive concentrations of highly destructible gases such as

21  sulfur dioxide.

22        In formulating your opinions in this case, sir, you

23  reviewed this document, didn't you?

24  A.    I did.

25  Q.    Now I'd like to look at Trial Exhibit 132.  Now, yesterday

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 405   Filed 06/09/09   Page 35 of 99
To purchase a complete copy of the transcript

1  you talked about Dr. Brooks, and you had some very kind words to
2  say about him.  You recall that?
3  A.    No.
4  Q.    You testified that he trained most of the lung doctors in
5  Cincinnati?
6  A.    That's correct.
7  Q.    And Mr. McClain in his opening statement said that
8  Dr. Brooks was a world-renowned occupational physician.  You'd
9  agree with that, wouldn't you?
10  A.    He's known around the world, yes.
11  Q.    And he's written a textbook?
12  A.    I wasn't sure about that yesterday.  I think that's
13  probably true.
14  Q.    But you would agree he's very knowledgeable as an --
15  occupational medicine; right?
16  A.    Yes.
17  Q.    Now, he came out to the plant in May of 1994; right?
18  A.    Yes.
19  Q.    And yesterday someone, either Mr. McClain or you, indicated
20  that he was in Cincinnati, but in this report it looks like at
21  that time he was at the University of South Florida; is that
22  right?
23  A.    Yeah, he was transitioning to South Florida at this time.
24  Q.    And they hired Mr. -- Dr. Brooks to see if they could find
25  out the cause of the problem at the plant; true?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 36 of 99
To purchase a complete copy of the transcript.

1  A.    I'm not sure.

2  Q.    Looking at the first paragraph, he was contacted by

3  Dr. John Hochstrasser about a possible work-related respiratory

4  health problem of some employees; right?

5  A.    That's correct.

6  Q.    And Dr. Brooks says initially it was believed by Tastemaker

7  that there were at least two employees and possibly a third with

8  bronchiolitis obliterans; true?

9  A.    That's correct.

10  Q.    And then Dr. Brooks says there are at least three known

11  causes of bronchiolitis obliterans:  Post-infectious, toxic

12  fumes or gas inhalation or idiopathic or unknown.  The latter

13  category is often associated with other medical conditions such

14  as connective disease disorder, post-lung transportation (sic).

15  Some cases are completely unknown.  For the Tastemaker setting,

16  category number 2 is the most appropriate consideration, but

17  epidemic viral infection is a possibility.

18          You reviewed this section of this report in

19  formulating your opinions in this case; correct?

20  A.    I read the whole report, yes.

21  Q.    And then Dr. Brooks says reported exposures include oxides

22  of nitrogen, sulfur dioxide, ammonia, chlorine, and phosgene

23  gases; right?  That's what Dr. Brooks said?

24  A.    You read that correctly.  That's part of what he said.

25  Q.    Now let's see what Dr. Brooks did in his investigation of

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
for purchase of complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 405   Filed 06/09/09   Page 37 of 99

1    the plant.  First of all, Dr. Brooks toured the entire plant;

2    correct?

3    A.    That's correct.

4    Q.    He met with a number of employees?

5    A.    That's correct.

6    Q.    He met with a number of executives?

7    A.    That's correct.

8    Q.    He met with the team we talked about that were

9    investigating the problem:  Hochstrasser, Higley, Karen Duros;

10   right?

11   A.    Yes.

12   Q.    And he talked to local physicians, Joseph Thorpe, Robert

13   Baughman, and Grady Campbell; right?

14   A.    That's correct.

15   Q.    And then Dr. Brooks reviewed the world's literature on

16   bronchiolitis obliterans; right?

17   A.    That's correct.

18   Q.    And yesterday you talked about Ann Midaugh.  Do you recall

19   that testimony?

20   A.    Yes.

21   Q.    And Dr. Brooks went out and spoke with Dr. Ann Midaugh;

22   right?

23   A.    I don't know if he met with her or called her on the phone.

24   I don't recall.

25   Q.    But anyway, she's an occupational medicine physician in

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 405   Filed 06/09/09   Page 38 of 99
To purchase a complete copy of the transcript.

1  Cincinnati?

2  A.    That's correct.

3  Q.    And at least Dr. Brooks indicated she was familiar with

4  Tastemaker and had examined at least one employee; right?

5  A.    That's correct.

6  Q.    And then Dr. Brooks contacted several of the top U.S.

7  researchers and experts in occupational lung diseases and

8  bronchiolitis obliterans about occupational associations; right?

9  A.    That's correct.

10  Q.    And then he went on a plant tour and looked at all the

11  operations that were going on at the plant; right?

12  A.    That's correct.

13  Q.    And one thing about the plant operation was that an

14  employee on any given day or week could be making a number of

15  different flavors on one particular day of the week; is that

16  right?

17  A.    That's correct.

18  Q.    So it wasn't like the plant where somebody would just make

19  butter flavoring all the time; right?

20  A.    That's correct.

21  Q.    So one employee actually could be making butter flavoring,

22  vanilla, all the other flavors we talked about the other day.

23  A.    That's correct.

24  Q.    Because he'd be given a formula, and they'd take the

25  formula, and then he'd make the product; right?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 39 of 99

1  A.   Right.  Certain workers were not exposed to certain

2  chemicals and were exposed to other chemicals.  So they weren't

3  all exposed to everything.

4  Q.   And then Dr. Brooks then reviewed all the MSDSs at the

5  plant; right?

6  A.   Correct.

7  Q.   And he failed to identify a product or chemical that was a

8  known cause of bronchiolitis obliterans; correct?

9  A.   That's correct.

10  Q.   Then he said there were a number of chemicals that are

11  known to cause occupational asthma, a condition which may

12  simulate bronchiolitis obliterans; correct?

13  A.   Yes.

14  Q.   And then Tastemaker shared patient information with

15  Dr. Brooks; right?

16  A.   No.

17  Q.   Detailed medical information was made available on five

18  employees; right?

19  A.   That's correct.

20  Q.   And Dr. Brooks contacted treating physicians and obtained

21  additional information on these individuals; right?

22  A.   That's correct.

23  Q.   And then he also reviewed information on 29 other

24  individuals at the plant; right?

25  A.   That's correct.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 405   Filed 06/09/09   Page 40 of 99
To purchase a complete copy of the transcript.

```
1              THE COURT:  Mr. Meador, could we take our stretch
2    break now?
3              MR. MEADOR:  That'd be great, Your Honor.
4              THE COURT:  Okay.  Thank you.
5              Okay.  Thank you.  Please be seated.
6              Any time you're ready.  Thank you.
7              MR. MEADOR:  Sorry, Your Honor.  I was daydreaming.
8              THE COURT:  That's okay.  I've been known to do that
9    too.
10   BY MR. MEADOR:
11   Q.   Dr. Egilman, when you had patients, you would respect their
12   privacy and confidentiality, wouldn't you?
13   A.   Yes.
14   Q.   You wouldn't just take those records and give them to third
15   parties without your patients' permission, would you?
16   A.   Unless there was a compelling legal reason.  There are some
17   diseases that are reportable, particularly occupational
18   diseases.  In Ohio, for example, there's a law that says you
19   have to report them to the state health department.
20   Q.   Let's go back to Dr. Brooks' report.  Conclusions and
21   recommendations, Dr. Brooks says there appears to be an
22   unusually high number of employees with either suspected or
23   confirmed bronchiolitis obliterans.  Is that what he said?
24   A.   You read that correctly.
25   Q.   An epidemic bronchiolitis obliterans of occupational origin
```

Case 5:06-cv-04009-MWB-RAZ Document 405 Filed 06/09/09 Page 41 of 99

1  has not previously been described.  That's what he said; right?

2  A.    You read that correctly.  That's part of what he said.

3  Q.    And then he -- fourth -- recommendation number 4, it is

4  recommended that an occupational health program be initiated by

5  Tastemaker and that medical personnel be identified to help with

6  this organization; correct?  That was his recommendation?

7  A.    That was one of his recommendations.

8  Q.    I'll get -- in number 4; right?

9  A.    Yes.

10  Q.    And after his report, in fact, Tastemaker did retain

11  Dr. McKay, Dr. Lockey, and Dr. Pinney; right?

12  A.    For a short period, yes.

13  Q.    And Dr. Lockey was the one setting up the medical

14  surveillance program; right?

15  A.    Well, the original plan for that was Brooks, and then

16  Lockey and McKay set one up after Brooks.

17  Q.    Right.  They were local in Cincinnati, weren't they?

18  A.    That's correct.

19  Q.    And they set up the medical surveillance program, and they

20  set up with Dr. McKay a respiratory protection program; right?

21  A.    That's correct.

22  Q.    So this recommendation that Dr. Brooks made was followed;

23  correct?

24  A.    Not correct.

25  Q.    Then he goes on to say, "It is highly recommended that an

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
for purchase of complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 405   Filed 06/09/09   Page 42 of 99

1    epidemiologic investigation be conducted to address at least two

2    questions:  Is there an excess of obstructive lung disease among

3    current Tastemaker employees?"  So this is 1994; right?

4    A.    That's correct.

5    Q.    And Dr. Brooks is suggesting that they have -- initiate a

6    study to find out if they had an excess of lung disease at the

7    plant.

8    A.    In this paragraph, that's correct.

9    Q.    Then he'd also want to do a study are there workplace

10   exposures that are affecting persons who have abnormal lung

11   function or who note respiratory complaints; right?

12   A.    That's correct.

13   Q.    So at this point in time, Dr. Brooks was saying let's

14   investigate to see if there are even workplace exposures causing

15   problems at the plant; right?

16   A.    That was what he wrote in the second -- in other

17   recommendations as well.

18   Q.    And you know that from reading the documents that

19   Tastemaker decided not to continue to initiate a study that was

20   going to look at whether there was an excess of obstructive lung

21   disease or it was related to workplace.  What they decided to do

22   was initiate the medical surveillance program, update the

23   respiratory protection program, and update the industrial

24   hygiene at the plant; correct?

