IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

RONALD KUIPER and                           No. C06-4009-MWB
CONLEY KUIPER,

      Plaintiffs,                          Sioux City, Iowa
                                            February 20, 2009
   vs.                                     8:07 a.m.

GIVAUDAN FLAVORS CORP.,                      VOLUME 4 OF 12

      Defendant.
_____/


TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
UNITED STATES DISTRICT JUDGE, and a jury.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

APPEARANCES:

For the Plaintiffs:          KENNETH BLAIR MCCLAIN, ESQ.
                             STEVEN EDWARD CRICK, ESQ.
                             SCOTT A. BRITTON-MEHLISCH, ESQ.
                             Humphrey, Farrington & McClain
                             Suite 400
                             221 West Lexington
                             Independence, MO  64050

                             DENNIS M. MCELWAIN, ESQ.
                             Smith & McElwain
                             Suite 530
                             505 Fifth Street
                             Sioux City, IA  51101

For the Defendant:           JAMES D. PAGLIARO, ESQ.
                             KEVIN M. DONOVAN, ESQ.
                             THOMAS J. SULLIVAN, ESQ.
                             Morgan, Lewis & Bockius
                             1701 Market Street
                             Philadelphia, PA  19103-2921

                             V. THOMAS MEADOR, ESQ.
                             Morgan, Lewis & Bockius
                             Suite 2200
                             300 South Grand Avenue
                             Los Angeles, CA  90071-3132

                             STEPHEN J. HOLTMAN, ESQ.
                             Simmons Perrine
                             Suite 1200
                             115 Third Street Southeast
                             Cedar Rapids, IA  52401-1266

Court Reporter:              Shelly Semmler, RMR, CRR
                             320 Sixth Street
                             Sioux City, IA  51101
                             (712) 233-3846

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ  Document 406  Filed 06/09/09  Page 2 of 123
To purchase a complete copy of the transcript.

1          (Proceedings reconvened outside the presence of the

2    jury.)

3          THE COURT:  Good morning.  Please be seated.  Is there

4    anything we need to take up this morning from the plaintiff,

5    anticipating any problems?

6          MR. MCCLAIN:  I don't think so.  I mean, I -- there's

7    some question -- they want us to stipulate to a net worth number

8    that I'm still trying to evaluate.

9          THE COURT:  Stipulate to what?  I'm sorry.

10         MR. MCCLAIN:  A net worth number.

11         THE COURT:  Oh.

12         MR. MCCLAIN:  Yesterday the suggestion was that we

13   would not tell the jury what it was and just hand them a sheet

14   of paper.  I wasn't willing to do that.  I'm trying to -- and so

15   apparently that's been withdrawn.  I'm not -- I'm just telling

16   you why we're in some -- but I was just told that they've

17   withdrawn that request.

18         So the problem is this.  They only have financials for

19   the entire company, the parent company being the Swiss Givaudan,

20   the American subsidiary being the company we sued which is all

21   North American operations for flavorings.

22         The combined -- the combined net worth of that company

23   from the financials that we've been able to obtain appears to be

24   about XXXXXXXXXXXXX dollars.  The American part of that

25   operation appears to be 58 percent of international sales.  So

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 3 of 123
To purchase a complete copy of the transcript.

1  it appears to us that the net worth is around XXXXXXXXXXX to our

2  economist.  They want us to stipulate to XXXXXXXXXXX dollars.

3          THE COURT:  Well, as a practical matter, what

4  difference does it make because if they're awarded punitive

5  damages they have to be reasonably related to the actual

6  damages?

7          MR. MCCLAIN:  Sure.

8          THE COURT:  So once you get over, you know, some

9  pretty lower -- much -- a number much lower than the numbers

10  you're talking about --

11          MR. MCCLAIN:  Yes.

12          THE COURT:  -- anything above that doesn't really make

13  any difference.  Am I missing something?

14          MR. MCCLAIN:  I asked the same question to myself in

15  trying to answer this question.  But your question to the jury

16  was relevant to my thinking in that the size of net worth

17  determines reasonableness of ability to pay.  And so although

18  the reasonableness has to be assessed in terms of compensatory

19  damages for sure, in terms of what the jury will award and that

20  they feel comfortable with in terms of accomplishing the other

21  purposes that you instruct them on may be relevant depending on

22  whether the number's XXX or XXXXXXXXXXX.  And that's the

23  quandary in terms of where I am in my thinking.

24          THE COURT:  Yeah.

25          MR. MCCLAIN:  But I think that we are willing to

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 4 of 123

1  stipulate to the XXXXXXXXXXX dollar number as long as we can

2  talk about net sales and other measures as ability to pay

3  relates to that number.  And so we will not be putting forward

4  another net worth number.  However, you know, we will be talking

5  about other measures from their combined balance sheet that

6  affect the question of reasonableness under the circumstance and

7  accomplishing the other goals of punitive damages.  And that was

8  disclosed in his deposition in terms of, you know, he had

9  several -- he had several measures --

10        THE COURT:  Is -- let me ask you a couple questions.

11  What's the relationship between the entity you've sued, Givaudan

12  Flavors Corp., and the international company?

13        MR. MCCLAIN:  They're a wholly owned subsidiary that

14  doesn't have separate financials.  They're all consolidated

15  together.  And under the TXO case, TXO holds that if a company

16  chooses to operate that way, then you can certainly consider the

17  net worth of the parent because otherwise -- as the court says,

18  otherwise you could just incorporate your undercapitalized

19  subsidiaries and keep yourself immune from any punitive damages.

20        THE COURT:  So what's wrong with just putting in both

21  numbers?

22        MR. MCCLAIN:  It would be fine with me.  That would

23  help -- that would help clarify it.

24        THE COURT:  I mean, I'm not -- you know, you can --

25  you can agree to anything you want to agree on.  I don't really

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-RAZ Document 406 Filed 06/09/09 Page 5 of 123

1  care what you agree to.  And if you can't agree, then I'll

2  decide.  But I assume I'd let you put in both numbers if you

3  can't agree.

4          MR. DONOVAN:  Your Honor, could we be heard on this?

5          THE COURT:  Sure.  It's a little premature.  When are

6  you resting anyway?

7          MR. MCCLAIN:  I'm sorry?

8          THE COURT:  Well, don't we have quite a bit -- is this

9  something we need to solve today?

10          MR. MCCLAIN:  Our economist is here today.

11          THE COURT:  Oh, I see.

12          MR. MCCLAIN:  We had anticipated, you know, being

13  closer to the end of our case.

14          THE COURT:  Well, what's the economist going to

15  testify to in terms of punitive damages?

16          MR. MCCLAIN:  He's just going to testify to that, to

17  those numbers that I just specified.

18          THE COURT:  Oh.  Based on his review of something

19  you've obtained in discovery?

20          MR. MCCLAIN:  Yes.

21          THE COURT:  It's a publicly traded company, isn't it?

22          MR. MCCLAIN:  In Europe, not in the United States.

23          THE COURT:  Yeah, but aren't their financials publicly

24  available?

25          MR. MCCLAIN:  Yes, but in Europe they're not as --

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ  Document 406  Filed 06/09/09  Page 6 of 123

```
1    they're not as detailed as ours are.  There's not an SEC-type
2    requirement to break it down, and so you have --
3            THE COURT:  But is there a publicly disclosed net
4    worth statement?
5            MR. MCCLAIN:  No.
6            THE COURT:  No.  They don't have to disclose it to
7    the --
8            MR. MCCLAIN:  No.
9            THE COURT:  -- some European --
10           MR. MCCLAIN:  Huh-uh.
11           THE COURT:  -- something or other?
12           MR. MCCLAIN:  You can derive it from the numbers.  You
13   can derive it from the numbers that they do publish, but it's
14   not spelled out.  And that's why we were trying to come to some
15   agreement on it.
16           THE COURT:  Oh, okay.
17           MR. MCCLAIN:  And it was -- you know, we understand --
18   we understand what they've done in terms of the number.  But
19   they acquired a cup -- well, you don't --
20           THE COURT:  Yeah, I don't really want to hear it.
21   Let's hear what the defense has to say.
22           MR. DONOVAN:  Your Honor, if I could just briefly,
23   the --
24           THE COURT:  Sure.
25           MR. DONOVAN:  I'm not sure how Mr. McClain is deriving
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ Document 406 Filed 06/09/09 Page 7 of 123

1  the number that he gave for the percentage of sales.  I think

2  that must be a combination of Flavors and Fragrances.  Givaudan

3  Flavors Corp. is a separate corporation.

4          THE COURT:  And that has nothing to do with the

5  fragrance part of the business.

6          MR. DONOVAN:  That's right.

7          THE COURT:  Okay.

8          MR. DONOVAN:  And the numbers that we gave him are GAP

9  numbers for the last fiscal year that will be used for the

10  consolidated financial statement.  There is case law including

11  the A.L. Labs case in the Eighth Circuit which is 803 F. 2d 378

12  that deals with the ability to use the parent's financial

13  information as a basis for an award of punitives.

14          In this case there is history to this.  We have

15  produced --

16          THE COURT:  And what does the Eighth Circuit case hold

17  in your view?

18          MR. DONOVAN:  The Eighth Circuit case holds that in

19  the absence of a piercing of the corporate veil or essentially a

20  fraudulent structure of the corporate entity that you respect

21  the corporate form.  And there's been no evidence or even

22  assertion of that in this case.

23          In the past discovery in other cases, financial

24  statements were produced under the protective order for 2001

25  through 2005.  In this case when Dr. Ward was deposed, he did

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov

Case 5:06-cv-04009-MWB-RAW   Document 406   Filed 06/09/09   Page 8 of 123
To purchase a complete copy of the transcript.

1    render opinions based upon the parent's numbers.

2           At the final -- at the first final pretrial conference

3    back in 2008, this was raised with Judge Zoss, and Judge Zoss

4    essentially ruled that, you know, the parties could do discovery

5    and that Dr. Ward would be allowed to testify unless a

6    stipulation could be reached.

7           And so following that the plaintiffs did file a motion

8    to do discovery out of time.  That was resolved by means of a

9    production of what was then the most current financial statement

10   for Givaudan Flavors Corp.

11          When we did not receive any sort of a notification

12   that they were planning to use those numbers at trial and the

13   only thing on the exhibit list was the annual reports of the

14   parent which is a separate entity, we -- that was when we

15   approached the plaintiffs and said we'd be willing to work

16   toward a stipulation.  The number that I got we got from the

17   financial people at Givaudan, and it is, you know, the net worth

18   number for --

19          THE COURT:  For just -- for Givaudan Flavors Corp.

20          MR. DONOVAN:  The defendant in this case.

21          THE COURT:  Yeah.  And what is the net worth number

22   for that?

23          MR. DONOVAN:  It is XXXXXXXXXXX.  Your Honor, the

24   issue on confidentiality is that Givaudan Flavors Corp. is not a

25   publicly traded company.  And so it has -- when it -- when it

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
for purchase of complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ Document 406 Filed 06/09/09 Page 9 of 123

1    discloses information that would be of interest to securities

2    analysts, it has -- it triggers certain types of requirements

3    and things.

4              THE COURT:  So how are you suggesting we handle it?

5              MR. DONOVAN:  Our initial proposal was that this would

6    be -- that this would be provided to the jury in a written form

7    that they could put in their notebooks and that Mr. McClain

8    could reference how he would use that number for an award of

9    damages and that the jury would then -- you know, if you needed

10   to say whatever, 10 percent of XXX is XX, that we would allow

11   him to provide the jury with something that laid that out in

12   writing but the number would be held -- would be held

13   confidential and that --

14             THE COURT:  And not be mentioned in open court.

15             MR. DONOVAN:  Yeah.  And part of the issue is we

16   have -- you know, our competitors have had people monitoring the

17   trial as well.  We'd mention it now, and I guess we would move

18   to seal this, but it is not public information.  It is, you

19   know, essentially trade secret information.  So we're not trying

20   to impede the case.  We're trying to make it work for the

21   plaintiffs.

22             THE COURT:  Right.  Right.  I don't think you're

23   trying to impede anything.  I was kind of taken aback by just

24   giving it to them in writing, but I hadn't really thought it

25   out, you know, but I don't really have a big problem with doing

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 10 of 123

1  it that way.

2          MR. DONOVAN:  We would object, though, to using

3  consolidated numbers for the other -- for the other --

4          THE COURT:  See, this is the type of thing that would

5  have been nice to know yesterday so I could've looked at it last

6  night or this morning.  I mean, I was getting ready for a huge

7  sentencing I have this afternoon.  So I've gotta rule on it now

8  whether or not you can use the consolidated number or the XXX

9  number?  I have a hard time understanding how it's really -- I

10 mean, I understand that it's not publicly known information.

11 But it's really not a trade secret.  I mean, how would that

12 really help a competitor to know?

13         MR. DONOVAN:  I understand, Your Honor.  I'm merely

14 conveying the concern that our --

15         THE COURT:  I can understand why you want to keep it

16 confidential.  That I understand.  It really doesn't rise to

17 something like a trade secret.

18         MR. DONOVAN:  No, it's more like -- more on the level

19 of proprietary financial information.

20         THE COURT:  Right, right.

21         MR. DONOVAN:  That's correct, Your Honor.  I do --

22         THE COURT:  Can you give me the cite real quick again

23 on the Eighth Circuit case?

24         MR. DONOVAN:  The Eighth Circuit case I cited was

25 803 F. 2d 378, and I can provide Your Honor with several other

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 11 of 123
To purchase a complete copy of the transcript

1    cites if you're interested in those.

2            THE COURT:  You know, I really just got -- I've got

3    ten minutes before I've gotta try and decide it so . . .

4            MR. DONOVAN:  Your Honor, I've got to bring one other

5    matter to your attention.

6            THE COURT:  Yeah.

7            MR. DONOVAN:  I made a mistake last night, and I

8    immediately communicated with Mr. Crick from plaintiffs'

9    counsel's office.  I was on the phone with the counsel for

10   American Pop Corn Company trying to arrange the witnesses for

11   the trial.

12           THE COURT:  Uh-huh.

13           MR. DONOVAN:  I asked him a factual question about

14   something we had talked about before.  He offered to get one of

15   the witnesses on the phone and did so.  And in the process of

16   asking him some questions, when I ended the call, I realized

17   that I had on several occasions said "they said" or "they said"

18   about something that had been said at the trial.

19           The two things I can recall is I said that there had

20   been -- they had said that Mr. Kuiper was the first mixer and

21   they had said that there had been some changes to the mixing

22   room.

23           And as soon as I ended the call, it dawned on me that

24   I should not have conveyed that to the witness.

25           I immediately contacted Mr. Crick and raised it with

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 12 of 123

1    him.  I wanted to bring it to Your Honor's attention.

2              THE COURT:  Thank you.

3              MR. DONOVAN:  I apologize to the Court.

4              THE COURT:  You handled it totally appropriately.  We

5    all make mistakes.

6              MR. DONOVAN:  Just a brain --

7              THE COURT:  Yep.  I totally understand.  The question

8    isn't what it is when you make a mistake.  It's what you do

9    about it.

10             MR. DONOVAN:  I understand, Your Honor.

11             THE COURT:  And you acted, you know, a hundred percent

12   professionally, totally appropriately.  I appreciate you

13   disclosing it.  I don't hear the other side complaining about

14   anything, do I?

15             MR. MCCLAIN:  No.  In fact, I said that I didn't know

16   that it needed to be raised with you because we didn't think it

17   was --

18             MR. DONOVAN:  And I appreciated the graciousness of

19   counsel, but I felt it was important I bring it to the attention

20   of the Court.

21             THE COURT:  No, and I appreciate you bringing it to my

22   attention.  I just think you handled it terrifically, and those

23   things happen.

24             MR. DONOVAN:  My apologies to the Court for this, Your

25   Honor.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 13 of 123

1          THE COURT:  Not necessary to apologize.  Thank you.

2          MR. MCCLAIN:  Let me just give you -- we're not going

3    to give -- we're not going to be trying to use the parent's net

4    worth in this, but there is -- they had over a billion three in

5    excess cash which they used to repurchase stock and other things

6    at the end of the year.  28 percent of that was generated by the

7    American subsidiary based upon the numbers roughly, and so that

8    is a measure in addition to the net worth that we want to use,

9    28 percent of the 1.3 --

10         THE COURT:  Now just a second.  Is it 28 percent of

11   this corporation or of all American subsidiary corporations?

12         MR. MCCLAIN:  It's 28 percent apparent -- from the

13   2007 report, it's 28 percent of this flavoring company -- this

14   flavoring company contributes 28 percent to the overall

15   operation of the company.

16         THE COURT:  And for some reason you think XXX --

17   woops --

18         MR. MCCLAIN:  No, no.

19         THE COURT:  Whatever number it is that I'm not

20   supposed to say, that number isn't sufficient for any argument,

21   any reasonable argument you could make?

22         MR. MCCLAIN:  It is.

23         THE COURT:  Why are you being piggish?

24         MR. MCCLAIN:  Well, if that's what I'm being, then I

25   withdraw --

```
 1          THE COURT:  I don't know.  Do you think maybe?  Do you

 2   think maybe?  Let me ask you this.  If we're certain it's

 3   okay -- assuming it's permissible to even submit punitive

 4   damages, but I'm making that assumption, if we all agree that we

 5   can use the one figure, the three-digit number starting with a

 6   6, why isn't that sufficient for any purpose that you might

 7   have?

 8          MR. MCCLAIN:  Sold.  I'll do it.

 9          THE COURT:  You really want to run the risk?

10          MR. MCCLAIN:  No.

11          THE COURT:  I mean, I'll be glad to read this Eighth

12   Circuit case.  I assume it says what they told me it said, and

13   it kind of makes sense.  I mean, I could understand using the

14   larger parent number if there was no way to parse out the

15   defendant you sued, but this is the defendant you sued.

16          MR. MCCLAIN:  We'll do it.

17          THE COURT:  Yeah.  Okay.  I think does that resolve it

18   then?

