IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

RONALD KUIPER and                          No. C06-4009-MWB
CONLEY KUIPER,

        Plaintiffs,                   Sioux City, Iowa
                                           February 24, 2009
    vs.                                    8:30 a.m.

GIVAUDAN FLAVORS CORP.,                     VOLUME 6 OF 12

        Defendant.
_____/


TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
UNITED STATES DISTRICT JUDGE, and a jury.

To purchase a complete copy of the transcript

```
APPEARANCES:

For the Plaintiffs:        KENNETH BLAIR MCCLAIN, ESQ.
                           STEVEN EDWARD CRICK, ESQ.
                           SCOTT A. BRITTON-MEHLISCH, ESQ.
                           Humphrey, Farrington & McClain
                           Suite 400
                           221 West Lexington
                           Independence, MO  64050

                           DENNIS M. MCELWAIN, ESQ.
                           Smith & McElwain
                           Suite 530
                           505 Fifth Street
                           Sioux City, IA  51101

For the Defendant:         JAMES D. PAGLIARO, ESQ.
                           KEVIN M. DONOVAN, ESQ.
                           THOMAS J. SULLIVAN, ESQ.
                           Morgan, Lewis & Bockius
                           1701 Market Street
                           Philadelphia, PA  19103-2921

                           V. THOMAS MEADOR, ESQ.
                           Morgan, Lewis & Bockius
                           Suite 2200
                           300 South Grand Avenue
                           Los Angeles, CA  90071-3132

                           STEPHEN J. HOLTMAN, ESQ.
                           Simmons Perrine
                           Suite 1200
                           115 Third Street Southeast
                           Cedar Rapids, IA  52401-1266

Court Reporter:            Shelly Semmler, RMR, CRR
                           320 Sixth Street
                           Sioux City, IA  51101
                           (712) 233-3846
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-RAZ Document 408 Filed 06/09/09 Page 2 of 27

1          (Proceedings reconvened outside the presence of the

2    jury.)

3          THE COURT:  Good morning.  Ready to have the jury

4    brought in?

5          MR. MCCLAIN:  We are.

6          MR. PAGLIARO:  Yes, Your Honor.

7          THE COURT:  Okay.  And what's the plan?

8          MR. MCCLAIN:  Finish Higley.

9          (The jury entered the courtroom.)

10          THE COURT:  Thank you.  Please be seated.

11          Members of the jury, we're going to be continuing with

12    this deposition.  I just wanted to give you a heads-up that, as

13    you know, tomorrow will be our last day this week.  And we're

14    going to just go till two o'clock tomorrow, so we'll be breaking

15    at two tomorrow.  Thank you.

16          Ready to proceed with the deposition?

17          MR. MCCLAIN:  Yes, sir.

18          THE COURT:  Okay.  Thank you.

19          (Continued videotaped deposition excerpts of Nancy

20    Higley taken April 6, 2006, were played in open court.)

21          MR. MCCLAIN:  Your Honor, we're going to go to the

22    videotaped deposition of Dr. Lockey that the jury's heard so

23    much about.  Maybe while we're switching over if they --

24          THE COURT:  Sure.  Why doesn't everybody take a

25    stretch break.  Thank you.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ   Document 408   Filed 06/09/09   Page 3 of 27
To purchase a complete copy of the transcript

1        And how long will this deposition be?

2        MR. MCCLAIN:  It's -- we cut about a half hour of it

3 out last night, and I think it's around 2 hours and 15 minutes

4 or so roughly.

5        THE COURT:  Okay.  Thanks.  Well, in about 40 minutes

6 or so, why don't we take another stretch break.

7        MR. MCCLAIN:  Okay.

8        THE COURT:  Thank you.  Please be seated.

9        (Videotaped deposition excerpts of James Lockey taken

10 August 11, 2006, were played in open court.)

11        MR. MCCLAIN:  You asked to stop this at about 40

12 minutes.

13        THE COURT:  Yes.  Thank you.  Everybody take a stretch

14 break.  Thank you.

