IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

RONALD KUIPER and                          No. C06-4009-MWB
CONLEY KUIPER,

         Plaintiffs,                       Sioux City, Iowa
                                           February 25, 2009
    vs.                                    8:05 a.m.

GIVAUDAN FLAVORS CORP.,                     VOLUME 7 OF 12

         Defendant.
_____/


TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
UNITED STATES DISTRICT JUDGE, and a jury.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ Document 409 Filed 06/09/09 Page 1 of 134

APPEARANCES:

For the Plaintiffs:      KENNETH BLAIR MCCLAIN, ESQ.
                                STEVEN EDWARD CRICK, ESQ.
                                SCOTT A. BRITTON-MEHLISCH, ESQ.
                                Humphrey, Farrington & McClain
                                Suite 400
                                221 West Lexington
                                Independence, MO  64050

                                DENNIS M. MCELWAIN, ESQ.
                                Smith & McElwain
                                Suite 530
                                505 Fifth Street
                                Sioux City, IA  51101

For the Defendant:      JAMES D. PAGLIARO, ESQ.
                                KEVIN M. DONOVAN, ESQ.
                                THOMAS J. SULLIVAN, ESQ.
                                Morgan, Lewis & Bockius
                                1701 Market Street
                                Philadelphia, PA  19103-2921

                                V. THOMAS MEADOR, ESQ.
                                Morgan, Lewis & Bockius
                                Suite 2200
                                300 South Grand Avenue
                                Los Angeles, CA  90071-3132

                                STEPHEN J. HOLTMAN, ESQ.
                                Simmons Perrine
                                Suite 1200
                                115 Third Street Southeast
                                Cedar Rapids, IA  52401-1266

Court Reporter:        Shelly Semmler, RMR, CRR
                                320 Sixth Street
                                Sioux City, IA  51101
                                (712) 233-3846

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
For purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ Document 409 Filed 06/09/09 Page 2 of 134

 1          (Proceedings reconvened outside the presence of the

 2   jury.)

 3          THE COURT:  Thank you.  Please be seated.  I

 4   understand we have some matters to take up.

 5          MR. MEADOR:  Yes, Your Honor.

 6          THE COURT:  Yeah.

 7          MR. MEADOR:  Good morning.

 8          THE COURT:  Good morning.

 9          MR. MEADOR:  Three quick things.  On the net worth

10   issue, we need to get the record sealed.  There's been some

11   interest in getting these transcripts, and we want the number

12   sealed.

13          THE COURT:  Have any objection to that?

14          MR. MCCLAIN:  No.

15          THE COURT:  No.  We'll seal that portion of the --

16   those portions of the transcript that make any reference at all

17   to the net worth.  And I find that the interest -- the

18   proprietary -- the interest in keeping that proprietary

19   information from the general public is substantially outweighed

20   by any interest of the public in knowing that proprietary

21   information.

22          MR. MEADOR:  Thank you, Your Honor.

23          Point number 2, as the Court knows, we had our B

24   objections that related to the motions in limine, and we also

25   had some B objections outside the motions in limine.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov

Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 3 of 134
To purchase a complete copy of the transcript.

        1              The parties, Mr. Sullivan who you met the other day

        2    and Mr. Crick, have been working very hard to narrow the list,

        3    but we may -- and I'm going to look at it over this weekend.

        4    But we may have five to ten documents that we're still -- that

        5    we may need a ruling on, and we'll just have to allocate some

        6    time whenever it's convenient to the Court.

        7              THE COURT:  Sure.  Maybe we can do that -- maybe what

        8    you could do is send me an e-mail over the weekend if possible

        9    as to which exhibits you're unable to agree on, and then I can

        10   rule on that Monday morning before we get started.  Would that

        11   be okay?

        12             MR. MEADOR:  That'd be fine, Your Honor.

        13             THE COURT:  Okay.  Thank you.

        14             Anything else?

        15             MR. MEADOR:  Yes.  Point number 3, today the

        16   plaintiffs are offering through video the deposition transcript

        17   of a Karen Duros and Mike Davis.  Karen Duros was the attorney

        18   for Tastemaker, and Mike Davis was an officer of the company.

        19   We'd like to object to the playing of those videos.  We think

        20   it's cumulative and repetitive and prejudicial under 403.  The

        21   sole issue in this case is -- it's a product liability case --

        22   is what we knew or should have known.  And as the Court noted

        23   the other day, there's been plenty of evidence on that point.

        24             We've watched three days of videos, and they put in --

        25   and you've already ruled that the corporate documents go in that

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov

Case 5:06-cv-04009-MWB-BAZ  Document 409  Filed 06/09/09  Page 4 of 134
To purchase a complete copy of the transcript.

1   show what we knew or should have known.  And I don't see why we

2   have to continue with this.  It's completely cumulative.  And we

3   move that it be excluded under 403.

4          THE COURT:  Mr. McClain?

5          MR. MCCLAIN:  I think that each of the witnesses that

6   we've presented has offered something different, substantially

7   different.  You know, we've presented the testimony from inside

8   the company.  We've presented it from their outside consultant.

9   We've presented it from the perspective of their trade

10  organization, all who we think establish that this company was

11  not forthcoming and hid information that was necessary to

12  prevent this epidemic of microwave popcorn lung.

13         Karen Duros is a very short deposition.  I don't know

14  how -- 29 minutes.  And what she says is that they did this

15  purposely.  She says that they didn't distribute this

16  information because it would be a competitive disadvantage to

17  them to do it, so that goes to one of the elements that we have

18  to prove in regard to punitive damages.

19         Likewise, likewise, Mike Davis says that he had no

20  obligation to warn the customers, his customers' employees, and

21  so he didn't.  And that's contrary to what we've already seen

22  the law is, that they must do that under the Hazard

23  Communications Information Act.

24         So these depositions -- and I think that Davis is

25  fairly short too, 40 minutes long.  So we don't believe that

1    they're cumulative.  And Davis was the CEO of the company.

2              THE COURT:  Well, I think there are -- I mean, a lot

3    of evidence is cumulative.  It's whether it's unreasonably

4    cumulative, I mean, but, you know, they do testify from

5    different perspectives, and I'm not going to sustain an

6    objection to -- that it's unduly cumulative.  I mean, yeah,

7    it's -- there's some repetition, and it's to a certain degree

8    cumulative but not sufficiently so to bar it from the jury

9    hearing it.  So I suspect we may have the same situation on the

10   defense side but maybe not where we get into what some people

11   could characterize as being cumulative.

12             But what's good for the goose is good for the gander.

13   I should have stuck to the 25-hour chess clock idea, but having

14   strayed from that, I can't say that it's so cumulative that it

15   would be prejudicial or that in the exercise of my discretion I

16   should prevent the jury from hearing the evidence.

17             Is there a number 4, Mr. Meador?

18             MR. MEADOR:  No, Your Honor.  Thank you.

19             THE COURT:  Okay.  Thank you.

20             MR. MCCLAIN:  Your Honor, could I say something?

21             THE COURT:  Sure.

22             MR. MCCLAIN:  It's just a point, and I was reminded of

23   this because I ran into Jose on the way in, and I know you're

24   going to go speak to a conference on this issue tomorrow.

25             THE COURT:  Yeah.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov

Case 5:06-cv-04009-MWB-RAZ  Document 409  Filed 06/09/09  Page 6 of 134
To purchase a complete copy of the trial transcript.

1          MR. MCCLAIN:  But it may be helpful so that you're not

2     tooting your own horn to hear from -- and I think this would be

3     shared on both sides.  And I try a lot of cases.  I know you've

4     tried probably more than I have, but, you know, in a 24-month

5     period I tried 20 cases.

6          THE COURT:  That's a lot.

7          MR. MCCLAIN:  All over the country, all over the

8     country, and I don't think that the technology anywhere is

9     superior to what you've got here.  You know, we have to

10    generally bring our own stuff in and run cords all over the

11    place, and it's still not as good a product as we're getting

12    here, and I told Jose that on the way in.  He said be sure to

13    tell Judge Bennett that, so I'm following Jose's direction

14    so . . .

15         THE COURT:  Well, I think I'll print out my realtime

16    and start my talk with that tomorrow.

17         MR. MCCLAIN:  I thought that might be helpful to your

18    talk.

19         THE COURT:  I'm just kidding you, but thank you.  You

20    know, we've worked hard to try and develop the technology, and

21    we were one of the first courts in the country to have a

22    high-tech courtroom.  And you don't know all the details behind

23    it, but we had very -- we only had about 60 days to plan it

24    because it was a typical U.S. government situation where here's

25    a pot of money but you've got 60 days to spend it, and so we had

1    to make a lot of decisions very quickly.

2          But we had great people to help.  And so I think it's

3    worked out well, and we have people like Jose who do such a

4    great job keeping it running.  And we've got some new updates

5    coming.  I was hoping they'd be in for this trial.  We've got a

6    brand new document camera that's much better, much better

7    optics, and we're constantly tweaking it, so appreciate the fact

8    that counsel have been using it so effectively in this case.

9          We'll see you back here at 8:30.  Thank you.

10    MR. PAGLIARO:  Thank you, Your Honor.

11    (Recess at 8:13 a.m.)

12    THE COURT:  Ready to have the jury brought in?

13    MR. MCCLAIN:  Yes.

14    MR. PAGLIARO:  Yes, Your Honor.

15    THE COURT:  Okay.  Thank you.

16    (The jury entered the courtroom.)

17    THE COURT:  Good morning.  Please be seated.

18    Mr. McClain?

19    MR. MCCLAIN:  Yes, Your Honor.  We call Dr. Curtiss

20    Farrell to the stand.  We're going to interrupt -- just to keep

21    the Court -- we have about an hour left of Mr. Hallagan's

22    deposition, but in order to get Dr. Farrell back to work . . .

23    THE COURT:  Sure.

24    CURTISS FARRELL, PLAINTIFFS' WITNESS, SWORN

25    THE COURT:  Thank you.  Please be seated.  You can

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 8 of 134

1   adjust the chair and the microphones so you can speak directly

2   into them. And would you tell us your full name, please.

3           THE WITNESS: It's Curtiss Dean Farrell.

4           THE COURT: And can you spell your last name for us.

5           THE WITNESS: F-a-r-r-e-l-l.

6           THE COURT: Thank you.

7           Mr. McClain?

8           MR. MCCLAIN: Thank you, Your Honor.

9                     DIRECT EXAMINATION

10 BY MR. MCCLAIN:

11 Q. Are you the Curtiss Farrell that was the golf champion of

12 Nebraska when you were in high school?

13 A. That's true, sir. That's a long time ago, though.

14 Q. Well, I thought I'd embarrass you first, Dr. Farrell.

15         Would you please introduce yourself in terms of your

16 current occupation and where you live and those kind of details.

17 A. I'm a family physician that practiced in this community for

18 20-some years from 1983 through 2008, and the last few months

19 I've been helping an old med school classmate down in Nebraska

20 with his practice.

21 Q. And, Dr. Farrell, where did you go to medical school?

22 A. University of Nebraska Med Center in Omaha.

23 Q. And did you receive any post-graduate education?

24 A. Yeah, family practice residency training was actually

25 performed here in Sioux City, Iowa, in the Siouxland Medical

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov

Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 9 of 134
To purchase a complete copy of the transcript.

1    Education Foundation.

2    Q.    All right.  And, Dr. Farrell, what kind of teaching

3    experience have you had?

4    A.    When I finished the program here in 1986, gentleman by the

5    name of Dr. Rudersdorf was retiring, and they asked me to stay

6    and teach in his position which I did for 10 to 12 years after I

7    finished training.

8    Q.    And was that training other doctors to be family practice

9    doctors?

10   A.    That's correct.

11   Q.    Doctor, have you published any research of yours?

12   A.    Many years ago I was involved in a study we performed on

13   students with respect to polio and vaccines they'd received as

14   children.

15   Q.    But may -- has most of your practice been family practice

16   here in Sioux City?

17   A.    That's correct, clinical practice, yeah.

18   Q.    And can you tell us, was Ron Kuiper and is Ron Kuiper a

19   patient of yours?

20   A.    He was, yes.  No longer is as I've left the community

21   but . . .

22   Q.    And so he's being seen by someone else now.

23   A.    I assume so, yes.

24   Q.    But up until a few weeks ago, you were his doctor.

25   A.    Up until the end of May of last year.

1  Q.   Okay.  Dr. Farrell, when was the first time you saw Ron?

2  A.   I believe I first met him in 1992.

3  Q.   Okay.  And at that time what was the problem that you were

4  seeing him for?

5  A.   He'd come to the office with some complaints of -- some

6  breathing complaints.

7  Q.   And, Doctor, has that been the situation ever since '92?

8  He's had breathing complaints?

9  A.   Yes, he's had lung -- chronic ongoing lung condition and

10 problems for -- ever since I first met him.

11 Q.   Okay.  And, Dr. Farrell, has his case been a difficult case

12 for you to diagnose and treat?

13 A.   It was very puzzling and frustrating early on because his

14 presentation looked like something we thought we knew what it

15 was, and he just didn't respond to anything we were trying to do

16 for him that worked on everybody else.  It didn't work for him,

17 and it just was very frus -- you know, doctors like cold, hard

18 facts.  We like answers, and he didn't follow the book, the

19 textbook.

20 Q.   And, Doctor, have you gone through a number of potential

21 diagnoses with him and excluded those?

22 A.   Early on we began to work up his condition.  We did several

23 testing including lung functions and some blood work and ruled

24 out -- ruled out the easy things.

25 Q.   Let's talk about some of those things that you ruled out.

1   Did you rule out asthma?

2   A.   That's one condition that his presentation looked like, and

3   we basically ruled that out, yes.

4   Q.   There's some tests that we've seen in this case thus far, a

5   test, 1087.  Doctor, you can see this on your screen, and I

6   think you're familiar with these documents.  They came out of

7   your files.  Doctor, what are we looking at here?

8   A.   This is a pulmonary function test report from November of

9   1992.

10  Q.   Okay.  And these are reports you're familiar with?

11  A.   Yes.

12  Q.   And, Doctor, did -- if you look back at Exhibit --

13       MR. MCCLAIN:  The prebronchodilator report, Scott, I

14  don't know what it's --

15  Q.   Pre, Doctor, why do you do these kind of tests when you

16  think that somebody might have asthma?

17  A.   Well, the condition of asthma is a condition that we have

18  medications that can treat and you can -- when someone is

19  breathing poorly, you can give them a medication and improve

20  their breathing fairly quickly.  And you can measure that

21  difference pre- and post-medication.

22  Q.   Okay.  And here's the pre -- the prebronchodilator

23  breathing test.  And it's 38 percent predicted.  In other words,

24  he had 38 percent of what a normal person would have.

25       MR. MCCLAIN:  And then the post-bronchodilator, Scott.

1  Q.   It didn't move at all.   He was 38 percent

2  post-bronchodilator.

3  A.   He did not change.

4  Q.   He did not change.   And if he had asthma, you would expect

5  it to change?

6  A.   You would expect it to improve some, yes.

7  Q.   Okay.   Now, we've seen that there's some tests in this

8  group that he does have some change, but overall, did you decide

9  that he didn't have asthma?

10         MR. PAGLIARO:   Objection.   Leading.

11         THE COURT:   Sus --

12  A.   Well, there wasn't appreciable improvement to --

13  Q.   Doctor, just wait a minute for the judge to --

14         THE COURT:   Yeah.   Sustained.   Can you rephrase the

15  question?

16         MR. MCCLAIN:   I sure can.

17  BY MR. MCCLAIN:

18  Q.   Doctor, is it true that there are a few scattered reports

19  where he does have some improvements with bronchodilators?

20  A.   I believe there are some throughout his -- whether they're

21  done at my clinic or my practice site or elsewhere, I'm not

22  sure, but yes, there were some that suggested minimal

23  improvement.

24  Q.   Okay.   And, Doctor, what was your conclusion about whether

25  he had asthma, though, based on the whole array of tests that he

1  had over time?

2  A.   Well, my experience at that time, most asthmatics show a

3  significant improvement with treatment, and he showed at best

4  insignificant improvement.

5  Q.   Okay.  And, Doctor, most asthmatics, do they have -- you

6  know, they gain full use of their lungs again after treatment?

7  A.   They have periods where they can have normal activity and

8  normal function, and they have exacerbations where it may flare

9  again.

10  Q.   This Exhibit 1292 I think is one that you're familiar with

11  from '96, again, down at the bottom.  No, down at the bottom.

12  A.   Okay.

13  Q.   Bronchodilators do not give him much benefit from '96.

14  A.   Yes.

15  Q.   And this is your note?

16  A.   That is.

17  Q.   Okay.  And that was -- that's what overall you saw in your

18  treatment of him; is that right?

19  A.   Yes.

20  Q.   Now, Dr. Farrell, there's one thing that we'd like to clear

21  up, and that's -- there is a note that you wrote in 1997 to

22  Dr. Oggel.  First of all, who's Dr. Oggel?

23  A.   Well, it's pronounced Oggel.  Jim is an allergist that

24  practices here in -- I think still does.

25  Q.   And did you or Dr. Bainbridge send him over to Dr. Oggel?

1  A.   Yes, we asked Dr. Oggel to help us determine whether there

2  was anything allergic involved here.

3  Q.   Another thing you were trying to rule out is an allergic

4  reaction.

5  A.   Uh-huh, correct.

6  Q.   Now, before we get to what you found on that, you wrote a

7  note to Dr. Oggel.

8          MR. MCCLAIN:  Scott, would you go to Exhibit 1452?

9  Q.   And in this note you say that there was a 1988 pulmonary

10  function test.  Can you tell us whether or not you've had a

11  chance to review that and whether or not that was accurate?

12  A.   I have, and I'm sure it was an incorrect -- either

13  incorrect dictation on my part or incorrect typography from the

14  transcriptionist part of it.

15  Q.   Is there any --

16  A.   The testing refers to the testing from 1992.

17  Q.   The one that we just looked at.

18  A.   Yes.

19  Q.   Okay.  So -- and is that the only one in the records?

20  A.   The only one I'm aware of, yes.

21  Q.   Okay.  And how do you know for sure that it's the 1992

22  record and not the 1998?

23  A.   The numbers are exactly the same.

24  Q.   Okay.  And is that ever possible, that the numbers be

25  exactly the same on different dates?

1    A.    Remotely, I mean.

2    Q.    Yeah.  But the only ones that you have are the '92 records,

3    and they show these numbers; is that right?

4    A.    That's correct.

5          MR. PAGLIARO:  Objection.  Leading.

6          THE COURT:  Overruled.

7    BY MR. MCCLAIN:

8    Q.    Doctor, as far as you know, was there ever a 1988 pulmonary

9    function test in your records?

10   A.    No, I do not believe there was.

11   Q.    And you're writing this record, and so the one you have is

12   a '92 record?

13   A.    Yes.

14   Q.    Okay.  Now -- okay.  I wanted to clear that up so we had

15   that out of the way on the record.  Now here let's go back to

16   Dr. Oggel's test.  Did I say that right?  Is it Oggel?

17   A.    Oggel, yes.

18   Q.    Okay.  This is Exhibit 1458 in evidence.  Is this the

19   allergy tests that you had done?

20   A.    This is a report of the testing that they typically do with

21   allergy testing.

22   Q.    Okay.  And was he allergic to anything that they tested

23   for?

24   A.    Nothing whatsoever.

25   Q.    And so, Doctor, was this helpful in ruling out such things

1    as corn dust as being the cause of his disease?

2    A.    They certainly checked for dusts, molds, pollens, things

3    like that that are common allergens to most people that suffer

4    with allergies.

5    Q.    The -- there's a note that -- 1298 of yours.  Hang on

6    before we go to that.  Let's -- did you -- in reviewing this

7    allergy panel, was it helpful in ruling out other things like

8    farmer's lung?

9    A.    There are some pulmonary conditions that have an allergy

10   basis, yes, and we did not turn anything up along those lines.

11   Q.    Okay.  And what about something like silo filler's disease.

12   We've heard that term.  Are you familiar with that?

13   A.    It's a term that hasn't been around for many years.  I've

14   never seen a case of it that I'm aware of.

