IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

RONALD KUIPER and                          No. C06-4009-MWB
CONLEY KUIPER,

      Plaintiffs,                    Sioux City, Iowa
                                           March 2, 2009
   vs.                                     7:55 a.m.

GIVAUDAN FLAVORS CORP.,                     VOLUME 8 OF 12

      Defendant.
_____/



TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiffs:      KENNETH BLAIR MCCLAIN, ESQ.
                              STEVEN EDWARD CRICK, ESQ.
                              SCOTT A. BRITTON-MEHLISCH, ESQ.
                              Humphrey, Farrington & McClain
                              Suite 400
                              221 West Lexington
                              Independence, MO  64050

                              DENNIS M. MCELWAIN, ESQ.
                              Smith & McElwain
                              Suite 530
                              505 Fifth Street
                              Sioux City, IA  51101

For the Defendant:      JAMES D. PAGLIARO, ESQ.
                              KEVIN M. DONOVAN, ESQ.
                              THOMAS J. SULLIVAN, ESQ.
                              Morgan, Lewis & Bockius
                              1701 Market Street
                              Philadelphia, PA  19103-2921

                              V. THOMAS MEADOR, ESQ.
                              Morgan, Lewis & Bockius
                              Suite 2200
                              300 South Grand Avenue
                              Los Angeles, CA  90071-3132

                              STEPHEN J. HOLTMAN, ESQ.
                              Simmons Perrine
                              Suite 1200
                              115 Third Street Southeast
                              Cedar Rapids, IA  52401-1266

Court Reporter:        Shelly Semmler, RMR, CRR
                              320 Sixth Street
                              Sioux City, IA  51101
                              (712) 233-3846

1          (Proceedings reconvened outside the presence of the

2   jury.)

3          THE COURT:  Mr. McClain, are you ready to go with

4   regard to the Givaudan filings from last night?

5          MR. MCCLAIN:  Sure.

6          THE COURT:  Okay.  Mr. Meador, are you taking the lead

7   on it?

8          MR. MEADOR:  Yes, Your Honor.  Judge, am I back to

9   Mr. Meador again?

10          THE COURT:  Yes.

11          MR. MEADOR:  Could I be Mr. Meador again?

12          THE COURT:  Oh, Meador.  Sorry.  Sorry.

13          MR. MEADOR:  No problem.  Do you want me to proceed?

14          MR. MCCLAIN:  Judge, you can call me whatever you'd

15   like.

16          First of all, could we take a minute and tell us how

17   the conference went?

18          THE COURT:  It went fine.  It's always surprising that

19   big cities like Atlanta and their courthouse aren't more

20   advanced in terms of technology.  You know, they have a few

21   lawyers, usually the IP lawyers.  There actually were a couple

22   patent lawyers who had tried a case in front of me, and I

23   remember when they came up they were kind of awed by the

24   courtroom.  And yeah, it's just surprising how far behind some

25   big cities are.  You think it'd be the other way around, but

1  it's not so . . .

2         MR. MCCLAIN:  It seems to be in large part judge

3  driven.

4         THE COURT:  It's judge driven, and it's decentralized

5  budgeting, so there's money there to do it, but it just depends

6  on whether they're a judge that drive the technology projects or

7  not.  And every court has a technology staff.  Sometimes the

8  staff is by culture very proactive like in ours where they're

9  always suggesting stuff to us.  In other districts they do as

10 little as they possibly can, hope that judges don't find out

11 anything and when they do simply say no, it can't be done.  So

12 it varies quite a bit.

13        But, Mr. Meador, why don't we get back to your -- your

14 brief deals with Exhibit 473.

15        MR. MEADOR:  Correct, Your Honor.

16        THE COURT:  And 473 is the affidavit of Susan Daum.

17        MR. MEADOR:  That's correct.

18        THE COURT:  And let me just try and see if I can

19 summarize it.  This is litigation in Marshall Circuit Court in

20 the County of Marshall, State of Indiana that was filed in the

21 late '80s?

22        MR. MEADOR:  Yes, Your Honor.

23        THE COURT:  And Givaudan was an original defendant in

24 the case; correct?

25        MR. MEADOR:  Correct.

          1          THE COURT:  And so are you dealing with three things?

          2     The com -- is the complaint already in evidence from that case?

          3          MR. MEADOR:  I don't think they offered the complaint.

          4     I think they just offered the declaration.

          5          THE COURT:  Just offered the declaration.

          6          MR. MEADOR:  I don't think it was on Mr. Crick's list.

          7     We've pared down the documents they're submitting to this Court.

          8          THE COURT:  So the only -- so you're fighting about

          9     the declaration.

         10          MR. MEADOR:  Correct, unless they're going to offer

         11     the complaint.  Then we have a problem with that too, but we've

         12     actually covered that in our stipulations in our pretrial order.

         13     Stipulation 78, 79, and 80 and 81 talked about that lawsuit and

         14     the fact that Givaudan was a party.  They were dismissed because

         15     they didn't supply any product at all to that facility.  And the

         16     declaration they want to offer is a declaration from a

         17     plaintiff's expert that was offered after we were out of the

         18     case.

         19          It's obviously a hearsay document.  It is being

         20     offered for the truth of the matter.  This was Givaudan only

         21     which Givaudan had no association with Tastemaker or Cincinnati.

         22     It was a, you know, separate company that had operations in New

         23     Jersey.

         24          And so this doesn't go to notice.  It's just like any

         25     expert declaration in any case.  It'd be like taking

1    Dr. Egilman's declaration in this case and trying to offer it in

2    other cases.  So there's no foundation for this.  We weren't in

3    the lawsuit.  We were dismissed.  And it's just a plaintiff's

4    declaration.

5         THE COURT:  Well, let me ask you this.  At the end of

6    the declaration, there's a proof of service.  Was Givaudan's

7    counsel listed in that proof of service?

8         MR. MEADOR:  For what, Your Honor?

9         THE COURT:  For the 473 -- for the affidavit, for the

10   473 affidavit.

11        MR. MEADOR:  We had been dismissed a year ago.

12        THE COURT:  That isn't my question.  I understand

13   you'd been dismissed.  That's not my question.  Who represented

14   Givaudan -- you know, a lot of dismissed parties remain on the

15   certificate of service because nobody takes them off.

16        MR. MEADOR:  True.

17        THE COURT:  So I just want to know -- they've got a

18   certificate of service.  It's page -- well, it's the last page

19   of Exhibit 473.  Who rep -- what firm represented Givaudan in

20   the case?  Maybe it's not one of these firms.  Does anybody know

21   the answer to that question?

22        MR. MEADOR:  No, Your Honor.

23        MR. MCCLAIN:  Yes.  We can find out real quick.

24        THE COURT:  Well, if you have a file on this case, it

25   would show somewhere in there who represented them.

 1          MR. MCCLAIN:  We have a whole file on that very

 2    subject, but we didn't bring it.  We didn't know that that was

 3    going to be a question this morning, but we can find out fairly

 4    quickly before 8:30 probably.

 5          THE COURT:  Well, here's what I'm wondering.  I think

 6    their point is -- Givaudan's point is -- I mean, the complaint

 7    it seems to me is admissible because the complaint puts you on

 8    notice that somebody claims one of your products can cause some

 9    lung disease.  Doesn't mean it's true.  It's just a question

10    that it puts you on notice that there's a worker out there.

11    It's not probative of a whole lot, but it's relevant.

12          But the affidavit is the same thing.  I don't think

13    the affidavit -- I don't think -- I mean, I think it's not

14    hearsay because it's not being put in for the truth of the

15    matter asserted.  It's being put in to put you on notice.  But

16    there may well be facts that indicate you never received the

17    affidavit, you reasonably couldn't have received it, and,

18    therefore, it couldn't have reasonably given you notice.

19          But I don't have enough of that information in front

20    of me because I don't know what happened -- you know, for

21    example, if your lawyers are still listed on here, if the

22    Givaudan lawyers are still listed on the certificate of service,

23    they got the affidavit.  Now, don't they have some duty to tell

24    the -- even though you'd been dismissed, don't they have some

25    duty to say, Hey, here's what this doctor claims in the

 1 | affidavit?

 2 |          MR. MEADOR:  I don't think so.  I've had so many

 3 | lawsuits in mass tort cases where it takes forever to get off

 4 | the proof of service, and everything just goes to the file room

 5 | because you've got a dismissal with prejudice and you're out of

 6 | the case.  I mean, there's no lawyers reviewing a dismissed

 7 | case.  There's no clients paying for that.  I can guarantee you

 8 | that.

 9 |          MR. MCCLAIN:  But, Judge, isn't the instruction that

10 | you're offering or that you're contemplating giving regarding

11 | that they're held to the standard of an expert in the field and

12 | charged with the knowledge of any other company in the field

13 | relevant?

14 |          THE COURT:  Right.

15 |          MR. MCCLAIN:  And whether they got it or not, this is

16 | relevant to that inquiry in the case that other companies were

17 | advised that they needed to test.  Givaudan did not test.  The

18 | jury can decide whether or not Givaudan should have tested based

19 | upon the advice being given and the risks that were clearly

20 | knowable to other companies and specifically known to Givaudan

21 | since they were sued in the case.

22 |          So that was the purpose of the offer was simply that

23 | this was a -- this was an early sentinel warning about the need

24 | to test and not to simply use these products on employees

25 | without testing.

```
 1          THE COURT:  But if Givaudan was out of the case when
 2    this affidavit came through, they wouldn't have had any actual
 3    notice.
 4          MR. MCCLAIN:  Correct.
 5          THE COURT:  Well, they could have had actual notice.
 6          MR. MCCLAIN:  They could have.  I think that we're
 7    going to find that their counsel is listed here, but I'm not
 8    going to make -- I'm not going to make that representation till
 9    I'm sure.
10          THE COURT:  Yeah.  But let's just assume counsel's
11    listed here.  Then it's a fact questions, it seems to me,
12    whether they got notice or not.
13          MR. MCCLAIN:  Right.
14          THE COURT:  Their defense can be, hey, once we're out
15    of a case, you know, we should have taken our name off the proof
16    of service, but we didn't or you really can't control what the
17    other parties put on their proof of service other than first
18    time you get something say take it off.  But if you get it, I
19    think the lawyers getting the affidavit puts Givaudan on notice.
20          MR. MCCLAIN:  Sure.
21          THE COURT:  Now, they can argue otherwise.  They can
22    say, "No, we didn't have any duty to send it to our client
23    because they weren't paying us at that point.  We just
24    deep-sixed it in the warehouse," or whatever they want to say,
25    but it's a fact question I think.  And then it also goes to the
```

1  standard . . .

2          MR. MCCLAIN:  Clearly other flavoring companies did

3  know, and the question is should they have known.  I mean, they

4  were investigating -- Tastemaker was investigating the whole

5  International Bakers study situation.  I mean, the only reason

6  we have this information is we went and got the file from court.

7  That's how we got it.  That's how it's in evidence.  You know,

8  when we began investigating this International Bakers event, we

9  went up and got the entire file.

10         The question is what did Givaudan do in light of their

11 knowledge to investigate this prior to the outbreak in their

12 plant and after because they were clearly on notice that that

13 was a relevant issue in their case, that is, the International

14 Bakers event.

15         In fact, you know, you're going to see from their

16 first witness that she, in fact, got a copy of the study and did

17 a cross-reference to the chemicals that those employees were

18 exposed to.  This was part of that case.

19         THE COURT:  So how does the -- how does the probative

20 value outweigh the -- how does the danger of unfair prejudice

21 substantially outweigh the probative value of it?

22         MR. MEADOR:  They have identified, as you know, a

23 couple experts in this case.  Dr. Egilman, Dr. Parmet have all

24 testified about the state of the knowledge and the science.

25 This is just a hearsay declaration from another plaintiff's

1  expert in another case, and it's full of all sorts of legal

2  conclusions and opinions.  We haven't had an opportunity to

3  cross-examine her.  She wasn't identified per Rule 26.  There's

4  no report, so I think there's a substantial prejudice.  There's

5  no way to cross-examine this hearsay declaration.

6       THE COURT:  Well, I was thinking that I would give a

7  limiting inst -- I thought it was more of a notice issue, and so

8  I would give a limiting instruction that the jury can consider

9  it, if at all, on the issue of notice to Givaudan but not for

10  the truth of the matter asserted in the -- in other words, when

11  you get that, whether the allegations in it are true or not, did

12  you have some kind of reasonable duty to do something?

13       MR. MEADOR:  Well, Your Honor, what I would suggest

14  then along those lines, if you're going to the notice, I think

15  the complaint, as you mentioned, is more probative than a

16  hearsay declaration from a plaintiff's expert that was given

17  after we weren't even in the case.  I mean, that's . . .

18       THE COURT:  Well, I kind of --

19       MR. MEADOR:  So we got the notice.

20       THE COURT:  I want to wait and find out to see if you

21  actually got it.  I think it changes things if you actually

22  received it.

23       MR. MCCLAIN:  Mr. Crick is checking on that right now.

24       THE COURT:  So let's set that aside while you check.

25       And what else is it that I need to rule on?  You guys

1   agreed these -- oh, no.  The scientific articles?

2          MR. MEADOR:  Yes, Your Honor, I have just one comment

3   on that.

4          THE COURT:  Paragraph 2 there?

5          MR. MEADOR:  I think we can get through that quickly.

6          THE COURT:  Are those learned treaties that the

7   various experts relied upon?

8          MR. MEADOR:  Yes.  And my theory on that, Your Honor,

9   originally Mr. McClain said these are demonstrative, but under

10  the theory of what's good for the goose is good for the gander,

11  we can put our studies in, they can put their studies in, and

12  we're fine with that with one exception.

13         And this is probably a mistake because I don't think

14  they probably meant to do this, but Dr. Egilman wrote an article

15  in which he criticized our company, criticized the flavoring

16  industry.  I interposed a timely objection, and you excluded

17  that document.  I believe it's 982, and that was in the pile of

18  scientific literature, and it may be that they're going to

19  withdraw it, but I wanted to -- of course, we would object to

20  that one.

21         MR. MCCLAIN:  I agree with that.  We will withdraw it.

22  We didn't intend to offer it the same way.  But I want to make

23  it clear why we're offering them, Judge, and why they're

24  relevant in this unique circumstance and wouldn't be otherwise.

25         THE COURT:  Wait a minute.  Wait a minute.  You've

1   agreed to it; right?

2          MR. MCCLAIN:  Just one, just the one article by

3   Dr. Egilman, not the rest of the articles.

4          THE COURT:  Wait a minute.  I'm confused now.  I

5   thought -- do you all have the e-mail that was sent to me last

6   night, paragraph 2, scientific articles?

7          MR. MEADOR:  Yes, Your Honor, and I was trying to

8   short-circuit this in saying we have an agreement on the

9   articles other than the Dr. Egilman now.

10         THE COURT:  Well --

11         MR. MEADOR:  I just wanted to make clear we could put

12  our articles in.  That was the only thing I was trying to

13  clarify.

14         THE COURT:  So I just want to find out because

15  paragraph 2 indicates you do not have an agreement.

16         MR. MCCLAIN:  Right.

17         THE COURT:  So do you have -- let's carve out 982.  Do

18  you have an agreement, or you don't have an agreement?

19         MR. MCCLAIN:  Is that Dr. Egilman's article?

20         MR. MEADOR:  Yes.

21         MR. MCCLAIN:  Yes, we do have an agreement on that.

22         THE COURT:  No, I thought it was on all the others.

23  No, you only have an agreement on 982.

24         MR. MCCLAIN:  That we're withdrawing that, yes.  It

25  was a demonstrative for Dr. Egilman's qualifications.  It's not

1    admissible on the same basis as the others.

2              THE COURT:  Okay.  So you're withdrawing 982.  Now,

3    with regard to the rest of them that are listed, 337, 827, 984,

4    985, 1234, 1235, 2140, do you have an agreement or you don't

5    have an agreement?

6              MR. MCCLAIN:  I don't know what he's saying now.  He

7    was objecting last night.

8              MR. MEADOR:  Yeah, I was trying -- I'm sorry, Your

9    Honor.  I'm just miscommunicating.  I was trying to say we've

10   short-circuited that, and as long as we're able in our case to

11   put in our articles, we have no problem.

12             MR. MCCLAIN:  Well, I'm not agreeing to that as a

13   blanket statement, and here's why.  These are being admitted not

14   as some accommodation.  They're being admitted because they are

15   factually relevant to the issue of statute of limitations when

16   he knew or should have known about his cause of action.  And

17   this shows a progression of the scientific knowledge beginning

18   in 2002 up through 2009 in which NIOSH is trying to get the word

19   out to local doctors because they're still misdiagnosing the

20   problem.

21             And that's -- and we showed that when we had

22   Dr. Farrell on the stand and when we had Dr. Egilman on the

23   stand, that it's been a continuing problem for local doctors to

24   misdiagnose this problem.  And my argument, of course, is it's

25   unfair to hold this blue-collar worker to a standard that even,

1   you know, medically trained individuals were still misdiagnosing

2   as of 2007 and 2009.  And that's the reason why we sought to

3   admit them, not because, you know, there's some other exception

4   to the hearsay rule.  They are evidence in this case by dates of

5   their publication.

6           THE COURT:  Well, they'd be evidence by dates of when

7   the plaintiff knew about them.

8           MR. MCCLAIN:  Well, the plaintiff didn't know.  The

9   question is should he have known something, and they're claiming

10  that he should have known, and clearly the articles show that

11  even doctors did not know during this time period.  And NIOSH

12  was trying to get the word out because doctors were confused at

13  the very time that they're claiming that he should have figured

14  it out.

15          THE COURT:  Well, I was looking at all of those

16  studies under 803(18) as learned treaties, and that's how I was

17  analyzing it at the time.  And the experts relied on those

18  studies.  And so, therefore, the experts can talk about the

19  studies.  They could be shown to the jury because the last line

20  of 803(18) says, "If admitted, the statements may be read into

21  evidence but may not be received as exhibits."

22          So nobody seemed to be complaining when you put them

23  up on the big screen and people would highlight text and blow it

24  up and the doctors would testify to them.  And while I wasn't

25  thrilled with the foundation requirement that the parties were

1  using for 803(18), that they were established as a reliable

2  authority by the testimony of the expert testifying, I could

3  infer that the experts thought they were reliable even though

4  nobody actually ever asked them that or rarely asked them that.

5       So I thought we were doing just fine and then

6  ultimately those documents would not go back to the jury because

7  they're not admitted as substantive evidence.  Or they're

8  admitted as substantive evidence, but the way the rule works

9  they're not received as exhibits.  I guess that's a better way

10 to put it.  They're admitted as substantive evidence through the

11 expert's testimony, but in and of themselves they don't become

12 substantive exhibits that go back to the jury.

13      MR. MCCLAIN:  Yes, and that's what I'm trying to say

14 is I understand that to be, but in this case the date of their

15 publication is substantive evidence because we have a statute of

16 limitations defense, and that's typically not the case in regard

17 to a learned treatise.

18      In this instance the fact that these are being

19 published at that time is relevant in terms of the probabilities

20 of what he knew or should have known, and that's all we're

21 trying to say.  I mean, they're trying to say that he should

22 have known back in '95 and '96.  The first of these articles is

23 published in 2002, and they say may have caused, and then we

24 have a whole --

25      THE COURT:  Well, I think what -- yeah, there's a

1    couple ways you can deal with that, though.  You -- to the

2    extent that they've all been discussed and -- you could create a

3    demonstrative exhibit for your closing argument where you had

4    the title and date of each of those exhibits.  And then when you

5    argue your statute of limitations issue, you could go through --

6    I'm not precluding him from going through that information.  You

7    could put it up on the screen.  You could probably even have a

8    separate exhibit that I would go -- let you put back that would

9    list the title of the article, the authors, and the date.  And

10   I'd let it go back solely on the issue of the statute of

11   limitations.  I wouldn't have a problem doing it that way.

12          I'm sure the defense would object, but it's a middle

13   ground.  It doesn't violate the spirit of 803(18).  And it meets

14   your objective of they're relevant to the statute of limitations

15   defense, and you're not putting in the substantive medical stuff

16   which is why 803(18) exists.  So there's a couple of different

17   ways to do it.  Either one is fine with me.

18          MR. MCCLAIN:  Okay.  That's fine.  We will do that if

19   you allow us to make that exhibit and submit it tomorrow after

20   we've rested because we don't have it.

21          THE COURT:  Right.

22          MR. MCCLAIN:  Yeah.

23          THE COURT:  And I can give it with a limiting

24   instruction that this -- that it's not being offered for the

25   truth of the articles, just to show the dates.

1          MR. MCCLAIN:  That's right.

2          THE COURT:  Right.

3          MR. MCCLAIN:  That's the purpose of the offer.

4          THE COURT:  Right.  Do you really have a problem with

5     that?

6          MR. MEADOR:  No, Your Honor.

7          THE COURT:  Okay.  Now . . .

8          MR. MEADOR:  Back to the first matter.  Our quick

9     research has shown that Givaudan's attorneys were not on the

10    proof of service at the time the Susan Daum affidavit was served

11    in the Givaudan litigation -- International Bakers litigation.

12         MR. MCCLAIN:  Who was the lawyers?  Do you know, Tom?

13         MR. MEADOR:  Peter J. Agnostigo and Edward N.

14    Kalamaros, K-a-l-a-m-a-r-o-s, in South Bend, Indiana.

15         MR. MCCLAIN:  First guy was Peter J. what?

16         MR. MEADOR:  A-g-n-o-s-t-i-g-o.

17         MR. MCCLAIN:  That seems to ring a bell with

18    Mr. Crick.

19         THE COURT:  So what are you asking me to do now?  You

20    asking me to -- how do I unring the bell?

21         MR. MEADOR:  Well, they questioned on it, but I just

22    want it to be excluded as evidence, not go back to the jury, and

23    order Mr. McClain not to argue it from the affidavit.

24         THE COURT:  What's your response?

25         MR. MCCLAIN:  I still th -- I mean, both of the

1   diacetyl suppliers of Givaudan were defendants.  I still think

2   it's relevant to the issue -- whether it goes back or not is

3   immaterial to the question of arguing it.

4        It seems to me that it's still relevant on the

5   instruction that you're considering in that they're held to the

6   standard of an expert in the field and charged with knowledge

7   that others have and that it's relevant as to that whether they

8   got it or not.  If they got it, of course, that's a separate

9   matter.  But it still seems to me to be relevant in that two of

10  their diacetyl suppliers were defendants in the suit at the time

11  of the settlement, so they clearly got it.

12       THE COURT:  How do you get around the hearsay problem?

13       MR. MCCLAIN:  It's not a question of hearsay.  It's a

14  question of notice.  The notice issue in this case is that a

15  prominent medical expert at the time was saying to the industry

16  in the case, "Look, you don't test any of this stuff.  You're

17  putting all these chemicals out here, and you're essentially

18  testing it on these poor workers.  Don't do this anymore.  Begin

19  testing these materials."

20       They still -- they never tested.  They didn't test the

21  entire time that this was all going on in their own plant.  It

22  demonstrates a very early warning that they ought to be testing

23  these materials which ultimately then NIOSH did in 2001 on

24  animals.  But that was essentially what Dr. Daum was saying back

25  in 1989.  Don't test this on blue-collar guinea pigs.  Use real

 1    guinea pigs, and that's what then 12 years later NIOSH did.

 2              THE COURT:  Mr. Meador, what's your view?

 3              MR. MEADOR:  My view still remains that it's a hearsay

 4    document that's being introduced specifically to prejudice --

 5    they got that quote from a plaintiff's expert in a case we

 6    weren't in that these people were treated like guinea pigs, so

 7    it's clearly being offered for the truth of the matter and not

 8    to notice, to have -- it's a way through the back door to get

 9    another expert in front of the jury, and they had plenty of

10    experts in this case.

11              THE COURT:  Is there any reason why I have to rule on

12    it this morning?

13              MR. MEADOR:  No, Your Honor.

14              THE COURT:  Okay.  So anything else we need to take up

15    this morning?