25   A.    You mean in terms of what they planned to do at that time?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
For purchase of complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ  Document 405  Filed 06/09/09  Page 43 of 99

1    Q.    Yeah.

2    A.    Yes.  They told -- they terminated Brooks and didn't go

3    along with his recommendations for how to examine the cause, and

4    they initiated a respirator program and made some beginning

5    industrial hygiene changes in the plant.

6    Q.    Yeah.  They did make industrial hygiene changes at the

7    plant; right?

8    A.    Some minor ones, yes.

9    Q.    Now, I know Dr. Brooks feels like he was terminated, but

10   Tastemaker hired three experts to continue to assist them with

11   their investigation at the plant; right?

12   A.    Not exactly, no.

13   Q.    Is there anything in Dr. Brooks' report in 1994 that

14   indicates that diacetyl was a cause of bronchiolitis obliterans?

15   A.    No.

16   Q.    In fact, in his report did he indicate any chemical was the

17   cause of bronchiolitis obliterans at the plant?

18   A.    That's correct.  He named no particular chemical, nor did

19   he indicate that he was given information that Hochstrasser had

20   identified diacetyl as a likely cause.

21           MR. MEADOR:  Move to strike as nonresponsive.

22           THE COURT:  Overruled.

23   BY MR. MEADOR:

24   Q.    Now, Dr. Lockey was hired in 1995; right?

25   A.    That's correct.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
for purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 405   Filed 06/09/09   Page 44 of 99

1  Q.    And Dr. Lockey was investigating the cause of the problems

2  at the Carthage plant; right?

3  A.    That's correct.

4  Q.    And at some point in time in '96 he told Tastemaker that

5  he'd identified the problem as a chemical not in butter

6  flavoring, a chemical called acetaldehyde; is that right?

7  A.    He thought that was the most likely cause, that's correct.

8  Q.    And isn't it true from your review of all the documents in

9  this case that Dr. Lockey never advised Tastemaker in the '95,

10  '96, '97 time period that diacetyl was the actual cause of any

11  of the problems at the plant?

12  A.    That's correct.

13  Q.    And Dr. Lockey or none of the other experts advised

14  Tastemaker they had to change any of their MSDSs; is that true?

15  A.    That's correct.

16  Q.    And no one advised Tastemaker that they needed to contact

17  customers to talk about problems at the plant; is that right?

18  A.    That's correct.

19  Q.    Now, you testified about MSDSs yesterday.  Recall that

20  testimony?

21  A.    Yes.

22  Q.    And it's fair to say that you've never actually drafted

23  your own MSDSs; right?