19          MR. MEADOR:  Yes, Your Honor.

20          THE COURT:  Oh, I guess we have to resolve the process

21   of whether we, like, do it in -- you know, I actually think the

22   way you suggested puts more emphasis on the number.  It's

23   just -- you know, I know I probably shouldn't weigh in on these

24   things, but I think there's more of a risk of -- if we, like,

25   don't mention the number and give it to them in writing and they
```

1  put it in their notebook that it kind of enhances the value of

2  it because it's the only piece of information in the whole trial

3  that's being treated that way.  And then it becomes like it's

4  the family jewel secret that we're just letting them in on and

5  nobody else.  And I'd be concerned, if I were sitting where you

6  are, that they put more weight on it than they should because of

7  the way in which we treated it.  But that's just my spin on it.

8         MR. DONOVAN:  Your Honor, I think that that's a fair

9  point, and I believe we've somewhat let the cat out of the bag

10 this morning as it's in the record.  Perhaps --

11        THE COURT:  We could seal that -- I mean, if you're

12 really gung-ho on it --

13        MR. DONOVAN:  I was going to say perhaps you should

14 just give an instruction to the gallery that this number's, you

15 know, not to be disseminated.

16        THE COURT:  I'll be happy to do that.  You want me to

17 do it at the time it's disclosed?  Is there anybody in the

18 gallery that you're concerned about now that you don't know

19 about?

20        MR. DONOVAN:  I don't recognize everyone in the

21 gallery.  I don't know if there are other flavoring company

22 lawyers in the gallery at this time.

23        THE COURT:  Let me ask you this.  Is there anybody in

24 the gallery that's not with our court because I see one of our

25 employees there, Jose, our tech person, or affiliated with the

Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 16 of 123
To purchase a complete copy of the transcript

1    law firms or parties in this litigation?  Is there anybody?

2    Raise your hand if you're not.  And who are with, ma'am?

3            UNIDENTIFIED FEMALE:  I'm an attorney from Omaha.  I'm

4    just monitoring --

5            THE COURT:  I can't hear you back there.  Would you

6    mind coming up to the podium?  Who are you monitoring -- do you

7    mind me asking I guess?

8            UNIDENTIFIED FEMALE:  Actually, Your Honor, I don't

9    know exactly who I'm monitoring for.  I was just sent down by an

10    attorney in our law firm, and so it's just an undisclosed third

11    party.

12            THE COURT:  Okay.  Well, I think as an officer of the

13    court I have extra leverage on you that I might not have on some

14    other folks.  So you've obviously sat in on the conversation,

15    and we're treating it kind of semi -- we're treating it as

16    confidential proprietary financial information, not a trade

17    secret.  Can I have your assurance as an officer of the Court

18    that you can report back on anything but not that number?

19            UNIDENTIFIED FEMALE:  Yes, Your Honor.

20            THE COURT:  Okay.  Are you uncomfortable being bound

21    by that?

22            UNIDENTIFIED FEMALE:  No, I'm not at all, Your Honor,

23    and I just walked in on the last part.  I'm not even sure what

24    was being discussed quite honestly, so I don't have any problem

25    with confidentiality of what I did hear.

1          THE COURT:  Okay.  Okay.  That three-digit number,

2     that's the combined IQ of two of the lawyers in the case, but I

3     can't disclose which two lawyers.

4          UNIDENTIFIED FEMALE:  I understand.  Thank you.

5          THE COURT:  Okay.  But yeah.  The financial number

6     that will be used in the trial, I'm asking you not to disclose

7     that to anybody in your law firm or the party that retained you

8     to sit in on the case.

9          UNIDENTIFIED FEMALE:  Understood, Your Honor.

10          THE COURT:  Okay.  Thank you so much.

11          MR. DONOVAN:  Thank you, Your Honor.

12          THE COURT:  Mr. Holtman.

13          MR. HOLTMAN:  Judge, Judge -- ma'am -- for the record,

14     could we ask her to identify herself?

15          THE COURT:  Sure.  We could.  But, you know, members

16     of the public aren't actually required to identify themselves

17     when they come into a federal courtroom because it's open to the

18     public.  So she represented that she was a Nebraska lawyer and,

19     therefore, an officer of the court.  I don't have a need to know

20     who you are.  If you want to satisfy Mr. Holtman's request,

21     that's totally up to you.

22          UNIDENTIFIED FEMALE:  I'd prefer not to at this time,

23     Your Honor.

24          THE COURT:  Okay.  That's fine.

25          UNIDENTIFIED FEMALE:  Thank you.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 18 of 123

```
 1              THE COURT:  Anything else?

 2              MR. MCCLAIN:  What are we going to do?  Do they want

 3   us to do this hand-it-over sheet?

 4              THE COURT:  No, I thought we decided we're not going

 5   to but I'm going to advise everybody in the courtroom at the

 6   time it's disclosed that it's considered confidential

 7   proprietary information and they're not to disclose it to

 8   anybody.

 9              MR. MCCLAIN:  Okay.

10              MR. DONOVAN:  Thank you, Your Honor.

11              THE COURT:  Does that handle it okay?

12              MR. DONOVAN:  Yes, Your Honor.

13              THE COURT:  Okay.  I think it's a nice middle ground.

14              MR. MCCLAIN:  What are we going to do?  Am I going to

15   do it today?  Do you want me to wait to do it?

16              THE COURT:  You know, you can do it whenever you want.

17              MR. MCCLAIN:  Okay.

18              THE COURT:  Because I just decided it.

19              MR. MCCLAIN:  Okay.

20              THE COURT:  I just decided the number you're going to

21   use.

22              MR. MCCLAIN:  Okay.

23              THE COURT:  Well, you actually decided that.  And then

24   we decided together the process we're going to use.