15        Thank you.  Please be seated.

16        MR. MCCLAIN:  And, Your Honor, do you want to stop at

17 ten again to take our break?  Is that what your --

18        THE COURT:  Yes, that'd be good, or we can go 30

19 minutes, until 10:10.

20        MR. MCCLAIN:  Okay.

21        THE COURT:  Thank you.

22        (Continuation of videotaped deposition.)

23        MR. MCCLAIN:  Your Honor, this is a good place to stop

24 for our break.

25        THE COURT:  Okay.  That's fine.  Members of the jury,

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 408   Filed 06/09/09   Page 4 of 27
To purchase a complete copy of the transcript

1    we'll be in recess until 10:25 -- I'm sorry, 10:35.  Please

2    remember to keep an open mind till you've heard all of the

3    evidence.  Thank you.

4          (The jury exited the courtroom.)

5          THE COURT:  Counsel, anything we need to take up?

6          MR. MCCLAIN:  No, sir.

7          MR. PAGLIARO:  No, Your Honor.

8          THE COURT:  Okay.  Thank you.

9          MR. PAGLIARO:  Thank you, Your Honor.

10         (Recess at 10:07 a.m.)

11         THE COURT:  Ready for the jury?

12         MR. MCCLAIN:  We are.

13         MR. PAGLIARO:  Yes, Your Honor.

14         THE COURT:  Okay.  Thank you.

15         (The jury entered the courtroom.)

16         THE COURT:  Thank you.  Please be seated.

17         (Continuation of videotaped deposition.)

18         MR. MCCLAIN:  Your Honor, is this a good time --

19         THE COURT:  Sure, good time for a stretch break.

20    Thank you.

21         Thank you.  Please be seated.

22         (Continuation of videotaped deposition.)

23         THE COURT:  Would now be a good time to take the break

24    before we get --

25         MR. MCCLAIN:  There's about five minutes, Your Honor.

To purchase a complete copy of the transcript

1   Should we --

2           THE COURT:  Okay.  Why don't we keep going then.

3   That's fine.

4           (Continuation of videotaped deposition.)

5           MR. MCCLAIN:  There's eight pages left of text.  Do

6   you want us to just take it up after lunch?

7           THE COURT:  Yes, I'd like to take -- I'd like to give

8   the jury a break now.

9           MR. MCCLAIN:  Okay.

10          THE COURT:  Okay, members of the jury.  It's about

11  12:15.  We'll have a 25-minute recess until 12:40.  And remember

12  to keep an open mind till you've heard all of the evidence in

13  the case.  Thank you.

14          (The jury exited the courtroom.)

15          THE COURT:  Please be seated for one minute.  I'm

16  going to give the lawyers a little homework assignment over our

17  break.  You know, I don't profess to have much knowledge about

18  products liability law.  I think this is only the second

19  products case I've had in my 14 1/2 years.  But it seems to me

20  that there's a concept we use fairly often in criminal law

21  called willful blindness, and it goes to the issue in the

22  instructions on page 15 about whether Givaudan knew or

23  reasonably should have known.  And that's the standard we use in

24  criminal law for a lot of offenses.  And there's a willfull

25  blindness instruction that's kind of a stock instruction in the

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

1  criminal law that basically says you can't avoid knowledge by

2  sticking your head in the sand when a reasonable person would

3  have made the effort to figure out what's going on.

4          And, of course, I'm going to figure out whether that

5  applies in a products case or not, but I'd be interested to know

6  if the lawyers know or if you've seen any case on it.  Of

7  course, it would depend upon whether the plaintiff wanted an

8  instruction.  I don't want to gum things up for the parties by

9  injecting my views.

10          But it seems to me that there's sufficient evidence in

11 the record that would support a willful blindness type

12 instruction on knowledge if that's an acceptable thing to

13 instruct on, and on that I have no opinion because I just don't

14 know.

15          MR. MCCLAIN:  There are some cases on this issue.  We

16 will find them.

17          THE COURT:  Okay.  Thanks.  We'll see you back here at

18 12:40.  Thank you.

19          (Recess at 12:16 p.m.)