15   Q.    Okay.  And you ruled that out too in his case.

16   A.    As far as we know, yes.

17   Q.    So in terms of this diagnosis by elimination, you've ruled

18   out asthma.  You've ruled out allergies.  You've ruled out silo

19   filler's disease.  You've ruled out farmer's lung.  Those are

20   things you did in your own practice.

21            MR. PAGLIARO:  Objection.  Leading.

22            THE COURT:  Sustained.

23   BY MR. MCCLAIN:

24   Q.    Doctor, did you rule those things out?

25   A.    We ruled out several things including a condition called

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 17 of 134

1   Alpha 1 antitrypsin deficiency.

2   Q.   What is that?

3   A.   It's an inherited disorder that an enzyme that the protein

4   the body makes that most people have in certain levels, those

5   people don't make enough of it, and they have pulmonary and

6   sometimes gastrointestinal conditions because of that.

7   Q.   Now, Doctor, have you had an unofficial role out at

8   American Pop Corn?

9   A.   I took on a position, yeah, back in the late '80s, early

10  '90s kind of as their company doc and took care of many of their

11  executives as well as their workers when they had issues needing

12  attention.

13  Q.   And from time to time, did you consult with the people at

14  American Pop Corn in management about their cleanliness

15  practices around the plant?

16  A.   I did.  I made I believe more than one trip to the plant

17  for a walk-through and looking at the practices and how they

18  were doing things.  And their safety director I believe was his

19  title was tip-top, was on top of everything, and was very good

20  about asking me if I had any input, would help him determine

21  things they could do better.

22  Q.   As far as you could tell, was the plant well maintained and

23  clean?

24  A.   Very much so.

25  Q.   And did they follow all the recommendations that you made

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 18 of 134

1   in terms of things you saw to make it even a cleaner

2   environment?

3   A.   Yes, they did as far as I know.

4   Q.   Were they concerned about safety out there based upon your

5   observation?

6   A.   Extremely so.

7   Q.   All right.  And were very concerned about their employees.

8   A.   Yes.

9   Q.   So Ron was your patient.  And you had some familiarity with

10  his workplace.  Did there come a time in 1995 or so when you

11  became concerned that he couldn't physically do the work anymore

12  in the mixing room?

13  A.   Yes.  Earlier on when we finally came down, we ruled all

14  these other things out, I was under the working assumption that

15  his condition was most likely caused or irritated by the

16  microwave salt that was used in the plant which is a very fine

17  flour-like substance that the -- aerosolizes quite easily, and I

18  wanted to get him away from that as quickly as we could.

19  Q.   Was there anything in the literature which said that salt

20  could cause this?

21  A.   None whatsoever, just a common-sense analysis.

22  Q.   Okay.  So you -- did you make a recommendation to get him

23  out of the mixing room because of the salt?

24  A.   It was my --

25          MR. PAGLIARO:  Objection.  Leading.

1  A.  At that time --

2          THE COURT:  Overruled.

3  A.  My working impression was the salt had to be the irritant

4  that was causing him his condition.

5  Q.  But did you recommend to get him out of the mixing room or

6  leave him in there?

7  A.  No, I think I asked Mr. Hoffman to see if they couldn't

8  find another place for him to move him out of the mixing room,

9  yes.

10 Q.  Okay.

11         MR. MCCLAIN:  Let's show him Exhibit 1298.

12 Q.  And I think this is a handwritten note that you can

13 probably read better than I can -- maybe you can -- not very

14 well.  Can you read that?

15 A.  Oh, give me a second.  I can probably move around and find

16 it.  Not well enough to vocalize it I don't believe.  The only

17 portion of it that I can read mentions a little bit about some

18 eye symptoms that he had not been having and would try to get

19 him out of the present situation as soon as possible.

20 Q.  I think that I can -- it says Ron probably getting -- and

21 then I can't read that word -- in --

22 A.  Influenza.

23 Q.  -- influenza in addition to eye irritation from microwave

24 salt, would like to get him out of the present situation as soon

25 as possible due to his baseline lung problems.  Dr. Farrell.  Is

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 20 of 134
To purchase a complete copy of the transcript

1  that -- here.  I've got a hard copy.  Is that close to what it

2  says?

3  A.   I believe that's reasonably accurate, yes.

4  Q.   And that's your handwriting?

5  A.   It is.

6  Q.   So, Doctor, was it salt at the time that you were worried

7  about?

8  A.   That's what I was most concerned about causing his

9  condition, yes.

10 Q.   Back in 1995, did you have any sense that butter flavor

11 could cause permanent lung injury?  Was that something that even

12 crossed your mind?

13      MR. PAGLIARO:  Objection.  Leading.

14      THE COURT:  Sustained.

15 A.   Never even thought about it.

16 Q.   I gotta ask another question.  Doctor, did you have any

17 idea back in 1995 that butter flavor could cause permanent lung

18 injury?

19 A.   None whatsoever.

20 Q.   So did Ron get moved out of the mixing area in 1995?

21 A.   I believe he did.

22 Q.   Did he improve?

23 A.   No.

24 Q.   Doctor, up until I guess a couple years ago, 2007, did you

25 still believe that the salt was the issue in regard to microwave

1   popcorn workers?

2   A.   That was my failed belief, yes.  I didn't think it was

3   anything else.  I was not aware of anything else that would have

4   been causing his condition, no.

5   Q.   I mean, Doctor, even through 2007, had you done research on

6   what's called bronchiolitis obliterans syndrome or what's called

7   popcorn workers' lung?  Had you done medical research on the

8   subject?

9   A.   Well, I'm sure I went to all the places I normally go to

10   try to find information on what could be associated with his

11   condition.  And there really wasn't anything written about it.

12   Q.   That you could find --

13   A.   In the last few years.

14   Q.   -- in 2007.  Look at 1292, though.  You -- and I think this

15   fixes it in time.  You say here, "Bronchiectasis, Ron has been

16   plagued with severe bronchiectasis pulmonary issues felt to be a

17   consequence of microwave popcorn salt exposure while employed at

18   Jolly Time here in Sioux City.  He mimics a severe COPD-type

19   picture with clinical appearance of pulmonary hypertension and

20   its sequelae if cor pulmonale syndrome."  And I'm going to ask

21   you about that in a minute.  "I believe the pulmonary guys

22   labeled it obliterans bronchiolitis."

23         MR. MCCLAIN:  Go down to the bottom there.

24         MR. PAGLIARO:  Objection.  Terminology's bronchitis,

25   Your Honor.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 22 of 134

 1          MR. MCCLAIN:  Oh, I'm sorry.  Let's go back if I

 2   misread that.

 3          THE COURT:  Objection's sustained.

 4   BY MR. MCCLAIN:

 5   Q.   Obliterans bronchitis.  Is that what you wrote?  Is that

 6   what you wrote?

 7   A.   Yes.

 8   Q.   And, Doctor, it says, "Severe pulmonary disease labeled

 9   obliterans bronchitis presumably secondary to microwave popcorn

10   salt exposure.  Plaintiff has never smoked or had significant

11   smoke exposure either primarily or secondarily in his lifetime."

12          First of all, Doctor, up through 2007, did you think

13   that the issue among microwave popcorn workers was a salt issue?

14   A.   That was my impression, yes.

15   Q.   Okay.  Now, you mentioned something here in regard to Ron's

16   history.  Did he ever smoke?

17   A.   Not that I'm -- no, none -- no smoking history at all.

18   Q.   Or drink?

19   A.   I doubt it.  Very rarely, if any.

20   Q.   Clean-livin' fella.

21   A.   Very clean.

22   Q.   So in terms of your process of elimination and diagnosis by

23   elimination, you had focused on the mixing room; is that

24   correct?

25   A.   Well, we didn't have an answer to his condition and what

1  was the cause of it and were looking at his workplace, see if we

2  could identify what might be causing issues there.

3  Q.   Okay.

4  A.   And thus the microwave salt was the easiest one to grab

5  ahold of.

6  Q.   Now, you were deposed two years ago.  And since that time,

7  have you had an opportunity to review medical articles on the

8  subject?

9  A.   I have.

10 Q.   And review Dr. Parmet's report?

11 A.   I have.

12 Q.   And, Doctor, did you look at some of these for me?

13 A.   At my request, I asked if there were any literature that I

14 could review that could enlighten me a little bit more about the

15 claim of this chemical and the condition.

16 Q.   Okay.  And did you review that stuff?

17 A.   I have.

18 Q.   And, Doctor, did you review Dr. Parmet's report?

19 A.   I did.

20 Q.   And review his credentials?

21 A.   Yes, sir.

22 Q.   And what was Dr. Parmet named just last year or this year?

23 A.   I don't remember the exact title.  He was given a special

24 award for the occupational doctors in the country.

25 Q.   Occupational physician of the year?

1      MR. PAGLIARO:  Objection.  Leading.

2      THE COURT:  Sustained.

3  A.    Yes.  Thank you.

4  Q.    What was he named?

5  A.    Occupational physician award of the year.

6  Q.    And did you review the Kreiss article?

7      MR. MCCLAIN:  Scott, would you go to that, Exhibit

8  1044?

9  A.    Yes, I did review this article.

10  Q.    And did you review the -- 1235, the Occupational

11  Bronchiolitis Obliterans Masquerading as COPD article?

12  A.    I did.

13      MR. MCCLAIN:  Scott, that's 1235, I believe, the front

14  page of that.

15  Q.    Occupational Bronchiolitis Obliterans Masquerading as COPD.

16  In fact, you thought that this looked like COPD, but he was

17  never a smoker; right?

18  A.    That's correct.

19      MR. PAGLIARO:  Objection.  Leading.

20      THE COURT:  Sustained.

21  BY MR. MCCLAIN:

22  Q.    Doctor, did you at one time label this as COPD?

23  A.    I believe Ron had many mislabels throughout the early

24  process of his condition.

25  Q.    And Bronchiolitis Obliterans Syndrome in Popcorn Production

1  Plant Workers, did you review this article, Exhibit 969?

2  A.    Yes, I did.

3  Q.    And, Doctor, did you review this article, Exhibit 1234,

4  Bronchiolitis Obliterans Syndrome in Chemical Workers Producing

5  Diacetyl For Food Flavoring?

6  A.    Yes, I did.

7  Q.    And did you review this article, the chapter 2140, Lung

8  Disease in Flavoring and Food Production, Learning From Butter

9  Flavoring, by Kreiss and others?

10  A.    Yes, I briefly reviewed this, yes.

11  Q.    Now, Doctor, do you now have an opinion upon reviewing

12  these about what the cause of Ron's disease is?

13         MR. PAGLIARO:  Objection.  Rule 26.  This is a

14  treating physician, Your Honor.

15         THE COURT:  Overruled.

16  A.    Well, I'm a man of many opinions, and I do have an opinion

17  with regard to Ron, and he obviously had a condition that I

18  couldn't explain, and this -- all this information explains it.

19  Q.    All right.  And what do you mean by all this information

20  explains it?

21  A.    His condition that we struggled to come up with a label and

22  we couldn't, he fits this picture so closely, it's obviously

23  what he -- only thing it can be.

24  Q.    Doctor, do you hold an opinion to a reasonable degree of

25  medical certainty that he has bronchiolitis obliterans syndrome?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 26 of 134

1    MR. PAGLIARO:  Objection.  Same basis, Rule 26, not

2  listed as an expert.

3    THE COURT:  Overruled.

4  A.    I do.

5  Q.    And, Doctor, do you hold that opinion to a reasonable

6  degree of medical certainty?

7  A.    Yes, I do.

8  Q.    And, Doctor, do you have a belief that his exposure to

9  butter flavor was a substantial cause of this disease?

10    MR. PAGLIARO:  Same objection, Your Honor.

11    THE COURT:  Thank you.  Same ruling.  Overruled.

12  A.    Well, that conclusion is certainly substantiated by the

13  recent literature I have reviewed, yes.

14  Q.    Now, Doctor, do you know based upon your inspections out at

15  the American Pop Corn plant that they did, in fact, use butter

16  flavor in that mixing room?

17  A.    I can't say that I necessarily recall from the tours, but I

18  do know that this company produced a product they called

19  Blast O Butter which was obviously heavily butter flavored.

20  Q.    And that's what they produced, and how they went about

21  doing that you're just not sure, but you know they produced

22  Blast Of Butter.

23  A.    Yeah.

24  Q.    Now, there's -- Doctor, there's another question that has

25  come up, and that is Dr. Bainbridge, do you know Dr. Bainbridge?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 27 of 134

1    A.   Yes, I do.  Dr. Craig Bainbridge I've known probably since

2    1983.

3    Q.   Okay.  And you're the one that brought Dr. Bainbridge into

4    this case?

5    A.   He's a pulmonary specialist here in town and at that time

6    was practicing with a couple other pulmonary doctors, and I'd

7    asked him to help us with this case, see if we could identify

8    the condition I had to treat.

9    Q.   And up until a few months ago, was he able to make a

10   determination on this issue in terms of a final judgment?

11   A.   Not that I'm aware of that he's ever really technically

12   labeled, no.

13   Q.   Okay.  I want to show you a record from 1-16-09 that's in

14   evidence, 2184, from Dr. Bainbridge.  He says in this record he

15   has a history of exposure to diacetyl in the mixing room of

16   microwave popcorn, and, consequently, there are issues about the

17   possibility of having microwave popcorn lung.

18          Doctor, is that consistent with your opinion today?

19          MR. PAGLIARO:  Objection.  Same basis, Your Honor.

20          THE COURT:  Overruled.

21   A.   This, I think, is very well stated.

22   Q.   Okay.  Now, Doctor, there's an issue that's come up in this

23   case that the jury's received an instruction on on so-called

24   untimeliness.  And, Doctor, I just want to ask you, by January

25   30 of 2004, did you know that Ron Kuiper's injuries had been

1  caused by exposure to Givaudan's butter flavor containing

2  diacetyl in the mixing room at American Pop Corn?

3  A.  No.  That to my knowledge was not available in the

4  literature anywhere that we would have known that.

5  Q.  Okay.  So you didn't have that knowledge.

6  A.  Had none, no.

7  Q.  Did you speak to Ron about this issue after that date?

8  A.  I believe Ron and I have discussed over the years that I

9  felt his condition was from the microwave salt.  Thus we moved

10  him out of that mixing area.

11  Q.  Okay.

12  A.  And I believe he saw Dr. Parmet in Kansas City at some

13  point.  And when he came back, we discussed Dr. Parmet had

14  mentioned there was another chemical that may have been the

15  culprit.

16  Q.  Okay.  We've had it established on the record that his

17  meeting with Dr. Parmet was in April of 2006.  Does that refresh

18  your recollection about the timing of your conversation with Ron

19  after he came back from seeing Dr. Parmet?

20  A.  I can't say it necessarily refreshes my memory.  I just

21  recall that we discussed that my assessment that it was

22  microwave salt, Ron was quick to correct me.

23  Q.  Okay.  After seeing Dr. Parmet.

24  A.  I believe that's when he discovered that there may have

25  been something else, yes.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 29 of 134

1   Q.   Okay.  Was that the first time you heard about butter

2   flavor being the cause?

3   A.   As far as I know, yes.

4   Q.   Okay.  That was in 2006 for you.

5   A.   Correct, yes.

6   Q.   And so in terms of this date that we've been given in the

7   instruction, by January of 2004, you didn't know that, and to

8   your knowledge based on your conversations, when was the first

9   time Ron learned about it?

10          MR. PAGLIARO:  Objection.  Leading.

11          THE COURT:  Overruled.

12  A.   Not until two years later at least.

13  Q.   Okay.  Till 2006.

14  A.   Yes.

15  Q.   Okay.  Now, there's another thing that I want to talk

16  about.  One, based on -- how many patients have you seen over

17  the years, Doctor?

18  A.   I couldn't even fathom an estimate.

19  Q.   Thousands?

20  A.   Thousands, hundreds of thousands probably.

21  Q.   In this community?

22  A.   Here and elsewhere, yes.

23  Q.   Are -- number one, is an individual like Ron, a 69-year-old

24  man who has been a clean liver, not a smoker, not a drinker, is

25  his condition different than what you would expect based upon

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 30 of 134
To purchase a complete copy of the transcript

1  all his other normal demographics and family history?

2  A.   Very much so.  His activity level is markedly limited by

3  his lung function.

4  Q.   And, Doctor, we saw the medical record.

5           MR. MCCLAIN:  Would you bring that up about cor

6  pulmonale again, Scott?  I can't remember where that was.  You

7  make this in -- what was the year of this record, Scott?

8  Q.   This is '07.  You say he has clinically presented as

9  bronchiolitis obliterans with resultant pulmonary hypertension

10 presenting as cor pulmonale picture.  What does that mean?

11 A.   Cor pulmonale is a condition that is kind of a trickle-down

12 effect from the lungs being damaged, and it begins to put

13 pressure on the heart to keep up, and the heart can't keep up.

14 The right side of the heart begins to fail, and fluid begins to

15 collect in the body, and it can't be gotten rid of.

16 Q.   And what do you mean by resultant, Doctor, when you say

17 that it's a result of the bronchitis obliterans as you called it

18 in this note?

19 A.   Well, many lung conditions that cause severe damage to the

20 lung function, the blood doesn't get through the damaged tissue

21 well, and the blood pressure within the lung itself increases,

22 and that has a back-filling pressure on the heart itself, and

23 the heart eventually . . .

24 Q.   Doctor, do you have an opinion as to whether or not his

25 pulmonary hypertension and cor pulmonale are the result of his

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 31 of 134
To purchase a complete copy of the trial transcript.

1   lung problems?

2          MR. PAGLIARO:   Objection.   Same basis, Your Honor, as

3   before.

4          THE COURT:   Overruled.   You may answer.

5   A.   I do.   Really at least to my understanding by definition,

6   cor pulmonale suggests pulmonary cause of the failure.

7   Q.   Okay.   And so is it fair to say that his heart problems are

8   caused by his lung problems?

9   A.   The finding of the clinical appearance he presented with,

10  yes.

11  Q.   And what about the swelling he experiences in his legs?

12  A.   That's part of the conditions.

13  Q.   Okay.   And so all of these cascade from the lungs.

14  A.   Yes.   The heart, the lung, and the kidneys all work as a

15  team.   And if one's not doing its job, the others can't do their

16  job.

17  Q.   Finally, Doctor, have you at my insistence agreed to send

18  me a bill for your time?

19  A.   Begrudgingly.

20  Q.   And can you tell me why it is you're here?   Why did you

21  agree to come?

22  A.   I promised Mr. Kuiper many months ago when I last saw him

23  that if this condition he had ever came to this I would be more

24  than happy to come back and testify on his behalf.

25  Q.   Okay.   And you reviewed those records in order to be

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov

Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 32 of 134
To purchase a complete copy of the transcript.

1  prepared today.

2  A.   I did.

3  Q.   Okay.  Thank you.

4  A.   I actually hand carried them.  They're in my car.

5         MR. MCCLAIN:  Thank you, Dr. Farrell.

6         THE WITNESS:  You're welcome.

7         THE COURT:  Why don't we give everybody a stretch

8  break before your cross-examination.

9         Okay.  Thank you.

10        Mr. Pagliaro, you may cross-examine when you're ready.

11        MR. PAGLIARO:  Thank you, Your Honor.  Appreciate it.

12                      CROSS-EXAMINATION

13  BY MR. PAGLIARO:

14  Q.   Good morning.

15  A.   Good morning.

16  Q.   Good morning.  How are you, Dr. Farrell?  Beautiful day

17  today, isn't it?

18  A.   Well, it is.

19  Q.   Dr. Farrell, you -- your practice has been a family

20  practice; isn't that right, sir?

21  A.   Family practice is my training, that's correct.

22  Q.   And I believe you told us that a family practice in your

23  words concerns healthcare from conception to the grave; is that

24  right?

25  A.   Basically, yes, and everything in between.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

1    Q.    Everything in between.  Now, in the course of a family

2    practice doctor, though, there are issues that come up that

3    affect certain body systems or organs in the body; isn't that

4    true?