16              MR. MEADOR:  No, Your Honor.

17              MR. MCCLAIN:  (Shook head.)

18              THE COURT:  Where is that light coming from for you?

19              MR. MCCLAIN:  Right in my eyes, right through that

20    window.  Better.  Thank you.

21              THE COURT:  What's the plan today?

22              MR. MCCLAIN:  We will play Karen Duros's deposition

23    and read two other depositions, put Conley Kuiper on the stand,

24    put in a few documents, about eight or nine, and rest.  That

25    should all be done within three and a half hours.

1          THE COURT:  That will be done in about three and a

2    half hours?

3          MR. MCCLAIN:  Yes, sir.

4          THE COURT:  And then we're going to reserve the Rule

5    50 motion till we send the jury out?

6          MR. MEADOR:  That's correct.

7          THE COURT:  And then so as soon as they rest,

8    depending on where we are in terms of taking breaks, you'll be

9    ready to start your case?

10          MR. MEADOR:  Yes, Your Honor.  We're calling Nancy

11   Higley as our first witness.

12          THE COURT:  And when do I need to rule on this do you

13   believe?

14          MR. MEADOR:  I guess the question is was he planning

15   to use this for cross-examination of Nancy Higley.  Otherwise,

16   if he's not, we can obviously wait till we get closer to

17   closing, so it's really --

18          MR. MCCLAIN:  I'm not planning on using it on Nancy

19   Higley.  She doesn't know anything about it, so I'm not planning

20   to use it, again, before closing, so I don't think you need to

21   rule on that before closing.  And by then we'll have a

22   definitive -- I believe what Mr. Meador says he believes to be

23   true, but we want to confirm in regard to the counsel issue.

24   But also as to the secondary point, we still believe it's

25   relevant as to the notice issue.

```
 1              THE COURT:  Okay.  Well, we'll see you back here in
 2    five minutes, four minutes; okay?
 3              MR. MEADOR:  Thank you, Your Honor.
 4              THE COURT:  Thank you.
 5              (Recess at 8:25 a.m.)
 6              THE COURT:  How long is this deposition going to last?
 7              MR. MCCLAIN:  Thirty minutes.
 8              THE COURT:  Okay.
 9              MR. MCCLAIN:  And then, Judge, we're going to be
10    reading two depositions.  That's the first time.  It's because
11    the audio's not good on those two, so rather than have that kind
12    of buzzing that we had that's so distracting, we're just going
13    to read two short depositions, so you might want to tell the
14    jury about that process when we do that if you would.
15              THE COURT:  Okay.  What, that you're just going to
16    read the depositions?
17              MR. MCCLAIN:  Yeah, that it's the same as if they were
18    watching it.
19              THE COURT:  Okay.  Let's have the jury brought in.
20              (The jury entered the courtroom.)
21              THE COURT:  Good morning.  Please be seated.
22              Mr. McClain, are you ready to play this deposition?
23              MR. MCCLAIN:  Yes, Your Honor.  This is Karen Duros,
24    the lawyer who attended some of the meetings that the jury's
25    already heard about, in-house at Givaudan's.
```

1    THE COURT:  And we think it will last . . .

2    MR. MCCLAIN:  About 30 minutes.

3    THE COURT:  Okay.  Thank you.

4    (Videotaped deposition excerpts of Karen Duros taken

5    March 2, 2006, were played in open court.)

6    MR. MCCLAIN:  Your Honor, we're going to read a

7    deposition now at this time of Mr. Bob Burns, a salesman for

8    Givaudan.

9    THE COURT:  Okay.  And how long is that estimated to

10   take?

11   MR. MCCLAIN:  About 20 minutes.

12   THE COURT:  Okay.  Why don't we give everybody a

13   stretch break.

14   MR. MCCLAIN:  Your Honor, would Shelly like a copy?

15   Does that help or hurt, or do you want a copy?

16   THE COURT:  I don't need one.  Shelly doesn't need one

17   either.  Thank you.  But I assume, Mr. McClain, you've marked it

18   as an exhibit or you will?

19   MR. MCCLAIN:  Yes, we will.  Mr. Crick is going to ask

20   the questions.

21   THE COURT:  Okay.  And please be seated.  I just

22   wanted to explain this one to the jury.  Sometimes we have

23   videotaped depositions, and then sometimes we have depositions

24   that are read.  There's kind of a variety of reasons why.  I

25   think there actually was an audio on this one, but for some

```
1   reason it's not syncing up with our technology.  It's not loud

2   enough, and there's a super buzzing noise that's a super

3   distraction, so we're going to have the answers asked and

4   answered here in court, and as I instructed you in the

5   instructions, it's just as if the witness were live here being

6   questioned.

7            Ready to proceed?

8            MR. MCCLAIN:  I am.

9            MR. CRICK:  Ready?

10           MR. MCCLAIN:  Yes.

11           (Deposition excerpts of Robert Burns were read in open

12  court.)

13           MR. CRICK:  That's the end of that deposition.

14           THE COURT:  Thank you.  Everybody can take a stretch

15  break.  And what's next?

16           MR. MCCLAIN:  Another deposition reading.

17           THE COURT:  Okay.  Fine.  Let's take a short stretch

18  break.

19           Mr. McClain, ready to proceed?

20           MR. MCCLAIN:  Yes, sir.

21           THE COURT:  Okay.  Thank you.  And how long do you

22  think this one will last?

23           MR. MCCLAIN:  It's about 20 minutes I think.  Oh, I'm

24  sorry.  I'm incorrect.  It may be up to an hour.

25           THE COURT:  Okay.  Well, we'll take a break then.
```

1    MR. MCCLAIN:  Okay.

2    THE COURT:  At some point.

3    MR. MCCLAIN:  This is the deposition, Your Honor, of

4 Greg Hoffman.

5    (Deposition excerpts of Gregory Hoffman were read in

6 open court.)

7    THE COURT:  Members of the jury, it's almost ten

8 o'clock.  We'll be in recess until 10:25.  Thank you.

9    (The jury exited the courtroom.)

10   THE COURT:  Please be seated.  Do you have a copy for

11 me to look at?

12   MR. MCCLAIN:  Yes.

13   MR. CRICK:  Your Honor, you can look at my copy.

14   THE COURT:  Thanks.

15   MR. CRICK:  It's at the top.

16   THE COURT:  So where's the objection?  Were we on page

17 16?

18   MR. SULLIVAN:  Your Honor, this is Tom Sullivan.  The

19 designation portion of the testimony that we had previously

20 discussed with the plaintiffs was on 59, 18, through 59, 23 I

21 believe.  When we were working out the designated testimony in

22 that telephone conference with Mr. Crick and Mr. McClain and we

23 worked through this, and they agreed that there would be no

24 reference to Mr. Remmes and bronchiolitis obliterans.  I have

25 that e-mail confirming that conversation.

1    THE COURT:  So that would be at the top of the page?

2  I mean, it's confusing to me because I have the redacted

3  version.  I mean, there's no objection in this version.

4    MR. SULLIVAN:  There is no objection -- I think --

5  Your Honor, I think maybe there had been -- I don't know that

6  there was an objection on the record in this particular

7  deposition, but the parties when we negotiated -- when we were

8  going back and forth on the designations, we reached an

9  agreement that none of the designated testimony would discuss

10  any reference to Mr. Remmes and the diagnosis of bronchiolitis

11  obliterans.  So that was an agreement that we had reached in the

12  process of preparing this.

13    THE COURT:  Okay.  So what are you -- well, what are

14  you asking me to do, if anything?

15    MR. SULLIVAN:  Your Honor, they were simply --

16    THE COURT:  No, no.  What are you asking me to do, if

17  anything?

18    MR. SULLIVAN:  That there be no reference to

19  Mr. Remmes and bronchiolitis obliterans in particularly from

20  lines 59, 18 through -- it looks like 59, 22.  That's the

21  testimony that says, "Okay."

22    THE COURT:  Yeah, I see it.  Now, do you agree that

23  that's your agreement or not?

24    MR. MCCLAIN:  I don't really recall on that.  It was

25  simply here, and I read it.  I really don't care one way or the

1   other whether it's in or out.

2            THE COURT:  Well, if you don't care and they want it

3   out, then it's out.

4            MR. MCCLAIN:  Right.

5            THE COURT:  Resolved?

6            MR. MCCLAIN:  Fine.

7            MR. SULLIVAN:  Resolved.

8            THE COURT:  Great.  Thank you.

9            See you back here at 10:25.  Thank you.

10           (Recess at 10:02 a.m.)

11           THE COURT:  Ready to have the jury brought in?

12           MR. MCCLAIN:  Yes, sir.

13           (The jury entered the courtroom.)

14           THE COURT:  Thank you.  Please be seated.

15           Mr. McClain, we're going to continue the reading of

16  the deposition?

17           What's the hold-up?

18           MR. MCCLAIN:  We thought we had it worked out, but

19  apparently we didn't.  If I can just confer with Mr. Meador,

20  I'll -- let me just explain it to him.

21           THE COURT:  Okay.

22           MR. MCCLAIN:  We've worked it out at least for the

23  time being.

24           THE COURT:  Okay.  Thank you.

25           (Continuation of deposition.)

1    MR. MCCLAIN:  Your Honor, we would call Mrs. Kuiper to

2 the stand, please.

3    THE COURT:  Thank you.

4    CONLEY KUIPER, PLAINTIFFS' WITNESS, SWORN

5    THE COURT:  Please be seated.  Make yourself

6 comfortable.  And please adjust the chair and the microphones so

7 you can speak directly into them.

8    And would you tell us your full name, please.

9    THE WITNESS:  My name is Conley Kuiper.

10                  DIRECT EXAMINATION

11 BY MR. MCCLAIN:

12 Q.   Good morning, Mrs. Kuiper.

13 A.   Morning.

14 Q.   Are you nervous?

15 A.   Yes.

16 Q.   Well, you've been up here in that side seat several times,

17 but it's different being in that seat, isn't it?

18 A.   Yes.

19 Q.   Well, I want to talk to you about several things, but

20 there's an instruction that the jury's going to be looking at

21 which is instruction 13 that relates specifically to your

22 losses, and so I'm going to touch on several things during our

23 exam that relate to this instruction because it tells them that

24 in determining the value for loss of spousal consortium, you may

25 consider the following factors:  The circumstance of Ronald

```
1   Kuiper's life; Conley Kuiper and Ronald Kuiper's ages at the
2   time of Ronald Kuiper's injury; Ronald Kuiper's health,
3   strength, character, and life expectancy; Ronald Kuiper's
4   capabilities and efficiencies in performing his duties as a
5   spouse; and Ronald Kuiper's skills and abilities in providing
6   instruction, guidance, advice, and assistance; and Conley
7   Kuiper's needs and all other factors and circumstances bearing
8   on this issue; okay?
9            So I'm going to try to talk about some of these issues
10  that will help the jury with this specific question that they're
11  being asked about; all right?
12  A.   Okay.
13  Q.   Now, let's tell them first about you if we can.  How old
14  are you?
15  A.   I'm 64.
16  Q.   And can you tell us where you were born?
17  A.   I was born in Battle Creek, Iowa, in a hospital.
18  Q.   Now, that would -- if I'm doing my math right, that's
19  during World War II?
20  A.   Yes.
21  Q.   Where was your dad?
22  A.   He was in the Army in Germany and France.
23  Q.   And what was his job before he be -- he was involved in
24  World War II?
25  A.   He farmed.
```

1   Q.   And so is your -- we met your mom last week, Gladys.   And

2   do you come from a family of farmers?

3   A.   Yes, I do.

4   Q.   And where was your family farm?

5   A.   At Oto, Iowa.

6   Q.   And I'm sure that the jury is all aware where Oto is, but

7   in case they're not, how far away is it from Sioux City?

8   A.   It's about 30 miles southeast.

9   Q.   So you've always lived in this area your whole life.

10  A.   Yes.

11  Q.   Now, were you married before you married Ron?

12  A.   Yes, I was.

13  Q.   What happened to your first husband?

14  A.   He died when he was -- in 1977 at the age of 37.   He had a

15  heart attack.

16  Q.   And did you have any children at that time?

17  A.   Yes, I had a five-year-old daughter.

18  Q.   And what was your husband doing at that point in time?   I

19  mean what was he doing back --

20  A.   He was farming.

21  Q.   He was farming.

22  A.   (Witness nodded head.)

23  Q.   What did you then have to do, Conley?   What -- in terms of

24  employment.

25  A.   While I was married, I worked as a secretary at school.

1 After my husband died, I had gone to work for my brother in his

2 grain elevator at Oto.

3 Q.    Your brother has a grain elevator?

4 A.    He did at the time.

5 Q.    Was it in Oto, or where was it?

6 A.    It was in Oto, uh-huh.

7 Q.    By the way, how big of a town is Oto?

8 A.    Well, I'm not sure what it is right now.  At the time when

9 I was still in school, it was I'd say around 300 people.  It's

10 much less now.

11 Q.    Yes.  That's not uncommon.  But at the time you were

12 growing up in the area, it was about 300 people?

13 A.    Around that I think.

14 Q.    About when was it that you met Ron?

15 A.    When I was still in high school.  I was around 16.

16 Q.    And you knew him from just --

17 A.    Oh, met Ron you mean?  I'm sorry.  That was my first

18 husband.

19 Q.    No, no.  When did you meet Ron?

20 A.    In I'd say 1980.  We were going to the same church.

21 Q.    Okay.

22 A.    And I met his whole family.

23 Q.    Okay.  And -- well, would you bring up the family photo

24 with Audrey in it then?  So did you know the family?

25 A.    Yes, I did.

1   Q.   Back when Audrey was alive?

2   A.   Yes, I did.

3   Q.   You all went to the same -- you all went to the same

4   church?

5   A.   Yes.

6   Q.   Is this how they looked back when you knew them?

7   A.   Well, the children were much older.  The youngest one was I

8   think 16 at the time that I knew them.

9   Q.   But you knew of them, and did you know -- and were you part

10  of the same church congregation --

11  A.   Yes.

12  Q.   -- when she passed?

13  A.   Yes, I was.

14  Q.   And were you also aware of the tragedy that Ron had with

15  his first son?

16  A.   Yes, I was.  I was aware of that even before I knew the

17  family.

18  Q.   Okay.

19  A.   I knew relatives of the family.

20  Q.   So you were well aware of --

21  A.   Yes.

22  Q.   -- of the family and knew Ron.

23  A.   Yes.

24  Q.   And knew him from 1980 or so.

25  A.   Yes.

1    Q.   Now, during that time period that you knew him and saw him

2    regularly at church I guess -- did you see him regularly at

3    church?

4    A.   Yes, definitely.

5    Q.   And around town?

6    A.   Yes.

7    Q.   Was he always -- did he always appear to be a healthy guy?

8    A.   Definitely.

9    Q.   And active?

10   A.   Yes.

11   Q.   And ever known to have health problems?

12   A.   No.

13   Q.   Now, when you and Ron first started dating each other,

14   approximately when was that?

15   A.   That was in December of 1983.

16   Q.   Okay.  And you got married shortly thereafter?

17   A.   Yes, in February 25 of 1984.

18   Q.   Okay.

19        MR. MCCLAIN:  Why don't we bring that picture up,

20   Scott, if we could.

21   Q.   Now, is this your wedding picture?  We've seen it.

22   A.   Yes.

23   Q.   It's 1728 in evidence.

24   A.   Yes, that's it.

25   Q.   And both -- were both of you healthy at that time?

1  A.   Yes.

2  Q.   How old -- how much older is Ron than you?

3  A.   About five years.

4  Q.   So he's only about five years older.

5  A.   Yes.

6  Q.   Was it your 25th anniversary just last week?

7  A.   Yes, it was.

8  Q.   Well, congratulations.

9  A.   Thank you.

10 Q.   Now, at this point in time in about 1984, where was Ron

11 working?

12 A.   I believe he was working for a laundry company.

13 Q.   Okay.  And we heard that he had several jobs until he went

14 to work at American Pop Corn.  When was that?

15 A.   That would have been probably in '85 or '6.  Our son wasn't

16 very old at the time.

17 Q.   Okay.  Now, I want to talk to you about that.  Talking

18 about Ron and his personal habits, was Ron a healthy liver?

19 A.   Yes.

20 Q.   Did he ever smoke?

21 A.   No.

22 Q.   Did he ever drink?

23 A.   No.

24 Q.   He was trim?

25 A.   Yes.

```
 1   Q.   And appeared to be physically fit?
 2   A.   Yes.
 3   Q.   Could he outwork just about everybody around?
 4   A.   Yes, he could.
 5   Q.   He talked somewhat about the fact that he worked two jobs,
 6   getting up at three in the morning and working till seven
 7   o'clock at night.
 8   A.   Yes, he did.
 9   Q.   Tell me, after the time that you were married, when he came
10   home, was he still active after seven after working for I guess
11   what was that?  That's 12, 14 hours at that point in time at 7
12   when he got off?
13   A.   Yes, he was.
14   Q.   Okay.
15   A.   He gardened.
16   Q.   We talked about that garden.  And during growing season,
17   how many hours would he spend in the garden a night?
18   A.   Oh, maybe two, maybe one or two probably.
19   Q.   Okay.  One or two until it got dark I would guess.
20   A.   Yes, yes.
21   Q.   And then would he come in and spend time with the family
22   and children?
23   A.   Yes.
24   Q.   Now, you mentioned Kevin.  When was Kevin born?
25   A.   He was born in 1985.
```

1  Q.   Okay.  And was Kevin's birth something that was very

2  important to Ron?

3  A.   Yes, it was.

4  Q.   Would you tell the jury about that situation?

5  A.   Well, he had lost his first son.

6  Q.   And his name?

7  A.   His name was Danny.

8  Q.   And he lost Danny.  And what were the circumstances in

9  losing Danny?

10  A.   He was I believe struck by lightning and killed at the time

11  when he was 14.

12  Q.   And did Ron -- did the birth of Kevin have significance for

13  both of you in terms of that experience in Ron's life?

14  A.   Yes.  This was a son that he was given a second chance with

15  I felt.  I had never had a son, so it was important for me too.

16  And I never thought I would have the opportunity to have one

17  because at -- at that age, but it worked out fine.

18  Q.   But it was a blessing for both of you as you saw it.

19  A.   Yes, it was, yes.

20  Q.   And did -- when Kevin was young, did Ron play with him and

21  was he active with him?

22  A.   Oh, yes.

23  Q.   And did Kevin trail along after him wherever he went?

24  A.   Yes, he did.

25  Q.   Like most boys do with their fathers?

1    A.    Yes.

2    Q.    And did Ron always have enough energy for Kevin?

3    A.    He did when he was young, yes.

4    Q.    Yeah.  Did that change some time around, oh, when Kevin was

5    6 or so in 1992 when Ron went into the mixing room at Jolly

6    Time?

7                 MR. MEADOR:  Objection.  Leading.

8                 THE COURT:  Sustained.  Can you rephrase it, please?

9                 MR. MCCLAIN:  Sure.

10   BY MR. MCCLAIN:

11   Q.    When -- did there come a time when Ron began to have less

12   energy and begin to complain about breathing problems?

13   A.    Yes, it was after he was in the microwave building.

14   Q.    Okay.  And before that time we've heard that, you know,

15   there were some subjective complaints of coughing and things

16   when he was in the corn area.  Connie, from somebody that was

17   there, were those major problems, or did those pass?

18                 MR. MEADOR:  Objection.  Leading.

19                 THE COURT:  Overruled.

20   A.    I was not aware of any problems at that time.  Ron was --

21   he never complained of anything like that.  He did not start

22   coughing at night until after he'd gone in the microwave

23   building.

24   Q.    Okay.  And when he went into the microwave building and

25   started mixing, did you have any idea that butter flavoring

1  could be a hazard to his health?

2  A.    No.

3  Q.    What were your thoughts about butter flavor?  Was that

4  something that you associated with risk and hazard?

5  A.    No.  I associate it with good flavor.

6  Q.    Food.

7  A.    Very good, yes.

8  Q.    Are you a cook?

9  A.    Yes, I am.

10  Q.    And did you ever think using butter that you were at any

11  risk of any health hazards other than, you know, weight gain I

12  would guess or things like that?

13  A.    Other than cholesterol, no.

14  Q.    Other than cholesterol, yeah.  But no breathing things that

15  you associated with it.

16  A.    No, no, none.

17  Q.    So when you heard that Ron was mixing butter flavor at

18  work, did you have any reason to believe that he was risking his

19  health?

20  A.    No.

21  Q.    Connie, if you had known that butter flavor was a health

22  hazard to him, would you have allowed him to keep working there?

23  A.    No.

24  Q.    Did you value your relationship with him, and did you enjoy

25  your relationship with Ron?

```
 1   A.    Yes, I did.

 2   Q.    Was he a good husband?

 3   A.    Yes, he was.

 4   Q.    Is he a good husband?

 5   A.    Yes.

 6   Q.    When he was a healthy husband, was it a lot better than it

 7   is now?

 8   A.    Definitely, yes.

 9   Q.    And so when I asked you, would you have told him "I want

10   you out of there" if you had any understanding that it was a

11   health risk?

12   A.    Absolutely.

13   Q.    And you had no such understanding.

14   A.    No, I did not.

15   Q.    Now, at some point in '92, '93, did you begin to notice any

16   change in his health?

17   A.    Yes.  He started to lose energy.  He had to go to bed

18   almost right after supper after a while.

19   Q.    So the situation you told us about before of his gardening

20   and those things, did those activities outside of work taper

21   off?

22   A.    Definitely.  He had two large gardens in the beginning.  He

23   gave up one side, one garden, and the other got -- it just kept

24   getting smaller until finally he had to give it up entirely.

25   Q.    And what about his activities with the children?
```

1  A.   There just didn't seem to be time or energy for that

2  because he had to try to sleep to get energy to go back to work.

3  Q.   Now, we had some question about barbecues.  Did Ron used to

4  do barbecues for family and friends, church, neighborhood?

5  A.   Yes, he called it grilling because he doesn't like barbecue

6  sauce.

7  Q.   Okay.  I gotcha.  All right.  And so would he have these

8  big grill cookouts?

9  A.   Yes, he would.

10 Q.   And at this point in time did he stop doing that?

11 A.   It got less and less as time went on.

12 Q.   And what about his activities at the church?  Did he used

13 to volunteer time at the church?

14 A.   Yes, he still kept attending meetings at that time.  I

15 think his service tapered off as time went on, less time to

16 spend there.

17 Q.   And -- now, at the point in time where he started -- when

18 he started -- were these changes permanent?  In other words, did

19 they ever go away after he started working in the mixing room?

20 A.   No, no.  Actually the things got worse, gradually worse, as

21 time went on.

22 Q.   And did you continue and did he continue to search for

23 answers to what was causing the problem?

24 A.   Yes.  He went to several different doctors.  And they were

25 saying different things, but nobody ever was sure.

1  Q.   Now, did you go on most of those visits with him to the

2  doctors?

3  A.   At that time I did not go along because he was capable

4  of -- he was still driving at that time and --

5  Q.   When did he stop driving, Conley?

6  A.   Probably about three or four years ago.

7  Q.   Now, can you tell me, did you attend the visit with

8  Dr. Parmet in 2006?

9  A.   Yes, I did.

10 Q.   Was that the first time to your knowledge that someone told

11 him that the butter flavor had caused his disease?

12 A.   Yes, it was.

13 Q.   Was that a shock to you?

14 A.   Yes, it was.

15 Q.   And was it a shock to him?

16 A.   Yes.

17 Q.   And so the first time that he became aware that butter

18 flavor had caused this was 2006.

19 A.   Yes, it was.

20 Q.   Now, I want to talk to you about these -- we put these

21 charts up when we were talking to Ron, and I want to ask you

22 about some of these items because they impact you too.

23 A.   Okay.

24 Q.   Now, he helped us make these, and we called it loss of

25 enjoyment of life, but he kind of listed the things on there.

1  You know, he's currently on oxygen, Conley.  Now, he wasn't on

2  oxygen until just real recently.

3  A.    That's correct.

4  Q.    And in some sense is the oxygen helping him?

5  A.    Yes, it is.  He can breathe easier with the oxygen.  I

6  think it might energize him a little bit more.