24  A.    That's correct.

25  Q.    Now, do you know who Thomas Bates is?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 405   Filed 06/09/09   Page 45 of 99
To purchase a complete copy of the transcript.

```
1   A.    You'll have to give me a clue.

2   Q.    Works at IFF?

3   A.    Ah.  I think so, yes.

4   Q.    And IFF is -- who is IFF?

5   A.    IFF is International Flavorings and Fragrances, a large

6   flavorings company.

7   Q.    In fact, do you know the attorney who works there, Frank

8   Woodside?

9   A.    Sure.  He used to represent me.

10  Q.    Now, yesterday -- let's go -- yesterday Mr. McClain showed

11  you an MSDS that he said was in the Tastemaker file.  Do you

12  recall that?

13  A.    No, I don't -- he didn't say where it was from.

14  Q.    If you'd look -- well, first of all, you see this is an

15  MSDS for diacetyl; right?

16  A.    Correct.

17  Q.    And then it says Bates, Thomas; true?

18  A.    Correct.

19  Q.    And that's the IFF person we were talking about?

20  A.    Oh, this is an IFF document.

21  Q.    So this document doesn't indicate that this particular MSDS

22  went to Tastemaker; is that right?

23  A.    That's correct.

24  Q.    Now, you know what international chemical safety cards are,

25  don't you?
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 46 of 99

1    A.    Yes.

2    Q.    In the first paragraph it says the international chemical

3    safety cards offer essential health and safety information on

4    chemicals to promote their safe use.  They are intended to be

5    used at the shop floor level by workers and employers in

6    factories, agriculture, construction, and other places of work,

7    being particularly useful in less developed areas and in small

8    and medium enterprises.  They are also designed to be part of

9    education and training activities.  Is it your understanding

10   that's what these cards are for?

11   A.    Yes.

12   Q.    Let's go to TRX 3165.

13          Now, this is the international chemical safety card

14   for diacetyl; right?

15   A.    I don't know that.

16          MR. MCCLAIN:  Your Honor, then I object.  Lacks

17   foundation.

18          MR. MEADOR:  It's in evidence.

19          MR. MCCLAIN:  Well, the witness doesn't know anything

20   about it.

21          THE COURT:  Well, it's not actually a foundation

22   objection.  He either knows or he doesn't know, so objection's

23   overruled.

24   BY MR. MEADOR:

25   Q.    Now, do you see where it says diacetyl on the safety card?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ Document 405 Filed 06/09/09 Page 47 of 99
To purchase a complete copy of the transcript.

1    A.    Yes.

2    Q.    And it was peer reviewed on October 26, 1994; right?

3    A.    Correct.

4    Q.    And you explained peer review yesterday; right?

5    A.    No.

6    Q.    That's when other scientists look at it and approve the

7    information that goes in a particular document?

8    A.    Well, not exactly, no.

9    Q.    Okay.  Why don't you explain to me what peer review is.

10   A.    That's a long answer.  I'll try and give you the short --

11   the abridged version.

12         Peer review generally means that a document or an

13   article or a study is looked at by other scientists who

14   generally don't get to look at the underlying data, but they do

15   evaluate whether it's internally consistent.  So for that reason

16   in the journal business, it's not infrequent that people can

17   successfully publish completely fraudulent data, and that's

18   happened even in the most prestigious journals over and over

19   again.

20         So peer reviewers don't look at the underlying data.

21   And the amount of work they do, they're almost always volunteer.

22   They usually spend for the most prestigious journals two to

23   three hours looking at a document or evaluating a document.  So

24   it is given much more credence than it deserves in terms of

25   giving a stamp of approval on a particular document.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 48 of 99

1   Q.   On the top of this document, it actually says NIOSH; right?

2   A.   That's one of the organizations, yes.

3   Q.   And let's go down where it says inhalation, and there's a

4   column that says prevention, and it says ventilation, local

5   exhaust, or breathing protection; correct?

6   A.   Correct.  You read that correctly.

7   Q.   And then it says for first aid if you're exposed to

8   diacetyl get fresh air and rest; right?

9   A.   That's correct.

10           MR. MEADOR:  I'd like to see TRX . . .

11  Q.   You see at the top where it says this is another safety

12  card for diacetyl?

13  A.   That's correct.

14  Q.   And again, NIOSH is one of the organizations; true?

15  A.   That's correct.

16  Q.   And then it says November 23, 2007, validated; right?

17  A.   Correct.

18  Q.   And then it says inhalation, prevention, ventilation, local

19  exhaust, or breathing protection; right?

20  A.   Correct.

21  Q.   And again under first aid it says fresh air, rest, and then

22  refer for medical attention; true?

23  A.   Correct.  You read that correctly.

24  Q.   And then on page 3 of this document, it says, "Workers

25  exposed to this substance in conjunction with other substances

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
for purchase of complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ  Document 405  Filed 06/09/09  Page 49 of 99

1   have been found to be at an increased risk of bronchiolitis

2   obliterans.  However, the evidence is inadequate at this time to

3   conclude that it is this specific substance that is responsible.

4   Health effects of exposure to the substance have not been

5   investigated adequately.  Environmental effects from the

6   substance have not been investigated adequately."  Is that what

7   the safety card was saying in 2007?

8   A.    You read it correctly.

9   Q.    Now let's go back and look at the Tastemaker MSDS that you

10   talked about yesterday which is TRX 1882.  And yesterday you

11   only showed us part of this document; right?

12   A.    That's correct.

13   Q.    And when you look at an MSDS, you want to look at the whole

14   document so you understand what type of protections to take;

15   right?

16   A.    If it's there, that's correct.

17   Q.    I mean, you would anticipate an industrial hygienist at a

18   plant, the person trained to read MSDSs, would read the whole

19   MSDS before initiating a protection plan for the workers; right?

20   A.    That's correct.

21   Q.    Let's take a look at it.  It says health hazard data.

22   First of all, permissible exposure limit, PEL, there isn't one,

23   is there?

24   A.    That's correct.

25   Q.    There wasn't one in '91?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 50 of 99

1   A.   And there still isn't one now.

2   Q.   And then threshold limit value, TLV, not established?

3   A.   Correct.

4   Q.   And there wasn't one in '91?

5   A.   And there isn't one now.

6   Q.   And then it says possible routes of entry:  Skin, eyes,

7   ingestion, inhalation of vapors; right?

8   A.   Correct.

9   Q.   And then under inhalation, it says, "Inhalation is

10  irritating to nose, throat, and lungs"; right?

11  A.   Yes.

12  Q.   And then there's a section called applicable control

13  measures; right?

14  A.   Correct.

15  Q.   This is a section that although an industrial hygienist

16  would read the entire document, this is one section he'd focus

17  on to think about how he'd set up the plant ventilation and

18  protect workers; right?

19  A.   This is one thing he'd consider, yes, or she.

20  Q.   In this section under appropriate hygienic practices, it

21  says, "Avoid contact with eyes, skin, and clothing.  Wash

22  thoroughly after handling.  Avoid breathing fumes"; right?

23  A.   You read that correctly.

24  Q.   And then engineering controls.  Now, engineering controls

25  can mean things like ventilation; correct?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ Document 405 Filed 06/09/09 Page 51 of 99
To purchase a complete copy of the transcript.

1    A.    Correct.

2    Q.    You can have local ventilation; right?

3    A.    That's correct.

4    Q.    You can have general ventilation; true?

5    A.    That's correct.

6    Q.    Now, under engineering controls, it says, "Provide adequate

7    ventilation"; right?

8    A.    That's correct.

9    Q.    Now, we were talking about Dr. Lockey a few minutes ago.

10   And he told Tastemaker he thought it was acetaldehyde; right?

11   A.    That's what he thought the most likely substance was.

12   Q.    And then he -- Trial Exhibit 461.  This is an abstract from

13   Dr. Lockey in the year 2002; right?

14   A.    That's correct.

15   Q.    So this is actually after Jasper and the NIOSH

16   investigation; right?

17   A.    That's correct.

18   Q.    And in 2002 Lockey still identifies acetaldehyde as the

19   cause of bronchiolitis obliterans; right?

20   A.    That's correct.  Well, as it -- why don't you show them.

21   Not exactly correct.

22   Q.    I want to be exactly correct.  The causes of BO range from

23   infectious agents, toxic gases, fumes, mists or dusts,

24   connective tissue --

25   A.    I can't -- can you just wait one second?  If you're going

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ  Document 405  Filed 06/09/09  Page 52 of 99

1    to ask me if you read it correctly, I gotta be able to read it.

2    Okay.  Where are you reading from?

3    Q.   The causes -- two sentences before the highlight.

4    A.   Go ahead.

5    Q.   The causes of BO range from infectious agents, toxic gases,

6    fumes, mists or dusts, connective tissue disorders, complication

7    from heart/lung transportation (sic) as well as idiopathic.  An

8    index case of BO was identified in a worker involved in the

9    food-flavoring manufacturing industry.  A subsequent survey of

10    the workforce identified an additional four workers with

11    clinical findings consistent with BO.  A comprehensive review of

12    the work site identified multiple agents within the

13    food-flavoring industry as potential causative agents and most

14    prominently acetaldehyde.

15          Now, my question is is the only chemical identified

16    directly by Dr. Lockey in 2002 was acetaldehyde; is that right?

17    A.   The only one he names is acetaldehyde, that's right.

18    Q.   Now, I'd like to move to a different topic.  Now, we've

19    talked about Tastemaker and Givaudan, and I want to put that

20    story aside, and let's go to the final pretrial conference

21    order, page 5, number 33.

22          Now, in this case we've entered in a stipulation with

23    Mr. McClain that will be read to the jury later, and this

24    stipulation is important.  Prior to an August 1, 2002, study

25    published in the New England Journal of Medicine called

1    "Clinical Bronchiolitis Obliterans in Workers At a Microwave

2    Popcorn Plant," it was not known in the general medical or

3    scientific communities that there could be any connection

4    between using butter flavoring containing diacetyl and the

5    potential for that lung disease.

6            Now, the article referred to in the stipulation

7    relates to the investigation in Jasper, Missouri; is that right?

8    A.   That's correct.

9    Q.   And the author who wrote this -- one of the authors is

10   Kreiss?

11   A.   Kay Kreiss, that's correct.

12   Q.   Kay Kreiss?  Now, even though this is the first published

13   literature on the subject, it didn't answer all the questions

14   about whether there's any connection between diacetyl or butter

15   flavoring in bronchiolitis obliterans; is that true?

16   A.   That's true.

17   Q.   Let's look a little bit more at the article.  Let's look at

18   TRX 834.  This is a copy of the article?

19   A.   That's correct.

20   Q.   Now, in the report it says, "Analysis of air samples from

21   the mixing room identified more than a hundred volatile organic

22   compounds.  There were no known occupational causes of

23   bronchiolitis obliterans identified among these compounds or in

24   the plant at large."

25           Now, when it says there were more than a hundred

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ  Document 405  Filed 06/09/09  Page 54 of 99

1    volatile organic compounds, she was talking about more than a

2    hundred volatile organic compounds in the air at the plant at

3    Jasper; right?

4    A.    That's correct.

5    Q.    In fact, that's what makes some of these investigations so

6    difficult because there's a number of different chemicals,

7    solvents, and other substances used at a plant that can be

8    emitted in the air; correct?

9    A.    That's not what made this difficult, no.

10   Q.    Well, I'm not -- okay.  But she identified there's more

11   than a hundred volatile organic compounds in the mixing room;

12   right?

13   A.    That's correct.

14          MR. MCCLAIN:  Under the rule of completeness, could we

15   read the rest of that sentence?

16          THE COURT:  Yes.

17          MR. MCCLAIN:  Diacetyl, 2,3-butanedione, a ketone with

18   butter flavor characteristics, was the predominant compound

19   isolated from air samples.

20   BY MR. MEADOR:

21   Q.    And then at the end of the article she says, "Although many

22   questions remain about the specific agents involved and about

23   safe and unsafe levels of exposure, prevention is possible on

24   the basis of the current findings."  This is consistent with

25   your prior testimony that there were still a lot of questions

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 55 of 99

1  about the relationship between butter flavoring and diacetyl?

2  A.   No, this is consistent with my prior testimony where he

3  said that you didn't have to identify the exact substance before

4  you prevent a disease since a supplied air respirator would

5  prevent exposure to all of the organic substances and you could

6  do that as they did it without identifying the particular

7  chemical compound.

8  Q.   Thank you.  Now, even though we have our stipulation as to

9  what the first published literature was, yesterday you talked

10 about a 1986 NIOSH report related to International Bakers.

11 A.   That's correct.

12 Q.   Correct?  And at International Bakers, NIOSH concluded that

13 they were unable to identify a specific cause of the workers'

14 illnesses at that bakery; correct?

15 A.   That's correct.

16 Q.   And so NIOSH recommended that since they couldn't figure

17 out the cause you should control the exposures; true?

18 A.   That's correct.

19 Q.   And part of the reason why they couldn't identify which

20 agent it was, because there were 48 different chemicals used at

21 that plant; right?

22 A.   That's part of the reason, yes.

23 Q.   And one of the things they were primarily focused on in

24 that study actually was mold and dust as a possible source of

25 the problem; right?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 405   Filed 06/09/09   Page 56 of 99

1  A.   They looked at mold and dust and a variety of other things,

2  yes.

3  Q.   In fact, they looked at 500 different sources; right?

4  A.   Hundreds.  I don't remember if it was 500.

5  Q.   Hundreds.  They looked at everything they could at the

6  plant; right?

7  A.   I think so.

8  Q.   And ultimately they concluded -- Trial Exhibit 506 -- none

9  of the chemical ingredients used in the mixes are known causes

10  of bronchiolitis or emphysema.  You reviewed this in formulating

11  your opinions, didn't you, sir?

12  A.   The whole document, yes.

13  Q.   And in conclusion they concluded no specific etiology of

14  the workers' illnesses was identified; right?

15  A.   That's part of what's there.  You read that correctly.

16  Q.   And what they conclude in that report in the absence of a

17  specific identified etiology for the two cases of severe

18  obstructive lung disease, every attempt should be made to

19  control airborne dust in the mixing room; right?

20  A.   That's exactly correct.

21  Q.   Let's go to TRX 922.  Let's wait on that actually.

22  Yesterday you talked about this BAS study.  You recall that?

23  A.   BASF, yes.

24  Q.   And you indicated that it was written in 1993.

25  A.   Correct.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 405   Filed 06/09/09   Page 57 of 99

1  Q.   But isn't it true that that study wasn't available to the

2  public or to FEMA until 2001?

3  A.   No.

4  Q.   Okay.  Let's see TRX 922.  It says, "Attached hereto are

5  two pages of records from the files of RIFM, FEMA database

6  relating to the diacetyl monograph which shows that the

7  unpublished BAS 1993 study on the acute inhalation toxicity LC50

8  of diacetyl as a vapor in rats, 4-hour exposure, parentheses,

9  BASF, 1993, was first received by RIFM on October 19, 2001, was

10 sent to RIFM toxicologist on October 23, 2001, and was

11 thereafter available to users of the RIFM database after October

12 28, 2001."

13        In formulating your opinions in this case, you

14 reviewed this document, didn't you, sir?

15 A.   Yes.

16 Q.   Now, yesterday you talked about the Hubbs study.  Do you

17 recall that testimony?

18 A.   Yes.

19 Q.   And the Hubbs studies were testing giving high

20 concentrations to rats; right?

21 A.   Relative to workers they're about the same concentration as

22 the mixing workers go.

23 Q.   And the problem with using rats is they actually don't get

24 bronchiolitis obliterans; is that true?

25 A.   They don't get the similar disease, that's right.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ  Document 405  Filed 06/09/09  Page 58 of 99
To purchase a complete copy of the transcript

1  Q.   And the results they found in the Hubbs study -- which, by

2  the way, that was 2002; right?

3  A.   Correct.

4  Q.   First Hubbs.

5  A.   Correct.

6  Q.   And so that was after the New England Journal article we

7  talked about before.

8  A.   No, I think there was a reference to it in the New England

9  Journal article.

10 Q.   It's about the same time.  They're both 2002?

11 A.   Correct.

12 Q.   And the results of the Hubbs studies is there was damage in

13 the rats that was limited to the nasal and upper airways; is

14 that right?

15 A.   Right.  Upper bronchus was involved as well as the nasal

16 and sinuses.

17         MR. MEADOR:  Just a minute, Your Honor.

18 Q.   Now, in this case you know we have an expert Dr. James

19 Stewart; right?

20 A.   Yes.

21 Q.   And you've read his reports?

22 A.   He's a hygienist.

23 Q.   Industrial hygienist?

24 A.   Correct.

25 Q.   And you've seen his testimony where he's concluded that the

1    MSDSs of my client are adequate; right?

2    A.    No, I didn't read his testimony.

3    Q.    So you haven't read his reports or testimony?

4    A.    I read his report.  I didn't read his testimony.

5    Q.    Now, yesterday you talked about in 1997 how Tastemaker went

6    to talk to FEMA.  Do you recall that testimony?

7    A.    '96 they went to talk to them.

8    Q.    '96.

9    A.    Yes.

10   Q.    And Dr. Lockey went with Nancy Higley?

11   A.    Correct.

12   Q.    And the purpose of going to see FEMA in '96 was to tell

13   FEMA that in general there had been a problem at one of the

14   flavoring plants, right, with bronchiolitis obliterans?

15   A.    It's not my understanding, no.  My understanding is the

16   purpose was to find out if anybody else was having a problem.

17   Q.    And FEMA went out and talked to all their members and

18   reported that there wasn't a problem; right?

19   A.    Hallagan called people up, and no one else reported having

20   similar cases I think.  That's correct.

21   Q.    Now, Dr. Egilman, in this case you've testified at

22   deposition that the MSDSs that Sensient supplied to American Pop

23   Corn were defective; right?

24   A.    In certain ways, yes.

25   Q.    And you've also testified that the MSDSs that International

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
for purchase of complete copy of transcript.
Case 5:06-cv-04009-MWB-RAZ Document 405 Filed 06/09/09 Page 60 of 99

1  Flavor and Fragrances provided to American Pop Corn were

2  inadequate; right?

3  A.    During this time period, yes.

4  Q.    And you also --

5  A.    In other words, the time period when he was exposed I would

6  have looked at.

7  Q.    And you've also testified that the MSDSs provided to -- I'm

8  sorry, provided by FONA to American Pop Corn were inadequate;

9  true?

10  A.    In certain respects, yes.

11  Q.    In fact, you've testified that all suppliers' MSDSs were

12  inadequate.

13  A.    I don't think so.

14       MR. MEADOR:  Egilman deposition, this is May 10, 2007,

15  page 198, lines 3 through 10.

16       (Videotaped deposition excerpt of David Egilman was

17  played in open court.)

18       THE COURT:  That's a different question than what you

19  asked him, so you gotta be real careful.

20       MR. MEADOR:  Okay.

21       THE COURT:  Because you asked him about all suppliers.

22  You didn't qualify it with regard to what they supplied.  They

23  could have supplied paperclips.

24       MR. MEADOR:  Okay.  Let's go Trial Exhibit 1046.

25       THE COURT:  Just to try and clarify things, why don't

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 405   Filed 06/09/09   Page 61 of 99

1  you go back and ask him.  I think what you're intending to ask

2  but, you know, it's for you to decide is not paperclips but

3  butter flavoring, suppliers of butter flavorings.  I think

4  that's what you were asking, but it's your question, but it --

5  BY MR. MEADOR:

6  Q.   Doctor --

7       THE COURT:  You know, the problem is -- just a second.

8  The problem is what you showed in his deposition was a different

9  question than what you asked him in court, so it really wasn't

10 fair attempted impeachment because you have to ask the identical

11 question or something very closely similar.

12      MR. MEADOR:  Yeah, I should have shown him further up.

13 I understand, Your Honor.

14      THE COURT:  Or I think you should have qualified what

15 you meant by the word supplier because a paperclip that American

16 Pop Corn has is supplied by somebody, but I don't think they're

17 required to supply a -- the MDMS form -- yeah, the MSDS form.

18 So just to clarify it so that the trier of fact can understand,

19 why don't you reask the question with regard to what you mean

20 about suppliers.

21      MR. MEADOR:  Thank you, Your Honor.  I will, Your

22 Honor.

23 BY MR. MEADOR:

24 Q.   I was asking questions at that deposition, wasn't I?

25 A.   Yes, you were asking -- that was you -- your voice on the

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ  Document 405  Filed 06/09/09  Page 62 of 99
To purchase a complete copy of the transcript

1  video.

2  Q.    And you have testified in this case and a number of cases

3  that all the suppliers of butter flavoring in the 1990s, that

4  their MSDSs were defective.

5  A.    I don't think so.  That's not what I said there.  What I

6  said of the ones I reviewed in this case were generally

7  inadequate.  I said what I said.  I mean, I said the MSDSs I've

8  seen in this case were generally inadequate.  That's my opinion

9  now, and that was what I said then.

10 Q.    Thank you.  Let's go to document TRX 1046.  We've talked

11 about this before, Dr. Egilman.  This is your report dated

12 January 12, 2007; right?

13 A.    That's correct.

14 Q.    Now let's go to your diagnosis section, please.  Okay.

15 Let's start at the top.  See where it says bronchiolitis

16 obliterans and go under there?  This is a report for Mr. Kuiper;

17 right?

18 A.    That's correct.  There's a typo in it.  We'll get there I

19 guess.

20 Q.    Okay.  Let's go down to that typo.  You say, "There's no

21 evidence that Mrs. Foth had any severe lung infection that might

22 have caused her BO, and steroid treatment has not worked.  Thus

23 I rule out these causes."  Mrs. Foth is not Mr. Kuiper; right?

24 A.    No, she's Mrs. Stillmunkes from another case.  I was doing

25 both reports I think around the same time.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
for purchase of complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 63 of 99