25              I guess I told them 8:35, so we have some more time.
```

1    Anything else on your agenda?

2              MR. MCCLAIN:  No, I don't think so.

3              THE COURT:  Anything on the defense agenda?  Okay.

4    Thank you.  We'll see you back at 8:35.

5              (Recess at 8:27 a.m.)

6              THE COURT:  Before we bring the jury in, I did look at

7    this A.L. Laboratories case, and I think it holds what you said

8    it held.  But I didn't realize it was a 1986 case.  And so do

9    you think there's anything in TXO that changes the holding of

10   this case?

11             MR. DONOVAN:  I don't believe so, Your Honor.  I mean,

12   I think that -- I think the issue is that the parent's

13   financials have sometimes been allowed, but when there is no

14   real manner or means to get the actual defendant's financials or

15   where there's been some sort of a proven case of kind of --

16             THE COURT:  Piercing the corporate veil or --

17             MR. DONOVAN:  Correct.

18             THE COURT:  Right.  And we don't have that here

19   obviously.

20             MR. DONOVAN:  There's been no allegation.

21             THE COURT:  Okay.  Thanks.

22             MR. MCCLAIN:  Just -- I know that we've decided this,

23   but, you know, I kind of like these legal issues too, but I

24   think you should look really at the West Virginia Supreme

25   Court's opinion which is relied upon by the Supreme Court in

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 20 of 123

1   regard to this issue because it's an important issue in terms of
2   deciding these things because the way that these companies do
3   these financials are just impenetrable, you know, so -- but --
4           THE COURT:  Now, is that the case that's on cert. now
5   to the Supreme Court?
6           MR. MCCLAIN:  No, sir.
7           THE COURT:  Involving the judge that allegedly should
8   have or should not have recused himself?  No?
9           MR. MCCLAIN:  No, no.  And I have a thousand tobacco
10  cases down -- I know about that a little bit if you ever want to
11  know about it.  But no, this is TXO -- this is TXO versus
12  Alliance Resources.
13          THE COURT:  Was TXO from the West Virginia Supreme
14  Court?
15          MR. MCCLAIN:  Yeah.
16          THE COURT:  Okay.  Well, I'll take a look at TXO.
17          MR. MCCLAIN:  We have a little brief on it if you're
18  interested just so you have the cites.
19          THE COURT:  Okay.  Thank you.  Do you have a --
20          MR. MCCLAIN:  Yeah.
21          THE COURT:  Okay.  Ready to have the jury brought in
22  now?
23          MR. MCCLAIN:  I am.
24          THE COURT:  And who are we starting off with?
25          MR. MCCLAIN:  Kathie Allison, Your Honor.  She's a

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 21 of 123

1   life care planner who the economist relies upon in terms of the

2   future medical expenses.

3          THE COURT:  Right.  Okay.

4          (The jury entered the courtroom.)

5          THE COURT:  Thank you.  Please be seated.  Good

6   morning.

7          Mr. McClain, are you ready to call your next witness?

8          MR. MCCLAIN:  I am, Your Honor.  I call Kathie Allison

9   to the stand.

10          THE COURT:  Okay.  Thank you.

11           KATHIE ALLISON, PLAINTIFFS' WITNESS, SWORN

12          THE COURT:  Okay.  Please be seated in the witness

13   box.  And you can adjust the chair and the microphones so you

14   can speak directly into the microphones.  And would you please

15   tell us your full name and spell your last name for us.

16          THE WITNESS:  Kathie Allison, A-l-l-i-s-o-n.

17          THE COURT:  Okay.  Thank you.

18          Mr. McClain?

19                    DIRECT EXAMINATION

20   BY MR. MCCLAIN:

21   Q.   Good morning, Ms. Allison.

22   A.   Morning.

23   Q.   Would you introduce yourself to the jury telling them where

24   you live and what you do.

25   A.   My name is Kathie Allison, and I am a life care planner,

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 22 of 123
To purchase a complete copy of the transcript

1    and I live in Kansas City, Missouri.

2    Q.    And, Ms. Allison, what is a life care planner?

3    A.    A life care planner is an individual that works with people

4    who have catastrophic injuries, and I work with their doctors

5    and therapists if they have therapists to determine the future

6    costs of care as it relates to functional deficits.

7    Q.    Now, Miss Allison, do you -- what is your training and

8    background?  What is your -- what is your degree in, and how do

9    you come to be a life care planner?

10   A.    My original degree is in physical therapy.  I graduated

11   from the University of Kansas in 1972.  I received my master's

12   degree in perceptual motor development out of the school of

13   education in 1979.  And I worked both as a physical therapist; I

14   worked in healthcare management.  I also taught physical therapy

15   at the University of Kansas for a number of years.

16        And then in 1993 I started working with life care

17   planning.  I sat for the national certification in the year 2000

18   and have been recertified in 2003 and again in 2006 as a life

19   care planner.

20   Q.    And so you're certified as a life care planner by the

21   National Organization of Life Care Planning?

22   A.    It's an organization that does the testing.  The

23   international organization is more of a professional

24   organization.  They do not do the testing.  They have another

25   organization called the Center For Healthcare Certification that

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 23 of 123

1    does the actual testing.

2    Q.    All right.  Now, Ms. Allison, to back up just for a minute,

3    in some of your work as a physical therapist, did you deal with

4    lung issues?

5    A.    Yes, I did.

6    Q.    Tell the jury about that, would you?

7    A.    Particularly during the period of time that I was an

8    instructor at the University of Kansas, one of the areas that I

9    taught the physical therapy students was the area of

10   cardiopulmonary physical therapy.  I was the coordinator of the

11   lecture series in which we brought in the specialists at the

12   university to talk about the different kinds of cardiopulmonary

13   problems and diagnoses that patients have.  And then I was the

14   instructor for the cardiopulmonary technique courses for the

15   physical therapy students.  And that was a semester-long course.

16   Q.    Now, Ms. Allison, have you also had the opportunity to work

17   with microwave popcorn workers who have sustained severe

18   injuries from breathing diacetyl?

19   A.    Yes, I have.

20   Q.    And has that been in the context of litigation?

21   A.    Yes, it has.

22   Q.    How many total cases have you had the opportunity to look

23   at for microwave popcorn workers?

24   A.    I would imagine by now probably between 40 and 50 cases

25   that I've done.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 24 of 123

1  Q.   Now, in regard to these workers that you've examined, have

2  you been able to determine whether or not the changes and

3  suggestions in regard to their care were, in fact, made outside

4  of the litigation context?

5  A.   Yes, they are.  Generally one of the things that you do

6  when you're doing a life care plan or you're starting to put a

7  life care plan together is that I contact their treating

8  physicians, and I contact any specialists who have done medical

9  examinations.  And over the period of the seven to eight years

10 that I've been doing them, there is a consistency in what is

11 ordered in terms of the support services, the consistency of

12 that, the consistency of the kinds of medications, although

13 there are some new medications on the market that are being

14 used.  But overall there's a real consistency there.

15 Q.   So you've been able to test whether or not the

16 recommendations that you've made for care, in fact, go forward

17 and this is the care that the individuals need and receive.

18 A.   For the most part, yes.

19 Q.   Now, tell us in this case what you did.

20 A.   I was contacted by your firm and asked if I would be

21 available to complete a life care plan for Mr. Kuiper.

22 Mr. Kuiper was going to be in Kansas City undergoing a medical

23 evaluation with Dr. Parmet.  I called Dr. Parmet's office and

24 arranged to be there at that time so that I could meet him and

25 visit with him.  That visit lasted about an hour.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 25 of 123

1       I met with Mr. Kuiper and his wife, discussed how he

2   was doing.  I was able to look at him, ask him to do some just

3   generalized gross motion activities, watched him walk, looked at

4   how he -- what his breathing pattern was.

5       After that I received medical records.  I asked your

6   firm.  I had a list of hospitals that he'd been in, let your

7   firm know what medical records I needed to review, received

8   those records, received an authorization so that I could contact

9   his treating doctors, and in this case that would be Dr. Farrell

10  and Dr. Bainbridge at that time.

11      I contacted Dr. Farrell, contacted Dr. Bainbridge, and

12  also talked with Dr. Parmet asking them, "What are your

13  recommendations for care that he will need as a result of his

14  lung dysfunction and the limitations that he -- that he

15  exhibits?"  Ron was having some limitations of motion.  He was

16  having some endurance issues.  He was having some fatigue

17  issues.  He has a chronic cough.  Those were some areas that I

18  was looking at.

19      When I did that, I then put together an initial life

20  care plan.  I told Ron at that time that at some point I would

21  need to come to Sioux City so that I could see his house.  One

22  of the reasons that you want to do a home visit if you're doing

23  a life care plan is that there are elements of a life care

24  plan -- we're trying to look down the future as far as what are

25  the needs and, if we know that someone's functional ability will

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 26 of 123

1    decline over time, then what needs must be considered either to

2    keep them in their living arrangement, his home, or would it be

3    better to recommend a -- some other alternative living

4    environment.

5    Q.    Now let me just stop you just for a moment.  At the time

6    that you saw him at Dr. Parmet's office, was he able to walk on

7    his own?

8    A.    He walked slow, but he was walking on his own, yes.

9    Q.    And based upon that visit -- and by the way, when was that?

10   A.    My visit with Ron was on -- just a moment -- April 6, 2006.

11   That was my first contact with the Kuipers.

12   Q.    Okay.  And so at that point in time he was able to walk on

13   his own and move on his own albeit slowly.

14   A.    Yes.

15   Q.    And when you observed him at that point in time, what did

16   you observe in terms of the factors that you were evaluating in

17   terms of his functional ability, his breathing rate when he was

18   able to walk and move and other things?

19   A.    Well, Ron was -- he was alert.  When we went through the

20   various things, I asked him to move his arms.  I wanted to see

21   whether or not he had full motion of upper and lower

22   extremities, did he have good expansion of his chest.  He had a

23   gait pattern that was steady.  He demonstrated a balance deficit

24   with turning and with sidestepping.  But for the most part, he

25   had some shortness of breath.  I usually ask people to walk -- I

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 27 of 123

1    try to have them walk somewhere between 150 and 200 feet with a

2    pretty good cadence.  I'm looking to see whether or not --

3    that's not a long walk, but that's a functional walk.  Do they

4    have shortness of breath?  Do they cough?  Do they have any

5    symptoms that would tell me that they're going to have some

6    limitations of endurance activities?

7    Q.    And what'd you find?

8    A.    He became a little bit short of breath.  His heart rate

9    with his exertion was greater than 30 beats a minute.  If you do

10   150-foot walk and if you look at the American Heart

11   Association's standards, somewhere between 20 and 30 beats a

12   minute raise is what we would accept as that's a pretty normal

13   elevation with a brisk walk for 150 feet.  His heart rate went

14   greater than that which tells me either we're dealing with

15   someone that has some endurance issues with a normal activity.

16   Q.    Now, how far is 150 feet just so that we can visualize it?

17   A.    150 feet, my estimation, would probably be right now from

18   here to the door and back.

19   Q.    Okay.  And so that's the distance.  Whatever it really

20   measures out to be is about as far as you walked Ron to the door

21   and back, and at that point his heart rate was up, and he

22   was . . .

23   A.    He was a little bit winded.  He was using a few accessory

24   muscles.  When you use accessory muscles, if you've ever seen

25   anybody that exercises and you see them and they take a little

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 28 of 123

1    bit deeper breath and you see a little bit of neck muscles to

2    work, then that's the use of accessory muscles.  I measured -- I

3    knew that it was 150 feet at Dr. Parmet's because I've measured

4    that distance.

5    Q.   I see.  So that was a precise measurement at that time.

6    A.   Yes, it is.

7    Q.   Okay.  All right.  But now -- so you saw that he could get

8    around, but he was somewhat breathless, but in your observation

9    of these microwave popcorn workers, do they tend to decline?

10   A.   Does their condition tend to decline?

11   Q.   Yes.

12   A.   Over time the functional abilities of many of the people

13   have declined, yes.

14   Q.   Okay.  So you had this initial visit with him, and you saw

15   where he was, but I interrupted you.  You were telling about the

16   visit to the house.  What happened then?

17   A.   Okay.  When I first met with Ron, we also -- not only do I

18   ask them what they can do, but then I go through a functional

19   activity checklist, and those are self-care activities and

20   functional daily activities.  Self-care activities are eating,

21   dressing, grooming, bathing, those kinds of things.

22           Ron had told me that he was able to do some of those

23   things but he had to rest afterwards and that he was tired.

24           When I did my home visit, one of the things that I

25   could see was that he had -- we needed to do modifications of

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 29 of 123

1   his home environment so that he would be safer.  He had stairs,

2   and stairs are a very difficult thing for him to accomplish.  He

3   gets very winded going up and down stairs.  And, in fact, the

4   last time I talked with Ron which was getting ready for this

5   trial, Ron is not walking stairs at all at this point.  And he's

6   now using a walker.  And he is -- the life care plan talked

7   about the need for and the recommendation that he would need

8   probably a motorized scooter for community mobility.

9            And I thought -- when I talked with Dr. Parmet who was

10  the recommender for that particular service, we thought it would

11  probably be in two or three years.  In 2008 Ron bought the first

12  scooter so --

13  Q.   And we've seen it, and unfortunately he's receiving some

14  attention this morning, but -- so -- but we've seen it in court.

15  Was that part of your recommendations?

16  A.   Yes.

17  Q.   Go ahead.

18  A.   One of the other areas that I look at are activities that

19  we call the functional activities:  Can you fix your own food?

20  Can you maintain some semblance of order in your house?  Can you

21  lift a laundry basket?  Can you do laundry?  Can you fold?  Can

22  you carry?  Can you shop?  Can you carry groceries?  Can you get

23  in and out of a car?  Can you drive?  Can you do things that are

24  general maintenance and heavy maintenance, spring cleaning,

25  leaves, gutters, et cetera?  Those are all functional activities

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 30 of 123
To purchase a complete copy of the transcript

1　that allow us to live independently.

2　Q.　By the way, when you saw him in 2006, was he on oxygen?

3　A.　No.

4　Q.　And we've seen that he's on oxygen now, but that was

5　something that you were concerned about as going forward, that

6　he would ultimately need oxygen?

7　A.　I questioned the use of oxygen, and that was one of the

8　things that we did not put in because they didn't feel that he

9　would probably need it.　That's new.　In fact, I was not aware

10　that he's on oxygen.　He did not -- when I talked to him on the

11　phone, he did not tell me that he was using the oxygen.

12　Q.　Well, that was through Dr. Bainbridge's office just last

13　week so . . .

14　　　　　MR. PAGLIARO:　Your Honor, I object to Mr. McClain's

15　testifying during the course of this questioning.　He's adding

16　information.

17　　　　　THE COURT:　Sustained.

18　BY MR. MCCLAIN:

19　Q.　Ms. Allison, I want you to assume that he is currently on

20　oxygen.　Is that something that you've observed in microwave

21　popcorn workers, that they frequently do need to go on oxygen?

22　A.　Yes.

23　Q.　Now, when you examined the house then and determined his

24　functional state, what was your next step?

25　A.　Well, there was going to need to be some modifications of

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 31 of 123
To purchase a complete copy of the transcript

1    the house to make it safe for him, and my biggest concern was

2    that I really felt like the house in and of itself was not going

3    to be safe even with extensive modifications.

4            So I looked at giving an allotment for making sure

5    that the bathroom would be accessible and that they would have

6    what I would call the minimum adaptions to that environment.

7            In addition, I talked with the Kuipers and recommended

8    that I felt at some point Ron would have to go into some kind of

9    a supported living, either a maintenance-provided community, or

10   in his case, without Conley's support, I felt that Ron would not

11   be able to live independently and that he would have to go to an

12   assisted living environment.  Conley at that time had some

13   health issues, and I was not able to look down my -- into my

14   crystal ball and say she's going to be able to do everything for

15   him because she was doing a significant amount of the daily

16   living activities for him then.  She was providing that care for

17   him.

18   Q.   Let me just stop you just for a moment.  He's currently

19   living on his own with Conley at home.  Is she the primary

20   caregiver for him currently?

21   A.   Yes.

22   Q.   And without that care that she is currently providing, it

23   would be necessary for him to go into assisted living?  Is that

24   what you're saying?

25   A.   Yes.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 32 of 123

1  Q.   As time goes on, as time goes on, based on your experience,

2  will the requirements placed upon whoever the caregiver is

3  increase in your opinion?

4  A.   In my opinion they will continue to go up, yes.

5  Q.   And so to the extent that Conley's having difficulty now,

6  is that likely to increase, decrease, or stay the same?

7  A.   That I think they -- in my opinion right now they are in a

8  supported apartment situation where some of the maintenance is

9  done, the interior/exterior maintenance.  They have a

10 housekeeper so that right now they probably can get by.  I still

11 think -- and when I look at a life care plan, it's not what the

12 spouse can also do.  It really -- that individual has to stand

13 alone.  And either we have to, which has been done in this case,

14 give credit for the amount -- put a dollar value on the amount

15 of services that are being provided by Conley or we have to be

16 able to identify how we can obtain those services.

17         And in Ron's case, I've looked at two options:

18 Keeping him at home or keeping him in an area that will provide

19 him some of these services and/or putting him in assisted

20 living, at least at the level of assisted living.

21 Q.   Okay.  Let's look then at your report in regard to the life

22 care plan itself, the exhibits.  Is that a good place for us to

23 go right now?

24 A.   Yes.

25         MR. MCCLAIN:  Scott, would you put that up?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 33 of 123

1          Your Honor, this is Plaintiff's Exhibit 1221 in

2     evidence.

3     Q.    Now, Ms. Allison, this is dated July 12, 2006.  This is

4     just shortly after your visit with Dr. Parmet; is that right?

5     A.    Yes.

6     Q.    All right.  And let's go to the life care plan tables for

7     Ron Kuiper if we can.  Now, tell us what we're looking at here.

8     A.    There are several areas that we look at in a life care

9     plan.  One is the acquisition of actual medical services, in

10    this case physician services.  The second chart is therapeutic

11    services, and then we look at other items in the life care plan.

12    This is the abs -- what has been recommended both by his care

13    providers and by Dr. Parmet for medical services.

14          Family medicine or his general practitioner,

15    Dr. Farrell, felt that he saw Ron at least four times more than

16    what we would expect for a well visit.  Four to six times a year

17    he saw him more frequently than he would an average client.

18          Dr. Bainbridge felt that he saw him two to four times

19    for specifically his pulmonary.  Over the period of 2006 to now,

20    that has -- that's really stayed pretty true.  He saw

21    Dr. Bainbridge four times in 2004.  He saw him four times in --

22    or three times in 2007, and he's already seen him more than once

23    now because he's currently having an exacerbation of his lung

24    condition.

25          He's seen internal medicine -- or excuse me, family

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 34 of 123

1  medicine 7 times in 2006 and 6 times in 2007. So we're pretty

2  close to what we have projected that he was going to need.

3  Q.  So what you try to do is come up with the unit costs for

4  what those visits would be?

5  A.  The doctor's office gives me an average charge of what they

6  think a level 2 or a level 3 visit. I look at that. Then I put

7  in what we predict will be the average number of visits and then

8  come up with an annualized cost for that care.

9  Q.  Okay. All right. And then by the way, you haven't totaled

10  any of these costs. That is what the next witness, an

11  economist, Dr. Ward, does in this process; is that right?

12  A.  Correct.

13  Q.  Okay. All right. Then shall we go to the next page, the

14  therapy page?

15  A.  The next area that is examined in the life care plan the

16  way that I organize life care plans is does this individual --

17  because of functional deficits, do they need any therapeutic

18  intervention? Dr. Parmet who has done most of the medical

19  evaluations on probably 50 to 60 of the individuals with

20  flavoring problems and the diagnosis of lung conditions has

21  recommended -- and there is some data out there that individuals

22  that have poor pulmonary function will do some better. We're

23  not going to improve their lungs, but we can improve their

24  endurance.

25        Pulmonary rehab has been recommended for Ron Kuiper.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 35 of 123

 1   That would be either two or three times a week and, because he's

 2   at such a low level, that it would be probably needed for about

 3   a year.

 4          And then because of the kinds of environment that you

 5   deal with up here in Sioux City, hot, dry, dusty, and very cold,

 6   I have then calculated that when he is able to exercise on his

 7   own he really needs an indoor facility to do so.  So I then

 8   looked at the cost of a health center that he would have a -- he

 9   would have access to very light weights.  We're not going to

10   build him up, but we're going to try and maintain what he's got

11   and a track or a treadmill for him to maintain.

12          In this case --

13   Q.   Now, you're not suggesting that he's going to be running on

14   this treadmill.

15   A.   No.

16   Q.   No.  It's after the pulmonary rehab walk as much as he can.

17   A.   And if he does -- if he's not able to do the walking, then

18   they do have recumbent bikes where he can actually do bike

19   ergometry as opposed to walking if that becomes an issue.

20          Looking at the services as they exist in Sioux City, I

21   used St. Luke's and Mercy as my cost analysis.  And the actual

22   range of cost was between 80 and $116 per unit 2 or 3 times a

23   week.  Then I looked at how long it would take if he actually

24   did that for six months or it took a year.  That gave you a

25   lifetime cost.  And then I also looked at what does it cost for

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 36 of 123

1  him for his lifetime to maintain a gym membership.

2  Q.   Okay.  Let's look at the next one beyond therapy with

3  equipment.

4  A.   In equipment there are a couple of things.  I look at

5  equipment that would either build strength, equipment that will

6  support individuals in improving their function, and in Ron's

7  case there are actually only two areas.  One is that there needs

8  to be an allotment for shower modifications.  And generally what

9  that means, as your endurance goes down, you really need to have

10  a seated bench in a shower, and you need to have a handheld

11  shower rather than expecting somebody to stand as they shower.

12        And I think I've already talked about we had

13  projected -- I had projected in my discussion with Dr. Parmet

14  that Ron would probably need a scooter in two or three years

15  after my initial meeting.  That has come to fruition.  If you

16  need a scooter, you need to have a portable ramp so that if he's

17  out he'll be able to access the community if there are not curb

18  cuts, and there needs to be a battery replacement on a periodic

19  basis for that.

20        One of the other aspects that I put in, I think Ron

21  needs to have one of the pendant lifeline alert systems because

22  he has already fallen more than once, and somebody's not in the

23  room present with him at all times.

24  Q.   Okay.  And you've gone over these with Dr. Parmet, at least

25  the scooter; is that right?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 37 of 123

1   A.   The scooter was recommended, concurred with me, yes.  And

2   the rest --

3   Q.   And these other things are things that have had to be

4   employed by other microwave popcorn workers and you believe are

5   appropriate here?

6   A.   Not only microwave popcorn workers, but when I look at

7   somebody who has the functional deficits to the extent Ron does,

8   whether it's a lung disease or other, when they get to a point

9   where there are functional deficits, you have to look at how do

10   you modify their environment.

11   Q.   What about over to medication and supplies?

12   A.   The medication and supply chart is for the most part --

13   that is a chart that it comes strictly from recommendations from

14   care providers.

15         If you look at the first three items, those are all

16   current drugs that are being taken by Mr. Kuiper, and they're

17   being recommended by Dr. Bainbridge.

18   Q.   So you're talking about Budesonide, Sp -- I can't --

19   A.   Spironolactone and Enalapril.

20   Q.   Okay.

21   A.   Those are all drugs that are being ordered by the doctor.

22   Q.   Okay.

23   A.   The next is laboratory testing, and when people have drugs

24   that have steroids, they need to have periodic lab testing

25   because steroids are tough on dr -- on the metabolism of the

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 38 of 123

1    body.  So Dr. Parmet has recommended that he would have an

2    annual lab panel.  I gave the cost of that.

3            Dr. Parmet, Dr. Farrell, and Dr. Bainbridge have all

4    stated that Ron will need to have periodic X-ray examination.

5            The next is pulmonary function testing, and Dr. -- and

6    all three doctors again have said based on his lung dysfunction

7    we need to plan for the cost of pulmonary functions testing, and

8    I have given simple spirometry to a complete pulmonary function

9    test.  Again, if you ask how frequently, the range of the

10   doctors is between two and four a year.

11           The reason bone density is there, one is immobility,

12   and two is he's been treated by steroids.  And there is a

13   tendency for that to have wear and tear on the bones.  In fact,

14   Dr. Parmet has even suggested that he start on biphosphates and

15   start taking a calcium supplement.

16           The flu shot and the pneumonia vaccine are

17   prophylactic.  People with lung disease do not need to get flu's

18   or pneumonias.

19   Q.    And by prophylactic, you mean preventative?

20   A.    Yes.

21   Q.    Okay.

22   A.    The antibiotic regime -- and this has pretty much stayed

23   close to what Ron has had.  He needs antibiotics at least twice

24   a year because of lung infections.  And the nebulizer unit, that

25   is a small plug-in unit that is used to administer the

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 39 of 123

1    Budesonide which is the first drug.  There are little ampules,

2    and it's a little mist applicator, and Ron does that twice a

3    day.

4    Q.   Okay.  Let's look at potential complications.

5    A.   If you look at potential complications for people that have

6    lung disease, there are two things.  They can get bronchitis,

7    and they can also have acute respiratory infections.  If I look

8    at that and I say over a lifetime how frequently do we need to

9    plan for that as a potential cost, with my discussions with

10   Dr. Parmet, we decided that major respiratory infections,

11   probably twice in his lifetime and bronchitis that would maybe

12   need an overnight stay which, in fact, he did have just recently

13   in January, two for his lifetime.

14            I then have a computer program that I use to go into

15   hospitals in this region and have the ICD 9 which is the

16   diagnostic code, what is the average length of stay for that

17   hospital and what is the average cost that's generated.  That

18   does not include any additional testing.  That certainly doesn't

19   include any physicians, but it does give us a ballpark figure

20   for cost.

21   Q.   Now -- and if it is as you say that he's declining more

22   rapidly than you anticipated, could these be more frequent than

23   you projected?

24   A.   Probably, yes.

25   Q.   Okay.  Let's go to maintenance costs.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 40 of 123

1  A.   I have discussed scooter maintenance with the manufacturer

2  rep., and I keep a running file of what they now charge for the

3  warranty, the new warranty that goes in, and then how much do we

4  need to plan on on an annual basis to maintain his scooter.

5  That's what is represented on this chart.  There are no other

6  pieces of equipment that I'm looking at for maintenance.

7  Q.   Okay.  Now, you have option 1 which is supported care.

8          MR. MCCLAIN:  Scott, will you go --

9  Q.   Now, you told us -- you told us when you started you looked

10 at this two different ways.  One, if Conley is able to continue,

11 which she wants to do, with his care or if it becomes too

12 burdensome and he has to go into supported care; is that right?

13 A.   Correct.

14 Q.   And this option 1 then is which of those two?

15 A.   Option 1 is allowing Ron and Conley to live together where

16 they're at now with the exception that we probably would have to

17 back out lawn care.  But the general maintenance is calculated

18 in their rent that they're now paying.  And they do pay for

19 housekeeping.  And the household assist is representative of the

20 number of hours a week that Conley is actually helping provide

21 care for Ron.

22 Q.   So in essence what you're saying is they've already moved

23 into the option 1 category.

24 A.   They're living in the option 1 category, yes.

25 Q.   Currently.  You didn't know -- that is not what the

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 41 of 123

1  situation was in 2006.  They were living in their own home at

2  that time.

3  A.   Yes.  And the only thing that I would make any

4  modifications would be to back out lawn care.

5  Q.   Okay.

6  A.   But if you look at when you go into these senior centers,

7  part of the rent that is being paid is because these services

8  are being provided.  So I didn't really change the costs of the

9  life care plan.  I made no modifications.

10  Q.   So these numbers, are they still good numbers to be using?

11  A.   I believe so, yes.

12  Q.   And conservative in terms of what is going to be needed in

13  the future?

14  A.   Yes.

15  Q.   They could possibly be more.

16  A.   Particularly the hands-on costs in terms of doing things

17  for Ron, yes.

18  Q.   Okay.  Now -- go ahead with the remaining items.

19  A.   The second option is that Ron needs to go to assisted

20  living where all three meals a day are provided, where they

21  provide medication administration, where they make his bed,

22  where they do the laundry, where they do the housekeeping.  And

23  if you look at that option, then there is a charge, and that

24  goes up.  And this is only for Ron.  This is not for a

25  supplement for Conley to live with him.

1    It runs -- in your area, in Sioux City, it runs

2  between 1,355 and 2,390.  In fact, at one point, Ron did live

3  for a short period of time in an assisted living environment,

4  and then he and Conley moved into where they're living now.

5  Q.    Okay.  So there has already been an experience where that's

6  been necessary for a short period of time already.

7  A.    Yes, from -- I think they moved in in 2007 in July and they

8  moved -- he was there a little over a year.

9  Q.    All right.  And based upon your experience, once this kind

10  of pattern starts, they're in assisted living and they move out,

11  what's the general way that -- with this disease progression

12  that the future looks in terms of whether this will be necessary

13  or not again?

14  A.    I think that in his lifetime he will have to go back to

15  assisted living.  And because we only have one opportunity when

16  you're doing a life care plan to look at the care options, I

17  provided you with both options of care.  In reality we will

18  probably see a combination of that.  And with Ron, I really feel

19  that -- it's my opinion that Ron probably will have to go back

20  to assisted living in the not-too-distant future, either that or

21  they're going to have to start paying for more care to help him

22  in the apartment.

23  Q.    And so all these costs that you have calculated here are

24  things that you believe are likely to be needed in the future?

25  A.    They're either doing them now, or they're likely to be

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 43 of 123

1   needed in the future, yes.

2   Q.   Let's look over at transportation then.   What's anticipated

3   here?

4   A.   I need to be able to get the scooter from one place to

5   another if Ron's going to be using a scooter for his community

6   mobility.   I've put in the costs associated with a lift for the

7   back of the car or the van to carry the scooter.   I also have

8   put in the cost for AAA.   They can't have a breakdown and go out

9   and get help if he's in a scooter.   He has to be able to have

10  a -- an emergency cell phone.   This is -- in fact, I recommend

11  this in most of my life care plans, and I have this service.   It

12  is a cell phone.   You keep it in your car.   It has an automatic

13  dial to AAA for assistance.   You have to buy your membership in

14  AAA, and then the monthly fee is the fee for the cell phone.

15          The last cost is his access to his healthcare, to

16  therapies, to his doctors, back and forth to the hospital.   And

17  I've given them an allotment of 250 miles in a year for that

18  access to health care.

19  Q.   Okay.   And you also have a chart here on architectural

20  renovations, but at this point in time has that kind of option

21  passed them by really?

22  A.   For right now they probably don't need this.   If they go to

23  a different apartment, then they may need it.   We may need to

24  have a little bit more in terms of making sure that they have

25  grab bars.   They have grab bars now.   Ron has said that they

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 44 of 123

1  have grab bars in the apartment that they have now, so I didn't

2  have to do that.

3  Q.    All right.  So this was based upon when they were living in

4  their home and architectural modifications to their home which

5  is really kind of by the boards now.  But in terms of them -- of

6  Dr. Ward's renovations just so that we're clear when he comes,

7  the option 2 category is the one that you think is more likely

8  than the option 1 previously listed?  Do you want to see his

9  report again to be -- so that we're clear?  I just want to be

10 sure that I'm on the right page.

11         MR. MCCLAIN:  I'm sorry, Your Honor, may I --

12         THE COURT:  No.  Of course.

13 A.    If you look at Dr. Ward's report, the option 1 which totals

14 $308,000 for Ron's lifetime is paying for the services that

15 would allow him to stay in the apartment.  And I would suspect

16 that the number of hours per week would go up in terms of the

17 kind of care.

18         Option 2 is putting Ron day 1 from this day on into

19 supported living which the total value over his life expectancy

20 is 504,000.  In reality, we're probably somewhere in between

21 those two.  I think that it will be sooner rather than later

22 than Ron's going to need to have more of a supported living

23 environment.

24 Q.    And if the -- if the decline that you were anticipating is

25 greater than you were anticipating as it has proven to be thus

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 45 of 123

1  far -- we hope that it's not.  We hope we get a handle on this,

2  but could it be more than these numbers?

3  A.   If he has to go into -- with assisted living, there are a

4  couple things.  First of all, with assisted living, someone has

5  to be able to have the cognition to understand an emergency

6  situation.  That's one of the areas that are necessary.

7          Another area that is necessary in assisted living is

8  that someone has to be able to get themselves out and be able to

9  identify the point of egress or the two doors that are necessary

10  if there is an emergency.  At present Ron can do that.  If Ron

11  gets any weaker and can't do that, then he would have to go to

12  the first level of some kind of long-term care or skilled

13  residential care.  That cost goes up.

14  Q.   Okay.  Have you stated all your opinions to a reasonable

15  degree of certainty within the profession of life care planning,

16  Ms. Allison?

17  A.   Yes, I have.

18          MR. MCCLAIN:  All right.  Thank you.  That's all the

19  questions I have.

20          THE COURT:  Mr. Pagliaro, any objection if we take a

21  stretch break before you begin your cross?

22          MR. PAGLIARO:  No, Your Honor.

23          THE COURT:  Okay.  Thank you.

24          Okay.  Please be seated.

25          MR. MCCLAIN:  Your Honor, I need to make a correction.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ Document 406 Filed 06/09/09 Page 46 of 123

1  The exhibit number for the life care plan is 1753.  I'm sorry.

2  I read the wrong number.

3          THE COURT:  Okay.  Thank you.

4          Mr. Pagliaro, are you ready to do your cross?

5          MR. PAGLIARO:  I am.  Thank you, Your Honor.

6          THE COURT:  Thank you.

7                      CROSS-EXAMINATION

8  BY MR. PAGLIARO:

9  Q.    Good morning.

10  A.    Good morning.

11  Q.    Ms. Allison?

12  A.    Yes.

13  Q.    I'm Jim Pagliaro.  I represent Givaudan.  Miss Allison, I'm

14  going to ask you a couple of questions about your visits with

15  the Kuipers.  Now, you actually originally met the Kuipers first

16  in Dr. Parmet's office; is that correct?

17  A.    That's correct.

18  Q.    And you met the Kuipers actually two times prior to your

19  completion of your original life care -- life planning report;

20  is that correct?

21  A.    I met them in --

22  Q.    April of '06?

23  A.    -- April of '06 and in March of '07.

24  Q.    And that's two times before you did your report you met

25  with the Kuipers.

1    A.    Yes.

2    Q.    Thank you.  And the first time you met them for about an

3    hour in Dr. Parmet's office.

4    A.    Correct.

5    Q.    And Dr. Parmet's office is in what city?

6    A.    Kansas City, Missouri.

7    Q.    And that's where you are as well; is that not right?

8    A.    Yes.

9    Q.    And the Kuipers actually obviously at that time lived in

10   this area in Sioux City; is that right?

11   A.    Yes, they still do.

12   Q.    And they had driven to Kansas City to visit with

13   Dr. Parmet.

14   A.    That's correct.

15   Q.    And then you were called by Mr. McClain's law firm to come

16   in and visit with them as well; is that correct?

17   A.    I knew that Mr. Kuiper was coming to Dr. Parmet's, and then

18   I called to see whether or not I could meet him there, yes.

19   Q.    Okay.  But the people that alerted you to that fact were

20   the lawyers at Mr. McClain's law firm or his staff.

21   A.    Correct.

22   Q.    And you also mentioned you saw the Kuipers at their home in

23   March of '07.

24   A.    Yes.

25   Q.    And at the time you visited with the Kuipers in Kansas City

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 48 of 123

1    at Dr. Parmet's office, did you give Mr. Kuiper a medical

2    examination?

3    A.    I did not give him a medical examination, but I did ask him

4    to do several functional activities, yes.

5    Q.    You spoke about that during your direct; correct?

6    A.    Yes.

7    Q.    Yeah.  You're not licensed to practice medicine.

8    A.    No, but I am a physical therapist, and I do know how to do

9    a general assessment.

10   Q.    I wasn't suggesting you couldn't.  I was asking if you were

11   licensed to practice medicine.

12   A.    No, I'm not.

13   Q.    And you're not a registered nurse.

14   A.    No, I'm not.

15   Q.    Thank you.  Now, you work in a consulting company; is that

16   correct?

17   A.    I have my own company, yes.

18   Q.    Okay.  And that company's called Rehabilitation Consulting

19   Life Care Planning.