20          THE COURT:  Ready to have the jury brought in?

21          MR. MCCLAIN:  Sure.  Before -- just so that you know,

22 the line of cases that you're asking about begins with Borel

23 versus Fibreboard, a Fifth Circuit case that holds that a

24 manufacturer is held to be an expert in the field and must be

25 aware of all scientific evidence.  And the extensions have been

1   from that to you can't willfully put your head in the sand, and

2   I'm having people do the research right now.  We should have at

3   least some cases to give you by the end of court today and

4   tomorrow too.

5           THE COURT:  That's fine.  Thanks.

6           (The jury entered the courtroom.)

7           THE COURT:  Please be seated.  I'll dim the lights.

8           (Continuation of videotaped deposition.)

9           MR. MCCLAIN:  That's the -- that's the end of

10  Dr. Lockey's testimony.  And we would -- are you ready to go a

11  little bit, Ron?  Would you like to go a little bit right now?

12  We would like to continue with Mr. Kuiper's testimony for a few

13  minutes.

14          THE COURT:  That's fine.

15          MR. MCCLAIN:  And then we will play John Hallagan's

16  testimony which will probably consume the rest of the afternoon.

17          THE COURT:  Okay.  Thank you.

18      RONALD KUIPER, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

19          THE COURT:  Mr. Kuiper, you're still under oath, so

20  I'm not going to have to swear you in each time.  Thank you.

21          Yes, you can be seated, Mrs. Kuiper, right next to

22  your husband.  Thank you.

23                  CONTINUED DIRECT EXAMINATION

24  BY MR. MCCLAIN:

25  Q.   Good afternoon, Mr. Kuiper.

1    A.   Hi.  Good afternoon.

2         MR. MCCLAIN:  Good afternoon, ladies and gentlemen.

3    Q.   When we broke yesterday, Mr. Kuiper, we were talking about

4    Kevin's birth and the sequence around that.

5         MR. MCCLAIN:  And would you go back to that for a

6    moment?

7    Q.   And I didn't really have a chance to ask you about this,

8    but I think it's an important thing.

9         MR. MCCLAIN:  Would you go back to the original

10   picture.

11   A.   Me?

12   Q.   I'm talking to Scott.

13        MR. MCCLAIN:  No, the picture of Audrey and the kids.

14   A.   Okay.

15   Q.   Now --

16   A.   Okay.

17   Q.   Right here.  Now, I know that this is painful, but the jury

18   needs to understand in terms of evaluating some of the things

19   that you've lost because of this illness, some of your -- some

20   of your personal history, Ron.

21   A.   Uh-huh.

22   Q.   Your son died in a tragic accident, didn't he?

23   A.   It was electrical accident.

24   Q.   And he died --

25   A.   Electricity.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 408   Filed 06/09/09   Page 9 of 27

1   Q.   How old was he?

2   A.   He was 14.

3   Q.   And that was one of the biggest regrets of your life.

4   A.   Yes.

5   Q.   And it's something that you live with every day.

6   A.   That's right.

7   Q.   But when Kevin came along, you got another chance to have a

8   boy to do some of the things that you'd always hoped to be able

9   to do; am I right?

10  A.   That's right.

11  Q.   And so Kevin was kind of a special gift that God gave you

12  in your view --

13  A.   Uh-huh.

14  Q.   -- to have another chance.

15  A.   Uh-huh.

16  Q.   To have a son.

17  A.   Right.

18  Q.   And so your marriage to Connie was a real blessing as you

19  look at it and particularly because it gave you another son.

20  A.   That's right.

21  Q.   And you had always hoped to be able to do all the things

22  that you were too busy to do the first time around.

23  A.   That's right.

24  Q.   And so one of the great things you looked forward to in

25  regard to Kevin was all of the physical activities, the learning

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov

Case 5:06-cv-04009-MWB-PAZ   Document 408   Filed 06/09/09   Page 10 of 27
To purchase a complete copy of the transcript.

1   to do all the physical activities that you'd always hoped to be

2   able to do.