5    A.    I'm not exactly sure what you're asking.

6    Q.    All right.  Let me be more specific.  So if someone comes

7    to you and says, "I have breathing problems," then you know, for

8    example, that his lungs are affected or her lungs are affected;

9    is that true?

10   A.    Well, not necessarily just the lungs.  There are other

11   things that can cause breathing problems.

12   Q.    But if a patient comes to you exhibiting some problem like

13   that, many times a family practitioner will send them off to see

14   a specialist; isn't that true?

15   A.    At some point.

16   Q.    Yeah.  And you, in fact, sent Mr. Kuiper off several times

17   to see specialists, didn't you?

18   A.    I did.

19   Q.    And when you sent him off to see Dr. Oggel, you were

20   considering that there may be some allergies that Mr. Kuiper

21   had; is that true?

22   A.    We were trying to check that off from the list of things

23   that might be causing his condition.

24   Q.    And Dr. Oggel's specialty is allergy immunology; isn't that

25   right?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 34 of 134
To purchase a complete copy of the transcript

1    A.    That's correct.

2    Q.    And by the same token, when -- at some point during your

3    treatment of Mr. Kuiper, you actually sent him to see a

4    pulmonologist; isn't that true, Dr. Farrell?

5    A.    That's correct.

6    Q.    And what is a pulmonologist?  Could you tell the jury this

7    morning?

8    A.    A pulmonologist is a medical doctor who has had special

9    training in lung disease, primarily just lung disease.

10   Q.    And no disparagement of part of your profession, but you

11   haven't had that special training that a pulmonologist has in

12   lung diseases, have you, Dr. Farrell?

13   A.    Not to the extent they have, no.

14   Q.    And there's a really good pulmonary practice here in Sioux

15   City, isn't there?

16   A.    Excellent.

17   Q.    And Dr. Bain --

18   A.    Highly respected.

19   Q.    Sorry.  I didn't hear the last --

20   A.    Highly respected.

21   Q.    Thank you, sir.  And that practice includes Dr. Bainbridge

22   who we talked about; right?

23   A.    Yes.  He was, I believe, the founding partner of the group.

24   Q.    And then there's a Dr. Bacon in that practice as well,

25   isn't there?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 35 of 134

1   A.   Yes, Ross Bacon, Bob Stewart, and Craig Bainbridge and
2   another gentleman I believe by the name of Gupta has joined them
3   within the last several years.
4   Q.   Yes, sir.  And in point of fact, Mr. Kuiper was seen by
5   Dr. Bainbridge repeatedly, wasn't he?
6   A.   I believe he saw him many times over the years.
7   Q.   And he was referred there by you because you wanted him to
8   see -- Mr. Kuiper to see a pulmonologist; right?
9   A.   Yes, I had answers I couldn't answer or questions I
10  couldn't answer, and I needed some help.
11  Q.   And Dr. Bacon saw him as well, didn't he?
12  A.   I believe he did someplace along the way, yes.  I can't say
13  when.
14  Q.   And you told the jury in response to one of Mr. McClain's
15  questions that you haven't actually seen Mr. Kuiper since May of
16  1908 (sic), treated him; is that right?
17  A.   I've not seen -- I believe since May 20 was the last I saw
18  him.
19  Q.   May 20.
20  A.   2008.
21  Q.   So that's about ten months ago roughly?
22  A.   Pretty close estimate, yes.
23  Q.   And since that time you've been in Nebraska I think you
24  say?
25  A.   Back and forth, back occasionally on weekends to do some

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 36 of 134

1  tidying up with our home, but been in Nebraska, yes.

2  Q.   And you visited with Mr. Kuiper's lawyers, though, didn't

3  you, in that time period?

4  A.   Just within the past week or so, yes.

5  Q.   And in the past week, all those articles Mr. McClain

6  flashed in front of you, did you read all those in the past

7  week?

8  A.   I have.

9  Q.   And those articles were gathered together and given to you

10  by Mr. McClain or one of his lawyers; is that right?

11  A.   At my request.  I asked them if they could supply me with

12  anything from the current literature that could help me open my

13  eyes to this condition.

14  Q.   Now, you're not here to testify about what Dr. Bainbridge

15  or Dr. Bacon knew about these lung conditions, are you?

16  A.   I couldn't even guess what they have read or know about it,

17  no.

18  Q.   So to the extent that you weren't certain about the cause

19  as you testified for a period of time, even as late as nine --

20  as 2007, you said you weren't certain of the cause; is that

21  right?

22  A.   I believe that's -- in fact, looking back, I may have been

23  leading Dr. Bainbridge a little bit when I sent Ron over to see

24  him because I think I was pretty adamant about my feeling it was

25  something at the plant and perhaps the microwave salt that was

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 37 of 134

1  causing his condition.

2  Q.    You're not aware or can't testify as to what Dr. Bainbridge

3  knew in 2001, 2002, or other times when he saw Mr. Kuiper.

4  A.    Not at all.

5  Q.    Now, let's talk a little bit about the condition that

6  Mr. Kuiper has.  You talked about at one point that you thought

7  it might be related to asthma; is that right?

8  A.    Well, his condition presented with a cough and shortness of

9  breath.  And those are symptoms commonly -- early symptoms of

10  people who struggle with asthma, yes.

11  Q.    And at another time you actually described his condition

12  as, quote, an asthma-like condition.  Do you remember that,

13  using those words, sir?

14  A.    I don't recall asthmatic.  I know I used the term

15  COPD-like.

16  Q.    Did you ever refer to Mr. Kuiper's condition as popcorn

17  lung, Dr. Farrell?

18  A.    I think there were several labels we tagged on to it along

19  the way, and only within the last few weeks I've come about --

20  that I've really become familiar with the condition

21  bronchiolitis obliterans syndrome.  That's not a condition

22  that's been in the literature till the most recent months.

23  Q.    You haven't seen it since --

24  A.    I have not seen it, no, just until recently.

25  Q.    But you'll agree with me that some of the articles

Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 38 of 134

1  Mr. McClain shared with you go back to 2002, and they do talk

2  about bronchiolitis obliterans, don't they?

3  A.   I believe the original condition -- bronchiolitis

4  obliterans is a pulmonary condition that I believe has been in

5  the pulmonary literature and textbooks for many years.

6  Q.   But Dr. Kreiss's article that talks about bronchiolitis

7  obliterans in the context of the Jasper popcorn plant, that goes

8  back to 2002, doesn't it?  You just read that.

9  A.   I don't know much about Jasper.  I don't know who Jasper --

10 Jasper was the name of some cartoon character in my book.  I

11 don't know what Jasper is.

12 Q.   All right.  Fair enough.  Let's talk about popcorn lung.

13 At any time did you diagnose Mr. Kuiper with what you called

14 popcorn lung?

15 A.   I think that's a term we labeled it with.  It was a

16 pulmonary condition that we felt was caused by something he was

17 exposed to at the popcorn plant.

18 Q.   So at one point you diagnosed Mr. Kuiper with a pulmonary

19 condition that you thought was related to the plant; is that

20 correct?

21 A.   That was what?

22 Q.   That you thought was related to the plant.  You called it

23 popcorn lung.  Did you diagnose Mr. Kuiper with that condition?

24 A.   That's the term we used, yes.

25 Q.   And the term bronchiolitis obliterans, was the first time

1　you heard that term from Mr. Kuiper himself, Dr. Farrell?  Do

2　you recall?

3　A.　I don't believe it was from Mr. Kuiper, no.

4　Q.　Okay.  And where do you think it was at the first time when

5　you actually heard that term used, bronchiolitis obliterans, in

6　conjunction with this situation?

7　A.　If memory serves me correctly, I believe the term was not

8　really part of my vocabulary until the time surrounding the

9　deposition in 2007.

10　Q.　Okay.  Now, let's talk about when you first saw Mr. Kuiper.

11　You first saw him I believe you testified in about 1992; is that

12　correct?

13　A.　That's correct.

14　　　　MR. PAGLIARO:  Could you put up 3102, Cort, please?

15　Q.　And I believe you talked about this.  You can see it on the

16　screen there, Dr. Farrell, if you take a look.  Those are your

17　notes, aren't they, Dr. Farrell?

18　A.　I'm sorry.  I didn't hear you correctly.

19　Q.　Are those your notes?  Maybe I'll move the mike up a little

20　bit.

21　A.　Yes.

22　Q.　And the note on the left you'll see a date there.

23　　　　MR. PAGLIARO:  Could you go up to the top of the page,

24　Cort, please?

25　Q.　You see a date there.  It says November 16, 1992; is that

1    correct?

2    A.    That's correct.

3    Q.    And you see there some -- that there was -- you make

4    reference to an abnormal pulmonary function.  Do you see that,

5    sir?

6    A.    Yes, it was in the context of my dictation.  There's a

7    line.

8    Q.    And you make the point that Richard -- although it's

9    Ronald, isn't it?  You had that name wrong, don't you?  You see

10   that?

11   A.    I hate to have to admit those type of typos are

12   unfortunately common in medicine as well as I'm sure other

13   industries.

14   Q.    Believe me, they are common in law too.  But the point is

15   it was Ronald Kuiper, wasn't it?

16   A.    Yes, this was Ron, yeah.

17   Q.    And you talk about the fact that you wanted Mr. Kuiper to

18   come in and repeat his pulmonary functions.  Do you see that?

19   A.    Let me catch up with you, please.

20   Q.    Yep.  The third sentence.  I want him to come in and repeat

21   them.  Did I read that correctly?

22   A.    Yes, the pulmonary functions as I recall originally -- when

23   this testing is done, there's a large component to it of the

24   effort put out by the patient.

25   Q.    They're effort-dependent tests; isn't that right,

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 41 of 134

1　Dr. Farrell?

2　A.　There needs to be some coaching done.

3　Q.　Yeah.  And at that time you diagnosed him with moderate to

4　severe obstruction.  And you suggested starting on some

5　medications for this.  Do you see that?

6　A.　Yes.  But an FEV1, the term FEV1 which stands for forced

7　expiratory volume in one second, when we take a full deep

8　breath, we can take in a certain volume.  And the amount of that

9　volume that we can force back out with forced exhaling within

10　the first second is called FEV1.

11　　　MR. PAGLIARO:  I move to strike that as nonresponsive,

12　Your Honor.

13　　　THE COURT:  Sustained.

14　BY MR. PAGLIARO:

15　Q.　The question I asked, Doctor, was did you diagnose him at

16　the time -- in your note, you say has mod -- just -- has

17　moderate to severe obstruction.  Is that what you wrote in your

18　note?

19　A.　That's correct.

20　Q.　And you wrote in your note, "I suggested starting on some

21　medications for this."  And you gave him inhalers; is that

22　correct?

23　A.　That's correct.

24　Q.　Now, you saw him again in -- the bottom of the page, in

25　December a few weeks later.  Do you see that?  December 8, 1992.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 42 of 134

1    A.    Yes, December 8, 1992.

2    Q.    Okay.  And you talk in the first line about Ron Kuiper and

3    he has moderately severe COPD.  Do you see that according to

4    your note?

5    A.    Yes.

6    Q.    And COPD stands for chronic obstructive pulmonary disease,

7    doesn't it, Dr. Farrell?

8    A.    It does.

9    Q.    And you talked about the fact that they moved him out of

10   the area.  He was working with steam and salt.  Do you see that?

11   A.    Yes.

12   Q.    Indicating that there was a relation between the breathing

13   problems and the fact that -- where he was working; is that

14   true?

15   A.    The exposures he was having, yes, at work.

16   Q.    And you go on to say, "He doesn't move air well."  Do you

17   see that in the next sentence?  On exam he doesn't move air

18   well?

19   A.    That's correct.

20   Q.    Then you say, "He said he tried to use the inhalers, but

21   they caused him to cough so much that he quit using them"; is

22   that correct?

23   A.    Yes.  He must have relayed to me that he didn't use the

24   inhalers I had given him because they made him cough.

25   Q.    And your note states in 1992 that Mr. Kuiper told you that

1    he's had this problem for maybe three years.  Do you see that?

2    A.    That's correct.

3    Q.    And then you go on to say in the next sentence, "However, I

4    see back in August of 1988 that he had some symptoms similar to

5    this and was seen by Dr. Fell."  Do you see that?

6    A.    Yes.

7    Q.    And you looked up some notes from Mr. Kuiper's record and

8    saw that he saw another doctor, Dr. Fell, and had been

9    complaining about breathing symptoms at that time in 1988; is

10   that correct?

11   A.    Yes.

12   Q.    Now, do you remember -- do you recall the next time you saw

13   Mr. Kuiper?

14   A.    I don't recall exact time, no.

15   Q.    There's a note --

16           MR. PAGLIARO:  Would you put up 3186?

17   Q.    Mr. McClain showed you your handwritten note.  I'm going to

18   show you a typewritten note.  Now, this is March 3, 1995, isn't

19   it, Doctor?

20   A.    It's a note from March 3, 1995, that's correct.

21   Q.    And this is from a Dr. Alan Kessler; is that correct?

22   A.    Yes.  Dr. Kessler was one of the student doctors in the

23   grads program.

24   Q.    And you were actually a doctor that helped train the

25   residents like Dr. Kessler; isn't that true?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 44 of 134

1   A.   That's correct.

2   Q.   And he puts -- on the side of Dr. Kessler's notes, he puts

3   on there staffed by Dr. Farrell, doesn't he?

4   A.   That was a standard deal.  Whichever staff doctor was

5   responsible for the young doctors for that period of the day

6   was -- all the notes were typed with "staffed by the doctor."  I

7   was that at that time.

8   Q.   And he knew you were Dr. -- excuse me, Mr. Kuiper's doctor,

9   didn't he, sir?

10   A.   I assume so.

11   Q.   And you see here, he also talks about severe COPD.  You see

12   that in the line number 1?

13   A.   Yes.

14   Q.   And in line number 2, the number 2, he says allergic

15   reaction.  Do you see that?

16   A.   I do.

17   Q.   Now, he refers to you, Dr. Farrell, in that note as well,

18   doesn't he, sir?

19   A.   Yes.  Apparently I discussed the patient with him that

20   date.

21   Q.   And he makes reference to the note that Mr. McClain showed

22   you that showed that you wrote a note to Mr. Kuiper's superior

23   telling him that Mr. Kuiper needs to get out of that situation

24   that he is in as soon as possible.

25   A.   That is correct.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 45 of 134

1  Q.   Preferably not to have to go back to work there at all; is

2  that correct?

3  A.   Yes.

4  Q.   And the note that you wrote you wrote to one of

5  Mr. Kuiper's superiors at American Pop Corn Company, didn't you,

6  Dr. Farrell?

7  A.   That's what this note documents.  I don't recall the note I

8  guess but . . .

9  Q.   Do you know a Mr. Hoffman over at the plant, sir?

10  A.   I do, Greg, yes.

11  Q.   And Mr. Hoffman holds a management position and did back

12  then, doesn't he, at APC?

13  A.   I believe Greg's role over the years I've known him has

14  been in a supervisory safety role at the plant.

15  Q.   So he'd be the guy as the plant doctor that you'd

16  communicate with if you had an issue with one of the employee's

17  health; is that right?

18  A.   That's correct.

19  Q.   And so he would naturally be the person that you would

20  write a note to in March of 1995 when you thought there was a

21  problem with Mr. Kuiper's work environment causing his lung

22  problem; is that correct?

23  A.   That would be correct.

24  Q.   Thank you.  Now, the next note I want to talk to you about

25  is a note that's dated July of '96.

1      MR. PAGLIARO:  And this is 3214, Cort, please.

2   Q.   Now, first let me ask you a question.  As Mr. Kuiper's

3   general physician and treating physician for many years, you

4   know about his family history, don't you, Doctor?

5   A.   I'm sure it's been documented.  I can't verbatim tell you

6   about it right now.

7   Q.   I'm going to refresh your recollection.  But you would have

8   asked him those questions as his treating doctor, wouldn't you?

9   A.   Of course.

10  Q.   It's relevant, isn't it, because some conditions are

11  hereditary, aren't they, Doctor?

12  A.   Many are.

13  Q.   And, for example, Mr. Kuiper suffered from hypertension for

14  many years; isn't that true?

15  A.   That's one of his health conditions, yes.

16  Q.   And you treated him and medicated him for hypertension over

17  the course of a long period of time, didn't you?

18  A.   I believe that's true, yes.

19  Q.   And in point of fact, he had a stroke in 2001, didn't he,

20  Dr. Farrell?

21  A.   I believe he had a stroke, yes.

22  Q.   And you indicated, for example, in this note right smack

23  dab in the center if you can see it there -- I'll have Cort

24  highlight it for you -- that Mr. Kuiper's mother died in her 70s

25  of hypertension; isn't that true?  Did you note that?

1  A.   Well, that's the first portion of that sentence, yes.

2  Q.   Yeah.  And what's CV?  I'm not sure what that is.

3  A.   CVA is cerebral vascular accident, same thing -- lay term

4  of a stroke.

5  Q.   Stroke; right?  And then some sort of cancer.  Do you see

6  that?

7  A.   Yes.

8  Q.   That's the last part of that sentence; right?

9  A.   Yes.  Unfortunately many, many people don't know the exact

10 terms of the conditions that their family have suffered with in

11 their lives.  This is as close as they can come.

12 Q.   But he did tell you in the next sentence that his father

13 died at age 66 of colon cancer, didn't he, Doctor?

14 A.   That's correct.

15 Q.   And, in fact, one of the conditions that Mr. Kuiper had at

16 one point during the course of a colonoscopy, they actually

17 found a polyp, didn't they?  Do you recall they?

18 A.   I believe at some point, yes, he had some blood in the

19 stool and had that worked up, and there was a polyp in his

20 colon.

21 Q.   And a natural concern for someone who has a parent with

22 colon cancer would be that this would be hereditary.  So you'd

23 look at that, wouldn't you, Dr. Farrell?

24 A.   That's correct.

25 Q.   There's another note in here at the top that you asked him

1  about his prior employment, and he told you he worked as an

2  Orkin man for a while using some chemicals.  Do you see that?

3  A.    I do.

4  Q.    And he told you that he worked as a delivery man, and, of

5  course, he told you he worked at APC; is that correct?

6  A.    Yes.

7  Q.    Now, that was July of '96.  You saw Mr. Kuiper again later

8  in July of '96.  I'm going to show you a note, 3222, that you

9  made at that time, Dr. Farrell.  There you go, Dr. Farrell.  And

10  you cc a Dr. Zuehlke.  Now, he's a cardiopulmonary doctor, isn't

11  he?

12  A.    No, Dr. Zuehlke is a cardiologist.

13  Q.    Cardiologist.

14  A.    At the time was an invasive cardiologist.  He's one of the

15  heart guys that does internal testing.

16  Q.    And he's one of the doctors at one point that you refer

17  Mr. Kuiper to because you were concerned about his heart; isn't

18  that true?

19  A.    Well, that's correct.  His complaints of having no wind can

20  be an indication of an underlying coronary condition.

21  Q.    So, again, because you needed some -- you wanted a

22  specialist in cardiology to take a look at Dr. (sic) Kuiper; is

23  that fair?

24  A.    That would be correct.

25  Q.    Look at the first sentence of your note here, first two

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 49 of 134
To purchase a complete copy of the transcript

sentences.  This again is referring to Mr. Kuiper.  This is a
56-year-old gentleman who I saw in the office last week sent in
because of high cholesterol -- excuse me, high cholesterol
screening at work.

MR. PAGLIARO:  Your Honor, I need some water.  Do you
mind?

THE COURT:  No, that's fine.

MR. PAGLIARO:  Please.  Thank you.

MR. MCCLAIN:  And, Your Honor, we left -- and,
Dr. Farrell, we left a water there for you.

THE WITNESS:  Oh, that's fine.

THE COURT:  Why don't we give everybody another
stretch break at this time.  Thank you.

MR. PAGLIARO:  Thank you, Your Honor.

THE COURT:  Thank you.  Please be seated.

BY MR. PAGLIARO:

Q.   Now, the second sentence is the one I'm interested in
looking at, Dr. Farrell, if you'd take a look at that for me,
please.  You said in July of '96, "I saw him several years ago,
and he was kind of lost to follow-up."  Do you see that
sentence?