7  Q.    But how does that make you feel that he had to go on

8  oxygen, I mean, in terms of your outlook and optimism about his

9  health?

10 A.    Well, it seems to me when someone goes on oxygen they're

11 usually on it for good, and you hate to see that come so soon.

12 Q.    Yeah.  Does -- we met Ron's brother.

13 A.    Yes.

14 Q.    He's two years older than Ron.

15 A.    Yes.

16 Q.    And is he healthy and can do all kinds of things?

17 A.    He seems as healthy as a horse to me.

18 Q.    And Ron is his younger brother.

19 A.    Yes, he is.

20 Q.    And can Ron work anymore doing anything?

21 A.    No.  It's a struggle just to survive the day-to-day

22 activities that one is forced to do.

23 Q.    Tell the jury about that.  What kind of difficulties does

24 Ron have just getting out of bed and going to the bathroom?

25 A.    At this point in time he needs help getting out of bed,

1  help going to the bathroom.

2  Q.    And who's the person most of the time that's left to do

3  that, Conley?

4  A.    That's me.

5  Q.    And what about any work and help around the house?  Is he

6  able to do anything around the house?

7  A.    No.

8  Q.    And who's left to do all that?

9  A.    Myself.

10  Q.    And he needs care 24/7.

11  A.    Yes, he does.

12  Q.    And who's the person that does that?

13  A.    Me.

14  Q.    And does this affect you?  You've lost friends.  You can't

15  go to church meetings.  You can't go to the dinners at church.

16  A.    Right.  It's such a struggle to get him out of the house

17  that it's -- and he can't take the cold air right now.  I'm

18  hoping maybe when the weather changes that might change a little

19  bit.

20  Q.    And what about the doctor visits?  Who takes him to those?

21  A.    I do.

22  Q.    And does he enjoy anything these days?  I mean, does he

23  enjoy dinners or gatherings or anything, or is everything a

24  chore?

25  A.    Everything's a chore.  He's lost -- he's lost his appetite.

1    He can't -- I worry about him eating enough to sustain him, but

2    he's trying.

3              MR. MCCLAIN:  Scott, go to the next slide, would you?

4    Q.   He mentioned about these physical symptoms.  Does he have

5    continual shortness of breath?

6    A.   Yes, he does.

7    Q.   And is that different than these -- well, you didn't even

8    know that he had any symptoms before he went in the mixing room

9    as far as you knew.

10   A.   No.

11   Q.   But this shortness of breath, does it ever go away?

12   A.   No.

13   Q.   Does he have trouble sleeping?

14   A.   Yes.  He has the swelling in his feet especially in legs,

15   and he has to take a diuretic, so he's up several times during

16   the night, so his sleep is very broken up.

17   Q.   And when you say he's up, who else is up?

18   A.   Well, I'm up naturally.

19   Q.   So you have to get up with him every time he gets up.

20   A.   Yes, yes.

21   Q.   And so can you ever sleep through the night?

22   A.   No.  Only if I have our son come over and stay maybe.

23   Q.   And does Kevin come from time to time to stay?

24   A.   Yes.

25   Q.   And what about leg pain?  Does he have pain in his legs

1  from the --

2  A.    Well, they are weeping.  They have sores because of the

3  skin breaking because of the swelling.  He doesn't really

4  complain of the pain there so much.  He has lung pain.

5  Q.    What about coughing?  Does he cough a lot?

6  A.    Yes, he coughs.

7  Q.    And spits up blood?

8  A.    Yes, that began couple months ago, spitting up blood.

9        MR. MCCLAIN:  Go to the next.

10  Q.    Have you gone through any of these emotional states with

11  him, you know, the anger, feeling that this is an injustice?

12  A.    Especially during these proceedings we're learning so much

13  more than we knew before.

14  Q.    You know, did -- did Ron want to do anything other than

15  work and support his family?

16  A.    No, that was his goal.  He wanted to set a good example.

17  Q.    And did he have any sense that he was doing hazardous work?

18  A.    No.

19  Q.    I mean, it's not like he was working with dynamite.

20  A.    That's right.

21  Q.    You thought he was working with food.

22  A.    That's right.  That's correct.

23  Q.    Was his family and being together and working towards

24  having grandchildren what you and he looked forward to in your

25  retirement?

1    A.    Yes.

2    Q.    Tell the jury about that.  How many grandchildren do you

3    have?

4    A.    Between us we have ten.

5    Q.    And I think we have --

6          MR. MCCLAIN: Scott, do we have that picture loaded,

7    the grandchildren picture?  Well, I thought we had one.  I'm

8    sorry that we don't have it loaded.

9    Q.    But you have ten grandchildren between you.

10   A.    Yes.

11   Q.    And how many great grandchildren do you have?

12   A.    He has three.

13   Q.    He has three because he had the older children.

14   A.    Yes.

15   Q.    And -- but when you were thinking about your life together,

16   was that something that you always anticipated, your

17   grandchildren and having them around and helping raise them and

18   doing things with them?

19   A.    Yes, especially after we got them.  You realize how

20   precious they are after they're born.

21   Q.    And was Ron a good father?

22   A.    Yes, he was.

23   Q.    And a concerned father?

24   A.    Yes.

25   Q.    And does he want to be a concerned grandfather?

1  A.    Yes.

2  Q.    Does he have the energy to do that anymore?

3  A.    No.

4  Q.    Is that something that your religious faith emphasizes, the

5  value of grandparents and grandmothers raising up their

6  grandchildren?

7  A.    Yes, being an integral part of their life, yes.

8  Q.    And is he able to do that?

9  A.    No.  He is concerned.  He worries about them, but he can't

10  do anything about it.

11  Q.    Now, have you -- Glenn, his brother, is he able to do those

12  kind of things for his family?

13  A.    Oh, yes.  They -- his family's scattered all over the

14  country, and they travel to visit them.

15  Q.    And did you hope to be able to do that, to be able to

16  travel with your grandkids and do fun things with them like

17  grandparents do all over the place?

18  A.    Yes.  Mine come and visit me -- us, but we can't go very

19  many places.

20  Q.    And how many different places are they now?

21  A.    Most of them are pretty local.  I believe -- I can't --

22  some of Ron's are living across the state.

23  Q.    Okay.  And you can't even go across the state to visit

24  them.

25  A.    No.

1  Q.   But Glenn can.

2  A.   Oh, yes.  Goes to California and East Coast, West Coast.

3  Q.   And, Conley, I know that you're completely dedicated to

4  Ron, and I know -- but would you like to go and do some of these

5  things if you had the opportunity?

6  A.   Oh, yes.

7  Q.   I mean, are you healthy enough to do just about everything

8  you want to do?

9  A.   Just about, uh-huh.

10 Q.   But you can't go because you're responsible to Ron.

11 A.   Yes.

12 Q.   And you don't begrudge that.

13 A.   No.

14 Q.   That's what you signed up for.

15 A.   That's right.

16 Q.   For better or worse.

17 A.   Yes.

18 Q.   But you did never -- you did never contemplate this.

19 A.   No.

20 Q.   Now, what about this depression, can't do things?  Before

21 all this happened, was Ron a pretty upbeat guy, had a positive

22 attitude?

23 A.   Yes.

24 Q.   He had -- a can-do type person?

25 A.   Yes, yes, right.

1   Q.   And is that the way that he looks at things now?

2   A.   No.  He's quite depressed these days because he's not the

3   type person that rests easily for someone waiting on him all the

4   time.  He likes to do things for himself.

5   Q.   When you were --

6   A.   Like most of us.

7   Q.   -- first married, did he expect you to wait on him, or did

8   he do things for himself?

9   A.   No.  He did things for himself.  He -- back then I did most

10  of the cooking, but then after I started to work, he started

11  doing some cooking, and he always liked to grill.

12  Q.   Yeah.  So Ron liked to do things for himself.  He was a

13  self-reliant guy.

14  A.   Yes, he was.

15  Q.   He was a typical Iowan.

16  A.   Yes.

17  Q.   What about the sadness?  Is he sad now frequently?

18  A.   Yes, goes along with the depression.

19  Q.   And you've told us about his frustration with being able to

20  take care of himself.  He can't take showers or the other things

21  like he should be able to.

22  A.   No.  He has to have help with that.  And the energy

23  being -- level being so low, he gets so tired that every time he

24  does one thing he has to rest.

25  Q.   Now, just give the jury some sense about how long it takes

1   you to get here to court in the morning, how early you have to

2   start just to get here and how much of a struggle it is just to

3   get in this building and get here.  We sometimes see you get

4   here a little after we've started.  How early do you have to

5   start to get that done?

6   A.   Well, if we was here on time, we'd have to get started

7   around 5 or 5:30 in the morning probably.  It takes two to three

8   hours to get him finally ready to go.

9   Q.   And is that a big inhibiter to just living life?

10  A.   Yes, it is.

11  Q.   And so any time that you need to get him out of the house,

12  it's two to three hours.

13  A.   Because of -- he has to rest, you know.  He can't just --

14  most of us are used to just --

15  Q.   Going.

16  A.   Going, yeah.

17  Q.   What about the embarrassment part of this?

18  A.   Well, having done things for himself and when you have to

19  have someone help do the basic things that all of us have

20  learned since the age of 2 to do for ourselves, 2 or 3, it's

21  tough to accept that.

22  Q.   And what about the self-consciousness?  Is Ron

23  self-conscious about people seeing him in this state of affairs?

24  Does he get sometimes self-conscious about that?

25  A.   I think he may have at first, but that's something you do

1 get used to I think.

2 Q.   Now, one of the factors --

3        MR. MCCLAIN:  Scott, can we flip over now to this?

4 Q.   Now, at the time -- Conley and -- Conley Kuiper and Ron

5 Kuiper's ages at the time of Ronald Kuiper's injury is something

6 the jury can consider.  And in '92 you were what?  47?  You were

7 born in '45, '92 if my -- huh?  If my math is right, that's 47.

8 Am I right?  47?

9 A.   Sounds right.

10 Q.   And Ron then was 49 or 50; right?

11 A.   Right, uh-huh.

12 Q.   So my age.

13 A.   Okay.

14 Q.   When this happened, 50 years old, and you've been living

15 with this now since '92, 18 years or so.  He's 69.  The math's

16 close anyway.

17 A.   Yes.

18 Q.   I'm getting lucky here.  18 years you've lived with this;

19 is that fair?

20 A.   Yes.

21 Q.   And the Court's instructions say that under the life

22 expectancy tables Ron will live another -- 69 to 82 --

23 approximately another 13 years.  So 18 plus 13, 21 years of

24 this, is that -- is that -- if I've done the math right?

25 A.   Sounds like it.

1  Q.  Eighteen years is a long time.

2  A.  Yes.

3  Q.  And the jury can consider your ages when this happened.

4  Connie, most of your life has been spent living through this

5  disease with your husband.

6  A.  Yes, it has.

7  Q.  It's been as much your burden as his.

8  A.  Almost.

9  Q.  And you're willing to do it?

10 A.  Yes.

11 Q.  For better or worse.

12 A.  Yes.

13 Q.  And in that last slide we saw up there about the injustice.

14 Are you seeking justice here?

15 A.  Yes, I am.

16 Q.  And are you trying to prevent any other family from having

17 to go through this?

18 A.  Yes, that's -- I believe this company needs to be punished

19 for what's going on, and I don't want to see anyone go through

20 this again.

21       MR. MCCLAIN:  Thank you.  I don't have any further

22 questions.

23       THE COURT:  Why doesn't everybody take a stretch

24 break, and then we'll have the cross-examination.

25       Thank you.  Please be seated.

1    Mr. Meador, you may cross-examine.

2    MR. MEADOR:  Thank you, Your Honor.

3    CROSS-EXAMINATION

4    BY MR. MEADOR:

5    Q.   Good morning, Mrs. Kuiper.

6    A.   Good morning.

7    Q.   Now, you were married in approximately 1984?

8    A.   Yes, we were.

9    Q.   And during your marriage both of you worked full time; is

10   that right?

11   A.   I did not start working till -- full time until 1995.

12   Q.   And then you worked full time at the Siouxland Community

13   Health Center?

14   A.   No.  At that time I worked for Gateway Computers.

15   Q.   You worked at -- so when did you work at the Siouxland

16   Community Center?

17   A.   I started doing that in nineteen eighty -- or nineteen --

18   or no, 2004 or '5.  I can't remember exactly.

19   Q.   So for most of the marriage you both were working.

20   A.   Yes.

21   Q.   And during the marriage Ron wasn't really that interested

22   in going on trips; is that right?  Is that fair?

23   A.   I'm sorry?  What was that?

24   Q.   You and Ron didn't go on many vacations, did you?

25   A.   No.  Once a year.

```
 1   Q.   Yeah, once a year you'd go down to Omaha for a convention;
 2   is that right?
 3   A.   Omaha or Lincoln, uh-huh.
 4   Q.   Now, we're talking about events that took place 15, 20
 5   years ago; right?
 6   A.   Less than 15 probably as far as . . .
 7   Q.   Is it fair to say that you don't really recall when Ron's
 8   breathing problems started and when you two started talking
 9   about his breathing problems?  Is that a fair statement?
10   A.   No.  It was definitely after he started in the microwave
11   building.
12   Q.   Do you recall that your deposition was taken in this case?
13   A.   Yes.
14   Q.   I'd like to refer you to deposition of February 6, 2007,
15   lines 8 through 25 and then page 20, lines 1 through 9.
16           MR. MCCLAIN:  What were those page and lines?  Before
17   we start, can we --
18           MR. MEADOR:  Sure.
19           MR. MCCLAIN:  And what is your question?  Your Honor,
20   I object.  The deposition question is not being asked.
21           THE COURT:  Do you have a copy of the deposition?
22           MR. MCCLAIN:  I do.
23           THE COURT:  Because I don't that I'm aware of.  How is
24   this impeaching?
25           MR. MEADOR:  I asked her the exact question.
```

1    THE COURT:  What's impeaching about this clip that you

2  want to play?

3    MR. MEADOR:  That she didn't recall back at the time

4  of her deposition at all when the problems began, and now she

5  does.

6    THE COURT:  Well, I don't see anything impeaching

7  about it.  It's a different answer, but it's not really

8  impeaching.  If you want to go ahead and play it, play it.

9    (Videotaped deposition excerpts of deposition of

10  Conley Kuiper taken February 6, 2007, were played in open

11  court.)

12  BY MR. MEADOR:

13  Q.   Now, Mrs. Kuiper, during the 1990s, your husband would go

14  see Dr. Farrell; is that right?

15  A.   Yes.

16  Q.   And you didn't go with him on those visits, did you?

17  A.   No, I did not.

18  Q.   And he also went to see a Dr. Bacon during the 1990s;

19  right?

20  A.   I believe that's when it was.

21  Q.   And you didn't go with him on those visits either, did you?

22  A.   No, I did not.

23  Q.   So during the 1990s Ron would take himself to the doctor?

24  A.   Yes, he would.

25  Q.   And it wasn't until the last five years or so that you took

1  him to the doctor?

2  A.    Yes.

3  Q.    And Ron had a stroke in 2001; that right?

4  A.    Yes.

5  Q.    Now, I'd like to show you Exhibit 3547.  Now, do you recall

6  Ron coming home from work and indicating to you that the

7  government was out at American Pop Corn investigating at the

8  plant?

9  A.    I think I knew more about it after he -- I just don't

10  remember exactly when that was.

11  Q.    But you remember him coming home and talking about --

12  A.    Yes.

13  Q.    -- the fact he had a pulmonary function test at work?

14  A.    Yes.

15  Q.    And that he was actually told at work that he had problems

16  with his lungs; right?

17  A.    I don't recall if they told him that or not.

18  Q.    Looking at Exhibit 3547, do you see where it says that he

19  was given the results of his tests which were interpreted as

20  being abnormally low?

21  A.    When we got the sheet about that, I remember seeing that.

22  Q.    And did Ron and you discuss the fact that he should go see

23  his doctor about this problem?

24  A.    No, but he'd been going about that for a long time.

25  Q.    And Ron wasn't surprised, was he, to learn that he had lung

1  problems back in 2002; right?

2  A.   Not really.  He just didn't understand what was going on.

3  Q.   Right.  But you weren't surprised either because he'd been

4  having lung problems for a number of years; true?

5  A.   True.

6           MR. MCCLAIN:  Under the rule of completeness, can we

7  read the later portion of that next paragraph?

8           THE COURT:  You may.

9           MR. MCCLAIN:  Any abnormal test results should not be

10  considered a diagnosis of disease.  That determination can only

11  be made by your personal physician following a complete medical

12  evaluation.

13  BY MR. MEADOR:

14  Q.   And words -- says you should provide this information to

15  your personal physician.  Do you know if Ron actually followed

16  up and gave this letter to his personal physician?

17  A.   I don't know for sure because I didn't go with him.

18  Q.   Did you discuss with him whether or not he should go see a

19  doctor to follow up on this letter?

20  A.   I believe he was going to the doctor on pretty much regular

21  basis at that time anyway.

22  Q.   Now, about this time or thereafter, did Gladys indicate to

23  you that she'd seen an article about Jasper and microwave

24  popcorn?

25  A.   Yes.

1    Q.   And what did she tell you?

2    A.   That this sounded like the same symptoms that Ron had.

3    Q.   And after you had this conversation with Gladys, did you

4    and Mr. Kuiper see an attorney in Minnesota?

5    A.   It was after that, but I'm not sure -- I can't remember

6    exactly how soon after.

7    Q.   And where did you meet with this attorney?

8    A.   I believe he talked to him on the phone if I'm not

9    mistaken.

10   Q.   Did you participate in this conversation?

11   A.   No, I did not.

12   Q.   And did Ron tell you why at that point in time he didn't

13   file a lawsuit?

14   A.   I think that attorney wanted him to see someone else, see

15   another attorney that he felt was more qualified to handle the

16   case.

17   Q.   Now, we're talking about when he went to see doctors.  You

18   actually went with Ron down to see Dr. Parmet in Kansas City?

19   A.   Yes, we did.

20   Q.   And you saw Kathie Allison there too?

21   A.   Yes.

22   Q.   And that was after this lawsuit was filed; right?

23   A.   Yes, in April of 2006.

24   Q.   And this was after his stroke; true?

25   A.   Well, yeah, he had the stroke in 2001.

1  Q.   And during some of these interviews, Ron seemed confused

2  with some of the questioning; is that right?

3  A.   I don't recall that he seemed confused, no.

4  Q.   Now, before this trial, during the last year, Mr. Kuiper

5  hasn't been living in your house, has he?

6  A.   He was living in assisted living for a time.  We have a lot

7  of steps in our house, and he just doesn't have the energy for

8  that anymore.

9  Q.   So for approximately a year was he living in the Floyd

10  House?

11  A.   Yes, he was.

12  Q.   And he was living there by himself?

13  A.   Yes, he was.

14  Q.   And then within the last 30 days or so, he actually left

15  the Floyd House and moved back in with you?

16  A.   Yes.

17  Q.   And in the last month or so, he's been placed on oxygen; is

18  that right?

19  A.   Yes, he has.

20  Q.   So prior to that time when he was living in the Floyd

21  House, he wasn't on oxygen; right?

22  A.   No, he was not.

23          MR. MEADOR:  Thank you.  I don't have any more

24  questions.

25          THE WITNESS:  Okay.

1    THE COURT:  Mr. McClain, any redirect?

2    MR. MCCLAIN:  Yes.

3                 REDIRECT EXAMINATION

4  BY MR. MCCLAIN:

5  Q.   Conley, in order so that you and Ron could start living

6  together again, did you have to move out of your house?

7  A.   Yes, I did.

8  Q.   And where have you and Ron found that you both can live

9  together again?

10 A.   We live in an apartment complex that has elevators and

11 convenience for handicapped.

12 Q.   Now, when he was at the Floyd House, was he receiving care

13 full time, managed care?

14 A.   He was -- they were individual apartments.  He had all his

15 meals, and at that time he was -- even up till recently he was

16 able to manage his own medications because he always has.

17 Q.   And I'm not sure that this was Mr. Meador's meaning.  I

18 didn't have anything to do with you and Ron getting the new

19 apartment.

20 A.   Oh, heavens no.

21 Q.   That was something you wanted to do.  You were trying to

22 find a way to be together again.

23 A.   Me and the family, yes.

24 Q.   And how long did it take you guys to find someplace that

25 was adequate for both of you to be in?

1  A.    A good month or so.

2  Q.    And can you tell us in regard to this oxygen, who

3  prescribed the oxygen?

4  A.    Dr. Bainbridge.

5  Q.    Yeah.

6  A.    Well, Dr. Bainbridge's partner.

7  Q.    And that had nothing to do with the lawsuit either, did it?

8  A.    No, it had nothing to do with that.  It had to do with the

9  oxygen tests they do at the doc -- every time he goes, and his

10  numbers indicated yes, he definitely needed it.

11        MR. MCCLAIN:  All right.  I don't have any further

12  questions.

13        THE WITNESS:  Thank you.

14        THE COURT:  You may step down.  Thank you.

15        THE WITNESS:  Thank you.

16        THE COURT:  Ready to call your next witness?

17        MR. MCCLAIN:  Your Honor, the next evidence we have

18  are some documents.

19        THE COURT:  Okay.

20        MR. MCCLAIN:  The first one, Your Honor, is 1889

21  (sic).

22        THE COURT:  And are these documents that are already

23  in evidence?

24        MR. MCCLAIN:  They are.

25        THE COURT:  Okay.  And what are you planning on doing?

1  Just showing --

2       MR. MCCLAIN:  I'm just going to show certain excerpts

3  from them that have not been read in depositions thus far.

4       THE COURT:  Okay.

5       MR. MCCLAIN:  And this is 1984 to Carlton Smith, vice

6  president, American Pop Corn Company, from Fries & Fries.  I'm

7  very happy to report to you based upon the investigation by Jim

8  Mazetis, director of chemical research and regulatory affairs,

9  we have come to some conclusions regarding your labeling

10  requirements for your butter-flavored microwave product.  The

11  information is as follows:  We certify that Fries & Fries

12  natural butter flavor D8607 is natural and all materials are FDA

13  and GRAS, G-R-A-S, generally regarded as safe, approved.

14       The following statements may be flagged as front

15  package labels or advertising claims:  Jolly Time -- A, Jolly

16  Time Microwave popcorn containing real butter; B, Jolly Time

17  microwave popcorn made with real butter; C, Jolly Time microwave

18  popcorn flavored with real butter; D, Jolly Time microwave

19  popcorn with real butter.  All of these statements may be stated

20  but must be footnoted in smaller print with the statement, With

21  other natural flavors, e.g., Jolly Time microwave popcorn with

22  real butter and other natural flavors.

23       Next exhibit, Your Honor, is 1901.  This is dated

24  January 19, 1990.  Notes on Dale's trip to Fries & Fries at

25  Cincinnati, Ohio.

1     I had a nice visit with the personnel at Fries &

2 Fries.  Their plant is an older plant, but they are doing

3 extensive remodeling.  I was a little disappointed in the

4 cleanliness of some of their storage areas and told them so.

5     I was impressed with my tour of the research and

6 development facility.  They spent a lot of money and time in

7 getting the proper facilities and the proper organization and

8 personnel to develop new flavors.  I have ordered enough double

9 strength butter flavor to run our line about a day and a half.

10 This should be delivered the first week in February.

11     I think this was a productive visit, and I know that

12 the people I have been talking to on the phone for so long and I

13 understand a little more about both their processing and

14 shipping.  I do plan on following up with Bob Burns on the plant

15 cleanliness that I saw.  I know he was not pleased at all that

16 there was some sloppiness in the warehouse.

17     Exhibit 1903, this is dated March 1, 1991.  It's

18 dated -- it's a Fries & Fries document to Mr. Dale Hartshorn,

19 American Pop Corn Company.

20     Dear Dale, with reference to your letter of January 2,

21 1991, we have completed formula review of all flavors purchased

22 by American Pop Corn Company.  The flavors are identified here,

23 natural butter flavor WONF, natural butter flavor WONF light,

24 natural flavor popcorn enhancer type, natural flavor popcorn

25 enhancer type light.  Sincerely, Robert P. Burns, senior account

1 executive, Fries & Fries.