```
 1  Q.   Isn't it true that you just cut and paste your analysis of
 2  Mr. Kuiper from another report that you prepared for Mrs. Foth?
 3  A.   No, but the language is the same.
 4            MR. MEADOR:  I don't have any more questions.  Thank
 5  you.
 6            THE COURT:  Well, I think now would be a good time to
 7  take our mid-morning recess.  We'll be in recess until 10:30.
 8  Remember to keep an open mind till you've heard all of the
 9  evidence in the case.  Thank you.
10            (The jury exited the courtroom.)
11            THE COURT:  Anything we need to take up?
12            MR. MEADOR:  No, Your Honor.
13            THE WITNESS:  May I stand down, Your Honor?
14            THE COURT:  You may.
15            Mr. McClain, anything we need to take up at this time?
16            MR. MCCLAIN:  No.
17            THE COURT:  Okay.  See you back at 10:30.  Thank you.
18            (Recess at 10:03 a.m.)
19            THE COURT:  Mr. McClain, ready to have the jury
20  brought in?
21            MR. MCCLAIN:  Mr. Britton-Mehlisch just ran to the
22  restroom.  We'll be ready I think.
23            THE COURT:  Well, remember what I told you in the
24  e-mail?
25            MR. MCCLAIN:  He's right here.
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ Document 405 Filed 06/09/09 Page 64 of 99
To purchase a complete copy of the transcript.

1          THE COURT:  Okay.

2          MR. MCCLAIN:  He was here.

3          (The jury entered the courtroom.)

4          THE COURT:  Thank you.  Please be seated.

5          Mr. McClain?

6          MR. MCCLAIN:  Yes, Your Honor.

7          THE COURT:  You may proceed.  Thank you.

8          MR. MCCLAIN:  Thank you.

9                    REDIRECT EXAMINATION

10  BY MR. MCCLAIN:

11  Q.   Dr. Egilman, I want to go over several of these things that

12  Mr. Meador talked to you about.  The first is he started out

13  yesterday by claiming that you were not on Brown's website.  Do

14  you remember that?

15  A.   Yes.

16          MR. MCCLAIN:  Your Honor, this is an exhibit number

17  which we have added for a rebuttal exhibit.  Is it all right if

18  I just announce it?

19          THE COURT:  Announce what now?  The number?

20          MR. MCCLAIN:  The number.  What it is is Brown's

21  website that we went on last night because a question was raised

22  about it in court yesterday as to whether or not he's on the

23  website.

24          THE COURT:  Oh, okay.

25          MR. MCCLAIN:  So I'd like to introduce that as an

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ  Document 405  Filed 06/09/09  Page 65 of 99
for purchase of complete copy of the transcript

1  exhibit since it was raised in --

2          THE COURT:  Yeah.  Well, what's the number?

3          MR. MCCLAIN:  It's 2176, Your Honor, and then the

4  syllabus list also on the website for his courses are 2177 and

5  2178.

6          THE COURT:  Any objection?

7          MR. MEADOR:  No, Your Honor.

8          THE COURT:  Okay.  So 2176, 2177, 2178 are admitted.

9                          *   *   *   *

10         (Exhibits 2176, 2177, and 2178 were admitted.)

11                          *   *   *   *

12         MR. MEADOR:  I said no, Your Honor.  If I could at

13  least look at them?

14         THE COURT:  Oh, sure.

15         MR. MEADOR:  Your Honor, now I've looked at them.  I'd

16  like to object to the last one, the syllabus.  I don't see how

17  that's rebuttal to anything.  I didn't suggest he didn't teach

18  any classes.  I mean, he does teach classes.

19         MR. MCCLAIN:  Yeah, that was the suggestion I believe.

20         MR. MEADOR:  No.  He actually answered in detail about

21  the cl --

22         THE COURT:  Well, remember what I said about speaking

23  objections?

24         MR. MEADOR:  Excuse me, Your Honor.

25         THE COURT:  That's okay.  But that would qualify as

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 405   Filed 06/09/09   Page 66 of 99

1    one.  You may proceed.  Twenty -- all three exhibits are

2    admitted.

3              MR. MCCLAIN:  Thank you.  And, Scott, do we -- can I

4    turn this on here?  Yes.  Okay.

5    BY MR. MCCLAIN:

6    Q.   Is this available on the website currently, Dr. Egilman?

7    A.   Yes.

8    Q.   And you identified yourself yesterday as clinical associate

9    professor of community health, and that's what you are on the

10   website; is that right?

11   A.   Right.  If you look at the whole document, it's -- Brown is

12   on top.  It's the Brown website search.

13   Q.   Okay.  Brown University.

14   A.   Correct.

15   Q.   And your syllabus in the community health program, 2177,

16   were the courses that you told us about yesterday?

17   A.   Yes.

18   Q.   And likewise, 2178.

19   A.   Yes.

20   Q.   And part of this course that you teach involves butter

21   flavor.

22   A.   Yes.

23   Q.   And the lessons that we've learned from the experience that

24   you told us about in regard to Givaudan and the other companies

25   involved in manufacture of butter flavor and the disease that's

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 67 of 99

1   resulted.