20   A.    Yes.

21   Q.    Are there any employees in that company?

22   A.    No.

23   Q.    So it's your company basically.

24   A.    Yes.

25   Q.    You have an ownership interest in it.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 49 of 123

1   A.   It is my company, yes.

2   Q.   Belongs to you.  And you provide, as you mentioned during

3   your direct, litigation consulting; is that correct?

4   A.   Most of the life care plans I do are for litigation,

5   correct.

6   Q.   And you've given a number of depositions in a variety of

7   matters in the context of litigation; is that correct?

8   A.   Yes, I have.

9   Q.   Over 55 as I counted on your résumé, but it could be more.

10  A.   I probably am up to more than that, yes.  Probably closer

11  to 70, 80 now.

12  Q.   And you've testified in a number of cases.

13  A.   Yes.

14  Q.   And you've testified in Oklahoma?

15  A.   Yes.

16  Q.   Tennessee?

17  A.   Yes.

18  Q.   You've testified in Ohio?

19  A.   I've had a deposition for Ohio.  I don't believe I've

20  testified in Ohio.

21  Q.   Fair enough.  You were deposed in an Ohio case.  Let me be

22  more specific.

23  A.   Yes.

24  Q.   And in Kansas?

25  A.   Yes.

To purchase a complete copy of the transcript.

1    Q.    And obviously Missouri where you live.

2    A.    Yes.

3    Q.    And you were hired by Mr. McClain's law firm in this case

4    to provide advice and life care planning; is that correct?

5    A.    That's correct.

6    Q.    And you've teamed up with Dr. Parmet in other cases like

7    this; is that correct?  You said that already.

8    A.    Frequently Dr. Parmet has been involved in the cases with

9    flavoring injury, yes.

10    Q.    Now, was Dr. Parmet the first doctor who diagnosed

11    Mr. Kuiper with bronchiolitis obliterans?

12    A.    Dr. Parmet's report stated that he had bronchiolitis

13    obliterans syndrome, and that report was -- his original report

14    was dated in 2006.

15    Q.    That's April 2006; is that correct?

16    A.    Correct.

17    Q.    And by the way, do you know what month and year the

18    complaint in this case was filed by the Kuipers?  Do you know

19    that?

20    A.    No, I don't.

21    Q.    So you don't have any idea what month and year they

22    filed -- the Kuipers filed their complaint that started this

23    lawsuit.

24    A.    No, I don't.

25    Q.    Now, you listed in your report --

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 51 of 123
To purchase a complete copy of the transcript

 1          MR. PAGLIARO: Could you put the report up, Cort,

 2    please?  It's plaintiffs' exhibit that Mr. McClain just referred

 3    to, Your Honor.

 4          THE COURT:  1753 I believe.

 5          MR. PAGLIARO:  Yes, Your Honor.  Can you go to the

 6    third page?

 7    BY MR. PAGLIARO:

 8    Q.    This is your report, isn't it, Ms. Allison?

 9    A.    Yes, it is.

10    Q.    Now, at the top of that report, you have a statement there.

11    You said, "Mr. Kuiper was diagnosed with bronchiolitis

12    obliterans syndrome by Dr. A.J. Parmet in 2006."  Did I read

13    that correctly?

14    A.    That's correct.

15    Q.    And with microwave popcorn lung by Dr. Craig Bainbridge in

16    2005.  Did I read that correctly?

17    A.    That's correct.

18    Q.    And that's a mistake, isn't it?

19    A.    Yes, and that -- we brought that up -- I believe that was

20    covered in the deposition, that the popcorn lung statement was

21    in Dr. Farrell's notes, not in Dr. Bainbridge.

22    Q.    Right.  Dr. Bainbridge didn't make that diagnosis, did he?

23    A.    No.

24    Q.    And, in fact, you have it repeated twice in your report,

25    don't you?

1   A.   Yes, I did.

2   Q.   Later on down below where it says, "Present medical and

3   functional status," you say again, "Dr. Bainbridge" --

4        MR. PAGLIARO:  Excuse me, Your Honor.

5   Q.   "Dr. Bainbridge reported that his CT scan was consistent

6   with microwave popcorn lung in March 2005."  Again, that

7   statement in your written report is not correct, is it?

8   A.   That's correct.

9   Q.   That's correct that it's not correct.

10  A.   Yes.

11  Q.   Now let's discuss some of the medical records you reviewed

12  to prepare your life care plan.  In the context of preparing a

13  life care plan, you sent out questionnaires to Mr. Kuiper's

14  treating physicians; is that correct?

15  A.   Yes.

16  Q.   And you asked Mr. Kuiper at that time when you spoke to him

17  who are your treating physicians; is that correct?

18  A.   Yes, I did.

19  Q.   And you sent a questionnaire out to Dr. Farrell.

20  A.   Correct.

21  Q.   And there's another doctor involved that we just talked

22  about, Dr. Bainbridge; is that correct?

23  A.   Correct.

24  Q.   And Mr. Kuiper told you at that time that Dr. Bainbridge

25  was his treating physician for his pulmonary problems.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 53 of 123

1   A.    That's correct.

2   Q.    And so you sent a questionnaire out to Dr. Bainbridge.

3   A.    Yes, I did.

4   Q.    And they returned those questionnaires to you, did they

5   not?

6   A.    Yes, they did.

7   Q.    So you had those available to you, those questionnaires by

8   the doctors who actually treated Mr. Kuiper, when you prepared

9   your life care plan.

10  A.    Yes.

11  Q.    Thank you.  And you reviewed some medical files in the

12  context of preparing this plan, did you not?

13  A.    Yes, I did.

14  Q.    And did you review all the medical files related to

15  Mr. Kuiper?

16  A.    I scanned most of the files in the years that I've given

17  document -- that I've documented in my life care plan.  The

18  records that I kept to review are the records that I had in my

19  work file which we reviewed at the time of the deposition.

20  Q.    Thank you.  So you didn't actually have access to all of

21  Mr. Kuiper's medical records.

22  A.    I -- is that the same question, or I -- I don't understand

23  that question.

24  Q.    I'm just trying to clarify.  For example, the first note

25  you make about a date of medical file is the year 1990 or '95;

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 54 of 123
To purchase a complete copy of the transcript

1   is that right?  What's the first date?

2   A.    I believe it's 1990.

3   Q.    1990.

4   A.    Yes.

5   Q.    So let me ask you a question.  When was Mr. Kuiper born?

6   A.    Mr. Kuiper's date of birth is -- just a moment -- January

7   2, 1940.

8   Q.    So the first medical record of Mr. Kuiper's that you looked

9   at was when he was 50 years old.

10   A.    Yes.

11   Q.    Okay.  And you would agree with me, would you not, that it

12   would be highly unlikely as a life care planner that there

13   wouldn't be lots of medical records, childhood diseases,

14   diseases through the 20s and 30s, that would be involved in

15   looking at someone's background before the age of 50; is that

16   correct?

17         MR. MCCLAIN:  Your Honor, I object.  She's not a

18   medical doctor.  She didn't make any medical diagnosis.  It's

19   not relevant.

20         THE COURT:  Overruled.  You may answer.

21   A.    In looking at -- in doing a life care plan and reviewing

22   medical records, I ask individuals when they initially have

23   symptoms, and then I try to look at making sure that I've looked

24   at the records from that point forward.

25   Q.    So is it your testimony that Mr. Kuiper told you himself he

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ Document 406 Filed 06/09/09 Page 55 of 123

1   started having symptoms in 1990?

2   A.    That he started having symptoms in the '90s when he was

3   working.

4   Q.    And when you did your review of the medical records, you

5   didn't actually get an authorization from Mr. Kuiper and go out

6   and gather the records yourself from the hospitals, did you,

7   Ms. Allison?

8   A.    Not most of the records.  I did send a fax to get an update

9   from Dr. Bainbridge for his 2000 records that I didn't have as I

10  was trying to keep my records up to date.  Most of the -- in

11  fact, all the records through 2006 came from the firm of

12  Humphrey, Farrington, and McClain.

13  Q.    So they came from Mr. McClain's law firm.

14  A.    Yes.

15  Q.    And this life care plan that you presented to the jury

16  today and to the Court, this is something that's prepared in the

17  context of litigation; isn't that correct?

18  A.    Yes, it is.

19  Q.    Now, you talked about providing continuing services to your

20  clients that you see for litigation purposes in your direct

21  examination.  Do you recall that?

22  A.    I don't --

23  Q.    I think the word was follow.  Let me be precise.

24  A.    I don't provide services after I do a life care plan.

25  That's not a correct statement.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 56 of 123
To purchase a complete copy of the transcript

1  Q.   Fair enough.  Fair enough.  I stand corrected.  You're

2  right.  You don't provide services after you prepare the life

3  care plan; is that correct?

4  A.   That's correct.

5  Q.   Okay.  So if you were to recommend, for example, that

6  Mr. Kuiper get pulmonary rehabilitation -- which you did in your

7  life plan; correct?

8  A.   Yes, I did.

9  Q.   -- you don't follow up to see whether or not Mr. Kuiper, in

10  fact, did get that service.

11  A.   The only follow-up in that context is that it was

12  recommended in 2008 -- '6, and in 2009, in January when I talked

13  with Mr. Kuiper, he still had not received that service.

14  Q.   Right.  So my question to you was you don't necessarily

15  follow up with people to see whether or not they got the

16  services that you recommend they get in your life plan.

17  A.   I don't follow them after the completion of the plan, but

18  over time there is a follow-up, yes.  There is a follow-up from

19  the time I meet with them and in many cases until a case goes to

20  court.  And I have a two- or three-year window to look at some

21  of the areas that have been recommended.  And as I stated in my

22  testimony earlier, the scooter was recommended and thought they

23  weren't going to need it until 2011, and they needed it now.

24  Q.   We'll talk about the scooter later.  But my question is

25  about the pulmonary rehabilitation.  Mr. Kuiper in that

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 57 of 123

1   intervening period of time since you saw him last has not

2   received pulmonary rehabilitation, has he?

3   A.    No, he has not.

4   Q.    And a question about Dr. Parmet.  When you interviewed

5   Mr. Kuiper initially and you asked him who his treating

6   physicians were and he identified Dr. Farrell and

7   Dr. Bainbridge, he did not identify Dr. Parmet as one of his

8   treating physicians.

9   A.    No, he did not.

10  Q.    And, in fact, the first time he saw Dr. Parmet is the first

11  time he saw you in April of '06; isn't that correct?

12  A.    That's correct.

13  Q.    And Dr. Parmet is not his treating physician and doesn't

14  prescribe him medications; is that correct?

15  A.    That's correct.

16  Q.    Now, is it the standard of practice for a life care planner

17  to have the plan reviewed by one of the patient's treating

18  physicians?

19  A.    It's the standard to go through the life care plan with a

20  physician, and in my case I used Dr. Parmet because of -- the

21  location of his office is in Kansas City.

22  Q.    So you did not check with Dr. Bainbridge who is treating,

23  currently treating, was treating then, Mr. Kuiper for his

24  pulmonary symptoms and go through the life care plan with

25  Dr. Bainbridge; is that correct?

1  A.    I did not call his office, correct.

2  Q.    And you didn't speak to him and tell him what you were

3  recommending in your life care plan.

4  A.    No, I didn't.

5  Q.    So to the extent you recommended scooters or pulmonary

6  rehabilitation, you didn't discuss any of that with the doctor

7  who's treating Mr. Kuiper and was treating him then for his

8  pulmonary condition; is that correct?

9  A.    That's correct.

10  Q.    And Mr. Kuiper regularly sees both Dr. -- certainly

11  Dr. Bainbridge at the time, still regularly sees Dr. Bainbridge;

12  isn't that true?

13  A.    That's correct.

14  Q.    Now let's talk a little bit about some of the other issues

15  that Mr. Kuiper has with his health.  Mr. Kuiper has several

16  other health issues, does he not, Ms. Allison?

17  A.    Yes, he does.

18  Q.    In addition to his breathing issues and his breathing

19  problems, Mr. Kuiper's medical records have referenced to

20  ongoing high blood pressure; isn't that correct?

21  A.    That's correct.

22  Q.    He's had hypertension for many years.

23  A.    Yes.

24  Q.    He's been medicated for hypertension.

25  A.    Yes.

1  Q.   There's also mention of a heart condition called atrial

2  fibrillation.

3          MR. PAGLIARO:  Your Honor, may I have some water,

4  please?

5          THE COURT:  Absolutely.

6          MR. PAGLIARO:  My mouth is sort of dry.

7          THE COURT:  I hope you didn't catch my cold.  I'm

8  sorry if you did.

9          MR. PAGLIARO:  I'm just catching my tongue on the roof

10 of my mouth.  Sorry, Your Honor.

11 BY MR. PAGLIARO:

12 Q.   Excuse me, Miss Allison.  Is there mention of a condition

13 that Mr. Kuiper suffers from called atrial fibrillation?

14 A.   Yes.

15 Q.   And that condition is a heart condition, is it not?

16 A.   Yes, it is.

17 Q.   And that can cause blood clots to form; isn't that correct?

18 A.   Yes.

19 Q.   And, in fact, Mr. Kuiper at one time, maybe even currently,

20 was on blood-thinning medication.

21 A.   Yes, he was.

22 Q.   And he's also currently on a diuretic for heart issues, is

23 he not?

24 A.   Correct.

25 Q.   And Mr. Kuiper in 2001 had a stroke, did he not?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 60 of 123

1    A.    Yes, he did.

2    Q.    And it was described in his medical records as a cerebellar

3    infarct; is that true?

4    A.    That's correct.

5    Q.    And that stroke occurred in the part of the brain called

6    the cerebellum; isn't that true, Miss Allison?

7    A.    That's correct.

8    Q.    And the cerebellum is important to controlling someone's

9    balance, is it not?

10   A.    It contributes to balance.

11   Q.    And to the extent you observed in Mr. Kuiper what you

12   describe as a balance deficit in your direct examination, a

13   stroke in that part of the brain can also cause a balance

14   deficit; isn't that true?

15   A.    That's correct.

16   Q.    You also indicate in your report that Mr. Kuiper was not

17   employable secondary to his lung disease.  Do you recall that

18   statement?

19   A.    Yes.

20   Q.    And, in fact, when you saw Mr. Kuiper in 2006, he had

21   already retired from American Pop Corn Company, had he not?

22   A.    Yes, he told me that he had to quit working there, yes.

23   Q.    That he quit working when he was 65 years old, did he not?

24   A.    Yes.

25   Q.    Now, you noticed that Mr. Kuiper had problems.  You called

1    it a balance deficit.  Surely balance deficit can affect

2    employability as well; isn't that true?

3    A.    Correct.

4    Q.    Now, Mr. Kuiper, you reported, is taking drug therapies,

5    was taking them then and is taking them now; isn't that true?

6    A.    That's correct.

7    Q.    Could you refresh our recollection what drugs he's taking

8    from your report, please?

9    A.    He's taking more drugs.  The drugs that were included in

10   the report are Budesonide which is a bronchodilator and then the

11   two diuretics, the Spironolactone and the Enalapril, and those

12   were put in because if he gets a fluid overload, it goes into

13   his lungs.  And so it becomes a contributing factor.  His lungs

14   have to stay dry so that he can breathe better.

15   Q.    Let's talk a little bit about the bronchodilator.  What is

16   that called again?

17   A.    Budesonide.

18   Q.    And when you spoke to Mr. Kuiper in 2006 and 2007, you

19   called -- Budesonide?

20   A.    It's Budesonide, and he originally was on other drugs.  He

21   was on Albuterol and another drug.

22   Q.    Albuterol's also a bronchodilator; isn't that correct?

23   A.    Yes, it is.

24   Q.    And so -- and these weren't drugs recommended by

25   Dr. Parmet.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 62 of 123
To purchase a complete copy of the transcript.

1  A.    These were drugs that were recommended by Dr. Bainbridge.

2  Q.    His treating physician.

3  A.    Correct.

4  Q.    So you'll agree with me that his treating physician then,

5  Dr. Bainbridge, and his treating physician now is recommending

6  drug therapies including a bronchodilator; is that correct?

7  A.    That's correct.

8  Q.    Okay.  Now, Ms. Allison, as we age, we also have decreasing

9  abilities, is that correct, in terms of our physical stamina and

10  our well being?

11  A.    Most of the time, yes.

12  Q.    Well, do you know anyone who doesn't have decreasing

13  ability as they age?

14  A.    You have to work a lot harder, but you can maintain.

15  Q.    Let me ask you a question.  Does your life care plan

16  differentiate between medical needs from his breathing issues

17  and those relating to the natural aging process?

18  A.    Only in the extent that he is now on a walker and the

19  walker may have something to do with his balance issues as

20  opposed to the scooter which I feel is in my opinion needed

21  because of the lung issues.

22  Q.    Did you check his medical records recently to see why or

23  who recommended the scooter and who approved the scooter?

24  A.    I did not.

25  Q.    Do you know whether or not it's stated in the medical

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 63 of 123

1    records that the reason for the scooter was his breathing

2    problems?

3    A.    No, I don't.

4    Q.    Okay.  Now, you visited with Mr. Kuiper in his home

5    again -- excuse me, when you saw him the second time, you

6    visited him in his home in Sioux City; is that correct?

7    A.    That's correct.

8    Q.    And I'm a little confused now about the residency issue.

9    When you visited with the Kuipers in March of '07 in their home,

10   where were they living?

11   A.    In their home.

12   Q.    Okay.  And what is -- describe the home for me.

13   A.    Their home is two stories.  There is a -- was an entrance

14   to the front of the house, and the ground slopes, and there was

15   an entrance to the back of the house.  Ron's room was in the

16   lower level, and his bathroom at that point was in the lower

17   level, and then there were -- there were living room, dining

18   room, kitchen on the first floor, and then there were stairs

19   that went up to the second floor, but he was not using those.

20   Q.    And Mr. Kuiper lives -- and Mrs. Kuiper at the time are

21   living in what's called a split-level house?  Is that a fair

22   assessment?

23   A.    Yes.

24   Q.    You mentioned too that you visited them in March of '07.

25   Just so I get my time line right, at some point Mr. Kuiper moved

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 64 of 123

1  out of that house; is that correct?

2  A.    July of '07, correct.

3  Q.    Okay.  And when you visited with Mr. Kuiper at his home, he

4  told you, did he not, that he thought he was ready for assisted

5  living at that time?

6  A.    I spoke with him about the needs of the house and the

7  unsafe issues that I felt, and I said to him when I do a life

8  care plan based on some of the functional deficits that I see,

9  I'm going to look at keeping you here and going to assisted

10  living.  At that point Mr. Kuiper said he thought probably he

11  would be ready for assisted living.  That's correct.

12  Q.    Did Dr. Bainbridge or Dr. Farrell in their questionnaire

13  responses recommend that Mr. Kuiper go into assisted living?

14  A.    No, they didn't.

15  Q.    And at some point in 2007, Mr. Kuiper actually moved out of

16  his split-level home that he shared with Mrs. Kuiper and moved

17  into another residence, did he not?

18  A.    He moved into assisted living, correct.

19  Q.    Do you know what the residence was called?  Let me see if I

20  have that name.  I made a note here.  Does the Floyd House sound

21  familiar to you?

22  A.    I will look in my notes.  I don't have it written down I

23  don't believe.  I know that when I talked with him that he had

24  moved to assisted living, yes.

25  Q.    Do you know whether Dr. Bainbridge recommended that he move

1   into assisted living?

2   A.   I don't know.

3   Q.   Do you know whether Dr. Farrell told him he had to go into

4   assisted living?

5   A.   I don't know.

6   Q.   And your testimony was I believe that he was in assisted

7   living from July of 2007 to May of 2008?

8   A.   To September of 2008.

9   Q.   Sorry, September 2008.  I couldn't read my own writing.  So

10  that's a little more than a year.  I do remember you saying

11  that.  Is that correct?

12  A.   That's correct.

13  Q.   And during that period of time, Mrs. Kuiper was not living

14  with Mr. Kuiper; is that correct?

15  A.   I don't believe she was living there.  He had his own room

16  in the assisted living environment.

17  Q.   And she was living back here in Sioux City or in her home,

18  the split-level home, is that correct, as far as you know?

19  A.   I don't know where Conley -- that wasn't relevant to me.  I

20  just knew that one of the recommendations I had was that he

21  probably needed assisted living, and he did go to assisted

22  living.

23  Q.   So for that period of time he was in assisted living, and

24  Mrs. Conley was -- excuse me, Mrs. Kuiper was not taking care of

25  him on a regular basis; is that correct?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 66 of 123

1  A.   That's correct.

2  Q.   And then in September of 2007 he moved again.  Now, where

3  did he move to at that point?  Do you know?

4  A.   To his current residence now.

5  Q.   And his current residence is -- do I have this right --

6  Willington --

7  A.   The Wellington at Dakota Dunes, and that is a -- it's an

8  apartment that has -- for seniors, and they have a -- they have

9  security.  They have -- they do all of the interior and exterior

10  maintenance with the exception that the Kuipers do pay to have

11  their apartment cleaned.

12  Q.   And do you know precisely when the Kuipers moved into the

13  Wellington on the Dunes?

14  A.   I just have down that it was in September.

15  Q.   September '08?

16  A.   '08 I believe.

17  Q.   So within the last eight or nine months; is that correct?

18  A.   That's correct.

19  Q.   Mr. Kuiper also told you some other things when you visited

20  him in his house.  First of all, you also -- you met some other

21  members of the Kuiper family, did you not, when you visited with

22  him in March of '07?

23  A.   His son was there.

24  Q.   Kevin Kuiper?

25  A.   Yes.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 67 of 123

1   Q.   How old is Mr. Kevin Kuiper?

2   A.   I didn't write Kevin's -- early 20s I believe.

3   Q.   Okay.  And Mr. Kevin Kuiper was living at home at the time.

4   Do you know?

5   A.   Yes, he was.

6   Q.   There was someone else present at the time as well, was

7   there not?

8   A.   No.  At that time my recollection is that it was Conley,

9   Kevin, and Ron.

10   Q.   Wasn't one of Mrs. Kuiper's brothers there, one of Kevin's

11   uncles?

12   A.   My recollection is that the uncle was the individual that

13   brought them to Kansas City, and that's when I was introduced to

14   the uncle.  I do not remember that he was at the house.

15   Q.   Okay.  Do you know whether there were any efforts to

16   prepare the house for your visit, Mrs. Allison?

17   A.   They said they had cleaned it up.

18   Q.   Okay.  Had there been indications in the medical records

19   that there was a problem with keeping the house clean in the

20   past?

21   A.   The house was cluttered, and I believe that -- I don't

22   remember.  I would have to go back and look at the records.  I

23   have no recollection of that.

24   Q.   And Mr. Kuiper --

25         MR. PAGLIARO:  Could you put the report up, please,

1  Cort?  Third page, please, first paragraph.

2  Q.   Mr. Kuiper indicated to you, Ms. Allison -- on the first

3  page you noted, "Mr. Kuiper required a job change in his work

4  function in 1995 secondary to his breathing problems."  Do you

5  see that?

6  A.   Yes.

7  Q.   And those were his words; is that correct?

8  A.   That's correct.

9  Q.   And those words indicate to you his knowledge that

10 something in his work environment in 1995 was causing his

11 breathing problems; is that correct?

12        MR. MCCLAIN:  Your Honor, objection to the opinion.

13 It's impossible for her to know what was in his mind.

14        THE COURT:  Overruled.

15 A.   The only thing that I've written down is that Ron said that

16 his breathing was -- it was really hard to breathe and he quit

17 doing his job, that I had trouble doing my job and he left his

18 job at that point.

19 Q.   And it was required because of breathing problems.  You

20 wrote that down.

21 A.   He required a job change.

22 Q.   Because of breathing problems.

23 A.   Because he was having trouble breathing, yes.

24 Q.   In 1995.

25 A.   Yes.

1   Q.   You mentioned that he had marked shortness of breath with

2   activity.  Do you recall that?

3   A.   Yes, I did.

4   Q.   Did you look at any of his early medical records?  When I

5   say early, I mean prior to 1992.  You looked at some in 1990 at

6   least, did you not?

7   A.   Yes, I did.

8   Q.   And isn't it true, Ms. Allison, that there were, in fact,

9   occasions as early as 1990 when Mr. Kuiper went to a doctor, in

10  fact, Dr. Robinson in 1990, and complained of breathing problems

11  as well; isn't that true?

12  A.   I don't have any records from Dr. Robinson that I'm aware

13  of.

14  Q.   So when you looked at the medical records at Mr. McClain's

15  office or looked at the records they provided you, you didn't

16  see a medical record from Dr. Robinson in 1990 that talked about

17  Mr. Kuiper complaining of breathing problems.

18  A.   I don't -- I did not have a record from Dr. Robinson,

19  correct.

20  Q.   And when you looked at later medical records from the '95,

21  '96 era when he was speaking with Dr. Farrell or speaking with

22  some of the other physicians -- got that?

23  A.   Excuse me.

24  Q.   That's okay.  When you looked at some of the later medical

25  records in '95 and '96 when Mr. Farrell -- excuse me, when

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ Document 406 Filed 06/09/09 Page 70 of 123
To purchase a complete copy of the transcript

1   Mr. Kuiper was reporting his conditions to Dr. Farrell and

2   others, do you seeing in those records in the '95, '96 era

3   Mr. Kuiper referring to the fact that his breathing problems

4   began as early as 1988?  Do you recall seeing that?

5   A.    No, I don't.

6   Q.    Okay.  Did you ask Mr. Kuiper whether or not his breathing

7   problems were -- went back as far as 1988?

8   A.    No.

9         MR. PAGLIARO:  Can we have the life care plan back up

10  again, please?  Go to the back where Ms. Allison has the charts.

11  I'm sorry, Your Honor, but my glasses --

12        THE COURT:  No problem.

13        MR. PAGLIARO:  -- I left back behind there.  That's

14  better.  Thank you.

15  BY MR. PAGLIARO:

16  Q.    So physical evaluations, these are evaluations by his

17  physician, excuse me, and these were recommended actually by his

18  treating physicians; is that correct?

19  A.    That's correct, and they were also recommended by

20  Dr. Parmet.

21  Q.    Fair enough.  But in the recommended column, you indicated

22  first that Dr. Bainbridge and Dr. Farrell, the doctors actually

23  treating Mr. Kuiper at the time, recommended these physical

24  physician evaluations.

25  A.    That's correct.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 71 of 123

1   Q.   Now we're on therapy.  We talked about this a little bit

2   before.  But in terms of pulmonary rehabilitation -- and I

3   believe here you had noted a health club membership -- the

4   pulmonary rehabilitation, that was not recommended by

5   Dr. Bainbridge or Dr. Farrell, was it?

6   A.   That's correct.

7   Q.   That was recommended only by Dr. Parmet; is that correct?

8   A.   That's correct.

9   Q.   Dr. Parmet who had seen Mr. Kuiper for approximately one

10   hour.

11   A.   You'd have to -- I don't know how long Dr. Parmet saw . . .

12   Q.   Relatively short time.

13   A.   That's correct.

14   Q.   And the health club recommendation, that was your

15   recommendation.

16   A.   That's correct.  As I stated, as I've done life care plans

17   for individuals with lung problems, there are two things that

18   can be offered to them, and one is to be able to do slow,

19   gradual exercise to improve their overall function.  We're not

20   going to make their lungs any better, but we are going to

21   improve their function.

22         As a physical therapist in dealing with individuals

23   with lung disease, it has been something that's been

24   recommended, and there is data out there that people with lung

25   disease do benefit from pulmonary rehab.  Dr. Parmet's

1    recommendation is consistent in dealing with a lot of the

2    individuals I've worked with.

3          The health club membership is my recommendation

4    because we have to have some way for Mr. Kuiper to continue to

5    do exercise in a safe environment.

6          MR. PAGLIARO:  Your Honor, I move to strike that

7    response as nonresponsive to my question.

8          THE COURT:  Sustained.

9          MR. PAGLIARO:  Thank you, Your Honor.

10   BY MR. PAGLIARO:

11   Q.   Just listen to the question.  You recommended the health

12   club membership; is that correct?

13   A.   That's correct.

14   Q.   And you spoke to Mr. Kuiper both in Dr. Parmet's office and

15   in his home.  Did you tell him at that time that he should join

16   a health club?

17   A.   Yes.

18   Q.   And do you know whether or not he has done anything to

19   follow up on the recommendation you made when you met with him

20   at Dr. Parmet's office or when you met with him at his home?

21   A.   Not at present.

22   Q.   Okay.  Thank you.  This is equipment; is that correct?

23   A.   Yes.

24   Q.   Let's start with the scooter.  Just listen to the question.

25   Dr. Bainbridge, Dr. --

1          MR. MCCLAIN:  I object to that, to the --

2          THE COURT:  Just a second.  Let's not go there.

3   Mr. Pagliaro's going to ask -- is asking you questions, and you

4   just try and -- you've done a nice job listening to the question

5   and then answering the question that he asks.  Thank you.

6   BY MR. PAGLIARO:

7   Q.   The scooter at the time, Ms. Allison, that was recommended

8   by Dr. Parmet and yourself; is that correct?

9   A.   That's correct.

10  Q.   Okay.  And the lifeline call system, that was your

11  recommendation; is that correct?

12  A.   Yes.

13  Q.   Did you speak with the Kuipers when you met with them

14  either time about getting a lifeline call system?

15  A.   I told the Kuipers that I felt that they would need a

16  lifeline call system for Ron for safety.

17  Q.   The portable ramp, is that a moot issue now because of the

18  living conditions, or is that still an issue?

19  A.   As long as he has a scooter, the portable ramp goes in the

20  trunk of the car so that he can get up and down curbs if there

21  are no curb cuts.

22  Q.   I understand.  I'm sorry.  I didn't understand what that

23  was.  Okay.

24          MR. PAGLIARO:  Can you go to the next one, please?

25  Q.   Now, this life care plan was your original, so some of the

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 74 of 123

1 medications here have changed since then, have they not?

2 A.    That's correct.

3 Q.    You changed those because Mr. Kuiper's now on different

4 medications; is that correct?

5 A.    That's correct.

6 Q.    And at the time we mentioned he was on Albuterol, and these

7 drugs were actually being recommended by Dr. Bainbridge who was

8 treating Mr. Kuiper at the time.

9 A.    That's correct.

10 Q.    And the other things here, chest X-ray and pulmonary

11 function testing, these are things that his treating physicians

12 were doing on a regular basis; isn't that true?

13 A.    Yes.

14 Q.    And, in fact, his records have a lot of testing in them,

15 don't they, Ms. Allison?

16 A.    That's correct.

17 Q.    Okay.

18         MR. PAGLIARO:  Would you go to the next one?

19 Q.    And again, the two potential complication issues were

20 issues you discussed with and were recommended by Dr. Parmet,

21 acute respiratory infection and bronchitis; isn't that correct?

22 A.    Yes.

23 Q.    Okay.  Thank you, Miss Allison.

24         You talked about the modifying Mr. Kuiper's

25 environment in his home.  I assume from your earlier testimony

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 75 of 123
To purchase a complete copy of the transcript

1  given what the living arrangements are now, the modification to

2  his home -- modifications to his home are moot; is that correct?

3  A.   With the exception that he still has -- both of his

4  bathrooms right now are step-over bathtubs, so we're still going

5  to need to look at shower modifications in terms of a handheld

6  shower and a shower bench.  And those are included in equipment.

7            MR. PAGLIARO:  Okay.  I have nothing further, Your

8  Honor.  Thank you very much.

9            THE COURT:  Thank you, Mr. Pagliaro.

10            Mr. McClain, any redirect?

11            MR. MCCLAIN:  Real briefly.

12                      REDIRECT EXAMINATION

13  BY MR. MCCLAIN:

14  Q.   Ms. Allison, have -- thus far, have all of your predictions

15  that were made in 2006 about his course and what would be needed

16  come true?

17  A.   For the most part, yes.

18  Q.   And, in fact, does it appear that the recommendations that

19  you made in 2006 are, in fact, going to be needed?

20  A.   I believe they are.

21  Q.   Now, he asked you some questions about medical records and

22  did you see this.  Is that really what your job is in this case?

23  A.   I use the medical records as a life care planner to give me

24  a blueprint of the questions -- the course of the disease, the

25  kinds of issues I need to question the treating physicians about

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 76 of 123

1  or therapy staff if he were getting therapy.  I use that as a
2  blueprint, and I use it to give me ideas of how I need to
3  structure my life care plan.
4  Q.    He mentioned that Dr. Parmet in 2006 was the first one to
5  diagnose him with popcorn lung.  Is there any doctor in the
6  country as far as you know who has more experience with this
7  disease?
8  A.    No.
9  Q.    Was Dr. Parmet the one that discovered it and brought in
10 NIOSH to Jasper, Missouri?
11 A.    Yes, he is.
12 Q.    And has he seen more patients with this disease than any
13 other doctor in the country?
14 A.    Yes, he has.
15 Q.    And is he recognized all over the country as the premiere
16 doctor regarding this disease?
17 A.    To my knowledge he is, correct.
18 Q.    All right.  But -- by the way, he mentioned Dr. Bainbridge.
19 Did you see anything inconsistent in Dr. Bainbridge's notes or
20 diagnoses about Mr. Kuiper having popcorn lung?
21 A.    I didn't see anything in Dr. Bainbridge's notes that were
22 inconsistent with the fact that he had lung disease.
23        MR. MCCLAIN:  In fact, Scott, can you bring up the
24 record just from last month?  It's a medical record.  Where
25 is -- can we put our hands on that real quickly?  Sorry.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 77 of 123

 1        Maybe if we can let the jury stretch for a minute I

 2   can find that record, Your Honor.

 3        THE COURT:  Okay.  Why doesn't everybody take a

 4   stretch break.  We're going to be taking our mid-morning break

 5   in a few minutes.

 6        MR. MCCLAIN:  We found it, Your Honor.

 7        THE COURT:  Okay.  Thank you.  Please be seated.

 8        MR. MCCLAIN:  I apologize to Amber for giving her a

 9   heart attack, Your Honor.  It's funnier to me than to her

10   apparently.

11   BY MR. MCCLAIN:

12   Q.   Let's see.  Just last month, he has a history of exposure

13   to diacetyl in the mixing room of microwave popcorn, and

14   consequently, there are issues about the possibility of having

15   microwave popcorn lung.  Is that your understanding of what

16   Dr. Bainbridge's position's been throughout this time period?

17   A.   Yes.

18   Q.   From your review of the medical records?

19   A.   Yes.

20   Q.   And Dr. Farrell's, has it even been stronger?

21   A.   Yes.  In fact, in Dr. Farrell's report there is a 2007

22   entry that I specifically flagged that he said that he had

23   popcorn lung and that he also had a pulmonary picture that he --

24   no tobacco exposure.  He has been clinically presented as

25   bronchitis obliterans with resultant pulmonary hypertension with

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 78 of 123

1  resultant cor pulmonale.

2        That was one of the reasons I asked about the two

3  diuretics being included in conjunction with the lung disease

4  and not the hypertension.

5  Q.  Tell me about that.  You say -- read that again to us so we

6  have a clear understanding because I think we glossed over that.

7  A.  2-21, 2007.  This is a Dr. Farrell report, and it talks

8  about his history.  Popcorn lung, assumed name given to his

9  to -- is the name given to his pulmonary difficulties.  He has

10  bronchiectasis, clinical picture of his pulmonary status as he

11  has had no significant tobacco exposure over his lifetime.  He

12  clinically presents as bronchiolitis obliterans with resultant

13  pulmonary hypertension presenting as a cor pulmonale picture.

14        So that tells me that he not only has the lung disease

15  but he has some cardiac involvement.

16  Q.  When the doctor says resultant, that he has microwave

17  popcorn lung with resultant lung disease, does that mean that

18  the lung disease is related to -- the heart disease is related

19  in the doctor's mind according to his note to his lung

20  condition?

21        MR. PAGLIARO:  Objection.  Beyond the scope of her

22  expertise.

23        THE COURT:  Sustained.

24  BY MR. MCCLAIN:

25  Q.  Did you read the note to mean that the heart condition was

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ  Document 406  Filed 06/09/09  Page 79 of 123

1  related by the word resultant?

2  A.   It was my opinion that there was a connection from -- with

3  the pulmonary hypertension --

4       MR. PAGLIARO:  Objection, Your Honor.

5  A.   -- and the lung disease.

6       THE COURT:  Well, I think she can give her opinion.

7  A.   And the value of that opinion as far as I'm concerned was

8  as I look at the myriad of drugs that he was on, because he's on

9  drugs for other things, and in a life care plan you only include

10  those drugs that are either directly or related to the treatment

11  of certain -- of whatever the issue is I'm dealing with.  And

12  that was one of the reasons I asked about the use of both the

13  Enalapril and the Spironolactone which are diuretics, to keep

14  his lungs dry so he had a better shot of having the

15  bronchodilator work effectively.

16       MR. MCCLAIN:  Thank you, Ms. Allison.  That's all the

17  questions I have.

18       THE WITNESS:  Thank you.

19       THE COURT:  You may step down.

20       THE WITNESS:  Thank you.

21       THE COURT:  Members of the jury, it is ten o'clock, so

22  good timing by the lawyers.  And we'll be in recess until 10:25.

23  Remember to keep an open mind until you've heard all of the

24  evidence in the case.  Thank you.

25       (The jury exited the courtroom.)

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 80 of 123

1          THE COURT:  Please be seated for one minute.

2          THE WITNESS:  Can I leave?

3          THE COURT:  You may leave.  Thank you.

4          Returning for a moment to the punitive damages

5   question, I've now had a chance to study in more detail the A.L.

6   Laboratories Eighth Circuit case and the TXO case and the West

7   Virginia higher court decision.

8          And I don't think the -- any financial information

9   from the parent company is relevant.  I'm not going to allow it.

10   I understand your citation in your brief to the West Virginia

11   Supreme Court language, but I'm focusing on the language of the

12   plurality opinion by Justice Stevens where he says, "We" -- in

13   part 4 which is the plurality part -- "We agree with TXO that

14   the emphasis on the wealth of the wrong doer increase the risks

15   that the award may have been influenced by prejudice against

16   large corporations, a risk that is of special concern when the

17   defendant is a nonresident."

18          Here not only is the parent corporation a nonresident;

19   it's, I believe, a Swiss company.  And I don't believe there's

20   going to be any evidence that you meet any of the exceptions

21   listed in the A.L. Laboratories case.

22          And so I think you'll ultimately conclude that I'm

23   doing you a favor, but that's not my goal.  I don't do favors to

24   parties.  But it's sometimes an unintended consequence by not

25   allowing you to get into the financial information for any

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 81 of 123

1  reason including the ability to pay of the parent corporation

2  unless, of course, there was some evidence that then opened the

3  door that I would then change my mind and allow you to put it in

4  if they claim that, you know, with a net profit of XXX we

5  couldn't pay a reasonable punitive damage award or something

6  like that.  I mean, I'm not saying even that would do it.  But

7  I'm always open to the possibility that the door could be

8  opened.

9        But right now I'm closing the door as tight as I can

10  on that kind of evidence just to make sure there's no

11  misunderstanding.  Anything about that you don't understand?

12        MR. MCCLAIN:  No.

13        THE COURT:  Is it unclear in any way?

14        MR. MCCLAIN:  It is not.

15        THE COURT:  Okay.  Anything we need to take up now?

16        MR. MCCLAIN:  No.  What I plan -- just so that you're

17  clear, we're all clear, since I know the sensitivity of these

18  issues, then we're just planning to discuss what net worth is

19  with Dr. Ward and --

20        THE COURT:  Of course.

21        MR. MCCLAIN:  -- talk about the concept and then tell

22  that we have stipulated to that number.

23        THE COURT:  Right.  And is it at that time when that

24  number comes out that you want me to make the announcement to

25  everybody in the courtroom?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 82 of 123