3           MR. PAGLIARO:  Objection.  Leading.

4           THE COURT:  Sustained.  Can you rephrase the question,

5   please?

6   BY MR. MCCLAIN:

7   Q.   Tell the jury, would you, some of your aspirations, I mean,

8   when Kevin was born how you looked forward to doing things with

9   him.

10   A.   Well, he was a real healthy child.  And growing up with

11   him, he was real meek.  He was -- paid attention.  He was

12   never -- never crossed me or anything, so he was a real good kid

13   as far as I was concerned.

14   Q.   And were you -- were you a healthy guy at this point in

15   time?

16   A.   Oh, yes.

17   Q.   And this -- back in this time?

18   A.   Oh, yes, I was.  I was working my -- I think I started the

19   paper route about that time too, and I was working the paper

20   route in the morning or evenings, and a lot of times I'd put him

21   in the truck and he'd go with me.

22   Q.   So -- and was it about this time that you began to work at

23   Jolly Time?

24   A.   In '85 I went to work for Jolly Time.  He was just not very

25   old.

To purchase a complete copy of the transcript.

1  Q.   And you were working another job?  You had a paper route at

2  the time?

3  A.   Yes, yes, delivering newspapers every morning.

4  Q.   So during that time how many hours a day were you working?

5  A.   Well, I was working from three in the morning till probably

6  seven at night.

7  Q.   And you were -- were you able to do it and keep up that

8  kind of pace?

9  A.   Oh, yeah, I was able to do it.

10  Q.   And play with Kevin at night?

11  A.   Well, some, but I never got as much done as I should have I

12  guess.

13  Q.   But you had quite a bit of energy during this time.

14  A.   Sure, sure, I had plenty.

15  Q.   And when you went to work at Jolly Time back in '85, what

16  job did you have?

17  A.   Well, I was just doing janitor work at the start when they

18  put me down there.  Then later on the guy that was doing the

19  janitor work, he left, and so then they -- or excuse me.  The

20  guy that was doing the oil room left, and so I had -- they asked

21  me if I wanted to go in there.  I says, "Well, I'll try it."

22  Q.   Just to be clear, when I said in opening that you were the

23  first oil mixer, that wasn't right.  You were the second oil

24  mixer.

25  A.   Yes, right.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov

Case 5:06-cv-04009-MWB-PAZ   Document 408   Filed 06/09/09   Page 12 of 27
To purchase a complete copy of the transcript.

1   Q.   And so you took over from him in the oil mixing room.

2   A.   Yes.

3   Q.   And did that involve mixing the butter flavors up?

4   A.   Yes.

5   Q.   And during that time period that you started doing that

6   work at Jolly Time, I guess that was what?  Around '91 or '92?

7   A.   I got into the oil room in -- yeah, that was about right.

8   Q.   Okay.  Now, let's talk about the time before you got into

9   the oil room, though, Ron.  What -- you were a janitor first.

10  Did you ever work in the corn areas?

11  A.   Yes.

12  Q.   What did you do out there?

13  A.   I helped them shell -- in the fall of the year I helped

14  them put the ear corn away in the cribs, and then when we got

15  that done, they wanted shelled popcorn to package.  But us guys

16  outside had to get it ready for them.

17  Q.   Okay.  And was that a dusty job?

18  A.   Yes, it was.

19  Q.   And would you cough when you worked around that?

20  A.   Some.  I would do that during -- you know, on the weekend.

21  It didn't last very long.

22  Q.   Okay.  So but when you were in that dusty environment you

23  would cough.

24  A.   Oh, yes.

25  Q.   And from time to time were you short of breath?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 408   Filed 06/09/09   Page 13 of 27
To purchase a complete copy of the transcript.

1    A.    Well, not that much there.  It didn't bother me much there

2    because I was -- I wasn't exposed to a lot of things, you know.

3    Q.    Okay.  But whatever the symptoms were, whether it was

4    coughing and some shortness of breath, would those always clear

5    up when you got out of that dusty environment?