A.   I do.

Q.   And by that, Doctor, I saw records in '92 and then that
record in March of '95 and then this '96 record.  Was there a
period of time between '92 and '95 where Mr. Kuiper was not

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 50 of 134

1  coming in and seeing you for his problems?

2  A.   I don't have any documentation of seeing him apparently

3  between those times, no.

4  Q.   And you say he was lost to follow-up during that period

5  between '92 and '95, don't you?  You use that term.

6  A.   That's what it says, yes.

7  Q.   And you refer back to the time when you saw him before, and

8  you said at the time he was seen he was having some respiratory

9  problems suggestive of COPD.  Again, that's chronic obstructive

10 pulmonary disease, isn't it, Dr. Farrell?

11 A.   Yes.

12 Q.   Now, look down a little further in that paragraph.  You say

13 about Mr. Kuiper he had worked in the corn shelling department

14 prior to that for a couple to three years which is about the

15 time he began noticing shortness of breath.  Do you see that?

16 A.   I do.

17 Q.   And I assume that's something that Mr. Kuiper told you;

18 isn't that right, Dr. Farrell?

19 A.   I'm sure on detailed questioning asking him about his

20 history and exposures I brought that out from him.

21 Q.   And it's your practice, of course, as a good historian to

22 ask questions of your patients; right?

23 A.   That's correct.

24 Q.   And it's in their interest if they want the right treatment

25 to give you honest answers; isn't that right, Dr. Farrell?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 51 of 134

1    A.    One would expect so.

2    Q.    Yes.

3          MR. PAGLIARO:  Could you put up 3225, Cort?

4    Q.    Now, this is a record from a cardiology consultant,

5    Dr. Zuehlke, that you talked about earlier.  Do you see that?

6    A.    I do.

7    Q.    And this practice is a local practice as well and a fine

8    practice, isn't it, Doctor?

9    A.    I'm sorry?  I didn't hear all that.

10   Q.    This is a local practice, Sioux City practice?

11   A.    He was -- at that time was a local cardiologist with a

12   group of cardiologists here in town, yes.

13   Q.    And it's a group that you referred your patients to at the

14   time; is that correct?

15   A.    That's correct.

16   Q.    And Dr. Zuehlke was a cardiologist that you referred your

17   patients to at the time.

18   A.    I would have referred him to that office, and Dr. Zuehlke

19   was the one who apparently saw him.

20   Q.    And this is a letter.  Have you ever seen this letter

21   before?

22   A.    Remotely I remember reading it.  I've not reviewed it

23   recently.

24   Q.    Look at the first paragraph.  Again, like a good doctor

25   anywhere, Dr. Zuehlke took a history from Mr. Kuiper.  And he

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 52 of 134
To purchase a complete copy of the transcript.

1   indicated that Mr. Kuiper's a 56-year-old gentleman.  Again,

2   it's the same year.  It's 1996.  And he indicated that he was

3   referred by you, Dr. Farrell, for evaluation of an abnormal

4   treadmill; is that correct?

5   A.   That's correct.

6   Q.   He then says again he's not a cigarette smoker.  We know

7   that.  He has had chronic dyspnea and has had several

8   evaluations for this in the past.  Would you explain to the

9   jury, Dr. Farrell, what chronic dyspnea is?

10  A.   The condition, chronic dyspnea, dyspnea is the term which

11  is basically what we would use the term shortness of breath.  If

12  you're short of breath, that's -- it's labeled dyspnea.

13  Q.   So it's a medical term for shortness of breath.

14  A.   That's correct.  And chronic is self-explanatory, I

15  believe.  It's a long-term -- it's been a chronic, ongoing

16  condition.

17  Q.   And he indicates there that Mr. Kuiper works for American

18  Pop Corn and there has been concern that he may have had

19  exposure related to his employment.  Do you see that?

20  A.   That's correct.

21  Q.   So there was expressed to Dr. Zuehlke by Mr. Kuiper that

22  there was a concern that his breathing problems were related to

23  his employment.  Do you see that?

24  A.   Yes.

25  Q.   And then --

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 53 of 134

1  A.   I can't really attest to Dr. Zuehlke's documentation from

2  that time what was discussed between the two of them.

3  Q.   But he makes a note that -- again, that Mr. Kuiper's

4  symptoms stretch back to at least 1988.  Do you see that?

5  A.   Yes.

6  Q.   And that's consistent with what Mr. Kuiper told you, isn't

7  it?

8  A.   I believe we had some documentation of a complaint of

9  shortness of breath in 1988 at one time.  Complaints can go

10 along with many conditions, yes.

11 Q.   Yes, sir.

12      MR. PAGLIARO:  Could you put up 3234, please, Cort?

13 Q.   Again, same time period, Dr. Farrell.  This is, again, July

14 of '96.  Do you see that?

15 A.   Yes.

16 Q.   And here there are doctors up at the top of the screen that

17 are being cc'd by St. Luke's Regional Medical Center.  Did I

18 read that correctly?

19 A.   Yes.

20 Q.   And those doctors include yourself; is that correct?

21 A.   That is correct.

22 Q.   And Dr. Bacon who we talked about before.

23 A.   Dr. Ross Bacon, yes, pulmonologist.

24 Q.   And what about Dr. Baller?  What is his specialty?

25 A.   Dr. Baller is or was and I think still is a member of the

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 54 of 134
To purchase a complete copy of the transcript

1   Cardiovascular Associates group, cardiology group.

2   Q.   So Dr. Bacon for the pulmonary and Dr. Baller for

3   cardiovascular cardiac; right?

4   A.   Yes.

5   Q.   Do I have that right?  And this note indicates, again,

6   Mr. Kuiper, pleasant 56-year-old gentleman, increased shortness

7   of breath over the last two to five years.  Do you see that in

8   the first sentence?

9   A.   I do.

10  Q.   Now, it goes on to say he has been employed by a popcorn

11  company and he has noted he keeps having increased shortness of

12  breath when exposed to the popcorn dust as well as to the

13  ingredients that are used in making the microwave popcorn.  This

14  includes oils, flavorings, and other salts.  Did I read that

15  correctly?

16  A.   Yes, I believe you did.

17  Q.   Okay.  So an indication here that -- and you received this,

18  didn't you, Dr. Farrell?

19  A.   I assume I would have at the time, yes.

20  Q.   -- that Mr. Kuiper has noted to his doctors that he was

21  having increased shortness of breath when exposed not only to

22  the dust of the popcorn but also -- and salt but also to oils

23  and flavorings; is that correct?

24  A.   Yes.

25  Q.   And that date is, again, July of '96, isn't it,

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 55 of 134

1  Dr. Farrell?

2  A.    Yes, July 15 of '96.

3  Q.    And again during this same period --

4        MR. PAGLIARO:  Would you put up 3235, please?

5  Q.    This is another note from St. Luke's.  Again, if you look

6  at the bottom of this --

7        MR. PAGLIARO:  Cort, please.

8  Q.    -- the note is dated same date, July 15, '96.

9        MR. PAGLIARO:  Go to the second page, please.

10 Q.    Same date, same period, and Mr. Kuiper's receiving

11 treatment at St. Luke's; is that correct?

12 A.    Yes.  I believe this would have been an admission, and

13 Dr. Baller and Dr. Bacon both were asked to see him during the

14 hospitalization.

15 Q.    And I want to refer you to the first paragraph of this,

16 Dr. Farrell.  And it refers to the fact that Mr. Kuiper was seen

17 by Dr. Zuehlke last week.  This is all during the period of July

18 11 to July 15; right?

19 A.    Yes, I believe so.

20 Q.    And again, Mr. Kuiper reports to Dr. Baller this time that

21 he has a chronic problem with shortness of breath dating clear

22 back to 1988; is that correct?

23 A.    That's how it reads, yes.

24 Q.    And the sentence down below says, "But he, Mr. Kuiper, has

25 noticed that going clear back to '89 or '90 when he would go up

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 56 of 134
To purchase a complete copy of the transcript

1    an incline at work and exert he would find it very hard to

2    breathe and have an oppressive breathlessness."  Do you see

3    that?

4    A.    Yes.

5    Q.    Does that sound like a minor problem to you, Dr. Farrell,

6    as a treating physician?

7    A.    Not at all.  That's, I'm sure, why these guys were

8    consulted, to get to the bottom of it.

9    Q.    So if someone in '89 or '90 is saying they have a hard time

10   going up an incline and they have oppressive breathlessness,

11   that sounds like a pretty serious condition, doesn't it,

12   Dr. Farrell?

13   A.    Certainly would get your attention or should get your

14   attention.

15   Q.    Yes, sir.

16   A.    To begin appropriate work-up for, yes.

17   Q.    Now, you mentioned in your direct that you sent Mr. Kuiper

18   off to see Dr. Oggel; is that correct?

19   A.    I believe Dr. Oggel saw him, yes.

20        MR. PAGLIARO:  Could you put up 3274, please?

21   Q.    I believe you saw this in the last -- in Mr. McClain's

22   examination of you.  And this is dated February '97, so it's a

23   bit later than those reports we've been looking at it, isn't it,

24   sir?

25   A.    Appears to, yes.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 57 of 134

1  Q.   And you're still -- again, when you have an issue, you're

2  still looking at some consultants and some specialists to sort

3  of help you in evaluating Mr. Kuiper; is that correct, sir?

4  A.   Normally there's a stepwise fashion.  You try to rule out

5  one condition; and then you still have no answers, you approach

6  another direction.

7  Q.   And in this case you sent him to Dr. Oggel, and you wanted

8  Dr. Oggel to do some allergy testing on him, didn't you?

9  A.   I believe that's what we asked him and asked him to consult

10 and he would do what he does, yes.

11 Q.   Now, there are different types of allergy tests, aren't

12 there, Dr. Farrell?

13 A.   I'm not an allergist, but I'm sure there are, yes.

14 Q.   Do you know what type of allergy test that was performed on

15 Mr. Kuiper?

16 A.   Well, just in reference to the report we reviewed earlier,

17 there is some skin testing that are done, scratch tests and

18 dermal testing.

19 Q.   So this is a skin scratch test that you believe Dr. Oggel

20 performed on Mr. Kuiper?

21 A.   I believe that's what we saw the report was from, yes.

22 Q.   So the report Mr. McClain showed you were the results of

23 that skin scratch test; is that correct?

24 A.   I think so, yes.

25 Q.   And in your letter to Dr. Oggel down in the third

1  paragraph, again you make the point in 1997, first line of that

2  last paragraph, "Since that time he has been somewhat lost to

3  follow-up." You make that point again, don't you, Doctor?

4  A.   Now, are we reviewing Mr. Oggel's note, or is this my

5  letter to Mr. --

6  Q.   No, this is your letter. I'm sorry.

7        MR. PAGLIARO: Can we just show Dr. Farrell his

8  signature at the end just to make sure?

9  Q.   That's your signature, isn't it?

10  A.   Yes.

11  Q.   That's your letter to Dr. Oggel; is that right?

12  A.   Correct.

13  Q.   And you refer to the fact in the beginning of the letter

14  that you had been treating Mr. Kuiper since '92 and then the

15  fact that there was a gap in time during which you weren't

16  treating Mr. Kuiper or wasn't complaining; is that correct?

17  Since that time he's been somewhat lost to follow-up.

18  A.   Yes.

19  Q.   And in that letter on the second page, you make reference

20  to two points.

21        MR. PAGLIARO: And the second full paragraph, Cort,

22  please.

23  Q.   You say, "I am not" -- let's start at the beginning. You

24  say, "Ron has had problems since I've known him for the last

25  five or six years"; correct? Those are your words; is that

1 correct?

2 A.    Yes.

3 Q.    And you say his -- surprisingly, surprisingly, his

4 pulmonary functions have not really changed.  At least his FEV1

5 and FVCs have remained about the same percentage of predicted as

6 they were five or six years ago.  Did you say that?

7 A.    That's correct.

8 Q.    So you're saying basically that Ron has been stable for

9 that five- or six-year period; is that correct?

10 A.    I did not say stable.  I said his FEV1 had not changed

11 significantly.

12 Q.    So his breathing tests have remained stable; is that fair?

13 A.    Yes, they had not changed significantly, yes.

14 Q.    And then you refer to -- you refer to the fact I am not

15 sure we have completed enough work-up to rule out any type of

16 allergic component; right?

17 A.    Yes.

18 Q.    And then you say, "I would like your opinion."  And you go

19 on to say finally his environmental exposures certainly may have

20 something to do with his long-term problems.  Do you see that?

21 A.    Yes.

22 Q.    So you believed at that time that something in his

23 environment may have had something to do with his long-term

24 problems; is that correct?