2 Exhibit 1273 (sic). This, Your Honor, is a new

3 exhibit. It's not -- it was not on the list. It's a new

4 exhibit number, 2173, but Mr. Meador does not object.

5 MR. MEADOR: That's correct.

6 MR. MCCLAIN: Dale's conversation with Bob Burns of

7 Fries & Fries Company. Fries & Fries is now part of the joint

8 venture and had merged with another flavor company. The new

9 name for the merged company is Tastemaker.

10 This exhibit is also a new one, 2175. Mr. Meador does

11 not object. September 25, 1992, Dale's conversation with

12 Dr. Nancy Higley of Tastemaker. I was talking to Nancy about

13 dairy ingredients in our flavors.

14 Exhibit 0537 is in evidence. October 13, 1992, Bob

15 Burns, Tastemaker. Dear Bob, I'm enclosing a copy of a letter

16 from a consumer who is concerned with the natural ingredients in

17 our Jolly Time microwave popcorn. What I would like from you is

18 a thorough check of these ingredients in any flavor that you

19 sell to American Pop Corn Company. Then send me a report

20 showing the flavor and either the presence or absence of gluten,

21 gliadin, and prolamin in that flavor. American Pop Corn, Dale

22 V. Hartshorn, microwave popcorn manager.

23 Exhibit 538 in evidence. Dear Mr. Hartshorn, Bob

24 Burns has referred your request for celiac sprue information on

25 the following products: Natural butter flavor WONF, natural

1  butter flavor WONF, natural flavor popcorn enhancer type,

2  natural enhancer type flavor.  The products listed above do not

3  contain any added gluten, gliaden, or prolamin in the present

4  formulations.

5      This is a new exhibit, 2209, which Mr. Meador does not

6  object to.  Morgan Food Products, specifications on Buttermor

7  7000, ingredients, butter, partially hydrogenated soybean oil,

8  and salt.

9      This is Exhibit 1905 in evidence.  Dale's visit to

10  Fries & Fries at Cincinnati, March 5, 1992.  The only real

11  negative during my visit was the discovery of several pails of

12  our flavor in their cooler when I thought we had shipped all of

13  our flavor into Chicago.

14      This is a new exhibit number, May 5, 1993, John Boyd.

15  It's on Jolly Time Popcorn stationery.  Our need for cold

16  storage has been greatly reduced.  The only two flavors that

17  require cold storage are natural and natural light flavors.  We

18  do not pack any great quantity of these flavors.  As a result of

19  the reduced need for cold storage, we are no longer storing

20  flavors at New Horizon warehouse in Itasca.  All flavor storage

21  will be at Sioux City, Iowa.  When you pack for us, we will send

22  the flavors to you on a truck with the popcorn.  This is

23  American Pop Corn Company, Dale V. Hartshorn, microwave product

24  manager.

25      2174, this is a new exhibit number, Your Honor.  On

March 31, 1997, Tastemaker and Givaudan Roure joined forces to become Givaudan Roure Flavors Corporation.  During our integration processes, we have appreciated your cooperation by remitting payment to several different addresses.

Your Honor, the first -- the next group involves some other documents.  Either they have been admitted or Mr. Meador doesn't object, and I'll identify which ones are which as I go through.

The first one, though, Your Honor, is 2134, and it's an answer to an interrogatory.  And I don't know whether or not -- do the instructions tell the jury about answers --

THE COURT:  Yes.

MR. MCCLAIN:  They do.  Interrogatory number 6, answers and objections to plaintiffs' second set of interrogatories directed to Givaudan Flavors Corporation.

THE COURT:  Let me just refresh the jurors' recollection on that.  Both -- all parties in civil litigation are entitled to send the other side interrogatories, and they are simply questions under oath from one side to the other.  Then the other side has to answer -- actually the questions aren't under oath.  The answers are.  They send a question in writing, and then like how many gallons of butter flavoring have you shipped to our company in 2006, and then the other side has to either object to it or answer it, or sometimes they do both.  And then that's under oath.

1       And so what I told you in the preliminary

2   instructions, just consider it as if it'd been asked and

3   answered here in court.

4       MR. MCCLAIN:  Thank you, Your Honor.  Interrogatory

5   number 6, identify each person who has worked for you or your

6   predecessor who has been diagnosed with bronchiolitis obliterans

7   or found to have an injury consistent with bronchiolitis

8   obliterans.

9       And after the objections, Givaudan refers plaintiff to

10  the documents previously produced, see e.g., and then it lists

11  all of the documents, and I'm going to show the jury those

12  documents that they refer us to, Your Honor.

13      Exhibit 193 is the first one they referred us to.

14  This is by Dr. Robert Baughman to Janice Dees, re Walt Vaske.

15  This is to clarify the diagnosis for Walt Vaske.  Mr. Vaske has

16  clinical syndrome obstructive airway disease, bronchiectasis

17  diffusely, and inflammatory changes of his airways.  All of

18  these are consistent with the diagnosis of bronchiolitis

19  obliterans.

20      196, R. Lanahan-Goodman, Dear Mr. Goodman, in the

21  letter I summarized -- this is from Dr. Baughman.  In that

22  letter I summarized the fact that Ms. Gaskins appears to have

23  bronchiolitis obliterans based on her pulmonary function tests

24  which showed obstructive lung disease with timing at the

25  workplace.  Given the fact that the patient's symptoms occurred

while at work, she has a fixed obstructive defect and that this appears to be a problem that has occurred in other workers at the Tastemaker plant that Ms. Gaskins is employed at, I feel there is a reasonable degree of medical probability that Ms. Gaskins has bronchiolitis obliterans as a result of her exposure to chemical vapors. She was exposed to these vapors while working as a compounder at Tastemaker.

Next exhibit is a new exhibit number, Your Honor, 2204. This is to Janet (sic) Dees from Robert Baughman, Mary Sue McGee. Ms. McGee, as you know, has a severe obstructive lung disease with a pattern most consistent with bronchiolitis obliterans confirmed by open lung disease.

Exhibit 2205 is a new exhibit to Janice Dees from Thomas Colby, M.D., at the Mayo Clinic in Scottsdale. I think Ms. McGee has a lesion in the small airways which would fit with the clinical diagnosis of chronic bronchiolitis with evidence of bronchiolitis obliterans. Based on the biopsy findings which I thought showed features of constrictive bronchiolitis and the clinical history, I think Mr. Wallace has small airway disease that would fit with the clinical diagnosis of chronic bronchiolitis with bronchiolitis obliterans.

Exhibit 2206 is a new exhibit number. March 1, 1996, University Internal Medicine Associates, University of Cincinnati Medical Associates letterhead to James Lockey. Dear Jim, I saw Clifford Walker in follow-up today. Mr. Walker had

1 underwent bronchoscopy and lavage recently. At the time of

2 bronchoscopy, he did have a moderate amount of airway

3 inflammation, and his biopsy did show some evidence of

4 bronchiectasis (sic). As you know, his HRCT is also being

5 consistent with bronchiolitis obliterans with some air trapping

6 and mosaic pattern.

7         Exhibit 238 is in evidence. This is in re Ron

8 Feldkamp to Mr. R. Lanahan-Goodman. Mr. Feldkamp has been

9 diagnosed by myself as having bronchiolitis obliterans

10 associated with his work environment. Based on this common

11 exposure and the fact that this disease occurs in this

12 environment, we felt that this was a specific-enough diagnosis.

13 This is not a common disease such as asthma; and, therefore, we

14 did not feel that we are dealing with a common situation but an

15 unusual environment. We specifically felt that this unusual

16 disease that he had acquired was a result of his work

17 environment.

18         And the last one is a new exhibit number, Your Honor,

19 2207. This is to Dr. James Lockey. Dear Jim, thank you very

20 much for asking me to see Gary Shea who I saw today, February

21 20, 1996. Mr. Shea, as you know, is a gentleman who has worked

22 at Tastemaker for 17 years. Mr. Shea has noticed that he has

23 been short of breath for the last two or three years. He notes

24 that when his (sic) exercise such as going up two flights of

25 stairs, walking briskly or carrying things. It is my impression

 1  that Mr. Shea most likely has bronchiolitis obliterans.  This is

 2  based on his relatively fixed airway obstruction, his HRCT

 3  findings, and his exposure history.  As you know, we have had

 4  other patients at this plant who have developed this disease,

 5  some whom we have biopsy confirmation.  The situation seems

 6  quite similar to the ones -- to the one that we are seeing here.

 7  The patient has developed a relatively severe fixed obstruction.

 8          And this group, Your Honor, appears to have been all

 9  admitted previously.  Exhibit 2021, confidential to Mike Davis,

10  Bob Pellegrino, Karen Duros, Terri Bonar-Stewart, Randy

11  Schmelzel, Mike Connor, Nancy Higley, Paul Farrell from John

12  Hochstrasser, September 9, 1993.  Occupational exposure

13  investigation liquids department, to investigate employee

14  exposures to potential respiratory tract irritants and

15  sensitizers released in the liquids department workplace at

16  Cincinnati plant during the period of January through March 1993

17  with special focus on the month of February.  The prognosis for

18  identifying a single etiologic agent is not good.  Also, two or

19  more chemicals could be acting synergistically, or a chemical or

20  combination of chemicals could be acting as a promoter.  To make

21  matters even more difficult, single or multiple chemicals could

22  be acting synergistically with viral or bacterial diseases to

23  effect bronchiectasis (sic) or bronchiolitis.

24          Exhibit 115, liquid flavors department, Cincinnati,

25  Ohio, November 8, 1993, hazard communication standard.  There is

no provision in the OSHA standard that requires the immediate
dissemination of information regarding a suspect occupational
health hazard.  However, if we find there is a specific health
hazard present, that information will have to be shared with
affected and potentially affected employees.

Exhibit 154, in speaking with Jim Lockey, it is our
profession opinion that a risk assessment on all the chemicals
is a work-intensive effort that is unnecessary.  We are
developing another approach that gets at the plant issues on a
broader basis rather than on an unmanageable
chemical-by-chemical basis.

2029, identification, chemical name, diacetyl,
appearance, intensely yellow or yellow-green mobile liquid with
a powerful and diffuse pungent buttery odor.  The vapors have a
chlorine-like odor.

Human health effects data, known effects of acute
exposure, toxicological and pathological data, harmful -- by
inhalation, harmful, sore throat, coughing, may be absorbed.
High concentrations may cause irritation of respiratory tract,
capable of producing systemic toxicity.  And the date of this,
Scott, the date of that document, please?  The date of this
document, September 2, 1985.

Tastemaker operational procedures, date, 8-13-92.
Summary of procedures.  The following procedures must be
followed during the usage of diacetyl.  This will reduce the

1 risk of injury to personnel. Safety equipment needed, goggles,
2 full-face respirator. Procedures, whenever liquid diacetyl or a
3 product where diacetyl -- liquid diacetyl is present is to be
4 used, a respirator with chemical-resistant gloves must be worn.
5 Any room containing diacetyl in a liquid state must be labeled
6 respirator required. Five, avoid heating or flame at all times.
7 Seven, whenever material is in any tank, lid must be closed. If
8 ventilation, paren, mechanical, is not connected to a tank or is
9 unavailable, a respirator must be worn at all times while in the
10 room.
11          Exhibit 112, September 13, 1993, from John
12 Hochstrasser to Nancy Higley. Review of toxicity information.
13 The enclosed memo defines a program that has top priority. A
14 possible occupational exposure case has been brought to our
15 attention similar to the ones that we previously reviewed.
16 Please send me copies of the literature that you obtained on
17 diacetyl during the last exposure review. Diacetyl still
18 appears to be a viable candidate as a possible etiologic agent
19 or at least one of the agents.
20          Exhibit 2016, December 22, 1992, meeting, 1:30 p.m.,
21 substance, diacetyl, literature search, rate of BO in U.S. and
22 Cincinnati.
23          Exhibit 160, James Lockey, M.D., history and physical,
24 Mr. Clifford Walker is a 48-year-old gentleman with 2 children
25 who was evaluated at the Center For Occupational Health because

1    of abnormal pulmonary function tests.  Chief complaint,

2    shortness of breath.  He noted the following chemical agents

3    that would cause him to have breathing problems:  Diacetyl.

4    This would be added to butter.  It would reach a certain

5    temperature and flash.  He subsequently would awaken at night

6    with chest tightness and cough, difficulty breathing.  This

7    would last approximately four or five days and then resolve.

8    There is no associated fever, chills, muscle aches or pains.

9    This occurred two or three times per week until the butter

10   operation was transferred to the spray dry area approximately

11   two years prior to this evaluation.

12           Exhibit 166 in evidence.  I'm sorry.  Next page of

13   Exhibit 160.  Pulmonary function tests, Mr. Clifford Walker is a

14   48-year-old gentleman who has clinical findings as well as

15   laboratory results consistent with bronchiolitis obliterans.

16   This includes a definite drop in his FVC and FEV1 from 8-3-88 to

17   9-91.

18           Exhibit 166 is project team meeting, September 14,

19   1995.  Dr. Jim Lockey, Dr. John Hochstrasser, Janice Dees, Nancy

20   Higley.  And three chemicals are highlighted:  Acetaldehyde,

21   benzaldehyde, and diacetyl.

22           Your Honor, that's the end of our readings, and we're

23   at noon, and I would like to review it, but I think that that's

24   the end of our evidence.

25           THE COURT:  Okay.  Thank you.

 1          Members of the jury, we'll take a recess until 12:30.
 2   And we'll come back at 12:30.  Remember keep an open mind till
 3   you've heard all of the evidence.  Thank you.
 4          (The jury exited the courtroom.)
 5          THE COURT:  Anything we need to take up?
 6          MR. MEADOR:  No, Your Honor.
 7          THE COURT:  Okay.  Thank you.  See you back at 12:30.
 8          (Recess at 11:56 a.m.)
 9          THE COURT:  Mr. McClain, is the plan that you're going
10   to rest?
11          MR. MCCLAIN:  Yes.
12          THE COURT:  Okay.  And then we all have an
13   understanding that the Rule 50 motions will be made at the end
14   of the day but you're reserving it as if they were made at the
15   close of the plaintiffs' case; correct?
16          MR. MEADOR:  That's correct, Your Honor.
17          THE COURT:  And any other record you want to make on
18   that at this time?
19          MR. MEADOR:  No, Your Honor.
20          THE COURT:  Okay.  Great.  And you're ready with your
21   first witness?
22          MR. MEADOR:  Yes, we are.
23          THE COURT:  Thank you.  Thanks, Arlen.
24          (The jury entered the courtroom.)
25          THE COURT:  Thank you.  Please be seated.

1    Mr. McClain?

2    MR. MCCLAIN:  Your Honor, the plaintiff rests.

3    THE COURT:  Okay.  Thank you.  Is the defense ready to

4  start their case?

5    MR. MEADOR:  Yes, we are, Your Honor.

6    THE COURT:  Okay.  You may call your first witness.

7    MR. MEADOR:  The defense calls Dr. Higley.

8         NANCY HIGLEY, DEFENDANT'S WITNESS, SWORN

9    THE COURT:  Okay.  Thank you.  Please be seated.  You

10  can adjust the chair and the microphones so you can speak

11  directly into them.  And when you're settled in, would you tell

12  us your full name, please, and spell your last name.

13    THE WITNESS:  Nancy Ann Higley, H-i-g-l-e-y.

14    THE COURT:  Thank you.

15    Mr. Meador?

16    MR. MEADOR:  Thank you, Your Honor.

17    If I block anybody's way, can you let me know because

18  I have a tendency to wander?

19                    DIRECT EXAMINATION

20  BY MR. MEADOR:

21  Q.   Where are you presently employed?

22  A.   I'm employed at PepsiCo.

23  Q.   And what do you do for that company?

24  A.   I'm vice president of food safety and regulatory assurance.

25  Q.   And can you explain what that involves?

1   A.    In terms of all -- I'm in charge of all the product

2   portfolio for Pepsi including the beverages, snacks, Quaker,

3   Aunt Jemima, all the products that we own as Pepsi.  My

4   responsibilities are for regulatory affairs, so that's

5   compliance with all the laws around the world internationally as

6   well as getting new ingredients approved.

7            And then from the food safety piece of it, that would

8   be, you know, the quality assurance and all the food safety

9   things that might come up as well as bio terrorism and making

10  sure that, you know, none of our products are tampered with.

11  Q.    So you handle food products at Pepsi domestic and

12  internationally?

13  A.    Yes.

14  Q.    Now, you don't reside around here?

15  A.    No, I live in New York.

16  Q.    And did you have quite an adventure getting here?

17  A.    It was great.

18  Q.    And you're here voluntarily, aren't you?

19  A.    Yes, I am here voluntarily.

20  Q.    You're taking time off from Pepsi to come here and testify?

21  A.    Yes.

22  Q.    And why are you doing that?

23  A.    I'm doing it because I feel that -- very strongly that what

24  we did as Givaudan was not only the right thing, that I think

25  that we had the best intentions and we approached it very

1  scientifically, and that's -- and I just want to be here to be

2  able to talk about that.

3  Q.   Now, have you ever testified before in a court of law?

4  A.   No.

5  Q.   But you spent the day with Mr. McClain, didn't you?

6  A.   I was -- yes, I've been deposed before.

7  Q.   And, in fact, you don't know this, but the jury's actually

8  seen some video clippings from you.

9  A.   Oh.  I'm sorry about that.

10  Q.   Now, your work at Pepsi, you always hear Pepsi and Coke and

11  they're in competition; right?

12  A.   Absolutely.

13  Q.   Do you think there'd be any problem if you could just give

14  me the recipe for Pepsi because I want to see if I can compare

15  it to Coke?

16  A.   Well, even if I had it, no, I wouldn't be able to give it

17  to you.

18  Q.   And why is that?

19  A.   Because it's -- I mean, a lot of the ingredients, the

20  ingredients that are found in the product there are trade

21  secrets, and there's a lot of differences between products even

22  around the world that just small little differences become what

23  we call a point of difference in terms of sales and people's

24  liking of the product.

25  Q.   Why do you call them trade secrets?

1  A.    Because we don't want anybody to know about them.  Again,

2  you know, they can mimic it.  We're very careful in what we

3  disclose to governments as well.  A lot of governments want us

4  to disclose the formulations, and we just don't -- we don't do

5  that unless there's a really good reason to do that because

6  somebody will get the formula and be able to make Pepsi or

7  Quaker or Tropicana, and that's what we don't want to happen.

8  Q.    And is that true in the food industry that many companies,

9  Sara Lee -- you can pick any company -- views their recipes as a

10  trade secret?

11  A.    Oh, yeah, intellectual property protection is very big at

12  the food companies.

13  Q.    Just like Microsoft and software?

14  A.    Yes.  Oh, definitely it's our bread and butter.  You know,

15  it's our trademark.  If anything happens to our trademark, for

16  the most part, protecting our trademark is our business.

17  Q.    And when you worked at Tastemaker, was that true at

18  Tastemaker?

19  A.    Yes, definitely.

20  Q.    And so why is flavoring considered as intellectual

21  property?

22  A.    It's the similar -- it's the similar situation.  Each

23  flavor is -- the way it's formulated, there might be parts per

24  million or parts per billion in there that are just enough to

25  make it just a tiny bit different than the competitor product

1  and make things like -- I'm not a flavorist but things like

2  there's certain ingredients you can add to a strawberry to make

3  it taste green so it's more of a fresher taste.  So if you're

4  trying to achieve some of those flavors, you want to protect the

5  ingredients that are in your product.

6  Q.    Now, you did work at Tastemaker?

7  A.    Yes, I did.

8  Q.    And you were there '91 through '97 when it was called

9  Tastemaker?

10  A.    Yes.

11  Q.    And then what happened in '97?

12  A.    That's when they were purchased by Givaudan.

13  Q.    And you stayed on with Givaudan?

14  A.    I stayed on until 2004.

15  Q.    And in 2004 you left to go to --

16  A.    Went to Pepsi.

17  Q.    And how did that happen?  Why did you leave?

18  A.    Pepsi called me.  I wasn't looking for a job, but since I'd

19  worked there before, I was walking back into the job that my

20  boss's boss had.  So for me, you know, it was almost a -- it's a

21  career progression that, you know, rarely in my field do you get

22  to do.  It's a major company to be able to do regulatory affairs

23  and scientific affairs at such a large company, such a credible

24  company as well.

25  Q.    And can you briefly tell the jury what your educational

1  background is.

2  A.    Besides high school, went from high school to get a

3  bachelor's of science in biology, and then I went on and got

4  a -- directly got a Ph.D. from University of New Hampshire in

5  biochemistry and then went to University of Wisconsin and did a

6  post-doc in toxicology.

7  Q.    And can you explain generally what toxicology is?

8  A.    Toxicology is the -- you know, it's the science of, you

9  know, looking at toxic end points, so to speak, and safety.

10 Q.    And what do you mean by toxic end points?

11 A.    You know, different ingredients and different materials

12 might have some kind of toxicity or safety to them, and that's

13 what toxicology pretty much looks at.

14 Q.    And is one of the things toxicologists do is look for

15 causes of diseases in the workplace?

16 A.    Yes, yes.

17 Q.    And at Tastemaker, is that one of the things you were

18 doing?

19 A.    My job was to look at -- you know, to look at the

20 ingredients in the formula and to come up with what are the

21 hazards which is different than the risks.  The hazards are

22 just, you know, laying out what are the -- what are the

23 possibilities that a certain ingredient, you know, might have a

24 toxic effect.

25 Q.    Now, have you published any papers?

1  A.    I've published 15 or more papers, yes.

2  Q.    Can you generally describe what they are?

3  A.    I did work on -- one of the biggest pieces of work I did

4  after my post-doc was cholesterol oxides and atherosclerosis, so

5  that was -- I teamed up with a colleague of mine who was -- did

6  histology, so we were looking at the effect of, in a sense,

7  derivatives of cholesterol and what -- the effect they had on

8  atherosclerosis.

9          And I've done some research on food safety in the area

10  of food allergens, in particular sulfites, and then some of the

11  more recent things that I've been working on or paper that's in

12  publication now is on intellectual property and conflict of

13  interest to see how we would -- how people in industry and

14  academia can work together to make sure we can do the best

15  science.

16  Q.    Let's talk a little bit about the business and what

17  Tastemaker did back in the early '90s.

18          MR. MEADOR:  Could you put on G31A, please.

19  Q.    Now, Tastemaker, they don't manufacture their own chemicals

20  at that plant?

21  A.    No, they do not.

22  Q.    So could you explain the process of how they would acquire

23  chemicals?

24  A.    Well, there's a various -- there's a lot of different

25  chemical suppliers that they would go to to get the ingredients

1   that they need to make a flavor formulation, so there's probably

2   thousands of vendors around the world that would be utilized for

3   that.  And so there's different specifications for different

4   ingredients, again, depending on the quality of the material

5   that you might want to -- that you might want to use to

6   formulate, compound.  It's called compounding a formula.

7   Q.   And how many chemicals in the early '90s would Tastemaker

8   purchase to make its flavorings?

9   A.   I mean, at any one time depending on where we were in some

10  of our joint ventures, it could get as high as 5,000 to 6,000

11  ingredients.

12  Q.   And why were there so many?

13  A.   Well, what happens is -- well, first of all, when we merge

14  with companies, you had different qualities of material.  For

15  example, orange oils, you could have several different qualities

16  of orange oil depending on how concentrated it was.  It's called

17  folding.  You could have ten times folding.

18          Then we also have chemicals that were -- we had the

19  kosher version and the nonkosher version.  And then you might

20  have the natural version versus the synthetic version.  So these

21  are just multipliers of the same ingredient as for quality and

22  for, you know, some of the more regulatory purposes that we

23  might want.

24  Q.   So Tastemaker would buy five or six thousand raw materials,

25  and they would be delivered to the plant in 55-gallon drums or

1 some kind of container?

2 A.   Or whatever.  It depended on the material.  Some materials

3 are used in very low amounts because they're very potent, so

4 they wouldn't come in the 55-gallon drums.  They might come in

5 smaller containers.