2   A.   Yes.

3   Q.   Now, the other thing that he started out with yesterday was

4   some question about whether Tastemaker and Givaudan and Fries &

5   Fries were all the same company.  Do you remember those

6   questions?

7   A.   Yes.

8   Q.   And you reviewed the stipulation in this case before

9   testifying as he established?

10  A.   Yes.

11  Q.   I'd like to show you Exhibit -- the stipulation, paragraph

12  1.  Stipulation of fact, for the purpose of this case only, the

13  parties stipulate to the following facts:  For purposes of this

14  lawsuit, Givaudan Flavors Corporation agrees that it is

15  responsible for sales of butter flavoring to American Pop Corn

16  by Fries & Fries, Tastemaker, Givaudan Roure Flavors

17  Corporation, and Givaudan Flavors Corporation.  Was that your

18  understanding?

19  A.   Yes.

20  Q.   And that's the basis that you proceed upon was the

21  stipulation of fact that counsel entered into.

22  A.   Yes.

23  Q.   Now, Dr. Egilman, he showed you a part of the record

24  that -- of the department of -- of the NIOSH survey that

25  Mr. Kuiper participated in.  Do you remember that?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 68 of 99
To purchase a complete copy of the transcript.

1   A.   Yes.

2   Q.   I want to show you a part of this.

3        MR. MCCLAIN:  Scott, would you go to -- do you have

4   this loaded, Scott, the -- you don't have this one loaded?

5   Q.   Dr. Egilman, he was asked specifically by the NIOSH

6   investigators when he started wheezing and wheezing away from

7   work and wheezing for 12 months.  And when did he indicate that

8   the wheezing began?

9   A.   1993.

10   Q.   And, Dr. Egilman, is it possible just to take bits and

11   pieces of these documents, or do you have to look at the whole

12   thing?

13   A.   You have to look at all of the records.

14   Q.   Yes.  And NIOSH looked at this when concluding that

15   Mr. Kuiper was one of the people that had been affected by

16   butter flavoring in the mixing room; is that right?

17   A.   Yes.

18   Q.   And they specifically wanted to know about when the

19   wheezing began; is that right?

20   A.   Yes, it was one of the questions.

21   Q.   Because shortness of breath can be caused by a number of

22   things.

23   A.   Yes.

24   Q.   Now, by the way, Dr. Egilman, on this subject of looking at

25   the entire record, you reviewed Dr. Parmet's report?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ Document 405 Filed 06/09/09 Page 69 of 99
To purchase a complete copy of the transcript

1    A.    Yes.

2    Q.    Which is in more detail than your medical report because

3    the emphasis of your testimony was on other things; is that

4    right?

5    A.    Yes.

6    Q.    But Dr. Parmet lays out in his report --

7              MR. MCCLAIN:   Is this loaded, Scott?

8    Q.    Would you go over -- he talked about Dr. Fell's report.

9    Dr. Parmet reviewed that report, did he not?

10   A.    He did.   I don't think that was discussed in cross, though.

11   Q.    He mentioned Dr. Fell.   I can't remember what he said about

12   him, but he did mention him.   He mentioned --

13             MR. MCCLAIN:   Well, Scott, really I wanted to go to

14   the second -- I wanted to go where he talks about Dr. Fell's

15   1988 report.   I think that that was specifically discussed by

16   Mr. Meador.   I wanted to look -- there's pages of these

17   reports -- over to Dr. Zuehlke.   He mentioned that one, 1996.

18   That was reviewed by Dr. Parmet, Dr. Zuehlke here.   Dr. Farrell

19   he mentioned.   There's a bunch of Farrell reports, Scott, but go

20   over to the 2-10, 2001.   I think that was one that was

21   mentioned.

22   Q.    He talked about Dr. Bainbridge, those reports.   Look over

23   at the March 3, 2005, report from Dr. Bainbridge and a report by

24   Dr. Bainbridge in December of 2005.   He reviewed all those

25   medical records as you did; am I right?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-BAZ   Document 405   Filed 06/09/09   Page 70 of 99

1  A.    Yes.

2  Q.    And his conclusion when taking all the evidence together

3  was found on page 13 of this report where he says that

4  bronchiolitis obliterans syndrome, this condition --

5              MR. MEADOR:  I'm going to object to this, Your Honor,

6  on hearsay.  I don't think this is an A exhibit.  This is --

7  Dr. Parmet's going to come and testify.

8              MR. MCCLAIN:  He was cross-examined, Your Honor, about

9  Dr. Parmet's report and whether he had read the report, and I'm

10 following up on his question.

11             MR. MEADOR:  He can --

12             THE COURT:  You can -- you can ask him about the

13 report, but it's not in evidence, if he relied on it.

14             MR. MCCLAIN:  He did rely on it.  The question --

15             THE COURT:  Okay.  Then you can ask him about the

16 report.

17             MR. MCCLAIN:  Okay.

18             THE COURT:  But it's not going to go in evidence.

19             MR. MCCLAIN:  Right.  And I was just --

20             THE COURT:  Because under Rule 703, it doesn't have to

21 be admissible for him to rely on it.

22             MR. MCCLAIN:  I understand.

23 BY MR. MCCLAIN:

24 Q.    And did he conclude, that, in fact, he had bronchiolitis

25 obliterans syndrome caused by microwave popcorn butter flavor

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
for purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ  Document 405  Filed 06/09/09  Page 71 of 99

1  exposure?

2  A.   Can I look at it to be . . .

3       He said he had that related to exposure to flavorings

4  at the American Pop Corn facility.

5  Q.   All right.  And was that consistent with your conclusion?

6  A.   Yes.

7  Q.   And by the way, just so that we're clear, Dr. Egilman, one

8  of the records that Mr. Meador showed you from Dr. Bainbridge,

9  he showed you part of it.

10      MR. MCCLAIN:  Scott, is this loaded, 1926, the 3-03-05

11 record?

12 Q.   Dr. Bainbridge says, "Obstructive airways disease, very

13 severe.  Differential would have to include microwave popcorn

14 lung."  Is that true?

15 A.   Correct.

16      MR. MEADOR:  Can we read the rest of it for

17 completeness, Your Honor?

18      THE COURT:  Yes.

19 BY MR. MCCLAIN:

20 Q.   And we're going to get a high-resolution CT scan to see if

21 we can see lobules with obstruction; is that right?

22 A.   That's part of what he wrote.

23 Q.   And Dr. Bainbridge wrote --

24      MR. MCCLAIN:  Scott, is this 2184 -- Your Honor, this

25 is a new exhibit added in rebuttal, 2184, a medical record from

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
For purchase of complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 72 of 99

1    Dr. Bainbridge from 1-16, 2009, just last month.

2              THE COURT:  Well, what's your foundation for it?

3              MR. MCCLAIN:  It's been stipulated to among counsel.

4    In fact, defense counsel produced it to us.

5              MR. MEADOR:  It's --

6              THE COURT:  Members of the jury, I really -- well, you

7    know, let's just do this at sidebar.  Why don't you approach.

8              MR. MEADOR:  Your Honor, we have no objection.

9              THE COURT:  Oh, you have no objection?  Okay.  Fine.

10   You may proceed.  And what number was that?

11             MR. MCCLAIN:  It's 2184, Your Honor.  It's the same

12   one I used in opening.  That's why I didn't approach before I

13   used it, 2184.

14             THE COURT:  Okay.  Thank you.  Well, then 2184's

15   admitted.

16                       *   *   *   *

17             (Exhibit 2184 was admitted.)

18                       *   *   *   *

19   BY MR. MCCLAIN:

20   Q.   Just last month he wrote he has a history of exposure to

21   diacetyl in the mixing room of microwave popcorn, and

22   consequently, there are issues about the possibility of having

23   microwave popcorn lung.  Is that what Dr. Bainbridge wrote just

24   last month?

25   A.   Yes.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-BAZ  Document 405  Filed 06/09/09  Page 73 of 99

1   Q.   Still his opinion.

2            MR. MEADOR:  Calls for speculation.

3            THE COURT:  Sustained.

4   BY MR. MCCLAIN:

5   Q.   It's consistent with the opinion he expressed in the

6   previous record.

7   A.   Yes.

8   Q.   And consistent with your opinion.

9   A.   Yes.

10  Q.   Now, he also said something about chlorine, showed you a

11  medical record with a reference to chlorine.  Do you recall

12  that?

13  A.   Yes.

14  Q.   I'd like first to look at the FFIDS that was in evidence

15  yesterday.

16           MR. MCCLAIN:  Scott, would you?  This is -- what's the

17  exhibit number, Scott?  It's 714 in evidence.  Would you go to

18  the paragraph regarding the characteristics of diacetyl,

19  appearance and odor, intense yellow or yellow green mobile

20  liquid with a very powerful and diffusive pungent buttery odor.

21  The vapors have a chlorine-like odor.

22  Q.   Does diacetyl have a chlorine-like odor?

23  A.   Yes.

24  Q.   And so when Mr. -- when Mr. Kuiper reports having a

25  chlorine-like odor in his nose after being in a butter room,

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ Document 405 Filed 06/09/09 Page 74 of 99
To purchase a complete copy of the transcript.

1   Dr. Egilman, is it quite possible that that is the effect of

2   diacetyl?

3   A.    Yes.

4   Q.    That's one of the ways you know if you've been exposed to

5   diacetyl.  It smells like chlorine; is that right?

6   A.    Butter and -- chlorinated butter I guess, yes.

7   Q.    And likewise, Exhibit 2025 which comes from Citrus &

8   Allied, one of the suppliers they identified yesterday in

9   Mr. Pagliaro's opening, says --

10            MR. MCCLAIN:  Would you pull it up, Scott, second

11  page?

12  Q.    Appearance, odor, and physical state.  Intense yellow or

13  yellow green mobile liquid with a powerful and diffuse pungent

14  buttery odor.  The vapors have a chlorine-like odor; is that

15  correct?