```
 1                MR. DONOVAN:  Yes, Your Honor, if you could just
 2      instruct the folks in the courtroom.
 3                THE COURT:  Okay.  Thank you.  Anything else?  Okay.
 4      Thanks.
 5                (Recess at 10:03 a.m.)
 6                THE COURT:  Mr. McClain, ready to call your next
 7      witness?
 8                MR. MCCLAIN:  I am, Your Honor.
 9                THE COURT:  Okay.
10                (The jury entered the courtroom.)
11                THE COURT:  Thank you.  Please be seated.
12                Mr. McClain, are you ready to call your next witness?
13                MR. MCCLAIN:  I am, Your Honor.  I thought I was.
14                THE COURT:  Don't get injured now.
15                MR. MCCLAIN:  I'm going to try not to.  Yes.  We call
16      Dr. Jack Ward, Your Honor.
17                THE COURT:  Thank you.
18                   JOHN WARD, PLAINTIFFS' WITNESS, SWORN
19                THE COURT:  Okay.  Please be seated.  Be careful.
20      Don't trip and fall.
21                THE WITNESS:  Trip over Mr. McClain's device here.
22                THE COURT:  And if you could adjust the chair and the
23      microphones so you could speak directly into the microphones.
24      And would you tell us your full name, please, and spell your
25      last name.
```