6    A.    Yes.

7               MR. PAGLIARO:  Objection.  Leading.

8               THE COURT:  Sustained.

9    BY MR. MCCLAIN:

10   Q.    Tell us whether or not whatever those symptoms were from

11   the corn dust, whether they were permanent or temporary.

12   A.    They were just temporary.

13   Q.    Okay.  Now, does that -- and you did that for a number of

14   years?

15   A.    Yes, uh-huh.

16   Q.    And tell us about the circumstances of how you were asked

17   to go into the mixing room.

18   A.    Well, they were just starting out there, and they had a

19   desperate situation and they needed someone to do it, and I

20   didn't even realize what I was going to be getting into.  But I

21   feel they'd guide me on my way, so I went.  I wanted to get some

22   little extra money, so I just took it on.

23   Q.    All right.  Tell me about this.  Were the folks at Jolly

24   Time good folks to work for?

25   A.    Oh, beautiful.  They took good care of their employees.  As

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 408   Filed 06/09/09   Page 14 of 27

1    long as you --

2    Q.   They really took care of their employees?  Is that what you

3    just said?

4    A.   Oh, yes.  As long as you were there, you were going to have

5    a job.

6    Q.   And so when they asked you to take over in the mixing room,

7    did you consider that to be a promotion?

8    A.   I really did because I thought I'd learn something and get

9    something good out of it.

10   Q.   And so you were willing to do it.

11   A.   Oh, yes.

12   Q.   Now, up until that time in '91, '92 when you went into the

13   mixing room, did you have good energy, Ron?

14   A.   Yeah, I had good energy.  I could pick up 50-pound bags of

15   salt and throw them around.

16   Q.   Were you able to work two jobs up until that point?

17   A.   Oh, yes, yeah, I could.  That wasn't a problem.

18   Q.   Getting up at three in the morning for the paper route?

19   A.   Yeah.

20   Q.   And work till seven at night.

21   A.   Yeah.

22   Q.   And then still did you have energy for Kevin on the

23   weekends?

24   A.   Well, not really too much, but we had a lot of help, you

25   know.  We had my two children that were not that old yet, and he

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-PAZ   Document 408   Filed 06/09/09   Page 15 of 27

1    had -- and we had quite a bit of activity at that time.

2    Q.    Still a lot of activity with your older kids and Kevin --

3    A.    Right.

4    Q.    Was it an active family?

5    A.    Right.

6    Q.    And did you notice before you went to work in the oil room

7    of having any permanent kind of health effects?

8    A.    Well, I didn't really know, no.  I just -- I didn't know

9    anything until later in the years.

10   Q.    Now, let me just be clear.  When you were away from the

11   corn shelling operation, would all those symptoms clear up?

12   A.    Oh, yes, yes, yeah.

13   Q.    So on the weekends and other times --

14   A.    Sure.

15   Q.    -- you were fine.

16   A.    Sure.

17   Q.    Now -- all right.  Then tell us about the oil mixing

18   experience that you had.  When you went in there, did you have

19   any idea that, number one, that butter flavor contained a

20   chemical called diacetyl?

21   A.    No, no.

22   Q.    So is it fair to say you had no idea --

23   A.    No.

24   Q.    -- that diacetyl had any kind of health effects because you

25   didn't even know it was in there?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 408   Filed 06/09/09   Page 16 of 27

1   A.   No.

2   Q.   And did you have any idea in general that butter flavor

3   could be hazardous?

4   A.   No, I didn't either.

5   Q.   Ron, were you making food?

6   A.   Yes.

7   Q.   And did you think that if it was food it was safe?

8   A.   That's right.

9   Q.   And so did you have any sense that this was a hazardous job

10  in any way?

11  A.   That's right.

12  Q.   Did you know it was a hazardous job?

13  A.   Well, not really that much until later.

14  Q.   Okay.  Later on that became . . .

15       But --

16       MR. PAGLIARO:  Objection to that statement, Your

17  Honor.

18       THE COURT:  Overruled.

19  BY MR. MCCLAIN:

20  Q.   Now, did the people at Jolly Time as you called it -- you

21  called American Pop Corn Jolly Time.