25 A.    I do, yeah.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 60 of 134

```
1    Q.    And you also point out that something like farmers' lung
2    may be also a possible; is that correct?
3    A.    That's a condition that could possibly present like this,
4    yes.
5    Q.    And there are studies published, are there not, many, many
6    studies published, Dr. Farrell, that talk about people having
7    obstructive lung disease as a result of exposure when they're
8    agricultural workers; isn't that true, sir?
9    A.    I'm sure there are, yes.
10   Q.    And Mr. Kuiper worked on a farm for many years, did he not?
11   A.    A few years, probably less than I had, but yes, some.
12   Q.    He was raised on a farm, though, too, wasn't he?
13   A.    I believe so, yes, until the age of 21.
14         MR. PAGLIARO:  Now let's look at a record, 3471, Cort.
15   Q.    Now, this is a record again from St. Luke's Medical Center.
16   Do you see that, sir?
17   A.    I do.
18   Q.    Up at the top it says it was dictated by you, Dr. Curtiss
19   Farrell, doesn't it?
20   A.    That's what it reads, yes.
21   Q.    So this would have been your notes from an admission to a
22   hospital; isn't that correct?
23   A.    Well, most likely this would have been the discharge
24   summary just by the fact there's an admission date recorded and
25   a discharge date recorded.
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ Document 409 Filed 06/09/09 Page 61 of 134
To purchase a complete copy of the transcript

1    Q.   I do see that.  So this was sort of a summary of what

2    happened during that hospitalization.

3    A.   That's what a discharge summary technically is, yes.

4    Q.   And this is important to keep for your records to indicate

5    what happened during the course of the hospitalization and what

6    conditions Mr. Kuiper had.

7    A.   That's the primary use of it, yes.

8             MR. PAGLIARO:   Could you go to the admitting

9    diagnosis?

10   Q.   At that time in March of 2001 Mr. Kuiper was admitted for a

11   variety of things.  According to your notes he had some vertigo

12   which is dizziness; right?

13   A.   That's correct.

14   Q.   And nausea and vomiting.  You also noted that he had

15   hypertension; is that correct?

16   A.   Yes, that had been an ongoing condition or at least maybe

17   that was new at that admission, yes.

18   Q.   You had treated him for hypertension for several years,

19   hadn't you?

20   A.   I can't recall when it started and -- treatment of that

21   but . . .

22   Q.   Now, you make another note here.  You say, "New onset

23   atrial fibrillation."  Did I read that correctly?

24   A.   That's correct.

25   Q.   Explain to the jury what atrial fibrillation is.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov

Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 62 of 134
To purchase a complete copy of the transcript.

1    A.    Well, atrial fibrillation is a condition -- the heart has

2    four chambers to it.  The two large pumping chambers are called

3    the ventricles and the two small chambers called the atrium.

4    And the electroactivity within the heart muscle begins in the

5    atrium, and it spreads out to the rest of the heart muscle to

6    cause it to contract.  And normally that little signal is

7    rhythmic and controlled.

8           In atrial fibrillation the electrical activity within

9    the atrium is haphazard and disjointed, and there's no rhythm to

10   it.  It's just beating haphazardly.  And it then affects the way

11   the conduction -- the way the electricity is then conducted on

12   to the rest of the heart and does affect the function of the

13   heart and can lead to some other conditions as well.

14   Q.    And that can cause a problem, can't it, Doctor, many

15   problems?

16   A.    It can.

17   Q.    One of the problems it can cause is that when your heart

18   isn't beating regular a clot can form; isn't that true?

19   A.    That's a possibility.

20   Q.    And sometimes those clots actually travel to the brain and

21   can cause a stroke; isn't that right, Doctor?

22   A.    That's possible.

23   Q.    In your discharge diagnosis, you also noted in this

24   hospitalization that Mr. Kuiper had suffered from what you

25   called a small cerebrovascular accident in the right medial

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 63 of 134

1  cerebellum region of the dentate nucleus.  And in laymen's term,

2  that means a stroke, doesn't it, Doctor?

3  A.   Well, cerebrovascular accident, yes, is the term for a

4  stroke.

5  Q.   And what you're saying in this note is that he had a stroke

6  in what's called the cerebellum region; isn't that true?

7  A.   The cerebellum, yes.

8  Q.   And one of the functions of the cerebellum is to control

9  our balance; isn't that true?

10  A.   One of its functions.

11  Q.   So that if someone's having some trouble with their balance

12  in the course of, you know, getting about, that could be caused

13  by a stroke in the cerebellum area; is that true?

14  A.   That's one of the things that could affect that, yes.

15  Q.   And, again, in a note, number 6 of that note, you say

16  chronic obstructive pulmonary disease, comma, stable, in

17  nineteen ninety -- in 2001.  Did you make that comment in 2001?

18  A.   Yes.  I mean, this mislabeled diagnosis has followed him

19  for many years.

20  Q.   But you indicated, though, that he was stable at that time,

21  his disease process was stable; is that true?

22  A.   Seemed to be, yes.

23  Q.   One other point there.  Number 4, you talked about the

24  problem with atrial fibrillation meaning a clot can be thrown,

25  and you said in your discharge diagnosis, Dr. Farrell, did you

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 64 of 134

1  not, that there was a probable embolic phenomenon from the

2  atrial fibrillation; isn't that true?

3  A.    That's one of the concerns we have when people have this

4  heart rhythm, that strokes can occur because of -- clots form,

5  yes, and we typically treat them.

6  Q.    And that could have been the cause of the stroke that he

7  had in 2001.

8  A.    Very possible, yes.

9  Q.    In fact, you indicated it was probable, didn't you?

10 A.    Highly probable.

11 Q.    Talk a little bit about bronchodilators, Doctor.  You

12 testified that there were situations when Mr. Kuiper was given a

13 bronchodi -- strike that.  Let's start at the beginning.

14        You have prescribed bronchodilators and inhalers for

15 Mr. Kuiper over a period of time; correct?

16 A.    I believe he's had several, yes.

17 Q.    And during the period of time that you saw him, he was

18 consistently given inhalers.  Sometimes he didn't use them, but

19 he was given them by you; isn't that correct?

20 A.    I believe that's correct, yes.

21 Q.    And you gave them to him I assume because you thought they

22 would have some effect; isn't that right, Dr. Farrell?

23 A.    We thought they should have some effect for him, yes.

24 Q.    And I would assume if you thought they had absolutely no

25 effect as a treating physician you wouldn't subject your patient

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 65 of 134

1  to medication that was having absolutely no effect, would you?

2  A.   Well, if it's not working, you would stop it, that's true.

3  Q.   Right.  So if you were convinced that it wasn't working at

4  all -- because these medications have side effects, don't they?

5  A.   Most do.

6  Q.   And steroids have side effects, and some of these were

7  steroids, weren't they, Dr. Farrell?

8  A.   Some of them were, yeah, glucocorticosteroids, yes.

9  Q.   And you wouldn't consistently over a period of years

10  prescribe over and over again bronchodilators to a patient of

11  yours if you thought they were having absolutely no effect,

12  would you, Dr. Farrell?

13  A.   If we couldn't document at least some subjective or

14  objective improvement, it typically wouldn't continue to be

15  prescribed.

16  Q.   So you were documenting some improvement, weren't you,

17  Dr. Farrell?

18  A.   I don't recall the documentation of that, no.

19  Q.   Okay.  You don't recall an indication during some times

20  when there was improvement from bronchodilators with Mr. Kuiper?

21  A.   I don't recall any documented improvements, no.

22  Q.   Let me show you a note from 3219.  Now, this note is

23  dated -- again, same period of time, July '96.  See that up at

24  the top?

25  A.   I do.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 66 of 134
To purchase a complete copy of the transcript

1   Q.   And this says pulmonary results, doesn't it?

2   A.   That's correct, yes.

3   Q.   And your name is up there as well, Dr. Farrell, isn't it?

4   A.   I would have been the ordering physician, correct, yes.

5   Q.   And this certainly would have been -- this report would

6   have been provided to you as a treating physician, wouldn't it?

7   A.   It would be in his hospital record, yes.

8   Q.   And in the last paragraph it says -- this is from the

9   pulmonary group at the hospital, St. Luke's -- "Mr. Kuiper most

10  likely has obstructive airways disease." Do you see that?

11  A.   I do.

12  Q.   The second sentence says, "With the improvement

13  post-bronchodilator, I suspect he likely has asthma." Do you

14  see that?

15  A.   I see what you're reading, yes.

16  Q.   And doesn't this record indicate that there's some

17  improvement post-bronchodilator in this hospital setting?

18  A.   This is a dictated comment about the numbers, but I can't

19  see the numbers.

20  Q.   You told us earlier, didn't you, that there are two

21  situations in which someone gets these tests. Sometimes they're

22  done in the office, aren't they, Doctor?

23  A.   Oftentimes they're done as an outpatient setting, yes.

24  Q.   And other times they're done in the hospital; is that

25  right?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 67 of 134

1    A.    They can.

2    Q.    And this one was done in the hospital, wasn't it?

3    A.    Appear to be, yes.

4    Q.    And didn't you make the point to us earlier, Doctor, that

5    the hospital equipment is different than the office equipment?

6    A.    Well, they may be different machines, different brand

7    names.

8    Q.    But they --

9    A.    Many offices have something called a spirometer which is a

10   little bit less invasive or less -- I wouldn't say less

11   accurate.  That's not the right term.  It's just not as high

12   tech.

13   Q.    And didn't you make the point, though, that the hospital

14   testing equipment actually enables more of the material, the

15   medicine, to get deeper inside the lung?  You don't recall that?

16   A.    That has nothing to do with the breathing measurements.  I

17   mean, you're talking two different -- you're talking apples and

18   oranges now.

19   Q.    What I'm asking you is whether or not there is increased

20   efficacy of the medicine when it's pushed deeper down in the

21   lungs.  It works better; is that correct?

22   A.    Well, that makes sense.  I mean, if medication needs

23   contact to do its job, I mean, the deeper you get it into the

24   lungs you would expect it to do a better job.

25   Q.    Did you ever order a CAT scan for Mr. Kuiper, Doctor?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 68 of 134
To purchase a complete copy of the transcript

1    A.   I don't recall.

2           MR. PAGLIARO:  I have no further questions, Your

3    Honor.  Thank you very much.

4           Thank you, Dr. Farrell.  Appreciate it.

5           THE COURT:  Thank you.

6           Mr. McClain?

7           MR. MCCLAIN:  Yes, Your Honor.

8                        REDIRECT EXAMINATION

9    BY MR. MCCLAIN:

10   Q.   Dr. Farrell, as Mr. Pagliaro pointed out, your area of

11   specialty is family practice.

12   A.   That's correct.

13   Q.   Is that right?  And he asked you about Dr. Bainbridge.

14   Dr. Bainbridge is a specialist in pulmonary medicine; is that

15   right?

16   A.   Yes, he is.

17   Q.   But is he an expert in popcorn lung?

18          MR. PAGLIARO:  Objection.  Calls for speculation.

19   A.   I couldn't answer that accurately.

20          THE COURT:  Just a second.

21   A.   I would assume not, yes.

22          THE COURT:  Well, he -- I was just going to say he

23   could answer if he knows, and he doesn't know, so thank you.

24   Q.   Let's -- let's talk about something you do know.  You

25   didn't see his name on any of these articles that you read, did

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ  Document 409  Filed 06/09/09  Page 69 of 134
To purchase a complete copy of the transcript.

1  you?

2  A.   I did not, no.

3  Q.   And in your discussions with him, has he been able to give

4  you any definitive answers on the issue?

5  A.   No.

6  Q.   So you both have been searching for an answer to this

7  problem together.

8  A.   Yes.  It's like two blind men stumbling in the dark

9  together, yes.

10  Q.   But you've both been trying to get to the bottom of the

11  association of this exposures at work and his condition for some

12  time.

13  A.   I can't speak for him, but I think we both believed there

14  was something causing it that we just couldn't put our finger

15  on.

16  Q.   And for -- as you've said, for at least most of the time,

17  you thought it was -- salt was the issue.

18  A.   That was my working assessment for a long time, yes.

19  Q.   All right.  Now, let's talk about this issue of symptoms,

20  Doctor.  Is -- the fact that someone has the same symptoms, does

21  that mean to you as a medical doctor that he has the same

22  disease going on?

23  A.   I'm not sure I understand your question.

24  Q.   If he had shortness of breath back in '88 that was

25  temporary and abated as we saw from those records, does that

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 70 of 134
To purchase a complete copy of the transcript

1  mean that a permanent lung function change in '88 causing -- in

2  '92 and beyond causing shortness of breath is the same disease,

3  Doctor, in your opinion?

4          MR. PAGLIARO:  Objection.  Leading.  Form as well.

5          THE COURT:  Sustained.

6  BY MR. MCCLAIN:

7  Q.   Doctor, do you have an opinion as to whether or not because

8  symptoms began in one setting that the fact that you have the

9  same symptoms in another setting means you have the same disease

10 process going on?

11 A.   I'm sorry.  I was formulating the answer before I listened

12 to the whole question.

13 Q.   Yeah.

14 A.   Would you repeat it?

15 Q.   Mr. Pagliaro asked you about the fact that there was some

16 shortness of breath in 1988 apparently from another doctor's

17 record.  Do you remember those questions?

18 A.   Yes.

19 Q.   All right.  And, Doctor, did that shortness of breath seem

20 to resolve for him?  In other words, did it go away?

21 A.   I don't believe it ever did.

22 Q.   Okay.  Does that mean that the mixing room shortness of

23 breath is the same shortness of breath he was suffering before?

24 A.   Not necessarily, no.

25 Q.   Tell the jury what that is.

1   A.    Shortness of breath is a patient's term to describe what he

2   feels, and the physician's job is to begin to pick that apart

3   and to determine what he's really trying to tell you, at least

4   in medical terms.  And shortness of breath, had I taken the

5   stairs this morning instead of the elevator, I would be short of

6   breath by the third floor easily as I'm sure most of us in the

7   room would have.  That's a different description of shortness of

8   breath than maybe somebody who has a lung condition.

9   Q.    Now, you've seen people that have been exposed to corn dust

10  as an example?

11  A.    I have.

12  Q.    And do they get short of breath?

13  A.    They can.  Any dust exposure's going to cause the lungs to

14  react and tighten down a little bit.

15  Q.    And does that typically resolve after they get out of that

16  environment?

17  A.    On removal from the corn dust, that typically will improve

18  in a period of time.

19  Q.    And so does corn dust exposure in your mind explain a

20  permanent lung injury to Mr. Kuiper?

21  A.    No, not at all.

22  Q.    And likewise, Doctor, is that one of the reasons you did

23  the allergy panel, to see whether or not there would be any

24  airway reactivity that might cause permanent injury?

25  A.    Whether there's anything else, perhaps molds or otherwise,

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 72 of 134
To purchase a complete copy of this transcript.

1    that might have done that, yes.

2    Q.    And what did you find?

3    A.    That was completely negative.

4    Q.    And so did you rule out the corn dust situation as causing

5    his permanent lung injury?

6              MR. PAGLIARO:  Objection.  Leading.

7              THE COURT:  Can you rephrase the question?

8              MR. MCCLAIN:  Sure.

9    BY MR. MCCLAIN:

10   Q.    Doctor, did you rule out the corn dust exposure as causing

11   his permanent lung injury?

12             MR. PAGLIARO:  Objection.  Leading.

13             THE COURT:  Overruled.

14   A.    In my mind the testing coming back negative was another

15   check on the list we could do away with.  It wasn't of our

16   concern.  It wasn't in our cause of his condition, at least in

17   my mind.

18   Q.    Now, Mr. Pagliaro showed you a number of records that --

19   where you listed the condition that Mr. Kuiper had as COPD.  Do

20   you remember that?

21   A.    Correct.

22   Q.    There was an article that you reviewed which addressed that

23   very issue, wasn't there, called -- oh, let me find the article.

24   Exhibit 1235, Occupational Bronchiolitis Obliterans Masquerading

25   as COPD?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 73 of 134
To purchase a complete copy of the transcript

1    A.    That's correct.

2    Q.    And, Doctor, is it fair to say that the articles that you

3    read document the difficulty that family practice doctors and

4    even lung specialists have had in diagnosing correctly

5    bronchiolitis obliterans caused by butter-flavoring exposure?

6          MR. PAGLIARO:  Objection.  Leading.

7          THE COURT:  Overruled.

8    A.    Very much so.  I think this article documents the --

9    doesn't give me any peace of mind but the frustrations I was

10   experiencing in trying to get this man improved, we couldn't

11   come to an answer for him, and this documents there were other

12   people with this condition similar if not identical.

13   Q.    Doctor, I want to refer you to a statement from the article

14   you read by Akpinar-Elci.

15         MR. MCCLAIN:  Scott, that's Exhibit 969, Bronchiolitis

16   Obliterans Syndrome in Popcorn Production Workers.  Second page,

17   Scott, just before the discussion, the paragraph beginning with

18   "None."  Next page with the lungs on them.  Yeah, beginning with

19   "None, none of the cases."

20   Q.    Doctor, did you read this statement, "None of the nine

21   cases received an initial diagnosis of bronchiolitis obliterans

22   syndrome.  Diagnoses of pneumonia, asthma, emphysema,

23   bronchitis, chronic obstructive pulmonary disease, hay fever,

24   and sinusitis were common.  All cases were prescribed oral

25   corticosteroids without showing improvement in airway

Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 74 of 134

1  obstruction.  Two received" -- how do you say that next drug,

2  Doctor?

3  A.    Cyclophosphamide.

4  Q.    -- "treatment and reported symptomatic improvement, but no

5  pulmonary function improvement was evident."  Doctor, did this

6  ring any bells with you when you read it?

7  A.    Bingo.

8  Q.    Huh?  Bingo.  Why?  Tell the jury why.

9  A.    Exactly this patient we were dealing with.  It's a perfect

10  description of the frustrations we had in trying to diagnose and

11  treat him.

12  Q.    And so this is the same process.  The process that's

13  described here that other doctors went to, was that similar to

14  the process you went through in trying to come to a conclusion

15  about this case?

16  A.    It appeared quite similar, yes.

17  Q.    Doctor, looking at the -- he asked you about asthma.

18        MR. MCCLAIN:  Look at that 2007 article, Scott,

19  Occupational Bronchiolitis Obliterans Masquerading as COPD.  Go

20  to that -- the next paragraph, the next page, please.

21  Q.    Although the hazard of diacetyl is not in question,

22  uncertainties do remain.  The spectrum of health effects related

23  to flavorings may be broader than fixed obstruction.  Asthma,

24  bronchiolitis obliterans with organizing pneumonia,

25  granulomatous pneumonia, tracheo-, bronchio -- how do you say

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 75 of 134

1   that, bronchio --

2   A.   I'm sorry, sir.  I was reading ahead of you.  I'll back up

3   to you here.

4   Q.   Tracheo-, bronchiomal --

5   A.   Bronchiomalacia.

6   Q.   -- malacia fibrosis and systemic symptoms without

7   obstruction have all been reported in flavoring-exposed workers.

8          Doctor, was this relevant to you in terms of sorting

9   through all of the symptoms that you had been looking at in Ron

10  Kuiper?

11  A.   Unfortunately after the fact very much so.

12  Q.   And was this helpful in reaching the conclusion you've

13  reached and expressed here today?

14  A.   It's helpful in letting me know that there's other people

15  out there in the same boat.

16  Q.   Now, he asked you about farmers' lung.  Have you ruled that

17  out?

18  A.   We felt we had, yes.

19  Q.   And are any of his conditions, his physical conditions,

20  accounted for by these other physical problems that he's had

21  over the years?  In other words, is his physical immobility and

22  his inability to work and be around the result of these other

23  things that he suffered over the years, or is it because of his

24  lung condition?

25  A.   In my opinion his cardiac condition is not a primary

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 76 of 134

1  cardiac condition, and he is limited because his heart and lungs

2  don't do well together anymore.

3          MR. MCCLAIN:  And, Scott, would you just bring up that

4  instruction again on statute of limitations because I want to be

5  clear about what language we're using.  33, the next page,

6  please.

7  Q.  Doctor, this is the instruction that the jury has.

8  Therefore, in this case, the Kuipers' claim accrued when they

9  knew or by the exercise of reasonable diligence should have

10  known that Ron Kuiper's claimed injuries may have been caused by

11  exposure to Givaudan's butter flavoring containing diacetyl in

12  the mixing room at American Pop Corn Company.  Doctor, did you

13  have any idea about that before 2004?

14          MR. PAGLIARO:  Objection.  Leading.

15          THE COURT:  Overruled.

16  A.  I don't think I had any idea, nor did many other people.

17  Q.  Okay.  And based upon your conversations, did Ron?

18          MR. PAGLIARO:  Objection.  Calls for speculation.

19          THE COURT:  Overruled.

20  A.  I seriously doubt that Ron would have known about diacetyl

21  at that time.

22  Q.  Okay.  At least he didn't talk to you about it.

23  A.  He did not discuss it.

24  Q.  But he did talk to you about it later, not diacetyl but the

25  flavorings.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 77 of 134

1    A.    Butter flavoring, something, yes.

2    Q.    In 2006.

3    A.    Later on, yes.

4              MR. MCCLAIN:  Thank you.  No further questions.

5              THE COURT:  Dr. Farrell, you may step down.  Thank

6    you.

7              THE WITNESS:  Thank you.

8              THE COURT:  And, members of the jury, we'll be in

9    recess until 10:30.  Please remember to keep an open mind until

10   you've heard all of the evidence in the case.  Thank you.

11             (The jury exited the courtroom.)

12             THE COURT:  Please be seated for a second.

13             Mr. Pagliaro, I just wanted to make sure I understood

14   your Rule 26 objection to Dr. Farrell's testimony.  I think I

15   understood it, but I just wanted to make sure I understand it.

16             MR. PAGLIARO:  Yes, Your Honor.  What I was objecting

17   to was that Dr. Farrell was not identified as an expert witness,

18   as a treating physician, and he was asked to give opinions, and

19   so I thought it was beyond the scope of what he was listed for.

20   He wasn't -- didn't do a report, wasn't asked -- wasn't listed

21   as an expert witness, Your Honor.  That was the basis for my

22   objection.

23             THE COURT:  And I think there's some merit to what you

24   say.  However, my understanding was you listed Dr. Farrell as an

25   expert on your witness list, that he wasn't listed on the

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ  Document 409  Filed 06/09/09  Page 78 of 134

1   plaintiffs' list, and I think had he been listed on the

2   plaintiffs' list, then they would have had a duty to supplement

3   with regard to the designation because it went broader than a

4   treating physician.  But because he was listed on your list and

5   not their list, I did not sustain your Rule 26 motion.

6           And also there couldn't really be any prejudice

7   because you're so familiar with the diagnosis, and I just

8   couldn't possibly see any prejudice, even if it went beyond the

9   designation.

10          But as I looked at the final pretrial order which

11  governs in the case, I didn't see Dr. Farrell on -- maybe I

12  missed it.  But I didn't see him on the plaintiffs' list, but I

13  did see him on the defendant's list.  Am I missing something?

14          MR. PAGLIARO:  The only reference I see, Your Honor,

15  just looking at it quickly -- and this is very long, and I don't

16  have the memory.

17          THE COURT:  Sure.

18          MR. PAGLIARO:  I see defendant's witnesses list, and I

19  do see Dr. Farrell listed as a treating physician.

20          THE COURT:  Yeah, but on defendant's witness list.

21          MR. PAGLIARO:  Yes.  Oh, yes.

22          THE COURT:  Yeah.  But why would a party be limited by

23  your designation?  They can call him for any reason they want.

24  The whole purpose of designating an expert is so if you call

25  that person they don't go beyond the scope of what you list them

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 79 of 134

1   for.  But when the other side calls a witness on somebody's

2   witness list, they can question them on anything they want.

3           So that's the -- I just wanted to explain to you.  I

4   think I was on top of it, but that's why I did not sustain your

5   objection.  It would have been a stronger objection had the

6   plaintiff listed the witness, designated him as a treating

7   physician, but -- and you relied on that.  But you listed the

8   witness.  Therefore, they can call him for any reason they want

9   in my view.  But that's how I rule.

10          You have received that supplemental instruction.  I

11  don't really want to talk about it now, maybe at the end of the

12  day.  But I'm not going to make any decision on it obviously

13  until next week, so I just wanted to make sure you've all

14  received it and everybody received it.

15          MR. PAGLIARO:  Yes, Your Honor, we did, yes.

16          THE COURT:  Okay.  Thank you.

17          MR. PAGLIARO:  Your Honor, may I ask a question?

18          THE COURT:  Yes.

19          MR. PAGLIARO:  What time did you say we were back?

20          THE COURT:  10:30.

21          MR. PAGLIARO:  10:30.  Okay.  Thanks.

22          (Recess at 10:06 a.m.)

23          THE COURT:  Sorry I'm late.  I had a visit from the

24  warden of the nearest federal prison and then a phone call from

25  a federal judge.  So ready to have the jury brought in?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 80 of 134

```
1              MR. MCCLAIN:  Yes.

2              (The jury entered the courtroom.)

3              THE COURT:  Thank you.  Please be seated.

4              And, Mr. McClain, this will be a continuation of the

5    deposition?

6              MR. MCCLAIN:  Yes, of John Hallagan, Your Honor.

7              THE COURT:  Thank you.

8              (Continuation of videotaped deposition excerpts of

9    John Hallagan taken June 25, 2008, were played in open court.)

10             THE COURT:  Why doesn't everybody take a stretch

11   break.

12             Thank you.  Please be seated.

13             Mr. McClain?

14             MR. MCCLAIN:  Yes.  Mr. Kuiper's going to retake the

15   stand, Your Honor.

16             THE COURT:  Okay.  Thank you.

17             MR. MCCLAIN:  This is going to take about five

18   minutes, Your Honor.  Could we -- maybe --

19             THE COURT:  So what are you suggesting?  We take a

20   recess?

21             MR. MCCLAIN:  Yeah, if we could have a recess, a

22   five-minute break.

23             THE COURT:  Sure.  Why don't we just take a

24   nine-minute recess.  Is that okay?