6 Q.   Now, you haven't been here, but we've been talking about

7 butter flavoring in this case.

8 A.   Okay.

9 Q.   Is that the only product Tastemaker was making in the early

10 '90s?

11 A.   No.  I mean, Tastemaker would make -- when we converted

12 over to one of the formulation systems right before I left,

13 there was as many as 30,000 formulas on the system at one time

14 that I can recall, and it was strawberry flavors, cheese

15 flavors, meat.  I mean, if you think about, you know, the

16 products that you purchase, if you look at the back label and

17 you see the word flavor, that's all the flavors that were made

18 by the flavor industry.

19 Q.   So pretty much anything you'd see on a store shelf.

20 A.   Abs -- yeah, absolutely.

21 Q.   Now, when Tastemaker purchased chemicals from

22 manufacturers, the manufacturers would send a material safety

23 data sheet with the product?

24 A.   There was a whole series of information that we would want

25 to get.  I mean, from a regulatory perspective, it goes all the

1   way the gamut from -- we have to make sure it meets the

2   specifications.  For example, there's an organization called

3   Food Chemicals Codex which is part of the Institute of Medicine.

4   It was a work that they did with the FDA under contract with the

5   FDA to make sure that the ingredients met the right

6   specifications so that we were considered, quote, food grade.

7   So that was a document.

8           If the material was natural, we would get a

9   certificate from the vendor saying that it was natural because

10  they need to make sure that they are complying with that part of

11  the regulation of the Code of Federal Regulations which happens

12  to be 101.22.

13          Then we would get -- if it was kosher, we need to get

14  a kosher certificate from the rabbinical services.  We'd also

15  get perhaps an allergen statement because if it was an

16  allergenic ingredient, we'd want them to swear whether -- you

17  know, what kind of allergen was in it.  And then on top of that,

18  we'd get specs as well as -- specifications as well as the

19  material safety data sheet.

20          So there was a whole big dossier of -- I'd say

21  critical data is about eight pieces of data or documents that we

22  would want to have with each dossier for each raw material that

23  we would buy.

24  Q.   Since you had 30,000 different type flavors, is it fair to

25  say you had more customers than American Pop Corn?

1  A.   We had several -- yeah, we had a lot of customers.  I don't

2  know the -- can't even quite now quote how many we had but major

3  food companies and companies all around the world.

4  Q.   Now, in terms of selling flavors to customers, would the

5  customer ever get involved in helping develop a particular

6  flavor?

7  A.   Yeah, quite a bit.  I mean, they would come -- they would

8  come to the facility, or I think our chemists would also go to

9  see them because they might have a different, you know, nuance.

10 As I mentioned earlier, the whole area of, like, strawberry

11 flavor, if they want more -- like a more greener note or they

12 want it to be fresher or, you know, whatever the profile might

13 be, our flavor chemists would sit with them and they would mix

14 things together.  They would taste them, and then they would go

15 back to the bench, and they would continue to modify them until

16 they met the taste profile that the customer was looking for.

17 Q.   Now, we're going to talk a bit today about diacetyl.  Can

18 you just tell what diacetyl is?

19 A.   It's a chemical.  It's a chemical found in -- it's found

20 naturally.  It's what's called a diketone.  It's a small

21 molecular weight chemical.  It's found in butter.  It's found in

22 some cheeses.  It's naturally occurring in a lot of the foods

23 that we consume.

24 Q.   Now, the jury's also heard a lot about another chemical.

25 It's called acetaldehyde.  Are you familiar with that?

1    A.    Yes, I am.

2    Q.    What is that?

3    A.    Acetaldehyde, it's smaller structure than diacetyl.

4    Acetaldehyde is also very prevalent in nature, orange juice, I

5    think also maybe in beer if I remember correctly, but it's

6    pretty -- it's got some significant levels in orange juice.

7    Q.    It has a citrus flavor?

8    A.    Yes, somewhat, yeah.

9    Q.    And diacetyl's has a butter flavor?

10   A.    And diacetyl somewhat has a butter flavor.  To me I think

11   it's a little bit pungent, a little bit beyond butter to my

12   liking but . . .

13   Q.    Now, do you know whether or not American Pop Corn knew that

14   there was diacetyl in the butter flavoring that you supplied to

15   them?

16   A.    Yes, I know that they knew.

17   Q.    And how do you know that?

18   A.    Because I recall getting a phone call from Dale Hartshorn

19   who I knew, and he -- when there was issues that come up, some

20   of our customers would call me directly, and he did call me, and

21   I disclosed how much diacetyl was in the formulations.

22   Q.    And let's look at how much diacetyl was in the

23   formulations.

24          MR.,MEADOR:  Could we have the pretrial order, please?

25   These are stipulations we've entered into in this case, and

1  let's look at stipulation 70 to 75, please.

2  Q.   So the first product talks about a spray dry suspension in

3  oil, and its formula contains approximately 3.46 diacetyl.  What

4  is that referring to?  What is a spray dry suspension in oil?

5  A.   Well, one of the processing for flavors -- I mean, you

6  could make a liquid.  But then you can also make a -- you could

7  dry it kind of like a powder which they then would suspend in

8  oil, so that's what that would refer to.

9  Q.   So the diacetyl is diluted with whatever the rest of the

10 chemicals are in the butter flavor?

11 A.   Oh, yes, right.  And in this case, you know, as -- what I

12 call as formulated, it contained 3.46 percent diacetyl, but it's

13 very likely under the spray drying that some of that diacetyl

14 would be -- you know, would be flashed off and wouldn't be

15 there.

16 Q.   And can you explain what you mean by that?

17 A.   Well, spray drying is a high heat process, so it's almost

18 like taking a liquid and it often gets spun in a drum and it

19 gets -- all the liquid gets taken off.  So those chemicals,

20 especially low molecular weight chemicals that are volatile, you

21 know, have a lower boiling point.  They'll flash off.  It's kind

22 of like when you're cooking, you know, and you can smell things

23 volatilizing off the frying pan.  You can think of it that way.

24 Q.   Now, there's a reference to spray dry powder, 1.73 percent

25 diacetyl, 1.74 diacetyl, 2.16 diacetyl, 2.27 diacetyl.  What is

1 a spray dry powder that they're referring to?

2 A.   A little bit different than the first one we talked about.

3 It still is a spray dry, and it remains in its powder form so

4 it's not suspended in oil which is what the first one would be.

5 So all the ones -- it looks like everything on your list, 70,

6 71, 72, 73, and 75, are spray-dried formulas.

7 Q.   And then 74 we skipped over, but that says oil soluble

8 liquid, 10.92 diacetyl.

9 A.   Right.

10 Q.   What is that referring to?

11 A.   So that is -- in a sense it's a liquid, but it is -- all

12 the other components that are in there are such that it's

13 soluble in oil as opposed to being soluble in water.

14           MR. MEADOR:  Let's put up G34, please.

15 Q.   Now, Dr. Higley, I want you to assume hypothetically since

16 you haven't been here that there's been testimony in this case

17 that Mr. Ron Kuiper was in the mixing room for '92 to '95 at

18 American Pop Corn; okay?  And I want to ask you some questions

19 about what we call state of the art and what you knew during

20 that time period '92 to '95; okay?

21 A.   (Witness nodded head.)

22 Q.   And looking at the exhibit in front of you, okay,

23 Tastemaker obviously was in Ohio; right?

24 A.   Right.

25 Q.   And American Pop Corn was here in Sioux City; right?

1  A.   Right.

2  Q.   And the way you communicate with your customers in written

3  form is how?

4  A.   Well, it depends on the subject, but in the case that you

5  have up here on the screen, to be able to convey hazards, you

6  would use what's called a material safety data sheet.  And if we

7  were conveying something else, I would use a different document,

8  but in this case an MSDS's sole purpose is for what's called

9  hazard communication.

10 Q.   So let's stop right now, and I just want to focus on '92 to

11 '95 when Mr. Kuiper was in the mixing room.  At any point during

12 that time, did you actually know that diacetyl had the potential

13 to cause bronchiolitis obliterans?

14 A.   No.

15 Q.   And during that time period, did you have any information

16 from any source that butter flavoring could cause bronchiolitis

17 obliterans?

18 A.   No.

19 Q.   During that time period, did you have any information that

20 any of the chemicals that were utilized at Tastemaker in the

21 manufacturing of the formulas could cause bronchiolitis

22 obliterans?

23 A.   No.

24 Q.   So during that time period -- well, strike that.

25          Did you ever see any information from any source

 1  during that time period, '92 to '95, that butter flavoring could

 2  cause bronchiolitis obliterans?

 3  A.  No.

 4  Q.  Now, let's talk about MSDSs, and we've had some testimony

 5  about that.  Could you explain what an MSDS is and how you were

 6  involved in that process?

 7  A.  Sure.  As I mentioned earlier, an MSDS, a material safety

 8  data sheet, its purpose is to communicate hazards.  And I'm

 9  particular when I say hazards because there's a difference

10  between hazards and risks, and the difference is a hazard is the

11  likelihood that it -- you know, that it could have an effect

12  whereas the -- a risk is using other factors that will then

13  determine whether or not that hazard becomes a reality.

14        So not knowing the exposure and the different

15  conditions of how the MS -- how the material might be used, what

16  an MSDS does is it communicates the hazards.  And it

17  communicates some other things as well.  It communicates spill.

18  So, for example, if that product is being shipped, there's a

19  section on that product that talks about how to clean it up if

20  there's a spillage.

21        It will -- and so you'll see things in it such as

22  whether it's a liquid or just some of the -- some of the

23  physical chemical characteristics of the formula.

24        The other thing is there's a section in there.  It's

25  the section 2 actually in most cases which would describe if

1  there's any ingredient within that formula above a certain level

2  for which OSHA has determined that that material has what's

3  called an exposure threshold.

4         So, for example, ethanol has an exposure threshold, so

5  if ethanol was in a formula, it would show up in section 2

6  because it has a permitted exposure level written down by OSHA.

7         Then there's a -- later on there's a section that

8  actually -- that talks about the hazards, and there's two parts

9  of it in a sense.  One is by law you have to -- you have to put

10  on a U.S. MSDS whether it contains any ingredient in that

11  formula that's a carcinogen and if it's a carcinogen above a

12  tenth of a percent.  And there's authoritative bodies that by

13  law you look at.  There's the National Toxicology Program.

14  There's a group called IARC which is the International Agency

15  for Research on Cancer, and then there's OSHA.  So there's lists

16  that we go to to say if that ingredient is present in that

17  formula greater than tenth of a percent, 0.1, then it would get

18  listed as a carcinogen.  So that's one section of the health

19  hazards.

20         The other section is what we call target organs and --

21  where you write the toxicity for the ingredients present in the

22  formula greater than 1 percent and you represent those hazards

23  as if they were in that formula undiluted.

24         So it gets a little complex, but what we literally

25  would do in the early stages back when it was Fries & Fries and

1  Tastemaker, we'd have a formulation, and my people would

2  literally draw a line at .1 percent and at 1, and we would look

3  at the hazards for each of those materials greater than 1

4  percent, and we would determine then how that would be part of

5  section -- it's probably 6 or 7 on the MSDS.

6  Q.   Now, you were provided information by the actual

7  manufacturers of the chemicals; right?

8  A.   Correct, because by law we need to get -- by law you're

9  required -- just as we would get from our -- give to our

10  customers an MSDS, we're required by law to also get -- for

11  hazard communication get an MSDS from our vendors as well.  So

12  they would be giving me the same -- us the same information that

13  we would be turning around and looking at getting to our

14  customers as well.

15  Q.   And you were the person that was overseeing the MSDS

16  program?

17  A.   Yeah, myself and my group, yes.

18  Q.   And so how did the information that you've described get

19  into the MSDS, for example, that you'd send to American Pop

20  Corn?

21  A.   Again, we would look at each of the ingredients.  And we

22  had -- the ingredients through the years had got more

23  computerized, but we would have -- for each ingredient we would

24  have the hazards by what's called route of exposure.

25          So we would know that an ingredient, you know, if it

1 is a skin irritant or eye or what the effects were by ingestion

2 or by inhalation. And then each ingredient would be coded, so

3 maybe it says, "May be irritating to skin and eyes," and then

4 another ingredient greater than 1 percent says, "Is irritating

5 to skin and eyes." Well, instead of repeating it, we would take

6 the worst case, and that MSDS would then say, "Is irritating to

7 skin and eyes." So we went through that algorithm each time for

8 each ingredient.

9 Q.   Now, there's been some testimony in this case that diacetyl

10 is an irritant.

11 A.   Yes.

12 Q.   Were there other chemicals used at Tastemaker in the early

13 '90s that were classified as irritants?

14 A.   Yeah, there's many ingredients that are irritants.

15 Q.   Can you give me a ballpark estimate?

16 A.   I would s -- I would say 500 or more. I mean, most

17 chemicals have an irritating capacity to them. So a lot of them

18 we would say, "May be irritating to skin and eyes." I mean,

19 definitely if you get chemical undiluted into your eye, it would

20 be -- very likely be irritating to your eye.

21        MR. MEADOR:  Trial Exhibit 3121, please.

22 Q.   Now, you provided MSDSs to American Pop Corn?

23 A.   Yeah, they were one of our customers.

24 Q.   And if you could just briefly take us through this MSDS

25 just describing the product identification.

1  A.   Okay.  I mean, I think I said one of the other -- one of

2  the uses or one of the sections of an MSDS is for spills.  So

3  one of the key things you need to make sure you do on an MSDS is

4  make sure that the name of the product on the MSDS matches the

5  name on the label.  So that's really very key so that if you

6  have a spill or somebody needs to look at it they can pick up

7  the MSDS and they can look at the drum and they know that they

8  have the right MSDS for that product.  So that's section 1.

9         Section 2 is the section I was mentioning that if

10 OSHA, IARC, or NTP indicates that there is a permitted PEL --

11 that's a permitted exposure limit -- for that ingredient or

12 TLV -- that's a threshold limit value -- then that would be

13 disclosed on the MSDS.

14        And then the other is what I'll call the physical

15 chemical characteristics.  Those are necessary in particular to

16 help with the cleanup or a spill so you know, for example, if

17 it's soluble or not so you can see in this case solubility in

18 water is complete.  What that means is if you have a spill you

19 can easily clean it up with water.  If it had said not complete,

20 then you would use something else besides water to clean it up,

21 and that's -- so those are the physical chemical characteristics

22 which we would capture.

23 Q.   You talked about PEL and TLV.  During that time period was

24 there a PEL or TLV for butter flavor or diacetyl?

25 A.   No.  Most flavoring ingredients, it's not at -- usually

1  there is not a PEL or a TLV for any compounded material.  There

2  are in the individual ingredients and for flavoring ingredients,

3  I would say less than -- maybe around 5 percent or less of the

4  ingredients have an OSHA limit to them in terms of the exposure

5  limit.

6  Q.    Now, is there a part of the MSDS that you would

7  specifically focus on as a toxicologist?

8  A.    Yeah, the hazards section which is in this case probably 7

9  or 8.

10 Q.    I think it's 6.

11 A.    So it'd be next page.  Seven.

12 Q.    No, let's go back.  There we go.  Section 5 says health

13 hazard data.  Describe what that is.

14 A.    That's the section where for the finished formula, you

15 know, what did we assess were the health hazards, and so in this

16 case when you look at the PEL or the TLV, there is none because

17 OSHA does not have a limit for finished compounded flavors.

18         And then we talk about the possible routes of entry so

19 you've got, you know, skin, eyes, ingestion, inhalation.  And as

20 I mentioned earlier, I said about one of the sections on health

21 hazard has to do with carcinogen which that's that first

22 paragraph which says, you know, the mixture, you know, has or

23 has not been listed as a carcinogen by the three authoritative

24 bodies that are listed there.

25         So in this case this one contained no carcinogen

1  greater than .1 percent that would be on any one of those three

2  authoritative body lists.

3  　　　　And then the final section is the mixture.  Again, we

4  looked at every ingredient in the formula present greater than 1

5  percent, and then the hazards would be presented in the section

6  below based on what those hazards are as if that ingredient were

7  undiluted.

8  　　　　It's very odd, but the way it works -- I mean, think

9  of it as if I were to have vinegar in a formula, vinegar is

10  about 3 percent acetic acid.  I would have to put on the MSDS

11  corrosive because acetic acid itself undiluted is corrosive, so

12  that's how the law is written and how we have to represent the

13  ingredients in terms of how they roll up for the MSDS.

14  Q.　Now, under inhalation, it says inhalation is irritating to

15  nose, throat, and lungs.

16  A.　That's correct.

17  Q.　Now, I don't see anything in there about that it might

18  cause permanent lung disease.

19  A.　No, because our assessment would have been for this

20  formula, whatever ingredients, again, were present at 1 percent

21  or greater, the final roll-up, so to speak, statement, the most

22  conservative statement, for the information that we knew at the

23  time would have been inhalation is irritating to nose, throat,

24  and lungs.  That's all.

25  Q.　And we'll come back to this in a minute.  But was there

1  anything in the medical or scientific literature during the '92

2  to '95 time period when Mr. Kuiper was in the mixing room that

3  indicated that exposure to butter flavoring or diacetyl could

4  cause permanent lung disease?

5  A.    No.

6  Q.    And how do you know that?

7  A.    Because the way we looked at -- besides looking at the

8  MSDSs, the other source we would look at was what's called the

9  flavor fragrance ingredient data sheets.  The history of that is

10  back in I think the late '80s --

11  Q.    Wait.

12  A.    Sorry.

13  Q.    Can I just stop you for a minute?  I want to finish this

14  MSDS.  That's easier.

15  A.    Okay.

16  Q.    Let's go on to the next section.

17  A.    So that's how I would know, so okay.

18  Q.    Sorry to interrupt you.

19  A.    That's okay.

20  Q.    There's a section called applicable control measures.

21  A.    Uh-huh.

22  Q.    Now, can you explain what this section is?

23  A.    This is the section for, you know, what -- you know, what

24  would be the controls for that flavoring given, you know, just

25  the information that we knew about that flavoring in terms of

1  how you might, you know, put on personal protective equipment,

2  what would be required.  It doesn't go into -- you know, we have

3  no way of knowing how each individual plant -- what percentage

4  they're using it at nor what their engineering controls is.  So

5  this would be the personal protective equipment that we would

6  say for that formulation as we would be using it.

7  Q.    So is this section actually written for industrial

8  hygienists in a plant?

9  A.    Oh, absolutely, yes.

10  Q.    So this is not really your section.

11  A.    No, it's not my section.

12  Q.    But you actually had industrial hygienists at Tastemaker;

13  right?

14  A.    Yes, yes, so their job is to take the hazards as I wrote

15  them and then do a risk analysis to determine what the personal

16  protective and applicable control measures should be.

17  Q.    Trial Exhibit 69.  Now, you mentioned a moment ago FFIDS.

18  Could you explain what that is?

19  A.    Sure.  Back in the late '80s -- until the late '80s -- I

20  want to say around 1986 -- the flavor and fragrance industry

21  were not required to create MSDSs.  And so when the law was

22  promulgated for us to have to write MSDSs -- you think about the

23  thousands of ingredients that are used in flavors and

24  fragrances -- we didn't know how to start, I mean, to look at

25  the toxicology of each one of these ingredients.

1    So the industry, both the flavor and fragrance

2 industry, commissioned a consulting group called ENVIRON to go

3 out and get all the data that would be needed for MSDSs to then

4 look at the data.

5    And what an FFIDS is is it's what I call the totality

6 of the evidence. It looks at all the evidence that they found

7 at that time, and they would look at it to say what's

8 applicable, what's not applicable, what's a robust study, what's

9 not a robust study to look at all the data to then help us as an

10 industry come to a conclusion as to what's the overall toxicity

11 and what I'll call the hazard statements for that particular

12 ingredient.

13    And they also would do it in such a way that it was

14 user friendly, friendly to the worker because the MSDS is

15 supposed to be for the worker. It's not for us scientists who

16 might use different terminology, so that's what the FFIDS sheet

17 would do.

18 Q.  When you say you look to see whether a study is robust,

19 what does that term mean?

20 A.  Well, in some cases, you know, some of the studies that

21 might be out there are personal communications, so they've not

22 been through the peer-reviewed literature. So one can't look at

23 that data to know what it says. There might be some studies for

24 which until you look at them it's not done on pure material, so

25 it might be on mixtures of material. So it's really difficult

1  to extrapolate a study that has a mixture of ingredients to the

2  same effect that might be, you know, at a hundred percent.  So

3  there's experts of toxicologists who sit there who went through

4  all these materials and they made those determinations.

5  Q.    That was ENVIRON?

6  A.    That was ENVIRON, yes.

7  Q.    And who is ENVIRON?

8  A.    It's a consulting firm that now is -- actually they're

9  quite large.  They're global now.  I don't know what their size

10  was back in '83, but it's a series of toxicologists that have

11  expertise in looking at data.

12  Q.    And you say peer-reviewed literature.  Can you explain what

13  that term means?

14  A.    Well, when you publish a paper in the scientific

15  literature, usually you submit a dossier or the paper, the

16  publication, to the journal who then in some cases has anywhere

17  from three or more reviewers, scientific reviewers, who

18  anonymously look at the paper to determine whether or not all

19  the steps of the study are done correctly so, for example, you

20  know, how you did the -- how you conducted the study and did you

21  interpret the results correctly and were your conclusions

22  correctly (sic).  And that is a process called peer review.

23          So before a scientific article gets published in, for

24  example, Journal of Toxicology or American Journal of -- New

25  England Journal of Medicine, it goes through a peer review of

1   scientists who look at it.

2   Q.    And did you review the FFIDS in preparing material safety

3   data sheets at Tastemaker?

4   A.    Yeah, we used the MS -- sorry.  We used the FFIDSs to come

5   to the final conclusion.

6   Q.    And what do they say in FFIDS?

7   A.    So this is one where they looked at all the data, and in

8   terms of laymen's language, they decided that it was -- in this

9   case the irritation data was as you've written it here -- I've

10  highlighted it here -- liquid and vapor may be irritating to

11  skin and eyes, and vapor is irritating to throat and lungs.

12  Q.    Was that consistent with the information that you put in

13  the MSDS that you provided to American Pop Corn?

14  A.    Yes, because I used this information directly in our

15  determination of the roll-up of the hazards.

16              MR. MEADOR:   Trial Exhibit 3165, please.

17  Q.    Exhibit 3165 is an international chemical safety card.  Can

18  you say what that is?

19  A.    Yeah.  There's several, again, authoritative bodies, global

20  authoritative bodies.  I can tell by looking at the icons.  One

21  of them is FAO WHO, World Health Organization.  The box with the

22  circles around it is the European Union.  Then you've got NIOSH.

23  So those organizations all would look at data and come up with

24  what is called the international chemical safety data card.

25              So they would look -- again, these were authoritative

1  bodies that would look at the data, and then they would

2  determine various information about it.

3  Q.   And what is this, the international chemical safety card,

4  for?

5  A.   It's to -- it's a summary of the -- in a sense it's a --

6  almost call it a mini-MSDS, but it's an information source to

7  again look at what do other experts think is the totality of the

8  evidence for a particular ingredient.

9  Q.   And then it says October 26, 1994, peer reviewed.  What

10 does that mean?

11 A.   That means that this information in this card was reviewed

12 by experts to make sure that it was accurate.

13 Q.   And it says 1994.  That was during the time period that

14 Tastemaker was providing a product to American Pop Corn?

15 A.   That's correct.

16 Q.   And if my assumption is correct as to when Mr. Kuiper was

17 in the mixing room, this international safety card was during

18 that time period, 1992 to 1995?

19 A.   Yes, it was available at that point.

20 Q.   And can you take me through this international safety card

21 and describe the information here.

22 A.   I mean, the header is -- you know, you can read the header.

23 What it does is it looks at the types of exposure.  So when you

24 look at the document, again, it's similar to an MSDS.  It's a

25 smaller card, but you know it talks about for that ingredient

1  what's its propensity for fire or explosion, exposure,

2  inhalation, skin, eyes, and ingestion.  So it talks about the

3  acute hazard symptoms in the first column.  Then it talks

4  further about prevention.