16  A.    Yes.

17  Q.    Now, then he asked you some que -- he showed you one record

18  and suggested that the medical doctors had found reversibility

19  and that hadn't he had asthma.  Do you remember those questions?

20  A.    Yes.

21  Q.    Doctor, in the vast majority of tests that he has had, have

22  the doctors found reversibility or not found it?

23  A.    In general I think he's had about 10 or 12 pulmonary

24  function tests.  He had partial reversibility on two or three.

25  He never had complete reversibility where he came back within a

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ Document 405 Filed 06/09/09 Page 75 of 99
To purchase a complete copy of the transcript

1  normal range.

2  Q.   All right.

3          MR. MCCLAIN:  Your Honor, this is Exhibit 1292 in

4  evidence.  This is from Dr. Farrell's record of 11-16-92.

5  Q.   Doctor, is this one of the records you reviewed, even after

6  bronchodilators he didn't do a lot better?  Was that what

7  Dr. Farrell found?

8  A.   Yes.

9  Q.   And likewise, the record from 7 of '96, bronchodilators did

10 not give him much benefit.  Is that a record you reviewed?

11 A.   Yes.

12 Q.   And then the reports of the actual test results that were

13 performed later, Doctor -- this is from Exhibit 1087 -- can you

14 see that, Doctor?

15 A.   Yes, in 1992.

16 Q.   And post-broncho -- can you interpret that for us?

17 A.   Yes.  Well, you need to look at both pre and post, but if

18 you look at both pre and post, you'd see that the forced

19 expiratory volume 1 which is the amount of air you get on the

20 first second which is evidence of obstruction, he's at 38

21 percent of predicted.  Anything below 80 percent of predicted

22 would be considered abnormal.  This is dramatically abnormal if

23 you think about it in quarts.  The predicted means -- this

24 predicted means that he should have about 4 liters of lung

25 capacity come out in the first second, and he actually has 1.44,

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-BAZ   Document 405   Filed 06/09/09   Page 76 of 99

1   so he's down about 2 1/4 quarts which is a considerable amount

2   in this lung function.

3   Q.   And, Doctor, the bronchodilators didn't have the desired

4   effect; is that right?

5   A.   Well, the diagnostic effect.  You do it to make a diagnosis

6   in this case, and it did not diagnose -- they did not -- it did

7   not appear based on this test he had any reversibility or any

8   asthmatic component.

9   Q.   All right.  And then this record, Doctor, from the same

10  document from the same exhibits of his medical records -- the

11  Bates number at the bottom is 30 just so we can identify it for

12  the record -- likewise, this record, Doctor, taken November 16

13  of '92, did it show any reversibility?

14  A.   It's the same one, isn't it?

15  Q.   They were separate pages.  I think that this one was

16  November 16, '92.  I think that they're part of the same record.

17  That's the pre result that you were asking us to look at.

18  A.   Okay.  So this is -- right.  So this is the pre.  It's 38.

19  And if you look at the post, it was also 38, so there's no

20  change.

21  Q.   Now, likewise, Doctor, the 1997 record from Exhibit 1457,

22  did it show any bronchodilator effect reversibility?

23  A.   It showed some effect.  That's the 7.5 percent.  But it's

24  usually not considered by anybody to be a significant or

25  diagnostic effect until it's at least 8 percent.  And you can

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 77 of 99

1   see that he had a 20 percent improvement in the total lung

2   capacity which is not affected by bronchodilator but is affected

3   by effort.  And so when you're -- and when you're sick, you can

4   often get inconsistent results.  Sick people tend to have much

5   more variability in the kind of test results you get because

6   they're sick.

7   Q.   And, Doctor, this medical note from 1440 on 3-5-02, severe

8   obstructive lung disease with progression over the last 6 years

9   with no improvement post-bronchodilators from Dr. Bacon, one of

10  the doctors that Mr. Meador mentioned?

11  A.   That's --

12  Q.   That was his conclusion?

13  A.   That's correct.

14  Q.   And likewise, Mr. Meador's suggestion that there hasn't

15  been any progression, would that have been correct?

16  A.   No.

17  Q.   There is progression.

18  A.   Oh, yes.

19  Q.   So that's 2002, no bronchodilator effect.

20        And finally, Doctor, I think that this is the test

21  results from that -- from -- is that March of '02 that I just

22  showed you?  Yes.  It's the same record as the test results.

23        Now -- so, Doctor, looking at the entire medical

24  record, do you think he's got asthma?

25  A.   No, he doesn't have asthma, and he doesn't have -- he

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 405   Filed 06/09/09   Page 78 of 99
To purchase a complete copy of the transcript

1    occasionally has reversibility, but it's hard to tell whether

2    it's because he's sick that day or giving a variable effort.

3    But for the most part he has what's called fixed obstruction

4    which means it doesn't get better with asthma medication.  In

5    other words, it's fixed.

6             If you remember from the definition I gave of asthma,

7    the definition of asthma is it's reversible.  It goes away with

8    treatment or you have some bad days and some days when you're

9    completely normal.  And in his case, his amount of obstruction's

10   almost always permanent, not affected by treatments.  And fixed

11   disease is very unusual.

12   Q.   Doctor, now let's turn our attention to this whole idea

13   that I guess the import of it was they didn't know for sure --

14             MR. MEADOR:  Object to form.

15             THE COURT:  Overruled.

16   BY MR. MCCLAIN:

17   Q.   Do you recall those questions, Doctor, where he was

18   suggesting they just didn't know, they were trying to find out

19   and they just didn't know?

20   A.   Yes.

21   Q.   Remember those questions?  Doctor, you expressed an opinion

22   yesterday regarding the obligation of a chemical manufacturer,

23   supplier to know.  Do you remember that testimony?

24   A.   Yes.

25   Q.   Doctor, is there a regulation of OSHA which is a standard

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 79 of 99

1  in the industry which you rely upon in rendering the opinion

2  that they have to know?

3          MR. MEADOR:  Objection.  Lacks foundation, calls for a

4  legal conclusion.

5          THE COURT:  Overruled.

6  A.   Yes.

7  Q.   Is it generally referred to as the right-to-know

8  legislation?

9  A.   It's the hazard communication standard from 1986 but . . .

10 Q.   So it's been in existence since '86, before this whole

11 thing occurred, before the incident at Tastemaker occurred.

12 A.   Yes.

13 Q.   I'd like to read a section of that to you and ask you to

14 comment on it if you could.  Would you put --

15         MR. MEADOR:  Objection.  Outside the scope of cross.

16         THE COURT:  Overruled.

17         MR. MCCLAIN:  Would you bring that up, Scott?

18 BY MR. MCCLAIN:

19 Q.   It says, "The purpose of this section is to ensure that the

20 hazards of all chemicals produced or imported are evaluated and

21 that information concerning their hazards is transmitted to

22 employers and employees.  This transmittal of information is to

23 be accompanied by means of comprehensive hazard communication

24 programs which are to include container labeling and other forms

25 of warning, material safety data sheets, and employee training."

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 80 of 99

1          So this is required under this regulation, this whole

2    scheme that we've talked about; is that right, Doctor?

3    A.    Yes.

4    Q.    And it's to ensure that the hazards of all chemicals

5    produced and imported are evaluated?

6    A.    Yes.

7    Q.    So it's not optional to evaluate them.  It is required.

8    A.    Yes.

9    Q.    Let's go to another section on that issue that makes it

10   even clearer.  Hazard determination, chemical manufacturers and

11   importers shall evaluate chemicals produced in their workplace

12   or imported by them to determine if they are hazardous.

13   Employers are not required to evaluate chemicals unless they

14   choose not to rely on the evaluation performed by the chemical

15   manufacturers or importers for the chemicals to satisfy this

16   requirement.  Is that what you were telling us yesterday,

17   Doctor?

18   A.    Yes.

19   Q.    And, Doctor, is -- in this instance under the regulation,

20   is Givaudan a chemical manufacturer by definition?

21        MR. MEADOR:  Objection.  Calls for a legal conclusion,

22   lacks foundation.

23        THE COURT:  Overruled.

24   A.    Yes.

25   Q.    And so they must, according to this, must evaluate or shall

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 405   Filed 06/09/09   Page 81 of 99

1  evaluate their chemicals; is that right?

2  A.   Yes.

3  Q.   And so was it required of them based upon industry practice

4  and also public health principles to know what the health

5  effects were of diacetyl before they used it in a butter flavor?

6  A.   Yes.

7  Q.   Now, Doctor, is that the meaning of this document we looked

8  at yesterday?

9         MR. MCCLAIN:  Would you bring that up, Scott?  It's

10  the one that says if we find out we have to tell.  I don't know

11  what number that was.  Would you bring the number up?  It's 115

12  I think, or is that a 7?

13  Q.   They're talking about the hazard communication standard,

14  and they say there is no provision in OSHA standard that

15  requires the immediate dissemination of information regarding a

16  suspect occupational health hazard.  However, if we find that

17  there is a specific health hazard present, that information will

18  have to be shared with the affected and potentially affected

19  employees.

20         They're referring to the hazard communication

21  standard.

22  A.   Yes.

23  Q.   And they're saying that if they know what the hazards are

24  they have to share it; is that right?

25  A.   Yes.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 405   Filed 06/09/09   Page 82 of 99
To purchase a complete copy of the transcript.

1  Q.   Now, under the regulation, they had to find out.

2  A.   Yes.

3  Q.   But they're taking the position that if they don't find out

4  they don't have to share it.

5        MR. MEADOR:  Objection.  Calls for speculation,

6  argumentative.

7        THE COURT:  Overruled.

8  A.   Yes.

9  Q.   And that was essentially what Mr. Meador was asking you

10  about earlier; right?

11  A.   Yes.

12  Q.   And by the way --

13        MR. MCCLAIN:  Would you bring up that record, Scott,

14  that has -- when they narrowed it down to three chemicals?