```
 1              THE WITNESS:  My name is Dr. John Ward.  The last name
 2    is W-a-r-d.
 3              THE COURT:  Actually I think that's your title.  I
 4    don't believe it says "doctor" on your birth certificate.
 5              THE WITNESS:  No, it doesn't.  It's John Ward.
 6              THE COURT:  Or did your parents have that kind of
 7    foresight?
 8              THE WITNESS:  No, they didn't.
 9              THE COURT:  Thank you.  And would you spell your last
10    name for us.
11              THE WITNESS:  W-a-r-d.
12              THE COURT:  Thanks.
13              Mr. McClain?
14              MR. MCCLAIN:  Yes.
15                         DIRECT EXAMINATION
16    BY MR. MCCLAIN:
17    Q.   Dr. Ward, what kind of a doctor are you?
18    A.   I'm a Ph.D. in economics.
19    Q.   And where do you live?
20    A.   I live in Prair -- well, Leawood, Kansas.  It's just south
21    of Prairie Village, Kansas.
22    Q.   Outside of the Kansas City metropolitan area?
23    A.   It's part of the metropolitan area of Kansas City, yes.
24    Q.   And, Dr. Ward, what educational institution have you been
25    associated with most of your life?
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 84 of 123

1   A.   Well, I started at the University of Oklahoma.  I taught

2   there, and I completed my Ph.D. at University of Oklahoma.  I

3   came to University of Missouri-Kansas City, in about 1969, and

4   I've been continuously at UMKC since 1969.  I've taught in the

5   meantime taking leaves at Tufts University, various universities

6   in South America, Ford Foundation, Rockefeller Foundation, but

7   my academic home is the University of Missouri-Kansas City.

8   Q.   And, Dr. Ward, what is your economic -- what is your

9   discipline?

10   A.   I'm an economist.  I was a member of the economics

11   department, started as an assistant professor and rose to full

12   professor.  I was chairman of the department of economics for

13   roughly 18 years, associate dean of the college of arts and

14   sciences for 8 years, but I've always been a member of the

15   doctoral faculty for the department and teach in the department.

16   Q.   All right.  And so would it be fair to say that you're an

17   economist?

18   A.   Yes.

19   Q.   And, Dr. Ward, tell us about your training, your academic

20   training.

21   A.   I have a bachelor's degree and a master's degree in

22   economics from the University of Toledo in Ohio that I received

23   in 1965 and 1967 respectively.  And then I went to Oklahoma, and

24   I taught there for three years while I received a Ph.D. in

25   economics.  And after I finished my Ph.D. in economics, I did a

Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 85 of 123

1  wide variety of post-doctoral programs for Tufts University,

2  Ford Foundation, Rockefeller Foundation.  And then I worked in

3  South America under Ford Foundation sponsorship.  The last

4  post-doc I did was a Harvard Institute For Educational

5  Management in 1978.

6  Q.    Doctor, you've mentioned that you've taught at UMKC and

7  been head of the department.  Has there been any particular area

8  of economics that has been your interest and focus over the

9  years?

10 A.    Well, my areas typically are microeconomics, labor

11 economics.  I've taught finance.  But my real field of

12 specialization is law and economics and forensic economics.

13 Q.    What is forensic economics?

14 A.    Forensic economics is the application of economics to

15 issues typically in litigation.  It would include industrial

16 organization and antitrust, but it also includes calculation of

17 damages and issues of liability in employment law, personal

18 injury, death litigation, laboratory and commercial litigation

19 and securities analysis.

20 Q.    Have you written articles in economic journals on this

21 issue?

22 A.    Yes.  I've -- well, I've been editor of the two major

23 journals in the field of forensic economics.  I was the founding

24 editor of the Journal of Forensic Economics in 1987.  I'm now

25 editor emeritus of that journal.  I was also editor of the

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 86 of 123
To purchase a complete copy of the transcript.

1    Journal of Legal Economics.  And I was editor of that journal

2    and continue as editor emeritus on that journal.  I've published

3    roughly 55 articles in the field of forensic economics, labor

4    economics, and human resource economics, and I've published

5    seven books.  I have a new book coming out this year in the

6    field, and that will be my final book.

7    Q.    It will be your final book?

8    A.    Yes.  My wife said don't do anymore.

9    Q.    Like Jack Nicholson's final movie, this is your final book?

10   A.    That's my final book.

11   Q.    Dr. Ward, what has been your focus in terms of this

12   scholarly work that you've done with other economists?

13   A.    Well, my primary area is human resource economics.  Even

14   though about half my work is in commercial litigation and

15   antitrust, my interest is in human resources, how people's

16   earnings are determined in the marketplace, how they should be

17   forecast, actuarial factors that affect ability to earn and the

18   process of growth and discounting as they apply to a wide

19   variety of fields including the one that we're here today.

20   Q.    Back in 1987 when you started this work, was there very

21   much standardization among economists in terms of how they went

22   about doing these kind of calculations?

23   A.    No, not really.  I mean, I actually started consulting in a

24   wide variety of areas going back to the 1970s, and I worked for

25   the Department of Labor and the Justice Department and the

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 87 of 123

1  Department of Defense on veterans' compliance matters.  But

2  there was no standardization of what's called the actuarial

3  method, and I was the founder of the National Association of

4  Forensic Economics in 1985.  It's now an organization of about a

5  thousand economists internationally, and they've developed

6  standardized methods.  And the standardized methods basically

7  represent actuarial present value calculations.

8  Q.   All right.  And that was one of the emphasis that you made

9  in the field that has ultimately now become the standard among

10  economists in terms of making calculations like you've made in

11  this case?

12  A.   Yes.

13  Q.   Dr. Ward, this might be interesting to the jury to know

14  about.  Would you tell them about your experience with the 9-11

15  victims?

16  A.   Sure.  Well, back in September 11 of 2001 and shortly

17  thereafter, there were numerous claims that were allowed against

18  the -- using the Justice Department as a conduit to provide

19  compensation to the victims of September 11, families whose

20  loved ones were killed or people who were injured.

21       And rather than pursuing compensation through

22  litigation against airlines and the World Trade Center, it

23  was -- the Justice Department set up a compensation program, and

24  they appointed a special master to administer it.

25       I was asked by the families to work with them and with

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 88 of 123

1  members of Congress in terms of building a model of

2  compensation. Ultimately I worked with the Justice Department.

3  I did programs in Atlanta with the families and then ultimately

4  in New York City, and I represented a large number of families

5  pro bono as did many other economists in seeking compensation

6  through the Justice Department. Ultimately there were over

7  2,800 families that were awarded compensation.

8  Q.   Now, when you say pro bono, does that mean for free?

9  A.   Sure. Almost all of the economists and the attorneys

10  involved worked for free.

11  Q.   And did the same methods that you're going to tell the jury

12  about that you used in this case, were they the same methods in

13  general that were used in that case?

14  A.   Absolutely. I mean, it's really straight mathematics.

15  After you build the model, you simply put in the numbers.

16  Q.   Tell us what you did in this case. What is it that you did

17  in terms of making a calculation to put on the life care plan?

18  A.   Sure. Well, what I deal with are what are called economic

19  damages. Someone's injured, they might suffer the loss of

20  earnings or benefits or future medical care costs or loss of

21  services.

22      In this case the only element of damages I was asked

23  to calculate was the present value of a life care plan, that is,

24  the future medical costs that Kathie Allison in conjunction with

25  doctors felt would be appropriate for the treatment of Ron

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 89 of 123

1   Kuiper through the balance of his life expectancy.

2          And my job was to project those items that she

3   specified through Mr. Kuiper's life expectancy which is

4   currently to age 83 and to discount those to present value

5   applying probabilities of death and other actuarial calculations

6   to come up with basically an amount of money which if you invest

7   it today would allow just through interest and principal in a

8   risk-free investment to compensate what his future medical costs

9   would be through his life expectancy and at the end of that time

10  all the money would be used up.  All the interest and principal

11  would be gone.

12         So -- and the issue is is that money today has greater

13  value than money in the future.  And as an example, if I had a

14  medical cost item that was going to cost $10,000 let's say 10

15  years from now, you wouldn't want to give Mr. Kuiper $10,000

16  today for an expense that's going to occur of that magnitude 10

17  years from now.  You'd only want to give him the present value

18  of it.  And assuming that interest rates are 3 percent which

19  they are currently on Treasury bonds and they've fallen

20  dramatically, but if -- assuming that they're 3 percent and it

21  is on a 10-year bond, you could simply take $7,440 today.  You

22  could buy a 10-year Treasury bond, and 10 years from now it

23  would be equal to $10,000, exactly what the medical cost would

24  be.

25         And so the present value of $10,000 ten years from now

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 90 of 123

1   is $7,440 today.  And that's what my job is.  I simply look at

2   each medical cost item that Kathie Allison specifies, when it

3   occurs each year in the future, and I calculate how much you'd

4   have to set aside today to compensate for that item in the

5   future.

6         So it consists of two items.  It consists of the

7   discount rate which is the rate of return on the investment, the

8   rate of growth and the cost of the item because medical costs

9   are going to continue to increase in the future as they have in

10  the past.  And we use Department of Labor data on medical cost

11  item by category to make those projections.

12  Q.   Now let me stop you just for a minute.  Does the Department

13  of Labor actually publish statistics on this?

14  A.   Yes, they publish through b-l -- it's a website called

15  bls.gov, and you go to what's called the consumer price index,

16  and you look at -- specifically at the medical cost index.  And

17  the medical cost index, the one I've used, breaks out roughly 14

18  different items of medical cost index that the Department of

19  Labor collects data on.

20        So, for example, you have nonprescription medical

21  equipment and supplies, physician services, prescription drugs,

22  and medical supplies.  And then you have all of the other items

23  that are contained in the life care plan which might include

24  motor vehicle maintenance and repair for a motor vehicle, a van

25  basically to transport him.  You have gardening, lawn care

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 91 of 123

1    for -- if he were to stay at home hiring someone to take care of

2    the lawn.

3             All of those indices are collected from the first date

4    which the data was collected.  In most cases it's around a range

5    of 1983 to '95 to the present.  And those items are shown in my

6    report, the real cost increase in those items for that length of

7    time which in most cases is 20 years.  And I use that to project

8    what the cost of the item will be in the future.