22  A.   Yeah.

23  Q.   It's on a street called One Fun Place; right?

24  A.   Yes.

25  Q.   Yeah.  Did the people at Jolly Time give you directions

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 408   Filed 06/09/09   Page 17 of 27

1  about how to work safely in that mixing room?

2  A.    Not really.  They were more concerned about the salt than

3  they were anything else.

4  Q.    That's what I mean.

5  A.    Yeah.

6  Q.    I mean, they gave you directions about wearing a mask.

7  A.    Yes.

8  Q.    When you were working around salt.

9  A.    Right.

10  Q.    As far as you knew, was salt the only issue that you needed

11  to wear a respirator around?

12  A.    Yes, that's what I felt.

13  Q.    All right.  And so you did.

14  A.    Yes.

15  Q.    So you did whenever you were around salt.

16  A.    That's right.

17  Q.    And, you know, I guess because there was salt in the room

18  most of the time you wore a respirator most of the time.

19  A.    That's right.

20       MR. PAGLIARO:  Objection.  Leading.

21       THE COURT:  Sustained.

22  BY MR. MCCLAIN:

23  Q.    Tell the jury when you were wearing a respirator then in

24  the room.  Was it just infrequently?  Was it, you know,

25  sometimes, or was it most of the time?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 408   Filed 06/09/09   Page 18 of 27

1   A.   Most of the time is when you -- because the biggest job was

2   to get the salt in there.  You had to scrub it through a screen

3   to get it to go through the screen, and that took quite a bit of

4   time.  Then we always had to put four bags, six bags in it, in

5   that oil.

6   Q.   Now, did you have any idea, Ron, that just lifting up the

7   lids to -- well, first of all, tell us what the process was of

8   mixing up the butter flavor into a mixture.  What were the steps

9   involved?

10  A.   Well, you had -- it came in a five-gallon bucket.

11  Q.   Five-gallon bucket.

12  A.   Yes, and you had to take the lid off and then stir it a

13  little bit to get everything stirred in.

14  Q.   What was in there -- what was in there when you would open

15  it up?

16  A.   That was the flavoring that was put in -- the butter

17  flavoring or whatever.

18  Q.   Was there oil in there already?

19  A.   Yes, yes.

20  Q.   Was there salt in there already?

21  A.   No, there was no salt in there.

22  Q.   Okay.  But there would be heated oil.  And would you then

23  pour the buckets of --

24  A.   Yes.

25  Q.   -- butter flavor into those big containers?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-RAZ   Document 408   Filed 06/09/09   Page 19 of 27

1    A.   Right.

2    Q.   And during the process that you were pouring, would you be

3    wearing a mask?

4    A.   No, I wasn't required to wear one.  I didn't think there

5    was anything wrong.  I thought it was food.

6    Q.   And so when you were in the mixing room, generally you had

7    a mask on is what you said; right?

8    A.   Till we got the salt in.

9           MR. PAGLIARO:  Objection.  Leading.

10           THE COURT:  Well, I think it was just foundational for

11   the next question.

12           MR. MCCLAIN:  It is.

13   BY MR. MCCLAIN:

14   Q.   But when you were actually pouring the buckets in, you

15   didn't know to wear a mask then.

16   A.   No.

17   Q.   Now, did you ever have to clean the tanks out after -- you

18   know, from time to time when you were done with a shift or at

19   the end of a week or how long --

20   A.   Every --

21   Q.   What was the frequency of cleaning the tanks out?

22   A.   Every Friday afternoon.

23   Q.   And at that point in time were you mixing anything up?

24   A.   No.

25   Q.   You would just be cleaning up.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-RAZ   Document 408   Filed 06/09/09   Page 20 of 27

1   A.   Right, right.

2   Q.   And when you were cleaning up those tanks, was there butter

3   flavor residue in there?