25             MR. MCCLAIN:  Yeah.
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-RAZ  Document 409  Filed 06/09/09  Page 81 of 134

```
 1            THE COURT:  Five minutes hardly lets them get down
 2   there.  So it's about 11:30.  We'll be back at 11:40.  Thank
 3   you.
 4            (The jury exited the courtroom.)
 5            THE COURT:  Mr. McClain, do you think you're going to
 6   be able to complete your direct examination of Mr. Kuiper in
 7   this installment?
 8            MR. MCCLAIN:  I do.
 9            THE COURT:  On the installment plan?
10            MR. MCCLAIN:  I do.  I think I'll be done with my
11   direct at noon, and we'll take our break.
12            THE COURT:  And then come back for the cross?
13            MR. PAGLIARO:  Your Honor, at one point yesterday
14   Mr. Kuiper's answers were overlapping Mr. McClain's questions at
15   times.
16            THE COURT:  Yes, they were.
17            MR. PAGLIARO:  It makes it really hard to interpose an
18   objection.  I wonder if you might just mention it to the witness
19   if he'd just wait for the question.
20            THE COURT:  Sure.  I'd be happy to.  Thank you.
21            MR. PAGLIARO:  Thanks.
22            THE COURT:  Oh, I'm sorry.  We'll be in recess.
23   Thanks.
24            (Recess at 11:31 a.m.)
25            THE COURT:  Ready to have the jury brought in?
```

```
 1              MR. MCCLAIN:  Yes.

 2              THE COURT:  Okay.

 3              Would you hold up one second?  Mr. Kuiper, I just want

 4    to make sure that you understand that you have to let the lawyer

 5    finish asking the question before you can respond, and then he

 6    has to wait for you to respond.

 7              MR. KUIPER:  Okay.

 8              THE COURT:  Okay?  So you can't talk over each other,

 9    because if you do that, then Shelly can't take it down, and the

10    other side doesn't have a fair opportunity to make an objection.

11              MR. KUIPER:  Okay.  Thank you.

12              THE COURT:  Thank you.

13              (The jury entered the courtroom.)

14              THE COURT:  Thank you.  Please be seated.

15              Mr. McClain, you may continue your direct examination

16    of Mr. Kuiper.

17          RONALD KUIPER, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

18                    CONTINUED DIRECT EXAMINATION

19    BY MR. MCCLAIN:

20    Q.   Mr. Kuiper, when we broke yesterday, the place where we

21    left off was that by 1995 you couldn't lift the buckets and you

22    couldn't lift the bags of salt and you had to leave the mixing

23    room.  So I want to pick up the story from there if we can.

24    A.   Okay.

25    Q.   At about that time, were you able to continue with the
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 83 of 134

1  paper route?

2  A.   What was that again?

3  Q.   Were you able to continue with the paper route after that

4  time?

5  A.   That would be 19 --

6  Q.   '95.

7  A.   -- '95?  I was thinking -- I was thinking about dropping

8  it because of my condition.

9  Q.   And did you ultimately have to drop it?

10  A.   Yes.

11  Q.   When you transferred out of the mixing room, what job did

12  you take at the plant?

13  A.   Janitorial work, just cleaning.

14  Q.   And -- but after that time, were there instances where you

15  went back into the mixing room?

16  A.   Well, when the man that I had trained -- sometimes I had to

17  go back in and help him at different times.

18  Q.   And what was his name?

19  A.   Kevin Remmes.

20  Q.   And Mr. Remmes became the mixer at the American Pop Corn

21  plant after you?

22  A.   Yes.

23  Q.   And from 1995 on, though, was your principal job mixing or

24  something else?

25  A.   No, it was basically the janitorial work.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 84 of 134
To purchase a complete copy of the transcript

1   Q.   And how long did you continue to do janitorial work at the

2   American Pop Corn Company, Jolly Time?

3   A.   Until I became 65 and I could get my full retirement.

4   Q.   Okay.  And what year was that?

5   A.   Pardon?

6   Q.   What year was that that you left the plant?  2005?

7   A.   Yeah, 2005.

8   Q.   All right.  Now, I want to try to review your physical

9   condition with you.  And you made up a chart, helped us make up

10  a chart, 2196.  Well, before you put it up, I want to show

11  Mr. Pagliaro.  2196.

12  A.   Okay.  What was it about in '96?

13  Q.   It's the exhibit number.  Just look at your screen, and

14  you'll see what we're putting up there, Mr. Kuiper.  This is

15  that chart that you helped us make up.

16  A.   Okay.

17  Q.   Are you short of breath currently?

18  A.   Yes.

19  Q.   Are you short of breath all the time?

20  A.   Yes.

21  Q.   When did you go on oxygen?

22  A.   About two weeks ago.

23  Q.   Is that helping at all?

24  A.   Yes.

25  Q.   You have cough and phlegm.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 85 of 134
To purchase a complete copy of the transcript

1   A.   Yes.

2   Q.   Is that continual?

3   A.   Well, that's why I got this -- I got this -- I can't think

4   of the name of it, sick in the 1st of January.  I had to go to

5   the doctor because I knew I had this construction (sic) in my

6   lungs and I was having trouble breathing, so I decided I was

7   going to go get some antibiotics to break it loose.

8   Q.   Yeah.  You were spitting up blood at that time?

9   A.   Yeah.  Well, not until the Saturday after that.  That was

10  on the Tuesday, Tuesday, January 2.  But then about Saturday

11  then is when I started coughing up blood.

12  Q.   And what about lung pain?  Is that just pretty constant?

13  A.   Yes.

14  Q.   And what about swelling of your hands and feet?  Are you

15  suffering from that?

16  A.   Well, that's come on after I -- the lungs were -- had to

17  start moving stuff out of my lungs, and that's when that showed

18  up too.

19  Q.   And is that one of the problems that you're having in terms

20  of being able to walk?

21  A.   Yes, yes.

22  Q.   And does -- the swelling in your legs, it's actually

23  causing weeping of fluid from your legs?

24  A.   Yes.

25            MR. PAGLIARO:  Objection.  Leading.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 86 of 134

1   Q.   Well, sores, weeping, what does that refer to?  I'll

2   rephrase it.

3            THE COURT:  Okay.  Thank you.

4   Q.   On the chart it says sores, weeping.  What are you

5   referring to there?

6   A.   Well, the skin breaks open, and it -- the inside stuff

7   starts to bleed out.

8   Q.   And are they giving you water pills to help move that fluid

9   out of your legs?

10  A.   Yes, yes.

11  Q.   And what about this -- you're having trouble sleeping?

12  A.   Well, I don't sleep very well.  I wake up because of this

13  pain, and I have to -- and then my bladder problem don't give me

14  any help either so . . .

15  Q.   And you've gotta have -- you put down 24/7 care.  What does

16  that mean?

17  A.   Well, I gotta have someone near me, close to me all the

18  time because I just -- I'm scared of my falling so much.

19  Q.   And that includes Connie, of course.

20  A.   Yes.

21  Q.   And Earl?

22  A.   Yes.

23  Q.   And you've had weight gain according to this chart?

24  A.   Yes, yes.

25  Q.   What's that from?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 87 of 134

1   A.   Well, I think it was my diet, that I was eating too much

2   pasta food or something.

3   Q.   What about the steroids?  Have the doctors said that your

4   steroids that you've been on have contributed to that?

5   A.   Yes, it could be.

6   Q.   Ron, there's a -- you made another chart.  Let me show it

7   to Mr. Pagliaro.  2195.  Loss of enjoyment of life, you've kind

8   of categorized what's listed here.

9   A.   Yes.

10   Q.   Ron, is your life very enjoyable now?

11   A.   No, it isn't, not when you're sick.

12   Q.   And you're on oxygen, can't move, exhausted according to

13   the first bullet point.  What -- describe for the jury what

14   that's like.

15   A.   Well, when you gotta fight to get air, that's terrible,

16   trying to get air and you start to wheeze and everything else

17   so -- and it gets pain -- that just brings on the pain too.

18   Q.   And what about this second bullet point where it says you

19   can't work and work equals fun?  What was -- did you enjoy

20   working?

21   A.   Oh, yes, I did.  Just cut that out pretty much so . . .

22   Q.   You spent your whole life working.

23   A.   That's right.

24   Q.   That was a way of life for you.

25   A.   Yes.

To purchase a complete copy of the transcript

1  Q.   And you enjoyed working.

2  A.   Yes, yes.

3  Q.   You said can't take care of home, garden, farmers market.

4  What does that refer to?

5  A.   Well, I always growed a big garden, and we give away a lot

6  of stuff, but we also took some to the market, but it was a joy

7  to see great big tomatoes that you grow, really wonderful.

8  Q.   And you were quite a gardener?

9  A.   Yeah, I guess I must have been.  I had a --

10 Q.   How big was your garden?

11 A.   Well, I had two spots.  There was probably about 30-by-30

12 on each spot.

13 Q.   And did it make so much that your family couldn't eat it

14 all?  You had to give it away or sell it --

15 A.   Oh, yes, yes.

16 Q.   -- or take it to the farmers market?

17 A.   Yes.

18 Q.   Tell the jury after you retired, did you plan to continue

19 with that activity?

20 A.   I wanted to, but I just couldn't handle it.  My balance was

21 so bad, and I can't handle it.

22 Q.   What about this being dependent, Ron?  Is that very

23 enjoyable?

24 A.   No.

25 Q.   Have you been -- were you a fellow your whole life that was

1  independent?

2  A.    Yep, that's right.

3  Q.    Took care of yourself, took care of your family?

4  A.    Yes.

5  Q.    Took care of your kids?

6  A.    Yes.

7  Q.    Never needed anybody to give you anything.

8  A.    No, not really.

9  Q.    What's it like to be a guy that was independent his whole

10  life and now being dependent 24/7?

11  A.    It's an awful change, yeah.

12  Q.    What about lost friends?

13  A.    Yes.

14  Q.    And being able to go to church?

15  A.    That's right.  I miss that a lot because I -- that was a

16  real close schedule for me.

17  Q.    And lack of a social life.  Did you used to have dinner

18  with folks and go out?

19  A.    Oh, yes, yes.

20  Q.    And socialize and do that at church too?

21  A.    Oh, yes.

22  Q.    You mentioned that you're frequently at doctors.  Have your

23  trips to the doctor almost replaced your social life?

24  A.    That's right.

25  Q.    Is that nearly as rewarding going to the doctor all the

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov

Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 90 of 134
To purchase a complete copy of the transcript.

1  time?

2  A.    No, it isn't.  It just takes up a lot of time that you

3  begin to wonder what's going to happen next.

4  Q.    Dr. Farrell's a nice fellow, but that's not the guy you

5  want to socialize with, huh?

6  A.    No.

7  Q.    How many times, just to give the jury -- have you had to go

8  to the doctor since the trial started?

9  A.    Well, since -- I think it's about four or five times.

10 Q.    So when we made this chart up it was only two, but there's

11 been two additional.

12 A.    Yeah.

13 Q.    And are you in pain frequently, Ron?

14 A.    Oh, yeah, I got pain in my back all the time.

15 Q.    And you mentioned coughing up blood.  What is this

16 appetite, slash, barbecue?  What does that refer to?

17 A.    I don't have no appetite anymore.

18 Q.    Did you used to like to barbecue and go to barbecues?

19 A.    I didn't really like barbecue too much.

20 Q.    Well, I don't know why barbecue's up there then.  Somebody

21 thought you liked barbecue apparently, but your appetite's

22 pretty well gone.

23 A.    Yeah, that's right.

24 Q.    Despite that, you're still gaining weight.

25 A.    That's right.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 91 of 134

1  Q.   Is that mainly the fluid and the steroids?

2  A.   I think so, yes.

3  Q.   Let's look at 2197.  You talk about your emotions, Ron.  Do

4  you get angry sometimes?

5  A.   Yeah, I do get angry with myself because of what I've done,

6  you know, what's happened to me so -- can't get done what I

7  would like to do.

8  Q.   So it's very frustrating.

9  A.   Yes, it is.

10  Q.   And you talk about the injustice of it.

11  A.   Yes.

12  Q.   Now, you don't wish this on anybody I take it.

13  A.   No, that's for sure.

14  Q.   But you sure wish you were like your older brother?

15  A.   Yes.

16  Q.   In term -- he's able to get around.

17  A.   Yes.

18  Q.   You guys were playmates your whole life.

19  A.   Yes, we were.

20  Q.   And nearly twins.

21  A.   Yeah.

22  Q.   And he's able to --

23  A.   Lot more than I can, yeah.

24  Q.   And that's what you envisioned retirement to look like,

25  more like what your brother's doing?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-RAZ  Document 409  Filed 06/09/09  Page 92 of 134
To purchase a complete copy of the transcript.

1  A.    Yes, yes, yeah.

2  Q.    And, Ron, on this injustice, as far as you can figure out,

3  did you do anything wrong?

4  A.    No, I didn't do nothing wrong.  I was just thinking --

5  Q.    Just working.

6  A.    Yeah, I thought I was preparing good food for people.

7  Q.    Did you think that working was what you ought to do?  That

8  was your responsibility --

9  A.    Yes, yes.

10  Q.    -- to this society?

11        MR. PAGLIARO:  Objection.  Leading.

12        THE COURT:  Sustained.

13  Q.    Ron?

14  A.    Yes.

15  Q.    Did you -- well, let me ask a different question.  Did you

16  believe that by working you were jeopardizing your own health?

17  A.    No, I didn't.

18  Q.    What about depression, Ron?  Do you suffer from depression

19  or feelings like that?

20  A.    Oh, yeah.  Now with this pain that I've got, I've been

21  really -- I'm depressed a lot.

22  Q.    Were you generally an optimistic fella before all this?

23  A.    Oh, yes, but not anymore.

24  Q.    What about sadness, Ron?

25  A.    Well, I have that too, but I endure because I have strong

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 93 of 134

1  faith that we're close to the end of things.

2  Q.   What about frustration, Ron?

3  A.   Yeah, I get frustrated with myself when I make mistakes and

4  stuff like that.  I'm getting to the point where my hands, I

5  can't write very good.  That's terrible.

6  Q.   And are you able to use the bathroom by yourself or --

7  A.   Well, I've been doing okay, but I'm getting to the point

8  where now I need to have assistance.

9  Q.   Assistance just to use the bathroom.

10  A.   Yes.

11  Q.   What about showering?

12  A.   Yes, I have that too.

13  Q.   And does it take a long time to do all this stuff?

14  A.   Oh, my wife is pretty fast at it.

15  Q.   She's a -- she's a real help to you.

16  A.   Yes, she sure is.

17  Q.   And what about embarrassment, Ron?  Does --

18  A.   Yeah, it's embarrassing when it comes to doing it.  That

19  happens.

20  Q.   And are you self-conscious with the oxygen and being in

21  this chair?

22  A.   Yeah.  I'm not sure of myself.

23  Q.   Ron, are you -- did you hope that you would be able to be

24  an active grandfather with your grandchildren?

25  A.   That's right.  I would have, but I haven't got near the --

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript

Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 94 of 134

1  no strength to do it anymore.

2  Q.   And your great grandchildren, would you love to be an

3  active great grandfather to them?

4  A.   Oh, yes, yes.

5  Q.   Is that something that you always looked forward to,

6  helping train, raise up those kids?

7  A.   Right.

8          MR. PAGLIARO:  Objection.  Leading.

9          THE COURT:  Sustained.

10  A.   Right.

11  Q.   Tell the jury what your aspirations were in terms of your

12  grandchildren and great grandchildren, Ron.

13  A.   Well, it's nice to see them when they're younger, but after

14  they got older, they gotta take on responsibilities themselves,

15  and you like to help them and help their parents to get that

16  done, go in the direction or whatever.

17  Q.   Is that part of your belief system, Ron?

18  A.   Oh, yes.

19  Q.   That that's part of your responsibility?

20  A.   Oh, yes, that's my responsibility.

21  Q.   And have you been able to do that?

22  A.   Well, not for the last six years I haven't.

23          MR. MCCLAIN:  Thank you, Ron.  I have no further

24  questions.

25          THE COURT:  Members of the jury, we're going to take

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-RAZ   Document 409   Filed 06/09/09   Page 95 of 134

1   our noon recess.  We'll be in recess until 12:25.  And then when

2   we come back, we'll have the cross-examination of Mr. Kuiper.

3   Thank you.

4            (The jury exited the courtroom.)

5            THE COURT:  Counsel, anything we need to take up?

6            MR. PAGLIARO:  (Shook head.)

7            THE COURT:  Okay.  See you back at 12:25.  Thank you.

8            (Recess at 11:58 a.m.)

9            THE COURT:  Mr. Pagliaro, ready for the jury?

10           MR. PAGLIARO:  I am, Your Honor.

11           THE COURT:  Okay.  Thank you.

12           (The jury entered the courtroom.)

13           THE COURT:  Thank you.  Please be seated.

14           Mr. Pagliaro, whenever you're ready, you may

15   cross-examine.

16           MR. PAGLIARO:  Thank you, Your Honor.

17                         CROSS-EXAMINATION

18  BY MR. PAGLIARO:

19  Q.   Good afternoon, Mr. Kuiper.

20  A.   Good afternoon.

21  Q.   Now, Mr. Kuiper, you indicated, did you not, to your

22  treating doctors in the past that you had breathing problems

23  from the time you worked in the shelling area of the plant at

24  APC, didn't you?

25  A.   Yes, I did.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 96 of 134

1    Q.    And you told your doctors at the time that corn dust

2    bothered you; is that correct?

3    A.    Well, it naturally did.  I just didn't -- I had the same

4    problem when I was on the farm.  It bothered me, but it didn't

5    last.

6    Q.    And you just indicated that you actually spent some time in

7    your youth on a farm; is that right, sir?

8    A.    Oh, I been -- most of my life I've been on.

9    Q.    And you were raised on the farm?

10   A.    Yes.

11   Q.    And you actually worked that family farm for several years

12   in your early 20s; isn't that right, sir?

13   A.    Yes.

14   Q.    And in the course of that work on the farm, you were

15   involved with feeding the animals; isn't that correct?

16   A.    That's right.

17   Q.    And you indicated that the material that you were exposed

18   to, the feed and whatnot, that bothered your -- bothered you,

19   too, at the time, didn't it, sir?

20   A.    No, the feed didn't bother me.  It was just -- I never -- I

21   could get over that real easy.  That was just a matter of just

22   getting a nice rest.

23   Q.    So what on the farm that you said earlier bothered your

24   breathing?

25   A.    I don't think there's anything on the farm.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
To purchase a complete copy of the transcript
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 97 of 134

1    Q.    Okay.  Now, Mr. McClain referenced the fact that NIOSH came

2    in to visit the APC plant.  Do you recall that?

3    A.    Yes.

4    Q.    And you recall that they came and visited in 2001 and 2002.

5    Do you recall that?

6    A.    Yes.

7    Q.    And you gave them some answers to some questions they asked

8    at that time, didn't you, Mr. Kuiper?

9    A.    Uh-huh.

10            MR. PAGLIARO:  Could you put up 3689, 02, Cort,

11   please?

12   Q.    And this comes from you, Mr. Kuiper, as you can see.  And

13   these answers were given July 23, 2002.  Do you see that, sir,

14   up at the top?

15   A.    Okay.  All right.

16   Q.    And one question they asked you on the questionnaire, this

17   government questionnaire, was in what month and year did your

18   breathlessness start, and you answered September 1989; is that

19   correct?

20   A.    '89.  I think it's too far back.  I can't remember that.

21   Q.    You don't remember that.

22   A.    No, I don't remember that.

23   Q.    Do you recall giving that answer to the government at this

24   time, Mr. Kuiper?

25   A.    Say that again.

1    Q.   Do you recall giving this answer to the government at the

2    time they asked you questions?

3    A.   I think so, yes.

4    Q.   Okay.  And, sir, you also were asked in that questionnaire

5    about your use of respirators at the plant.  Do you recall that?

6    A.   Yes.

7    Q.   And you told us in response to Mr. McClain's questions that

8    while in the mixing room you only used the respirator when you

9    were using salt; is that right?

10   A.   Yes, yes.

11   Q.   Because you understood that the only time you had to wear

12   it was when you were using salt.

13   A.   Yes.

14   Q.   And, in fact, when the government asked you --

15        MR. PAGLIARO:  Could you go to the one above that,

16   actually the one above that first, please?  Thank you.

17   Q.   The government asked you what percentage of the time did

18   you wear a respirator while pouring flavorings into the tanks in

19   the mixing room.  You answered 30 percent; is that correct?  Do

20   you recall that?

21   A.   Well, I don't think so.  I don't think that's right.  I

22   don't think that was -- I kind of cheated myself there a little

23   bit.  I think it was probably -- it wasn't quite as bad I don't

24   think because it wasn't -- I hadn't been in there that much

25   long, and you get away from it, why, that's kind of a break.

1   Q.   So is your answer that the response 30 percent of what

2   percentage of time did you wear a respirator while pouring

3   flavors into the tanks in the mixing room that you gave to the

4   government investigators at NIOSH in 2002 that that 30 percent

5   is not correct?

6           MR. MCCLAIN:  Your Honor, I object to the form of the

7   question.  It lacks foundation.

8           THE COURT:  Overruled.

9   BY MR. PAGLIARO:

10  Q.   Is that correct, sir?

11  A.   Well, I don't know what to say here now.  I got myself in a

12  corner here.  I just felt that the -- as far as the oil was

13  concerned, there was nothing really bothered me.  I just figured

14  it was food.

15  Q.   Okay.  My question is did you tell the government

16  investigators when they asked you this question that you only

17  wore your respirator while pouring flavors in the mixing room 30

18  percent of the time?  Was that what you told the government in

19  2002?

20  A.   Yeah, yes.

21  Q.   Okay.  Thank you.  And the next question they asked you is

22  what percentage of the time did you wear a respirator while

23  pouring other ingredients into tanks in the mixing room, and you

24  answered 20 percent.  Is that correct?

25  A.   Well, yeah.  The salt is what was the basic condition they

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov

Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 100 of 134
to purchase a complete copy of the transcript.

1    were concerned about.  That was the only thing we knew that was

2    going to hurt us.

3    Q.   Third question, Mr. Kuiper, is what percentage of time did

4    you wear a respirator while checking the levels in the tank, and

5    you answered 20 percent.  Is that correct, Mr. Kuiper?

6    A.   Well, not even that much because I just -- it was just a

7    matter of just quickly opening the lid to see how much I had,

8    whether I had to get ready to mix another batch.

9    Q.   And you said it was quickly.  In fact, you told us before

10   that when you lifted that tank lid it was only open for a few

11   seconds; isn't that true?

12   A.   Well, that's true.

13   Q.   You didn't put your head down in that tank when you were

14   opening that tank for a few seconds, did you, Mr. --

15   A.   No.

16        MR. PAGLIARO:  Thank you, Cort.