5          So, for example, if you just take fire, diacetyl is

6  highly flammable.  And so when you're working with it, the

7  prevention would be, you know, don't work around open flames

8  with diacetyl.  And then the latter is in a sense, you know, if

9  you had a fire how would one, you know, firefight it?  So this

10 kind of information is what's on all of their cards.

11 Q.   Now, there's a column that says acute hazard, slash,

12 symptoms.  First of all, what's an acute hazard?

13 A.   I think of acute as like an immediate effect.  So like some

14 ingredients -- and you might hear of over time, you know,

15 smaller and smaller doses over time, you know, might be a

16 carcinogen.  Acute is you get a -- depending on the level, you

17 get a bolus amount of it.  That is acute -- and something

18 happens, that's acute.  It happens right away.

19 Q.   And what does NIOSH list as the acute hazard, slash,

20 symptom under inhalation in 1994?

21 A.   In 1994 they did not list anything.

22 Q.   And let's go to page 2, please.  And what do they say

23 about -- just take me through this part of the card.

24 A.   I mean, this -- I mean, this page 2 is a little bit more

25 detailed information where it's talking a little bit more about

1  the physical chemical characteristics, but they also are getting

2  into are there any occupational exposure limits, and you can see

3  the one highlighted is, you know, as we have talked about, there

4  is no threshold limit value set for diacetyl in 1994. And it

5  talks again about routes of exposure. I mean, that's very

6  critical when you're trying to look at an MSDS and look at the

7  risk as to know how it might poss -- somebody might possibly get

8  exposed to it, and this is one where they're indicating that it

9  could be absorbed into the body by way of inhalation or through

10 the skin.

11 Q.   It says, "Effects of short-term exposure." What does NIOSH

12 list as the effects of short term-exposure at that time?

13 A.   I think if you go back -- I think the one you're talking

14 about is right above. The effects of short-term exposure is

15 blank, so they didn't list anything.

16 Q.   And what does NIOSH in 1994 say about long-term exposure?

17 A.   And long term they are citing that repeated or prolonged

18 contact may cause skin sensitization.

19 Q.   And what's your understanding as to what skin sensitization

20 is?

21 A.   It's like an allergenic response, somewhat like a -- think

22 of it like a poison ivy. So it's an immunological response, so

23 you get sensitized. Sometimes it's not right away. It might be

24 after you're exposed to it, you know, at a later time. You

25 know, like a bee sting, you know, you might not be allergic to a

1  bee sting, but the next time you get stung you get a reaction.

2  That would be a sensitization reaction.

3  Q.   Is there anything in this NIOSH document about a danger of

4  being exposed to diacetyl and causing severe and permanent lung

5  damage?

6  A.   No, I don't see anything.

7  Q.   Now, let's turn back to your experience at Tastemaker.  You

8  started in 1991?

9  A.   Correct.

10  Q.   And in 1992 something happened that was brought to your

11  attention at the plant; right?

12  A.   In 1992 --

13        MR. MEADOR:  Let's put 110 trial exhibit.

14  Q.   Go ahead.  I didn't mean to interrupt you.

15  A.   Sorry.  In 1992 the coroner for the -- Montgomery County

16  called Terri Bonar-Stewart, who was in HR at the time, and

17  indicated that a former employee of Tastemaker had passed away,

18  and there was some suggestion that there might have been a --

19  there might have been a association with a lung disorder.  And

20  you can see we were mobilized in 19 -- December 8 to discuss

21  that coroner's --

22  Q.   And that was Janice Irick?

23  A.   That was Janice Irick, yes.

24  Q.   And she was a former employee?

25  A.   Yeah, she was a former employee.  She was no longer working

1   at Tastemaker when the coroner called us.

2   Q.   So since you'd started in '91, you didn't know who she was?

3   A.   No, I didn't know who she was, never met her.

4   Q.   Now, was this something that was taken seriously by

5   Tastemaker?

6   A.   Yeah.  I believe -- I don't know if this memo says it.  I

7   believe we were called probably earlier in that week, so within

8   less than a week is when this meeting was called on December 8.

9   And the seriousness of this I think for me shows in the fact

10  that -- the number of the people who are on this list.  You got

11  the president of the company, Mike Davis.  And Bob Pellegrino

12  was president of North America.  Karen Duros is legal counsel.

13  Randy Schmelzel was head of the plant.  John Hochstrasser was in

14  charge of environmental health and safety, myself as a

15  biochemist toxicologist.  And then we had the lead for human

16  resources.

17  Q.   So this is the first time you were involved in a task force

18  at the company?

19  A.   Yes, on this.

20  Q.   I mean, this was highly unusual?

21  A.   Very unusual.

22  Q.   And what was your role in the task force?

23  A.   Well, my role was -- I worked very -- I worked closely with

24  John Hochstrasser.  My role was to look at the raw materials, do

25  literature searches to determine if -- you know, what we could

1 find out about it in the literature, look at the raw materials.

2 The coroner had asked for a list of raw materials. So John got

3 the list of -- Hochstrasser got the list of raw materials, and I

4 looked at them as well. So again, try to find out if there was

5 anything from a ingredient perspective that I saw in doing a

6 complete literature review of the disease to find out if

7 anything that we had missed, if anything is showing up.

8 Q. And when you said you looked at the raw materials, what

9 you're meaning is you looked at the MSDSs for the raw materials.

10 A. Correct, and the FFIDS sheets.

11 Q. And what was the purpose in doing that?

12 A. Again, it was, you know, when we did a literature search of

13 the disease looking at -- we were trying to see if there was any

14 ingredient that was either the same ingredient or structurally

15 related to any of the ingredients that -- or any chemicals that

16 are cited to be causative agents.

17 Q. And when you did your searches in the MSDSs, the medical

18 and scientific literature that was available in '92, '95 time

19 period, what did you find out?

20 A. There was no ingredients that were cited as being causative

21 agents that we were using that were causative agents of the

22 disease.

23 Q. And I take it the task force started an investigation?

24 A. Oh, yeah, we met several times between then. Actually we

25 started meeting quite frequently. We each had our own job to do

1    in terms of looking at -- mine was looking at the ingredients.

2    John Hochstrasser's was looking at the records, the medical

3    records, and looking at any -- again, at any other indicator

4    that there might be.

5    Q.   And were you trying to find the answer to this problem?

6    A.   Absolutely, right, yes.  I mean, we took the coroner quite

7    seriously.  I mean, it wasn't -- it wasn't anything we'd ever

8    seen before, and so we wanted to make sure that -- you know,

9    that we looked at everything to make sure that, you know, there

10   wasn't anything in the plant.

11   Q.   And did you respond to the coroner?

12   A.   Yes.

13   Q.   And what did you do in that regard?

14   A.   We gave the coroner the list of the ingredients as

15   requested.

16   Q.   Now, in terms of identifying a specific operation at the

17   plant where a worker might have been exposed to a specific

18   chemical, did you have any difficulties in trying to match up

19   chemicals with workers?

20   A.   Yeah.  Our plant's a little different than a lot of

21   manufacturing plants.  Sometimes, you know, a lot of functions,

22   plants are such that, you know, it's very -- it's a closed

23   environment, so to speak, so somebody maybe works on one task,

24   then a different group of people that work on another task.

25            In our case people moved between the different

1  departments.  So people were constantly going from spray dry to

2  liquid, or there was a lot of movement.  So it wasn't that we

3  could identify one job function to a particular area within the

4  plant.

5  Q.  And when you say there's spray dries, liquid, describe what

6  those departments are.

7  A.  Well, I mean, liquids, liquids department is one where

8  people literally took liquids and they compounded them, so they

9  take all the ingredients, and they would make a compounded

10  flavor.  And then if that flavor had to be further processed

11  such as, you know, a spray dry, then they would have to then

12  move that compounded material to the spray dryers which are big,

13  big, huge machines to spray dry this material.  So they would

14  physically have to move the product.  And so there was a lot of

15  crossing of lines.

16  Q.  And on any given day at -- in one of these departments,

17  could a worker be making one of any hundreds of flavors?

18  A.  Oh, yes, definitely, yeah.

19  Q.  So each flavor would have a lot of different ingredients?

20  A.  And they might be making an intermediate that might be used

21  the next day.  So they might not -- they might do stops and

22  starts because there could be processing.  Maybe things had to

23  be nixed for a little while, so they might start one -- and

24  that's called an intermediate -- and store it overnight, and

25  while they're waiting for that one, they would start another

1  one.

2  Q.   Did the coroner ever come back and ask for more

3  information?

4  A.   No, he did not.

5  Q.   Now, at this time did you retain an outside physician to

6  assist you in this investigation?

7  A.   Yeah.  John Hochstrasser retained Dr. Baughman, a pulmonary

8  specialist.

9  Q.   And who is he?

10  A.   He's a specialist that -- a pulmonary medical specialist

11  that would look at the -- he was looking at the data, and he met

12  with some of the people to look at the data, look at the

13  pulmonary function tests, et cetera.

14  Q.   And were several of the employees that you suspected had

15  lung problems, were they referred to Dr. Baughman?

16  A.   Yes, yeah, yes.

17  Q.   And it was Dr. Baughman's task to identify whether they had

18  any disease and whether it was work related?

19  A.   Yeah, he would look -- yes, he would look at the -- he

20  would look at the data.  He would look at the records, and he

21  would interview the people and to determine whether or not he

22  thought that there was an occupational exposure that was causing

23  the diseases.

24  Q.   And what did he say in that regard to you?

25  A.   Most of the correspondence I've seen, it's sometime

1  equivocal, or it might say consistent with, or it might say

2  doesn't exist.  It might be asthma, but it's not -- you know,

3  not the obstructive disease.

4  Q.   So you were getting conflicting information from

5  Dr. Baughman?

6  A.   Yeah, we got conflicting information from a lot of the

7  medical people.

8  Q.   Different diagnosis?

9  A.   Different diagnosis, yes.

10 Q.   Was there even a question whether the disease related to an

11 occupational exposure?

12 A.   That was in several of the correspondence as well, whether

13 it was disease related or maybe it was, you know, some prior

14 condition or maybe it was, you know, a result of -- you know, of

15 a viral infection.  We've got -- there's several conflicting

16 information about that.

17 Q.   But in terms of the task force, what was your mind-set?

18 A.   Our mind-set was to try to figure it out right away to make

19 sure that even if we couldn't figure it out to make sure that,

20 you know, the plant was set up so that, you know, we took all

21 precautions to make sure that it was not a worker-related

22 situation.

23 Q.   Did Dr. Baughman ever shed any light on whether butter

24 flavoring or any other chemical at the plant was causing any

25 respiratory disease in the plant?

1 A.  I mean, he never talked about flavors themselves.  I mean,

2 if we talked about anything, it would have been ingredients, not

3 finished flavors because, again, our workers are exposed to the

4 raw material at a hundred percent, and that's what we were

5 most -- that was their exposure was the ingredients, not

6 necessarily the finished flavor.

7 Q.  So in terms of your assumptions, did he take a conservative

8 approach?  And by that I mean did you assume that it might be

9 related to the workplace and then you need to figure out what

10 the problem was?

11 A.  We certainly did, yeah, our task force did.  We didn't --

12 we didn't assume otherwise.  We just made sure that, you know,

13 we started -- and everybody had their, so to speak, homework to

14 do and their part to play to go out and make sure, you know,

15 that look at the environmental controls, you know, look at the

16 ingredients, look at the pulmonary function tests to make sure

17 everything was being done.

18 Q.  And who was looking at the pulmonary function tests?

19 A.  John Hochstrasser did that.

20 Q.  And at that time in the '92, '93 time period, did he begin

21 to upgrade some of the engineering controls at the plant?

22 A.  Yes, yes.

23 Q.  And why was he doing that?

24 A.  One of our consultants -- well, couple things.  One is,

25 again, to do the -- you know, to continue to do an upgrade to

1   the plant.  But one of our consultants -- Dr. Brooks it was --

2   when he came to visit, he also mentioned, you know, especially

3   in the small orders department that it would benefit if we did

4   some upgrading of the ventilation facility in what's called

5   small orders.  We also upgraded -- John also upgraded the PFTs

6   at that point.  Dr. Brooks recommended a expert called Dr. Roy

7   McKay, very well known in conducting pulmonary function tests.

8   So during that time period, that's -- John was engaging in those

9   activities.

10  Q.    And why was he upgrading the plant?

11  A.    Well, again, for ventilation.  As I said, you know,

12  Dr. Brooks, one of the things when he did a tour of the

13  facility, he in particular pointed out the small orders

14  department, that maybe some look at the ventilation needed to

15  occur there, and so that's why we did the ventilation department

16  for small orders.

17          MR. MEADOR:  T35, 5.

18  Q.    Now, during this time period, '92 to '95, you were the

19  person in charge of looking for the cause of the problem at the

20  plant?

21  A.    Yeah, I was one of them.  I mean, the other was John, but

22  my job was to look at the supplier MSDSs for the ingredients.

23  Q.    Just a second before I --

24  A.    Yeah.

25  Q.    But you and John were working together to figure out if you

1  could figure out the cause.

2  A.    Yes.

3  Q.    Can I just finish reading --

4        MR. MCCLAIN:  Your Honor, I haven't seen these

5  exhibits, and they're argument.

6        MR. MEADOR:  It's demonstrative.

7        MR. MCCLAIN:  But I haven't seen them, Tom.  They're

8  argumentative.

9        THE COURT:  Overruled.  Why don't we take a stretch

10 break, though.

11       MR. MCCLAIN:  Could I approach counsel?

12       THE COURT:  Sure.

13       MR. MEADOR:  Sure.

14       THE COURT:  Thank you.  Please be seated.

15       MR. MEADOR:  May I proceed, Your Honor?

16       THE COURT:  You may.

17 BY MR. MEADOR:

18 Q.    I just want to make one thing clear here for the record.  I

19 just finished reading the Harry Truman biography, and you know

20 he had a little sign on his door that says, "The buck stops

21 here," and in terms of finding the cause of disease at the

22 Tastemaker plant, the buck stopped with you; right?

23 A.    With our team, yes.

24 Q.    Now, would you tell me -- and this exhibit is illustrative.

25 Just tell me what you did.

1 A.   I mean, what you have illustrated here is some of the

2 sources that one would go to.  But, again, we reviewed the

3 supplier MSDSs, FFIDS sheets for each ingredient, did searches.

4 There's searches that you could subscribe to, that we do

5 subscribe to, to do keyword searches for ingredients and

6 causative agents.  Read the articles, read the book, you know,

7 reviewed what else -- what all was in the literature.

8 Q.   And did you continue to do these searches during the '92,

9 '95 time period to see if anything had evolved in the scientific

10 or medical literature?

11 A.   Yes.

12 Q.   And how often did you --

13 A.   I recall it was probably at least monthly.  I think it was

14 monthly, not more frequently than that but monthly sounds --

15 Q.   And there's a NERAC database.  What was that?

16 A.   That's one of the services that you can subscribe to.  So

17 it's almost a list of lists or -- so there's things that are

18 called MEDLINE, TOXLINE, Chemical Abstract Services.  A lot of

19 services that then -- it's one service that pulls it all

20 together so you give your key word and it goes out to all the

21 abstracts and it looks for that key word, and then it brings you

22 back a summary document of all the articles in that time period

23 that were published with that key word.

24 Q.   And what was the key word you were investigating?

25 A.   We were investigating the key word bronchiolitis

1  obliterans.

2  Q.   And it said you reviewed NIOSH literature.  What did you

3  look at for NIOSH?

4  A.   That would be the same thing, what literature showed up in

5  the toxicology review for that term.  They're just one of the

6  many sources that would have the potential to showing up under

7  that key word.

8  Q.   And there's a book that says Interstitial Lung Disease by

9  Talmadge King.

10 A.   Yes.

11 Q.   And who's that?

12 A.   Talmadge King was actually one of the authors of several

13 papers.  When you do a literature search on bronchiolitis

14 obliterans, he's one of the most foremost authorities on

15 bronchiolitis obliterans.  He's written several articles on it

16 as well.

17 Q.   And what did you learn from reviewing that textbook?

18 A.   In looking at Talmadge King's, that book plus the articles

19 that he's written on it, we were obviously looking for causative

20 agents and pretty much I think the -- my recollection is that

21 there's three -- he groups them into three areas.  There's one

22 that's post-infection as a causative agent, exposure to gases,

23 and the third one is what we call idiopathic, you can't identify

24 what the cause is.  So those are three groups of causative

25 agents that are in his articles.

1  Q.   And what did you find out from the NERAC and NIOSH

2  searches?

3  A.   I didn't see anything in the NIOSH articles.  I didn't see

4  anything under the term bronchiolitis obliterans that would then

5  show up anything from NIOSH.

6  Q.   Now, I think I skipped over one thing.  In terms of butter

7  flavoring, we went through the components.  And let's say

8  powder, for example, that had 1 to 2 percent diacetyl.

9  Obviously the formula had more ingredients in it; right?

10 A.   Oh, flavor formulas typically can hold -- you know, be a

11 hundred to two hundred or more ingredients.

12 Q.   And did you do -- you weren't -- in terms of your

13 investigation, you just weren't focusing on looking at diacetyl;

14 right?

15 A.   No, no, no, we looked at all the ingredients.  Diacetyl

16 wasn't on any kind of a radar screen.  We looked at all

17 ingredients equally, so to speak.

18 Q.   And when you say equally, what do you mean by that?

19 A.   There was no preference over one ingredient over another in

20 terms of doing its literature review or looking at the FFIDS

21 sheets or looking at the MSDSs.  They were all looked at.

22 Q.   And did -- in the '92 to '95 time period, did you ever find

23 anything that gave you a clue that there's some association

24 between anything in butter flavoring and bronchiolitis

25 obliterans?

1  A.    No, none of the ingredients that I looked at were, again,

2  linked to any of the causative agents that were in the

3  literature at that time.

4  Q.    Let's look at Trial Exhibit 111.  This is a memo dated

5  September 9, 1993?

6  A.    Correct.

7  Q.    I believe that's by John Hochstrasser?

8  A.    It would be coming from his department, yeah.  Occupational

9  exposure investigation would be coming from John.

10  Q.    And John and you were working hand in hand to try to find

11  the cause of the problem?

12  A.    Yes.

13  Q.    And so this is a memo dated September '93.  What was the

14  status of your investigation at that point in time?

15  A.    I mean --

16  Q.    Purpose?

17  A.    Yeah, under purpose.  At this time John had -- and this

18  memo was letting us know that there was a potential employee

19  exposure in the focus time frame of February.  So he wanted us

20  to go back and look at liquids department and what kind of

21  ingredients or maybe what might have happened in the months of

22  January through March of 1993.

23  Q.    And what did he tell you the prognosis was for finding the

24  solution?

25  A.    I suspect it's -- yeah.  I mean, it's -- I mean, as it says

```
 1   here, the prognosis for identifying a single etiologic agent is
 2   not good because when you're working with so many thousands of
 3   materials that could be acting individually or they could be
 4   acting, you know, synergistically or in combination, it's
 5   impossible to look at all of them and all the ramifications of
 6   them.
 7   Q.   Did John tell you it was like looking for a needle in a
 8   haystack?
 9   A.   I mean, so to speak, yes.
10   Q.   Let's look at Trial Exhibit 112.  Now, this is a memo dated
11   September 1993?
12   A.   Yes.
13   Q.   To you?
14   A.   From -- to me from John, yes.
15   Q.   Copy to Randy Schmelzel?
16   A.   Randy Schmelzel.  He was in charge of the plant.
17   Q.   He's the plant manager?
18   A.   Yes.
19   Q.   And what was he telling you in this memo?
20   A.   This was a case -- this is probably the time frame of Mary
21   Sue McGee where --
22   Q.   Let me stop you.  Who's Mary Sue McGee?
23   A.   Mary Sue McGee was an employee who we found out in roughly
24   September that in February she was working with a flavor.  I
25   believe it was an apple flavor.  And when she was looking at the
```

1    mixer, she got a bolus, so to speak, of acetaldehyde, and she

2    subsequently had, you know, coughing fits and some respiratory

3    issues, and she reported that I think somewhere around

4    September.

5              So this is John asking me, again, alerting me on, you

6    know, looking at the toxicology again and asking me to do

7    additional work once again on the compounds, one of which is

8    diacetyl.

9    Q.   And what does he say about diacetyl in this memo?

10   A.   What did he say?

11   Q.   Yeah, still appears, in that line.

12   A.   What he's saying is it's still a viable candidate.  We

13   never took -- we never took any ingredients off the radar screen

14   at this point, so he's saying this is still a viable candidate

15   as one of the possible agents or one of many agents that we

16   needed to look at.

17   Q.   And are we still looking at other chemicals at that time?

18   A.   Yeah, we're looking at them all still.

19   Q.   You were looking at other irritants?

20   A.   Yes.

21   Q.   And did you comply with Mr. Hochstrasser's request to run

22   another literature search?

23   A.   Yes, I did.

24   Q.   And what information did you find, if any?

25   A.   I didn't see any connection with diacetyl and bronchiolitis

1  obliterans.

2  Q.   Now, this was Mary Sue McGee.  Was it later determined by

3  Dr. Lockey that she'd actually been exposed to acetaldehyde?

4  A.   Acetaldehyde, right, yeah.

5  Q.   Now, some -- Trial Exhibit 116.  Now, at some point in

6  time -- let's say November of 1993 -- you were investigating

7  additional chemicals to see if there was some association with

8  any problem in the plant?

9  A.   Yeah.  One of the approaches that one can take is look at

10 structurally related chemicals.  So what this list of chemicals

11 is, I went to the Talmadge King article again, and some of the

12 gases, the types of gases that he mentions in there are like

13 sulfur dioxide, nitrogen oxides, and some other chemicals.

14         And so structurally what I did was I looked at our raw

15 materials and said do we have anything that's in that same

16 structural class.  And in particular I was thinking about the

17 things that are related to sulfur dioxide, so sulfur-type

18 compounds.

19         So you can see on this list the chemicals that I

20 identified, I didn't identify any that were in the Talmadge King

21 article.  But the ones that were structurally related were

22 things like the dimethyl sulfate, so you got the sulfur.  Allyl

23 isothiocyanate, that's got a sulfur as well.  The thio-type

24 compounds, the thiolactic -- the word thio is -- the thiolactic

25 acid, thio is a term for sulfur-type compounds.

1          So what you're seeing on this list are those

ingredients that we use, used, that were potentially related to

something that was in Talmadge King articles.  It's a stretch,

but it was mostly the sulfur compounds.

Q.   And what do you mean it was a stretch?

A.   Well, they're not the chemicals themselves, so they aren't

things like -- they aren't sulfur dioxide which is what he had

on his list.

Q.   I'm sure Mr. McClain's going to ask you why diacetyl wasn't

on that list, so let me ask you that.  How come diacetyl wasn't

on that list?

A.   Because it wasn't structurally related to anything that was

on Talmadge King -- in any of Talmadge King's articles that he

had listed as causative agents for bronchiolitis obliterans.

Q.   And why wasn't acetaldehyde on that list?

A.   That's another one that was not, you know, listed in his

articles as being a causative agent for bronchiolitis

obliterans.

Q.   Now, we're talking about '92 to '94 time period.  And at

some point in time did you -- you'd been using Dr. Baughman who

was a pulmonologist.

A.   Right.

Q.   Did you seek additional outside consultant help?

A.   Yes.  One of the approaches that we wanted to do was also

go out and find a medical -- a physician, a medical -- add

1   medical monitoring and medical surveillance to our overall

2   program.  So you had the industrial hygiene piece.  You had the

3   toxicology/physical/chemical review piece, and what we really

4   also needed was a medical consultant to also kind of ring fence

5   all the information so we had a cross -- a truly

6   cross-functional team that covered all the disciplines.

7   Q.    So you hired Stuart Brooks.

8   A.    John brought -- John Hochstrasser brought in Stuart Brooks

9   to come in and, you know, look at the situation and give us a

10  proposal.