15  Q.   And they had it narrowed down to three chemicals, Doctor.

16  One of them was acetaldehyde as Dr. Lockey said in his paper; is

17  that right?

18  A.   Yes.

19  Q.   Benzaldehyde?

20  A.   Yes.

21  Q.   And finally diacetyl.

22  A.   Yes.

23  Q.   And is that why Dr. Lockey said acetaldehyde and other

24  flavoring ingredients were identified?

25        MR. MEADOR:  Calls for speculation.  Lacks foundation.

1    MR. MCCLAIN:  Strike that.  I withdraw the question.

2  BY MR. MCCLAIN:

3  Q.    Dr. Lockey said in the clip that Mr. Meador showed you

4  other chemicals and predominantly acetaldehyde; right?

5  A.    He mentioned acetaldehyde and other chemicals.

6  Q.    These are the other chemicals.

7          MR. MEADOR:  Calls for speculation, lacks foundation.

8          THE COURT:  Overruled.

9  A.    Yes.

10  Q.    And, Doctor, was it permissible for Givaudan, as they did,

11  not to find out which of these chemicals it was for sure, or

12  under the hazard communications should they have found out the

13  health effects of these three identified chemicals?

14          MR. MEADOR:  Object to form.  Compound.  Calls for

15  speculation.

16          THE COURT:  Overruled.

17  A.    The latter, yes.

18  Q.    The latter meaning what?

19  A.    The latter meaning they had an obligation to try to find

20  out what the exposure was --

21  Q.    Now, he talked about --

22  A.    -- that was causing the disease.

23  Q.    He talked about Dr. Brooks, and he read you a portion of

24  this document, Plaintiff's Exhibit 132 in evidence.

25          MR. MCCLAIN:  Is this loaded, Scott?  Page 4 of this

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ Document 405 Filed 06/09/09 Page 84 of 99

1   document, Scott, I wanted to go to.  Number 1, would you bring

2   up the conclusions and recommendations?

3   Q.   There appears to be an unusually high number of employees

4   with either suspected or confirmed bronchiolitis obliterans.

5   Was that Dr. -- was that Dr. Brooks' conclusion?

6   A.   That's part of them.

7   Q.   And page 5.  It is recommended that an occupational health

8   program be initiated by Tastemaker and that medical personnel be

9   identified to help with this organization.  That's the part that

10   Mr. Meador read?

11   A.   Yes.

12   Q.   It's the next paragraph he didn't read.  It's highly

13   recommended --

14         MR. MEADOR:  Objection.  Misstatement.

15   A.   He did read that paragraph.

16   Q.   He did read that paragraph?  My mistake.

17         THE COURT:  Just a -- just a second.

18         MR. MCCLAIN:  I withdraw the question.

19         THE COURT:  Well, that's fine.  But we need to let

20   Mr. McClain finish his question before you interpose an

21   objection.  You can't speak over him while he's still asking a

22   question.  So why don't you rephrase the question.

23         MR. MCCLAIN:  I will.

24   BY MR. MCCLAIN:

25   Q.   I want to ask you a question then about paragraph 5.  Did

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 85 of 99
to purchase a complete copy of the transcript

1    they ever do the epidemiologic investigation?

2    A.    No.

3    Q.    Did they ever do the investigation in number 2 to determine

4    which workplace exposures are affecting persons who have

5    abnormal lung function or who note respiratory complaints?

6    A.    No.

7    Q.    Would that have been possible to do, Doctor?

8    A.    Yes.

9    Q.    Was that advisable to do?

10   A.    Yes.

11   Q.    Now, Mr. Meador said, you know, there was nothing published

12   in the literature until 2002.  Do you remember those questions?

13   A.    Yes.

14   Q.    Was Dr. -- was Dr. Brooks suggesting they do exactly what

15   NIOSH did at Jasper Popcorn way back in 1994?

16   A.    Yes.

17   Q.    And --

18   A.    And more.

19   Q.    Huh?  And more.  And Dr. Brooks was suggesting that it be

20   done, and would NIOSH have come in in 1994 to Givaudan's plant

21   and done the very same thing they did in Jasper in 2002 which

22   led the rest of the world to recognizing what they knew back at

23   that time and conducted the discover -- the study that he was

24   suggesting?

25              MR. MEADOR:  Objection.  Lacks foundation, argument,

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-BAZ Document 405 Filed 06/09/09 Page 86 of 99
To purchase a complete copy of the transcript.

1　object to form.

2　　　　　THE COURT:  Overruled.

3　A.　Yes.  NIOSH does those kinds of tests and health workplace

4　evaluations for employers all the time.

5　Q.　And, Doctor, did the technology and the expertise exist

6　when Dr. Brooks suggested it within NIOSH to conduct the

7　essential -- essentially the same study that they conducted in

8　2002 at the Jasper plant?

9　A.　Yes.

10　Q.　And was the coroner suggesting to them as early as '92 that

11　they do this kind of inquiry?

12　A.　Yes.

13　Q.　Now, he said that -- or suggested to you that the reason

14　that they didn't use Dr. Brooks any further was because he began

15　teaching in south Florida.  Do you remember those questions?

16　A.　Yes.

17　Q.　Wasn't the real reason why Dr. Brooks was not retained was

18　because they weren't sure he could handle litigation?

19　　　　　MR. MEADOR:  Objection.  Calls for speculation.

20　　　　　THE COURT:  Sustained.

21　BY MR. MCCLAIN:

22　Q.　Have you examined Dr. Hochstrasser's notes, Exhibit 2014?

23　A.　Yes.

24　　　　　MR. MCCLAIN:  Is this loaded, Scott?  You've got it

25　loaded?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ Document 405 Filed 06/09/09 Page 87 of 99
To purchase a complete copy of the transcript.

1   Q.   These are his handwritten notes?

2   A.   Yes.

3   Q.   Page 6424.  Did you read the note, Doctor, where he wrote

4   the question about Dr. Brooks after addressing confidentiality,

5   "Could he handle litigation," question mark?

6   A.   Yes.

7   Q.   So at the very beginning of all this, their -- one of their

8   concerns apparently was litigation.

9   A.   Yes.

10  Q.   Not employee health.

11  A.   Correct.

12  Q.   Now, he then mentioned -- he then mentioned to you the

13  International Bakers study.  Do you recall that?

14  A.   Yes.

15  Q.   And was Givaudan a defendant in the International Bakers

16  study lawsuit?

17  A.   Yes.

18  Q.   Now, Doctor, there is an instruction that I want to get

19  regarding -- here it is.  In this case a defense that Givaudan's

20  raising is called the state of the art defense.  Are you

21  familiar with that?

22  A.   Yes.

23  Q.   And --

24       MR. MCCLAIN:  Scott, can I switch over to this, or do

25  you have this loaded?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 88 of 99
To purchase a complete copy of the transcript.

1   Q.   It says, "The state of the art is the safest and most

2   advanced technology and the most current scientific knowledge

3   that reasonably could have been used in the design of butter

4   flavorings at the time that they were manufactured.  In

5   determining whether the design of Givaudan's butter flavoring

6   containing diacetyl was state of the art, you should consider

7   whether the butter-flavoring industry, using the technology and

8   scientific knowledge that existed at the time, could feasibly,

9   practically, and economically have designed a butter flavoring

10  that would have prevented Ron Kuiper's injuries while at the

11  same time meeting the needs of the butter-flavoring users

12  generally.  Custom in the industry is not necessarily the state

13  of the art, nor is every alternative design for which technology

14  exists necessarily feasible so that a design for which

15  technology exists but that is not feasible is not state of the

16  art."

17          Are you familiar generally with this concept, Doctor?

18  A.   Yes.

19  Q.   And have you reviewed the filings that were made in that

20  case and were available to the entire butter-flavoring industry

21  regarding what ought to be done about these flavorings?