9    Q.   And, Dr. Ward, are these items broken out by region of the

10    country so that you can standardize them for the midwest, Sioux

11    City?

12    A.   Well, they are national -- they are national data, but in

13    terms of cost index, almost all of these are the same regardless

14    of where you are in the categories of prescription drugs,

15    medical supplies, and nonprescription medical equipment.  The

16    only one that would differ would be physician services, and

17    that's at less than 1 percent per year, so it really is not

18    going to be a factor affected much by locality.

19    Q.   Okay.  So tell me then with -- I interrupted you.  What

20    additional, besides looking at the Bureau of Labor standards,

21    were required in making this calculation?

22    A.   Well, the balance of it is pretty basic.  I start off with

23    Kathie Allison's life care plan.  And we had an original one,

24    and then there were some modifications in 2007, and we prepared

25    our report of 3-29-07 based on those modifications.

And there were two options in her life care plan.  One option is he stays at home, and the second option is he needs assisted living.  And we used each item that she specified in her life care plan.  She specifies what the item is.  She specifies when it starts like today or five years from now, when it ends, five years from now, ten years from now, life expectancy.  She specifies the cost of the item, the frequency of taking the item, the annual cost of the item.  So all that's provided by Kathie Allison.

All I do then is take that item.  I project it to Mr. Kuiper's life expectancy.  I provide growth in the cost of the item, and I discount it to present value, and I come up with a number, as I stated, if you invested that today, it would simply pay for what Kathie Allison specifies the item to be throughout his lifetime and at the end of the period all the money's gone.

MR. MCCLAIN:  Your Honor, may I set this stand up now?

THE COURT:  You may.

MR. MCCLAIN:  Oh, I think that right here's okay.  Or you're probably right, Scott.  That's probably a better idea, although now we're going to be blocked -- no, I think I was right.  Thank you.

BY MR. MCCLAIN:

Q.  Dr. Ward, I put this up because I want to make -- I want to make -- keep a reference here to what your opinion is regarding

1    option 1 and option 2 as Ms. Allison laid them out.  And we have

2    an underlying document which we'll admit, but I just want the

3    totals.  You can tell them how you went about making the

4    calculation, but for our purposes, if you'll just tell us after

5    giving us the background what the option -- option 1.

6              MR. MEADOR:  Excuse me, Your Honor.  Do you mind if I

7    stand and watch?

8              THE COURT:  No.  That's fine, Mr. Meador, wherever you

9    can see better.

10             MR. MEADOR:  Thank you.

11   BY MR. MCCLAIN:

12   Q.   And should we call this future economic -- or future --

13   A.   Future life care costs.

14   Q.   Future life care costs?

15             MR. MCCLAIN:  You want me to move this, Tom, so you

16   can see?  Is that better?

17             MR. MEADOR:  Thanks.

18             MR. MCCLAIN:  Is that all right?  Can everyone see

19   that okay?

20   BY MR. MCCLAIN:

21   Q.   Tell us how -- what the elements are of the calculation,

22   and then you can tell us what the total is.  And we'll mark the

23   subtotal so that everyone can see how you got your number later,

24   but I wanted to make a chart here if we could.

25   A.   Sure.  My report contains all the assumptions of the

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 94 of 123

1    calculation.  And then there are a number of spreadsheets.

2    There are Excel spreadsheets at the back that specify each of

3    the items that's in Kathie Allison's report with all of the

4    beginning, ending, and cost data that she provided.  And we can

5    break it down into two categories.  One's option 1.

6    Q.    Okay.

7    A.    Option 1 is that he's able to stay at home and physician

8    cost and some supportive care.  He's able to maintain himself in

9    his home throughout his life expectancy.  His life expectancy

10   when we first did this report back in 2007 was 82.4.  It's now

11   83.4 because --

12   Q.    Because he lived another year.

13   A.    You live longer, your life expectancy goes up.  But in any

14   event, using the original report, we had various items that are

15   contained in the report.  The first one is physician

16   evaluations.  Second one is therapy.  Third one's equipment.

17   The next is medication and supplies.  These are both

18   nonprescription and prescription.  Potential complications that

19   she provides cost for covering, maintenance costs, supportive

20   care in the home which are people to take care of lawn and do

21   other things and assist in his life, transportation which is van

22   modification and various things to allow mobility, and then

23   architectural renovations which involve putting in ramps to

24   allow him to function more easily in his home.

25           And the present value of option 1 of all of those

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 95 of 123

1   items I can give you.

2   Q.   Okay.  I should write this -- this is the total?

3   A.   This is the total.

4   Q.   Okay.

5   A.   It's $308,769.

6   Q.   Three hundred and what?

7   A.   308,769.  Now, that isn't what the value of the future cost

8   would be.  That's the present value of the future cost, how much

9   you would have to invest today accumulating interest to pay for

10  what those future costs would be.  And at the end of the life

11  expectancy of 83, all the money would be gone.

12  Q.   Okay.  So that's the option 1 if he were to be able to stay

13  in his home and not go into assisted care.

14          Option 2 was assisted care?

15  A.   Option 2 is pretty much the same as option 1 except for the

16  category of supportive care because if he goes into assisted

17  care, the costs are going to go up.  In fact, they will more

18  than double.  Of course, you don't need architectural

19  renovations if he's going into assisted care, so you take that

20  item out of the calculation.  But you add to the supportive care

21  as Kathie Allison has specified, and the present value under

22  option 2 if he goes into assisted care is $504,117.

23  Q.   504.

24  A.   117.

25  Q.   And that is the option 2 cost.

1    A.    Right.

2    Q.    And you're not expressing an opinion as to which of these

3    are more likely than not.  Kathie Allison's already talked to us

4    about that.

5    A.    I'm not a life care planner, and I'm not a doctor.  I work

6    with numbers, and as an economist I'm simply calculating the

7    present value of the expenses from the life care plan she

8    specifies.

9    Q.    Okay.  Now, I'd like to show you the jury verdict form just

10   to be sure that -- what numbers these represent.

11            MR. MCCLAIN:  Would you go to page 2 of the jury

12   verdict form, Scott?

13   Q.    And you can see this down there on your screen.  I have to

14   put it up.  The jury's going to be asked in this case about

15   should they find for the -- we're going to get to that next.

16   You didn't calculate past medical expenses; is that true?

17   A.    No.  Whatever those are, you can simply add them up and

18   present them to a jury.  I mean, if you have receipts you can

19   claim them.

20   Q.    Okay.  Future medical expenses, this is -- is this that --

21   future life care costs, is that this category of expenses?

22   A.    That's what I've calculated here.

23   Q.    Okay.  So this 504 or the first number, that's what this

24   number represents.

25   A.    Right.

1  Q.   But did you make any calculation about past loss of

2  function of the mind and body?

3  A.   No.   That would be categories like loss of enjoyment of

4  life and so on, and I don't make those calculations.

5  Q.   Okay.   Future loss of function of the mind and body, did

6  you make any calculation --

7  A.   No.

8  Q.   -- about that?   Past pain and suffering?

9  A.   No.

10  Q.   Or future pain and suffering?

11  A.   No.   Those are noneconomic damages, and I don't make them.

12  Q.   And the reasonable value of past loss of spousal

13  consortium?

14  A.   No.

15  Q.   Made no calculation for that?

16  A.   Correct.

17  Q.   And the reasonable value of future loss of spousal

18  consortium, you didn't make any damages for that.

19  A.   I did not.

20  Q.   Or calculations for that.

21  A.   Correct.

22  Q.   That's generally not something you do as an economist.

23  That's something that can be considered based on other factors.

24  A.   That's right.

25  Q.   All right.   Now, there's one last area that I want to talk

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 98 of 123
To purchase a complete copy of the transcript

1    about, and that's the issue of -- there's an instruction that

2    the Court's going to give that this next issue's related to, and

3    that's the issue of punitive damages.

4            MR. MEADOR:  I'm going to object.  It's outside the

5    scope.  He's here to talk about net worth.

6            THE COURT:  Well, I assume that's what you're doing,

7    isn't it?

8            MR. MCCLAIN:  It's just introductory to why we're

9    talking about net worth.

10           THE COURT:  Yeah, I think Mr. Meador was just trying

11   to be careful.

12           MR. MCCLAIN:  Yes.

13           THE COURT:  As long as that's our understanding.

14           MR. MCCLAIN:  Yes.

15   BY MR. MCCLAIN:

16   Q.   And the Court's instruction on this issue that we've

17   already had is that punitive damages are not intended to

18   compensate for injury but are allowed to punish the

19   defendants --

20           MR. MEADOR:  Objection.  Outside the scope.

21           THE COURT:  Yeah, it really is.  I think the jurors

22   are familiar with my -- we don't really need to go into that.

23           MR. MCCLAIN:  Okay.  All right.

24           THE COURT:  Thank you, Mr. McClain.

25           MR. MCCLAIN:  Okay.  Thank you.  I appreciate it.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ   Document 406   Filed 06/09/09   Page 99 of 123
To purchase a complete copy of the transcript.

1    BY MR. MCCLAIN:

2    Q.    But -- so we're dealing now with something outside of the

3    area of compensatory damages.  We're talking about net worth of

4    the company.  Are you familiar with that concept?

5    A.    Sure.

6    Q.    What does the net worth of a company represent in a general

7    sense, Dr. Ward, from an economist's standpoint?

8    A.    Well, it's an accounting entry, and it occurs on your

9    balance sheet.  And it's the old axiom from accounting assets

10   minus liabilities is equal to net worth.  Net worth is after

11   you've paid all of the liabilities that are listed through the

12   disposition of assets how much is left over in terms of owner's

13   equity, in terms of retained earnings for investment, retired

14   Treasury stock, and other accounting items that are of value to

15   the company.  It's the value of the company.

16              Now, net worth, you have to be careful.  Net worth is

17   a book entry.  It's based upon the book value of assets and the

18   book value of liabilities.  That's not necessarily the same as

19   the market value of assets and the market value of liabilities.

20              So economists always look at net worth with a degree

21   of suspicion as an accounting entry because it doesn't

22   necessarily mean this is what the net value of the company would

23   be after they paid their obligations.  It's simply what it is on

24   paper.

25              MR. MCCLAIN:  Okay.  And we have stipulated to an

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 100 of 123

1   amount, Your Honor.  Is this the time that we're . . .

2           THE COURT:  Yes.

3           MR. MCCLAIN:  Okay.  I thought you were going to say

4   something.  Do you want me to --

5           THE COURT:  Oh, why don't you --

6           MR. MCCLAIN:  -- put the number up first?

7           THE COURT:  Okay.  We can do it that way.  That's

8   fine.  The parties have agreed on a number for the net worth of

9   the defendant in the case.  And because that's considered

10  confidential proprietary business information, I'm asking

11  everybody in the courtroom not to reveal it to anybody else.

12  Obviously you can discuss it when you go down to the jury room.

13  You can write the number down in your notebooks.  But when the

14  trial's over, I said you can discuss everything about this case

15  with anybody you want.  That's true.  This is the one exception

16  to it.  This is a number that is just -- we're going to do our

17  best to try and keep it confidential.  And we had other ways to

18  try and do it, but I just thought telling everybody and trusting

19  everybody was the best way to go.

20          So I'm asking everybody in the courtroom not to

21  release this number.  Obviously the jury can use it for any

22  purpose, if any, in your jury deliberations.

23          MR. MCCLAIN:  Thank you, Your Honor.  The net worth

24  that we've agreed to is XXXXXXXXXXX dollars.  That's correct?

25  XXXXXXXXXXX dollars.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 101 of 123

1  BY MR. MCCLAIN:

2  Q.   And that's a book entry; is that what you're telling us?

3  A.   Right.

4  Q.   Okay.

5       MR. MCCLAIN:  Thank you, Dr. Ward.  That's all the

6  questions I have.

7       THE WITNESS:  Sure.

8       THE COURT:  Mr. Meador?

9       MR. MEADOR:  Thank you.

10      MR. MCCLAIN:  Do you want me to take that?  Your

11 Honor, just before he does that, can I mark these three as

12 exhibits, and then I'll take them down?

13      THE COURT:  Well, you can mark them, but they're just

14 demonstrative.

15      MR. MCCLAIN:  Yeah, I plan to use them in closing, and

16 that's why I wanted to mark them.

17      THE COURT:  That's fine.  Sure.

18      MR. MCCLAIN:  Is that all right?

19      THE COURT:  That's fine.

20      MR. MCCLAIN:  2186 is the future life care option 1.

21 Future life care option number 2 is 2187.  And the net worth is

22 2188.

23      THE COURT:  Okay.  And those are marked just solely

24 for demonstrative purposes.

25      MR. MCCLAIN:  Thank you, Your Honor.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 102 of 123

```
 1              THE COURT:  Thank you.
 2              Mr. Meador, whenever you're ready to proceed, you may.
 3  Thank you.
 4              MR. MEADOR:  Thank you, Your Honor.
 5                          CROSS-EXAMINATION
 6  BY MR. MEADOR:
 7  Q.   Good morning, Mr. Ward.
 8  A.   Good morning.
 9  Q.   My name's Tom Meador.  We haven't met before, have we?
10  A.   No.
11  Q.   But you've known Mr. McClain for quite a while; is that
12  right?
13  A.   Sure.
14  Q.   You've worked with him maybe 15, 20 years; is that true?
15  A.   I would say so.
16  Q.   And he's hired you in about 50 to 60 cases; is that about
17  right?
18  A.   Well, his firm has over that period of time, sure.
19  Q.   Doesn't he look like he's in charge of his firm?
20  A.   Actually I've worked for a number of people in his firm
21  other than him, yes.
22  Q.   Now, you talked about your pro bono work.
23  A.   Sure.
24  Q.   You're not here today pro bono, are you?
25  A.   No.
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 103 of 123

1    Q.    You're making $700 an hour to testify today?

2    A.    Oh, I wish I was.  No.  My billing rate is $400 per hour.

3    Q.    Oh, glad to hear that.  You don't have a set rate here at

4    trial?

5    A.    I'm sorry?  What?

6    Q.    You don't have a set trial rate?

7    A.    It's $400 per hour.

8    Q.    Now, in this case if I understand what you did is you got

9    Kathie Allison's report and you did your calculations.

10    A.    Sure.

11    Q.    And you didn't need a Ph.D. in economics to do these

12    calculations, did you?

13    A.    No.

14    Q.    I mean, these are pretty simple calculations.

15    A.    These were pretty simple calculations.  It's just straight

16    mathematics.

17    Q.    And you didn't evaluate whether any of the items in the

18    report were correct or not?

19    A.    No.  That's correct.

20    Q.    You relied on the information she gave you; is that right?

21    A.    Yes, correct.

22    Q.    If we could put up your report real quick, 2166.  It's

23    coming.  You don't have to do anything.

24    A.    I don't have to do anything.  Okay.  Good.

25    Q.    While we're putting up your report, let me just ask you a

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 104 of 123

1   few other questions.

2   A.    Sure.

3   Q.    Let's talk about what you're not here to testify about.

4   You're not here to testify about what Mr. Kuiper knew about the

5   cause of his injury two years before he filed his lawsuit, are

6   you?

7   A.    No.

8   Q.    And you're not -- we heard a lot about science yesterday.

9   You're not here to talk about what the science was about

10   diacetyl during the '92 to '95 time period when Mr. Kuiper was

11   in the mixing room; right?

12   A.    I am not.  Yes, that's correct.

13   Q.    And you're not here to talk about whether the MSDSs from

14   Tastemaker were adequate during the '92 to '95 time period when

15   Mr. Kuiper was in the mixing room, are you?

16   A.    That's correct.

17   Q.    And you're not here to talk about what Tastemaker in

18   Cincinnati, Ohio, knew about diacetyl during the '92 to '95 time

19   period --

20   A.    That's correct.

21   Q.    -- when Mr. Kuiper was in the mixing room; right?

22   A.    Right.

23   Q.    You're just here to talk about the economic damages?

24   A.    Just numbers.

25   Q.    Now, in your report you say Mr. Kuiper began working for

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 105 of 123

1    American in 1986.

2    A.    That's right.

3    Q.    And that Mr. Kuiper's pulmonary symptoms began in 1991;

4    right?

5    A.    That was contained in Kathie Allison's report, and I simply

6    took it directly from her report.

7    Q.    So you didn't do anything to independently investigate

8    that?

9    A.    No.

10   Q.    So everything you have done in this case is based on the

11   information that Kathie Allison gave you.

12   A.    Other than applying discount rates, growth rates, and

13   probabilities of survival, that's correct.

14   Q.    And you're not here to talk about whether any of these

15   damages were any way caused by the defendant in this case.

16   A.    That's correct.

17   Q.    In fact, I said the name Tastemaker.  Have you ever heard

18   that name before?

19   A.    Tastemaker?

20   Q.    Yes.

21   A.    I have.  I can't offhand recall what the context is, but I

22   have heard it.

23   Q.    And do you know the name of my client?

24   A.    Givaudan?  Yes.

25          MR. MEADOR:  Thank you.  I don't have any more

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 106 of 123

1    questions.

2              THE WITNESS:  Okay.

3              THE COURT:  Mr. McClain, any redirect?

4              MR. MCCLAIN:  No, Your Honor.

5              THE COURT:  Okay.  You may step down.

6              THE WITNESS:  Thank you.

7              THE COURT:  And everybody can take a stretch break.

8              And are you ready to call your next witness?

9              MR. MCCLAIN:  Yes, Your Honor.  It's a videotaped

10   deposition.

11             THE COURT:  Mr. McClain, I'm not sure you realize it,

12   but videotaped depositions are the three most important words to

13   a court reporter's ears.

14             MR. MCCLAIN:  I do know that, Your Honor.

15             THE COURT:  She doesn't have to take it down then.  So

16   she turned -- Shelly turned and smiled when you said videotaped

17   deposition.

18             Are you ready to proceed with your videotaped

19   deposition?

20             MR. MCCLAIN:  Yes, Your Honor.  It's Dr. Roy McKay is

21   who the witness is.

22             THE COURT:  Okay.  And do you know approximately how

23   long this is going to last?

24             MR. MCCLAIN:  Yes.  It's going to last an hour and 51

25   minutes and 3 seconds.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 107 of 123

```
 1              THE COURT:  Okay.  Well, I'll tell you what.  In an
 2    hour we'll take a break.
 3              MR. MCCLAIN:  Okay.  That will be fine.
 4              THE COURT:  So why don't I just leave it to you all to
 5    kind of stop it right around noon.  And maybe 30 minutes into it
 6    let's stop and take a 20-second stretch break and then complete
 7    the 30 minutes, go till right around noon, and then we'll break
 8    for our lunch break.
 9              MR. MCCLAIN:  That would be great.
10              THE COURT:  Okay.  Please be seated.
11              (Videotaped deposition excerpts of Roy McKay taken
12    July 13, 2006, were played in open court.)
13              THE COURT:  Now would be a good time to take a stretch
14    break.  Thank you.
15              Okay.  Thank you.  Please be seated.
16              (Continuation of videotaped deposition.)
17              THE COURT:  Now be a good time to take our break?
18              MR. MCCLAIN:  Yes, it would.
19              THE COURT:  Okay.  Members of the jury, it's just a
20    little bit before noon.  We'll be in recess until 12:25.  Please
21    remember to keep an open mind till you've heard all of the
22    evidence in the case, had a chance to hear the closing arguments
23    of the lawyers, and go back to deliberate.  Thank you.
24              (The jury exited the courtroom.)
25              THE COURT:  Anything we need to take up?
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 108 of 123

1             MR. MEADOR:  No, Your Honor.

2             THE COURT:  Okay.  Thank you.

3             (Recess at 11:57 a.m.)