4   A.   I would think so, yes, if I'd have known that.

5   Q.   Okay.  And during that time, did you wear a mask?

6   A.   No, I didn't because I just didn't -- I wasn't told that it

7   was anything that was bad for me.

8   Q.   And what would you do to clean up during that time period?

9   How would you go about cleaning it up?

10  A.   Well, the oil that was left in the line that they had been

11  processing was -- put air on and blow it out, blow that out of

12  the line.  And after we got that blowed out, then we'd switch

13  and run hot water in the line.

14  Q.   Okay.  Just hot water.

15  A.   Hot water and soap and let that circulate for a while, get

16  the pipes heated up again.  And then when that was done, why,

17  then we'd blow the water out.

18  Q.   Okay.  Now, when this was getting heated up, could you

19  smell butter again?

20  A.   No, not that much.

21  Q.   Okay.  But it would be heated up with water in those tanks.

22  A.   That's right.

23  Q.   And did you know to wear a mask during that time?

24  A.   No, I didn't wear a mask because I figured it was -- it was

25  all food.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 408   Filed 06/09/09   Page 21 of 27

1  Q.   Now, when did you first -- when did you first start

2  noticing, Ron, that you were having permanent shortness of

3  breath?

4  A.   Well, it was back in -- probably in '0 -- latter part of

5  '05, '06 in there that I began to get bronco -- bronchitis.

6  Q.   Now, you said '05.  Did you mean '95?

7  A.   Yes.  '95.

8  Q.   '95, just a few years after you started in there.

9  A.   Yes.

10 Q.   That's what the medical records kind of said, so I -- so in

11 '95, what did you notice?

12 A.   Well, my doctor, my doctor even said, why, he says, "Your

13 lungs are so bad," he says, "You're going to have to quit and

14 get out of there," so . . .

15 Q.   Did you know what was causing it at that time?

16 A.   No, I didn't have no idea.

17 Q.   Was the doctor even -- did the doctor tell you that it was

18 butter flavor?

19 A.   No, he didn't.

20 Q.   Did that ever even enter your mind at the time that it was

21 butter flavor?

22 A.   I didn't think there was anything wrong with it.

23 Q.   But you just didn't -- did you have the physical stamina at

24 that point to stay in the mixing room lifting those buckets and

25 the other things you had to do?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 408   Filed 06/09/09   Page 22 of 27

1   A.   No.

2   Q.   So let's be clear.  When you started in the mixing room,

3   you could lift those five-gallon buckets?

4   A.   Yeah.

5   Q.   How many of them a day would you lift?

6   A.   Oh, it was -- probably depend on what we were doing that

7   day, but sometimes we mixed three different flavors at the same

8   time.

9   Q.   Okay.

10   A.   And so some of it was buckets, probably five or six.  And

11   then we had some hundred-pound boxes that the cheese, cheese

12   popcorn was made with, and it had to be put up on the platform

13   and get them dumped in to the mix too.

14   Q.   And then how about the bags of salt?  How many of those

15   would have to be lifted?

16   A.   Well, on average of 6 of them in a big batch of 300

17   gallons.

18   Q.   And how heavy were those?

19   A.   They were 50-pound bags.

20   Q.   And when you went into the mixing room, were you healthy

21   enough to do all that?

22   A.   Oh, yes, yes.

23   Q.   But by '95, could you lift all that stuff?

24   A.   Not without having problems at that time.

25   Q.   Okay.  And were you short of breath all the time?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 408   Filed 06/09/09   Page 23 of 27

1   A.   Well, a great deal of the time when I was working there I

2   was, so I was beginning to wonder what was going on.

3   Q.   Okay.

4         MR. MCCLAIN:  Your Honor, this is a good point to

5   stop --

6         THE COURT:  Okay.

7         MR. MCCLAIN:  -- with this for right now.

8         THE COURT:  That's fine.  You may step down,

9   Mr. Kuiper.  Thank you.

10        Why doesn't everybody take a stretch break.  Thank

11  you.

12        Thank you.  You may be seated.

13        MR. MCCLAIN:  This, Your Honor, is the testimony of

14  John Hallagan who was the director of FEMA who the jury has

15  heard about.