17   Q.   Now, Mr. Kuiper, you received a letter back from NIOSH soon

18   after your questionnaire, didn't you, sir?

19   A.   Yes.

20        MR. PAGLIARO:  Could you put up 3547, please, Cort?

21   Q.   This is a letter that's directed to Ronald Kuiper dated

22   August the 27th, 2002, sir.

23   A.   Uh-huh.

24   Q.   And you received that letter, didn't you, Mr. Kuiper?

25   A.   Yes.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 101 of 134

1  Q.   That letter had some breathing test results that the
2  government sent to you from the tests they took of you at around
3  that time, didn't they, sir?
4  A.   Yes, yes.
5  Q.   And those results were enclosed with the letter, weren't
6  they, Mr. Kuiper?
7  A.   Yes.
8  Q.   And the government described those results to you in the
9  following way.  Do you see the language there?  The results of
10 your baseline spirometry testing conducted on July 23, 2002,
11 were interpreted as being abnormally low.  Does it say that,
12 Mr. Kuiper?  Do you see that?
13 A.   Uh-huh, yes.
14 Q.   Okay.
15       MR. PAGLIARO:  And could you look at 3539, Cort,
16 please?
17 Q.   And that is the report of the findings, Mr. Kuiper, that
18 they sent to you with the letter.  Do you remember that?
19 A.   No, I don't even remember it.
20 Q.   Okay.  Did you get --
21       MR. PAGLIARO:  Would you show the whole letter to
22 Mr. Kuiper, please, the whole page, Cort, so he can look at it?
23 Q.   Do you remember getting this list of numbers, Mr. Kuiper,
24 that told you what your results actually were along with the
25 letter from the government?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 102 of 134

1    A.    No, I don't.

2    Q.    You don't recall that.

3    A.    I don't remember it anyway.

4    Q.    Do you recall the government telling you in this letter

5    that the reduction in your breathing was very severe?  Do you

6    recall that?

7    A.    I knew it was severe from the time I was in there.  I

8    didn't have to . . .

9    Q.    So the government investigators were there in 2001, 2002,

10   spoke to you in 2002.

11   A.    Uh-huh.

12   Q.    And did breathing tests of you in 2002.

13   A.    Yeah, but they never told me anything was going to hurt me

14   but the salt.

15   Q.    Well, the gov -- you knew the government was there

16   investigating whether or not there was a connection between

17   people's breathing problems and what was going on in the mixing

18   room at American Pop Corn, didn't you?

19   A.    Well, they did that, but they didn't explain anything about

20   what was causing it.

21   Q.    Okay.  And is it your testimony that you didn't have any

22   knowledge from the employer there, from your American Pop Corn

23   Company employer, that there was any other issue other than salt

24   in the mixing room?

25   A.    That's right.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 103 of 134

1  Q.   That's your testimony.

2  A.   That's right.

3  Q.   Now, Mr. Kuiper, you knew there were respirators available

4  for you to use in the mixing room; is that correct?

5  A.   Well, yes.

6  Q.   And you described those respirators.  They were cartridge

7  respirators, weren't they, sir?

8  A.   Right, yes.

9  Q.   And did you know, sir, about any indication of diacetyl

10  causing eye irritation in the mixing room?  Did you know that?

11  A.   No.

12  Q.   And no one at American Pop Corn Company told you that one

13  of the reasons for the respirators was the fact that there was

14  diacetyl in butter flavoring that was irritating to the eye.

15  A.   No.

16  Q.   And do you recall ever complaining to the people at

17  American Pop Corn about eye irritation when you were in the

18  mixing room?

19  A.   No.

20  Q.   Now, at some point in 1995 you requested a transfer out of

21  the mixing room; isn't that true, Mr. Kuiper?

22  A.   '95 I think is a little bit too early.  I think it was

23  closer to when I was 62 that I decided I wanted to be out of

24  there.

25  Q.   So you don't recall being taken out of the job of mixer in

Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 104 of 134

1    '95, permanent mixer.

2    A.    Boy, I thought I was in there longer than that.  I don't

3    remember.  I just don't remember.

4    Q.    Sorry.  After you left your mixing position, you testified

5    that you went back to work as a janitor; is that correct?

6    A.    That's right, yes.

7    Q.    And you were a janitor in the microwave building; is that

8    right?

9    A.    Yes, yes.

10    Q.    And the microwave building was a building separate from the

11    other buildings in the plant, wasn't it?

12    A.    It was sealed off from the hallway and so forth.

13    Q.    And the mixing room actually was separate from the rest of

14    the building; is that right?

15    A.    Well, not really, but it was part of the building, but it

16    was -- the doors were kept shut on it all the time.

17    Q.    Okay.  So it was a separate room in the building with shut

18    doors.

19    A.    That's right.

20    Q.    And they were supposed to be kept shut all the time.

21    A.    That's right.

22    Q.    And you retired from American Pop Corn Company in 2005; is

23    that right, Mr. Kuiper?

24    A.    Well, I took my retirement in 62 because I -- my condition

25    was so bad by then.  My doctor, Dr. Farrell, told me I had to

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 105 of 134

1  get out of there.

2  Q.   Okay.  But you didn't finally retire from the company till

3  2005.  Don't I have that right?

4  A.   That's right.

5  Q.   Okay.  But at 62 actually you applied to the Social

6  Security Administration for disability, didn't you, sir?

7  A.   Yes.

8  Q.   And you applied for a job-related disability, didn't you,

9  Mr. Kuiper?

10 A.   Yes, because I thought I had -- because of the salt.

11 Q.   But you applied for a job-related disability in 19 --

12 excuse me, in 2002.

13 A.   Yes.

14 Q.   To the federal government.

15 A.   Yes.

16         MR. PAGLIARO:  Could you put up Exhibit 3520, please?

17 Q.   And this is a form, a disability report form, for Ronald

18 Kuiper; is that right, sir?

19 A.   Yes.

20 Q.   And if you look at the back of this form --

21         MR. PAGLIARO:  The very last page, Cort, please.

22 Q.   -- that's your signature, isn't it, Mr. Kuiper?

23 A.   Yes.

24 Q.   And that signature is dated January the 9th, 2002, isn't

25 it, Mr. Kuiper?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov

Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 106 of 134
to purchase a complete copy of the transcript.

1   A.   Uh-huh, yes.

2   Q.   And again, this form is a form that you provided to the

3   federal government; is that true?  The Social Security

4   Administration is part of the federal government?

5   A.   I don't know who it was made out to anymore now.

6   Q.   All right.  Let me just ask it this way.  It's a form that

7   you provided to the Social Security Administration; isn't that

8   right?

9   A.   It looks like it.

10  Q.   And you wanted a government disability check; is that

11  right, Mr. Kuiper?

12            MR. MCCLAIN:  Your Honor, relevance.

13            THE COURT:  Overruled.

14            MR. MCCLAIN:  Your Honor, could I approach at sidebar?

15            THE COURT:  No thanks.

16  A.   They probably were doing that, but -- because of my

17  condition was so bad at that time already that I was, shall we

18  say, to the point of getting desperate as to how I was going to

19  get out of there.

20  Q.   Okay.  And on the second page of that form, Mr. Kuiper --

21            MR. PAGLIARO:  Could you put up page 2, please?

22  Q.   -- you indicated that you had breathing and lung problems.

23  Do you see that?

24  A.   I thought I did because of the condition I was in.

25  Q.   And the government -- and the Social Security

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 107 of 134

1  Administration form that you filled out said on D, "When did

2  your illness, injuries, or conditions first bother you?"  Do you

3  see that?

4  A.   Uh-huh, yes.

5  Q.   And you answered September 1990, didn't you, Mr. Kuiper?

6  A.   That wasn't right.

7  Q.   I'm sorry, sir?

8  A.   I don't think that was right.  It should have been back

9  in -- closer to the 2000 area.

10  Q.   Okay.

11  A.   I probably made a mistake there when I filled that out.

12  Q.   So you made a mistake when you filled out the --

13  A.   I think so.

14  Q.   Now, you indicated when you were working in the --

15       MR. PAGLIARO:  You can take that down, please, Cort.

16  Q.   -- when you were working in the corn shelling department

17  you worked in and around a corn crib; is that right, sir?

18  A.   Uh-huh.

19  Q.   And that job was pretty physical, wasn't it, Mr. Kuiper?

20  A.   Yes.

21  Q.   You had to make sure the corn was on the conveyor belt

22  getting into the sheller, didn't you, sir?

23  A.   Uh-huh, yes.

24  Q.   And you had to sweep up and clean up whenever there was a

25  mess there; isn't that right, sir?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ  Document 409  Filed 06/09/09  Page 108 of 134

1    A.    That's right.

2    Q.    And you weren't handling any butter flavoring or any of the

3    ingredients --

4    A.    No.

5    Q.    -- there in the shelling area, did you, sir?

6    A.    That's right.

7    Q.    And then in 1992, you transferred to the mixing room; isn't

8    that right?  First janitor and then the mixing room; is that

9    right?  Do I have that right?

10   A.    Yes.

11   Q.    And after you left the mixing room, one of your duties

12   continued to be cleaning out the tanks every Friday; right?

13   A.    Yes, that was rinsing them out with the hot water.

14   Q.    And you -- every Friday routinely in the mixing room,

15   things were taken apart, and the tanks were flushed with hot

16   water; right?

17   A.    That's right.

18   Q.    And in addition, there were some cleaning agents used;

19   isn't that right, sir?

20   A.    Yes.

21   Q.    Now, did you have to wear a respirator when you cleaned the

22   tanks?

23   A.    No.

24   Q.    So you did not wear a respirator --

25   A.    No.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 109 of 134

1    Q.    -- at the time you were cleaning the tanks out.

2    A.    No.

3    Q.    Did you report to Dr. Farrell or any of your other

4    physicians at the time that the process of cleaning the tanks

5    was bothering your breathing?

6    A.    Well, more from the steam, from the water.

7    Q.    Did you complain about the cleaning materials that you

8    used?  Do you recall that?

9    A.    No, I don't recall that.

10   Q.    Now, your current diagnosis is from Dr. Parmet; is that

11   correct?

12   A.    Yes.

13   Q.    And you saw Dr. Parmet as a result of a contact you had

14   with Mr. McClain's office; is that correct?

15   A.    Yes.

16   Q.    So Mr. McClain directed you to go to Kansas City to see --

17   or someone in his office to see Dr. Parmet.

18   A.    Yes.

19   Q.    And that was in April 2006, wasn't it, sir?

20   A.    Yes.

21   Q.    And that was the first time you had ever met Dr. Parmet.

22   A.    That's right.

23   Q.    And you hadn't sought him out on your own.  You didn't see

24   him in a phone book or anything; right, sir?

25   A.    No.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 110 of 134

1  Q.   You made a special trip.

2  A.   Right.

3  Q.   And you got in your car, and you all drove to see

4  Dr. Parmet.

5  A.   Uh-huh.

6  Q.   And the first time you ever laid eyes on Dr. Parmet was the

7  day he diagnosed you in April 2006.

8  A.   Yes.

9  Q.   Now, Mr. Kuiper, you've had some other health issues,

10  haven't you, sir?

11  A.   Well, it's all connected with this salt and flavoring.

12  Q.   Let's take them one at a time.  You've had high blood

13  pressure for many years, haven't you, Mr. Kuiper?

14  A.   Well, yeah.  That didn't bother me that much.

15  Q.   And you were taking medications for high blood pressure,

16  weren't you, sir?

17  A.   Yes.

18  Q.   And, in fact, in 2001 unfortunately you had a small stroke,

19  didn't you, sir?

20  A.   Yes.

21  Q.   And you were hospitalized at that time.

22  A.   Uh-huh.

23  Q.   And you understood that there was a blood clot from -- that

24  was thrown that caused you to have the stroke.

25  A.   That's what they told me anyway.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 111 of 134
to purchase a complete copy of the transcript.

1  Q.   And did that stroke cause you to have problems with your

2  balance, Mr. Kuiper?

3  A.   To a certain amount, not that time.  It was just not that

4  severe because it didn't bother my balance as much as it did my

5  speech and my arms.

6  Q.   And the stroke did have an impact on your life, didn't it,

7  sir?

8  A.   Oh, yes.

9  Q.   You have your scooter.  How long have you been using just

10 your scooter?

11 A.   Well, since about September.

12 Q.   September?

13 A.   September of last year.

14 Q.   And were you using a walker as well, sir?

15 A.   Yes, I was at the time.  When I can't get around with the

16 scooter, why, I just use a walker.

17 Q.   And you mentioned that the oxygen that you're using right

18 now, you only started using that oxygen about two weeks ago; is

19 that correct?

20 A.   Yeah, two weeks, three weeks ago, yes.

21 Q.   All right.  So we've been at this trial a week, so it was a

22 little bit before the trial; is that correct?

23 A.   Yes, yes.

24 Q.   And you haven't seen Dr. Farrell or treated with

25 Dr. Farrell for many, many months, have you, Mr. Kuiper?

Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 112 of 134

1  A.   No, I haven't -- Dr. Farrell moved out of town in about the

2  1st of November.

3  Q.   You were hospitalized, as Mr. McClain asked you, in

4  January, weren't you, Mr. Kuiper?

5  A.   Yes.

6  Q.   And that hospitalization was the result of an infection you

7  developed, wasn't it, Mr. Kuiper?

8  A.   Yes, right.

9  Q.   And that infection was what resulted in the blood you were

10  coughing up, isn't it, sir?

11  A.   That's right.

12  Q.   Has that infection cleared up, Mr. Kuiper?

13  A.   Most of it has, but still my lungs are sore.  I can tell

14  that.

15  Q.   Are you on an antibiotic now, Mr. Kuiper?

16  A.   Yes.

17  Q.   You mentioned that you also are coughing up a lot of

18  sputum, phlegm, whatever.  Do you recall that?

19  A.   Yes.

20  Q.   Now, that coughing up of phlegm, sputum, that's been going

21  on for many, many years, hasn't it, Mr. Kuiper?

22  A.   No, not necessary -- no, huh-uh.  Basically since I've been

23  in the oil room.

24  Q.   Have you reported to your doctors over the years that that

25  was an issue with you, Mr. Kuiper?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 113 of 134

1   A.   Well, I just -- I knew -- I just blamed -- I knew that was

2   what it was.  I didn't know what was causing it.

3   Q.   You mentioned also that you have pain in your back and your

4   hip; is that right?

5   A.   Yes, it's all caused by the same thing because they're all

6   connected together here.

7   Q.   You've been diagnosed also with osteoporosis, haven't you,

8   Mr. Kuiper?

9   A.   Pardon?

10  Q.   You've been diagnosed with osteoporosis?

11  A.   No.

12  Q.   You don't know that?

13  A.   No.

14  Q.   Okay.  Now, Mr. Kuiper, you -- when you worked in the

15  mixing room, you know that there were available material safety

16  data sheets, don't you --

17  A.   Yes.

18  Q.   -- for materials?

19  A.   Yes.

20  Q.   And you indicated you never looked at those material safety

21  data sheets, did you?

22  A.   I never did because I felt that the people who were in

23  charge of that -- those things were -- would warn me if there

24  was a problem, and I just feel we were mixing food.

25  Q.   But you didn't consider yourself a cook or a chef, did you,

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 114 of 134

1  Mr. Kuiper?

2  A.    No.

3  Q.    And, in fact, you told Dr. Parmet when he interviewed you

4  that when you used some of those flavorings -- you talked about

5  North American Flavoring Company's flavors -- that the flavoring

6  actually bothered you, didn't you?

7  A.    Well, I was just trying to -- didn't know where to put the

8  finger on.  It was just that there was something going on.

9  Q.    But you told Dr. Parmet that the flavorings bothered you,

10  didn't you, Mr. Kuiper?

11  A.    Dr. Parmet?

12  Q.    Yes.

13  A.    I don't remember that.

14  Q.    You don't recall that.  Now, you worked with butter

15  flavorings in the mixing room.  Did you ever work with the

16  material pure diacetyl?

17  A.    No.

18  Q.    You never saw -- worked with or saw a container just of

19  diacetyl.

20  A.    I don't think so.

21  Q.    What you were working with were butter flavors.

22  A.    Yes.

23  Q.    Okay.  And did you look at the labels of those products at

24  all, Mr. Kuiper?

25  A.    No.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 115 of 134

1  Q.   Now, Dr. Farrell was the plant doctor, wasn't he,

2  Mr. Kuiper?

3  A.   Yes.

4  Q.   And did you know he was the plant doctor when you went to

5  see him originally?

6  A.   Yes.

7  Q.   Did he ever come and look at your situation when you were

8  working in the plant?  Did he come and observe you?

9  A.   Yes, I think so.

10 Q.   He did?  And when was that?  Do you know what year that

11 was?

12 A.   No, I don't remember.

13 Q.   And did he come to look at you because he was ind -- strike

14 that.

15          Did he come to look at you for the reason of observing

16 your job duties in the mixing room?

17 A.   Probably.  I don't know.

18 Q.   Did they have safety meetings at American Pop Corn?

19 A.   The worst part about it is I had to miss those because I

20 was mixing the oil and I had to be in there 24/7 to keep

21 everything going, make sure it was all ready to go when they

22 come back.

23 Q.   When you decided to bring this lawsuit, was it your

24 mother-in-law who saw something about the lawsuit and told you

25 about it?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 116 of 134

1   A.   I had read things about it before that when she -- before

2   she mentioned it to me, and I just figured that, Well, Jolly

3   Time has been so careful, it must be that they must be keeping

4   it away.

5   Q.   And you said you read something.  What did you read,

6   Mr. Kuiper?  Do you recall?

7   A.   I don't remember now.

8   Q.   Did you see it in the newspaper?

9   A.   No, I don't think so.

10  Q.   And that's what prompted you to call Mr. McClain or his

11  office?

12  A.   Well, yeah, to -- after I found out more what was going on

13  because of what she was reading or so forth, then I thought it

14  was time for me to do something.

15  Q.   But you had met with a lawyer before you met Mr. McClain,

16  didn't you, Mr. Kuiper?

17  A.   Probably.

18  Q.   Didn't you tell us that you met with a lawyer from

19  Minnesota at some point?

20  A.   Yes.

21  Q.   And that lawyer was related to someone you know; isn't that

22  true?

23  A.   Yes.

24  Q.   And who was that person?  Do you remember?

25  A.   Mel Holst.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 117 of 134

1    Q.    Mel Holst?

2    A.    Yes.

3    Q.    And you met with Mel Holst and a lawyer at a breakfast; is

4    that true?

5    A.    Yes, we went and met.

6    Q.    Do you remember when that was, Mr. Kuiper?

7    A.    No, I don't remember when that was.

8    Q.    Did you decide at that point not to file a lawsuit?

9    A.    No, I didn't at that time because I didn't know what was

10   going on, what did I have.  Didn't know until '06 that I had

11   butter flavoring obliterans.  It was 1906 -- or 2006, excuse me.

12   Q.    Did anyone tell you Mr. Remmes had been diagnosed with any

13   condition?

14   A.    Well, they said that, but I'm not -- I don't buy that very

15   much because I knew Mel, what he was doing, and he was exposed

16   to it just as well as anybody else was.

17         MR. PAGLIARO:  Your Honor, I have no further questions

18   at this time.  Thank you very much.

19         THE COURT:  Okay.  Thank you.

20         MR. PAGLIARO:  Thank you, Mr. Kuiper.

21         THE COURT:  Mr. McClain?

22                     REDIRECT EXAMINATION

23   BY MR. MCCLAIN:

24   Q.    Can you answer a few more?  Are you okay?

25   A.    Yeah, I'm all right.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 118 of 134

1  Q.   Okay.  Now, Mr. Pagliaro asked you some questions about

2  life on the farm and, you know, that you started being short of

3  breath when you went into the corn crib in '85.  In 1988 did you

4  take a treadmill test?

5  A.   A what?

6  Q.   Treadmill test.

7  A.   Treadmill -- you mean on the treadmill?

8  Q.   Yeah.

9  A.   Yes, Dr. Farrell did that.

10 Q.   Yeah.  And Dr. Parmet talked to us about that.  That was in

11 1988.

12 A.   Yeah.

13 Q.   And in 1988 after you'd already been working with the corn,

14 you went for ten minutes; is that right?

15 A.   Yeah.  Not anymore.

16 Q.   Yeah.  And so was the shortness of breath before you got

17 into the mixing room something that would come and go?

18 A.   Yes, it would.

19 Q.   But after you got into the mixing room, did it pretty much

20 stay?

21 A.   That's right.  It just stayed right there.

22 Q.   Now, I don't have that chart.

23       MR. MCCLAIN:  Can you put that chart back up for me

24 from NIOSH, whoever -- who's ever running that, the

25 questionnaire?  Mr. Pagliaro, can you give us the number of

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 119 of 134

1   that?

2          MR. PAGLIARO:  Yeah, sure.  Hold on.  Hold on.

3          MR. MCCLAIN:  3689.002.  Okay.  Yeah.  Would you go to

4   those numbers that Mr. Pagliaro was showing you about the

5   percentage of time?  No, no, the next page, percentage of time

6   he was wearing a respirator, wherever those were, the 20, 30,

7   40, yeah, those numbers right there.

8   BY MR. MCCLAIN:

9   Q.   Ron, I was noticing something here.  In regard to the

10  percentage of times you were wearing the respirator, it looks to

11  me like you told them when you add all these together that you

12  were wearing the respirator pretty much all the time.  Is that

13  really what you were saying to the NIOSH investigators?

14  A.   No, I don't think so.

15  Q.   Okay.  What were you telling them in terms of your

16  percentage of time that you wore the respirator in there?

17  A.   Well, I wore it because of the salt.

18  Q.   But did you wear it most of the time?

19  A.   Oh, yes, I always wore it when putting salt in.

20  Q.   Okay.  And that was -- and pretty much you were around salt

21  all the time in there.

22  A.   That's right.  That's right.

23          MR. PAGLIARO:  Objection.  Leading.

24          THE COURT:  Overruled.

25  Q.   Is that right?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 120 of 134

1  A.    Yes.

2  Q.    Okay.  And so when you add all these up, that's a hundred

3  percent of the time.  Is that fair?

4          MR. PAGLIARO:  Objection.  Leading.

5          THE COURT:  Sustained.

6  BY MR. MCCLAIN:

7  Q.    Mr. Kuiper, what did you tell the NIOSH investigators about

8  how much time you really were wearing a respirator?

9  A.    I -- they never questioned me about that as to how much,

10 how long I was wearing it.

11 Q.    Well, you tell us then.  As between, you know, very little

12 time or most of the time, how much time were you actually

13 wearing a respirator in there in the mixing room?

14          MR. PAGLIARO:  Objection.  Asked and answered.

15          THE COURT:  Overruled.

16 A.    Well, I used it basically for the salt.

17 Q.    Okay.  You didn't know to wear it for the butter flavor.

18 A.    No.

19 Q.    And you mentioned about the NIOSH test.  When the

20 government was there, did they tell you anything about butter

21 flavor being a cause of any problem you were having?

22 A.    No, they did not.

23 Q.    Did they ever tell you you have bronchiolitis obliterans

24 caused by exposure to butter flavor?

25 A.    No.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 121 of 134