11  Q.    And --

12  A.    So -- yeah, so John -- or Stuart Brooks came I think for

13  either two and a half -- two days or two and a half days to the

14  plant.

15  Q.    Let's look at his report, Trial Exhibit 132.  So Dr. Brooks

16  is from the University of South Florida?

17  A.    Yes.  He's an expert in occupational health.

18  Q.    And occupational medicine?

19  A.    Yes.

20  Q.    And John brought him in to look at -- to investigate

21  whether it was work related and what the nature of the problem

22  was?

23  A.    Yes, right.

24  Q.    And he was provided with background information?

25  A.    Yeah, he was given, you know, carte blanche to all the

1  information.

2  Q.   Now, he signed a confidentiality agreement; right?

3  A.   Yes.

4  Q.   And what was the purpose of having your outside expert sign

5  a confidentiality agreement?

6  A.   For a lot of times we have our consultants -- it's pretty

7  typical in the food industry as well to have consultants sign a

8  confidentiality agreement.  It's so that they can have access to

9  every record so there might be cases that they might be looking

10  at a record and they might have access to our customers or

11  financial information, and you don't want to have to say, Oops,

12  take that piece of paper away.

13       So if they sign a confidentiality agreement, you don't

14  have to worry.  You can show them absolutely everything and not

15  have to worry that they're looking at the secret formula or

16  they're looking at some, you know, privileged information with

17  regard to customers or vendors who we buy things from.  So

18  that's -- it paves the way that they can see anything and

19  everything.

20  Q.   So you hired Dr. Brooks to help you solve the problem at

21  the plant.

22  A.   Yes, to give us some advice, yes.

23  Q.   So he -- in a way he was a double-check on you because he

24  researched what the known causes of bronchiolitis obliterans

25  was.

1   A.   He did a -- before he came he did a very thorough search of

2   the literature as well.

3   Q.   And could you read in what he concluded?

4   A.   He concluded three known causes: Post-infectious, toxic

5   fumes or gas, and idiopathic or unknown.

6   Q.   And then it says for Tastemaker?

7   A.   For Tastemaker category 2 which is toxic gas or fume

8   inhalations would be the possibility, but he also did mention

9   that viral infection could be a possibility.

10   Q.   And this was in 1994?

11   A.   That's correct.

12   Q.   So is it fair to say he wasn't telling you anything that

13   you didn't already find out on your own?

14   A.   No, there was nothing new.

15   Q.   So it is fair to say.

16   A.   That is very fair to say. Sorry.

17   Q.   And what did he list as some of the exposures that can

18   cause bronchiolitis obliterans?

19   A.   These are the same ones that are in Talmadge King's

20   article: Oxides of nitrogen, sulfur dioxide, ammonia, chlorine,

21   and phosgene gases.

22   Q.   So then Dr. Brooks -- let's go to methodology and

23   observation. He came out and visited the plant in Cincinnati?

24   A.   Yes, he did.

25   Q.   And this was in -- looks like May of --

```
 1   A.    This is May, uh-huh.

 2   Q.    May of '94?

 3   A.    Correct.

 4   Q.    And he toured the plant?

 5   A.    Yes.

 6   Q.    And he met with Paul Farrell.  Who's he?

 7   A.    Paul Farrell worked for John Hochstrasser.  He was the

 8   plant occupational -- environmental health and safety person at

 9   the plant.

10   Q.    And he met with John Hochstrasser?

11   A.    He met with John.  He met with Karen Duros.  He met with

12   myself.  John and I and he went out to lunch.  He met with human

13   resources.

14   Q.    And then he was actually authorized to contact some local

15   physicians that were treating some of the employees at the

16   plant?

17   A.    Yes, yeah.

18   Q.    And who did he call?

19   A.    You can see he called Dr. Thorpe who was one of the first

20   physicians that had given us information that there potentially

21   was a case.  Robert Baughman, we've already talked about

22   Dr. Baughman, and then Grady Campbell was a physician for one --

23   for one of the people.

24   Q.    And then it says in his report he reviewed the world

25   literature and spoke with Ann Midaugh?
```

1  A.    Correct.

2  Q.    And who's Ann Midaugh?

3  A.    She's an occupational medicine physician at Cincinnati --

4  University of Cincinnati.

5  Q.    And then it says Dr. Brooks spoke with several of the top

6  U.S. researchers and experts in occupational lung disease.

7  A.    That's correct.

8  Q.    Do you know who he talked to?

9  A.    I know he talked to Talmadge King.

10  Q.    Let's go to the next page, please.  So then he did go on a

11  plant tour?

12  A.    Yes, he did a plant tour.

13  Q.    And then he duplicated --

14        THE COURT:  You know, Mr. Meador, a lot of this is

15  just totally cumulative from her deposition.

16        MR. MEADOR:  I'm almost done with this, Your Honor.

17        THE COURT:  Pardon me?

18        MR. MEADOR:  It goes to her state of mind.

19        THE COURT:  Doesn't go to her state of mind.  It's

20  cumulative.  I didn't expect that you would call this witness to

21  simply rehash what we've already heard from her deposition.

22  It's only entitled to come in one time.  If you have something

23  other than what she testified in her deposition, that's fine.

24  But you're just -- you're just treading old ground.

25        MR. MEADOR:  Okay.

1   BY MR. MEADOR:

2   Q.   Let's go on to the next page.  Now let's go to the

3   conclusion.  Now, Dr. Brooks also reviewed medical records?  Is

4   that another reason for the confidentiality agreement?

5   A.   Yes.

6   Q.   Now, in terms of his conclusion, I take it you read this

7   conclusion?

8   A.   Yes, I've read this conclusion.

9   Q.   And he told you that you had a number of employees with

10  bronchiolitis obliterans at the plant?

11  A.   He -- yeah, and the conclusion was there were a number of

12  employees with suspected or confirmed bronchiolitis obliterans,

13  yes.

14  Q.   And there's a reference here to the small orders area.

15  What is that referring to?

16  A.   I mean, there's a section of the plant for orders that were

17  small, not to be made in the big kettles.  I don't remember what

18  the limit was, but for small amounts there was a whole

19  department that their job was to make those small orders.  It

20  was in a different area of the plant.

21  Q.   And when you say different area, what do you mean by that?

22  A.   It was not where the liquids was or the spray dries.  It

23  was in its own building.

24  Q.   And he was also concerned about the smoking policy at the

25  plant?

1    A.    Yes, he was.

2    Q.    Let's go to the next page, please.  Now, there's a

3    reference -- it said, "It is recommended that an occupational

4    health program be initiated by Tastemaker."  Did you follow this

5    recommendation?

6    A.    Yes, we did.

7    Q.    And he actually said that you needed to identify medical

8    personnel.

9    A.    Yes, he did, and we did.

10   Q.    And who is that?

11   A.    It ended up to be Dr. Lockey.

12   Q.    Now, was there anything in this report that indicated to

13   you as to what the cause of the problem was at the plant?

14   A.    No.  In fact, his report said there was nothing that

15   indicated what the cause of it was.

16   Q.    Now, number 5 talks about an epidemiologic investigation.

17   First of all, can you describe what that is?

18   A.    An epidemiological investigation is one where you look at

19   the data and you try to connect it with -- might be, you know,

20   sex -- gender, age, other factors to see if you can see a trend.

21   Q.    Now, the first recommendation he made was is there an

22   excess of obstructive lung disease among current Tastemaker

23   employees.  What was your understanding as to what he was

24   recommending there?

25   A.    Well, he was -- I mean, he was recommending going out and

1 doing an epidemiology study that would then, I mean, answer that

2 question. And if there was, you know, were there any workplace

3 exposures? So this is based on doing an epidemiological study.

4 Q. Okay. But in 1994, you were already operating under the

5 assumption that there was an excess of obstructive lung disease

6 at your plant.

7 A. Right, which is why, I mean, I didn't recommend that this

8 was the right -- this was a prudent route to go in because an

9 epi study can sometimes take a long time. And the statistical

10 power of it might not be robust enough. So by the time you get

11 done with it, either you might have an equivocal answer or you

12 might have an answer that says yes but you've used up all that

13 what I'll call valuable time.

14 And so I'm not fond of doing an epidemiological study

15 in this case because it was time that we needed to spend, you

16 know, setting up the medical surveillance program and going out

17 and using a medical personnel to look at it.

18 Q. Now, the second recommendation, are there workplace

19 exposures that are affecting people who have abnormal lung

20 function, and what was your understanding what he was

21 recommending in that regard?

22 A. Again, that would be from an epidemiological study to look

23 at to see -- look at the raw materials and to determine if

24 indeed -- if the answer to number 1 was correct which would be

25 the causative agent for the excess obstructive lung disease.

1  Q.   So he wanted to research as to whether there might be

2  workplace exposures at your plant?

3  A.   Yeah.  In fact, he had a Ph.D. student that he was

4  recommending to do this work.

5  Q.   This is somebody at the University of --

6  A.   Somebody at the University of Florida, yeah, so this would

7  have been potentially her Ph.D. thesis.

8  Q.   And in terms of your investigation at that time, you were

9  already assuming that people were injured and that it related to

10 workplace exposure.

11 A.   Yeah, until we had the answer that -- until we had the

12 answer that no, there wasn't, we assumed the worst case, that --

13 take the conservative approach and say let's assume there is and

14 let's continue on the path of looking at the ingredients and

15 looking at the PFTs, et cetera.

16 Q.   Now, did you fire Dr. Brooks?

17 A.   No, we didn't fire Dr. Brooks.

18 Q.   What did you do?  What happened?

19 A.   I mean, this approach was one that, you know, we didn't

20 choose to take, and I know John went out -- John Hochstrasser

21 went out and got another consultant, Dr. Lockey, who was

22 actually at the University of Cincinnati, so quite close.  So I

23 don't know the discussion that John had with Dr. Brooks, but we

24 did not pursue an epidemiological study with Dr. Brooks.

25 Q.   And what approach did you decide to take?

1  A.  Our approach was to bring in Dr. Lockey, again, as a

2  medical expert from the University of Cincinnati to be part of

3  the team, part of the medical surveillance team.

4  Q.  And was he in charge of the team?

5  A.  He was one of our members, yeah.  He was the external

6  medical doctor on the team with John, myself, and the other

7  members.

8  Q.  And what do you mean by external medical team?

9  A.  Well, I mean, he also had at his disposal other people at

10  the University of Cincinnati, Dr. Lockey did.  So he had Roy

11  McKay as well as Susan Pinney.  But at our meetings, you know,

12  he was the representative for those activities that came to our

13  team meetings.

14  Q.  And was he also diagnosing employees at your plant?

15  A.  Oh, yeah, he was seeing patients, yeah, and he and

16  Dr. Baughman would talk and exchange correspondence.

17  Q.  So he was helping you with your investigation and looking

18  at employees.

19  A.  Yes, yes.

20  Q.  And what was Dr. McKay's role?

21  A.  Dr. McKay's role was to conduct pulmonary function tests,

22  to make sure that we were using state-of-the-art equipment,

23  using the right methodology.  He was a pulmonary function test

24  expert.

25  Q.  And did he participate in all your meetings, Dr. McKay,

1  with you and Dr. Lockey?

2  A.    No.

3  Q.    And why was that?

4  A.    Because Dr. Lockey was -- he was the primary on our team,

5  and again, most of Dr. McKay's activities were pulmonary

6  function tests, so his interface would have been with John

7  Hochstrasser.

8  Q.    Did Dr. McKay ever indicate to you that he thought he could

9  further assist with the investigation into the cause of the

10  problems at the plant?

11  A.    No.

12  Q.    Did he indicate that to anyone on your team?

13  A.    Not that I know of, no.

14  Q.    And was his role somewhat limited in terms of work he was

15  doing at the plant?

16  A.    Yeah, it was -- he was the expert in pulmonary function

17  tests, and he went with John to Australia, the St. Louis plant.

18  And he was the person in charge of the methodology for pulmonary

19  function tests.

20  Q.    And he put together a good program?

21  A.    It was a great program.

22  Q.    There's nothing you're saying -- you're criticizing

23  Dr. McKay.

24  A.    Oh, no, no.  He really changed the way people do pulmonary

25  function tests.

1  Q.    And, in fact, after he established the program, Tastemaker

2  continued to follow the program.

3  A.    Yes.

4  Q.    Can you just generally describe what it was?

5  A.    I mean, the program, I mean, besides, you know, making

6  sure, again, that you have the right method and you're looking

7  at the data correctly, they also set up a criteria in terms of

8  how frequently people needed to go back and get additional

9  pulmonary function tests.  So it was almost a tracking depending

10  on what their pulmonary function was, you know, did they get

11  once a year, three times a year?  So he helped set the

12  frequency.  He and John set up the frequency of the testing.

13  Q.    Now, did you talk to Dr. Lockey about possible causes of

14  the respiratory problem at the plant?

15  A.    No.  My contact was John -- was Dr. Lockey.

16  Q.    I'm sorry.  I thought I said Dr. Lockey.

17  A.    Did you say Lockey?  Oh, sorry.  You did.  Sorry.  I

18  thought -- I was still on Roy McKay.  Sorry.  Yes, Dr. Lockey

19  was my contact.

20  Q.    And eventually did he -- well, strike that.

21        Do you recall who Robin Doane is or Robin Gaskins?

22  A.    I recall Robin Gaskins, yes.

23  Q.    And at some point did he diagnose her with bronchiolitis

24  obliterans?

25  A.    I recall that he diagnosed her, yes.

1  Q.   And do you recall the nature of her exposure at the plant?

2  A.   Her exposure -- I recall that one -- was acetaldehyde.  She

3  described it quite clearly that she was dispensing acetaldehyde

4  into a tank.

5  Q.   And she had an acute exposure that exploded in her face?

6  A.   She had a very -- yeah, she had acute exposure, uh-huh.

7  Q.   And --

8  A.   I think Dr. Lockey explained that she dropped to her knees

9  and -- with choking and overwhelmed by the acetaldehyde fumes.

10  Q.   And Dr. Lockey told you at some point in time that he

11  thought acetaldehyde might be one of the causative agents?

12  A.   He did, yeah.

13  Q.   And when Dr. Lockey told you that, did you stop your

14  investigation at that time?

15  A.   No.  I mean, Dr. Lockey and I talked quite a bit.  When you

16  looked at the several potential cases, you couldn't link them

17  all back to just acetaldehyde.  So when he and I met, we talked

18  about -- we really did not want to go down the route of only

19  acetaldehyde because there were other potential cases that

20  weren't exposed to acetaldehyde.  So our approach was a

21  comprehensive medical program in looking at all the ingredients.

22  Q.   And what did you do to continue the investigation?

23  A.   My part of it was we -- I broke things -- all the chemicals

24  into structure categories and then worked with an external

25  consultant that went out and got all the literature.  And we

1  came up with a paradigm for all the raw materials to determine

2  if we couldn't prioritize them in terms of the -- the term we

3  used was high, medium, and low level of concern.  And the idea

4  was instead of going after 5,000, 6,000 raw materials, it's an

5  approach that we can use to try to narrow it down based on

6  structural class.

7  Q.   Now, during the time period that you were working with

8  Dr. Lockey, was the entire plant upgraded with new engineering

9  controls?

10  A.   There were several upgrades to the plant, yes.

11  Q.   At some point in time, did you realize that you weren't

12  going to find what the cause of the disease was at the plant?

13  A.   Yeah.  Dr. Lockey and I did talk about that.  You know, we

14  weren't able to find, you know, a cause.  So again, the holistic

15  approach of a total medical surveillance type program was -- you

16  know, was the way to go.

17  Q.   What do you mean by a holistic approach?

18  A.   I mean in terms of, you know, what I was doing on structure

19  activity relationships, trying to identify and prioritize

20  chemicals which then would get fed into John Hochstrasser's

21  group to go out and do monitoring for the presence of these

22  ingredients or do biomonitoring.  And then the other part would

23  be -- the other part of the arm would be Dr. Lockey, you know,

24  looking at patients and looking at PFTs.

25  Q.   Now, at some point in your investigation --

1    THE COURT:  Is your microphone off because with your

2  back to the jury, I doubt if they can -- can you hear him okay?

3  No?  I assume you want the jury to hear you.  And that's why we

4  have all the static because you have it under your tie, your tie

5  moves, and then -- we were through this problem a week ago.

6    MR. MEADOR:  Sorry, Your Honor.

7    THE COURT:  That's okay.  I assume you want the jury

8  to hear you.

9    MR. MEADOR:  I do.

10    THE COURT:  Well, they weren't.

11  BY MR. MEADOR:

12  Q.   Now, at some point in time did someone bring the IBS report

13  to your attention?

14  A.   Yes.

15  Q.   And who did that?

16  A.   Janice Dees.

17    MR. MEADOR:  And could we see TRX 808?  Actually let's

18  go to -- I'm sorry.  Let's go to TRX 139.

19  Q.   So on May 10, 1995, she sent you a copy of the IBS article?

20  A.   Yep.  In this memo she sent the abstract of the article.

21  And then we obtained the entire report later.

22  Q.   And did you do that?

23  A.   Yes.

24  Q.   And did you read the report?

25  A.   Yes.

1    MR. MEADOR: And can you just turn to TRX 808, please?

2  Q.   And there's been quite a bit of testimony about this.  I

3  just want to ask you a few questions.  Why did you read this

4  report?

5  A.   Because it had to do with potential cases of bronchiolitis

6  obliterans.

7  Q.   And this was a plant in South Bend where they had called in

8  NIOSH to do an investigation?

9  A.   Correct.

10 Q.   And NIOSH came into the plant?

11 A.   That's correct, 1986, '85 or '86 I recall.

12 Q.   And they were trying to evaluate the cause of the outbreak

13 at the plant?

14 A.   Correct.

15 Q.   And what did NIOSH find when they investigated the plant?

16 A.   Couple things.  I mean, there's some confounding

17 information.  There was two employees, but there was -- that

18 potentially had the disease, but again -- but there was also two

19 employees doing the same job function that didn't.  So that they

20 mentioned in the report.

21       They also mentioned in the report they did some

22 experimentation, and so they looked for things that are

23 typically known for things like bronchiolitis -- obstructive

24 lung disease, so they looked at -- you can see it here --

25 nuisance particles.  They looked for that.  They measured for

1  that.  They measured for grain dust.  I think they also measured

2  for proteolytic enzymes, silica, okay.  And I believe there's

3  the proteolytic enzymes and then the bacterial endotoxins.

4  Q.   Was the NIOSH investigation focused on dust at the plant?

5  A.   That was one of their conclusions, yes, was dust.

6  Q.   And what was the conclusion?  What did NIOSH find after

7  they conducted their investigation?

8  A.   I mean, the conclusion was that, you know, no specific

9  etiology or, you know, conclusion in terms of what were the

10  causative agents.  And then their conclusion was a

11  recommendation for engineering controls.

12  Q.   When it says no specific etiology was identified, what does

13  that mean?

14  A.   That means -- etiology means there was no specific

15  causative agent found for -- in their investigation.

16  Q.   And was there anything in this report about diacetyl or

17  butter flavoring?

18  A.   Not in the body of the report, no, not in the conclusions.

19  Q.   And in the appendix, though, they do list some of the

20  chemicals they looked at at the plant; right?

21  A.   Yes, they listed some of the chemicals that were maybe used

22  in some of the formulations.

23  Q.   And how did this assist you if it did in identifying a

24  causative agent at the plant?

25  A.   It didn't.

1   Q.   And why is that?

2   A.   Because I looked at the body of the paper and their

3   conclusions, and their conclusions didn't mention any of these

4   ingredients as being causative agents.

5   Q.   And in terms of the investigation that you ultimately

6   conducted with Mr. Hochstrasser at the plant, did you in essence

7   follow the recommendations in this report?

8   A.   Yeah, engineering controls, yes.

9   Q.   And can you explain what you mean by that?

10  A.   I mean the upgrades to the plant in terms of ventilation,

11  especially in small orders.  At some point there was upgrades to

12  the dispensing, ventilation in the dispensing of acetaldehyde.

13  So engineering controls were the primary focus.

14  Q.   Now, at some point in time did you have the employees fill

15  out questionnaires?

16  A.   Yes.

17  Q.   And what was the purpose of these questionnaires?

18  A.   Part of a medical program is -- you know, besides Baughman

19  or Lockey physically looking at them is getting a medical

20  history.  So with the help of Lockey and his staff, Janice Dees

21  developed a questionnaire for the employees to get their medical

22  history.

23  Q.   And what was the purpose of this questionnaire?

24  A.   To get medical history and to get some information from

25  them in terms of, you know, what -- you know, what they might be

1   citing in the plant were some issues they might have.

2            MR. MEADOR:  So let's look at 3802, please.

3   Q.   Okay.  This is the memo you were discussing putting

4   together medical questionnaires?

5   A.   Correct.

6   Q.   So let's just look at -- and we've seen some questionnaires

7   on some other witnesses, but I just want to look at a couple

8   questionnaires with you.

9   A.   Uh-huh.

10           MR. MEADOR:  If we could look at Exhibit 163, please.

11  Q.   Now, this is for Walt Vaske.

12           MR. MEADOR:  If we could see question number 18,

13  please.

14  Q.   Now, the question that was being asked of the employees,

15  was it focused solely on respiratory problems, or were they

16  asking broader questions?

17  A.   This is a broad question.  They're asking them, you know,

18  are there any chemicals which they might think results in

19  burning eyes, throat, nose, and then they also talked about

20  breathing.

21  Q.   So you had them identify any chemicals that, you know,

22  related to eye irritation?

23  A.   That they might feel is irritating, yes.

24  Q.   And you got a lot of different answers from the employees.

25  A.   Correct.

1    MR. MEADOR:  And let's just look at 408, please.

2  Q.    This is one for Gary Shea; correct?

3  A.    Correct.

4  Q.    Let's go to number 18.  What does Mr. Shea say?

5  A.    Too many to put down on paper.

6  Q.    So when you got all this information from the employees,

7  what did you do with it?

8  A.    I mean, it was captured.  You know, we wanted to make sure

9  that, you know, we captured what they felt were ingredients that

10  they felt were irritating, so Janice and John captured all this

11  information.

12  Q.    And did you perform some calculation to see what percentage

13  of people reported what chemicals?

14  A.    Yes, I did.

15  Q.    And have we put this in a chart?  I have a chart.

16    MR. MEADOR:  I didn't show it to you if you want of a

17  summary of her work.  Hold on.  Hold on.

18    MR. MCCLAIN:  I object to it.

19    THE COURT:  Well, why don't you bring it up and let me

20  see it.  No.  Let me just see it.

21    Members of the jury, why don't you take a stretch

22  break.  You know what, members of the jury?  We're just going to

23  call it a day a little bit early.  I've got some matters I need

24  to take up with the defense -- I'm sorry, with all the lawyers,

25  and so we'll see you back here tomorrow morning at 8:30.

1  Remember keep an open mind until you've heard all of the

2  evidence.  Thank you.

3          (The jury exited the courtroom.)

4          THE COURT:  Okay.  Please be seated.

5          You may step down.

6          First of all, she's not even on your witness list.

7          Second of all, 80 to 90 percent of her testimony was

8  totally cumulative from the deposition, totally cumulative.  And

9  if you think I'm going to allow -- I'm going to subject the jury

10  to having to sit through a lengthy videotaped deposition and

11  then you bring in witnesses and rehash it as totally cumulative,

12  you have another thing coming.

13          So you didn't even list her as a witness.  I'm tempted

14  to just strike her entire testimony and tell the jury to

15  disregard it.

16          MR. MEADOR:  Want me to respond, Your Honor?

17          THE COURT:  Sure.

18          MR. MCCLAIN:  Your Honor, could the witness be

19  excused?

20          THE COURT:  Sure.  Dr. Higley, why don't you leave the

21  room for a little bit.

22          MR. MEADOR:  While we're checking, I believe she is

23  identified on the joint witness list.

24          THE COURT:  No, she's not.  She was listed by

25  deposition, and then you have this "we reserve the right to call

1  anybody" which is -- I'm not bound by that.  You didn't list her

2  as a witness, and when you have somebody as a videotaped

3  deponent, you don't reserve the right to c -- well, you have to

4  list her as a witness because if she had been called live, then

5  you would have been able to examine her.  But you knew she was

6  testifying by deposition.