22          MR. MEADOR:  Object to the form of the question.

23  Leading, suggestive, lacks foundation.

24          THE COURT:  Sustained as to leading.

25  BY MR. MCCLAIN:

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov

Case 5:06-cv-04009-MWB-PAZ   Document 405   Filed 06/09/09   Page 89 of 99
To purchase a complete copy of the transcript.

```
1   Q.    Doctor, have you reviewed the file?

2   A.    Of the Bakers case?

3   Q.    Yes.

4   A.    Yes.

5   Q.    And, Doctor, does it assist you in rendering an opinion

6   regarding this state of the art in regard to butter flavors?

7   A.    Yes.

8   Q.    Doctor, do you know who Dr. Susan Daum is?

9   A.    Yes.

10  Q.    Doctor, was she -- what was her role in that case?

11  A.    She was a specialist in occupational medicine and internal

12  medicine, and she was a witness at the request of the workers

13  who were injured.

14        MR. MEADOR:  I'm going to object.  This is beyond the

15  scope.

16        THE COURT:  Overruled.

17  BY MR. MCCLAIN:

18  Q.    And, Doctor, have you reviewed her affidavit?

19  A.    Yes.

20        MR. MCCLAIN:  Your Honor, Exhibit 473 in evidence.  Is

21  this loaded, Scott?  Would you go to the last page of Dr. Daum's

22  affidavit.  And this was 19 --

23        MR. MEADOR:  I'm going to object.  We have a B

24  objection, hearsay.

25        THE COURT:  Overruled.
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-RAZ Document 405 Filed 06/09/09 Page 90 of 99

1              MR. MCCLAIN:  This is 19 --

2              THE COURT:  Just a second.  Did you tell me -- you

3    said this was in evidence.

4              MR. MCCLAIN:  This was on the exhibit list with a B

5    objection covered by the previous discussion.

6              THE COURT:  Oh, okay.  Well, then it's in evidence.

7              MR. MCCLAIN:  Yes, it is.

8              THE COURT:  Yeah, because I overruled the objection.

9              MR. MCCLAIN:  You did.

10             THE COURT:  Yeah.

11   BY MR. MCCLAIN:

12   Q.   Dr. Daum wrote to the entire industry in 1989, "The fact

13   that defendants supplied chemicals to International Bakers

14   Services as the ultimate users and consumers without having

15   first tested these chemicals for inhalation or taken appropriate

16   measures to see if they were safe for use by humans is

17   tantamount to using the blenders at International Bakers

18   Services as blue-collar guinea pigs."  Was that her opinion,

19   Doctor?

20   A.   Yes.

21   Q.   And, Doctor, did that same practice continue with Givaudan

22   in terms of distributing these products without testing them?

23   A.   Yes.

24   Q.   And was one of the chemicals identified by Dr. Daum way

25   back in 1989 diacetyl?

1    A.    Yes.

2              MR. MCCLAIN:  Doctor, that's all the questions I have.

3              THE COURT:  Thank you.  You may step down.

4              Everybody can take a stretch break.

5              Mr. McClain, are you ready to call your next witness?

6              MR. MCCLAIN:  Your Honor, it will be a video -- not a

7    video but a CD now, deposition of Dr. Hochstrasser who the

8    jury's heard about.

9              THE COURT:  Okay.  And do you know approximately how

10   long that deposition is?

11             MR. MCCLAIN:  This -- the first volume is 45 minutes,

12   so it is about where --

13             THE COURT:  Okay.  That should work well in terms of

14   taking our noon recess.  Thank you.  You may proceed.

15             (Videotaped deposition excerpts of John Hochstrasser

16   taken January 5, 2006, were played in open court.)

17             THE COURT:  Mr. McClain, would now be a good time to

18   take our second recess?

19             MR. MCCLAIN:  Yes, Your Honor, it would.

20             THE COURT:  Okay.  Members of the jury, we'll be in

21   recess until 11:20 -- I'm sorry, until 12:20 which would be 25

22   minutes, maybe 26 minutes.  Remember keep an open mind until

23   you've heard all of the evidence in the case.  Thank you.

24             (The jury exited the courtroom.)

25             THE COURT:  Please be seated.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-RAZ Document 405 Filed 06/09/09 Page 92 of 99

1            What's your plan next, Mr. McClain?  Mr. McClain?

2    Mr. McClain?  What's your plan next?

3            MR. MCCLAIN:  We're playing the remainder of

4    Hochstrasser.

5            THE COURT:  And how long will that be?

6            MR. MCCLAIN:  Hour and a half.  And then Stuart Brooks

7    is a half hour.  Does that take us to 2:30?

8            THE COURT:  Okay.  Great.  Thank you.  See you back

9    here at 1:20 -- I'm sorry, 12:20.

10           (Recess at 11:55 a.m.)

11           THE COURT:  Ready to have the jury brought in?

12           MR. PAGLIARO:  Yes, Your Honor.

13           MR. MCCLAIN:  Yes, sir.

14           THE COURT:  Thank you.

15           (The jury entered the courtroom.)

16           THE COURT:  Thank you.  Please be seated.

17           And we're going to continue with the deposition clip;

18   is that correct?

19           MR. MCCLAIN:  Yes, of Dr. Hochstrasser.

20           THE COURT:  Okay.

21           MR. MCCLAIN:  This is the second volume that was

22   resumed on a different day.

23           THE COURT:  Okay.  Thank you.

24           (Videotaped deposition excerpts of John Hochstrasser

25   taken March 10, 2006, were played in open court.)

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-RAZ   Document 405   Filed 06/09/09   Page 93 of 99

```
1            THE COURT:  Could we stop at some point so I can give

2    everybody a stretch break?  Okay.  Great.

3            Matter of fact, why don't I give everybody -- why

4    don't we just take a ten-minute recess because it's kind of like

5    watching a long full-length feature film.  So why don't we take

6    a 10-minute recess, and we'll reconvene at 1:25.  Thank you.

7            (The jury exited the courtroom.)

8            THE COURT:  Anything we need to take up?

9            MR. MEADOR:  No, Your Honor.

10           THE COURT:  Okay.  Thank you.

11           (Recess at 1:15 p.m.)

12           THE COURT:  Ready for the jury?

13           MR. MCCLAIN:  We are.

14           THE COURT:  Thank you.

15           (The jury entered the courtroom.)

16           THE COURT:  Thank you.  Please be seated.

17           (Continuation of videotaped deposition. )

18           MR. MCCLAIN:  There's another short volume of this.

19           THE COURT:  Okay.  Why doesn't everybody take a

20    stretch break.

21           MR. MCCLAIN:  Judge, just to give you a heads-up,

22    there's 8 minutes on this next one and then 29 on Brooks, so we

23    might be a little bit over at 2:30, about 5 minutes or so.

24           THE COURT:  Okay.  I think we'll -- can everybody stay

25    an extra five minutes so we can get it done?  That'd be great.
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of this transcript.
Case 5:06-cv-04009-MWB-BAZ   Document 405   Filed 06/09/09   Page 94 of 99

1    Thank you.

2              Please be seated.

3              (Videotaped deposition excerpts of John Hochstrasser

4    taken April 30, 2008, were played in open court.)

5              THE COURT:  Are we going to shift now to the next

6    deposition?

7              MR. MCCLAIN:  Yes, Dr. Brooks, Your Honor.

8              THE COURT:  Okay.  And I just wanted to -- I'm not

9    going to bother to turn the lights on, but I just did want to

10   explain to the members of the jury that the videotaped

11   depositions have obviously been edited, and that's why it's kind

12   of jerky at times, and it's edited for a couple of reasons.

13             The parties either get together and agree on certain

14   segments that should be in it, or I rule on various objections,

15   and then it gets edited, so that's why it's edited.

16             There's nothing wrong with it being edited.  I've

17   rarely ever had a videotaped deposition played in court that

18   wasn't edited for the reasons that I just indicated.  So it's

19   really part of the custom and practice of videotaped

20   depositions.

21             You ready to proceed?

22             MR. MCCLAIN:  Yes.

23             THE COURT:  Thank you.

24             (Videotaped deposition excerpts of Stuart Brooks taken

25   February 21, 2005, were played in open court.)

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
for a purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ Document 405 Filed 06/09/09 Page 95 of 99

1          THE COURT:  Does that conclude the testimony for the

2     day?

3          MR. MCCLAIN:  It does, Your Honor.

4          THE COURT:  Members of the jury, that concludes the

5     testimony for today.  Thank you for staying ten minutes late.

6     As a reward, we'll start at 8:35 tomorrow, give you 5 minutes,

7     cut the difference with you.

8          Please keep an open mind till you've heard all of the

9     evidence.  And we'll see you at 8:35 tomorrow.  And just a

10    reminder, next week we'll be going Monday, Tuesday, and

11    Wednesday but not Thursday and Friday.  Thank you.

12          (The jury exited the courtroom.)

13          THE COURT:  Please be seated.

14          Anything we need to take up for tomorrow?

15          MR. MCCLAIN:  I don't think so.

16          THE COURT:  Now, do you think we've got the problems

17    with exhibits resolved because I don't know that I've got an

18    updated exhibit list?

19          MR. MCCLAIN:  My understanding was my paralegal had

20    met with someone and decided on a way to get all that

21    straightened out.

22          THE COURT:  Okay.  Well, we'll hope that happened or

23    will happen.

24          MR. MCCLAIN:  Okay.

25          THE COURT:  Thanks.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
for purchase of a complete copy of the transcript.
Case 5:06-cv-04009-MWB-BAZ Document 405 Filed 06/09/09 Page 96 of 99

1            Mr. Meador, did you have something?

2            MR. MEADOR:  I just want to find out what the line-up

3    was tomorrow.

4            THE COURT:  Oh, sure.  You guys aren't going to

5    voluntarily do that?

6            MR. MEADOR:  We have been.

7            THE COURT:  Yeah.  Okay.  Well, you don't need to do

8    it in front of me because I don't care.

9            Let me just tell you this.  I'm just trying to be as

10   candid as I can.  I have a totally open mind because I think

11   Mr. Pagliaro said there were two sides.  There are usually more

12   sides than two to every given version of events.

13           But I'll just tell you this.  I think I've tried a lot

14   more cases than all the lawyers in this courtroom combined.  And

15   after two days of testimony, I've never seen a better case for

16   substantial punitive damages than I see in this case from the

17   jury.  I mean, I don't know what they're going to do.  I'm just

18   saying after two days of testimony I've never seen a stronger

19   case for punitive damages.

20           And, you know, maybe it will be a defense verdict.

21   You never know.  Could be.  Maybe you'll win on your statute of

22   limitations claim.  Could be.

23           I'm just telling you I've seen a whole lot of jury

24   trials.  I've seen a lot of punitive damage awards, and I've

25   never seen a better case after two days than this one.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ  Document 405  Filed 06/09/09  Page 97 of 99

1    So obviously you have evaluated the case completely

2 differently, and that's what makes the world go round, and

3 that's why we have a Sixth and Seventh Amendment, and that's why

4 we have an adversary system.

5    But I'm just telling you from my perspective, I've

6 never seen a better jury case for punitive damages than this

7 one.

8    So we'll see you tomorrow morning at 8:35.

9    (The foregoing trial was

10    adjourned at 2:43 p.m.)

11

12

13

14

15

16

17

18

19

20    CERTIFICATE

21    I certify that the foregoing is a correct transcript

22 from the record of proceedings in the above-entitled matter.

23

24

25    _____          3-24-09
       s/ Shelly Semmler
       Shelly Semmler, RMR, CRR              Date

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 405   Filed 06/09/09   Page 98 of 99
To purchase a complete copy of the transcript.

**INDEX**

**WITNESS:**                                                    **PAGE:**

DAVID EGILMAN
        MR. MEADOR                              454
        MR. MCCLAIN                             510

VIDEOTAPED DEPOSITION
        John Hochstrasser                      537
        John Hochstrasser                      538
        John Hochstrasser                      540

        Stuart Brooks                          540

\* \* \* \* \*

**EXHIBITS:**

2176, 2177, and 2178                                            511
2184                                                            518

\* \* \* \* \*