4             THE COURT:  Thank you, Nick.

5             Ready to have the jury brought in?

6             MR. MEADOR:  Yes, Your Honor.

7             THE COURT:  Okay.  Thank you.

8             (The jury entered the courtroom.)

9             THE COURT:  Thank you.  Please be seated.

10            (Continuation of videotaped deposition.)

11            THE COURT:  Why doesn't everybody take a stretch

12   break.

13            MR. MCCLAIN:  Yes.

14            THE COURT:  Can you do something about that feedback?

15   Oh, there we go.

16            Mr. McClain, are you ready to call your next witness?

17            MR. MCCLAIN:  Yes, Your Honor.  I was just . . .

18            THE COURT:  Is Mr. Kuiper your next witness?

19            MR. MCCLAIN:  No.  Mr. Kuiper's leaving.  I think he's

20   going --

21            THE COURT:  Oh, okay.

22            MR. MCCLAIN:  And I thought it would be less

23   disruptive if he could get that done and then --

24            THE COURT:  Oh, absolutely.  Thank you.

25            MR. MCCLAIN:  The next is another videotaped

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 109 of 123

1    deposition of Nancy Higley, the toxicologist from Givaudan that

2    the jury has heard about already.

3            THE COURT:  Okay.  You know what?  Why don't I give

4    the jurors a ten-minute recess.  How long is that?

5            MR. MCCLAIN:  It's going to be a couple hours, so

6    we're going to have to break it.

7            THE COURT:  Okay.  We'll have to break anyway.

8            MR. MCCLAIN:  Yeah.

9            THE COURT:  Okay.  Why don't we take a ten-minute

10   physical recess.  Thanks.

11           (The jury exited the courtroom.)

12           THE COURT:  Anything we need to take up?  Okay.

13           MR. MEADOR:  Yes, Your Honor.  I don't know if you

14   want to do it now or at the end of the day?

15           THE COURT:  Well, I don't have time at the end of the

16   day.  I start a couple-hour complex sentencing, so why don't we

17   take it up now.

18           MR. MEADOR:  Yes.  At the pretrial we raised with

19   the -- with Judge Zoss that Dr. Bainbridge had a scheduling

20   problem, and Judge Zoss said, yeah, we'd work around that.  And

21   Mr. McClain said we could call him out of order if it wasn't in

22   the first week of his case.  So Dr. Bainbridge cleared next

23   Tuesday morning of patients so he could testify out of order.

24   We actually thought the case would be over, plaintiffs' case, by

25   then.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 110 of 123

1          THE COURT:  You don't think the plaintiff would be

2     prejudiced just like you allegedly were prejudiced by your

3     failure to extend the same courtesy to their expert witness?

4          MR. MEADOR:  Well, the big difference --

5          THE COURT:  What's good for the goose isn't good for

6     the gander?

7          MR. MEADOR:  I think it's a little bit apples and

8     oranges.

9          THE COURT:  Well, it is a little bit apples and

10    oranges, but they're still fruit.  So what's the -- I mean, I

11    see some obvious differences.

12         MR. MEADOR:  The app -- I mean, we have our own

13    scheduling problems with our experts.  I could see if I have

14    that and raised that I could see you telling me right now --

15         THE COURT:  It coming back to bite you, right.

16         MR. MEADOR:  But we always work around -- I've had --

17    and I know you preside in a lot of cases.  You always work

18    around the local treating physician because, you know, they're

19    not on the clock like the rest of us.  And Dr. --

20         THE COURT:  Actually I don't, interestingly enough.  I

21    work around the out-of-town experts, but I don't give any

22    deference to the local experts.

23         MR. MEADOR:  But Dr. Parmet, their last medical guy,

24    is going to testify Monday.  Dr. Egilman's already testified.

25    So all they're left with is the plaintiff, some relatives, and

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 111 of 123
to purchase a complete copy of the transcript.

1    they may call somebody from --

2            THE COURT:  I'm just giving you a hard time.  Do you

3    really have a serious objection to letting -- taking him out of

4    order even -- notwithstanding what happened earlier, take the

5    high road?  Do you really have an objection?

6            MR. MCCLAIN:  The question I had is can't he come the

7    next week?  I don't know that he can't come the next week.  I

8    think that -- well, I think there's a tactical advantage to them

9    trying to interject him into my case in the middle of my medical

10   case.  Dr. Parmet's testifying Monday.  We're going to be --

11   we're putting on the plaintiffs.  Then we have Dr. Farrell

12   coming.  So I still have quite a bit to get done next week

13   without taking a break so that they can say, well, you know,

14   there's somebody here that might have a question about your

15   diagnosis which is I think tactically what is --

16           THE COURT:  Oh, I wouldn't impute any ill motives.

17           MR. MCCLAIN:  I didn't do that.

18           THE COURT:  Yeah.

19           MR. MCCLAIN:  I'm just saying tactically that is part

20   of the decision I'm making.  You know, tactically I would not

21   want it to happen if I can avoid it.  If he can come the third

22   week, I would prefer to do that.  That's my tactical decision,

23   not his.

24           THE COURT:  Right.

25           MR. MCCLAIN:  So I wasn't imputing anything unless

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 112 of 123

1     I --

2              THE COURT:  I see.  You're talking about your tactical

3     decision.  Okay.  And are you representing to me that Bainbridge

4     can only -- what is it?  Next Tuesday?

5              MR. MEADOR:  Tuesday morning, Your Honor.

6              THE COURT:  He can't come the third week?  Or you just

7     don't want to ask him?

8              MR. MEADOR:  No.  What I am told -- Mr. Holtman has

9     been talking to Dr. Bainbridge, and he told me that he'd

10    cancelled his patients on Tuesday morning.

11             THE COURT:  I see.

12             MR. MEADOR:  I'll double-check because I don't want

13    to --

14             THE COURT:  No, no, no.  I'm going to let him testify.

15    Yep.  You know, I . . .

16             You really think it's a strategic problem for you?

17             MR. MCCLAIN:  Well, look, what he says is, you know,

18    it might be bronchiolitis obliterans; I don't know; I would have

19    to take a lung biopsy; I haven't taken one.  It's all his

20    decisions about what he's done and what he hasn't done.  But

21    that's essentially what he's going to say, and that's what they

22    want him to say to show doubt in the jury's mind as to whether

23    it's bronchiolitis obliterans.

24             THE COURT:  Right.

25             MR. MCCLAIN:  So I'll deal with it whenever I have to,

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov

Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 113 of 123
to purchase a complete copy of the transcript.

1    but I would prefer to deal with it when they're going to do it

2    with their witnesses as well, so that's all I'm saying, you

3    know.  My witnesses all are in agreement, you know.  No question

4    about it.

5              THE COURT:  Yeah.  I mean, you gotta deal with the

6    pimples on your case at some point or another, you know.

7    Actually, all due respect to you, all the psychological data is

8    you're better off taking them in between and then ending with

9    your witnesses than waiting for -- to hear it in their case.  I

10   mean, that's what the Solomon Asch study -- there's lots of

11   studies about that.  You're a lot better off doing it this way.

12             But I'm not here to -- even though I do second guess

13   everybody's trial strategy, I'm not really here to do that, but

14   I just think as a --

15             MR. MCCLAIN:  I thought of that.  I -- it's six of

16   one, half a dozen of another.

17             THE COURT:  Yeah.

18             MR. MCCLAIN:  And I gotta be honest.  The Egilman

19   thing really ticked me off but --

20             THE COURT:  Well, I understand that.

21             MR. MCCLAIN:  So, you know, if they have to call him

22   Tuesday, so be it.  We'll deal with it.

23             THE COURT:  Well, I appreciate you taking the high

24   road with a little help.

25             Woops.  I guess our time's up.  Is our time up?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 114 of 123

1      MR. PAGLIARO:  Your Honor?

2      THE COURT:  Yeah.

3      MR. PAGLIARO:  Excuse me.

4      THE COURT:  Yes.

5      MR. PAGLIARO:  I need to take a bathroom break.

6      THE COURT:  Yeah, why don't we just extend it for five

7  more minutes so that everybody can take a break.  Thank you.

8      (Recess at 1:30 p.m.)

9      THE COURT:  Everybody ready to rock and roll?

10     MR. MEADOR:  Yes, Your Honor.

11     MR. PAGLIARO:  Yes, Your Honor.

12     THE COURT:  Okay.

13     (The jury entered the courtroom.)

14     THE COURT:  Thank you.  Please be seated.

15     And, Mr. McClain, can you tell me again who the video

16  deposition is of?

17     MR. MCCLAIN:  This is Nancy Higley, the in-house --

18     THE COURT:  Yes.

19     MR. MCCLAIN:  -- toxicologist from Givaudan.

20     THE COURT:  Thank you.

21     (Videotaped deposition excerpts of Nancy Higley taken

22  April 6, 2006, were played in open court.)

23     THE COURT:  Would this be a good place to stop now?

24     MR. MCCLAIN:  I think at the end of the page is, Your

25  Honor.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 115 of 123

1          THE COURT:  Okay.  Fine.

2          (Continuation of video deposition.)

3          MR. MCCLAIN:  This would be a good time to stop.

4          THE COURT:  Okay.  Members of the jury, that's going

5    to conclude our testimony for the week.  We'll start in at 8:30

6    on Monday.  We'll go Monday, Tuesday, Wednesday next week, and

7    then we'll go into the following week.  I expect that we'll

8    finish that week, but I'll let you know more on Monday.

9          Remember keep an open mind till you've heard all of

10   the evidence in the case.  And have a good weekend, and we'll

11   see you back Monday morning at 8:30.  Thank you.

12         (The jury exited the courtroom.)

13         THE COURT:  Please be seated for one second.  Anything

14   we need to take up now --

15         MR. MEADOR:  No, Your Honor.

16         THE COURT:  -- that you can think of?  Mr. McClain,

17   you may want to give some thought to how you're going to have

18   Mr. Kuiper testify.  We do have a ramp.  We can take that chair

19   out.  I have no idea whether his mobile chair will fit in the

20   witness box, if he can just walk up that step and sit in the

21   chair, if he wants to be next to the witness box and we can take

22   that microphone and move it towards him, if he wants to hold a

23   handheld mike and be in front of the witness box.  You'll just

24   have to sort that out.

25         Now, I've had some time to think about my ruling in

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 116 of 123

1   Dr. Bainbridge, and if it's -- you know, I don't really see

2   these strategic things either way, but it's really not that

3   different than what happened in your case, and so -- I mean,

4   there are some differences but not enough that I should reach a

5   different result.  So if you want Bainbridge to testify in their

6   case, then I won't let him testify on whatever day it was,

7   Tuesday.  It's really your call.

8           MR. MCCLAIN:  I will talk to them about it.

9           THE COURT:  Okay.  Well, whatever you decide is going

10  to be fine with me.

11          MR. MCCLAIN:  Okay.

12          THE COURT:  But if you decide you want to wait and

13  have him testify in their case, then that's what I'm going to

14  rule because I think what's good for the goose is good for the

15  gander.  There are some differences, but it's not sufficiently

16  different that I would reach a different result.

17          MR. MEADOR:  May I just say one thing, Your Honor?

18          THE COURT:  Why don't you use the microphone so at

19  least I can hear you.  Thanks.

20          MR. MEADOR:  Thank you, Your Honor.  We gave the

21  parties' ten days' notice.  Dr. Egilman, we got notice at 2:30

22  while he was testifying.  It was complete surprise.  We're

23  supposed to work together and give heads-up.  And we told Judge

24  Zoss ten days ago.  We picked a day -- it would have been day 6

25  or 7 in trial.  We were supposed to be in our case.  I don't see

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 117 of 123

1  what prejudice when all his doctors have already testified.

2          THE COURT:  Well, I didn't see any prejudice to you by

3  delaying it for a day.  We obviously just disagree.  You saw

4  prejudice.  I didn't.

5          MR. MEADOR:  No, the --

6          THE COURT:  I don't see any prejudice in your

7  situation, and you were very vociferous that you weren't willing

8  to accommodate Dr. Egilman.  So like I said, what's good for the

9  goose is good for the gander.  I don't see it as substantially

10  different.  There are differences.  Like you said, it's apples

11  and oranges, but they're still fruit.  They're not cupcakes.

12  They're apples and oranges, and it's a very similar situation.

13          And you weren't willing to extend the professional

14  courtesy to the other side to do that because it was a strategy

15  decision.  That's fine.  He's entitled to make the same strategy

16  decisions you are.

17          Why should he not be able to make the same strategy

18  decisions you are and have me defer to them which I did to yours

19  even though I strongly disagreed with it?  Why should I not

20  defer to his choice of strategy after deferring to yours?  Do

21  you have a good reason?  You're awfully quiet.

22          MR. MEADOR:  Well, I didn't want to interrupt you,

23  Your Honor.

24          THE COURT:  Okay.

25          MR. MEADOR:  You were still talking.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 118 of 123

         1          THE COURT:  Well, go ahead.  Why should I defer to
         2   your choice of strategy but not his?
         3          MR. MEADOR:  Well, my ch -- it wasn't a strategy.
         4          THE COURT:  You told me it was a strategy decision.
         5          MR. MEADOR:  The doctor couldn't come back until, you
         6   know, the following week, and I just started my
         7   cross-examination.
         8          THE COURT:  Well --
         9          MR. MEADOR:  That would have been highly unusual for
        10   him to leave in the middle of cross-examination.  It would have
        11   been nice for him to give us a heads-up so we can work around
        12   the problem.  I just --
        13          THE COURT:  It would have been nice.  I understand
        14   that.  It didn't happen that way.  But you're telling me now it
        15   wasn't a strategy decision that you made, that it was better
        16   strategy for you to be able to finish your cross-examination?
        17   If it wasn't a strategy decision, what was it?
        18          MR. MEADOR:  I would agree with that, Your Honor.
        19          THE COURT:  It's a strategy decision; right?  Now he's
        20   making a strategy decision.  Why is it I should defer to you but
        21   not to Mr. McClain?
        22          MR. MEADOR:  Because we gave ten days' notice.
        23   Mr. McClain agreed to it.  The doctor cancelled his schedule.
        24   He's got patients.  He's -- I mean, he's not an expert.  He's a
        25   treating physician, and we all agreed to work around him.  I

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 119 of 123

1  just -- I just think the situations are so dramatically

2  different.

3           I'm not asking you to give me a break on my experts.

4  I'm not trying to dump one of my experts in his case, so I -- I

5  understand what you're saying, but I -- you've told us

6  repeatedly from the pretrials that we give you notice and try to

7  work around problems, and that's what we did with Judge Zoss.

8  And it was agreeable to Mr. McClain.

9           I understand he's mad now, but it just seems when you

10 work out something it should stay that way but . . .

11          THE COURT:  Well, I didn't realize -- now you're

12 saying something I didn't un -- either I didn't appreciate it or

13 wasn't told or -- I'll take the blame -- I didn't fully

14 appreciate it.  You know, I know you guys don't understand this.

15 This case is just about cash.  I've got somebody's liberty at

16 stake at 2:30, much more important matter to me.  I have had

17 every day this week, and I will every day next week.  So if I

18 didn't pick up the nuances of it, I apologize.  I'm a little

19 preoccupied.

20          MR. MCCLAIN:  Judge, I --

21          THE COURT:  You had already agreed to have him testify

22 on Tuesday?

23          MR. MCCLAIN:  I didn't do that, but I will now rather

24 than go through all this whining.  I just -- you know, I'll do

25 it.  It's not fair.  It's not fair.  It's not fair to me.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 120 of 123

1   They're not being fair about it, but I will --

2         THE COURT:  Well, let me ask a question.  Either you

3   agreed to have Bainbridge testify on Tuesday or you didn't.

4   Now, you're free to change your mind I guess, but I just want to

5   know whether Mr. Meador's representation that you agreed to

6   Bainbridge testifying on Tuesday is correct.

7         MR. MCCLAIN:  They raised it on the phone with Judge

8   Zoss, and I made the -- I said that if it works out that that's

9   the only day he can testify and as long as it's not in the first

10  week of my case I probably will not object.  That is what I

11  recall I said.

12        Now, that's different than saying I agree you can call

13  him on Tuesday.  It was kind of contingent based on where we

14  were if that was the only day he could testify.  And that's

15  still my position.  If that's the only day he can testify next

16  Tuesday, okay, I'll live with it.  But if he can go the next

17  week, I probably would prefer that.  That's still my position.

18        THE COURT:  Well, I can't believe it's the only day he

19  can testify.  Yeah, is it going to be a hassle?  He'll have to

20  cancel patients the following week?  That's okay.

21        MR. MCCLAIN:  And that's all I was asking is check.

22        THE COURT:  Well, you gotta -- you can't call him

23  until -- excuse me.  You can't call Dr. Bainbridge until after

24  the plaintiff rests.  That's my ruling.  You can take an

25  interlocutory appeal this weekend, give your associates all

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov

Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 121 of 123
to purchase a complete copy of the transcript.

1  something to do.  We'll see you Monday morning at 8:30.  Thanks.

2          MR. MEADOR:  Thank you, Your Honor.

3          (The foregoing trial was

4          adjourned at 2:33 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript

22  from the record of proceedings in the above-entitled matter.

23

24

25      s/ Shelly Semmler          3-25-09
        Shelly Semmler, RMR, CRR        Date

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 406   Filed 06/09/09   Page 122 of 123

**INDEX**

**WITNESS:**                                                      **PAGE:**

KATHIE ALLISON
            MR. MCCLAIN                                            566
            MR. PAGLIARO                                           591
            MR. MCCLAIN                                            620

JOHN WARD
            MR. MCCLAIN                                            628
            MR. MEADOR                                             647

VIDEOTAPED DEPOSITION
            Roy McKay                                              652
            Nancy Higley                                           659

* * * * *