16        THE COURT:  Thank you.

17        (Videotaped deposition excerpts of John Hallagan taken

18  June 25, 2008, were played in open court.)

19        THE COURT:  Would now be a good time to take a stretch

20  break?

21        MR. MCCLAIN:  Sure.

22        THE COURT:  Thanks.

23        Thank you.  Please be seated.

24        (Continuation of videotaped deposition.)

25        THE COURT:  Would now be a good time to stop?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
for purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 408   Filed 06/09/09   Page 24 of 27

1          MR. MCCLAIN:  Yeah, I think it would be a good time to

2   stop.

3          THE COURT:  Okay.  Members of the jury, that is going

4   to conclude the evidence for today.  Please remember to keep an

5   open mind till you've heard all of the evidence.  Remember our

6   schedule tomorrow.  We'll start at 8:30, but you'll be going

7   home at 2:00.  So we'll see you tomorrow morning.  Thank you.

8          (The jury exited the courtroom.)

9          THE COURT:  Please be seated for a second.  I've

10  already looked at some law.  They don't call it willful

11  blindness, but I've read that Fifth Circuit case, and there's

12  actually some similar language from some Iowa Supreme Court

13  cases.

14         So I'm going to work on a small supplemental

15  instruction, and I'll have it to you -- I don't know if I'll

16  have it to you tomorrow, but I'll have it to you on Monday.  I'm

17  not saying I'm going to give it.  I'm just saying I'm going to

18  work on it.

19         I'm also working on a modification to the punitive

20  damage instruction as it relates to the "specifically targeted

21  at the plaintiff" language.  But I'm still toying with that

22  so . . .

23         MR. PAGLIARO:  Your Honor?

24         THE COURT:  Yes.

25         MR. PAGLIARO:  You'll allow us to submit something on

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 408   Filed 06/09/09   Page 25 of 27

1   that --

2          THE COURT:  Oh, absolutely, yeah, yeah.  I just

3   thought I'd give you my first cut, and then you can -- I think

4   it's kind of easier to -- for me to put it out there and then

5   all of you to take shots at my work than it is to get cross

6   stuff from each party and then me have to try and put it

7   together, and that's exactly why I send you my instructions

8   early.  So absolutely.  I haven't made up my mind at all.  It's

9   just something I'm looking at.  It kind of triggered when I was

10  listening to the evidence.

11          Anything else we need to take up?

12          MR. MCCLAIN:  No, Your Honor.  I think we'll be fairly

13  close to being done if not completely done tomorrow with our

14  evidence.  I think that we're going to -- the only question is

15  how much of this is left I guess.  It will be close.

16          THE COURT:  Okay.  Well, remember, they are going to

17  cross-examine the plaintiff.

18          MR. MCCLAIN:  Yeah, but it won't be very long.

19          THE COURT:  We'll see about that.  Anything else we

20  need to take up?

21          MR. PAGLIARO:  Nothing from us, Your Honor.  Thank

22  you.

23          THE COURT:  Thank you.  We'll see you tomorrow

24  morning.  Thank you.

25          MR. PAGLIARO:  Thank you, Your Honor.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 408   Filed 06/09/09   Page 26 of 27

1          (The foregoing trial was

2          adjourned at 2:31 p.m.)

3

4

5

6                    CERTIFICATE

7      I certify that the foregoing is a correct transcript

8  from the record of proceedings in the above-entitled matter.

9

10

11      ____s/ Shelly Semmler____              3-26-09
        Shelly Semmler, RMR, CRR               Date
12

13

14

15

16                    **INDEX**

**WITNESS:**                                      **PAGE:**

17

18      VIDEOTAPED DEPOSITION
          Nancy Higley                            819
          James Lockey                            820
19

20      RONALD KUIPER
          MR. MCCLAIN                             824

21      VIDEOTAPED DEPOSITION
          John Hallagan                           840
22
                        * * * * *

23

24

25

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 408   Filed 06/09/09   Page 27 of 27