```
 1   Q.   They ever mention Givaudan to you at all?

 2   A.   No.

 3   Q.   Did they ever mention diacetyl to you at all?

 4   A.   No.

 5   Q.   When this thing was taken in 2002, had you already had your

 6   stroke?

 7   A.   I had, yes, I had.

 8   Q.   So by the time you were being questioned, you'd already had

 9   the stroke.

10   A.   Yes.

11   Q.   And by that time, you weren't mixing anymore either, were

12   you?

13   A.   It was in -- okay.  No, I don't think so.

14   Q.   By the way, he mentioned osteoporosis.  You've been on

15   steroids for your breathing, haven't you?

16   A.   I don't remember.

17   Q.   You've been on steroids for your breathing?

18   A.   I think so.  I'm not sure.

19   Q.   Is one of the side effects of taking steroids bone loss?

20   Do you know that?

21   A.   No, I didn't know that.

22   Q.   Okay.

23            MR. MCCLAIN:  Thank you, Mr. Kuiper.  That's all the

24   questions I had.

25            THE COURT:  Okay.  Why doesn't everybody take a
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 122 of 134

1    stretch break.

2           MR. PAGLIARO:  Thank you, Your Honor.

3           THE COURT:  Mr. McClain, what's next?

4           MR. MCCLAIN:  We're going to call Ron's mother-in-law,

5    Gladys Crawford, and very -- you know, few questions I have, and

6    then play the video deposition of Mr. Davis, Mike Davis, the CEO

7    of Givaudan, which is about 40 minutes, so I'm kind of thinking

8    that that will take our day.

9           THE COURT:  Okay.  Why don't you call your next

10   witness.

11          MR. MCCLAIN:  We call Gladys Crawford to the stand.

12           GLADYS CRAWFORD, PLAINTIFF'S WITNESS, SWORN

13          THE COURT:  Okay.  Please be seated in the witness box

14   there.  You have to walk around the other way.  Thank you.  And

15   you can adjust the chair and the microphones so you can speak

16   directly in them.  Can I get you to scoot that chair up a little

17   bit?  And would you tell us your full name, please, and spell

18   your last name.

19          THE WITNESS:  It's Gladys Leesley Crawford,

20   C-r-a-w-f-o-r-d.

21          THE COURT:  Thank you.

22          Mr. McClain?

23                        DIRECT EXAMINATION

24   BY MR. MCCLAIN:

25   Q.  Miss Crawford, would you tell the jury who you are?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 400   Filed 06/09/09   Page 123 of 134

1  A.    I'm Ronald's mother-in-law, Connie's mother.

2  Q.    And can you tell us where you live?

3  A.    I live at Sloan, Iowa, formerly at Oto, Iowa, on a farm.

4  Q.    And is that where Connie grew up, in Oto?

5  A.    Yes.

6  Q.    You've been a farmer your whole life or a farm spouse?

7  A.    Most of my life.  My father became ill when I was -- in the

8  eighth grade we moved into town, and then after I got married

9  and my husband came home from service, we started farming.

10 Q.    I want to take you back to the time when Ron and Connie

11 began dating.

12        MR. MCCLAIN:  Would you put up that picture, Scott, of

13 their wedding?  Can you find that?

14 A.    Where's it at?  Over here?  Right here.

15 Q.    This takes you back I guess.

16 A.    (Witness nodded head.)

17 Q.    Back at that time would you describe Ron's health for the

18 jury, please.

19 A.    Well, he was very healthy.  I thought he was vigorous.  He

20 worked hard, had lots of energy, seemed like he -- always busy.

21 He loved his gardening.  I remember that.

22 Q.    You mentioned his garden too.  How big was that garden?

23 A.    Pretty huge.  He had two actually.  One was mostly

24 potatoes.  In fact, I think it was all potatoes, and he dug

25 those by hand.  I remember that.  And then the other one was

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 124 of 134

1  just as large, and it was just across the -- on the other side

2  of the yard, and, oh, I'd say it was bigger than that area

3  there.

4  Q.   Now, he said that back in those days when he got married he

5  was working two jobs.  Is that accurate?

6  A.   As far as I know, yes.  He had -- I think the paper route

7  early in the morning, I know that -- I think he had to get up

8  about four o'clock for that one.  And then he'd go to work after

9  he got off of that to his other job.

10  Q.   And can you tell us whether or not in addition to the paper

11  route and working at American Pop Corn, Jolly Time, he also

12  maintained this garden, this huge garden that you talked about?

13  A.   Yes.

14  Q.   And did he also remain active with the kids?

15  A.   Yes, sort of.  I don't remember too much.  I know he

16  barbecued and always seemed like he was feeding a bunch all the

17  time.

18  Q.   Oh, so he was pretty much the cooker.

19  A.   Yes, he was.

20  Q.   All right.

21  A.   Very good too.

22  Q.   And so -- and maybe that's why we had barbecue up there on

23  that list.  You weren't in here, but we were trying to figure

24  out why we put up -- did he enjoy things back then being the

25  host at those family gatherings?

Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 125 of 134
to purchase a complete copy of the transcript.

1   A.   Yes, he did.

2   Q.   All right.  And so he was an active, healthy fellow.

3   A.   Yes, I'd say so.

4   Q.   And was he ever a smoker or drinker as far as you know?

5   A.   No, never.

6   Q.   And healthy liver.

7   A.   (Witness nodded head.)

8   Q.   He was -- was he -- as far as you could tell when you

9   were -- when he first married your daughter, any health problems

10  at all that you could tell?

11  A.   No, none.

12  Q.   Now, since '95, has he been well?

13  A.   Not very.  It seemed like he just went -- every time you

14  seen him, he was a little weaker and seemed like tireder, needed

15  a lot more sleep, just seemed like he just -- as soon as he was

16  done eating, he'd have to go lay down.

17  Q.   And from a grandmother's perspective, did you see how this

18  was impacting the family?

19  A.   Well, yeah, I mean, it was just like -- I don't know.  He

20  wasn't with them, I mean.  He was either at work or sleeping

21  seemed like or eating.

22  Q.   And that was different than the fellow that your daughter

23  married.

24  A.   Yes.

25  Q.   He was always active and always involved up until the time

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 126 of 134
to purchase a complete copy of the transcript.

1  that he started getting sick.

2  A.    Right.

3  Q.    But from '95 on even though he was sick, did he keep

4  working?

5  A.    Yes, always.

6  Q.    Huh?

7  A.    Yes.

8  Q.    He was always -- he kept working.

9  A.    Yes, he did.  Up early and gone to work.

10  Q.    Was that a struggle for him to be able to get to work every

11  day as you observed it?

12  A.    Couldn't really tell.  I mean, he just did it.

13  Q.    He just pushed himself through it.

14  A.    Yes.  He never complained about it.

15  Q.    And then finally -- and finally he had to quit.

16  A.    Yeah.

17  Q.    Now, have you been observing since the time that he quit?

18  I guess that was back in '05, and now it's '09.  It's four

19  years.  Has he continued to decline during that time period?

20  A.    Yes.

21  Q.    Just to give -- go ahead.

22  A.    They had so many steps in the house, it was a struggle for

23  him to get up and down the steps, you know.  He always did it

24  but, awe, struggle and then got so he didn't at all.  I mean, he

25  had to just give it up.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 127 of 134

1    Q.    Has it been a struggle more and more as time's gone on?

2    A.    Yes.

3    Q.    And by the way, how old are you?  I don't mean to put you

4    on the spot but . . .

5    A.    I don't mind.  I usually say I'm going to be 83 in April,

6    but I'm 82.

7    Q.    You're 82.  And he's s --

8    A.    My sister says why do you want to make you sound older than

9    you are.

10   Q.    And he's 69.  Thank you.  I don't have any further

11   questions.

12   A.    Seems like young to me.

13            THE COURT:  Mr. Meador?

14            MR. MEADOR:  Thank you.

15                       CROSS-EXAMINATION

16   BY MR. MEADOR:

17   Q.    Good afternoon.

18   A.    Oh.  Hello.

19   Q.    Hi.  How are you doing?

20   A.    Oh, good I guess.  I'm a little nervous.

21   Q.    Aren't we all?

22   A.    Never did this before.

23   Q.    What is the Foster house?

24   A.    Excuse me?

25   Q.    The Foster house, what is that?

Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 128 of 134

1   A.   The Foster house.   What --

2   Q.   Yeah.   Prior to the last couple months, where was Ron

3   living?

4   A.   Oh.   Down at Sergeant Bluffs you mean?   He's living in an

5   apartment now.

6   Q.   Let me try one more time.   Do you know what the Floyd House

7   is?

8   A.   Yes, Floyd House.   I didn't understand you the first time.

9   Q.   It's okay.   I can't read my own handwriting.   What is the

10  Floyd House?

11  A.   What is it?

12  Q.   Yeah.

13  A.   It's a assisted living home.

14  Q.   And Ron was living there the last year; right?

15  A.   Yes, for a short time.   I don't know just how long.

16  Q.   He was living there by himself; true?

17  A.   Yes, but Connie was there a lot and different -- and the

18  daughters were nearby.   They were in and out.

19  Q.   And then he moved out of that house recently; right?

20  A.   Yes, last fall.

21  Q.   And he also recently was placed on oxygen; right?

22  A.   Yes.

23          MR. MEADOR:   Thank you.   I don't have any more

24  questions.

25          THE WITNESS:   Okay.

1            THE COURT:  Any redirect?

2            MR. MCCLAIN:  No redirect, Your Honor.

3            THE COURT:  Okay.  Mrs. Crawford, you may step down.

4            THE WITNESS:  Oh.

5            THE COURT:  Wasn't so bad, was it?

6            THE WITNESS:  No.  Better take my purse, though.

7            MR. MCCLAIN:  Your Honor, may she stay in the

8    courtroom now?

9            THE COURT:  Any objection?

10           MR. MEADOR:  No objection.

11           THE COURT:  Sure.

12           MR. MCCLAIN:  Mr. Davis's deposition, Your Honor, is

13   our next piece of evidence.

14           THE COURT:  And that's about 40 minutes?

15           MR. MCCLAIN:  It is.

16           THE COURT:  Okay.  That should take us right till two

17   o'clock, a little before, and then we'll be done.

18           MR. MCCLAIN:  Thank you.

19           THE COURT:  Thank you.

20           (Videotaped deposition excerpts of Michael Davis taken

21   March 16, 2006, were played in open court.)

22           THE COURT:  Mr. McClain?

23           MR. MCCLAIN:  Your Honor, that is the end of that

24   deposition, and we have ten more minutes till two, so what's

25   your pleasure?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.
Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 130 of 134

1          THE COURT:  Do you have another witness?

2          MR. MCCLAIN:  We have the Duros video deposition that

3     we could start, or we can call it a day.

4          THE COURT:  Okay.  Why don't we call it a day.

5          Members of the jury, that's going to conclude the

6     testimony for today and, as you recall, the testimony for the

7     week.  We'll see you back here Monday at 8:30.  We'll have the

8     same schedule.

9          And remember it's very important to keep an open mind

10    till you've heard all of the evidence in the case, had an

11    opportunity to hear the closing arguments of the lawyers to

12    summarize and interpret the evidence for you, and, most

13    importantly, go back to the jury room and begin your

14    deliberations.  So we'll see you Monday morning at 8:30.  Thank

15    you.

16          (The jury exited the courtroom.)

17          THE COURT:  Please be seated.  I don't want to hold

18    you up too much, but how many more witnesses do you have,

19    Mr. McClain?

20          MR. MCCLAIN:  We have Mrs. Kuiper, a very short video

21    deposition of Mr. Hoffman at the American Pop Corn plant, the

22    half-hour Duros deposition, and a reading from the Burns

23    deposition, so about two hours total amount of time, two and a

24    half hours.

25          THE COURT:  Okay.  How does the defense want to handle

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 131 of 134

1  the Rule 50 motion?  I'll tell you what I don't do.  I don't

2  interrupt the flow of the trial to take a Rule 50 motion unless

3  I think there's some substantial likelihood that I'm going to

4  grant it.  Based on the evidence I've heard, there's no

5  substantial likelihood I would grant it in whole or in part.

6         So I want to make sure you have a full opportunity to

7  make your record on it, but I don't really want to slow up the

8  jury trial for what I consider to be a formality in terms of

9  making a record.

10        MR. PAGLIARO:  What's your pleasure, Your Honor?  Do

11  you want to do it after court on Monday or before?

12        THE COURT:  Well, what would be easier for counsel?

13  Let me just check real quick my calendar on Monday and see what

14  I've got going afterwards.  That would be good.

15        MR. PAGLIARO:  I'm sure it won't take very long, Your

16  Honor.

17        THE COURT:  Okay.  Let me just check here.

18        MR. PAGLIARO:  Or maybe we could come in a little

19  earlier on Tuesday if you like.

20        THE COURT:  Well, I've got a sentencing at 3 and a

21  hearing on damages in a civil case at 4, so could we do it maybe

22  at like 7:45 on Monday?  Would that be too early to meet Monday

23  morning?  And then I'm going to have to rule on your exhibit B

24  objections that I need to rule on, and then I could take the

25  Rule 50 motion?

Case 5:06-cv-04009-MWB-PAZ  Document 409  Filed 06/09/09  Page 132 of 134

1          MR. PAGLIARO:  As long as it's done, Your Honor, with

2   the understanding that it would be as if it were at the end of

3   the close of evidence.

4          THE COURT:  Absolutely.  And let me ask you this.  Do

5   you think there's any -- oh, yeah.  I misread my schedule.  My

6   law clerk pointed out to me that that was Tuesday.  I hit the

7   expanded Monday, and then it flipped to Tuesday.  But -- because

8   I don't have anything Monday afternoon.  So shall we just

9   wait -- why don't we just wait and do it at the end of the day,

10  and we'll deem it having been done at the close of the

11  plaintiffs' case.

12         MR. PAGLIARO:  That'd be fine, Your Honor.

13         THE COURT:  Is that acceptable?

14         MR. PAGLIARO:  That's very acceptable.  Thank you very

15  much.  Appreciate it.

16         THE COURT:  Thank you.

17         MR. PAGLIARO:  And thanks for letting us out early.

18         THE COURT:  Oh, absolutely.

19         MR. PAGLIARO:  Thank you very much.

20         THE COURT:  And without further ado, I think I better

21  let you out.  So thank you very much.  Travel safely, and we'll

22  see everybody Monday morning.

23         MR. PAGLIARO:  Thanks, Judge.

24         THE COURT:  Thank you.

25         (The foregoing trial was adjourned at 1:55 p.m.)

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of the transcript.

Case 5:06-cv-04009-MWB-PAZ   Document 409   Filed 06/09/09   Page 133 of 134

1                                    CERTIFICATE

2          I certify that the foregoing is a correct transcript

3  from the record of proceedings in the above-entitled matter.

6       s/ Shelly Semmler            3-26-09
       Shelly Semmler, RMR, CRR        Date

11                          **INDEX**

12  **WITNESS:**                                **PAGE:**

13    CURTISS FARRELL
       MR. MCCLAIN               852
14       MR. PAGLIARO            876
       MR. MCCLAIN               912

16    VIDEOTAPED DEPOSITION
       John Hallagan           924

17    RONALD KUIPER
       MR. MCCLAIN               926
18       MR. PAGLIARO            939
       MR. MCCLAIN               961

20    GLADYS CRAWFORD
       MR. MCCLAIN               966
       MR. MEADOR                971

22    VIDEOTAPED DEPOSITION
       Michael Davis           973

23                        *****