7        If you intended to call her live, you needed to list

8  her, and you didn't because there's no designation for what her

9  testimony is that she's going to testify to.

10        And if you think I'm going to get you -- let you get

11  around the pretrial order like that, you have another thing

12  coming.

13        And why did you spend 80 percent of your time going

14  over exactly what she testified to in her deposition?  That's

15  totally cumulative.

16        MR. MEADOR:  Your Honor, her --

17        THE COURT:  It was the same exhibits and the same

18  parts of it highlighted that we heard the first time around.

19  And your answer was, when I asked you, state of mind.  That's

20  ridiculous.  That's patently ridiculous.  What do you mean her

21  state of mind?  That's not an exception to cumulative testimony.

22  So you explain to me why 80 -- at least 80 to 90 percent of it

23  wasn't cumulative and, if it was cumulative, how you think

24  you're entitled to call cumulative witnesses.

25        MR. MEADOR:  Well, Your Honor, they put in depo

1    transcripts.  We want --

2          THE COURT:  You could have designated anything in the

3    deposition, and you did.

4          MR. MEADOR:  This is our only witness that's going to

5    put stuff in context to say what we did, why we did it, what

6    we're thinking.

7          THE COURT:  Didn't you designate her deposition

8    testimony?

9          MR. MEADOR:  Yeah, but, I mean, a lot of these

10   depositions she wasn't asked questions.  The plaintiff --

11         THE COURT:  Well, then you should have listed her as a

12   witness you were going to call.  She's not on your witness list,

13   not the one I have.  Of course, there's so many different lists

14   because you've been so ill prepared at the final pretrial

15   conference that, you know, there's probably a new list that

16   you've created that I've never seen.  But the witness list that

17   I have in the final pretrial order that Judge Zoss signed off on

18   dated February 11, 2009, you don't list her as a witness, and

19   you don't give a designation as to what she's going to testify

20   to.  Now, am I wrong about that?

21         MR. MEADOR:  Yes, she's identified as a witness.  It

22   says Givaudan's going to call her live.

23         THE COURT:  Where does it say that?

24         MR. MEADOR:  We gave notice to the other side.

25         THE COURT:  Where does it say that?

1    MR. MEADOR:  On page 9.

2    THE COURT:  Okay.  I'm wrong.  Oh, I see.  You didn't

3    follow the pretrial order.  You have witnesses listed by both

4    parties.  You didn't designate what her testimony was going to

5    be.  And it says by deposition.  Givaudan is seeking to obtain

6    her attendance as a live witness at trial.  There's no

7    designation as to what she would testify to, is there?

8    MR. MEADOR:  Well, it identifies that we're going to

9    be calling her live.  I mean, she's going to be talking about

10   all the issues in this case.  It's our one company witness, Your

11   Honor.

12   THE COURT:  Why was -- do you agree with me that much

13   of her testimony was cumulative?

14   MR. MEADOR:  I think some of the issues have been

15   touched on, but we have to explain her motivations.  We're being

16   sued by -- for punitive damages, and everything came in through

17   cross-examination's completely disjointed.  I just want to put

18   it in context so she can explain it and tell what her state of

19   mind is because certainly since we're being sued for conscious

20   disregard, what she did or didn't do and what she thought and

21   why she did something is certainly relevant.  And that -- the

22   events came out.  She was cross-examined on documents, but she

23   didn't have the opportunity to explain like she's explaining

24   now.  I mean --

25   THE COURT:  You had the opportunity when they took her

1    deposition.

2           MR. MEADOR:  Well, you generally don't -- I mean --

3           THE COURT:  Well, that's the risk you run.

4           MR. MEADOR:  These weren't trial depositions.

5           THE COURT:  But that's the risk you run.  What if she

6    hadn't showed up?  You would have been stuck with it, so that's

7    the risk you run when you take a deposition.  But you didn't

8    designate anything about the scope of her testimony in the

9    pretrial order, did you?  Did you?

10          MR. MEADOR:  We're checking.  Your Honor, we have

11   another hour of testimony.  She's our key witness in the case.

12          THE COURT:  Oh, don't give me that "she's our key

13   witness" stuff.  Everybody's your key witness according to you.

14   We couldn't break up the -- you know, the cross-examination of

15   their expert because that was the key to your case, you'd be

16   severely prejudiced.  So you're like the boy who cried wolf.

17   You do it a little too often, and I don't believe it.  Did you

18   designate it or not?  The answer's either yes or no.

19          MR. MEADOR:  It was listed as a joint witness is all I

20   can say, Your Honor.

21          THE COURT:  Well, that isn't what I asked you,

22   Mr. Meador.  I asked you did you designate the scope of her

23   testimony in the pretrial order?  Why are you having such a hard

24   time just admitting the answer is no?  You can't admit the

25   obvious?  Is that what they train super lawyers to do, not admit

1  the obvious?

2          MR. MEADOR:  No, Your Honor.

3          THE COURT:  Okay.  Did you designate the scope of her

4  testimony or not?

5          MR. MEADOR:  It doesn't say it there.

6          THE COURT:  Oh.  Does it say it somewhere else?

7          MR. MEADOR:  My only hesitation is --

8          THE COURT:  Answer my question.

9          MR. MEADOR:  -- is we have --

10         THE COURT:  Did you desig -- just a second.  Did you

11 designate the scope of this witness's testimony or not in the

12 pretrial order?  Yes or no.

13         MR. MEADOR:  That -- no.

14         THE COURT:  Why was that so hard?

15         MR. MEADOR:  I was just trying to consult with my

16 co-counsel.

17         THE COURT:  Well, why was it so hard?  Either you did

18 or you didn't.  Was there something you didn't understand about

19 the question?

20         MR. MEADOR:  No, Your Honor.

21         THE COURT:  Now, we'll come back to that.  What's your

22 objection -- why didn't you exchange your demonstrative -- did

23 you have an agreement to do so?

24         MR. MEADOR:  We -- I only had two of those, Your

25 Honor.  I didn't --

1    THE COURT:  You know, you're not listening to my

2 questions.

3    MR. MEADOR:  Okay.

4    THE COURT:  I -- I don't care if you had two or two

5 hundred.  You apparently did not exchange them.  Do you agree

6 with me that you did not exchange them?

7    MR. MEADOR:  I do agree with that, and I apologize.

8    THE COURT:  I'm not interested in apologies.  I'm

9 interested in knowing why you did not exchange them.

10    MR. MEADOR:  It was an oversight preparing this last

11 night.

12    THE COURT:  An oversight?

13    MR. MEADOR:  Yes, sir.  I've been cooperating with

14 Mr. McClain this whole trial.  I will continue to do so, and I

15 apologize to him and to you.

16    THE COURT:  You know, how many oversights has the

17 defense team had already in this trial?  I can think of several.

18 Can you think of several?  You claimed it was an oversight

19 basically when you did frivolous objections to documents about

20 confidential employee records.  Then there was another oversight

21 by the same lawyer who had that oversight, and now we have this

22 oversight.  What's with that?

23    MR. MEADOR:  I am endeavoring to cooperate with

24 Mr. McClain.

25    THE COURT:  Practicing law by oversight?

1    MR. MEADOR:  No, Your Honor.

2    THE COURT:  What's your objection to this exhibit?

3    MR. MCCLAIN:  Your Honor, I would think that it would

4    have to be a 1006 summary which must be an accurate summary of

5    some underlying evidence, and I haven't been able to see the

6    evidence.

7    THE COURT:  And they have to produce it before trial

8    before you can have a 106 (sic) summary.

9    MR. MCCLAIN:  Right.  That's my objection.

10   THE COURT:  Is this for her state of mind too?  That's

11   how you get around Federal Rule of Evidence 106?

12   MR. MEADOR:  No, Your Honor.

13   THE COURT:  How do you get around the 106 problem?  Is

14   that an oversight?

15   MR. MEADOR:  Your Honor, I'll withdraw the exhibit.

16   THE COURT:  Well, you didn't answer my question.  How

17   do you get around the Rule 106 problem?

18   MR. MEADOR:  I think that's a good objection.

19   THE COURT:  So you would knowingly tender somewhat

20   surreptitiously because you didn't disclose it a demonstrative

21   exhibit that you knew violated Rule 106.  Is that what you're

22   telling me?

23   MR. MEADOR:  No, sir.

24   THE COURT:  Well, what are you telling me then?

25   MR. MEADOR:  I'm saying it was inadvertent from last

1  night.

2           THE COURT:  Oh, another inadvertent one.  That's two

3  in a row.  Was it inadvertent that you failed to disclose the

4  scope of this witness's testimony on the pretrial order?  Was

5  that inadvertent?  Dr. Higley, that was inadvertent?  Now this

6  demonstrative exhibit in violation of Rule 1006, that's

7  inadvertent too, huh?

8           MR. MEADOR:  Yes, Your Honor.

9           THE COURT:  Mr. Holtman, what's with all the

10  inadvertence going on here?

11           MR. HOLTMAN:  Well, I don't know, Judge.  We certainly

12  apologize for it.  I don't know what the background is.  It

13  should not have happened.  That's all I will say.

14           THE COURT:  So are you withdrawing this exhibit, this

15  demonstrative?

16           MR. MEADOR:  Yes, I will, Your Honor.

17           THE COURT:  Okay.  So that's withdrawn.  I don't have

18  to rule on that.

19           You can finish with the witness on your direct, but I

20  think I'd be well within my discretion to exclude the witness

21  from testifying because while you did indicate that you were

22  going to call her, you didn't give any designation whatsoever,

23  and that's the purpose of the pretrial order but -- and I think

24  you could have easily structured her direct examination to raise

25  all of the points about her state of mind and to the extent that

1 she's testifying about kind of the corporate state of mind

2 without being so cumulative. But I guess you didn't really give

3 that a thought, so, you know, she's testified for quite a while,

4 so you can finish up her testimony.

5 　　　　　Mr. McClain, do you want to weigh in on this? I think

6 it's basically been 80 to 90 percent cumulative.

7 　　　　　MR. MCCLAIN: I thought so too, but I didn't -- the

8 jury was sleeping, so I didn't object. It was tactical on my

9 part. I didn't know what was -- you know, it was -- but I agree

10 with the Court that it was cumulative.

11 　　　　　THE COURT: Now, you can finish your direct of her.

12 Do you have any other demonstrative exhibits with her?

13 　　　　　MR. MEADOR: No, Your Honor.

14 　　　　　THE COURT: Okay. Will you be more -- I'm sorry. Let

15 me rephrase that. Will you be less inadvertent and make sure

16 you disclose other demonstrative exhibits to the other side?

17 　　　　　MR. MEADOR: Yes, Your Honor.

18 　　　　　THE COURT: Okay. Because that's I'm sure what you're

19 trying -- intend to do. You have been very cooperative on many

20 things.

21 　　　　　Do we have other witnesses like this witness who have

22 testified in the plaintiffs' case by videotape that you're

23 calling live, or is this the only one?

24 　　　　　MR. PAGLIARO: Your Honor, we may call Mr. Hoffman

25 too. But I'll make sure if we do that we don't replow old

1 ground.

2      THE COURT:  Would that be the only other one that

3 would be in this situation?

4      MR. PAGLIARO:  It's the only one I can think of right

5 this second, Your Honor.

6      THE COURT:  Well, you know, there's a problem with the

7 way you listed that one too.  I guess you guys think my pretrial

8 order is a joke, but you know what?  There's Eighth Circuit law

9 that says it binds the parties' responsibilities and obligations

10 at trial.  Here's what you said about Hoffman under your listed

11 by both parties.  Greg Hoffman, by subpoena or via deposition.

12 Doesn't say "and," does it?  It's in the disjunctive.  It's not

13 in the conjunctive.  Am I wrong about that?

14      MR. PAGLIARO:  No, sir.

15      THE COURT:  So if he's testified by deposition, I

16 don't have to let him testify by subpoena, do I?

17      MR. PAGLIARO:  I guess not, Your Honor.

18      THE COURT:  Let me ask, inadvertent?

19      MR. PAGLIARO:  Your Honor, I guess we just

20 misunderstood the pretrial conference.

21      THE COURT:  Mr. Pagliaro, I don't think your

22 microphone's on.

23      MR. PAGLIARO:  I'm sorry.

24      THE COURT:  Yeah.  And what is it about the pretrial

25 order that you misunderstood?

1      MR. PAGLIARO:  Your Honor, I just didn't realize

2  that --

3      THE COURT:  That I actually used it?

4      MR. PAGLIARO:  Wasn't sure whether they were going to

5  call him live, whether they were going to use the deposition.  I

6  mean, that's the only thing, Your Honor, not that you wouldn't

7  use it.  Of course you'd use it.

8      THE COURT:  Well, I mean, but you're lawyers, so, you

9  know, the Supreme Court just had oral argument on Tuesday last

10  week over a single word in a federal criminal statute because

11  the circuits were split 3-3 as to what it meant.  So there's a

12  huge difference between "and" or "or" in the law.

13      MR. PAGLIARO:  Your Honor, and again, I apologize.

14  The one I'm holding that says pretrial conference, 11 on page 8

15  says Givaudan served a subpoena on Mr. Hoffman to compel his

16  attendance at trial and may call him live.

17      THE COURT:  I understand that, but then if you look in

18  the left-hand column, it says Greg Hoffman, by subpoena or via

19  deposition.  Doesn't say, "And," "and/or," or "and."  It says,

20  "Or."  So the plain meaning of "or" is he's testified -- if he

21  had testified by subpoena, we'd be done.  Or if he testified by

22  his deposition, we'd be done.  But it's not both.  It's one or

23  the other.  And he's already testified by deposition.  So there

24  is no more subpoena because the word is "or," not "and."

25      MR. PAGLIARO:  Your Honor, if his testimony isn't

1  cumulative, if it's different testimony?

2           THE COURT:  But because it says "or" rather than

3  "and," it doesn't make any difference whether it's cumulative or

4  not.  You didn't properly designate him.  But I assume it's the

5  key witness.  Is that right?

6           MR. PAGLIARO:  Your Honor, also, this is the joint

7  list, Your Honor.  I mean, we had separate lists.  We were asked

8  to try to consolidate the witnesses.  We went back, Your Honor,

9  if you remember this from the first pretrial.  We tried to merge

10 the two lists so there weren't so many witnesses because Your

11 Honor and Judge Zoss were complaining there were too many listed

12 witnesses.  So we tried to merge them, Your Honor.

13          I apologize if by merging them it created a problem.

14 But we did try to merge them, Your Honor.  We had all these

15 witnesses listed separately by party.  And then we were asked to

16 try to put them together in a joint list, and we tried to do

17 that, Your Honor.  And I apologize if it's caused confusion or

18 if we did something wrong.

19          THE COURT:  But it was inadvertent.  Well, right?  It

20 was inadvertent?

21          MR. PAGLIARO:  Obviously we wouldn't do anything to

22 intentionally upset the Court obviously.

23          THE COURT:  So, therefore, it was inadvertent.

24          MR. PAGLIARO:  It would obviously be inadvertent

25 because we wouldn't want to upset you, Your Honor.

1    THE COURT:  Well, you can go ahead and call

2  Mr. Hoffman.

3    MR. PAGLIARO:  Thank you, Your Honor.

4    THE COURT:  But --

5    MR. PAGLIARO:  I will try very hard not to make

6  anything redundant.

7    THE COURT:  And, you know, it's -- in some ways by

8  necessity it has to be some -- you know, it's probably going to

9  be somewhat cumulative.  I mean, you're probably going to touch

10  on some of the topics.  But all I'm asking you to do is just

11  make an effort not to beat a dead horse over what he's already

12  testified to.  That's all.  By necessity there's going to be

13  some cumulative because it's almost impossible to avoid it.  I

14  understand that.  But I just thought with Higley we just got

15  carried away with how cumulative it is.

16    But do you have any objection to them calling Hoffman?

17    MR. MCCLAIN:  No, sir, but can I ask a question?

18    THE COURT:  Sure.

19    MR. MCCLAIN:  We have the same problem with their

20  witness Bratton.  Is he going to testify?  And if so, what is he

21  going to testify to?

22    THE COURT:  Are you planning on calling David Bratton

23  live?

24    MR. PAGLIARO:  Yes, Your Honor.  We mentioned that

25  during our opening I think.

```
 1              THE COURT:  And is your question, Mr. McClain, what
 2     the scope of Mr. Bratton's testimony is going to be?
 3              MR. MCCLAIN:  Yes, sir.
 4              THE COURT:  Are you willing to accept something, kind
 5     of an oral proffer from them as to what the scope of the
 6     testimony would be?
 7              MR. MCCLAIN:  Sure.
 8              THE COURT:  Are you willing to do that?
 9              MR. PAGLIARO:  Of course, Your Honor.
10              THE COURT:  Okay.  That solves that?  Any other
11     problems you see?
12              MR. MCCLAIN:  (Shook head.)  Are you talking about
13     through the rest of the trial that I see with witnesses?
14              THE COURT:  Sure.
15              MR. MCCLAIN:  Yes.  They're calling Dr. Bainbridge
16     apparently, and we have the same problem in regard to
17     Dr. Bainbridge in regard to the 26(f) disclosure in light of the
18     fact that they've named him as a 26(f) witness, therefore, an
19     expert without a report.  And, therefore, he's restricted based
20     on my understanding to what he testified to.  But I asked
21     Mr. Meador about that, and he didn't seem -- well, he was
22     noncommittal to that point, number one.  Number two --
23              THE COURT:  Well, but just a second.  Isn't what's
24     good for the goose good for the gander?  And I allowed one of
25     your treating physicians to give some expert opinions.
```

1    MR. MCCLAIN:  Yes.

2    THE COURT:  Beyond the scope of the treatment because

3  there wasn't any prejudice.

4    MR. MCCLAIN:  Right.

5    THE COURT:  And how could there be any prejudice if

6  Bainbridge gives -- assuming he's going to give some expert

7  opinions that he didn't -- hasn't already given in his medical

8  records, why would there -- how could there be any prejudice to

9  you about it?

10    MR. MCCLAIN:  Well, if that, in fact, is the case,

11  number one, and they know it, I would like notice of it because

12  I'm asking for it.

13    THE COURT:  Well, you gave them a whole lot of notice,

14  didn't you?

15    MR. MCCLAIN:  I gave them -- I gave them notice when

16  he was on the stand, yeah.

17    THE COURT:  Yeah, that's a whole lot of notice.

18    MR. MCCLAIN:  Right.  I'm asking for it, though.  I

19  would have given it to them if they'd asked.

20    THE COURT:  I'm sure they would have asked you if they

21  thought you were going to do it.

22    MR. MCCLAIN:  Well, but they didn't ask.  All they had

23  to do was ask me, and I would have told them.

24    THE COURT:  Now wait a minute.  You went beyond the

25  scope of the designation.

1    MR. MCCLAIN:  Yeah.

2    THE COURT:  And it's not --

3    MR. MCCLAIN:  Nobody asked me about it.  In fact,

4  there wasn't even an objection until after it was over, and then

5  you had to weigh in on the 26(f) because there wasn't even an

6  objection.  If anybody had asked me in advance and I -- you

7  know, I'll challenge anyone to say that I haven't done this --

8  any time anyone has asked me including show me all your exhibits

9  even though you didn't order it, I do it.  I show everybody.  I

10  don't have any surprises.  If they say, "Hey, does he have any

11  new opinions?"  "Yeah, he does.  He's read all the articles, and

12  he believes now it's bronchiolitis obliterans," what would they

13  have done about it?  Nothing.  I would have told them.

14    So, I mean, I would have done exactly what I'm saying

15  here.  Number one, I need a disclosure.  Is there a new opinion?

16  And if there is, then there may be a question I have about it.

17    THE COURT:  And so you say the difference is you're

18  asking and they didn't ask.

19    MR. MCCLAIN:  Right.

20    THE COURT:  Who's going to be handling Dr. Bainbridge?

21    MR. PAGLIARO:  I will, Your Honor.  I'm happy to talk

22  to Mr. McClain about this.  I have no problem.

23    THE COURT:  Okay.  I'm going to leave it up to you.

24  Personally I think kind of what's good for the goose is good for

25  the gander.  If you want to wait --

1  MR. PAGLIARO: I have no problem, Your Honor. He can

2 ask me. I'll be happy to answer.

3  THE COURT: But you're going above and beyond what I'm

4 asking you to do because I think it's exactly reciprocal.

5  MR. PAGLIARO: I understand, Your Honor.

6  THE COURT: Yeah.

7  MR. MCCLAIN: Now, here's the second point, though.

8  THE COURT: Okay.

9  MR. MCCLAIN: If Dr. Bainbridge is coming in and he

10 doesn't have an opinion to a reasonable degree of medical

11 certainty that it is X, Y, or Z, I don't think he can testify

12 under Daubert.

13  THE COURT: Well, it's not -- it's not a Daubert

14 issue. No expert can testify unless they have an opinion to a

15 reasonable degree of certainty, and that was the law before we

16 ever heard of Daubert.

17  MR. MCCLAIN: Sure. I understand that.

18  THE COURT: Right. So don't get me going on Daubert,

19 but -- and, of course, if they don't ask him about his opinions

20 to a reasonable degree of medical certainty and you want

21 permission to voir dire Dr. Bainbridge before he actually gives

22 his opinion to see if those opinions are based on a reasonable

23 degree of medical certainty, you can certainly do that.

24  MR. MCCLAIN: Thank you. And the only reason I raised

25 it is because you said is there anything else, and I didn't want

        1    to hold back on something that I've been thinking about and not

        2    tell you about it.

        3              THE COURT:  Okay.  Anything else?

        4              MR. MCCLAIN:  Nope.

        5              THE COURT:  Any other problems that the defense can

        6    see?

        7              MR. MEADOR:  No, Your Honor.

        8              THE COURT:  Okay.  We'll see you tomorrow morning then

        9    at 8:30.  Thank you.

       10              MR. DONOVAN:  Your Honor?

       11              THE COURT:  Yes.

       12              MR. DONOVAN:  I'm sorry.  Defendants have filed a

       13    motion for judgment as a matter of law.

       14              THE COURT:  Oh, yeah.  I guess we were going to take

       15    that up.  You know what?  Why don't we take a 10-minute recess,

       16    and then we'll come back and hear the Rule 50 motion.  Thank you

       17    very much.

       18              MR. DONOVAN:  Your Honor, I was going to offer if

       19    you -- we could do it -- if you want to hear it now or if you

       20    want to take a look at the papers and hear it in the morning, we

       21    can do either one as you prefer.

       22              THE COURT:  How extensive are your papers?

       23              MR. DONOVAN:  I think they're about -- just about 20

       24    pages.

       25              THE COURT:  Would you mind -- how much time would you

1  like to hear it?

2          MR. DONOVAN:  Only 10 or 15 minutes, Your Honor.

3          THE COURT:  Okay.  Would you mind taking it up at

4  eight o'clock tomorrow morning?

5          MR. DONOVAN:  Absolutely.

6          THE COURT:  Okay.  And then we'll just be in recess

7  and take it up at 8 tomorrow morning.

8          MR. DONOVAN:  Yes, Your Honor.

9          THE COURT:  Okay.  Thank you.

10          (The foregoing trial

11           adjourned at 2:36 p.m.)

12

13

14

15

16

17

18

19

20                          CERTIFICATE

21          I certify that the foregoing is a correct transcript

22  from the record of proceedings in the above-entitled matter.

23

24

25      S/Shelly Semmler                        3-27-09
        _____            _____
        Shelly Semmler, RMR, CRR                Date

**<u>INDEX</u>**

<u>WITNESS:</u>                                                                <u>PAGE:</u>

VIDEOTAPED DEPOSITION
            Karen Duros                              1000

DEPOSITION
            Robert Burns                            1001
            Gregory Hoffman                         1002

CONLEY KUIPER
            MR. MCCLAIN                             1005
            MR. MEADOR                              1030
            MR. MCCLAIN                             1037

NANCY HIGLEY
            MR. MEADOR                              1052

*****