IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

RONALD KUIPER and                         No. C06-4009-MWB
CONLEY KUIPER,

          Plaintiffs,                     Sioux City, Iowa
                                          March 4, 2009
     vs.                                  7:57 a.m.

GIVAUDAN FLAVORS CORP.,                   VOLUME 10 OF 12

          Defendant.
_____/


TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiffs:        KENNETH BLAIR MCCLAIN, ESQ.
STEVEN EDWARD CRICK, ESQ.
SCOTT A. BRITTON-MEHLISCH, ESQ.
Humphrey, Farrington & McClain
Suite 400
221 West Lexington
Independence, MO  64050

DENNIS M. MCELWAIN, ESQ.
Smith & McElwain
Suite 530
505 Fifth Street
Sioux City, IA  51101

For the Defendant:        JAMES D. PAGLIARO, ESQ.
KEVIN M. DONOVAN, ESQ.
THOMAS J. SULLIVAN, ESQ.
Morgan, Lewis & Bockius
1701 Market Street
Philadelphia, PA  19103-2921

V. THOMAS MEADOR, ESQ.
MICHAEL T. ZARRO, ESQ.
Morgan, Lewis & Bockius
Suite 2200
300 South Grand Avenue
Los Angeles, CA  90071-3132

STEPHEN J. HOLTMAN, ESQ.
Simmons Perrine
Suite 1200
115 Third Street Southeast
Cedar Rapids, IA  52401-1266

Court Reporter:        Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA  51101
(712) 233-3846

1    (Proceedings reconvened outside the presence of the

2 jury.)

3    THE COURT:  Thank you.  Please be seated.  Well, no

4 plaintiffs, huh?

5    Okay.  With regard to the instructions, I've just

6 received the objections.  With regard to the punitive damage

7 instruction, you're right.  We left off the phrase -- just part

8 of the phrase the second time we used it in the instruction.

9 That actually inures to your advantage because significant is

10 less than clear and convincing.  I know you're nitpicking to try

11 and create some error, but -- and I'm sure you didn't realize it

12 inured to your advantage in leaving it off, but I'll be glad to

13 add it in.

14    I'm not even sure you have standing to raise the issue

15 because it's an issue of allocation of punitive damages should

16 they be awarded between the state and the plaintiff.  You have

17 no say in it whatsoever.  It's not an issue you even have

18 standing to raise in my view.  But your objections are noted.

19    In terms of your objection that it violates Philip

20 Morris, that is beyond frivolous because if you look -- you

21 always try and pick and choose language and take it totally out

22 of context which is what you've done in the jury instructions

23 throughout this case when you've even submitted ones that were

24 in compliance with Iowa law which was rarely.

25    But on page 29 of the instruction set, paragraph 4 is

1  the entire section that totally complies with Philip Morris.

2  Your argument is totally ridiculous because it deals with the

3  question of after punitive damages are awarded how I would

4  allocate those damages between the state and the plaintiff.  It

5  has nothing to do, absolutely nothing to do, with the amount of

6  punitive damages to be awarded.

7          So to raise a Philip Morris objection to how the

8  damages are divided between the state and the plaintiff is

9  ludicrous.

10          MR. DONOVAN:  Your Honor, that was not the nature --

11          THE COURT:  Well, that's exactly what you said.

12          MR. DONOVAN:  Well --

13          THE COURT:  That's exactly what you said.  And if you

14  would look at paragraph 29 -- at page 29 on the amount of

15  punitive damages, subsection 4 there, that takes care -- that's

16  totally in compliance with Philip Morris.

17          MR. DONOVAN:  Your Honor, I did address that in the

18  papers, or tried to.  The point I was only raising was that

19  paragraph 4 on page 29 as I read it drew elements from several

20  cases that the Supreme Court has decided on due process and

21  punitive damages.  And you do have the language in the first

22  clause of that that appears to be the Philip Morris language,

23  but the other clauses I believe to some extent have been

24  superseded by Philip Morris.

25          And when we had this special interrogatory without the

1   idea of a class in it, I felt that that corrected the problem

2   because there was going to be a determination by the jury as to

3   whether --

4          THE COURT:  A special interrogatory only involves how

5   the damages are allocated between the plaintiff and the state.

6   It has nothing to do with the amount of damages.  So it can't

7   possibly be a Philip Morris problem.

8          MR. DONOVAN:  Well, Your Honor, we believed it also

9   had the collateral effect of pointing out whether, in fact, the

10  damages --

11         THE COURT:  Well, fine.  I don't believe it, so sit

12  down, please.

13         MR. DONOVAN:  Yes, Your Honor.

14         THE COURT:  You don't want a supplemental instruction

15  number 4?  Fine.  I won't give it.  How's that?

16         MR. DONOVAN:  Your Honor, we do.

17         THE COURT:  Nope.  You objected to it.  I'm not going

18  to give it.  Teach you to make frivolous objections.  You

19  objected to it.  You didn't say you wanted it but in addition.

20  You objected to it, so I'm not going to give instruction number

21  4.

22         MR. DONOVAN:  The intent of the objection, Your Honor,

23  was just to --

24         THE COURT:  That wasn't what you said, so I'm not

25  going to give it.

 1            MR. DONOVAN:  Your Honor, we would request the

 2    instruction.

 3            THE COURT:  It's too late.

 4            MR. DONOVAN:  I was not trying to quibble with Your

 5    Honor.  I was just pointing --

 6            THE COURT:  Yeah, of course you are.  That's all you

 7    do.  That's what they pay you to do.  And that's what you do.

 8            MR. DONOVAN:  I was merely trying to point out the

 9    fact that there is a dual standard in the underlying

10    instruction.  Paragraphs 1 and 2 of the explanatory comment talk

11    about accrual either through known or should have known or

12    through the inquiry standard.

13            THE COURT:  We already addressed the inquiry standard

14    in the instruction.

15            MR. DONOVAN:  I understand, Your Honor.

16            THE COURT:  This goes to a different section.  But you

17    know what?  I'm not going to give it.

18            MR. DONOVAN:  We'd just renew our request for the

19    instruction before then.

20            THE COURT:  Fine.  Any other record you want to make?

21    Any other record you want to make?

22            MR. DONOVAN:  No, Your Honor.

23            THE COURT:  Okay.  Now, when did you first object to

24    giving preliminary instructions?  Did you object before March 2?

25            MR. DONOVAN:  I believe we did, Your Honor.  In our

 1    initial objections to the charge we did.

 2              THE COURT:  Mr. McClain, what's your view?

 3              MR. MCCLAIN:  Regarding which issue, Your Honor?

 4              THE COURT:  Any one you want to weigh in on.

 5              MR. MCCLAIN:  Your Honor, I think that we're not at

 6    the end of defendant's case, but there's several of these

 7    instructions that I question whether there's any evidence to

 8    give in regard to their defenses, and so we'll see where they

 9    end up.  But right now --

10              THE COURT:  Okay.  I was just talking about the

11    supplemental instructions.

12              MR. MCCLAIN:  The supplemental instructions appeared

13    to me to be fine.  I didn't have any objections to them.  I

14    thought that -- I thought that -- you know, I -- I really think

15    in regard to your willful blindness observation that what

16    happened here really goes beyond what you're instructing, but I

17    know of no law which I can cite to you which has addressed this

18    issue because as far as I know, this is the one example of a

19    corporation doing this.  So . . .

20              THE COURT:  You can argue that.

21              MR. MCCLAIN:  I know, and I'm gonna.

22              THE COURT:  I'd assume so.

23              MR. MCCLAIN:  That's what I'm saying is is that in

24    terms of established cases I think this may be as far as you can

25    go, so I don't object to -- in the supplemental instruction

```
 1   which is labeled as 2.

 2          And I think that instruction 3 does help clarify, and

 3   I do think that it is a correct statement to say that it was Ron

 4   Kuiper or the class of people that Ron Kuiper was a member of.

 5   And so we don't object to instruction 3.

 6          And you've already dealt with instruction 4, and I

 7   don't have anything to say about that.

 8          THE COURT:  Well, Mr. Donovan, looking at paragraph 4

 9   of your pleading, to me it's absolutely clear unless I give the

10   inquiry notice part, you've objected to that instruction.  You

11   didn't say, We have no objection to this instruction as given;

12   however, we think it should have so and so.  You just say you

13   object to the instruction.

14          MR. DONOVAN:  Your Honor, that was inartfully raised.

15          THE COURT:  Inadvertent; right?

16          MR. DONOVAN:  No, not inadvertent, Your Honor, but it

17   was done overnight.  We tried to get something -- we tried to

18   get papers to Your Honor to lay this out clearly to you, and

19   there was not an intent to -- we're merely trying to represent

20   what the Iowa law was on the point, and the fact that it was

21   being given separate from the rest of the charge, we felt it was

22   important that both aspects would be included.  We would request

23   that the charge -- if Your Honor overrules, you know, the

24   supplemental language be given as drafted.

25          THE COURT:  You know, if I had given the instructions
```

1 you proposed, this case would have been so riddled with error.

2 You made no effort to comply with Iowa law in your proposed

3 instructions.  But I'll go ahead and give instruction number 4

4 as indicated, but I'm not adding the inquiry notice because

5 that's fully covered in the instruction.

6          MR. DONOVAN:  Understood, Your Honor.

7          THE COURT:  Now, I think we do have one outstanding

8 issue, and that's that affidavit.  I don't remember the number

9 now because I'm totally lost in our exhibit list for different

10 reasons.  But we have that outstanding affidavit.

11          MR. MEADOR:  Exhibit 473, Your Honor.

12          THE COURT:  Yeah, Exhibit 473.  Here's my view on it.

13 It's not being offered for the truth of the matter asserted.

14 Therefore, it cannot be hearsay.  It's being offered on notice.

15 If it is being offered for the truth of the matter asserted, it

16 meets the requirements of 803(3) I believe and would be an

17 exception to the hearsay rule, 803(4), and would be an exception

18 to the hearsay rule.  But my understanding is it's being offered

19 on the question of notice, not for the truth of the matter

20 asserted in the affidavit.

21          MR. MCCLAIN:  It was being offered for notice, Your

22 Honor.  That was the issue that there was -- there was a

23 recognition in the field that there was a duty to test that

24 wasn't being met, and that goes to a very important issue in the

25 case, of course.  And since we are giving the instruction 1 --

1  or number 2 which is imperfect in my view because of our unique

2  circumstance, that at least it helps flesh out that issue and

3  allows the argument to be made.  You know, back in 1989 this

4  issue was flagged that these chemicals needed to be tested.

5  They simply couldn't be used around people and hope that they

6  were safe and then subsequently if somebody got sick do

7  something about it.

8       That's the essence of the argument, and that

9  document's helpful as evidence of that.  It's a recognition that

10  an expert in the field called out the need to test as early as

11  1989 in a very similar circumstance.  And it reflects the best

12  thinking that companies should have been doing about this issue

13  including, as they admit, two of their suppliers of diacetyl who

14  were being informed of this at that point in time.  So that's

15  the idea of what the document is relevant to.

16       THE COURT:  It's already in evidence.  Their motion,

17  as I understood it, was to preclude you from arguing it.

18       MR. MCCLAIN:  Right.

19       THE COURT:  Is there anything you want to add,

20  Mr. Meador?

21       MR. MEADOR:  Yes, Your Honor.  I just want to say

22  again that a hearsay document in a lawsuit that we weren't a

23  party to at the time the document was created, we weren't in

24  privity with the party, it was a lawsuit pending in Indiana that

25  we were dismissed out of, I don't see how that can be used to

1  somehow create notice to us or even the industry.  So I don't

2  see how it's imputed.

3       I understand the difference between hearsay and

4  offering something for notice.  But I'm saying the notice

5  doesn't relate to us in any way.  There's no connection.  It's

6  just a plaintiffs' expert report, I mean, just like we have in

7  this case in which she concludes -- makes certain conclusions.

8       And so they're simply offering that -- that has to be

9  offered for the truth of the matter to her opinion that we

10  should have tested.  I mean, Mr. McClain's even said we

11  should've tested, we should've tested, and this document shows

12  you should have tested.  Well, that's not notice.

13       THE COURT:  Thank you.  Anything else you'd like to

14  add?

15       MR. MEADOR:  Other than for the record this -- we had

16  the B objections to this, and when it was offered by

17  Mr. McClain, I did object on the record on B objections on

18  hearsay, outside the scope, and foundation, and I don't think

19  those --

20       THE COURT:  Well, foundation wouldn't be a B exhibit.

21  That'd be a C exhibit.

22       MR. MEADOR:  That was --

23       THE COURT:  So --

24       MR. MEADOR:  That was the problem we had in some of

25  his examination.  He pulled out some documents.  Okay.  In any

```
 1   event --
 2             THE COURT:  Well, no.  I think the only -- you go
 3   ahead and make your record, and then I'll finish up.
 4             MR. MEADOR:  Yeah, I think I misstated.  Let me back
 5   up.
 6             THE COURT:  You don't have a foundation objection.
 7             MR. MEADOR:  I don't have a foundation.
 8             THE COURT:  Right.
 9             MR. MEADOR:  It's outside the scope, and it's also a
10   Rule 26 violation because he's bringing in an expert report,
11   making it like -- an expert declaration, making it like an
12   expert report.  It's just another way to get more testimony in
13   the case.
14             THE COURT:  Anything else?
15             MR. MEADOR:  No thank you, Your Honor.
16             THE COURT:  Okay.  What's your schedule like for the
17   rest of the day on the defense?
18             MR. PAGLIARO:  We're going to finish Dr. Repsher, Your
19   Honor.  Then we have Dr. Bainbridge and then Dr. Stewart.
20             THE COURT:  And do you anticipate maybe we'll finish
21   today?
22             MR. PAGLIARO:  That's quite possible, Your Honor.
23             THE COURT:  Okay.  Thanks.  Okay.  We'll see you back
24   at 8:30.
25             (Recess at 8:14 a.m.)
```

```
 1              THE COURT:  Mr. Meador, ready to have the jury brought
 2    in?
 3              MR. MEADOR:  Yes, Your Honor.
 4              THE COURT:  Thank you.
 5              (The jury entered the courtroom.)
 6              THE COURT:  Good morning.  Please be seated.
 7         I just wanted to bring you up to date on where we
 8    think we're at.  There's some possibility, probably pretty
 9    small, that we'll finish all of the evidence today, but more
10    likely we'll finish tomorrow morning and then have arguments
11    tomorrow and it will be submitted some time during the day
12    tomorrow.  But I'll try and give you a better guesstimate
13    towards the end of the day, so thank you.
14              Mr. Meador, you may continue your direct examination.
15              MR. MEADOR:  Thank you, Your Honor.
16         LAWRENCE REPSHER, DEFENDANT'S WITNESS, PREVIOUSLY SWORN
17                    CONTINUED DIRECT EXAMINATION
18    BY MR. MEADOR:
19    Q.   Yesterday, Dr. Repsher, we were talking about Mr. Kuiper's
20    preexisting condition, and I want to talk about now just one
21    follow-up question on the severity of this preexisting
22    condition.  Do you have an opinion to a reasonable medical
23    certainty on the seriousness of Mr. Kuiper's preexisting
24    condition which I'm referring to prior to the time he went in
25    the mixing room '92 to '95?
```

1  A.    I do.

2  Q.    And what is that opinion?

3  A.    That is that he clearly had severe respiratory problems

4  probably going back to at least 1988 as documented in the

5  medical records and in the depositions.

6  Q.    Now, we also talked yesterday about the mixing room and

7  your opinion that the mixing room didn't cause his respiratory

8  problems.  I have one follow-up question on that subject.  Do

9  you have an opinion to a reasonable medical certainty as to

10  whether any exposure in the mixing room '92 to '95 caused or

11  exacerbated his preexisting condition?

12  A.    I have an opinion.

13  Q.    And what is that opinion?

14  A.    That it did not.

15  Q.    And what's that opinion based on?

16  A.    It's based on the fact that the pulmonary function tests

17  did not have any particular pattern or trends.  The values were

18  more or less randomly up and down and without pattern, and the

19  only time that he may be beginning a pattern would be the last

20  two pulmonary function tests where it appeared that there was a

21  trend to deterioration after he left the mixing room.

22  Q.    And what was the trend after he left the mixing room?

23  A.    It was a trend of deterioration in lung function.

24  Q.    And what significance do you attach that it got worse after

25  he left the mixing room?

1  A.   Well, that it's just further evidence that it did not

2  appear to be any connection between being in the mixing room and

3  his pulmonary function.

4  Q.   Now, you've read Dr. Parmet's and Dr. Egilman's reports in

5  this case?

6  A.   Yes, I have.

7  Q.   And they're not board-certified pulmonologists?

8  A.   That's correct.  They're occupational medicine physicians.

9  Q.   And do you have any criticism of the differential diagnosis

10  that Dr. Egilman performed in this case?

11  A.   Well, yes.  He didn't perform a differential diagnosis.  He

12  just made a diagnosis and looked at the various possible causes

13  of that particular diagnosis bronchiolitis obliterans, but he

14  didn't consider other diseases.

15  Q.   And I want you to assume hypothetically that Dr. Egilman

16  testified in this case that when he prepared the report back in

17  2007 he didn't review any medical records prior to 1996.

18  Assuming he testified to that, do you have any criticism of that

19  analysis?

20  A.   Well, yes, because the medical records prior to that did

21  document that he'd had respiratory problems, significant ones,

22  long preceding his work in the mixing room.

23  Q.   Now, do you have an opinion as to reasonable medical

24  certainty as to whether Mr. Kuiper showed any signs of

25  bronchiolitis obliterans or bronchiolitis obliterans syndrome?

1    A.    I do have an opinion.

2    Q.    And what is that opinion?

3    A.    That he did not have the signs of bronchiolitis obliterans

4    syndrome.  He was not exposed apparently based on the NIOSH

5    studies to increased or very high concentrations of diacetyl.

6    He did not talk about or specifically denied having mucus

7    membrane irritation when around the butter flavoring.  He did

8    not have any skin rashes or skin irritation.  He did not ever

9    evidence rapid loss of FEV sub 1 as a -- as a trend.

10   Q.    Let me stop you there.  What significance is there in your

11   opinion that there's no rapid decline in the FEV1 in the medical

12   records?

13   A.    Well, that's very significant because that was noted in all

14   of the Jasper cases.

15   Q.    Now, there's some -- is there some indication in the

16   medical records of reversibility?

17   A.    Yes.

18   Q.    Can you explain -- first of all, could you explain what

19   reversibility is?

20   A.    Reversibility is a significant improvement in the lung

21   function tests, either spontaneously or more commonly due to the

22   administration of a bronchodilator like an Albuterol inhaler.

23   Q.    And how is reversibility inconsistent with a diagnosis of

24   bronchiolitis obliterans or bronchiolitis obliterans syndrome?

25   A.    BOS is a fixed obstructive disease that doesn't respond to

1 bronchodilators. It doesn't even respond to systemic steroids,

2 that is, Prednisone or Medrol.

3 Q. Now, yesterday we talked about the HRCTs that you reviewed

4 in this case.

5 A. Yes.

6 Q. Dr. Bainbridge in 2005 and Dr. Hanson, 2007.

7 A. Correct.

8 Q. And what's the significance of a lack of mosaic pattern on

9 the HRCT?

10 A. Well, it appears to be very significant because all eight

11 of the eight Jasper cases that did have an HRCT, they were

12 abnormal showing mosaic pattern.

13 Q. Now, did you personally review the HRCT?

14 A. Yes, I did.

15 Q. And behind you we actually have a photograph of the HRCT.

16 Could you with the laser pointer kind of explain what the

17 results were on the HRCT?

18 A. Yes. If you look over here, you can see kind of a

19 generalized veiled pattern of a lighter color to the lung

20 tissue. But if you look over in here, you see that it's a

21 darker black, and that's the area of air trapping and -- due to

22 obstruction of the small airways, the bronchioles, and there may

23 be some right here and a little bit around here, but it's more

24 striking here, and then on this side it's very striking in this

25 area and then to a lesser degree as you move out into this area.

1    And this is Mr. Kuiper's expiratory view, and you

2 don't see these areas of distinct difference in color as you do

3 over here and over here.

4 Q.   Now, what does expiratory view mean?

5 A.   That means that you ask the patient to do a full exhalation

6 and then you do -- you take the CT scan.

7 Q.   And what part of the lung is this showing?

8 A.   Well, this is just a slice through the lower half of -- or

9 lower third of the chest.  CT scans, you take slices

10 horizontally through the chest.  You can do them other ways, but

11 most standardly you do them horizontally through the chest.  And

12 this would be a horizontal slice in the lower third of the

13 chest.

14 Q.   Now, we've talked about what disease Mr. Kuiper doesn't

15 have.  And we've talked about his preexisting condition.  As you

16 sit here today, do you have an opinion to a reasonable medical

17 certainty as to what the nature of his disease is?

18 A.   I do.

19 Q.   And can you tell me what that opinion is?

20 A.   He appears to have adult onset bronchial asthma which has

21 continued.  And as what happens in a number of patients who have

22 severe asthma, particularly adult onset asthma, he has developed

23 fixed obstruction in addition to the reversible airways

24 obstruction from the asthma.  And so --

25 Q.   Okay.  Let me ask you this because that sounds confusing.

1  How -- we talked about asthma and reversibility.  How do you

2  have asthma and then have a fixed obstructive disease?

3  A.  Well, as we talked about yesterday, asthma is an

4  inflammatory disease, and that chronic inflammation from

5  continuing asthma problems will end up causing scarring.  The

6  body tries to repair itself.  And the scarring of the bronchial

7  tubes can give you a fixed obstruction because scar tissue

8  doesn't expand and contract like normal bronchial smooth muscle

9  does.

10  Q.  Now, did you review Dr. Hanson's report in this case?

11  A.  Yes.

12  Q.  And who's Dr. Hanson?

13  A.  He's a pulmonologist at The Iowa Clinic.

14  Q.  And did he examine Mr. Kuiper?

15  A.  He did.

16  Q.  And was his diagnosis of Mr. Kuiper consistent with yours?

17  A.  Yes, it was.

18  Q.  And what did he say?

19  A.  That he had asthma.

20  Q.  Now, what's the significance of the fact that from time to

21  time Mr. Kuiper was given a bronchodilator and showed

22  reversibility?

23  A.  Well, that's evidence that he has reversible airways

24  obstruction which is the equivalent of asthma.

25  Q.  And the fact that there's reversibility, is that

1  inconsistent with the NIOSH literature, you know, documenting

2  the symptoms of this disease?

3  A.   The symptoms and signs of the disease, yes.

4  Q.   And what literature is that?

5  A.   Well, that would be the Kanwal report and the original

6  Kreiss report.

7  Q.   And did Dr. Bacon find reversibility?

8  A.   Yes, he did.

9  Q.   And did NIOSH do a test in 2002?

10  A.   They did, and they showed reversibility as well.

11  Q.   Was that 19 percent?

12  A.   I believe that's correct, yes.

13  Q.   And then Dr. Hanson did a pulmonary function test in 2007?

14  A.   That's right.

15  Q.   And what did that show?

16  A.   That showed reversibility.

17  Q.   And was that 21 percent?

18  A.   I believe it was around 20 percent, yes.

19  Q.   And did you find that significant?

20       MR. MCCLAIN:  Your Honor, these are all leading

21  questions.

22       THE COURT:  Sustained.

23  A.   The answer is yes.

24       THE COURT:  Well, the answer is you can't answer the

25  question.

 1          THE WITNESS:  Okay.  I'm sorry.

 2          THE COURT:  You've testified so much, you ought to

 3    know what sustained means.

 4    BY MR. MEADOR:

 5    Q.    Now, is there any evidence in the medical records that

 6    Mr. Kuiper at any time was reacting to any substance?

 7    A.    Yes.  When he was back on the farm, he recalled having some

 8    breathing problems when he was farming.  He had breathing

 9    problems in the corn crib, had breathing problems mowing the

10    lawn.  Whether that was due to an irritant or whether that was

11    just due to the exertion we don't know.  And then he complained

12    about breathing problems when he was cleaning the vats on

13    Fridays from the chlorine and the solvent.

14    Q.    And what's the significance of him complaining about the

15    cleaning solvent?

16    A.    That's a feature of asthma.

17    Q.    And could you explain that?

18    A.    Well, the airways in asthma are twitching.  They're very

19    sort of set as like a trigger.  And certain chemicals,

20    particularly if they're irritants, can trigger an asthma attack.

21    Q.    Are you saying that the chlorine actually caused his lung

22    disease?

23          MR. MCCLAIN:  Your Honor, I object.  There's no

24    evidence of chlorine in the case.  Assumes facts not in

25    evidence.

1    MR. MEADOR:  Let me rephrase.

2  BY MR. MEADOR:

3  Q.   Are you saying any exposure to the cleaners actually caused

4  his lung disease?

5  A.   It didn't c -- well, under certain circumstances it could

6  cause it, but in this situation it's acting as a trigger, as a

7  transient aggravation of the existing lung disease.

8  Q.   And that's what a trigger is?

9  A.   Yes.

10  Q.   Now, in forming your opinions in this case, did you review

11  any medical literature?

12  A.   Yes, I did.

13  Q.   Document 3367, could you explain what this article is?

14  A.   This is an article which describes a carefully controlled

15  study of patients with asthma, some of whom go on to develop

16  irreversible -- at least an irreversible component to their

17  underlying asthma.

18  Q.   And how does this article relate to Mr. Kuiper if it does?

19  A.   Well, it shows that Mr. Kuiper is not -- by far not the

20  only person to develop a fixed obstructive component to his

21  underlying asthma.  This is a group of patients who were

22  followed and were shown to do the same thing.

23  Q.   Now, in formulating your opinions in this case, have you

24  reviewed the 2004 NIOSH health hazard evaluation report?

25  A.   I have.

1   Q.   And have you reviewed Dr. Parmet's testimony about that

2   report?

3   A.   I have.

4   Q.   And do you disagree with any of his opinions on that

5   report?

6   A.   I do.

7   Q.   Let's turn to Trial Exhibit 3603.  Now, looking at the

8   highlighted part of this report, what did this report tell you?

9   A.   It tells you that the workers outside of the mixing room in

10   the plant had pulmonary -- overall pulmonary function similar to

11   that of the general population.

12          MR. MEADOR:  Let's go to page 13, please.

13   Q.   Now, there's a sentence there we got highlighted.  Can you

14   see that?

15   A.   I can see it.

16   Q.   Could you read that in the record?

17   A.   The difference in onset of asthma after hire in microwave

18   popcorn production workers was 0 percent as compared to workers

19   outside of the production building in the other areas outside --

20   outside areas like the corn crib and the silos and that area,

21   and that was 9 percent, and the difference between the 9 percent

22   and 0 percent was statistically significant.

23   Q.   And could you explain what that means?

24   A.   That means that the difference wouldn't be -- would most

25   likely be not by chance alone but would be a real difference.

1   Q.   And what does statistically significant mean?

2   A.   That it's a real difference, most -- it is probably a real

3   difference.

4   Q.   And this is saying workers outside the plant had more

5   asthma?

6   A.   Outside --

7           MR. MCCLAIN:  Your Honor, it's leading.  I object.

8           THE COURT:  Sustained.

9   BY MR. MEADOR:

10  Q.   Okay.  What does this tell us about the workers outside?

11  A.   It tells you that the workers outside had a higher risk --

12  actually -- well, had a higher risk of being diagnosed with

13  asthma following their being hired at the plant.

14  Q.   Now, returning back to page 5 -- and Dr. Parmet talked

15  about this -- that says 6 -- I'm just -- first of all, read in

16  the record, and I'll ask you a question.

17  A.   You --

18  Q.   Yeah, go ahead and read it.

19  A.   Oh.  Six of thirteen workers with experience as mixers had

20  abnormal lung function, three with fixed obstruction and three

21  with restriction.

22  Q.   In this report, was NIOSH diagnosing bronchiolitis

23  obliterans?

24  A.   No, they were not.

25  Q.   And why do you say that?

1  A.   Well, they didn't -- they didn't -- they were just talking

2  about lung function abnormalities.  They weren't talking about a

3  diagnosis.

4  Q.   And did you look at the data with respect to the people

5  referred to, these six workers?

6  A.   Yes.

7  Q.   And what did you discover?

8  A.   Three of them had airway -- had restrictive impairments of

9  their lung function tests.  Those three could not have BOS

10  because BOS is a pure obstructive disease.  One had mild airways

11  obstruction, but BOS causes severe and rapidly progressive

12  airways obstruction.  So that left us with two who had mixed

13  disease, that is, impairment of the FEV1 and the FVC.

14  Q.   Is there anything in this report that actually diagnoses

15  Mr. Kuiper's medical condition?

16  A.   No, there is not.

17  Q.   And why is that?

18  A.   Well, it's just not there.  It only talks about the results

19  of the breathing tests.

20  Q.   Now, let's change subjects and talk about Mr. Kuiper's

21  stroke.  I know you weren't here, so I want you to assume

22  hypothetically that Dr. Farrell in a family practice came in

23  here and testified that he thought the stroke was related to his

24  lung condition.  Do you have a disagreement with that opinion?

25         MR. MCCLAIN:  Your Honor, this is not in his report.

1  This was not an opinion that he offered in his deposition.  I

2  object to it.

3            THE COURT:  Is it in his expert report?

4            MR. MEADOR:  About the stroke?  Yes.

5            THE COURT:  Let's see his expert -- let's see his

6  expert report.

7            Members of the jury, why don't you take a stretch

8  break.

9            MR. MEADOR:  Could we approach for a minute, Your

10  Honor?

11            THE COURT:  Pardon me?

12            MR. MEADOR:  Could we approach?

13            THE COURT:  No.  I want to see his expert report.

14            MR. MEADOR:  May I approach the witness, Your Honor?

15            THE COURT:  Sure.

16            Members of the jury, we're going to take a short

17  recess.  Hopefully it will be about ten minutes or so, and then

18  we'll bring you back.  Thank you.

19            (The jury exited the courtroom.)

20            THE COURT:  What's so hard about finding his report?

21            Mr. Meador, are you taking the position that the

22  subject of the stroke was covered by his expert report?

23            MR. MEADOR:  Here's two points, Your Honor.

24            THE COURT:  Okay.  No.  I'm not interested in your two

25  points.  We'll get to those.

1   MR. MEADOR:  Okay.

2   THE COURT:  I'm interested in you asking my --

3   answering my question.  Did you understand my question?

4   MR. MEADOR:  Yes, Your Honor.

5   THE COURT:  Okay.  Does the expert report disclose

6   that this witness is giving an opinion about a stroke?  Yes or

7   no.

8   MR. MEADOR:  No.

9   THE COURT:  Okay.  Now let's get to your two points.

10  MR. MEADOR:  My two points is you allowed Dr. Farrell

11  as a treating physician to be turned into an expert.  He had

12  never had a Rule 26 report.  He had never opined on this issue.

13  And Mr. McClain was allowed to ask him opinion question and have

14  him testify, so I would like to rebut that.  Dr. Repsher is

15  board certified.  I can lay a foundation.  He's qualified to

16  respond and rebut that report.  None of their experts, Your

17  Honor, designated experts, were opining on the stroke in their

18  reports either.  So I think the door was opened by Mr. McClain

19  when he had Dr. Farrell for the first time in this litigation

20  give that opinion.

21  THE COURT:  Mr. McClain?

22  MR. MCCLAIN:  Your Honor, that opinion was -- could

23  the witness be excused, Your Honor, because --

24  THE COURT:  Okay.  You know, let's speed this up.

25  We're already keeping the jury waiting.

1   MR. MCCLAIN:  I'm sorry.  No.

2   THE COURT:  He doesn't need to be excused.

3   MR. MCCLAIN:  All right.  That's fine.

4   THE COURT:  It's not going to change his opinion.

5   MR. MCCLAIN:  The resultant language found in the

6   medical record -- the resultant -- the resultant language --

7   THE COURT:  You can sit down, Doctor, if you'd like,

8   or you can take a stretch break if you want to, whatever your

9   pleasure.

10   MR. MCCLAIN:  This -- Dr. Farrell's opinion was

11   offered because the language contained in the medical records

12   said that his stroke and his cor pulmonale was resultant from

13   his underlying lung condition if the Court will remember why the

14   Court allowed Dr. Farrell to opine.  It was in his medical

15   records.  It wasn't a new opinion.  It was no surprise.

16   Dr. Farrell was the only person who was asked about the subject

17   because our experts weren't asked about the issue in their

18   depositions or in their reports.  But it was in the medical

19   records, and Dr. Farrell was clearly within the confines of the

20   rule that the Court established for treating physicians in terms

21   of what they could say without a report.  And so I don't see how

22   this is unfair surprise in light of the fact that it was in the

23   medical records.

24   THE COURT:  Mr. Meador?

25   MR. MEADOR:  Yes, Your Honor.  I just think it's a

1   misstatement.  Dr. Farrell has never given opinion whatsoever

2   one way or another whether his lung condition is related to the

3   stroke or vice versa.

4            THE COURT:  But he was a treating physician.

5            MR. MEADOR:  I know but --

6            THE COURT:  This guy's a retained whatever.

7            MR. MEADOR:  And we're entitled -- the opinion that he

8   gave in the court is the first time he's ever given that

9   opinion.  It's the first time any expert -- Dr. Parmet didn't

10  come in here, Dr. Egilman --

11           THE COURT:  But it was based on his -- it was based on

12  his treating of his patient.  This is an expert who's been paid

13  to give these opinions.  It's a different situation.

14           MR. MEADOR:  Well, I think the door was opened once

15  Mr. McClain was allowed to turn a treating physician into an

16  expert and give an opinion.  Treating physicians are supposed to

17  come in and just give, you know, what I did, what I saw, what I

18  diagnosed.  And this had nothing to do with his diagnosis.  He

19  wasn't -- from the stroke.  He wasn't treating him -- remember,

20  Dr. Farrell was a family practitioner that he went to, and he

21  got referrals out to specialists.  He got referrals out to

22  cardiologists, pulmonologists.  So he wasn't -- he's not a

23  cardiologist, and so he wasn't the person that has rendered an

24  opinion about this --

25           THE COURT:  So this hired expert is now a

1 cardiologist?  What does being a cardiologist have to do with

2 anything?

3          MR. MEADOR:  I'm just saying Dr. Farrell went --

4          THE COURT:  Well, he's not a cardiologist either, so

5 what does that have to do with it?

6          MR. MEADOR:  Because he's already testified yesterday

7 about the interrelationship of the heart and the lungs, and I

8 can lay a further foundation.  I mean, he has a basis and the

9 background and experience to opine to rebut this new opinion in

10 the case.

11          It would be different, Your Honor, if Egilman and

12 Parmet had come in here -- they're the paid experts.  If they

13 came in here and said, Hey, here's my opinion and then I -- and

14 this witness hadn't rebutted them during the course and scope of

15 discovery and if that had happened, then I understand where your

16 ruling's going.

17          THE COURT:  No, it's just the opposite.  If they had

18 come in and given an opinion about the stroke because they're

19 retained experts rather than treating physicians, then obviously

20 your retained whatever would be allowed to rebut it.  But they

21 had a treating physician testify to it.  This is a retained

22 whatever.

23          MR. MEADOR:  I -- with all due respect, I think you

24 just got it backwards because a treating --

25          THE COURT:  Well, you take a minute and explain that

1  to me now.

2           MR. MEADOR:  Because a treating physician by

3  definition -- that's why we have Dr. Bainbridge coming next --

4  is -- and I remember you did that research yesterday.  What they

5  do is they evaluate and they diagnose if they can, and then they

6  refer them out to other doctors.

7           Dr. Farrell at no time, at no time, has made any

8  diagnosis that relates to his lung condition and a stroke

9  because, again, he referred Mr. Kuiper out to other doctors.  So

10  all he was doing was making the handoffs.

11           But then for the first time when we're in court,

12  Mr. McClain was allowed for the first time -- it's not in his

13  records -- was allowed to ask him opinion, an expert opinion, a

14  treating physician asking an expert opinion, and he gave it.

15           So from my perspective, that opens a door for him just

16  to say -- to rebut it and say I disagree.  And this is my last

17  point.  I think it's legit, and I'm done today.  I know that's

18  not a reason to grant or deny it, Your Honor.  Don't get me

19  wrong.  But it is the very first time and it was opened the door

20  when Mr. McClain was allowed to elicit that opinion because,

21  again, he's a treating physician.  It's not in his records.

22  He's never opined to that, and I think I should have a fair

23  opportunity to rebut it.

24           THE COURT:  Where was the record about the stroke?

25  Where did that come from?

1          MR. MEADOR:  The record --

2          THE COURT:  Yeah.  Where was the record from the

3   stroke that Dr. Farrell opined from?

4          MR. MCCLAIN:  It was Dr. Farrell's medical record.

5          MR. MEADOR:  No, it's a --

6          MR. MCCLAIN:  Regarding the stroke?  It's in

7   Dr. Farrell's medical record.

8          THE COURT:  Well, that's not what Mr. Meador is

9   representing to me.  You're saying it wasn't part of the

10  treating physician's medical records.

11         MR. MEADOR:  No, I'm not -- of course there's a

12  reference to the fact -- I mean, you take a history from the

13  patient.  Of course there's reference in his history.  There's

14  always going to be a reference to his medical conditions.  But

15  that's completely apart and separate from the issue as to

16  whether a treating physician can opine, and, you know, we --

17         THE COURT:  So is your point that when Dr. Farrell

18  opined about the causation of the stroke he wasn't testifying as

19  a mere treating physician but testifying as an expert?

20         MR. MEADOR:  Yes, Your Honor.

21         THE COURT:  And then . . .

22         MR. MCCLAIN:  It's record 1229 in evidence, Your

23  Honor, is the exhibit number which -- what is it?  1292.

24         THE COURT:  1292?  I don't have a 1292 so . . .

25         MR. MCCLAIN:  I have it, Your Honor.

1    THE COURT:  Surprise, surprise.

2    MR. MCCLAIN:  No.  You do, but it's a group exhibit.

3    It's all his medical records.

4    THE COURT:  Well, where is the information with regard

5    to the stroke?  I'm sorry.

6    MR. MCCLAIN:  It's the language "was resultant cor

7    pulmonale and hypertension" which was what Dr. Farrell said

8    caused the stroke.  It's the resultant hypertension, and that's

9    why he said it was caused by the lung condition which he had

10   diagnosed previously.  And there's a later reference in the

11   record to the stroke because he was the treating physician, but

12   that's the basis upon which you allowed it, because it was in

13   the medical record that he was diagnosing both the cor pulmonale

14   heart condition and the resultant hypertension which caused the

15   stroke.

16   MR. MEADOR:  When you're done reading it, Your Honor,

17   I'd like to add one thing.

18   THE COURT:  Yes.

19   MR. MEADOR:  He was treating -- he has two separate

20   doctors treating him, Dr. Baller and Dr. Zuehlke, whose records

21   have been referred to in this case.  He was treated for the

22   stroke at St. Luke's Regional Medical Center.  So Dr. Farrell

23   being the general family practitioner was referring him out to

24   other people.  He wasn't making the diagnosis of the stroke and

25   causation.  I just think in all fairness that since this family

1 practitioner was opining like an expert -- he sounded like he
2 was a combination pulmonary cardiologist -- that I should be
3 able to respond.

4        THE COURT:  Well, Mr. McClain, when Dr. Farrell --
5 when I allowed Dr. Farrell to opine on the causation with regard
6 to the stroke, as I understand the case law that I looked at
7 yesterday, he went beyond the . . .

8        MR. MCCLAIN:  Judge, there was no objection to it.
9 There was no objection to this testimony.  The only objection
10 there was was to the testimony about bronchiolitis obliterans.
11 That's the only objection they raised.  They never raised an
12 objection to this opinion at all, period.  But there was a basis
13 in the record to offer the opinion regardless of whether they
14 objected or not, but that's all I'm saying, that there was a
15 good-faith basis for the opinion, but they didn't object even if
16 there wasn't.  They never objected to this opinion ever.

17        THE COURT:  Did you object to the opinion?

18        MR. MEADOR:  I don't think so, Your Honor.

19        THE COURT:  Well, what does that have to do with it
20 actually, Mr. McClain?

21        MR. MCCLAIN:  Well, I mean, if they're now claiming
22 that they need to rebut it because it was unfair surprise, why
23 didn't they object to it?  I mean, the basis that they're
24 claiming that they're getting to do this extraordinary thing,
25 letting him testify outside of the report and the deposition, is

1  because of unfair surprise.  Well, they didn't object on that

2  basis because it's not true.  There was no unfair surprise.

3          And so I'm saying this is a late hit.  That's all I'm

4  complaining about.  If he'd offered this opinion in his

5  deposition, I would have -- I would have gotten ready and

6  demonstrated how he doesn't know what he's talking about.

7  That's what my -- that's what the prejudice is to me.

8          So Dr. Farrell offered an opinion within the scope of

9  his medical record without objection.  Dr. Repsher had this

10 record.  He had Dr. Farrell's records.  We marked them as

11 exhibits.  He had reviewed them.  He could have opined regarding

12 this issue if he had wanted to, but he didn't.

13         MR. MEADOR:  Your Honor, one thing to add, in his

14 expert report, he does say left cerebral and cerebellar CVA with

15 mild residual --

16         THE COURT:  Where are you reading from now?  Which

17 page?

18         MR. MEADOR:  Page 2, number 4.

19         MR. MCCLAIN:  That's exactly the point.  He was aware

20 of the issue and did not opine about it.

21         THE COURT:  Yeah, that's an impression, but it's --

22 then after that it says, "As a result of the above."  Then he

23 gives the following opinions, and he didn't give any opinion

24 based on that.  So it is surprise.  You'd agree that it's

25 surprise to the plaintiff.

          MR. MEADOR:  I wouldn't agree it's a surprise to the
plaintiff because their expert --

          THE COURT:  Okay.  That does it.  Denied then.  You
won't admit the obvious.  Fine.  Denied.  Thank you.

          MR. MEADOR:  Well, wait --

          THE COURT:  Nope.

          MR. MEADOR:  I understand you deny it, but what I --

          THE COURT:  Nope.

          MR. MEADOR:  Can I ask him generally about the stroke?

          THE COURT:  Nope.  You can't go into the stroke at
all.

          MR. MEADOR:  I can't go into the stroke at all?

          THE COURT:  No, no.

          MR. MEADOR:  Well, don't bring the jury back in.  I'm
at the end of my examination then, so I would like to make a
record on what he'd testify to.

          THE COURT:  That's fine.  You can make an offer of
proof at the end of the day.  I'm not keeping the jury waiting.

          You just snatched defeat from the jaws of victory.

          (The jury entered the courtroom.)

          THE COURT:  Thank you.  Please be seated.  I am sorry
it took us as long as it did.  You know how it is when you get a
roomful of lawyers, and just took us a little longer than I
thought it would be, so I apologize.

          Mr. Meador?

```
 1            MR. MEADOR:  Thank you very much, Your Honor.
 2   BY MR. MEADOR:
 3   Q.   Dr. Repsher, all the opinions you gave today, did you give
 4   these opinions --
 5            MR. MEADOR:  No, take that off.
 6   Q.   Did you give opinions to a reasonable medical certainty?
 7   A.   Yes, I did.
 8            MR. MEADOR:  Thank you, Dr. Repsher.  I don't have any
 9   more questions.
10            THE COURT:  Thank you, Mr. Meador.
11            Mr. McClain --
12            MR. MEADOR:  Thank you.
13            THE COURT:  -- you may cross-examine.
14            MR. MCCLAIN:  Your Honor, do we need to instruct the
15   jury about -- to the extent that there were any opinions offered
16   on the last subject that they're stricken?
17            THE COURT:  I didn't think he actually gave any
18   opinions but . . .
19            MR. MEADOR:  He didn't, Your Honor.
20            MR. MCCLAIN:  All right.  Then I don't have the record
21   in front of me.  I couldn't remember where I interposed the
22   objection.
23            THE COURT:  You im -- you imposed it early enough.
24                         CROSS-EXAMINATION
25   BY MR. MCCLAIN:
```

1  Q.   Dr. Repsher, as part of your qualifications yesterday,

2  Mr. Meador told the jury about all the places that you've

3  testified.  Do you remember that?

4  A.   Yes.

5  Q.   And that's the reason I'm mentioning this, because you used

6  it as part of your qualifications yesterday to the jury.  One of

7  the places that you've testified frequently is before the

8  Colorado Division of Workers' Compensation; isn't that true,

9  sir?

10  A.   Yes, I do environmental occupational lung disease, so I

11  testify fairly frequently, yes.

12  Q.   And the judges there offer written opinions, don't they?

13  A.   Yes, they do.

14  Q.   And, Dr. Repsher, in reports that those judges who have

15  heard you testify, they have found your reports to be incredible

16  and unworthy of belief; isn't that true, sir?

17  A.   There was a judge from southern Colorado who I believe did

18  make that statement.

19  Q.   He called your reports internally inconsistent and the

20  conclusions drawn are without rational factual basis; isn't that

21  right?

22  A.   As I recall, it was something like that, yes.

23  Q.   And that was a case that you testified about asthma in;

24  right?

25  A.   I believe it was hypersensitivity pneumonia if we're

1 talking about the same case.

2 Q.   Well, it was a case where the patient did respond to a

3 bronchodilator to the effect of 19 percent, and you said it

4 wasn't asthma; isn't that right?

5 A.   I don't recall.  That's not the case I'm thinking about.  I

6 don't recall that case.

7 Q.   Well, would you like to -- would you like to review it to

8 refresh your recollection?

9 A.   Please.  Well, it's the same judge, but it's not the c --

10 well, no, this is the case that I was thinking of.  This was a

11 case of alleged hypersensitivity pneumonia.

12 Q.   But, Doctor, wasn't the issue whether or not he had asthma?

13 That was one of the issues?

14 A.   Not to my recollection, no.

15 Q.   Do you recall, Doctor, that Dr. Repsher interpreted a 19

16 percent increase in air flow after bronchodilator to be no

17 response and stated that there was no objective evidence of

18 occupational asthma?  You just read that.  Do you remember it?

19 A.   No, I don't.

20 Q.   Doctor, do you remember that another judge said that

21 Dr. Repsher states that your opinions were disingenuous?  Do you

22 remember him making that comment in another report?

23 A.   I vaguely remember that statement, yes.

24 Q.   Disingenuous.

25 A.   Is that Dr. -- Mr. -- Judge Barringer again?

1  Q.   I believe this is Judge Martinez, a different judge.

2  A.   Yes.

3  Q.   Remember Edward Martinez --

4  A.   Edward Martinez.

5  Q.   -- had that opinion about you that you were disingenuous?

6  A.   From Grand Junction, yes.

7  Q.   And Judge Barringer you mentioned that your opinions

8  were -- in another case that your opinions were entitled to no

9  weight.  Do you remember that?

10  A.   Well, the judges are -- have to find -- have to find which

11  witnesses he's going to give weight to and which ones he's not.

12  That's part of the -- that's part of the process.

13  Q.   And they can give both experts weight or one weight and

14  others no weight; right?

15  A.   They're free to do what they want.

16  Q.   They gave you no weight.  That means they didn't believe

17  you.

18  A.   That particular judge, that's correct.

19  Q.   And, Doctor, another one of these judges, Dr. (sic) Bailin,

20  a district judge, in your home state of Colorado said, Doctor,

21  that your testimony was not accorded much weight in a case where

22  you offered opinions about asbestos; right?

23  A.   I don't recall that case, but I'm certainly not disputing

24  it.

25  Q.   He said you weren't familiar with the major researchers in

1  the field of asbestos-related occupational disease and you

2  hadn't read any books on asbestos malignancy, and you weren't an

3  epidemiologist, and you weren't board certified in occupational

4  medicine.  Do you remember those -- that -- those criticisms of

5  your opinions?

6  A.    I remember that case, yes, I do.

7  Q.    Now, Dr. Repsher, at least four physicians that have

8  examined Mr. Kuiper have concluded that he has bronchiolitis

9  obliterans caused by butter flavor; isn't that right?

10 A.    Which ones are you talking about?

11 Q.    Dr. Egilman would be one.

12 A.    Okay.

13 Q.    He's board certified in occupational medicine; right?

14 A.    Yes, he is.

15 Q.    You're not.

16 A.    That's correct.

17 Q.    And you were criticized by the judge in Colorado for not

18 being board certified in occupational medicine; right?

19 A.    Yes, that's what she said.

20 Q.    And Dr. Parmet who is the discoverer of these eight cases

21 you keep referring to, he was the one that put it all together

22 according to the medical literature, Dr. Parmet who actually

23 examined Mr. Kuiper -- and by the way, you didn't examine

24 Mr. Kuiper, did you?

25 A.    I did not have that opportunity.

1  Q.   Well, wait.  Let's just stop for a minute.  You didn't ask.

2  His Honor would have given you an opportunity to examine

3  Mr. Kuiper if you'd asked.  You never asked.

4  A.   I'm not sure that that's true, but I didn't -- the facts

5  are that I didn't have the opportunity.  Exactly how that came

6  about I don't know.

7  Q.   When did you ask?  Where is there any record of you ever

8  asking to examine Mr. Kuiper?

9  A.   I don't believe that there's any record, but I -- if I'd

10  been afforded the opportunity, I certainly would have examined

11  him.

12  Q.   Did you ever ask?

13          MR. MEADOR:  Objection.  Asked and answered.

14          THE COURT:  Overruled.

15  A.   I may have, yes.  I believe that I did, but I -- there's no

16  record of it.

17  Q.   And I don't know of it.  So you didn't ask me, did you?

18  A.   No, I did not ask you.

19  Q.   And you didn't ask Mr. Hall who deposed you from my office,

20  did you?

21  A.   No, I did not.

22  Q.   And you certainly didn't ask Judge Bennett, did you?

23  A.   No, I did not.

24  Q.   And then Dr. Farrell was here, his treating physician, who

25  he said he's worried about him for now some 16 years.

1  Dr. Farrell was here, and he offered the opinion that he has

2  bronchiolitis obliterans caused by butter flavor, and he's seen

3  him a whole lot; isn't that right?

4  A.   Dr. Farrell has seen him over the years, yes.

5  Q.   And Dr. Bainbridge who's in the hall has in his records

6  repeatedly microwave popcorn lung with a history of exposure to

7  diacetyl, doesn't he, as part of his differential diagnosis?

8  A.   Dr. Bainbridge has continued -- has continued to keep that

9  in the differential diagnosis.  He has not made that diagnosis,

10 however.

11 Q.   And Dr. Wolpert, you've seen Dr. Wolpert's record?  It's

12 part of your records?  You recall that?

13 A.   I don't recall it.

14 Q.   Let's look at 1447.  This is part of your medical record,

15 Dr. Michael L. Wolpert.  The patient is a gentleman with a

16 history of bronchiolitis as a result of immolations injury in

17 his job at a popcorn plant where he was apparently exposed to

18 one of the substances used for adding butter flavor to popcorn.

19 Do you recall that?

20 A.   I don't recall it, no.  There's a lot of records in this

21 case.  I don't recall it.

22 Q.   And you didn't really have a chance to review them very

23 closely, did you, Doctor?

24 A.   Oh, I've reviewed the records -- the treating records that

25 I have in my files very, very closely.

1 Q.   How'd you miss this one then?

2 A.   I don't recall seeing this record.

3 Q.   And Dr. Ross Bacon who we saw by video yesterday said maybe

4 it's asthma caused by exposures at the microwave popcorn plant;

5 right?

6 A.   Yes, but that's not bronchiolitis obliterans.

7 Q.   Well, it doesn't really matter in this case.  You

8 understand that, don't you?  Mr. Kuiper recovers no matter what

9 the disease is called caused -- if it was caused by the butter

10 flavor, if you call it asthma or COPD or if you call it fungi.

11 If it was caused by butter flavor, he wins the lawsuit.  Do you

12 understand that?

13        MR. MEADOR:  Objection.  Argumentative.  Calls for

14 speculation.

15        THE COURT:  Sustained.

16 BY MR. MCCLAIN:

17 Q.   Doctor, do you understand that the name that's employed is

18 not at issue in the case?

19 A.   I'm not an attorney.  I'm a physician.

20 Q.   Well, let's leave the attorney aside, Doctor.  No matter

21 what you call a disease, if the disease is caused by a product,

22 it's still caused by the product; right?

23 A.   I'm not an attorney.  I can't answer that question.

24 Q.   Okay.  Doctor, he said that the asthma that he diagnosed

25 was caused by butter flavor; isn't that right?

1     A.    Yes, apparently so.   I don't see it written here, but

2     apparently so.

3     Q.    Now, you, I guess, came to a conclusion at some point that

4     this was asthma from an unknown cause, right, essentially?

5     A.    Yes.   At one point that's true.   I mean, the cause of

6     asthma is not entirely known.

7     Q.    Now, Doctor, you will acknowledge, won't you, that in the

8     literature you've now read -- and by the way, you didn't write

9     any of that literature; right?   You weren't part of the NIOSH

10    team that investigated Jasper or have written any of these other

11    articles?

12    A.    No, I was not.

13    Q.    And you said to Mr. Meador that you've been studying it for

14    ten years, and surely if somebody wanted your expertise from

15    NIOSH they could have called you; right?

16    A.    They were free to do that, yes.

17    Q.    Okay.   No one ever called you from NIOSH, did they?

18    A.    No.

19    Q.    No one ever said, "Dr. Repsher, we need your opinion to be

20    able to figure all this out," did they?

21    A.    No, they had their own experts.

22    Q.    The only ones that ever called you were the defense

23    lawyers; right?

24    A.    In this particular case, yes.

25    Q.    Now, you agree, don't you, that in those articles that

1  you've reviewed, that you've read, that lots of doctors have

2  struggled with this diagnosis, bronchiolitis obliterans caused

3  by popcorn?

4  A.   Caused by butter flavoring, but yes, physicians have been

5  struggling over this for a long time.

6  Q.   Calling it asthma and COPD and lots of things; right?

7  A.   Correct.

8  Q.   And that's pointed out in the medical literature, that lots

9  of doctors get confused about it; right?

10 A.   I'm not sure that I've seen that pointed out in the

11 literature, but that's true.

12 Q.   Oh.

13        MR. MCCLAIN:  Well, let's bring up -- let's bring up

14 COPD Masquerading As Bronchiolitis Obliterans, Scott.  It's

15 Exhibit 1235, Scott.  I should have given you the number.  I'm

16 sorry.

17 Q.   This is by Dr. Kreiss who wrote the lead paper.  You

18 recognize her name, don't you?

19 A.   Yes, and I have read this article.

20 Q.   Occupational Bronchiolitis Obliterans Masquerading as COPD;

21 right?

22 A.   Yes.

23 Q.   Where she points out that lots of doctors get confused?

24 A.   Yes.  I do recall reading this, yes.

25 Q.   Okay.  And she says although the hazard of diacetyl is not

1  in question, uncertainties do remain.  The spectrum of health

2  effects relating to flavorings may be broader than fixed

3  obstruction.  Asthma, bronchiolitis obliterans with organizing

4  pneumonia, granulomatous pneumonitis, tracheo-,

5  bronchiomalacia -- did I say that right?

6  A.    No.

7  Q.    Say it, please.

8  A.    Bronchiomalacia.

9  Q.    -- fibrosis and systemic symptoms without obstruction have

10  all been reported in flavoring-exposed workers; do you see that?

11  A.    I see her statement there, yes.

12  Q.    Okay.  And that's what I was trying to say to you before

13  without trying to argue about being a lawyer.  You know,

14  flavorings can cause lots of problems according to the

15  literature; right?

16  A.    Some people feel that way, yes.

17  Q.    Okay.  And likewise, she wrote a 2009 primer because of

18  this problem, 2140, Dr. Kreiss did, to try to teach doctors how

19  to diagnose this; right?

20  A.    Apparently so, yes.

21  Q.    You're not familiar with this document?

22  A.    It looks like a chapter from a book, and I don't -- I

23  don't -- I don't have that book.

24  Q.    So this is one of the things that you hadn't yet reviewed;

25  am I right?

1   A.   I wasn't aware that it existed.

2   Q.   Okay.  Here.  Well, let me help you then.  These --

3   shortness of breath, cough, and wheeze are common symptoms of

4   respiratory diseases.  These shared symptoms make misdiagnosis

5   by physicians common if the diagnosis is based solely on

6   reported symptoms.  Medical tests help to distinguish the

7   respiratory diseases from each other.  Other pitfalls in medical

8   diagnosis include diagnosing common diseases such as asthma,

9   emphysema, chronic bronchitis instead of the actual rarer

10  disease such as BO and not considering occupational exposures as

11  the cause.  Is that news to you, Doctor?

12  A.   That is not news to me at all.

13  Q.   You hadn't read that before, though.

14  A.   I have not seen this chapter before, but the statement is

15  true.

16  Q.   And so when I said that it's well reported in the

17  literature that doctors misdiagnose this condition, that would

18  be a true statement; am I right?

19  A.   Well, it's certainly reported in these two instances, yes.

20  Q.   Now -- and, Doctor, I know that even though you weren't

21  involved, Dr. Parmet who was involved in the diagnosis of all

22  these people told us that all of them were misdiagnosed

23  initially.

24  A.   I believe that he's written about that as well.

25  Q.   Yeah.  And, in fact, doctors as well qualified as at the

1   Mayo Clinic and at National Jewish Hospital in Denver

2   misdiagnosed this group of people as having asthma or COPD or

3   other conditions; am I right?

4   A.    Well, National Jewish, specifically one patient, yes.

5   Q.    Now, Doctor, it's true, isn't it, that although you haven't

6   written anything about this disease you've been testifying as an

7   expert witness in litigation for over 30 years?

8   A.    That's right.

9   Q.    More than 600 cases?

10  A.    At least, yes.

11  Q.    Ninety percent of them for defendants like Givaudan?

12  A.    For workmen's comp. and toxic tort cases, about 90 percent.

13  For medical malpractice, it's about 80 to 90 percent the other

14  way.

15  Q.    You make over a million dollars a year testifying?

16  A.    I really don't have a specific number, but as far as what

17  I --

18  Q.    That's the number you gave us in your deposition, isn't it,

19  a million dollars a year for the last five years?

20  A.    As far as gross billing, that would probably be true.

21  Q.    And, Doctor, in preparing to testify for Givaudan's lawyers

22  before your deposition, you met with them eight times, eight

23  times; right?

24  A.    I've met with them a lot, yes.

25  Q.    More than 18 hours; right?

1  A.   I would say that's probably correct.

2  Q.   And they supply a special lawyer just for you; right?

3  A.   Well, I've worked particularly with one of their lawyers,

4  yes.

5  Q.   Mr. Zarro.

6  A.   Correct.

7  Q.   He's kind of here, isn't he?  He's right here.

8  A.   Yes, he is.

9  Q.   He's kind of your escort.

10  A.   He's an attorney that I work with.

11  Q.   And in all that time, all that time, they never showed you

12  a single Givaudan internal document, did they?

13  A.   I don't believe that I've seen any internal documents from

14  Givaudan.  I've seen them referred to, but I don't believe I've

15  actually seen one of the documents.

16  Q.   Did you ask for those?

17  A.   I don't recall specifically.  I may have at one time.

18  Q.   Are you aware that they had 9 cases of bronchiolitis

19  obliterans from their own plant beginning in 1992?

20          MR. MEADOR:  Objection.  Outside the scope.

21          THE COURT:  Overruled.

22  A.   I'm aware that there have been documented cases of

23  bronchiolitis obliterans from the Givaudan plant.

24  Q.   You were never asked by Givaudan to consult regarding those

25  cases, were you?

1  A.    Some of them, yes.

2  Q.    You were.  And did you consult about them?

3  A.    Yes.

4  Q.    And did you conclude that they had bronchiolitis

5  obliterans?

6  A.    Yes.

7  Q.    Did you know that there was a doctor here by the name of

8  Higley yesterday who said that they hadn't been confirmed?

9          MR. MEADOR:  Objection.  Misstates the testimony,

10  argumentative.

11          THE COURT:  Overruled.

12  BY MR. MCCLAIN:

13  Q.    Do you know Dr. Higley?

14  A.    No, I don't.

15  Q.    Does she know that you confirmed those cases?

16  A.    I don't know.

17  Q.    Does Givaudan corporation know that you confirmed those

18  cases?

19  A.    I don't know.

20  Q.    Do you know why they didn't report them to authorities

21  after you had confirmed them?

22  A.    Well, the case -- as I recall, the cases have already been

23  reported to authorities.

24  Q.    Only after 2002, not until after this incident at Jasper

25  Popcorn came to light.

1 A.   That may or may not be true.  I just don't know one way or

2 the other.

3 Q.   When did you review them?

4 A.   Over the last several years.

5 Q.   Beginning when?

6 A.   I can't give you a specific date.

7 Q.   Did you confirm the diagnosis in Cliff Walker?

8 A.   No, I didn't.

9 Q.   Now, let's talk about how the diagnosis is made because you

10 talked about those symptoms.  Shall we?

11 A.   Sure.

12 Q.   You said that the symptoms for bronchiolitis obliterans are

13 dry cough.  Do you remember that?

14 A.   Yes.

15 Q.   The fact is is that Dr. Kreiss reports productive cough in

16 the workers, doesn't she?

17 A.   Later on in the course of the disease, yes.

18 Q.   And you agree that he does have shortness of breath with

19 exertion.  That was another symptom that you put up for the

20 jury; am I right?

21 A.   That's correct.

22 Q.   And you agree he has that symptom; right?

23 A.   Yes.

24 Q.   And eye irritation, you -- somehow in the medical records

25 that you reviewed, I guess you missed the fact that he did have

1    eye irritation.

2    A.    He did have eye irritation, but I believe he attributed

3    that to the salt and the cleaning solvents, chemicals.

4    Q.    Well, did you review Dr. Farrell's testimony when he said,

5    "Well, we all thought that what the problem was was salt, not

6    butter flavor"?  Do you remember that?

7    A.    I do.

8    Q.    Okay.  And then later he learned it was really butter

9    flavor, not salt at all?

10   A.    That was his opinion, yes.

11   Q.    And you agree that he's had significant FEV1 loss; right?

12   A.    Yes, he certainly has.

13   Q.    And you agree that he has a fixed obstructive pattern on

14   spirometry; right?

15   A.    He has primarily a fixed obstruction, but he also has

16   reversible obstruction.

17   Q.    Well, we're going to talk about that in just a minute.  But

18   he does have a fixed pattern on his spirometry; am I right?

19   A.    On some of his testing, yes.

20   Q.    And by the way, Doctor, you're not aware of this

21   apparently, but Dr. Parmet said that in all eight cases they had

22   some reversibility in all of the first eight cases.  Are you

23   aware of that?

24   A.    I don't agree with that.

25   Q.    Well, you didn't ever see them, did you?

1 A.    I've seen -- I've read the report.

2 Q.    You never saw the medical records, did you, like Dr. Parmet

3 did?

4 A.    The actual pulmonary function tests?

5 Q.    Yeah.

6 A.    No.  They were described as fixed obstruction.

7 Q.    Yeah.  Dr. Parmet talked to us about being brought all the

8 medical records and he spread them all over his table and he

9 reviewed the records from National Jewish and he reviewed the

10 records from Mayo Clinic and he looked at all of them and

11 concluded they had bronchiolitis obliterans and reviewed those

12 patients and knew them by name.  You didn't do any of that, did

13 you?

14 A.    No.  I was not afforded that opportunity.

15 Q.    And so, Doctor, who would you say is in a better position

16 to say whether or not those patients had some degree of

17 reversibility?  You or Dr. Parmet?

18 A.    Well, Dr. Parmet not being a pulmonologist, I would say I

19 would.

20 Q.    Dr. Parmet's an occupational physician, isn't he?

21 A.    Yes.

22 Q.    He was named occupational physician of the year last year.

23 You know that, don't you?

24 A.    I didn't know that, but I'm not surprised about it.

25 Q.    And he was named occupational physician of the year because

1    of his work on microwave popcorn workers; isn't that right?

2    A.    I don't know that for a fact, but I would presume so, yes.

3    Q.    Now, the -- as I heard your testimony, the real problem

4    that you find in the diagnosis is a lack of a mosaic pattern as

5    I heard your testimony.  You kept coming back to that; am I

6    right?

7    A.    That's one of the problems, yes.

8    Q.    Now, it's interesting in regard to another mixer at the APC

9    plant who was diagnosed with bronchiolitis obliterans,

10   Mr. Remmes -- you remember that case?

11   A.    I do.

12   Q.    And in that case, Mr. Remmes had a mosaic pattern, and you

13   still refused to call it bronchiolitis obliterans, didn't you?

14   A.    That is correct.

15   Q.    And, in fact, what you told us then was that the mosaic

16   pattern rather than being a cardinal feature like you told the

17   jury here was grossly insufficient evidence of bronchiolitis

18   obliterans; isn't that right?

19   A.    In Mr. Remmes, yes.

20   Q.    And he had six high-resolution CAT scans showing a mosaic

21   pattern; am I right?

22   A.    I wasn't aware that he had six, but I was aware that he had

23   some.

24   Q.    And they were from the Mayo Clinic; isn't that right?

25   A.    I can't challenge that.

1  Q.   So which is it?  The cardinal sign or grossly insufficient,

2  or does it just depend on which day you're testifying?

3  A.   Has nothing to do with which day I'm testifying.

4  Mr. Remmes was a smoker, a long-time heavy smoker, and he had

5  mild COPD and mild -- and COPD is one of the causes of a

6  positive HRCT for mosaic pattern.

7  Q.   Well, let's review the 2009 article by Dr. Kreiss which you

8  didn't have an opportunity to review on that issue.

9          MR. MCCLAIN:  Scott, it's over on page 178, 178.

10  Q.   Now, Doctor, first of all, you mentioned that you both have

11  to have inspiratory and expiratory images and that what a mosaic

12  pattern shows is air trapping; am I right?

13  A.   That's correct.

14  Q.   Now, Dr. Kreiss is the world's expert on this disease next

15  to Dr. Parmet; right?

16  A.   Dr. Kreiss has had a lot of experience with this disease,

17  yes.

18  Q.   And she in 2009 wrote the up-to-date way to go about

19  diagnosing this so physicians don't make mistakes; right?

20  A.   I haven't seen that, but it doesn't surprise me.

21  Q.   She wrote spirometry tests --

22          MR. MCCLAIN:  Scott, pick up right there in the middle

23  of the paragraph, spirometry tests down under bronchiolitis

24  obliterans, spirometry tests -- can you highlight that for the

25  doctor so he can read it?

1  Q.   Spirometry tests reveal fixed airway obstruction.  HRCT --

2  now, that's a high-resolution CAT scan; right?

3  A.   That's right.

4  Q.   With inspiratory and expiratory images may show air

5  trapping in the expiratory images; right?

6  A.   That's what she states there.

7  Q.   It's not required.  It may be there, and it might not be

8  there; right?  That's what "may" means; right, Doctor?

9  A.   That's not consistent with her earlier writings, though.

10 Q.   Well, Doctor, maybe that's just the problem.  Maybe you're

11 just not up to date yet.  This is the newest work, and she says

12 it may be, it's not necessary.  Do you see that, Doctor?

13 A.   She doesn't footnote that with any scientific reference to

14 a scientific article, so I can't really comment.

15 Q.   Doctor, I didn't ask you to comment.  I just asked does she

16 say it?

17 A.   That's what she says, yes, but it's not documented.

18 Q.   And "may" means that it doesn't always have to be there; am

19 I right?  That's your interpretation of what "may" means.

20 A.   That's what is stated here, but it's not referenced with a

21 footnote.

22 Q.   Now, one of the other things you said was that none of the

23 workers at Jasper had this pattern like Mr. Kuiper did of

24 declines after he left the mixing room.  Do you recall that?

25 A.   Can you say that again?  I didn't follow it.

1  Q.   You said that all the workers, once they were removed from

2  exposure, were stable -- do you remember that -- in the Jasper

3  group?

4  A.   That's my understanding, yes.

5  Q.   And you said that that was a distinction with Mr. Kuiper

6  because he continued to decline after he was out of the mixing

7  room.  Do you remember that?

8  A.   I do.

9           MR. MCCLAIN:  Scott, will you bring up the reference

10 to case number 2?  I believe that that's in the original Kreiss

11 article.  Do you have the reference?

12 Q.   Doctor, you're familiar with this paper?

13 A.   Yes, I am.

14 Q.   Okay.  Did you read where it says cases 2 and 7 showed

15 considerable deterioration in symptoms and pulmonary function

16 even 16 to 28 months after leaving their work but appear to have

17 subsequently stabilized?

18 A.   Yes.

19 Q.   Did you miss that too?

20 A.   I did not miss it.

21 Q.   Did you mean to then tell the jury that the workers from

22 Jasper didn't decline after their exposure ceased?

23 A.   What I stated is that event -- that most of them did not --

24 well, I didn't state that, but most of them did not decline, but

25 two of them did decline for some period of time after cessation

1  of exposure but then ultimately stabilized.

2  Q.    Do you know how they stabilized?

3  A.    I don't understand the question.

4  Q.    Do you know that they were treated with chemotherapy drugs

5  to stabilize them?

6  A.    They may have been treated, but there's no evidence that

7  the treatment is effective.

8  Q.    Doctor, I just want to be clear about this.  The workers

9  continued to decline after exposure ceased; isn't that true?

10  A.    Two of them did for a period of time after cessation of

11  exposure, that is correct.

12  Q.    Now, Doctor, let's talk about this issue of reversibility

13  for a few minutes.  Doctor, your opinion in this case has been

14  fairly fluid, hasn't it?

15  A.    Yes, as I've done more reading and have had more

16  experience, yes.

17  Q.    It's been kind of like capturing smoke.  At first you said

18  he didn't have asthma.  That was in your report; right?

19  A.    That's correct.

20  Q.    You said he had COPD.

21  A.    That is correct.

22  Q.    And then you read this Hanson report.  And just so that the

23  jury's aware, Hanson is another expert that the lawyers --

24           MR. MEADOR:  Object to his characterization.

25           THE COURT:  Sustained.

1  BY MR. MCCLAIN:

2  Q.   Isn't Dr. Hanson an expert retained by defendants?

3  A.   I believe that's correct.

4  Q.   He wasn't a treating physician, was he?

5  A.   I don't believe so, right.

6  Q.   So when you referred to Dr. Hanson, he was another guy like

7  you; right?

8  A.   He was a retained expert I believe.

9  Q.   Apparently that they're not going to call, but he was

10  retained like you.

11          MR. MEADOR:  Object to his characterization.

12          THE COURT:  Over -- sustained.  Why don't you rephrase

13  the question.

14  BY MR. MCCLAIN:

15  Q.   Yeah.  Do you know whether they're planning to call him?

16  A.   Do I know?

17  Q.   Yeah.

18  A.   No, I don't.  I believe that he's not going to be recalled,

19  but I don't -- called, but I don't know that for a fact.

20  Q.   So you issued your first report, and you called it COPD;

21  right?

22  A.   Right.

23  Q.   You said it wasn't asthma, it didn't react to

24  bronchodilators; right?

25  A.   Right.

1 Q. And then you got this report from Hanson who disagreed with
2 you; right? He said it was asthma.
3 A. I also got a lot of other information that showed that he'd
4 been ill for a lot longer than I originally was aware of.
5 Q. Well, Doctor, that wasn't my question. I said your first
6 report came out. You had COPD; right?
7 A. Right.
8 Q. And apparently you thought you had a basis to make that
9 diagnosis, a medical basis.
10 A. Sometimes it's very difficult to make a differential -- to
11 differentiate between COPD with a bronchospastic component and
12 asthma with a fixed obstructive component. The two can overlap,
13 and sometimes it's very difficult to make that diagnosis.
14 Q. Doctor, is the answer to my question yes or no?
15 A. The answer to the question is the answer I gave you.
16 Q. Well, I guess maybe I didn't make myself clear. I asked
17 you did you have a medical basis to make the opinion that it was
18 COPD?
19 A. Yes, I did.
20 Q. Okay. Now, after then you received the Hanson report who
21 said he had asthma, you changed your report to be consistent
22 with Dr. Hanson; isn't that right?
23 A. No, that's not right.
24 Q. Well, it was after you received Dr. Hanson's report; right?
25 A. Temporally that may be true.

1  Q.   Isn't it true that Mr. Zarro told you that you couldn't

2  have two experts for the defense disagreeing with each other?

3  A.   No.

4  Q.   Now, it's true, isn't it, Doctor, that in a case that I've

5  showed you already, in a case where there was a 19 percent

6  improvement with bronchodilators, you refused to call it asthma;

7  am I right?

8  A.   Well, the case -- no, you're not right because the case was

9  not a case about asthma.  It was a case about hypersensitivity

10 pneumonia in a saw mill.

11 Q.   Doctor, I guess I'm just having a hard time communicating.

12 I asked in the case there was a 19 percent bronchodilator

13 response, and the judge said you refused to call it

14 occupationally induced asthma; am I right?

15 A.   I need to -- I haven't read that decision in a long time.

16 I would need to see the context.

17 Q.   Is it still up in front of you?  I think I handed it to

18 you.

19 A.   I don't see it.

20      MR. MEADOR:  I'd object to putting that up, hearsay.

21 He's certainly entitled to cross-examine.

22      THE COURT:  Sustained.

23      MR. MCCLAIN:  Which is the exhibit number so I can

24 give it to the doctor?  What is it?

25 BY MR. MCCLAIN:

1   Q.   Doctor, is 2219 in front of you?  I have another copy if

2   you don't have it.

3           MR. MCCLAIN:  And what was the paragraph for me,

4   Scott?

5   A.   It's not in front of me.

6           MR. MCCLAIN:  May I approach the witness, Your Honor?

7           THE COURT:  You may.

8   BY MR. MCCLAIN:

9   Q.   It's paragraph 17, Doctor.

10   A.   Well, that is what is stated here by Judge A.L.J.

11   Barringer.

12   Q.   That's all I asked you.  That's what the doctor (sic) said

13   is you refused to call a disease that responded to

14   bronchodilators with a 19 percent improvement as occupational

15   asthma.  That's truly stated there, isn't it?

16   A.   That's what is stated, but it's a false statement.

17   Q.   So the judge made a false statement?

18   A.   Yes, among many.

19   Q.   Dr. Repsher, in this case there is no evidence in the

20   record, in the medical record, that Mr. Kuiper had asthma before

21   he started working at American Pop Corn Company; isn't that

22   right?

23   A.   That's right because we have no records.

24   Q.   And so, Doctor, the only pulmonary function tests that we

25   have are after he started working in the mixing room; am I

1  right?

2  A.    The first -- the date of the first test that's available

3  that I'm aware of is October 1992.

4  Q.    That was after he started in the mixing room; right?

5  A.    It was about the time he started in the mixing room, yes.

6  Q.    And at that point in time we have nothing but abnormal

7  pulmonary function tests; right?

8  A.    That's right.

9  Q.    And we have no evidence of abnormal pulmonary function

10  tests before that time.  They just don't exist.

11  A.    We don't have any pulmonary function tests before that

12  time.

13  Q.    That's right.  So that means yes, we have no evidence of

14  it; right?  We have no evidence of an abnormal pulmonary

15  function test; right?

16  A.    We have no evidence of any test.

17  Q.    Well, we do have evidence of a test that he took, a

18  treadmill test; am I right?

19  A.    Yes, he took a treadmill test in 1986 I believe.

20  Q.    '88.

21  A.    '88.

22  Q.    And he passed the treadmill test, didn't he?

23  A.    He did.

24  Q.    And, Doctor, you would agree, wouldn't you, that other

25  workers in that mixing room were found to have abnormal

1  pulmonary function tests; am I right?

2  A.   Yes, you're correct.

3  Q.   Three out of the six; am I right?

4  A.   No, there were 6 out of 13.

5  Q.   Six out of thirteen had abnormal pulmonary function tests,

6  three out of six mixers; right?

7  A.   Right.

8  Q.   And two of those mixers were Mr. Remmes; am I right?

9  A.   Right.

10 Q.   Who was diagnosed with bronchiolitis obliterans?

11 A.   That was the -- that was the diagnosis that was given to

12 him, yes.

13 Q.   And Mr. Kuiper; right?  They were two out of the three that

14 had abnormal pulmonary function tests from the mixing room.

15 A.   That's right.

16 Q.   And you would agree that diacetyl containing -- butter

17 flavor containing diacetyl can cause fixed obstructive pulmonary

18 disease; am I right?

19 A.   Yes, it can.

20 Q.   And you would agree that the exposures in that mixing room

21 were high enough to cause fixed obstructive pulmonary disease;

22 am I right?

23 A.   They may have been transiently high enough, but my

24 understanding, Mr. Kuiper was using a mask.

25 Q.   Well, he wasn't using a mask when he was cleaning.  Are you

1 aware of that?

2 A.   That's correct.

3 Q.   And he wasn't wearing a mask when he would check the mixes;

4 am I right?

5 A.   It's my understanding that when he was adding butter

6 flavoring to the tank that he was wearing a mask at that time.

7 Q.   Yes.  You're absolutely right about that.  But when he

8 would open the mixes up to look in the tanks, he wasn't wearing

9 a mask.  Are you aware of that?

10 A.   I'm not aware one way or the other on that.

11 Q.   All right.  Are you aware that within Givaudan's own plant

12 as early as '92, any time you looked at a mix or were around a

13 mixture containing diacetyl it had to be a closed process?

14 A.   Yes.

15 Q.   And are you aware they never warned, that is, Givaudan

16 never warned, American Pop Corn Company that that had to be the

17 same procedure employed when working around their butter flavor?

18          MR. MEADOR:  Objection.

19 Q.   Are you aware of that?

20          MR. MEADOR:  Objection.  Outside the scope and

21 argumentative.

22          THE COURT:  Sustained.

23 BY MR. MCCLAIN:

24 Q.   Do you know whether or not Givaudan ever warned American

25 Pop Corn about exposure to diacetyl in any regard?

1    MR. MEADOR: Objection. Outside the scope and
2 argumentative.
3    THE COURT: Sustained.
4 BY MR. MCCLAIN:
5 Q.    Doctor, let me ask you this. Is it your medical opinion
6 that when working around diacetyl one should always wear a
7 respirator?
8 A.    Well, not always, no. We're around diacetyl, all of us,
9 every day, when we eat, drink a cup of coffee.
10 Q.    Let's not get off track. In regard to that mixing room at
11 American Pop Corn, would you have recommended, knowing what you
12 know now, to always wear a respirator?
13 A.    Yes.
14    MR. MCCLAIN: Thank you, Dr. Repsher. No further
15 questions.
16    THE COURT: You may do your redirect now.
17    MR. MEADOR: Thank you, Your Honor.
18                    REDIRECT EXAMINATION
19 BY MR. MEADOR:
20 Q.    Dr. Repsher, did Dr. Hanson conduct an examination of
21 Mr. Kuiper?
22 A.    He did.
23 Q.    And what's your understanding of what that examination
24 consisted of?
25 A.    It was quite a thorough examination. It included a

 1    history, physical, probably some review of records, and he did

 2    pulmonary function testing, and he obtained a high-resolution CT

 3    scan both on inspiration and expiration.

 4    Q.   And what was the results of his examination?

 5    A.   The result of the examination is he made a diagnosis of

 6    asthma.

 7    Q.   What was that diagnosis?

 8    A.   Asthma.

 9    Q.   And what did he comment about reversibility?

10    A.   And the basis for his diagnosis was that there was a

11    significant reversibility.

12    Q.   And what did he say about the mosaic pattern?

13    A.   And that there was a definite mosaic pattern on expiratory

14    view.

15    Q.   Now, Mr. McClain brought out you testified in a number of

16    cases?

17    A.   Yes.

18    Q.   And is it your experience in the cases you've testified in

19    that generally the court allows one defense medical examination?

20    A.   That may be true, yes.

21    Q.   And if you could have had an opportunity to examine, would

22    you have done that?

23    A.   Yes, I very much wanted to examine him.

24    Q.   Now, he asked you some questions about an A.L.J. that you

25    apparently got cross-purposes with.  What's an A.L.J.?

1   A.   Administrative law judge.

2   Q.   And what's that?

3   A.   It's usually an attorney that is hired by the state in

4   Colorado, hired by the state of Colorado, to administer

5   workmen's compensation claims.

6   Q.   And you got cross-purposes with him?

7   A.   Not that I was aware of at the time, but Judge Barringer --

8   I won't comment any further.  It just -- his decision -- his

9   statements and his decision, many of them are in error, and he

10  shortly after this either resigned or was fired from his job.

11  Q.   And you've testified in a lot of other worker's

12  compensation proceedings?

13  A.   Yes, many, many.

14  Q.   And has your opinions been accepted in those proceedings?

15  A.   The overwhelming majority of them, my opinion has been

16  accepted, yes.

17  Q.   Now, you have a diagnosis of asthma with remodeling.  And

18  you gave an opinion to a reasonable medical certainty.  So let

19  me ask you this question:  Have you ruled out -- other than

20  butter flavoring, have you ruled out other possibilities?

21  A.   No, I haven't.

22  Q.   And what other possibilities are still on the table?

23           MR. MCCLAIN:  Your Honor, it's beyond the scope.

24           THE COURT:  Sustained.

25           MR. MEADOR:  I don't have any more questions.  Thank

1  you.

2          THE COURT:  You may step down.

3          THE WITNESS:  Thank you, Your Honor.

4          THE COURT:  And, members of the jury, it's ten

5  o'clock.  So we'll be in recess until 10:25.  Remember to keep

6  an open mind until you've heard all of the evidence in the case.

7  Thank you.

8          (The jury exited the courtroom.)

9          THE COURT:  Is Dr. Bainbridge next?

10          MR. PAGLIARO:  Yes, Your Honor.

11          THE COURT:  And then there's one more after that?

12          MR. PAGLIARO:  Yes.

13          THE COURT:  Okay.  Thank you.  Anything we need to

14  take up?

15          MR. MEADOR:  I just want to make my record whenever --

16          THE COURT:  Yeah.  Would you like to do that now or at

17  the end of the day?

18          MR. MEADOR:  I can wait till the end of the day.

19          THE COURT:  Okay.  I've got a note to remind you

20  so . . .

21          MR. MEADOR:  Thank you, Your Honor.

22          THE COURT:  Thank you.

23          (Recess at 9:59 a.m.)

24          THE COURT:  Please be seated for a second.

25          I'm going to correct -- I'm going to correct a

1    misimpression that Mr. Meador left with the jury.  I'm willing

2    to assume it was, again, inadvertent.  But there was no request

3    by Givaudan to have Lawrence Repsher do an examination of

4    Mr. Kuiper.

5          And to the extent that you implied that there's

6    somehow a one-limit rule, that's simply not true.  I've approved

7    Rule 35 examinations multiple times in cases for multiple

8    experts, and I thought it was totally impermissible for you to

9    try and suggest that to the jury.  I'm going to give you the

10   benefit of the doubt that it was, once again, inadvertent, but

11   I'm going to correct the misimpression in front of the jury.

12         And I'm simply going to say that the defense never

13   asked to have Lawrence Repsher examine Ron Kuiper, and there's a

14   procedure under the federal rules for them to do so, and there

15   is no limit on the number of examinations that the rule

16   authorizes.  I'm not going to say one way or the other whether I

17   would have granted it because I'm not in that position.

18         And I want to know if you have any objection to me

19   correcting that misimpression you left with the jury.

20         MR. MEADOR:  The question -- and I don't have the

21   transcript right in front of me -- was that generally the

22   cases --

23         THE COURT:  You know, I'm not interested in an

24   explanation from you.

25         MR. MEADOR:  Oh, okay.

1    THE COURT:  I'm interested in whether you have any

2  objection in me correcting the misimpression that I believe you

3  left with the jury inadvertently.

4    MR. MEADOR:  Yeah, I'd just object for the record.

5    THE COURT:  Okay.  What's the basis for your

6  objection?

7    MR. MEADOR:  I think it puts undue emphasis on part of

8  the testimony.  It shows bias and prejudice on the part of the

9  Court.

10    THE COURT:  Well, then you shouldn't have tried to

11  sneak in something that was simply untrue.  But I'm going to do

12  it in a very neutral -- you want me to do it in a not-so-neutral

13  way?

14    MR. MEADOR:  No, Your Honor.  I thought I had an

15  opportunity to state my objection for the record.

16    THE COURT:  That's fine.  Thank you.

17    (The jury entered the courtroom.)

18    THE COURT:  Thank you.  Please be seated.

19    I did want to talk to you just for a moment about

20  something that came up during the last witness's testimony,

21  Lawrence Repsher.  And there was some discussion about whether

22  Mr. Rep -- Dr. Repsher did an examination of Mr. Kuiper.  And

23  here's how that works:

24    Givaudan had the right to ask me under the Federal

25  Rules of Evidence for any physician they have to do an

    1    examination of Mr. Kuiper.  And they never made the request to

    2    me.

    3            And to the extent that there was some discussion about

    4    there's -- some courts might limit it to one examination,

    5    there's nothing in the Federal Rules of Civil Procedure that

    6    limit the number of examinations that the parties can request.

    7    And I just wanted to clarify that.  Thank you.

    8            Are you ready to call your next witness?

    9            MR. PAGLIARO:  I am, Your Honor.  I would call

   10    Dr. Bainbridge to the stand, please.

   11            THE COURT:  Thank you.

   12            CRAIG BAINBRIDGE, DEFENDANT'S WITNESS, SWORN

   13            THE COURT:  Thank you.  Please be seated in the

   14    witness box.  And make yourself comfortable, and you can adjust

   15    the chair and the microphones so you can speak directly into

   16    them.  And would you tell us who you are and spell your last

   17    name for us, please.

   18            THE WITNESS:  My name is Craig Wayne Bainbridge,

   19    B-a-i-n-b-r-i-d-g-e.

   20            THE COURT:  Thank you.

   21            And, Mr. Pagliaro, you may proceed with your direct

   22    examination.

   23            MR. PAGLIARO:  Thank you, Your Honor.

   24                          DIRECT EXAMINATION

   25    BY MR PAGLIARO:

1 Q. Good morning, Dr. Bainbridge.

2 A. Good morning.

3 Q. How are you today?

4 A. Good.

5 Q. Good. We've only met today; isn't that true?

6 A. Yes.

7 Q. Tell us a little about yourself, Dr. Bainbridge. You a

8 native of Sioux City?

9 A. I grew up in Kingsley, Iowa. I went to college here in

10 Sioux City at Morningside College and then was in Iowa City at

11 the University of Iowa for approximately eight years. Then I

12 finished my training at the University of California in

13 San Francisco, and I came to Sioux City to practice medicine in

14 1979.

15 Q. So you're a University of Iowa medical school graduate?

16 A. Yes.

17 Q. And where did you do your residency, Dr. Bainbridge?

18 A. University of Iowa.

19 Q. And have you practiced here in the area locally during your

20 professional career, sir?

21 A. Yes.

22 Q. Did you have a fellowship from the University of Iowa,

23 Dr. Bainbridge?

24 A. I split my fellowship. I did one year at the University of

25 Iowa, and I did an additional year at the University of

1  California in San Francisco.

2  Q.   And what was your fellowship at the University of Iowa,

3  what specialty, sir?

4  A.   Pulmonary.

5  Q.   And have you specialized in lung conditions since that

6  time?

7  A.   Yes, I have.

8  Q.   I want to have the jury appreciate your professional

9  certifications, Dr. Bainbridge.  You're board certified, are you

10  not?

11  A.   Yes, I am.

12  Q.   Could you tell the jury what areas in which you have board

13  certification, Dr. Bainbridge.

14  A.   I'm board certified in internal medicine, pulmonary

15  disease, critical care, and also occupational medicine.

16  Q.   So you have not only the board certification in pulmonary

17  medicine but also on the occupational medicine side?

18  A.   That's correct.

19  Q.   And have you had these certifications for a good period of

20  time?  How long have you had these certifications?

21  A.   My first certification was in internal medicine in 1977.  I

22  was certified in pulmonary disease in 1980, occupational

23  medicine I believe it was 1982, and I was certified in critical

24  care medicine in 1987.

25  Q.   And in what states are you licensed to practice medicine,

```
1   Dr. Farrell --

2   A.   In Iowa --

3   Q.   Dr. Bainbridge, excuse me.

4   A.   Sure.  In Iowa, Nebraska, and South Dakota.

5   Q.   You've been practicing around here a long time.

6   A.   Thirty years, nearly thirty years.

7   Q.   Seen a lot of patients.

8   A.   Yes.

9   Q.   Tell the jury a little bit about what expertise a pulmonary

10  specialist brings to an examination of a patient with breathing

11  problems.

12  A.   Well, we deal with basically problems of breathing.  We do

13  other things as well, but I would say primarily we're the person

14  to look to when a person's having trouble breathing.

15  Q.   And would that include diagnosing people with breathing

16  illnesses?

17  A.   Yes.

18  Q.   Have you been involved in referrals of patients from other

19  local physicians who aren't specialists in pulmonary medicine?

20  A.   Yes.

21  Q.   Have you had referrals from Dr. Farrell?

22  A.   Yes.

23  Q.   Now, is -- Doctor, is Ron Kuiper a patient of yours?

24  A.   I am seeing Mr. Kuiper now.

25  Q.   And how did you come to see Mr. Kuiper originally?
```

```
 1              THE COURT:  Excuse me.  Mr. Meador, are you texting on
 2    your phone?
 3              MR. MEADOR:  It's my Blackberry, Your Honor.  Sorry.
 4              THE COURT:  Well, that's not allowed in the courtroom.
 5              MR. MEADOR:  Excuse me.  I'll put it away.
 6              THE COURT:  Okay.  Thank you.
 7              Excuse me for interrupting.
 8              MR. PAGLIARO:  No problem, Your Honor.  Thank you.
 9    I'm sorry.  I forgot the question.
10              THE WITNESS:  What is the question?
11              MR. PAGLIARO:  I forgot it myself.
12              THE COURT:  We could have Shelly read it back, see if
13    she's actually taking anything down.
14              MR. PAGLIARO:  She's working hard, Your Honor.
15              THE COURT:  It's a little late to find that out, but
16    let's find out.
17              MR. PAGLIARO:  Shelly, I'm sorry.
18              THE COURT:  Shelly?
19              MR. PAGLIARO:  I lost my train of thought.
20              (The requested portion of the record was read.)
21              MR. PAGLIARO:  Thank you, Shelly.
22    A.   I believe that I first saw Mr. Kuiper, if my memory serves
23    me correctly, in 2005, and he was referred I think by
24    Dr. Farrell for my opinion about his breathing condition and
25    what we should do about it.
```

1  Q.   And Dr. Farrell is a -- is a local doctor who has a general

2  practice; is that fair?

3  A.   Yes, Dr. Farrell was a family practitioner.  I believe he's

4  left the community by this time.

5  Q.   When you first saw Mr. Kuiper -- I believe you said it was

6  '85; is that right?

7  A.   No.

8  Q.   I'm sorry, '05?

9  A.   I tried to say it was 2005 if my recollection serves me

10  correctly.  We could look at the record.  But I think it was

11  2005.

12  Q.   March 2005 sound right?

13  A.   2005.

14  Q.   And when you saw Mr. Kuiper in 2005, you saw him as a

15  referral from Dr. Farrell.

16  A.   If I remember correctly, that's correct.

17  Q.   By the time you saw Mr. Kuiper, had he already retired from

18  his employment at American Pop Corn?  Do you know?

19  A.   My recollection is he was no longer employed there at that

20  time.

21       MR. PAGLIARO:  Cort, could you put up 1441, 001?

22  Q.   Might want to take a look at that, Dr. Bainbridge.  Do you

23  recall now that it was about March '05 when you first saw

24  Mr. Kuiper?

25  A.   Yeah, the date -- excuse me.  The date on my records

1 suggest I saw him March 3, 2005.

2 Q. Is that about the first time you saw him as a consult?

3 A. I think it was.

4 Q. Now, he had -- did you know whether or not he had seen

5 anybody in your pra -- you practice with other doctors, don't

6 you?

7 A. Yes, I do.

8 Q. You practice with other pulmonologists.

9 A. Yes.

10 Q. And one of those is Dr. Bacon; is that correct?

11 A. That is correct.

12 Q. Do you know whether he had seen Dr. Bacon, Dr. Bainbridge?

13 A. If I recall correctly, the record suggests that Dr. Bacon

14 saw him -- I think it was 1998.

15 Q. Did you go back and look at any of the earlier records from

16 your practice when Mr. Kuiper came to visit you?

17 A. I think I did, although 1998 would be 7 years previous, and

18 that's kind of on the cusp of keeping the record. But if the

19 record was available to me in his office chart, I certainly

20 would have.

21 Q. And you would keep those office charts by patient; is that

22 correct?

23 A. That's correct.

24 Q. In here you say you took a -- I guess a medical history of

25 Mr. Kuiper; is that correct?

1  A.    That is correct.

2  Q.    And what did Mr. Kuiper report to you about how long he had

3  been short of breath?

4  A.    Well, I remember from a previous deposition that this is a

5  typo -- a typographical error.

6  Q.    There's a typo in that report.

7  A.    In that report it says, quote, he says he's been short of

8  breath since about 1996 (sic), unquote.  And if I remember

9  correctly, dissecting that, that that was a typographical error,

10 and I think the number should be 1996.

11 Q.    Right.  In fact, your report said '66, but it should be

12 '96;  isn't that correct?

13 A.    Correct.

14 Q.    That was just a typo.

15 A.    I think it's a typo.

16 Q.    Yeah.  You dictate these, I assume?

17 A.    Yes, I do.  I'm supposed to read them over again, but I

18 missed -- I obviously missed that.

19 Q.    That happens.  But you made the point also that he told you

20 he had been short of breath for many years.

21 A.    My -- the direct quote doesn't say many years.  It says

22 he's been short of breath for years.

23 Q.    And you indicate that he had been in the hospital in 1996;

24 is that right, sir?

25 A.    That's correct.

1  Q.   And he was short of breath at that time.

2  A.   Yes.

3  Q.   He indicates also he was coughing; is that correct?  Do you

4  see that?

5  A.   Yeah, the quote says he coughs up a half a cup of whitish

6  material.  That's assumed on a daily basis.

7  Q.   And he also indicated to you that he had been working at

8  the American Pop Corn Company from 1986 to 2004; is that

9  correct, Dr. Bainbridge?

10  A.   That's the information he gave me at that time.

11  Q.   Now, in there you also note the fact that he told you what

12  he was doing there; isn't that correct?

13  A.   Yes.  My record says that he worked in the mixing room

14  which contained, of course, diacetyl chemical that had been

15  implicated in the microwave popcorn lung.

16  Q.   And you knew that, didn't you, Dr. Bainbridge, that it had

17  been implicated in pop -- microwave popcorn lung, diacetyl?

18  A.   I said so, yes.

19  Q.   You had done some consulting work for American Pop Corn

20  back in the early part 2001, 2002?

21  A.   Yes.  I believe that was the time frame.

22  Q.   And you knew the conditions in that plant, didn't you?

23  A.   I knew that -- I had never been to the plant.  I did not

24  visit the plant.  I didn't do a site visit, but I knew that they

25  had a mixing room and they mixed material for microwave popcorn.

1 Q.   And you weren't confused, were you, about the fact that

2 there were issues relating to diacetyl being implicated in

3 microwave popcorn?  That was the language you used; isn't that

4 correct?

5 A.   From the context of my statement, obviously I knew about

6 the chemical.

7 Q.   Mr. Kuiper also gave you a medical history, didn't he?

8 A.   Yes.

9 Q.   And he told you -- I guess you asked him about his parents

10 as well; right?

11 A.   I do believe I have a family history recorded here

12 someplace.  Yes, I do.

13 Q.   Down below, do you see that?

14 A.   It says mother died at age 71 of cancer.  Father died at

15 age 74 of cancer.  Cancer runs in the family is what I

16 ascertained.

17 Q.   You also asked Mr. Kuiper repeatedly throughout all your

18 records whether he was a smoker; isn't that correct?

19 A.   Yes.

20 Q.   Why is that, Doctor?

21 A.   Well, because one of the big etiologic factors in shortness

22 of breath is cigarette smoking, so I like to know whether a

23 person has been a smoker or not.

24 Q.   What about whether his parents smoked?  Did you ask him

25 that?

```
 1   A.    I don't believe I did.  I don't usually go down to that

 2   detail.  Maybe I do in some special instances, but I did not in

 3   this case.

 4   Q.    You indicated that Mr. Kuiper was wheezing.  Do I have that

 5   right from your records?

 6   A.    Yes.

 7   Q.    What does that indicate to you as a pulmonary specialist,

 8   Dr. Bainbridge?

 9   A.    That suggests to me that he is having trouble exhaling his

10   air and that when he does so that there's a noise associate --

11   that's not normal, and it's important as one weaves together the

12   story if one is to come up with a diagnosis.

13   Q.    And as part of the diagnosis, Doctor -- you talked about

14   taking a history -- what else would you do in doing the

15   diagnosis?  What other tests, symptoms would you look for just

16   to give the jury some sense of a pulmonary point of view?

17   A.    We talked about taking a history from him.

18   Q.    Yes, sir.

19   A.    His current complaint, his past history, his family

20   history, his social history.  We also talked a bit about his

21   occupational history.  Then I would do a physical examination

22   where I would look him over, and then almost always I have

23   either -- I get a chest X-ray or I have access to a recent chest

24   X-ray, and almost always when people are short of breath I do

25   pulmonary function studies.
```

1  Q.   Did you do pulmonary function tests?  Do you know?

2  A.   Yes, I did.

3  Q.   Now, you wrote on the bottom there, Doctor, the first sort

4  of capped part, impression.

5        MR. PAGLIARO:  Would you pull that up for me, Cort,

6  please?

7  Q.   Do you see that, sir?

8  A.   Yes.

9  Q.   That seems to be pretty typical in your records.  Is

10 that -- is that the way you --

11 A.   Yes, that's my pattern.  After I go through the

12 aforementioned routine of looking at all these things, then I

13 have an impression which means this is what I think is going on.

14 Q.   Now, you say here obstructive airways disease, very severe.

15 A.   Correct.

16 Q.   You also say differential would have to include microwave

17 popcorn lung; is that true?

18 A.   Yes.

19 Q.   So that's something you considered; is that true?

20 A.   Yes.

21 Q.   And you indicate you're going to do a high-resolution CT

22 scan.

23 A.   Yes.

24 Q.   Why were you doing that, Dr. Bainbridge?

25 A.   Well, because characteristically of microwave popcorn lung,

1  we often have a particular pattern on the high-resolution CT of

2  the lung which is called a mosaic pattern, and it speaks to the

3  fact that often in microwave popcorn lung we have a condition

4  called bronchiolitis obliterans which is an inflammation which

5  I'm sure the Court's already heard about which causes some

6  obstruction in the small airways or the bronchioles that are

7  usually about two to three millimeters in diameter and often

8  have no -- by definition have no cartilage.

9         And when one does a high-resolution CT scan in those

10 folks that have bronchiolitis obliterans, oftentimes there is

11 what we call a mosaic pattern which is formed from some

12 obstruction in those little small airways.  So the small lobules

13 in the lung, some are hyperexpanded, ballooned up, and others

14 are not, and we get this what we call a mosaic pattern.  And

15 it's fairly characteristic.  I wouldn't say it's pathognomonic.

16 I wouldn't say you can't have bronchiolitis obliterans without

17 that pattern.  But it's a pretty good -- in my mind it's a

18 pretty good way to help try to differentiate the etiology of

19 this obstructive airways disease.

20 Q.   Thank you, Doctor.  You weren't confused at all about the

21 diagnosis of bronchiolitis obliterans when you saw

22 Mr. Bainbridge (sic).  You knew that that disease process

23 existed, didn't you?

24 A.   Yes, I've known about bronchiolitis obliterans for a number

25 of years.

1   Q.   And you've actually -- have you seen patients with that

2   condition?

3   A.   Yes.

4   Q.   You also mentioned something you called a probable RML

5   syndrome.  What does that mean, Dr. Bainbridge?

6   A.   RML syndrome means right middle lobe syndrome.  And what

7   happens peculiarly to the right middle lobe because of its

8   anatomy in the lung, the right middle lobe of the lung, the

9   right middle lobe bronchus can get kinked or blocked very

10  easily, and then there's some volume loss in the right middle

11  lobe.  It doesn't stay inflated like it should.  It becomes less

12  inflated, and I was concerned that he may have a right middle

13  lobe syndrome.

14  Q.   Understood.  Thank you.  You mentioned differential.  The

15  jury's heard many times in the trial about a differential

16  diagnosis.  Is that what you were referring to?

17  A.   Yeah.  To me when I say differential, I'm thinking of what

18  kind of things could this be, what fits with the information

19  that I know?  And it's kind of like making a list of

20  possibilities and then you try to eliminate ones that you can

21  write off and you try to zero in a little more on what this

22  could be.

23  Q.   One thing you asked Mr. Kuiper further up -- and I forgot

24  to ask you about this earlier -- was whether or not he had had

25  asthma; is that correct?

1   A.   I believe I did that.  I don't see it right now.  But I --

2   that would be my habit.

3   Q.   Let me direct you.  It's he's never had any asthma or

4   bronchitis that he knows of.

5        MR. PAGLIARO:  Do you see that, Cort?  It's up towards

6   the top.  No, it's the second paragraph.

7   Q.   Do you see it now, Doctor?  It's on the right-hand side,

8   the third line, starts "He's never," right-hand side, third line

9   from the bottom.

10  A.   From the bottom?

11  Q.   Yes, sir.  I'm sorry.

12  A.   Yeah.  I say, quote, he's never had any asthma or

13  bronchitis that he knows of, unquote.

14  Q.   Now, you mentioned that he had seen Dr. Bacon, one of your

15  colleagues and somebody you practice with; is that correct?

16  A.   Someone I did practice with.  We're no longer together as

17  of the 1st of December, 2007.

18  Q.   Okay.  But at that time you were partners with him.

19  A.   Yes.

20  Q.   Did you see any reflection in his medical records from

21  Dr. Bacon about an asthma condition?

22  A.   Well, at this time I don't remember whether I saw his

23  record or not, but I have seen his record if not at that time

24  subsequently and Dr. Bacon's diagnosis, what he thought he had,

25  asthma.

1  Q.   And you've talked about people who even without a history

2  of asthma have -- get late onset or adult asthma.  Isn't that --

3  doesn't that happen sometimes?

4  A.   The beginning of asthma can be at any age.

5  Q.   So you don't necessarily have to get it when you're a

6  child.

7  A.   No.

8  Q.   Now, you saw --

9        MR. PAGLIARO:  Could you put up 1442, 001, please,

10  Cort?

11  Q.   First record was March the 3rd.  You saw Mr. Kuiper

12  relatively soon after, didn't you?  You saw him on March the

13  22nd of '05; is that correct, sir?

14  A.   That would appear to be my next entry in the record.

15  Q.   And you're basically following up on what you had written

16  the last time; isn't that true?

17  A.   Yes.

18  Q.   And as of that time, you had done a CT scan on Mr. Kuiper?

19  A.   Yes.

20  Q.   What did the CT scan disclose to you, Dr. Bainbridge, and

21  to the radiologist?  Who was the radiologist that read it?  Why

22  don't we tell the jury that.

23  A.   I don't recall.  Oh, wait.  I'm sorry.  Is it in my note?

24  I say I'll discuss the situation with Dr. Saulsbury who read his

25  film to see if there could be a possibility of microwave popcorn

1  lung.

2  Q.   And how does that work?  The CT scan is done, and then --

3  A.   Yeah.  What happens in practice is I order the CT scan.  I

4  may have written "rule out microwave popcorn lung."  But in any

5  event, I'm inferring that Dr. Saulsbury didn't address that

6  directly to me, so I wanted to go over things with him again to

7  be careful and to specifically ask him the question really did

8  he see this mosaic pattern.

9  Q.   You say there was nothing reported on a CT scan to suggest

10  bronchiolitis; is that correct?

11  A.   That's correct.

12  Q.   And did you subsequently discuss that with Dr. Saulsbury as

13  part of your treatment?

14  A.   I do recall discussing that with him, and he said he saw

15  nothing to suggest bronchiolitis.

16  Q.   Your impression at that time was what in terms of what you

17  were seeing and what you thought the diagnosis was?

18  A.   Well, my impression was that he had acute bronchitis

19  superimposed on chronic obstructive lung disease, and I was

20  still a bit concerned about the process going on in his right

21  middle lobe.

22  Q.   Now, when you say acute bronchitis, that's not a permanent

23  condition, is it, Dr. Bainbridge?

24  A.   Not usually.  If it's a permanent condition, we usually

25  call it chronic bronchitis.

1    Q.    So he had some condition.  Is it caused by infection or --

2    A.    It certainly could be.  I think the point is that when I

3    saw him on the 3rd of March he indicated that he'd been coughing

4    up about, as I recall, a third a cup of whitish material.  But

5    since I saw him on the 3rd, it says that he's been coughing up

6    some more yellow material.

7    Q.    What does that tell you as a pulmonologist?

8    A.    Well, it changed in quality, and oftentimes this can mean

9    that you have a new infection.

10   Q.    So you suspected there might be an infection; is that

11   correct?

12   A.    I did.

13   Q.    And you actually gave him Amoxicillin which is an

14   antibiotic, isn't it, Dr. Bainbridge?

15   A.    That is correct.

16   Q.    The next time you saw Mr. Kuiper was about a month later, a

17   little less than a month later, on April the 12th.  Do you see

18   that, the next note entry?

19   A.    I do.

20   Q.    That's your note?

21   A.    Yes.

22   Q.    And what did you say about Mr. Kuiper in your first line of

23   your note?

24   A.    I said Mr. Kuiper is a gentleman who has significant severe

25   obstructive airways disease.

1  Q.   Again, you make what point?

2  A.   And then I say interestingly, it says she's -- I beg his

3  pardon, but it should say he's never smoked.

4  Q.   So again, that's something that you looked at because that

5  would be a common thing, wouldn't it, to be related to smoking?

6  A.   Certainly.

7  Q.   You do mention again that he worked at Jolly Time Popcorn;

8  is that correct?

9  A.   Yes, I did.

10 Q.   And what did you say exactly about his work at Jolly Time

11 Popcorn?

12 A.   I said that he worked in the mixing room and around dusty

13 corn for a number of years.

14 Q.   Now, how did you know about the dusty corn part?

15 A.   I suspect I asked him.

16 Q.   So these would be things you wouldn't know of your own --

17 they would be things told to you by the patient; is that right?

18 A.   I would get the information from the patient.

19 Q.   What did you discuss in your note about talking to

20 Dr. Saulsbury, Dr. Bainbridge?

21 A.   I said, quote, I did discuss the situation with

22 Dr. Saulsbury, and he's going to re-read his film.  We did not

23 see anything suggestive of bronchiolitis that one might get from

24 microwave popcorn exposure; however, nevertheless, he does have

25 significant obstructive airways disease.

1 Q.   And you also note the bronchitis?

2 A.   Yes.  I said that his acute bronchitis has improved

3 considerably.

4 Q.   Let's skip ahead to the September 12.  That's 3626.  You

5 saw Mr. Kuiper again in September of '05; isn't that right?

6 A.   Yes.

7 Q.   Now, here's where you make a note about Dr. Bacon.  Do you

8 see that?

9 A.   Yes.

10 Q.   What do you say about Dr. Bacon?

11 A.   I said, "Looking back, Dr. Bacon had seen him in 1996."

12 Q.   And what did you say about what he had at that time?

13 A.   I said at that time he had fairly obstructive airways

14 disease.  Mr. Kuiper is concerned that he -- concerned as he was

15 in the mixing room mixing seasoning from 1991 to 2002.

16 Q.   Did you do a CT scan?  Did you mention the CT scan again?

17 A.   I believe that had already been done, but I recapped that I

18 did do a CT scan, and he did not have any mosaic pattern or

19 anything suggestive of any bronchiolitis.

20 Q.   Were there any other symptoms you looked for to suggest the

21 bronchiolitis besides the CT scan material?

22 A.   Well, the CT scan is not a symptom.

23 Q.   I misspoke.  You're right.

24 A.   That would be a sign.

25 Q.   That's a sign.

1   A.   But I think bronchiolitis obliterans causes obstructive

2   airways disease, and you look at all those things, cough,

3   shortness of breathe, decreased exercise capacity, et cetera.

4   Q.   But that's true of a lot of lung diseases, isn't it?

5   A.   Yes.

6          MR. PAGLIARO:  Let's look at 3642, Cort.

7   Q.   You were giving Mr. Kuiper inhalers; isn't that true?

8   A.   I've tried inhalers on him since I've actually taken over

9   the pulmonary portion of his case.

10  Q.   Now, at some point did Mr. Kuiper disclose to you that he

11  was involved in litigation?

12  A.   I think that came up at some point.

13  Q.   Did you see any diagnosis by Dr. Parmet?

14  A.   I don't remember a doctor's name, but I believe at some

15  point I saw a note from some physician thinking he had

16  bronchiolitis obliterans.

17         MR. PAGLIARO:  Would you put up, Cort, 3682?

18  Q.   You continued to see Mr. Kuiper through '05, '06, '07; is

19  that true?

20  A.   Yes.  Actually I saw him within the last two weeks.

21  Q.   And you saw him January 4, 2007?  Do you recall that?

22  A.   Could you sharpen that up a bit?  It's really quite blurry

23  until you -- now maybe my eyes are going.  I have a notation

24  here that I saw him January 4, 2007, yes.

25  Q.   Again, you mentioned the smoking; isn't that right?

1  A.   Yes.  I'm kind of fixed on that because sometimes folks say

2  they don't smoke and they do, and so I usually ask multiple

3  times.  And Mr. Kuiper's been very consistent he's never smoked.

4  Q.   You also mention here in your impression -- what is your

5  impression?

6  A.   I state my impression is obstructive airways disease, very

7  severe but I think stable.  And then I write number 2, history

8  of exposure to microwave seasoning as a worker in a popcorn

9  company, and I put down no history of smoking ever.

10 Q.   Okay.  Did you diagnose him at that time with bronchiolitis

11 obliterans?

12 A.   No.

13 Q.   Did you diagnose him with bronchiolitis obliterans

14 syndrome?

15 A.   No.

16 Q.   Then you saw Mr. Kuiper --

17         MR. PAGLIARO: Could you put up 3726?

18 Q.   This is a record from October the 14th, 2008, so how many

19 months ago?  Four or five months ago?

20 A.   Uh-huh.

21 Q.   You saw him?  Again, you saw him then.  Did you have an

22 impression at that time?

23 A.   I write, "My impression's obstructive airways disease.  The

24 possibility of microwave popcorn does exist but certainly not

25 proven in my mind."

1   Q.   And you say at the top there has been a question about
2   whether he has had microwave popcorn lung.  Do you see that?
3   A.   Yes.
4   Q.   Was it part of your diagnosis that he had microwave popcorn
5   lung?
6   A.   No.
7   Q.   Let's look at the most recent record that I have anyway.
8   This is 2184.  Mr. Kuiper came to see you -- I believe this was
9   in January of '09; is that right?
10  A.   Looks as if the notation is January 16, 2009.
11  Q.   And you saw Mr. Kuiper at that time?
12  A.   Yes.
13  Q.   And Mr. Kuiper had had some antibiotic treatment and
14  steroids?
15  A.   Yes.  His family practitioner had treated him with, as I
16  recall, both steroids and antibiotics because he developed some
17  hemoptysis, or he coughed up some blood.
18  Q.   And was that caused by infection?
19  A.   I didn't know at that time what it was caused by.  The most
20  likely cause would be infection, but at that time I really
21  didn't know what that was due to.
22  Q.   Did you treat him for that, Dr. Bainbridge?
23  A.   Actually I proceeded with a diagnostic procedure called a
24  fiberoptic bronchoscopy in order to look at his airways to make
25  sure there was not any neoplasm or something causing the

1    bleeding and also to take cultures to make sure that he didn't

2    have fungus or atypical TB or bacteria.

3    Q.   And what did that disclose, Dr. Bainbridge?

4    A.   That disclosed no tumor and no infection with bacteria, at

5    least no growth to substantiate bronchitis of either bacterial,

6    fungal, or tuberculosis character.

7    Q.   As of that time, you indicate again there's a possibility

8    of having microwave popcorn lung.  Do you see that?

9    A.   Well, this is one of the themes here in this, quote, great

10   mystery, and I usually speak pretty candidly to my notes about

11   what I'm thinking about.  I'm able to restructure things a

12   little bit better.  But yeah, that was an issue.  Again, I think

13   I stated about the smoking, and I also stated about the exposure

14   to the diacetyl.

15   Q.   And have you concluded that Mr. Kuiper has bronchiolitis

16   obliterans, Dr. Bainbridge?

17   A.   I cannot say he has bronchiolitis obliterans.

18   Q.   And have you concluded that he has bronchiolitis obliterans

19   syndrome, Dr. Bainbridge?

20   A.   I cannot say that he has bronchiolitis obliterans syndrome.

21           MR. PAGLIARO:  That's all the questions I have, Your

22   Honor.  Thank you.

23           THE COURT:  Thank you.

24           Why doesn't everybody take a stretch break, and then

25   we'll have the cross-examination.

1            Thank you.  Please be seated.

2            Mr. McClain, you may cross-examine Dr. Bainbridge.

3            MR. MCCLAIN:  Thank you, Your Honor.

4            I need that 2009 article that we used with Dr. Repsher

5  if you can find it, the hard copy.

6                    CROSS-EXAMINATION

7  BY MR. MCCLAIN:

8  Q.    Good morning, Dr. Bainbridge.

9  A.    Good morning.

10  Q.    You and I met for the first time out in the hall.  My

11  name's Ken McClain.

12  A.    That's correct.

13  Q.    Now, Dr. Bainbridge, before Dr. Farrell testified in this

14  case -- you know Dr. Farrell.

15  A.    I do know Dr. Farrell.

16  Q.    He's a friend of yours.

17  A.    He's an acquaintance.  We don't do anything socially that

18  I --

19  Q.    Friendly?

20  A.    But I would say hello to him by name when I saw him in the

21  doctors' lounge.  We might talk about the weather or how the

22  Nebraska team did.

23  Q.    How his son was doing in golf?

24  A.    That might be the case.

25  Q.    Doctor, Dr. Farrell testified here, and before he

1  testified, we called him -- we gave him all the articles on

2  bronchiolitis obliterans and microwave popcorn lung and asked

3  him to review those.  Did the defendants ask you to do something

4  like that?  Did they give you all the articles --

5  A.    No.

6  Q.    -- so you could be prepared here to testify?

7  A.    I don't recall the defense giving me any articles.

8  Q.    And that's -- and that's not a criticism of you by any

9  means, but you're in the practice of a general pulmonary

10  medicine specialty; am I right?

11  A.    Correct.

12  Q.    You have not published any articles on bronchiolitis

13  obliterans and microwave popcorn workers' lung?

14  A.    I have not.

15  Q.    And you haven't been involved in any of the NIOSH studies.

16  A.    I have not.

17  Q.    But, Doctor, you've read a little bit about it, and you've

18  read a few of the articles I glean from the medical records and

19  from your testimony.

20  A.    I have a nodding acquaintance with that condition.

21  Q.    Nodding condition -- nodding acquaintance.  That's a good

22  expression.  And what you've seen in that article is lots of

23  very fine pulmonary doctors failed to diagnose the Jasper

24  popcorn workers with bronchiolitis obliterans; am I right?

25  A.    That was discovered at some point in time.  I don't recall

1  seeing the folks did not diagnose those.  I really don't know

2  that.  I can't agree with you.

3  Q.  Did you know that doctors at National Jewish -- the jury's

4  heard about this already, so I'm just asking you if you know

5  it -- National Jewish and at the Mayo Clinic failed to diagnose

6  the original eight patients with bronchiolitis obliterans?

7  A.  I did not know that.

8  Q.  They diagnosed them with a variety of conditions like

9  obstructive lung disease or asthma or emphysema, all kinds of

10 things.  Were you aware of that?

11 A.  I was not aware of that.

12 Q.  Let's talk about a few of the things.  The fact that he's

13 been a never smoker is significant to you; am I right?

14 A.  Yes.

15 Q.  The fact that he never had asthma or allergies was

16 significant to you; am I right?

17 A.  Yes.

18 Q.  You performed a PFT on him, and it revealed a very severe

19 obstructive defect; am I right?

20 A.  That's correct.

21 Q.  In fact, he's lost over 70 percent of his lung function.

22 A.  I think it was in that ballpark.  Certainly he lost

23 considerable lung function.

24 Q.  And through your examination and consultation with American

25 Pop Corn, you determined that he had an exposure to diacetyl in

1  his working lifetime.

2  A.   I don't think I ever discovered that he had exposure.  That

3  was historical from the patient.

4  Q.   All right.  And, of course, you were aware as the

5  defendants have pointed out that he had visited a specialist who

6  specializes in popcorn lung; am I right?

7  A.   I knew that he'd been visiting with his legal team and had

8  been sent for evaluations and so forth.  I was not privy to what

9  those evaluations came up with.

10  Q.   Well, you might not remember, but you were provided

11  Dr. Parmet's report, the doctor that discovered these eight

12  original cases, and you hadn't had a chance to review it at the

13  time of your deposition.

14  A.   I think I remember that name.  I can't tell you -- I can't

15  remember the exact form, but I vaguely remember the --

16  Dr. Parmet's name.

17  Q.   And I don't know whether you ever reviewed it, but you

18  didn't review it in preparation for your testimony here today;

19  am I right?

20  A.   No, I did not.

21  Q.   Okay.  And over and over in your report, you report that

22  continuing on up until, you know, last month microwave popcorn

23  workers' lung was still in your differential diagnosis; am I

24  right?

25  A.   I think I have to be concerned about that etiologic factor

1  in Mr. Kuiper's disease.

2  Q.    Sure.  But let's talk about the things you've ruled out.

3  He doesn't have asthma in your opinion.

4  A.    My opinion, he doesn't have asthma.

5  Q.    You don't think he's got farmers' lung either?

6  A.    I really don't.  I wasn't directed towards farmers' lung,

7  but I don't think he has farmers' lung.

8  Q.    And although you've been practicing for over 30 years here

9  in the midwest and have seen a lot of people exposed to corn

10 dust, this doesn't look like corn dust exposure to you either.

11 A.    That is not particularly high on my differential list.  Can

12 I say absolutely without question he doesn't have?  No, I can't

13 say that.

14 Q.    All right.  And likewise, in regard to exposures on a farm,

15 that's not something that you think caused this disease.

16 A.    Oh, I don't think so, although there are certain things

17 that -- on the farm such as silo emptiers' disease, one can be

18 exposed to nitric oxides which can cause bronchiolitis

19 obliterans.

20 Q.    Is there any history of that in his background?

21 A.    Not that he gave me.

22 Q.    Okay.  And we haven't seen any in the medical records that

23 have been produced here in court.  You don't know of any history

24 like that for him.

25 A.    I haven't seen any medical records produced here in court.

1  Q.   Oh, I know.  But I'm just telling you there haven't been

2  any.

3  A.   Oh, okay.

4  Q.   Okay?

5  A.   I wasn't questioning you.  I'm sorry.

6  Q.   All right.  Well, I just want to make it clear there aren't

7  any, flat out aren't, and you don't know of any.

8  A.   I know of none.

9  Q.   Okay.  Now -- and so if there aren't any, you know of no

10 reason to suspect farmers' lung or farmers' -- or what did you

11 call it?  Silo fillers' lung?

12 A.   (Witness nodded head.)

13 Q.   You wouldn't know of any reason to suspect it.

14 A.   There's silo fillers' lung, and there's silo emptiers'

15 lung, two different things.

16 Q.   Okay.  Either one, there's no record of it in the medical

17 record.

18 A.   No, not in mine.

19 Q.   Okay.  Now, there's a fellow that Mr. Kuiper trained out

20 there at American Pop Corn by the name of Kevin Remmes.  You saw

21 Mr. Remmes?

22 A.   Yes.

23 Q.   And diagnosed him with bronchiolitis obliterans?

24 A.   I did.

25 Q.   And the only difference between Mr. Remmes and Mr. Kuiper

1  in your mind was this mosaic pattern; am I right?

2  A.    I don't know that I'd say the only difference.

3  Q.    Major.

4  A.    But that was a significant difference.

5  Q.    Now, Doctor, because you weren't supplied with the most

6  recent literature -- do you know who Dr. Kay Kreiss is?

7  A.    That name does not mean anything to me.

8  Q.    Well, she is the -- she is the lead investigator on the

9  original paper that NIOSH put out about bronchiolitis obliterans

10  and exposure in microwave popcorn plants.  And she put out a

11  chapter in a book to help doctors like you and others to know

12  her current thinking and the team at NIOSH about how to go about

13  diagnosing this bronchiolitis obliterans syndrome in microwave

14  popcorn workers.  And I take it you weren't supplied that before

15  you came here to testify today; am I right?

16  A.    I've not read that.

17  Q.    Would that have been helpful to you?

18  A.    Today?  I don't know that it would have been helpful to me

19  today.  It would be interesting.  I'd be interested in it.

20  Q.    All right.  Well, we'll be happy to -- just for the record,

21  we'll be happy to send all this to you because you're

22  interested.  But they didn't supply it to you; am I right?

23  A.    No.

24  Q.    Now, we showed this to the last witness who was here who

25  was their expert, Dr. Repsher, who talked about this mosaic

1  pattern as being necessary.  But you -- even before you came on,

2  you said, well, it's frequently there but not always necessary.

3  A.   In my opinion it doesn't have to be necessary.  I don't

4  think that it's a necessary condition.  But it certainly is a

5  good guideline if it's there.

6  Q.   If it's there.  If it's there, it's positive.  If it's not

7  there, it doesn't mean that it doesn't exist.

8  A.   Makes it less likely, but it doesn't mean that it's -- in

9  my mind it doesn't mean that it can't be there.

10       MR. MCCLAIN:  Would you bring up that page from the

11  report that we showed Dr. Repsher and see if Dr. Bainbridge

12  agrees with it about the HRCT scans?  If someone can hand me the

13  exhibit, I'll put it on the . . .

14  Q.   Yes.  Doctor, this -- here, just to confirm that you've not

15  seen this before, it's Lung Disease in Flavoring and Food

16  Production, Learning From Butter Flavor.  It's a chapter from a

17  book.  You haven't had a chance to see this?  It's just new out

18  this year.

19  A.   To my knowledge I haven't read that.

20  Q.   Okay.  Reading from the report -- it's on your screen --

21  HRC of the chest with inspiratory and expiratory images may show

22  air trapping in the expiratory images.  So like you, Dr. Kreiss

23  says it may be there but it's not necessary.  You agree with

24  that.

25  A.   I would agree with that.

1   Q.   Now -- but in terms of his symptoms that are consistent

2   with bronchiolitis obliterans or popcorn workers' lung, how ever

3   you define it, is obstructive -- he's got obstructive airways

4   disease?

5   A.   He certainly does.

6   Q.   He's got elements of inflammation?

7   A.   Yes, he has some inflammation.

8   Q.   And exposure to microwave -- to diacetyl; am I right?

9   A.   By his report, uh-huh.

10  Q.   Now, one of the things that I noted, Doctor, in your report

11  was that he had atelectasis; am I right?

12  A.   He had some abnormalities on his chest X-ray.  This was

13  part of that right middle lobe syndrome thing I was talking

14  about.  That is in part atelectasis which means a partial

15  collapse of the lobe.

16  Q.   Right.  And emphysematous changes.

17  A.   I believe the radiologist did talk about emphysematous

18  changes.

19  Q.   Now, did anyone ever show you the study that was done by

20  BASF Corporation on laboratory rats?  Has anyone ever showed

21  that to you, Doctor?

22  A.   I don't know if anyone showed it to me --

23       MR. PAGLIARO:  Objection.  Beyond the scope of the

24  direct, Your Honor.

25  A.   -- but I don't remember it.

1    THE COURT:  Sustained.  Move on.

2  BY MR. MCCLAIN:

3  Q.   Doctor, are you aware as to whether or not in animals

4  exposed to diacetyl they have been reported to have atelectasis

5  and emphysematous changes?

6    MR. PAGLIARO:  Objection.  Beyond the scope of the

7  direct.

8    THE COURT:  Overruled.

9  A.   I have, as I said, a nodding acquaintance with this

10  disease.  I've diagnosed one in my life.  And if I remember

11  correctly, I have read something about those pathologic changes

12  in mice.

13  Q.   Yes.

14  A.   But I could not discuss it with you in any detail.

15  Q.   Right.  But I -- well, that's -- thank you for talking

16  about your familiarity, and I understand it's one of the things

17  that you're dealing with, not your focus.  But at least you have

18  a nodding acquaintance that those changes were seen in mice,

19  atelectasis and emphysema, emphysematous changes.

20  A.   I can't say a hundred percent.  I think I remember the

21  atelectasis part.  I don't remember the emphysema part.

22  Q.   Okay.  Now, before this latest illness when you were

23  deposed in 2007, you thought that Mr. Kuiper might be a

24  candidate for a double lung transplant; am I right?

25  A.   That certainly is a consideration for treatment in somebody

1    as severely ill as Mr. Kuiper.

2    Q.   He currently can't fight off colds or pneumonia, or he

3    would have a difficult time with that.

4    A.   He has difficulty with those things.

5    Q.   And the daily activities that we take for granted he can't

6    do.

7    A.   His activities are very limited.  He usually comes -- the

8    last few times he's come to visit me in a wheelchair meaning

9    that he really can't walk from the waiting room to the exam

10    room.

11    Q.   And, Doctor, you would never allow him in his current

12    condition to be exposed to any more diacetyl; am I right?

13    A.   Certainly not.

14    Q.   And, in fact, Doctor, you wouldn't recommend for any mixer

15    of butter flavors to be exposed to diacetyl without a full

16    respiratory hood to protect them from any exposure.

17    A.   Oh, I think the current state of understanding is that we

18    do scuba, self-contained breathing apparatus, with complete air

19    exchange such that the person doesn't breathe in any acetyl.  I

20    think that's most -- I think that's industry standard now.

21    Q.   And that would be your recommendation from a medical point

22    of view:  Don't be exposed to any of it.

23    A.   You know, I'm not an expert on it, but I certainly would

24    not argue with the recommendation.  If you're going to be around

25    diacetyl in the manufacturing setting, manufacturing of popcorn,

1 I'd recommend that you have a self-contained breathing apparatus

2 with outside air.

3          MR. MCCLAIN:  Thank you, Dr. Bainbridge.

4          THE COURT:  Mr. Pagliaro?

5          MR. PAGLIARO:  May I ask a couple more questions?

6          THE COURT:  Absolutely.

7          MR. PAGLIARO:  Thank you.

8                    REDIRECT EXAMINATION

9 BY MR. PAGLIARO:

10 Q.   Dr. Bainbridge, I know you have rounds this afternoon,

11 don't you?  We'll get you out.

12 A.   I'm okay.

13 Q.   Just a couple more questions.  Appreciate it.  You

14 testified that you did diagnose someone with bronchiolitis

15 obliterans; isn't that true?

16 A.   Yes.

17 Q.   And who was that person?

18 A.   That was the gentleman aforementioned.  I think his name

19 was either Remmes -- Kevin Remmes I believe.

20 Q.   And Kevin Remmes was somebody who worked with Mr. Kuiper;

21 isn't that right?

22 A.   Yes, they had acquaintance.

23 Q.   And when did you diagnose Mr. Remmes?

24 A.   I don't remember, but I went through the same routine with

25 the CAT scan, and he had a very classic, as I recall, mosaic

1  pattern.

2  Q.   Different than Mr. Kuiper's?

3  A.   Yes.

4  Q.   And did you diagnose him before you saw Mr. Kuiper in March

5  '05?

6  A.   I'm sure I did.  I'm sure I did.  I think that he was

7  before, although it's hard to put all these folks in order.

8  Q.   Do you keep up with the medical literature, pulmonary

9  literature?

10  A.   I try to.  Obviously I'm a busy practitioner, and I

11  certainly don't want to hang myself out as one of the leading

12  experts in microwave popcorn lung, but obviously I knew about

13  it, and that's how Mr. Remmes got diagnosed.

14  Q.   And you knew enough about it, isn't it true, that didn't

15  the company contact you about it, APC?

16  A.   The company contacted me, and they were concerned about

17  what they should do about this issue.  They were concerned about

18  following their workers, people that had been in the mixing

19  room, about deterioration of lung function.  And as I recall, my

20  task was to try to come up with some recommendation such that we

21  could catch these folks early --

22  Q.   Yes, sir.

23  A.   -- if they were deteriorating more rapidly than we thought.

24  And that's not as easy as it sounds, but I did put together a

25  protocol to trigger concern when somebody's pulmonary functions

1 changed if they were in the mixing room.  And the company for a

2 time had me do that, and I no longer do that.  But this was back

3 in the early days.

4 Q.   That was back in '01, '02?

5 A.   Probably, probably something like that.

6 Q.   One more question, Doctor.  Mr. McClain represented to you

7 in one of his questions about the lack of medical records from

8 Mr. Kuiper's childhood.  Let me ask you this question:  Is it

9 typical for someone not to have any medical records at all till

10 their mid 40s?

11 A.   Very typical.

12 Q.   Typical?

13 A.   Very typical.

14        MR. PAGLIARO:  Okay.  Thank you, Doctor.  That's all I

15 have.

16        Thank you, Your Honor.

17        THE COURT:  Thank you, Mr. Pagliaro.

18        Thank you, Dr. Bainbridge.

19        THE WITNESS:  Thank you, Your Honor.

20        THE COURT:  Sorry for the scheduling glitch prior to

21 this.

22        THE WITNESS:  No problem.

23        THE COURT:  Thank you.  You're free to go now.

24 Thanks.

25        Why doesn't everybody take a stretch break.

```
 1              MR. PAGLIARO:  Your Honor, can I ask for a five-minute
 2    break to use the --
 3              THE COURT:  Yes.
 4              MR. PAGLIARO:  Please.
 5              THE COURT:  Five minutes?
 6              MR. PAGLIARO:  Just five minutes.
 7              THE COURT:  Why don't we take a -- we'll take a
 8    10-minute recess and come back at 11:30.  Remember keep an open
 9    mind till you've heard all of the evidence.  Thank you.
10              MR. PAGLIARO:  Thanks, Your Honor.
11              (The jury exited the courtroom.)
12              MR. PAGLIARO:  I need a comfort break, Your Honor.
13              THE COURT:  Thank you.  That's fine.  Thank you.
14              MR. PAGLIARO:  Thank you.
15              (Recess at 11:19 a.m.)
16              THE COURT:  Ready to have the jury brought in?
17              MR. PAGLIARO:  Yes.
18              THE COURT:  Thank you.
19              (The jury entered the courtroom.)
20              THE COURT:  Thank you.  Please be seated.
21              Mr. Pagliaro, ready to call your next witness?
22              MR. PAGLIARO:  I am, Your Honor.  Thank you.  We'd
23    like to call James Stewart, please.
24                JAMES STEWART, DEFENDANT'S WITNESS, SWORN
25              THE COURT:  Thank you.  Please be seated in the
```

1  witness box, and you can make yourself comfortable, and adjust

2  the chair so you can speak directly into the microphones.  And

3  would you please tell us your full name and spell your last name

4  for us.

5          THE WITNESS:  My name is James Henry Stewart, and the

6  last name is spelled S-t-e-w-a-r-t.

7          THE COURT:  Thank you.

8          Mr. Pagliaro?

9          MR. PAGLIARO:  Thank you, Your Honor.

10                        DIRECT EXAMINATION

11  BY MR. PAGLIARO:

12  Q.   Now, Mr. Stewart, you actually hold some degrees, don't

13  you?

14  A.   Yes, I do.

15  Q.   Could you tell us what -- in what fields you hold degrees?

16  A.   I hold -- let me start from the beginning.  I hold a

17  variety of different academic degrees, but starting when I

18  came -- got out of the Army, got back from Vietnam, I got a

19  bach -- I went to school under the GI bill.  I got a bachelor's

20  in public health.  After that I went and got a master's in

21  chemistry, and after that I got a Ph.D. in environmental health

22  and toxicology.

23  Q.   And from what institutions did you get your master's degree

24  in chemistry?

25  A.   I got all of the degrees from University of Massachusetts.

1  Q.    And you live in Massachusetts?

2  A.    Yes, I do now, yes.

3  Q.    Now, do you hold any professional -- you have a Ph.D.; is

4  that right?

5  A.    Yes.

6  Q.    So you have a doctor of philosophy, not a medical degree;

7  is that right?

8  A.    I'm not a medical doctor, no, I'm not.

9  Q.    Explain to the jury again what's your Ph.D. in.

10  A.    Environmental health and toxicology.  So I was in the

11  toxicology program which was part of the department of

12  environmental health, and so in that process you end up getting

13  a doctor of philosophy degree is what they call it.  It's a

14  science degree versus the medical degree.  And I had a minor in

15  epidemiology too.  I should have said that.

16  Q.    Thank you, Dr. Stewart.  And do you hold any professional

17  certifications, Dr. Stewart?

18  A.    I hold two.  One is a certified industrial hygienist, and

19  that's from the American Board of Industrial Hygiene.  And I

20  have another one, a certified safety professional, which is from

21  the Board of Certified Safety Professionals.  They're both

22  national, international.

23  Q.    The jury's heard in the course of the case about industrial

24  hygiene, Dr. Stewart.  Would you just explain very briefly to

25  the jury what it is an industrial hygienist does.

```
 1  A.   The classic definition -- I'll put it in my words but get
 2  all of the pieces in there -- it's the anticipation, the
 3  recognition, evaluation, and control of occupational health
 4  hazards.  And so those are the four pieces:  the anticipation,
 5  recognition, evaluation, and control.
 6          The evaluation piece, when you see people -- maybe
 7  you've seen it on the news, doing air sampling and looking at
 8  radiation measurements, that kind of thing.  That's the
 9  evaluation piece.
10          Control might be something like ventilation or
11  shielding if it's radiation, something like that, or ventilation
12  if it's a chemical.  So that kind of -- I think that kind of
13  puts it in perspective.
14  Q.   Have you heard the term industrial hygiene survey?  Are you
15  familiar with that term?
16  A.   Yes, I am.
17  Q.   And explain to the jury what an industrial hygiene survey
18  is, Dr. Stewart.
19  A.   Industrial hygiene survey, there are different pieces to
20  it.  One is where you -- a walk-through piece where you get an
21  understanding about what's going on in the organization or in
22  the plant.  And the second piece is you plan a sampling strategy
23  where you look to see what kind of air samples or surface
24  sample, whatever kind of sampling, needs to be done.  And then
25  you go and actually do it, actually take those samples.
```

1   Q.   Okay.  And you've done these before?

2   A.   I've done many, many of those, yes.

3   Q.   Explain to the jury what the term -- are you familiar with

4   the term exposure reconstruction?

5   A.   Yes, I am.

6   Q.   Explain to the jury what an exposure reconstruction is,

7   Dr. Stewart.

8   A.   An exposure reconstruction, it's a necessity because if we

9   were going to sample in this courtroom today, I could go and put

10  sampling devices on you and it would be -- you know, I could

11  measure whatever exposure was taking place, if any.  Exposure

12  reconstruction, what we're doing is we're going back in time and

13  trying to figure out what the exposures were that were not

14  there, you know, in that time frame.  So you're trying to

15  reconstruct exposures that existed at a prior time.

16  Q.   Is that an exercise that industrial hygienists do?

17  A.   It's very common, yes.

18  Q.   Have you done it in your career?

19  A.   Yes.

20  Q.   Many times?

21  A.   Many times.

22  Q.   You talked about being certified as an industrial

23  hygienist.  What does that mean?

24  A.   The certification process that I went through involves --

25  involved a two-day written exam.  But before you could get to

1  take the exam, you had to have the academic degrees in place.

2  And you needed five years' experience because this field

3  requires experience.  You can't learn a lot of this material

4  we're talking about really well unless you actually get out

5  there into workplaces, so it required five years' experience,

6  two-day exam, and certain academic qualifications.

7  Q.    Okay.  And what areas are you examined on as part of this

8  examination process?

9  A.    There were -- there's -- there are a number of -- they call

10  them rubrics or areas you have to qualify in.  And they involve

11  things as different as noise exposure and evaluation, radiation,

12  chemicals, air sampling strategies, epidemiology, community

13  hazards, air pollution, things like that.

14  Q.    How long have you been a certified industrial hygienist,

15  Dr. Stewart?

16  A.    Since 1979.

17  Q.    Could you just, again, just briefly just tell us about your

18  experience as an industrial hygienist.  What kinds of things

19  have you done as an overview?

20  A.    Okay.  I'll do it quickly.  I tried to stay active in the

21  field in doing things, working with -- the American Industrial

22  Hygiene Association is an -- it has American in the name, but it

23  actually has members from 20 or more countries around the world.

24  And I'm on the exposure assessment committee for -- it's called

25  the exposure assessment strategies committee for the American

1   Industrial Hygiene Association.  I teach in their exposure

2   assessment course that they offer nationally.  I review

3   publications for the -- in the exposure area.  So those are the

4   current ones.

5   Q.   Have you yourself published any articles?

6   A.   Yes, yes.  There's one -- well, you talk about other

7   things, I think there -- I was on two National Academy of

8   Science committees in the past, and I think that gives you a

9   flavor for it.

10  Q.   Now, did you have any experience in the government as part

11  of government service after you got your IH degree --

12  certification I should say?  Excuse me.  Strike that.

13         Did you have any government experience after your IH

14  certification?

15  A.   Yes, I did.  I went to work for OSHA as a compliance

16  officer, you know, the person that does the actual inspections

17  and recommends, is involved in the issuing of citations and

18  penalties.  And I was trained as a compliance officer in the

19  industrial hygiene area.

20  Q.   So you worked for the U.S. Department of Labor Occupational

21  Safety and Health Administration?

22  A.   Yes, I did.

23  Q.   How many years did you do that, Dr. Stewart?

24  A.   It's been a long time.  It's been 30 years.  But it was a

25  year and something, not two years but a year and something,

1  couple years, more or less than that.

2  Q.   And as part of your experience, did you go out and visit

3  employment settings to see if they were complying with the law?

4  A.   We did a wide -- yes, we did.  Yes, we did.  We'd sometimes

5  go out on -- we would go to the plant for one reason or another

6  whether they got selected randomly for an inspection or whether

7  they had some issue, you know, at the plant.

8  Q.   Do you have any affiliations with any academic

9  institutions?

10  A.   Yes, I do.

11  Q.   And how long have you been and with what institutions?

12  A.   I am currently an instructor in industrial hygiene at

13  Harvard University School of Public Health.  And I got that

14  appointment in 1994.  But I've been with Harvard since 1989.  In

15  1989 I was hired as the director of environmental health and

16  safety for the entire university.  But on the academic side,

17  1994, I was appointed as an instructor there.  I still have

18  that.  And I also have an appointment at Brandeis University.

19  Q.   And what -- do you teach courses at the Harvard School of

20  Public Health?

21  A.   Yes.

22  Q.   What courses do you teach there, Doctor?

23  A.   The primary one I have responsibility for is called the

24  Work Environment, and it's an -- they're all graduate courses at

25  Harvard, so the School of Public Health courses are all graduate

1    courses.  And it's a course that -- it's an industrial hygiene

2    course really, and it's for incoming physicians,

3    epidemiologists, industrial hygienists, a wide range of

4    students.  But it's required for the School of Public Health

5    ones, the ones that are going to work in the envir -- excuse me,

6    the environmental or occupational area.

7    Q.    And what are you teaching these doctors, epidemiologists,

8    and others?

9    A.    Well, what -- we start off right in the beginning very

10   early telling them about OSHA, NIOSH, and those basic things,

11   what these organizations do.  And then we progress through the

12   semester talking about everything that you can fit into 14

13   weeks' course.  We cover sampling methods.  We cover sampling

14   strategy, data analysis.  We cover the basics of -- you know, of

15   noise and heat and all of these other things that they --

16   hazards they might come across in the workplace.

17   Q.    Okay.  Are you also affiliated with an organization called

18   EH&E?

19   A.    Yes.

20   Q.    And what is EH&E?

21   A.    EH&E -- I actually have two jobs and get paid by both of

22   them.  I have two jobs.  And one is I'm the director of --

23   advanced analytics is the title at Environmental Health &

24   Engineering.

25   Q.    And right now what are some of your current professional

1  activities in industrial hygiene area?

2  A.   Oh.  I think I covered -- I covered those a little bit.

3  Like I said, I'm still -- I'm on the exposure assessment

4  strategies committee for the AIHA.  That's the most time

5  consuming, the biggest commitment I have right now.

6  Q.   You did mention that.  I'm sorry.  I'd forgotten that.  Why

7  don't you tell us a little bit about what you do at EH&E as

8  director of advanced analytics.

9  A.   It's an unusual name for that group, but it actually fits

10  what we do.  For those complicated or -- yeah, complicated

11  exposure reconstructions or exposure assessments, our group

12  handles those, so that's our primary responsibility during -- in

13  the group.

14  Q.   And have you been retained as an expert in this case by the

15  defense?

16  A.   Yes.

17  Q.   As part of your work as an industrial hygienist or in your

18  career, have you had any interactions working on MSDS sheets?

19  A.   Yes, I have.

20  Q.   Explain to the jury what you've done -- the Court and the

21  jury what you've done in terms of MSDS sheets.  They've heard a

22  lot about MSDSs during the course of the trial.

23  A.   Okay.  An MSDS is -- for example, currently and for the

24  last, oh, about six years as part of the work at Environmental

25  Health and Engineering, we've had clients that ask us to review

1  MSDSs and make recommendations to them on how to handle

2  chemicals, how to store them, that kind of thing.  Then a prior

3  job in manufacturing and industry, my work was involved in

4  reviewing and setting up the MSDS distribution and approval

5  process.

6  Q.    Have you actually written MSDSs?

7  A.    Yes.

8  Q.    Over the course of how many years?

9  A.    Well, we started middle '80s, somewhere in there, is about

10  the time that we started, that I started.

11  Q.    You mentioned that -- your stint as an OSHA compliance

12  officer.  Since you've gone to EH&E -- for some reason that's

13  not in my head.  EH&E; is that right?

14  A.    EH&E, yes.

15  Q.    EH&E.  Have you ever -- have you done any contracting work?

16  Have you been retained by any government agency when you --

17  since you've joined the --

18  A.    One of the exposure reconstructions that we -- well, I'll

19  talk about two of them now that popped into my head there.  One

20  of them was for NIOSH.  You may have heard NIOSH.  I mentioned

21  it, but we did a study of a building for NIOSH.  And we also at

22  Environmental Health and Engineering were the indoor air quality

23  contractor for EPA.  They designate one company for a five-year

24  contract, and I think we did it three times.  I could be wrong,

25  but at least 10 years but I think it was 15 years actually that

1  we were the primary contractor for EPA.

2  Q.   And were you actually retained and paid by NIOSH to do a

3  study?

4  A.   Yes.

5  Q.   And tell us about that a little bit.

6  A.   It was a study of the occurrence of asthma in office

7  buildings trying to find, you know, what was going on there.

8  Q.   And what part did you play in that study, Dr. Stewart?

9  A.   I was the manager of the group and peripherally involved in

10 that but involved in it.  I was the manager of the group, yeah.

11 Q.   Have you ever been involved with corporate investigation

12 workplace exposures?

13 A.   Yes.

14 Q.   What are they?

15 A.   What it is, it's the same -- it's a similar process but a

16 different setting when you work in industry in the field that

17 I'm in and then that's what -- that's what you get involved in.

18 That's what you do.

19 Q.   Jury's heard about air and air sampling at the APC plant.

20 Have you ever participated personally in air -- designing or

21 conducting air sampling programs?

22 A.   Yeah, it's just part of what I've done since 19 -- well,

23 before 1979 actually.

24 Q.   Is that a fairly common occurrence for an industrial

25 hygienist?

1   A.   It's a very common occurrence.

2   Q.   As part of your work on this case, have you actually

3   visited the American Pop Corn plant here in Sioux City?

4   A.   Yes, I did.  I had the opportunity to visit several years

5   back.

6          MR. PAGLIARO:  Would you put up a photo, just a

7   demonstrative photo?

8   Q.   Did you take this photo, Dr. Stewart?

9   A.   Yes.

10  Q.   Does it accurately represent what you saw when you were out

11  at American Pop Corn plant?

12  A.   Yes.

13  Q.   Tell the jury what they're seeing in this photo if you can.

14  A.   This is when we first drove up.  I don't know if anybody

15  has seen this.  But the -- those containers on the left are

16  where they store the corn, and they transfer it across the way

17  to a cleaning house, and ultimately it gets used in products

18  like microwave popcorn.

19  Q.   How much corn is stored there?  Do you have any sense?

20  A.   I don't know the volume of it.  I know that it's stored for

21  up to a year.  The president during the trip told us they bring

22  the corn in once a year and it's stored in these -- and you can

23  see the ventilation devices at the bottom of those large

24  containers there.

25  Q.   As part of your -- excuse me.  As part of your work on this

1  case, did you review documents from the American Pop Corn plant?

2  A.    I reviewed many, many documents, yes.

3  Q.    And what else did you review?

4  A.    Depositions.  Again, I visited the plant, looked at NIOSH

5  data, government data, looked at various kinds of records,

6  whether they be payroll or medical, that kind of thing.

7  Q.    Did you look at Mr. Kuiper's records?

8  A.    Yes, I did.

9  Q.    Did you do a walk-through of the plant?

10  A.    Yes, we did, yes.

11  Q.    Explain to the jury what a walk-through is.

12  A.    A walk-through, what we did there was the American Pop Corn

13  people greeted us and then brought us through the microwave

14  facility.  Well, they brought us through the -- not inside those

15  bins, but they brought us to the room where the corn is cleaned,

16  brought us to the room where the -- showed us how it was

17  transferred from there to the microwave facility, and then in

18  the microwave facility they brought us through from the

19  warehouse to the packaging area to the mixing area.

20  Q.    And why were you doing this walk-through?  What did you

21  hope to observe, and what were you hoping to learn?

22  A.    Like I said before in the beginning about the IH survey,

23  you're trying to figure out exactly what's going on, what kinds

24  of systems are in place, that kind of thing, looking for

25  ventilation, looking for chemicals, things like that.

1  Q.   Were you looking to do any assessment of Mr. Kuiper's

2  historical exposure?

3  A.   Not at that point.  What you're trying to do there is

4  collect information that may help you after you gather other

5  information.

6  Q.   Did you look at Mr. Kuiper's work history as he reported

7  it?

8  A.   Yes, I did.

9  Q.   As an industrial hygienist, what did you find significant

10 about the work history in terms of potential exposures?

11 A.   He had -- he had several jobs at American -- oh.  Before

12 American Pop Corn?

13 Q.   His work history.

14 A.   His work history and period?  Okay.  Yes.  Before coming to

15 American Pop Corn, he was a farmer for a number of years, and he

16 was a pesticide applicator for Orkin and a delivery person for a

17 cleaner.  And those are the ones that I -- before American Pop

18 Corn that I recall.

19 Q.   Did you look at his deposition in terms of what he

20 testified to about his work history at American Pop Corn as

21 well?

22 A.   Yes, I did.

23 Q.   When did he first work there?

24 A.   Sep -- he started working there September 1986 in the

25 records that I reviewed.

```
1    Q.    And do you recall what his job duties were at that time?

2    A.    At that time he was working in shelling.  And I don't know,

3    again -- he was working in corn shelling.

4    Q.    Did you observe the corn shelling area when you went to the

5    plant?

6    A.    There wasn't any corn shelling going on when we were there.

7    Q.    Did you see the area where it was going on, would have been

8    going on?

9    A.    It wasn't clear if they still do corn shelling today from

10   the information that we gathered during the site visit.

11   Q.    Are you familiar with corn dust as an industrial hygienist?

12   A.    Grain dust I'm familiar with, grain dust in general, yes.

13   Q.    Could you tell the jury and the Court a little bit about

14   what you know from your research and your experience as an

15   industrial hygienist about corn dust or grain dust exposure.

16   A.    These corn dusts and grain dusts are associated with

17   declines in pulmonary function.  That's what -- that's what I

18   know about them.

19   Q.    Are there industrial hygiene articles that refer to

20   agricultural exposures for workers in that area?

21   A.    Oh, yes, yes.

22   Q.    What about sampling?  Has there -- sampling been done in

23   that industry?

24   A.    In that industry, yes.

25   Q.    What are some of the things that are found with operations
```

1  like this in terms of grain dust or corn dust?

2  A.   Okay.  During the shelling operation, what they're doing is

3  taking the grain -- the actual corn off the cob.  And so it's a

4  mechanical operation really.  So it's a dusty operation.  And

5  Mr. Kuiper in his deposition said it was dusty, and everybody

6  else agreed it was dusty.

7          What happens, though -- so in that dust you have corn

8  dust and grain dust that we just talked about.  Another thing

9  from an industrial hygiene point of view is you look at -- I'm

10  not -- have had dealings with mold, and corn gets moldy, and

11  they were told -- telling us during the site visit what a

12  challenge it was to make sure that the -- that they tried --

13  they did everything they could to control mold so they could

14  minimize the amount of product they might have to dispose of.

15  Anyway, the -- so if you are grinding up or shelling moldy corn,

16  then you have other exposures to mold and some of the products

17  that they produce.

18  Q.   As a toxicology person and industrial hygienist, what are

19  some of the problems that mold can produce that are a concern

20  from an employee exposure point of view?

21  A.   One of the things you look for, any kind of moldy grain

22  whether it's corn or some others, are things called mycotoxins.

23  I know it's kind of an unusual name.  But myco means mold, and

24  toxin means it's a toxic material.  So it's toxic materials from

25  molds.  And it's a concern both for humans and animals, and

1 that's why moldy corn is not -- some people don't like to eat

2 moldy corn or work with moldy corn.

3 Q.   Have you done any research on the occurrence of -- what do

4 you call them?  Mycotoxins?  Do I have that right?  Mycotoxins?

5 A.   Say that again.  Ask --

6            MR. MCCLAIN:  Your Honor, I object on relevance

7 grounds for this.

8            THE COURT:  Overruled.  You may answer.

9 BY MR. PAGLIARO:

10 Q.   Have you done any research on the occurrence of mycotoxins

11 in Iowa corn?

12 A.   What I did because -- what I looked -- went out to look for

13 was information about the mycotoxin contamination of corn in

14 Iowa during the time that he was conducting these -- doing this

15 job.  I was able to find Iowa State had done a study of corn in

16 1988 in Iowa, and 30 percent of it was contaminated with

17 mycotoxins, so I wrote that in the report.

18 Q.   Are mycotoxins a concern from an industrial hygiene

19 standpoint?

20 A.   They are a concern.  Yes, they are.

21 Q.   And why is that?

22 A.   Because these are very biologically active agents, and

23 it's -- and you're -- and that's why.  They have a variety of

24 effects in animals and humans.

25 Q.   Now, you're familiar with the NIOSH investigation of the

1 American Pop Corn plant.

2 A.    Yes, I am.

3 Q.    And as an industrial hygienist, that's the kind of report

4 you would look at and rely upon in coming to opinions about what

5 went on in a plant like that.

6 A.    Yes, that -- yes, I would.

7 Q.    When NIOSH visited the plant, did they do any sampling in

8 the corn shelling area?

9 A.    They did not.

10 Q.    It's not written in the report?

11 A.    It's not in the report, no.

12 Q.    Where did Mr. Kuiper work after he left the shelling area?

13 A.    The records I reviewed showed that he went to become a

14 janitor in the microwave popcorn plant, janitor in the plant,

15 though.

16 Q.    Now, again, from an industrial hygiene point of view, what,

17 if any, concerns would you have about janitorial work that might

18 lead to an exposure issue?

19 A.    I mean, and it's common sense.  I mean, what -- and he

20 answered it in his deposition.  They used a variety of

21 chemicals, didn't really remember what they were, to clean the

22 areas that he was responsible for cleaning, hallways, break

23 rooms, things like that.

24 Q.    And what, if any, concern would that give an industrial

25 hygienist from the standpoint of chemicals or materials he used

1  to clean?

2  A.    If you were able to track down the actual chemicals, you

3  would be able to maybe do some exposure reconstruction in this

4  case.  But I wasn't able to do that here.  There was a general

5  reference to what was used but no specific reference.

6  Q.    And what was the reference Mr. Kuiper made to those

7  chemicals in his deposition and his medical records?

8  A.    Well, he said they were a variety of cleaning chemicals.

9  Sometimes he had to mix them from concentrate.  Other than that,

10  there wasn't really much specific detail.

11  Q.    How about the impact on him?

12  A.    Oh.  During the -- let me think about this.

13  Q.    Did he talk about cleaning the tanks?

14  A.    Yeah, he talked -- he talked about cleaning the tanks.  I

15  don't -- I think that during this time as a janitor, I think the

16  only thing he said really was that he didn't really like the

17  smell of it.  The cleaning of the tanks was when he was a

18  janitor later, I'm thinking the first year -- first year as a

19  janitor.

20  Q.    And I'm mixing two periods up.  I'm sorry.  It's my fault.

21  A.    Okay.

22  Q.    You're talking about the earlier period from '91 and '92

23  when he's a janitor.

24  A.    Yes, just strictly a janitor.  He's cleaning -- he's

25  working with various kinds of chemicals but cleaning hallways,

1   break rooms, things like that.

2   Q.   Your memory's better than mine.  I apologize.

3        You mentioned NIOSH.  What is NIOSH?

4   A.   NIOSH, the acronym stands for the National Institute For

5   Occupational Safety and Health.  And it's really the -- kind of

6   the science or research arm that's associated with OSHA, the

7   compliance piece that I worked for.

8   Q.   And you had interactions with NIOSH people I assume when

9   you were with OSHA; is that correct?

10  A.   Yes.

11  Q.   After Mr. Kuiper left his job as a janitor and went into

12  the -- well, let me strike that.  Let me start over again.

13       After he left his job as a janitor, what was the next

14  position he held in the plant?

15  A.   From the records I read -- and I read quite a few that

16  confirm that -- that point in this -- he became a mixer after

17  that point, and he went to work in the mixing room.

18  Q.   And did you view the mixing room when you did your plant

19  survey?

20  A.   Yes, we spent a fair amount of time in there.

21  Q.   Did you actually take a photo of the tanks in the mixing

22  room?

23  A.   Yes, I did.

24       MR. PAGLIARO:  Would you put up that, Cort, please?

25  Q.   Does that accurately represent what you saw when you were

1  in the mixing room at APC?

2  A.   That's one of the five -- one of the tanks that's in there.

3  Q.   And there are five tanks you said in there.

4  A.   As best I remember, five, yes.

5  Q.   And did you take that photo yourself?

6  A.   Yes, I did.

7  Q.   Tell the jury what they're seeing in that photo.  What's --

8  there's --

9         MR. PAGLIARO:  Can I move up a little bit, Your Honor?

10        THE COURT:  You can.  But is there going to be any --

11  you know, is there going to be any foundation or any information

12  about whether this tank is in substantially similar condition to

13  the tank as --

14        MR. PAGLIARO:  I'll ask --

15        THE COURT:  Well, this witness wouldn't know that as

16  to when Mr. Kuiper worked there years earlier.  Otherwise it has

17  no relevance whatsoever.

18        MR. PAGLIARO:  Okay.

19  BY MR. PAGLIARO:

20  Q.   Do you know that, Dr. Stewart, if that's substantially

21  similar to the tank that was in effect when Mr. Kuiper worked

22  there?

23  A.   Yes, I do, from the records, from the depositions of

24  several people that I can cite if you'd like.

25        THE COURT:  Well, there's no way you could know that.

1    THE WITNESS:  Like I said, I know from what I read in

2  the depositions.  That's it.  Yes, that's my --

3    THE COURT:  Okay.  You know what?  We're going to take

4  a 30-minute recess till 12:30.  And remember to keep an open

5  mind till you've heard all of the evidence in the case.  Thank

6  you.

7    (The jury exited the courtroom.)

8    THE COURT:  Please be seated.

9    Now, Dr. Stewart, how could you possibly know that on

10  the day you took that picture that that tank was in a similar

11  condition when Mr. Kuiper worked there?

12    THE WITNESS:  What I know is that both -- let me

13  finish -- Hartshorn, Hoffman, and Mr. Kuiper himself said -- and

14  other -- Remmes, one other one, said that really nothing had

15  changed in there.  The only thing that changed was the scrubber,

16  that they always had the ventilation that you see on the top of

17  that tank, they always had the lids.

18    THE COURT:  Well, was Mr. Kuiper with you on this

19  trip?

20    THE WITNESS:  I honestly don't know.  He might have

21  been.  I don't know.

22    MR. PAGLIARO:  I don't think he was, Your Honor.

23    THE WITNESS:  He wasn't?  I don't know.  They didn't

24  introduce everybody when we went around.

25    THE COURT:  Well, how could somebody in a prior

1  deposition testify to the con -- when were you there?  What was

2  the date you were there?

3           THE WITNESS:  I think it was 2005.  I'd have to check

4  on that.

5           THE COURT:  And when were these depositions taken that

6  you relied on to establish that it was in the same condition as

7  when Mr. Kuiper worked there?

8           THE WITNESS:  What I said was it had the same

9  features, the lid, the ventilation.  Whether -- the ventilation,

10  the lid, the operations, the way they were performed, all of

11  that, everybody agreed that I read -- there was no disagreement

12  on anything I read about that.

13           THE COURT:  Well, when did you read it?

14           THE WITNESS:  When was the first Kuiper deposition?

15  Probably 2006?  Again, I'm estimating that date.

16           MR. MCCLAIN:  Your Honor, there were substantial

17  changes to the mixing room from the time that Mr. Kuiper went

18  out.  That was one of the objections we had to this.  There were

19  two scrubbers added, not one.

20           THE WITNESS:  Right.

21           MR. MCCLAIN:  The room was -- the room was completely

22  changed.  You saw the pictures yesterday that Mr. Hoffman talked

23  about where they had put that plastic before they'd built the

24  enclosure.  Well, when Mr. Stewart went, the enclosure was up,

25  so it was a completely different environment.

1    MR. PAGLIARO:  The only issue, Your Honor, is the

2  tank, whether that's the same operation as the tank.  The

3  scrubbers aren't involved directly in the tank.

4    THE COURT:  Is the -- tell me about the picture.  Is

5  that being used demonstratively, or is that an exhibit?

6    MR. PAGLIARO:  It's just a demonstrative, Your Honor.

7  We didn't mark it as an exhibit.  We showed it to them last

8  night.  It's just a demonstrative to show what the tank looked

9  like, and I was going to ask him about the local exhaust.  And I

10  believe from everything I've read the local exhaust feature was

11  there -- and Mr. Hoffman said it yesterday --was there early on,

12  and it's there now.  That was the only thing I was going to ask

13  him and the fact that it had an open lid.  And again,

14  Mr. Hoffman testified to that.  Mr. Kuiper testified to that.

15  There's no dispute about that.

16    THE COURT:  How many other photos do you have that

17  you're going to try and use demonstratively?

18    MR. PAGLIARO:  There's only one other, and that's a

19  respirator, the kind of respirator Mr. Kuiper wore, and that's

20  it.

21    THE COURT:  Okay.  Well, I don't think there's any

22  foundation to show that the tank was in substantially similar

23  condition as to when Mr. Kuiper worked there.  But I'm going to

24  let it go.  You can use it demonstratively, and it really goes

25  to the weight of it.  It's just -- you're not trying to offer it

1   as an exhibit.  You're using it demonstratively.  And it's

2   certainly demonstrative of what Dr. Stewart saw when he was

3   there.  Whether it's demonstrative of what took -- which really

4   is not relevant unless it's in the same condition as when

5   Mr. Kuiper worked there.  But that's going to be a fact

6   question.  I'll just leave it to the trier of fact to decide

7   that.

8           MR. PAGLIARO:  Your Honor, thank you.  Yes.

9           THE COURT:  Okay?  And we'll see you back here at

10  12:30.  Thank you.

11          MR. PAGLIARO:  12:30, Your Honor?

12          THE COURT:  Yeah.

13          MR. PAGLIARO:  Thank you.

14          (Recess at 12:02 p.m.)

15          THE COURT:  Mr. Pagliaro, ready to have the jury

16  brought in?

17          MR. PAGLIARO:  Yes.

18          MR. MCCLAIN:  Your Honor, could I raise an issue?

19          THE COURT:  Yes.

20          MR. MCCLAIN:  In light of your comments, I went back

21  to check this, and I would like to voir dire the -- the essence

22  of his testimony is on air levels that he reconstructed in the

23  room of diacetyl.  And I don't think there's a basis to offer

24  that opinion.

25          First reason why, we've already had their doctor,

1  Dr. Repsher, testify that the levels measured were sufficient to

2  cause disease.  So it's a 403 problem in terms of confusing the

3  jury with air levels which he can't talk -- he's not going to

4  talk about --

5          THE COURT:  Well, it wouldn't be the first time their

6  own witnesses impeached each other so . . .

7          MR. MCCLAIN:  I understand that.  But the 403 problem,

8  I mean, their own witness has already said it, and he's not

9  going --

10          THE COURT:  Well, here's the deal.  I'm not keeping

11  the jury waiting.  You can voir dire the witness in front of the

12  jury when it gets to that point.  We're not to that point yet I

13  don't think.

14          MR. MCCLAIN:  No, we're not.

15          THE COURT:  And I'll rule on whether there's a

16  sufficient foundation for any opinions this expert is intending

17  to offer.

18          MR. MCCLAIN:  Thank you.

19          THE COURT:  Thanks.

20          (The jury entered the courtroom.)

21          THE COURT:  Thank you.  Please be seated.

22          Mr. Pagliaro, you may resume your direct examination

23  of Dr. Stewart.

24          MR. PAGLIARO:  Thank you, Your Honor.

25          Could you put up that photo?

1   BY MR. PAGLIARO:

2   Q.   Dr. Stewart, when NIOSH went out to look at the American

3   Pop Corn plant, did they report about ventilation at the plant?

4   A.   Yes, they did.

5   Q.   Did they report about ventilation in the mixing room?

6   A.   Yes.

7   Q.   What types of ventilation did NIOSH find when they looked

8   at the plant when they were there?

9   A.   They found the local exhaust and general ventilation.

10  Q.   Is this an illustration of local exhaust, Dr. Stewart?

11  A.   Yes, that hose on the top is, yes.  That connects to it,

12  yes.

13  Q.   Is it this hose that we're talking about, Dr. Stewart, the

14  one on the left?

15  A.   Yes, yes.

16  Q.   And what function does that hose or local ventilation

17  perform in this situation?

18  A.   On the other end of that, there will be some kind of a

19  suction device, a fan that's pulling air through that opening

20  out through that hose and out somewhere, to a scrubber or

21  whatever.

22  Q.   And the tank has a lid; is that correct?

23  A.   Yes.

24  Q.   And what's this part of the lid?  What's the handle for if

25  you know?

1  A.   The process was described in a number of settings, but also

2  when we were there, they lift up that lid.  That's how they add

3  the materials to it.

4  Q.   Did NIOSH talk about --

5       MR. PAGLIARO:  Take it down.

6  Q.   Did NIOSH talk about in their report the amount of

7  ventilation there was in the mixing room when they visited in

8  2001, 2002?

9  A.   They -- what they talked about was -- and I'm not sure this

10  is exactly -- they talked about the mixing room being under

11  negative pressure meaning that more air was being drawn out of

12  the room than was being supplied to the room.

13  Q.   From an industrial hygiene perspective, what's the purpose

14  of negative pressure, Dr. Stewart?

15  A.   From an industrial hygiene point of view, it's a form of a

16  control.  Remember the recognition, evaluation, and control.

17  It's a form of control in the sense that anything generated

18  inside the mixing room because it's under negative pressure, it

19  would -- air is moving into the mixing room from the hallway and

20  then going out of the mixing room to the environment.  So it

21  controls the flow of any emissions out into the hallway or the

22  rest of the plant.

23  Q.   Now, NIOSH also reported in the report of July 2004 --

24  you're familiar with that report?

25  A.   Yes, I am.

1    Q.    Is that report typical of other reports NIOSH writes in

2    similar situations?

3    A.    It's the same format, same sections, yes.

4    Q.    One of the things they refer to is the fact that the

5    company reported that workers who handled flavorings had used

6    full facepiece respirators with particulate filters and organic

7    vapor cartridges since shortly after the microwave popcorn plant

8    began operating in December of '88.  Do you recall that?

9              MR. MCCLAIN:  Your Honor, it's leading.

10             THE COURT:  It is, but it's foundational, so I'll

11   overrule the objection.

12   BY MR. PAGLIARO:

13   Q.    Do you recall that part of the report?

14   A.    Yes, they said that on the first page.

15   Q.    Now, Dr. Stewart, have you brought today a photo of that

16   type of respirator just to show to illustrate to the jury?

17   A.    Yes, I did.

18             MR. PAGLIARO:  Could you put that up, Cort, please?

19   Q.    Explain to the jury what they're seeing there, Dr. Stewart.

20   A.    This is the full face --

21   Q.    Let me use a pointer.  I have a pointer.

22   A.    Oh, okay.  Sure.

23             MR. PAGLIARO:  May I approach, Your Honor?

24             THE COURT:  Yeah.  Well, you know, he can do it on the

25   annotation monitor, and then that way his back isn't to the

1  jury, or he can step down and use your laser pointer, but then

2  he's going to need to either move that microphone or wear a

3  lavaliere mike so the jury can hear.

4        MR. PAGLIARO:  Let me handle it a different way, Your

5  Honor.

6        THE COURT:  Okay.

7        MR. PAGLIARO:  Let me handle it a different way.

8        THE COURT:  And, see, the problem is when you point

9  with a laser pointer, that doesn't show up on the annotation

10  monitor, so he has to turn around to see it.

11        MR. PAGLIARO:  I get it.

12        THE COURT:  Yeah.

13        MR. PAGLIARO:  I wasn't focusing.

14        THE COURT:  No, that's one of those quirks of

15  technology so . . .

16        MR. PAGLIARO:  I'm challenged that way.  I apologize.

17  BY MR. PAGLIARO:

18  Q.   There's two round canisters.  Do you see those,

19  Dr. Stewart?

20  A.   Yes, I do.

21  Q.   They're on either side of the front; is that correct?

22  A.   That's correct.

23  Q.   Explain to the jury what those are.

24  A.   These cartridges perform -- the ones they use at American

25  Pop Corn, the ones that were taken from the site, perform two

1  functions.  The first part, the plastic part that you see on the

2  outside, is a filter in the sense that it's just a particulate

3  filter but a very, very good one, very, very good one.  It's

4  tested, certified, stamped to show that it's good at what it

5  does.  And it's really just a particular kind of -- or specific

6  kind of fiber that's good at filtering out particulates.

7          The second part, the part behind there that you can

8  see the -- a little bit of it, you see how that other thing kind

9  of clips over the front like the plastic part's clipping over

10 like the canister on the back?  The canister on the back is a --

11 and the ones that they collected at American Pop Corn, NIOSH

12 did, is an organic vapor collection device.  It's completely

13 different than that first one -- thing I just talked about.

14          What's inside there is an absorbant material.  A lot

15 of times it's activated carbon.  Other times -- it's somewhat

16 absorbant or absorbant material so that when the air's coming

17 through there it's coming through kind of a sand-like structure

18 but designed to take out organic vapors and gases as they travel

19 through.

20          See, the first filter is only for particles.  The

21 gases and vapors are going to go right through, and so the

22 second part takes those out, takes out the organic vapors.

23 Q.   And with that organic vapor cartridge, would that be useful

24 and efficacious to remove diacetyl vapors?

25 A.   Yes, this is the one you would use for organic vapors like

1   diacetyl.

2           MR. PAGLIARO:  Could you put that right back up,

3   please?

4   Q.   I want to ask another question.  Dr. Stewart, the plastic

5   on the front, what's that piece, the piece that . . .

6   A.   This is a full-face respirator meaning it's going to seal

7   around the outside of your face like this, and the shield --

8   it's full face because the shield covers your eyes and it covers

9   your full face.  And part of -- there are a couple reasons for

10  that large glass shield.  It keeps irritants away, stops things

11  from splashing in your eyes, a whole range of things, but also

12  makes the respirator fit better because it's going around kind

13  of like a smoother surface, the rubber around the outside.

14  Q.   From your review of the records of NIOSH and also the

15  records in this case and your view of the plant and your

16  discussions at the plant, how were batches mixed at the plant?

17  A.   The way that they made batches was described again by a

18  number of people.  And that lid that you saw, all right, that

19  would be the opening.  So before they do that, they need to

20  measure the ingredients; right?  Need to measure the

21  ingredients.

22           They need to then get the right amount, right, measure

23  it, get the right stuff, measure it, open up the lid.  And what

24  they would do is there is a screen that goes across that half of

25  the tank.  You saw how the lid opened halfway.  And the screen

1  would allow all of the powders, the things that -- powder kinds

2  of things to go through the screen.  They were required to put

3  them through the screen.  Anything that was a paste would be

4  heated in hot water like tap water hot and then poured in to the

5  soybean oil.

6          Oh, inside the tank there's soybean oil, several

7  hundred gallons of warm soybean oil.  They would dump in the

8  powders, heat the paste, dump the paste in, and the liquids

9  would be dumped in directly.

10 Q.    And how long do those batches take to mix based on your

11 understanding and your view of the circumstances there?

12 A.    It's variable.  It depends on the product.  I saw some

13 notes that it might only take 15 -- or reports that it might

14 take only 15, 20 minutes.  Other times it might take an hour or

15 two.

16 Q.    And were those tanks cleaned regularly, Dr. Stewart, based

17 on what you reviewed in the records and the reports?

18 A.    Yes.  Again, during the -- both from depositions and from

19 during the site visit, that was discussed by the American Pop

20 Corn people, and they're cleaned regularly, at least every

21 Friday.

22 Q.    There's been a lot of testimony about the sampling done by

23 NIOSH at the American Pop Corn plant.  When did OSHA first --

24 excuse me.  When did -- strike that.

25          When did NIOSH first visit the American Pop Corn

1  plant?

2  A.    My memory tells me July of 2001.

3  Q.    And what was the first thing they did?  What's typical of

4  NIOSH's routine when they do a visit like this?

5  A.    Same way that I described the beginning of an IH survey.

6  They went and they walked through the facility, took a few

7  samples, some range finding kind of samples to see what kinds of

8  exposures might be going on and got a layout, kind of like a lay

9  of the land at American Pop Corn.

10 Q.    Based on the interim reports and reports that you read,

11 these are things that industrial hygienists would rely on; is

12 that true?

13 A.    Yes.

14 Q.    What type of sampling did NIOSH do on that first occasion

15 when they came out?

16 A.    They took some what they called semi -- I think it was

17 semi-quantitative, yeah, samples, and they were trying to --

18 again, you're doing this through the first visit, and you're

19 going to take some samples just to see what's out there, so they

20 took some range finding samples.

21 Q.    And what were the purpose of those samples based on your

22 understanding and knowledge?

23 A.    What you would normally use those for in an industrial

24 hygiene survey is to figure out the next step.  Do you need to

25 do anything here?  If you do, where do you need to do it?

1  Q.    Did NIOSH do any personal sampling?

2  A.    During the first visit, I don't believe there were personal

3  samples during the first visit.  That was the walk-through.

4  Q.    Describe to the jury what a personal sampling is.  How does

5  that work?

6  A.    It's an important distinction here in industrial hygiene.

7  We have -- I used that word, and I didn't say what it was.  But

8  a personal sample and an area sample are two different types of

9  samples that we take.  And a personal sample means that I'm

10  going to take a sample that's the best estimate we can get, kind

11  of like the gold standard, of your exposure.

12        And so to do that, I have to take that sample in the

13  breathing zone.  That's a really important concept.  Six to nine

14  inches of the nose is the most common definition of the

15  breathing zone.

16        If you think about the breathing zone, think about

17  when you breathe in air, you don't breathe in -- you don't feel

18  the wind come by your hands when your hands are a foot or two

19  from your face.

20        So the idea that we're trying to do as industrial

21  hygienists is to get the air that you're breathing, so six to

22  nine inches.  Normally what you do is you attach a sampling

23  device to the lapel, right, so that when I walk around -- like,

24  for instance, in this courtroom, if I had a -- if I wanted a

25  personal exposure estimate for me, I would have something in my

1  breathing zone, and it would go wherever I go during the day,

2  right, during the day and the afternoon.  And then I would

3  analyze that sample and call that a personal exposure estimate,

4  right, breathing zone sample.

5       Area samples might be -- one of the ones we use in

6  school is that we would say, look, this cup here is a source of

7  water in this case.  And so I might put an area sampler near

8  that.  I might put a sampler near that on that table, on that

9  table, maybe over in the jury box so that during my day if I

10  walked around like that and I came back with a number that

11  was -- I needed to follow up on, I would know that the area

12  samples came out high in this area, low in that area, and I

13  would focus here.

14       So area samples are good for finding sources, but

15  personal samples are the ones that are taken in your breathing

16  zone, and those are the most important ones.  Those are the ones

17  you rely on for exposure.

18  Q.   As an industrial hygienist, what do you rely on them for,

19  Dr. Stewart?

20  A.   As an estimate of that person's exposure on a time that --

21  for the time that that sample was taken.  That's the best

22  estimate you can get.

23  Q.   And are they sometimes used for a period of time, or how's

24  that work?  How does the time work?

25  A.   Oh, that's -- when we do that, that personal exposure

1   estimate we're talking about, that stays with me my workday.  It

2   doesn't -- it doesn't end.  It's not just, you know, a few

3   minutes.  It stays with me for my workday, so it's really

4   important that that's the personal exposure estimate for the

5   day.

6   Q.   What's a peak exposure?  The jury's heard about a peak

7   exposure, Dr. Stewart.  What's that?

8   A.   A peak exposure is just like the name sounds.  What we're

9   going to do is get an instrument that's going to be able to --

10  instead of looking at a day's average exposure is going to look

11  at a certain period of time and react very fast.  So depending

12  on the resolution of the instrument, you can get the peaks to go

13  to different -- you can get different time cuts on the peak.

14  That make sense?  I mean time cuts on the peak.

15  Q.   Is there a concept in industrial hygiene called a

16  time-weighted average?

17  A.   Yes.

18  Q.   And explain to the jury when OSHA talks about or NIOSH

19  talks about a time-weighted average, what does that refer to?

20  A.   Time-weighted average, what you're doing is you're

21  taking -- because exposures are not constant, right, so if I

22  work from eight to nine doing one thing and got one exposure and

23  then from nine to ten and got another exposure level, I need to

24  average those.  So I'm going to take the average time weighted,

25  how many hours did you have at that level and how many hours did

```
 1   you have at that level.  And you come out with a time-weighted
 2   average.  And again, that's classic industrial hygiene.
 3   Q.   Tell us what NIOSH found from the first visit and the
 4   sampling results, can you?
 5   A.   Well, those samples that they took then, they couldn't find
 6   any diacetyl at that time.  They were below the detectable limit
 7   which means that the sampling and analytical tools they had
 8   couldn't detect the presence of that material.
 9   Q.   Now, what about the next visit?  Did they come out again?
10   A.   They came out again.  They came out in July and early
11   August of 2002 to do more air sampling and medical work.
12           MR. PAGLIARO:  Would you put the next one up?
13   Q.   Do you recognize this?  This is from the NIOSH report.
14   A.   That's the table from the report, yes, one of the tables.
15   Q.   Okay.  This is one of the tables directly from the 2004
16   report?
17   A.   Yes.
18   Q.   What does this table show in terms of the -- is this from
19   the second visit, by the way?
20   A.   This is from the results of the sampling from the second --
21           MR. MCCLAIN:  Your Honor, could I voir dire the
22   witness because we're offering opinions interspersed with this
23   testimony and my --
24           THE COURT:  You may.
25           MR. MCCLAIN:  Thank you.
```

1                       VOIR DIRE EXAMINATION

2    BY MR. MCCLAIN:

3    Q.   Dr. Stewart, your report relied on three sets of samples,

4    am I right, three groups of samples?  Let me explain.  One from

5    Iowa OSHA; right?

6    A.   I did mention that in the report, yes.

7    Q.   The NIOSH samples.

8    A.   Yes.

9    Q.   And the Wausau samples.  Those haven't come up yet, but

10   those three; right?

11   A.   I mentioned those in the report, yes.

12   Q.   Now, in regard to any of those days of sampling, you don't

13   know who the manufacturer of butter flavor, if any, was

14   occurring on the days that those samples occurred; am I right?

15   A.   I don't believe that's right, no.

16   Q.   Well, when you were deposed, was that the situation?

17   A.   They asked me if I know.  I figured it out from the

18   depositions, but again, I wasn't standing there looking at when

19   they did it, but I figured it out.

20   Q.   Yeah.  At your deposition you did not know.

21   A.   The word -- the question was did I know meaning like you're

22   standing there.  Nobody asked me did I figure it out.

23   Q.   Okay.  You didn't offer us any opinions regarding which

24   manufacturers of butter flavor were being manufactured on any

25   particular day; right?

A. No, I was not asked, no.
Q. All right. And likewise, you don't know the percentage of diacetyl being used on any particular day; am I right?
A. I figured it out, but I don't know. I wasn't there.
Q. Okay. You figured it out after the deposition. You didn't know on the day of the deposition. You didn't offer that testimony anyway; am I right?
A. Right, yes, that's correct.
Q. And in order to clarify this because we're not trying to figure out in this case, are we, what the levels were in 2001 when Iowa -- when Iowa OSHA took the samples or September of 2001 or April of 2004. You're trying to figure out what they were back when Mr. Kuiper was in the mixing room; am I right?
A. That part's correct, yes.
Q. Okay. And so the samples that were taken in 2001 by Iowa OSHA were very limited-in-time samples, weren't they?
A. Yes.
Q. There was one sample that was for 115 minutes; right?
A. I believe that's right. I don't know the number right off.
Q. And there was one for 400 minutes?
A. Four hundred. That makes sense, yeah.
Q. Okay. And in that report there's no mention of diacetyl at all; right? It was a dust sample.
A. There were dust samples, yes.
Q. And if they were using a liquid or a paste butter flavor on

1  that day, it wouldn't have measured it because they were only

2  measuring dust; am I right?

3  A.   Correct.

4  Q.   So you don't know even how accurate that is in terms of

5  making an estimate of how much dust was in the air if any

6  portion of it was diacetyl at all; right?  That's a true

7  statement?

8  A.   Ask it again.  I'm not so sure.  I'm trying to figure

9  out -- there's a lot.

10  Q.   All you know about is how much dust was in the air.  They

11  weren't even measuring diacetyl; am I right?

12  A.   That's correct, yes.

13  Q.   Then the 9-26-01, the NIOSH samples, there were 8 samples

14  taken over 3 days; right?

15  A.   9-26, I don't remember the exact number, but yes.

16  Q.   That's what I got from the report.  And one day of the

17  sampling of the three days was only the liquid and paste-type

18  material; am I right?

19  A.   I believe that's right.

20  Q.   And two days were powder, right, of the sampling?

21  A.   I think you're mixing up the dates on this.  I think those

22  are the July and August -- I think that's July 29, th --

23  switching the date, I think you're right.

24  Q.   Okay.  It doesn't matter which date we're talking about.

25  I'm just talking about in terms of our ability to extrapolate

1  backwards is what I'm trying to get at.

2  A.    Okay.

3  Q.    Some of the days there's just powder sampling.  Some of the

4  days there's liquid sampling, and you didn't know at the time of

5  your deposition who the manufacturers were on those days; am I

6  right?

7  A.    I think I did figure it out later that day.

8  Q.    Later that day but not when you were being deposed.

9  A.    Well, it was in the questions that you had asked.  I was

10  able to figure it out, yes.

11  Q.    And did you offer opinions about that in your testimony?

12  A.    No, be -- the question was -- and I keep saying this over

13  and over -- do you know in the sense that were you there?  There

14  were no follow-up questions.  Nobody said could you, did you, or

15  anything.

16  Q.    When you were asked the question, you didn't offer any

17  opinions about that subject; am I right?

18  A.    I was not asked, that's correct.

19  Q.    And then there was no evidence from those NIOSH samples of

20  anyone cleaning any tanks; am I right?

21  A.    That's correct.

22  Q.    And there was no measurement of the powdered flavors being

23  subjected to hot water during cleaning; am I right?

24  A.    That's -- I believe that's true, yes.

25  Q.    Okay.  Last group of samples that I want to talk about are

1  these Wausau tests.  They were taken in 2004.  There were 1, 2,

2  3, 4, 5 samples taken, and they ranged from 46 minutes to 23

3  minutes to 21 minutes to 64 minutes to 65 minutes for each of

4  those samples; right?

5  A.    That's correct.

6  Q.    All taken on the same day.

7  A.    Uh-huh.

8  Q.    And again, you don't know which product or at least you

9  didn't during your deposition know which product was being used

10 on that day.

11 A.    Right.

12 Q.    And by the way, in terms of changes, in that room there was

13 at least one new scrubber added.

14 A.    Correct.

15 Q.    During the samples and later -- in the later samples, the

16 Wausau samples, there were two new scrubbers as opposed to the

17 time when Mr. Kuiper worked in that mixing room; am I right?

18 A.    That's correct, yeah.

19 Q.    And the analytical method that was being used at the time

20 is not the analytical method being used today, is it?

21 A.    Being used by --

22 Q.    NIOSH.

23 A.    By NIOSH, that's correct.

24 Q.    Because the old analytical method underestimated the amount

25 of diacetyl in the air when moisture was in the environment; am

1  I right?

2  A.   Not completely, but what it did was when there -- under

3  certain conditions of high humidity -- and they're still working

4  on what that actually means -- it would underreport, yes.

5           MR. MCCLAIN:  Your Honor, I object to any opinions

6  regarding the conditions that existed in 1996 based upon the

7  voir dire of the witness in terms of substantial dissimilarity

8  in regard to the conditions that were measured from the three

9  sets of samples that he looked at.

10          THE COURT:  Members of the jury, I regret this, but

11  I'm going to have to send you out and take up a matter with the

12  lawyers.  So I apologize.  We'll be back as soon as we can with

13  you.  Thank you.

14          (The jury exited the courtroom.)

15          THE COURT:  And, Dr. Stewart, would you mind stepping

16  out for a few moments?  And we'll be back with you as soon as we

17  can.  Thank you.

18          Please be seated.

19          Mr. Pagliaro, what opinions are you planning on

20  soliciting from Dr. Stewart?

21          MR. PAGLIARO:  I was going to ask Dr. Stewart, Your

22  Honor -- if you remember, Dr. Egilman talked about the peak

23  exposures from that report, and he talked about the sampling.

24  I'm just trying to ask him to put the sampling in context, what

25  it meant.  I think we have the opportunity and the right to do

1  that from our perspective.  This man has been in the field a

2  long time --

3         THE COURT:  Well, no, no, no, no.  Don't give me

4  argument.

5         MR. PAGLIARO:  Okay.

6         THE COURT:  I'm just trying -- tell me what opinions

7  you're going to solicit.

8         MR. PAGLIARO:  I was going to ask -- the opinion I was

9  going to solicit was what was the average -- based on that data

10 the average of the exposure level to a mixer in that working

11 room based on that data.  That was what I was going to ask him.

12        THE COURT:  The average exposure for what date?

13        MR. PAGLIARO:  Based on that data.  It can only be on

14 that data, Your Honor.  That's a matter of weight that the jury

15 wants to give it.

16        THE COURT:  So we're talking about 2001?

17        MR. PAGLIARO:  He's going to talk about the exposure

18 levels, average exposure levels for mixtures based on that data.

19        THE COURT:  Yeah, but for what date, what dates?  Are

20 you saying the dates the data was collected so the NIOSH sample

21 in 2001?

22        MR. PAGLIARO:  The dates the data was collected would

23 be the average, but, of course, he can give an opinion that it

24 would have been a similar circumstance back when Mr. Kuiper

25 worked in the --

```
 1            THE COURT:  Well, that doesn't pass Daubert.  There's

 2   no -- he can't give that opinion.  There's absolutely no -- you

 3   don't even meet a single one of the Daubert standards.

 4            MR. PAGLIARO:  Will you allow him to testify, Your

 5   Honor, what the average was based on the report?

 6            THE COURT:  Well, the reports speak for themselves.

 7            MR. PAGLIARO:  But there's no averages, Your Honor.

 8   Could he please talk about the averages of what NIOSH found?  I

 9   mean, there's been a lot of testimony about what NIOSH found.

10   This is only our part of the case on what NIOSH found.  There's

11   been a ton of testimony in the plaintiffs' case about it, Your

12   Honor.

13            THE COURT:  Well, I understand that, but there wasn't

14   any objection.

15            MR. PAGLIARO:  Well, Your Honor . . .

16            THE COURT:  So what else are you going to be asking

17   Dr. Stewart, what other opinions?

18            MR. PAGLIARO:  Ask him about putting together MSDSs,

19   what that process is.

20            THE COURT:  Well, that's fine.  He can certainly

21   testify to that.  So all you're having him do is compute the

22   arithmetic average of the tests.

23            MR. PAGLIARO:  You asked what the opinion was, yes.

24            THE COURT:  Yeah.

25            MR. PAGLIARO:  But I want him to talk about personal
```

1   sampling and the peak exposure.  I mean, they had a lot of

2   testimony in about the peak --

3         THE COURT:  Well, did he do any sampling?

4         MR. PAGLIARO:  No, sir, no, but neither did

5   Dr. Egilman.  He talked about the peak exposure in that report.

6   That was part of his testimony.  I think I have the right to say

7   what were the circumstances of that peak exposure and what does

8   an industrial hygienist say about that.  I think that's

9   responsive to an issue they raised.  They certainly made the

10  allegation or the insinuation that that peak exposure reflected

11  something for Mr. Kuiper.

12        MR. MCCLAIN:  Judge, we made no such allegation.  We

13  asked the question -- we asked the question of all witnesses

14  including Dr. Repsher an hour ago, two hours ago, was the peak

15  exposure reported in the NIOSH report sufficient to cause

16  disease to which Dr. Repsher said yes, period.  And that was --

17  that would have been permissible even over objection I believe

18  because even with all the precautions being taken in the mixing

19  room, still peak exposures in that room were sufficient to cause

20  disease.  And, therefore, we can say, well, before precautions

21  were being taken in the room, the peak exposures would have been

22  higher or equal to --

23        THE COURT:  Mr. McClain, just a second, though.  So

24  are you objecting to something they're not actually going to be

25  asking?

1       MR. MCCLAIN:  No.  I think they are going to be asking

2  it, and that is they're trying to compute what an average

3  concentration was back in 1996.  That was the purpose of why

4  they did this calculation.

5       THE COURT:  No, I don't hear -- I don't hear

6  Mr. Pagliaro saying that.

7       MR. MCCLAIN:  Then what's the relevance -- what's the

8  relevance then of an average concentration in 2001 -- 2001 --

9  2001 and 2004 to Mr. Kuiper?  There can't be any relevance to

10  it.

11       THE COURT:  Well, I think the relevance is that the

12  defense wants the trier of fact to infer that something that

13  happened in 2001 and 2004 could be similar enough to what the

14  conditions were when Mr. Kuiper worked there.

15       MR. MCCLAIN:  And that's my objection.  There is no

16  substantial similarity here for that.  If there was some

17  relevance to the number, yes, he could calculate it from the

18  report.  The only relevance to our use of the calculated number

19  in the report to which -- which was admitted without objection

20  was that the peak exposures in 2004 -- or 2001 must have been

21  lower than they were back for Mr. Kuiper and they were

22  sufficient according to all experts to cause disease.

23  Therefore, he had sufficient exposure.  That was the reason why

24  we offered it, and it was scientifically supportable.

25       I'm objecting because this comparison is not found in

 1   the report itself.  He's calculating it.  And, two, it doesn't

 2   have substantial similarity to anything as far as we can tell to

 3   what he was being exposed to.  In other words, he could have

 4   been exposed to those peak exposures all day long back in 1996.

 5           THE COURT:  Well, and I understand that, and based on

 6   your voir dire of the witness, there's no substantial

 7   similarity, and it certainly doesn't meet a Daubert test that

 8   there's any substantial similarity to the data that they're

 9   asking him to discuss and what actually took place in the mixing

10   room when Mr. Kuiper worked there.  But I'm still not sure

11   that's what they're asking.  All you're asking him to do is to

12   compute the average?

13           MR. PAGLIARO:  I'm going to ask him to compute the

14   average of what they found when they were in the mixing room.

15   And also, Your Honor, if I may.

16           THE COURT:  Yes.

17           MR. PAGLIARO:  Why is it that the peak exposures that

18   they've been referring to and relying on and asking witnesses

19   about from that 2001 report, why are they relevant and the

20   average is not relevant?

21           THE COURT:  Because you didn't object to it.

22           MR. PAGLIARO:  Well, Your Honor --

23           THE COURT:  Did you object to it?

24           MR. PAGLIARO:  I don't remember, but if you say I

25   didn't, I didn't.

1   THE COURT:  Well, no.  I'm asking you if you think you

2   objected to it.

3   MR. PAGLIARO:  I don't recall.  I don't recall.

4   THE COURT:  So I'm still having trouble understanding

5   this.  All you're asking him to do is compute the arithmetic

6   average.  But then you're not going to ask him to draw any

7   conclusions to Mr. Kuiper's exposure?

8   MR. PAGLIARO:  Well, if I do, I'll obviously get an

9   objection, so -- I was going to, but I'd like to at least get

10  him to compute the arith -- I mean, there are inferences you can

11  draw from those reports.  It's a matter of weight, Your Honor.

12  They can argue it.  They can cross-examine him on it.  Why is it

13  excluded?

14  THE COURT:  I haven't ruled on it yet.

15  MR. PAGLIARO:  I know.  I know.

16  THE COURT:  That's okay.

17  MR. PAGLIARO:  Sorry.  Sorry.

18  THE COURT:  Mr. McClain?

19  MR. MCCLAIN:  Yeah.  The whole purpose -- the whole

20  purpose of raising this and the Court having a gatekeeper

21  function under the Daubert case to the extent there is a

22  legitimate purpose is that the jury not be allowed to draw

23  inappropriate inferences from data without sufficient scientific

24  basis.

25  And my objection goes to the scientific basis of

1 drawing the very inference he wants the jury to draw. There is

2 not substantial similarity unless the Court instr -- if he wants

3 this in front of the jury, at the very least the jury ought to

4 be provided by the Court with an instruction that there is no

5 substantial similarity to the condition that existed. I'm not

6 sure that's appropriate.

7 But what I'm saying is that exactly what he wants the

8 jury to be able to do by just throwing this number out there is

9 exactly what I'm trying to prevent because it's just not

10 allowable.

11 THE COURT: Well, what's your rejoinder to

12 Mr. Pagliaro's point that you got into the NIOSH studies?

13 MR. MCCLAIN: I did. And I explained that I think.

14 THE COURT: Yeah, but try and run it by me again.

15 MR. MCCLAIN: Okay. In 2001 NIOSH came to the plant

16 after there had been substantial changes to the room to reduce

17 the levels of exposure to workers in the plant. And they

18 measured those levels in that room and found peak exposures

19 still existing in the room which now at least three experts have

20 testified were sufficient to cause disease.

21 My argument, if there had been an objection raised,

22 would have been that if after all these precautions were taken

23 exposures in the room still existed which caused disease, it's a

24 reasonable inference and scientifically supportable to presume

25 that without controls the exposures would have at least been as

1   high if not higher previously.  Therefore, Mr. Kuiper would have

2   had sufficient exposures to cause his disease.  That's the

3   syllogism.

4           Now, that's a different thing than saying I want the

5   jury to presume without evidence that the reduced levels found

6   in the mixing room were the same or similar as existed in the

7   room previously to show that he wasn't exposed to very much.

8   That's a much different proposition and requires a better

9   foundation than I had to offer the other -- the other opinion.

10          THE COURT:  Now, what about -- when did Dr. Stewart go

11  back and figure out what product was being used during the NIOSH

12  test?  And can you tell me what the Wausau test is?  What does

13  that refer to?

14          MR. PAGLIARO:  Your Honor, that was an insurance

15  company that went out to the plant.  Those records were

16  available.

17          THE COURT:  Oh, okay.  Okay.  I wasn't sure if it was

18  at a popcorn plant in Wausau, Wisconsin, or if it was Wausau

19  Insurance Company at the American Pop Corn plant because nobody

20  explained it.

21          MR. PAGLIARO:  Mr. McClain got a jump on me, Your

22  Honor.

23          THE COURT:  Right.

24          MR. PAGLIARO:  I didn't get to that point in my

25  script.

1    THE COURT:  You didn't have a chance to get to it.

2    No.  I understand that.  But we're at least talking at the

3    American Pop Corn plant.

4    MR. PAGLIARO:  I believe so.

5    THE COURT:  Okay.

6    MR. MCCLAIN:  Now, he's absolutely incorrect.

7    THE COURT:  Who is?

8    MR. MCCLAIN:  Mr. Stewart when he says he wasn't

9    asked.  He says, Oh, you know, nobody asked me.

10   THE COURT:  Right.

11   MR. MCCLAIN:  At page 88 of his deposition, Mr. Crick

12   asked, "Am I correct that you are not familiar with what

13   products were being used at the American Pop Corn plant on the

14   days the air samples were taken?"  His answer was, "I don't know

15   the specific products that were made that were used on that

16   day."  There's no -- none of this, you know, semantic problem.

17   THE COURT:  Okay.  Did the -- did Givaudan supplement

18   their expert witness disclosure to indicate that after the

19   deposition he went back and figured out who made the product?

20   MR. MCCLAIN:  No, sir.  And to make it more specific,

21   we asked the -- we asked this question at page 14 of his

22   deposition:  "So it could have all been Sensient product used on

23   that day.  You can't tell from the documentation."

24   THE COURT:  Okay.

25   MR. MCCLAIN:  So he was unequivocal about that.

```
 1              THE COURT:  I understand that.

 2              Now, you had a point, Mr. Pagliaro.

 3              MR. PAGLIARO:  I wasn't offering the evidence, Your

 4    Honor.  I wasn't -- I didn't ask those questions.  He asked

 5    those questions in voir dire.  He got so far ahead of what I was

 6    going to cover with Dr. Stewart.

 7              THE COURT:  Well, that's what I'm concerned about,

 8    that he's objecting to things that you're not going to ask.

 9              MR. PAGLIARO:  He's done some of these.  I wasn't even

10    going to ask him that.

11              MR. MCCLAIN:  Here's the problem.  Unless you know

12    that, unless you know that, you can't make a substantial

13    similarity argument because each of those products had different

14    levels of diacetyl in them.  And the powders are different than

15    the pastes.  And we have all kinds of tests about that subject

16    which our experts know and use and base their opinions on.

17              They don't have any of that.  And, therefore, in terms

18    of the Daubert question, that's another level of substantial

19    similarity which they can't meet here.  That's why I asked the

20    question.  Because he doesn't know which products were being

21    used, he can't make a substantial similarity opinion based on

22    any scientific knowledge.

23              THE COURT:  Okay.  Just let me think -- is there

24    anything you'd like to add, Mr. Pagliaro?

25              MR. PAGLIARO:  The only thing I would like to add,
```

1  Your Honor, is I think all these things go to the weight.  He's

2  certainly free to cross-examine Dr. Stewart.

3       But again, all I think I said, Your Honor, was I'd

4  like him to be able to look at those charts.  They've talked a

5  lot -- heard a lot about NIOSH.  They've heard a lot about the

6  sampling that was done and just explain to the jury from an

7  industrial hygienist's standpoint what those samples are and

8  what the average would be from those sample charts and also

9  explain -- he's going to critique the peak exposure that

10 Dr. Egilman talked about.  Those are the two purposes, Your

11 Honor.

12      THE COURT:  But the average has no scientific

13 relevance if you don't know what product was being used on the

14 date they were tested because of the different levels of

15 diacetyl.

16      MR. PAGLIARO:  Well, why would -- why would the peak

17 exposure then have any relevance?  They used that, and they're

18 claiming that's the basis --

19      THE COURT:  It only has relevance because the experts

20 testified that the peak exposure was sufficient to cause injury,

21 and you could infer from the modifications made that the

22 exposures would have been higher when Mr. Kuiper worked there

23 and that they're lower now.  And that's the difference.

24      Mr. Holtman, would you like to chime in?

25      MR. HOLTMAN:  No.  I was just going to say wouldn't it

1  still be an issue, Your Honor, as to what was being tested under

2  the peak exposure even under their analysis?

3          THE COURT:  Well, but you didn't object to it.  No, it

4  really -- well, yeah, it could be an issue, but there wasn't any

5  objection to it.  Here there's an objection to it.  It's totally

6  different.

7          Mr. Pagliaro, anything else you want to add?

8          MR. PAGLIARO:  Would you permit him to testify and put

9  the peak exposures in context in that report, Your Honor,

10  because I do intend to ask him about that?

11          THE COURT:  And what is it that you're going to ask

12  him?

13          MR. PAGLIARO:  I'm going to ask him where the samples

14  were taken and from an industrial hygienist's standpoint what

15  the significance of the location of the sampling is for those

16  results.

17          THE COURT:  Do you have an objection to that?

18          MR. MCCLAIN:  I don't.

19          THE COURT:  Yeah.  I'm going to sustain the

20  plaintiffs' objection on Daubert grounds, on the fact that it's

21  not -- that he has no basis whatsoever to know what product was

22  being used on the dates, that the extent that he found out what

23  product was being used after the deposition Givaudan violated

24  their duty of ongoing supplementation with regard to experts and

25  didn't supplement their expert designation to include that

1  information and that in the context of which you're offering

2  this evidence it's simply not relevant.

3          Furthermore, under the rules, it's more likely to

4  confuse the jury than assist the jury and the trier of fact.  So

5  there's my ruling.  Do you have any questions about what you can

6  ask and what you can't ask?

7          MR. PAGLIARO:  I do.  I have a clarification if I may.

8          THE COURT:  Yes, yes.

9          MR. PAGLIARO:  We have the charts from the report.

10 Can he at least speak about what NIOSH found in 2001 and explain

11 what those levels mean in comparison to Jasper?

12         THE COURT:  In comparison to Jasper?

13         MR. PAGLIARO:  Yes.  It's part of the report.

14         MR. MCCLAIN:  It would be relevant if we were claiming

15 that someone in the mixing room was exposed at that point in

16 time when they took the samples and had disease.  That would be

17 a relevant inquiry.

18         THE COURT:  Absolutely.

19         MR. MCCLAIN:  But that's not the claim.  The claim is

20 is that the individuals in 1996 or -- or 1992 to '95 that were

21 exposed had sufficient exposures, and that would be the relevant

22 comparison to Jasper.  Comparing what people in 2001 after the

23 precautions were employed were in relation to Jasper I don't

24 think is a relevant inquiry.

25         THE COURT:  I don't either.  And to the extent you're

1  going to ask him that, that's sustained.

2         Do you have any other questions about the scope?

3         MR. PAGLIARO:  I think that clears it up.

4         THE COURT:  Okay.  Thank you.  Let's have the jurors

5  brought in.

6         (The jury entered the courtroom.)

7         THE COURT:  Dr. Stewart, you may return to the witness

8  stand.  Thank you.

9         Again, I apologize for the delay.  It's a hundred

10 percent my fault, so I apologize.  Thank you.

11                CONTINUED DIRECT EXAMINATION

12 BY MR. PAGLIARO:

13 Q.   Good afternoon, Dr. Stewart.  Dr. Stewart, NIOSH, when they

14 were in the plant at APC, found a peak exposure, did they not?

15 A.   Yes, they reported one, yes.

16 Q.   How many were there?  Was there just one?

17 A.   Well, it appears from the report that they may have made

18 more measurements.  They only reported one.  I'm not sure why.

19 Q.   Okay.  And explain what a peak exposure is to the jury,

20 please.

21 A.   Okay.  We talked about -- if you have an instrument that

22 can read by minute or by second or something like that

23 concentration, you're able to tell those very fine changes in

24 concentration where that sampling device I told you before, if

25 they sample over a day or work shift, you're going to get what

1  it was on average over that work shift.  Remember the

2  time-weighted average.  The peak is going -- peak exposure's

3  going to be some sharp peak over some defined period of time.

4  Q.   Okay.  And what was the peak exposure that they found?

5  A.   The peak exposure that they found went as high -- one they

6  reported went as high as 83 parts per million if my memory is

7  correct on that.

8  Q.   And where did they take the peak exposure, Dr. Stewart?

9  A.   They were very careful to point it out that it was near the

10  breathing zone.  It was not a breathing zone sample.

11  Q.   And what's the significance of that from an industrial

12  hygiene perspective if you know?

13  A.   Remember I said at the beginning, it's really important

14  that breathing zone samples be noted as breathing zone samples

15  so they can get you -- get a personal exposure.  This was not a

16  breathing zone sample.  It was near the breathing zone.  They

17  didn't really describe where they did it.  They just pointed out

18  that it was not a breathing zone sample.

19  Q.   Now, is diacetyl the only thing that was measured in the

20  plant?

21  A.   No, they measured several other things.

22  Q.   Were there any other volatile organic compounds that were

23  measured?

24  A.   Oh.  Yes.  They took another tube -- remember I told you

25  they collect these on these absorbant tubes.  And what they did

1  was -- on that tube was to look for -- collect volatile organics

2  of any kind.  They didn't really care.  They wanted to collect

3  everything they could in the mixing room.  And what they did was

4  to take that tube, then bring it back to the lab, and then they

5  heat it up and -- essentially heat it up, and then they drive

6  off those compounds, and they look for it in a way that's not

7  quantitative but it tells you what it is.  Doesn't tell you

8  really -- it's not a good estimate of how much stuff is there,

9  but it tells you what it is.

10          And so they did that.  And they found over a

11  hundred -- I think I counted 106 different organics in the

12  breathing zone -- excuse me, of the air in the mixing room.

13  Q.   Now, the jury's heard about material safety data sheets.

14  And you testified I think already that you've done some of

15  those.  What does OSHA require -- from an industrial hygiene

16  perspective, what does OSHA require a manufacturer to prepare an

17  MSDS, material safety data sheet?

18  A.   What they require you to do is to take the material safety

19  data sheets that you get from your supplier -- there's a cascade

20  that happens; right?  So you take the material safety data

21  sheets from your supplier, and then you develop a process, and

22  there's no specific process outlined, but this is what it

23  includes.

24          You would do -- take a look at the literature, find a

25  way to find out what kind of information's available.  You take

1 that with the information from the supplier.  And then you

2 design or construct an MSDS or material safety data sheet from

3 that.

4 Q.   And what are some of the things, some of the sources you

5 would consult if you're preparing a material safety data sheet,

6 Dr. Stewart?

7 A.   Over time it's changed.  In the earlier days when they

8 first passed these laws back in the '80s, people would go to

9 some databases, but mainly they would go to books, reference

10 books, things like that.  People still do that.  Still a good

11 way to go.  But books, now computers, literature searches, and

12 in the -- it's kind of unique in this industry that they have an

13 organization that can provide a lot of that for you.

14 Q.   And what is -- and for -- for a flavor manufacturer, what

15 organization would that be, for example?

16 A.   It's called RIFM.  It's the Research Institute for

17 Fragrance Materials.  I think that's what it is.  Don't hold me

18 to that.  It's RIFM.  Everybody calls them RIFM.  They have a

19 website you can go to and look at.

20 Q.   And do they describe on that website what you do with the

21 material they provide?

22 A.   Yes, they describe in detail the process that they use to

23 get to -- what they do is they supply companies with information

24 and those reviews that I talked about.  They do the literature

25 searches.  And they have independent -- they're a nonprofit, by

```
 1   the way.  They have a th -- it's a third-party review of

 2   experts, and they give you their consensus in a document.  It's

 3   called an FFIDS I think is the name of the form.

 4            MR. PAGLIARO:  Can you put up 0069, please?

 5   Q.   Is this what you described as an FFIDS?

 6   A.   That's one of the FFIDSs.

 7            MR. PAGLIARO:  And this is one, Your Honor, that's

 8   been introduced already.

 9            THE COURT:  Yes.

10   BY MR. PAGLIARO:

11   Q.   It's 1985 for diacetyl.  Do you see that, Doctor?  You need

12   your glasses?  So do I.

13            THE COURT:  They'll enlarge it for you too.

14   Q.   Modern technology.  Do you see that, Doctor?

15   A.   I see that, yes.

16   Q.   Okay.  The jury's heard a lot of testimony.  You're

17   familiar with these documents, aren't you?

18   A.   Yes, I am.

19   Q.   You're familiar with these -- you've used documents like

20   this in preparing MSDSs over the years?

21   A.   Similar, not -- yeah, similar.

22   Q.   On page 2 it talks about human health effects.  Do you see

23   that?

24   A.   Yes, I do.

25   Q.   It talks about inhalation.  Do you see that?
```

1    A.    Yes, I see it.

2    Q.    Now, there's a comment there that says high concentrations

3    may cause irritation of respiratory tract.  Do you see that?

4    A.    I see it.

5    Q.    And it says capable of producing systemic toxicity.  And

6    then there's some initials behind that.

7    A.    I see it.

8    Q.    From an industrial hygiene perspective and in your opinion,

9    what does that term systemic toxicity mean in this context?

10   A.    It's clear what it means.  What it means on my field is

11   that the effect -- that this chemical is capable of causing an

12   effect remote from the site of contact.  So systemic means --

13   see, if I put it on the skin and it causes an effect somewhere

14   else, that's systemic because it goes somewhere else.  It

15   doesn't mean the whole system.  It means that it's capable of

16   causing -- something like an organic chemical like this would be

17   capable of causing drowsiness, for example.  That's a normal

18   thing for organic compounds.

19           So what it means specifically is that it causes an

20   effect remote from the site of contact or can cause -- that says

21   capable, so it's saying it's possible that it can cause effects

22   remote from the site of contact.

23   Q.    If you look at the end of this document, sir, what is --

24   the statements relevant to making a health hazard determination,

25   what is that language at the end of the document, again, the

1   significance from an industrial hygienist's standpoint?

2   A.    This is the statement -- the health hazard determination is

3   the result of all of those experts looking at the data that is

4   on the first three or four pages of this document.  This is --

5   they're telling you in your MSDS what you need to say.  The

6   health hazard determination is part of the preparation of the

7   MSDS.  And that's the language that they're telling you should

8   be used on an MSDS, material safety data sheet.

9   Q.    Now, we've heard a lot of testimony about NIOSH's

10  investigations of popcorn plants.  Does NIOSH make available to

11  health and safety professionals like you for quick reference

12  books or materials on hazardous chemicals?

13  A.    Yes, they do provide those.

14  Q.    And is one of those the Pocket Guide to Chemical Hazards?

15  A.    Right, that's one of the more popular ones, yes.

16         MR. PAGLIARO:  Illustration, Your Honor.  This has

17  already been marked 3155.

18  Q.    Is that this book?

19  A.    That is that book.

20  Q.    And what's the purpose of this book like this to an

21  industrial hygienist?

22  A.    That book -- and that's the hard copy obviously form of

23  that; they have an electronic version also -- provides health

24  and safety professionals -- that's one of the audiences for

25  that -- with a quick reference.  So you can look for the

1 chemicals that NIOSH somehow triaged and came up with a list

2 of -- I think there are about maybe 500 in there. It's not 600.

3 I used -- around 500 chemicals. And on one page you get

4 information about, you know, the boiling point, the vapor

5 pressure, things that you would need to know, some of the

6 hazards of it, some of the information you might need to do --

7 used in exposure reconstructions. And employees sometimes have

8 it. Sometimes they're provided in laboratories, different

9 places. Sometimes they're provided in workplaces, different

10 audiences, but I think most often it would be the health and

11 safety professionals.

12 Q. And currently what does this guide show for diacetyl,

13 Dr. Stewart?

14 A. There's no listing in that guide -- and I looked just

15 before I came here. There's no listing in that guide. There's

16 not an entry for diacetyl.

17 Q. And what does NIOSH now officially consider diacetyl as an

18 industrial hygienist practicing in the field at this point in

19 time?

20 A. The -- what the official position as of the 2007 -- I don't

21 know if they've seen that international safety -- chemical

22 safety card, but it's an irritant.

23 Q. Has OSHA set a permissible exposure limit for diacetyl?

24 A. No, they have not.

25 Q. Now, have you reviewed another report, the International

1  Bakers Services report?

2  A.    Yes.

3  Q.    Is that by OSHA as well?

4  A.    NIOSH.

5  Q.    NIOSH, excuse me.  And again, the jury's heard a lot about

6  that report as well.  What type of product was made at

7  International Bakers Services plant?

8  A.    From the report -- I'm going from the report -- what I

9  learned from the report was that they were a flavor

10  manufacturer.  It's International Bakers Services, so they

11  prepared -- they had several hundred ingredients that they made

12  various products out of and then shipped them to other companies

13  to use.

14  Q.    And did they use diacetyl?

15  A.    It was listed as one of the occasional used ingredients on

16  a table 2 if I remember right.

17  Q.    Was the situation at International Bakers the same as the

18  situation at APC, the popcorn plant, in terms of the number of

19  chemicals or exposure issues?

20  A.    The two operations are different.  I mean, just think of it

21  this way:  One that makes batches using 200 different

22  ingredients that they mix together to make products to be sold

23  as a flavoring to somebody else where American Pop Corn makes

24  popcorn.  That's what they did.  So it's a different operation.

25  One is they're mixing batches, small batches of different things

1  every day.  And the other one is they're making the same thing

2  every day.  So in my view they're quite different.

3         MR. PAGLIARO:  Could you put up 808, please?

4  Q.   Is that the copy of the report we've been talking about?

5  A.   That's the cover p -- yes.

6  Q.   And have you read that report?

7  A.   Yes, several times.

8  Q.   And it's investigation --

9         MR. MCCLAIN:  Your Honor, this is outside the scope of

10  his report.  It's not covered in his report.

11         MR. PAGLIARO:  I'll withdraw the question, Your Honor.

12  I'll withdraw the question.

13  BY MR. PAGLIARO:

14  Q.   One other question for you, Dr. Stewart.  NIOSH and OSHA,

15  when they look at exposures in a plant setting based on your

16  experience -- and give your opinion, please -- do they have

17  rules about the way in which to address exposure levels?

18  A.   Yes.  There's a hierarchy of controls that's written in the

19  regulations and into industrial hygiene practice.  And under

20  OSHA, engineering controls come first, engineering controls

21  meaning like local exhaust ventilation, the ventilation in the

22  room here maybe, things like that.

23         And then farther down the list, the last resort is

24  personal protective equipment like gloves and respirators,

25  things like that.  So that's the hierarchy.  It goes from

1  engineering controls.  Last resort is personal protective

2  equipment.

3  Q.   And why is that, Doctor, if you know?

4  A.   Because on personal protective equipment, it has to be worn

5  all the time.  It has to be worn properly.  There's training

6  involved.  And it's not -- if anybody has worn respirators knows

7  it's not a -- it's a difficult thing to do sometimes for some

8  people, and so it's hard to enforce that.  So the company gets

9  in a situation or the organization -- it's not just the company.

10  It's the organization -- gets in a situation of having to

11  enforce that continually on PPE where if you engineer it out,

12  then people can just work and be fine.  Sometimes it requires

13  both sets of controls.  But engineering controls are the

14  preferred answer if you can get it.

15  Q.   And for the opinions you gave today, Doctor, do you state

16  those opinions as an industrial hygienist with a reasonable

17  degree of scientific certainty?

18  A.   Absolutely.

19       MR. PAGLIARO:  I have no further questions, Your

20  Honor.

21       THE COURT:  Thank you, Mr. Pagliaro.

22       MR. PAGLIARO:  You're welcome.

23       THE COURT:  Mr. McClain?

24                    CROSS-EXAMINATION

25  BY MR. MCCLAIN:

1  Q.   Dr. Stewart, I want to take up the issue of the MSDSs with

2  you if I can.

3  A.   Oh, sure.

4  Q.   Doctor, would you --

5       MR. MCCLAIN:  Scott, would you pull up that FFIDS

6  that's 714 that Mr. Pagliaro was looking at with Dr. Stewart?

7  Q.   Dr. Stewart, when you look over at the second page --

8       MR. MCCLAIN:  Would you look at that, Scott, that

9  health effects data?

10 Q.   When you're talking about the words harmful and you're

11 talking about capable of producing systemic toxicity, that's by

12 inhalation; am I right?

13 A.   That's under the inhalation category, that's correct.

14 Q.   Right.  Now, Dr. Stewart, let me ask you --

15      MR. MCCLAIN:  Would you put up the SOP, Scott, 100?

16 Q.   Dr. Stewart, you're familiar with the precautions currently

17 being employed at American Pop Corn?  You've testified about

18 that?

19 A.   I think I did.  I think I did earlier, yes.  I'm familiar

20 with it.  I don't --

21 Q.   Okay.  Let me just ask you, these precautions here listed

22 about working around materials with diacetyl in them to whenever

23 liquid diacetyl or a product where liquid diacetyl is present is

24 to be used, a respirator with chemical-resistant gloves must be

25 worn, that's good advice, isn't it?

1  A.   This is -- I don't know if this memo's been -- this is good

2  advice for a particular situation.

3  Q.   Okay.  It's good advice when working around a material

4  where diacetyl can get into the air; isn't that right?

5  A.   No.  I said it's good advice for a particular situation.

6  This is being taken from one situation and something else.  I

7  don't know.  For a particular situation is the way an industrial

8  hygienist looks at it.

9  Q.   Okay.  Can you tell me -- can you answer my question?  Is

10  it a good idea when working around butter flavors that are

11  heated containing diacetyl to wear a respirator and

12  chemical-resistant gloves?  That's a good idea, isn't it,

13  Dr. Stewart?

14  A.   Around butter -- this didn't -- around butter flavor.  Say

15  the whole thing again.  I got -- there's so many pieces to it,

16  I'm trying to figure out.

17  Q.   Dr. Stewart, if you're working around butter flavor which

18  contains diacetyl and it's heated, it's a good idea to wear a

19  respirator and chemical-resistant gloves; am I right?

20  A.   I think that's correct.

21  Q.   And any room containing diacetyl in a liquid state should

22  be labeled respirator required; am I right?  That's good advice.

23  A.   It depends on the situation.

24  Q.   Well, is it true that if a room contains liquid diacetyl a

25  respirator should be required?

1  A.   For this situation, this is how this memo --

2  Q.   If you just answer my question.  Is that good advice or

3  not?

4  A.   You cannot have good advice that applies to all situations.

5  Q.   I didn't ask you that.  I asked you if you have a room

6  containing diacetyl in a liquid state, should it be labeled

7  respirator required?

8  A.   Maybe.

9  Q.   Maybe?

10  A.   Maybe.

11  Q.   It shouldn't?

12  A.   No.  I said it depends on the situation.

13  Q.   You shouldn't be required to wear a respirator?  I thought

14  you just said that you should wear a respirator.

15  A.   What you -- the first part was if you -- can I ask to read

16  back -- what he asked was did you -- around butter flavoring was

17  very, very specific.  The next question is not specific.  It's

18  specific to this situation.

19  Q.   Okay.  Dr. Stewart, you're having difficulty.  Let me ask

20  it to you again.  Isn't it true that in any room containing

21  diacetyl in a liquid state a respirator should be required?

22  That's true, isn't it?

23  A.   See, I don't believe that that statement applies to all

24  situations where diacetyl may be in a liquid state?  It might

25  be --

1  Q.   Then just say no.

2  A.   It might be in a can or a bottle or something.

3  Q.   Just say no.  That's the answer to the question.  I'm not

4  trying to have a fight with you.  If the answer's no, say no.

5  A.   It isn't.  It's one of these things like when did you stop

6  beating your wife kind of a question.  It's what it -- it

7  applies to the situation.

8  Q.   Okay.  So your answer is maybe yes, maybe no.

9  A.   I'd have to investigate it and see if that's the right

10  answer.

11  Q.   And you should avoid heating materials containing diacetyl

12  at all times unless you're wearing a respirator; isn't that

13  true?

14  A.   I don't believe that's -- I don't believe that's true at

15  all times either.  It's the situation dependent.

16  Q.   And whenever material is in a tank containing diacetyl, the

17  lids must be closed.  You agree with that?

18  A.   I think I agree with that.  I think that would be a

19  generally applicable thing.

20  Q.   And if ventilation, mechanical, is not connected to tanks

21  or is unavailable, a respirator must be worn at all times while

22  in the room with a material containing diacetyl; true?

23  A.   No.  I think that's one of the specific ones.  That's not

24  generally applicable to all situations.

25  Q.   Any room containing a powder that contains or is formed

1   from liquid diacetyl must be labeled chemical gloves required

2   before entering.  Do you agree with that?

3   A.    For certain situations I agree with that.

4   Q.    Whenever dispensing or weighing diacetyl in a powdered

5   state or a product containing diacetyl in a powdered state,

6   chemical goggles and chemical-resistant gloves must be worn.  Do

7   you agree with that?

8   A.    Again, that's one of those things that if the situation

9   warranted it, the ventilation wasn't there, that might be the

10   way to go.

11   Q.    Okay.  Now, in regard to butter flavors, are you aware that

12   Givaudan supplied an MSDS to American Pop Corn that had a health

13   hazard rating of zero?  Are you aware of that, Doctor?

14   A.    I think I did see an MSDS.  I'm not sure if it went to

15   American Pop Corn.  But I did see one that had zero on it.

16   Q.    And are you aware that they did not have any requirement

17   for any respiratory protection under any circumstance?  Did you

18   see that also?

19   A.    No, I didn't see that.

20   Q.    You didn't see that.

21   A.    (Witness shook head.)

22          MR. MCCLAIN:  Would you bring up the American Pop

23   Corn --

24   A.    I may not have seen this MSDS.  I saw one in the past.

25   Q.    Okay.

1    MR. MCCLAIN:  Would you go to the page on inhalation,

2   Scott?

3   Q.   Inhalation --

4   A.   That one has a health hazard of 1 on it.

5    MR. MCCLAIN:  Scott, I'm looking for the one from 2003

6   that has the zero on it, the Givaudan.  This is from Tastemaker.

7   Number, Scott, is 1022.

8   Q.   Here's the one, Doctor, that you were remembering.  This is

9   from Givaudan 2003, health hazard rating of zero.  Do you see

10  that?

11  A.   I see it.

12  Q.   And this was after the NIOSH reports had been published;

13  right?

14  A.   Yes, yes.

15  Q.   That's after Kay Kreiss's article.

16  A.   It is.  It is.

17  Q.   And they published a material safety data sheet with a

18  health hazard rating of zero; right?

19  A.   It looks that way, yes.

20  Q.   And over in regard to inhalation, they said that there were

21  no known health hazards by inhalation and that there were no

22  medical conditions aggravated by exposure; right?

23  A.   I see that, yeah.

24       MR. MCCLAIN:  And in regard to personal protective

25  equipment, Scott, in well-ventilated areas, respiratory

1   protection is not normally required.

2   Q.   Did you know that was the recommendation as of 2003?

3   A.   Like I said, I don't know if I saw this sheet, but I see

4   the language there.

5   Q.   Yeah.  Now they're wearing scuba gear out there.  You saw

6   that; right?

7   A.   They're not -- they have a supplied air system, not --

8   Q.   Supplied-air respirators.  Mr. Hoffman described it as

9   scuba.

10  A.   No.  It's self --

11  Q.   Self-contained --

12  A.   Scuba means self-contained breathing apparatus.  They have

13  a tank like a fireman on it, you know, kind of a thing.  That

14  isn't what they use.  They use a mask that has air coming from a

15  compressor.

16  Q.   Right.  From outside the room.

17  A.   From outside the room.  That's correct.

18  Q.   That's right.  That's what they're using; right?

19  A.   That's correct.

20  Q.   Okay.

21       MR. MCCLAIN:  And would you go then, Scott, to the

22  Berje material safety data sheet?  That's Number 2172.

23  Q.   Did you know that in 1991 Givaudan was told that when

24  working around diacetyl to use positive pressure self-contained

25  breathing apparatuses?  Did you know that, Doctor?

1    A.   I don't know that I've seen that MSDS before, but no, I

2    didn't know that.

3              MR. MCCLAIN:  All right.  Thank you.  No further

4    questions.

5              THE COURT:  Mr. Pagliaro?

6              MR. PAGLIARO:  Just one, Your Honor.

7                       REDIRECT EXAMINATION

8    BY MR. PAGLIARO:

9    Q.   Dr. Stewart, Mr. McClain asked you about the FFIDS sheet

10   and about the inhalation and the comment about capable of

11   producing systemic toxicity.  Do you recall that?

12   A.   I do recall that.

13   Q.   When that says capable of producing systemic toxicity, as

14   an industrial hygienist, do you take that to mean it has an

15   effect on the lungs which is where you're inhaling it?

16   A.    It means that it's a separate effect, that when they talk

17   about systemic toxicity, it's going to happen somewhere else.

18   It's not an effect on the lung.

19             MR. PAGLIARO:  Thank you, Dr. Stewart.

20             No further questions, Your Honor.

21             THE COURT:  Dr. Stewart, you may step down.  Thank

22   you.

23             Does Givaudan have any further evidence they'd like to

24   present?

25             MR. PAGLIARO:  We'd like to read some documents if we

 1  could, Your Honor.

 2          THE COURT:  That's fine.  Thank you.

 3          MR. PAGLIARO:  Is that okay?

 4          THE COURT:  Yes.

 5          MR. PAGLIARO:  Can I show them to Mr. McClain first?

 6          THE COURT:  You may.  Mr. Pagliaro, these are

 7  documents that are already in evidence?

 8          MR. PAGLIARO:  The first one Mr. McClain doesn't have

 9  any problem with.

10          THE COURT:  Thank you.  Then it's now in evidence.

11          MR. PAGLIARO:  May I read it now?

12          THE COURT:  You may.

13          MR. PAGLIARO:  Your Honor, let me use the lavaliere

14  mike.

15          THE COURT:  Sure.

16          MR. PAGLIARO:  Your Honor, this has already been

17  identified as a memo from Mr. Hochstrasser who the jury heard

18  from.  The title of the memo is Occupational Exposure

19  Investigation, Liquids Department, Cincinnati, Ohio, and the

20  date is September 9, 1993.

21          THE COURT:  Thank you.

22          MR. PAGLIARO:  Thank you.  The purpose, to investigate

23  employee exposures to potential respiratory tract irritants and

24  sensitizers released in the liquids department workplace of the

25  Cincinnati plant during the period of January through March 1993

1  with special focus on the month of February.

2  Note, this investigation assumes that episodes of

3  respiratory irritation and impairment have been caused or

4  promoted by chemical substances into the workplace.  These

5  episodes could also be related to off-the-job exposures.

6  Investigation, assemble a list of all products made in

7  the liquids department for the subject period, liquids

8  department.

9  These are assignments to the different departments,

10  Your Honor.

11  Expand the list to include all raw materials and

12  intermediates used in the production of the products, MIS.

13  Review the material safety data sheets for all materials on the

14  list to identify any potential respiratory tract irritants and

15  sensitizers, regulatory affairs.

16  Review the list and identify the most probable

17  etiologic agents and determine if occupational exposure limits

18  have been defined for these chemicals, regulatory affairs and

19  EH&S.

20  Contact the EPA Office of Pollution Prevention and

21  Toxics to determine if any of the probable etiologic agents have

22  been reported under the substantial risk rule, TSCA section

23  8(e), regulatory affairs.

24  For suspect etiologic agents with occupational

25  exposure limits, conduct industrial hygiene sampling to

1    determine employee exposure levels, EH&S.

2         For suspect etiologic agents with no occupational

3    exposure limits, 1, contact the suppliers to determine -- I'm

4    sorry, to obtain occupational exposure information and exposure

5    limits and/or conduct mini risk assessments to estimate

6    occupational exposure limits, regulatory affairs; and, 2,

7    conduct industrial hygiene sampling to determine occupational

8    levels, EH&S.

9         Conduct industrial hygiene sampling to identify

10   possible atmospheric releases of chemicals during the production

11   of selected products, e.g., for example, those products produced

12   in February.

13        Prognosis, the prognosis for identifying a single

14   etiologic agent is not good.  Also, two or more chemicals could

15   be acting synergistically or a chemical, combination of

16   chemicals could be acting as a promoter.  To make matters even

17   more difficult, single or multiple chemicals could be acting

18   synergistically with viral or bacterial diseases to effect a

19   bronchitis or bronchiolitis; or a chemical or chemicals could be

20   invading the respiratory tracts of employees weakened by an

21   infectious disease and/or could be interacting with antibodies

22   formed by recent diseases and/or exposures.  The combination of

23   information searches, risk assessment, and industrial hygiene

24   surveys could and most likely will take months to complete and

25   cost thousands of dollars.

1    For example, the analysis of a single industrial

2 hygiene sample to identify process emissions could take from 1

3 to 2 weeks to complete and cost from 500 to $3,000 depending on

4 the number of chemicals captured on the sampling media and the

5 laboratory's ability to identify those substances.

6    Additionally, as many as four different sampling media

7 could be required to capture a representative sample of the

8 chemicals in a single process emission.

9    Control, the only possible effective control available

10 to prevent occupational exposure in liquids production is to

11 employ a combination of local and general exhaust ventilation.

12 This control method would remove the bulk of the chemical vapors

13 from the breathing zones of the employees.

14    The downside of this control method is that the

15 chemical vapor emissions would have to be significantly reduced

16 and eliminated, if possible, prior to being exhausted into the

17 ambient air.  Issues for consideration in exhausting into the

18 ambient air include, 1, odor emissions, exhausted workplace air

19 would introduce an additional odor burden into the ambient air,

20 and emission controls would have to be installed to eliminate

21 odors.

22    Two, create a public health problem and an

23 occupational health problem, the large volume of air that would

24 be exhausted into the ambient air could dilute chemical vapors

25 so that any public health threat will be eliminated or

1  minimized.  Additionally, air pollution, slash, control -- odor

2  control devices would eliminate most of the chemical emissions.

3  The public health assessment would have to be conducted for the

4  emission sources.

5       Use of respirators as a primary control for

6  occupational exposures is unacceptable.  Prior to any decision

7  to use respirators, OSHA requires that, quote, the primary

8  objective shall be to prevent atmospheric contamination.  This

9  shall be accomplished as far as feasible by accepted engineering

10  control measures, open parens, for example, enclosure or

11  confinement of the operation, general and local exhaust

12  ventilation, and substitution of less toxic materials, close

13  parens.

14       Then there's the legal cite to 29 CFR.  OSHA has also

15  defined that administrative or engineering controls must first

16  be determined and implemented whenever feasible, again, the

17  legal cite, 29 CFR 1000 -- 1900.1000.  Engineering controls are

18  considered to be feasible as far as they don't create a greater

19  ability -- a greater safety or health hazard than the hazard

20  being controlled.

21       One second, Your Honor.  This is a medical record,

22  Your Honor, that's Exhibit 3530.

23            MR. MCCLAIN:  No objection.

24            THE COURT:  You may proceed.  Thank you.

25            MR. PAGLIARO:  Thank you, Your Honor.  This is the

1  medical records from Dunes Family Medicine.  Patient is Ronald

2  Kuiper, has his date of birth and his age.  There's also a

3  reference to Curtiss D. Farrell, M.D., and the date is July the

4  12th, 2002.  The patient requested eval -- I'm sorry, Your

5  Honor.

6          Chief complaint, the patient requested evaluation for

7  the problem listed below.  History, Ron presents complaining of

8  body aches.  He feels like his heart is racing and had some

9  chills last night.  He is having a hard time swallowing as well.

10  What he describes is migratory arthralgias just here and there.

11  He has longstanding COPD -- that's chronic obstructive pulmonary

12  disease -- although has never been a smoker.  Apparently there

13  has been involvement at the plant with concerns to lung disease

14  and some of the microwave popcorn.  He is wondering about

15  whether or not to get into this program, and I will leave that

16  up to him.

17          One second, Your Honor.  Can I have a second?

18          THE COURT:  Sure.  Why doesn't everybody take a

19  stretch break.

20          MR. PAGLIARO:  Won't be long.  I promise.  I found

21  them, Your Honor.  I'm sorry.

22          THE COURT:  That's all right.

23          MR. PAGLIARO:  In a paperless society, there's still

24  paper.

25          THE COURT:  I understand.

1        MR. MCCLAIN:  No objection.

2        THE COURT:  Ready to proceed?

3        MR. PAGLIARO:  Yes.

4        THE COURT:  Thank you.  Please be seated.

5        MR. PAGLIARO:  Sorry for the interruption, Your Honor.

6   I apologize.

7        THE COURT:  No problem.  All the lawyers have done a

8   great job of keeping track of the exhibits.  It's not easy in a

9   case like this.

10       MR. PAGLIARO:  Challenge at times, Your Honor.

11       Your Honor, the first is a letter on the stationery of

12  Bethesda TriHealth Good Samaritan.  It's dated July 17, 2001,

13  and it's addressed to Glenn Ingraham, the director of corporate

14  health and safety, Givaudan Flavors in Cincinnati.  Dear

15  Mr. Ingraham, the purpose of this letter is to provide you and

16  the management at Givaudan with an assessment of the outcomes of

17  the medical surveillance program to date and by implication my

18  perspective on the effectiveness of Givaudan's health and safety

19  program.

20       In addition, I will summarize my representations to

21  Givaudan for ongoing medical monitoring.  As you are aware, as

22  medical director for TriHealth corporate services, I've been

23  directly involved through multiple meetings and through ongoing

24  administrative and supervisory responsibilities with both the

25  nursing and medical programs provided onsite and through the

1  Bethesda Care at Norwood in support of Givaudan Flavors' health
2  and safety program.  I've been functioning in this role for
3  nearly three years.
4          Prior to that time, I worked at the Center For
5  Occupational Health within the Department of Environmental
6  Health at the University of Cincinnati Medical Center.  As such,
7  I have had some perspective of health issues at Givaudan, then
8  Tastemaker.  Related to my involvement as a physician and at one
9  time director of the occupational medicine center at UC, I have
10  had direct involvement with Givaudan's medical surveillance
11  program including evaluating and testing Givaudan's employees.
12          Historically under previous ownership and previous
13  management, Givaudan became aware of an unusual and as yet
14  unexplained outbreak of pulmonary symptoms and illness occurring
15  in production workers at the flavor manufacturing facility here
16  in Cincinnati.
17          The employer, on learning of the potentially
18  work-related respiratory health problems, initiated an
19  exhaustive investigation of these health problems at Cincinnati
20  as well as at other flavoring manufacturing -- flavor
21  manufacturing facilities at other locations around the world.
22  They became involved in multiple and simultaneous efforts to
23  evaluate the respiratory health of current and past employees
24  and to investigate potential specific workplace exposure risks
25  that alone -- that alone -- sorry, that alone or in combination

 1   might have contributed to any adverse respiratory health effects

 2   identified at the Cincinnati facility.

 3         The company hired and funded the medical surveillance

 4   unit at the Department of Environmental Health at the University

 5   of Cincinnati in conjunction with the Occupational Medicine

 6   Clinic at that facility to perform a comprehensive occupational

 7   epidemiology and medical surveillance program.  The epidemiology

 8   study did not identify the cause or causes for the apparent

 9   outbreak.

10         In addition, considerable internal resources were

11   expended and outside consultation was accomplished in an attempt

12   to identify and reduce respiratory exposure risks for company

13   employees.  The health and safety department at the company

14   working in conjunction with company toxicologists, consultants,

15   and the work force implemented numerous work site interventions.

16   These interventions were intended to eliminate or reduce

17   workers' risk of exposure to workplace chemicals in general and

18   with particular attention to those chemicals that had been

19   associated with employee complaints and sensitivities in the

20   past.

21         After due diligence, a decision was made to perform

22   future medical surveillance activities onsite at Givaudan.  A

23   commitment was made to implement and maintain an ongoing

24   in-house medical program.  TriHealth physicians and nurses were

25   contracted to provide the medical surveillance program.

1   The medical program was carefully designed to

2   coordinate with ongoing industrial hygiene and safety

3   initiatives at Givaudan.  Hygiene and safety programs

4   characteristically target primary -- and that's underlined --

5   prevention.  Industrial process redesign, local and regional

6   ventilation systems, worker education and training, and personal

7   protective equipment programs including use of appropriate

8   respirators are examples of these primary prevention programs.

9   The strategy for the medical program included a role

10  in primary prevention, that is, documenting the continued

11  healthfulness of the production workers in relation to workplace

12  exposure risks.  The medical program helps answer the question

13  is our health and safety program working?

14  The medical program, however, also has critical

15  importance as a secondary prevention strategy.  The objective is

16  one of early detection.  This is a role which cannot be

17  accomplished through hygiene and safety programs alone.  Here

18  the strategy is to track sensitive indicators of pulmonary

19  health in a way that will enable medical professionals to

20  recognize and explain declines in lung function in potentially

21  exposed production workers.  These results can help the company

22  to continue to assure workers' health and safety.  From a

23  medical perspective, a successful medical surveillance program

24  identifies changes in these lung function measures at a time

25  before there are any lung symptoms or illnesses.

1  A key issue which is not altogether straightforward

2  when addressing potential work-related health problems of

3  unknown cause is which employees should be included in the

4  medical surveillance program.  Givaudan health and safety

5  representatives have addressed this question in a manner which

6  optimizes the ability to identify changes in workers with

7  exposure risks.  The program is targeted to the production

8  workers and the maintenance personnel, those workers who must

9  have medical clearance for respirator use.

10  In addition, the program is offered every other year,

11  yearly if requested, to laboratory workers and is optional for

12  office workers and administrative staff.  This flexible approach

13  meets company objectives for a comprehensive program and at the

14  same time is responsive to the objectives and is compliant with

15  the requirements of existing standards and legislation, e.g.,

16  for example, the ADA which is I think the Americans with

17  Disabilities Act.

18  The medical surveillance program has also been

19  designed to follow sensitive measures of lung function at a

20  frequency that is consistent with current best practices for

21  performance of pulmonary medical surveillance programs.  Drs.

22  Roy McKay, Ph.D. and James Lockey, M.D., M.S., who participated

23  in the earlier UC research effort and are recognized authorities

24  in the field assisted with the design of this program.

25  Pulmonary health indicators including questionnaire

1   responses, physical examinations by a physician, and spirometric

2   testing, breathing tests, by an occupational health nurse are

3   offered annually.  Apparent declines in lung function as

4   indicated by a decline in breathing test results either from

5   normal or from the individual's previous results are followed up

6   with repeat testing to confirm apparent change.

7          Worker interviews, medical examinations, and, when

8   indicated, specialist consultation with Dr. Lockey are initiated

9   by the occupational medicine physician.  Requests (sic) of lung

10   function tests are charted over time to allow the physician to

11   identify any declining trends in results.

12          The results of this periodic medical surveillance

13   program and the medical evaluation of production workers with

14   health complaints or findings potentially related to their work

15   at Givaudan has been quite reassuring.  To date, since inception

16   of the onsite program in 1997, we have not identified any

17   additional employees beyond those identified previously with

18   evidence of respiratory medical illnesses that are not better

19   explained by known preexisting health problems in the workers,

20   for example, asthma or chronic cigarette smoking-related lung

21   disease or to nonwork-related medical problems that occur

22   periodically in all adult workers including upper respiratory

23   infections, sinus infections, and so forth.

24          In summary, as someone who's been involved in

25   occupational and environmental medicine for over 20 years and

1  who has been involved in innumerable occupational and

2  environmental exposures, it is my opinion that the company

3  management and its health and safety have shown good faith and

4  reasonable efforts towards identifying and resolving pulmonary

5  health risks at Givaudan.

6         Recommendations, while Givaudan has identified no new

7  cases, it is important the company continue to exercise due

8  diligence in their health and safety programs because the

9  causative agent inducing the pulmonary problems was never

10 identified.

11        Specific medical program elements should include at a

12 minimum, 1, preplacement medical evaluations to document

13 preexisting conditions, assure medical suitability of

14 anticipated job placements, and assess ability to perform

15 essential job functions; 2, an ongoing respiratory medical

16 surveillance program for production workers coupled with a

17 respirator medical clearance program; and, 3, conditioned onsite

18 occupational medical and nursing services to evaluate and treat

19 health problems in employees, assess any potential relationship

20 to exposure risks, and address any health concerns employees may

21 have related to their employment at Givaudan.

22        The presence of an onsite program staffed by

23 occupational medicine professionals provides tangible evidence

24 of Givaudan's commitment to employee health and safety.

25 Givaudan requires the continued contribution from a high-quality

```
 1   health and safety program that can anticipate and mitigate risks
 2   associated with continued innovation, new product development,
 3   and growth in the flavor manufacturing business.  At Givaudan,
 4   health and safety is truly a part of the core business.
 5        Please let me know if you have any questions or
 6   concerns regarding this report.  Sincerely, Douglas Linz,
 7   medical director of TriHealth Corporate Health Services.
 8        One more, Your Honor.  This is a FEMA memorandum, and
 9   this was addressed actually, Your Honor, in Mr. Davis's
10   deposition.  It's Plaintiffs' Exhibit 0310.
11        THE COURT:  Thank you.
12        MR. PAGLIARO:  Excuse me.  It's a m -- excuse me.
13   Sorry, Your Honor.  I got a frog in my throat.  0310.  This memo
14   is dated October 4, 2001, to FEMA official representatives, FEMA
15   government relations committee, from Glenn Roberts.
16        There are press reports attached that several workers
17   at a popcorn factory were seriously injured due to exposure to
18   high concentrations of ingredients in the process of microwave
19   popcorn manufacturing.  Preliminary reports by NIOSH suggest
20   that diacetyl, an ingredient in butter flavor, may have been
21   the -- it says case, but I believe it means cause; I think it's
22   a typo -- the cause of the workplace injury.  The investigation
23   is still ongoing, and additional testing is in progress.  Copies
24   of the articles are attached.
25        And attached to this are two articles, one, a Wall
```

1   Street Journal article dated October 3, 2001, titled

2   Investigators Find Butter Flavoring May Pose a Risk to Factory

3   Workers.  And the other article attached is a New York Times

4   article dated October 4, 2001, titled Artificial Butter

5   Suspected in Lung Disease.

6               That completes it, Your Honor.

7               THE COURT:  Okay.  Thank you.

8               Does the plaintiff have any -- do you have any

9   additional evidence?

10              MR. PAGLIARO:  No.  The defense rests, Your Honor.

11              THE COURT:  Okay.  Thank you, Mr. Pagliaro.

12              MR. PAGLIARO:  You're welcome, Your Honor.

13              THE COURT:  Mr. McClain, do you have any rebuttal

14  evidence?

15              MR. MCCLAIN:  Yes, Your Honor, but our rebuttal

16  witness is not --

17              THE COURT:  Scheduled till tomorrow morning?

18              MR. MCCLAIN:  Until tomorrow morning, yes.

19              THE COURT:  Okay.  Then, members of the jury, that's

20  going to conclude the evidence for today.  I'm confident this

21  case will go to the jury tomorrow, so we'll hear whatever

22  rebuttal evidence that is admissible that the plaintiff has.

23  And then I'm going to have a couple -- I think four actually --

24  short -- the good news is very short -- supplemental jury

25  instructions.  I underline short.  And you'll have a copy of

1    those.  Then you'll hear the closing arguments of the lawyers.

2              And just to explain ahead of time how that works, the

3    plaintiff goes first.  Then we hear from Givaudan.  And then we

4    hear from the plaintiff last in what's called a rebuttal closing

5    argument.

6              So I don't know exactly when that's going to be during

7    the day.  But it will definitely go to you some time tomorrow.

8    So we'll see you tomorrow morning at 8:30.  Thank you.

9              (The jury exited the courtroom.)

10             THE COURT:  Please be seated.

11             Mr. Meador, I wanted to give you an opportunity now to

12   make that offer of proof concerning Dr. Repsher's testimony on

13   the stroke.

14             MR. MEADOR:  Thank you very much, Your Honor.

15   Dr. Repsher was going to opine that the stroke was not related

16   to any pulmonary problem; that the stroke was a disorder of the

17   brain that had nothing to do with the lungs; and that the stroke

18   left side effects of balance.  And one of the reasons why he

19   went into assisted living in 2006 is he had balance problems, he

20   had a bad fall, and that his family agreed that he needed to get

21   into assisted living because of the balance problems related to

22   the stroke.  And that was going to be his testimony.

23             He was going to -- he was going to lay a foundation to

24   talk about his ability to understand the nature and cause of the

25   stroke and how -- that it was not related to the pulmonary

 1    system, and that was it, Your Honor.

 2             THE COURT:  Okay.  And, you know, I went back kind of

 3    at your suggestion and reread the realtime transcript with

 4    regard to your questioning of Dr. Repsher with regard to his

 5    examining Mr. Kuiper if he had the opportunity to do so.  And I

 6    am really perplexed by the impression you were attempting to

 7    leave with the jury by that question.  You only asked a couple

 8    of questions.

 9             And so I'm wondering what you were -- what impression

10    were you trying to leave with the jury when you asked him that

11    because you never asked permission to have him examine

12    Mr. Kuiper?  And it seems to me the only fair reading of that

13    was that you were trying to create an impression that there was

14    some external factor unrelated to Givaudan and the doctor that

15    caused him not to examine Mr. Kuiper.  And that is patently

16    false.

17             And, you know, I would characterize it and I

18    previously did as inadvertent, but unless you have an

19    explanation for me, that was -- it was false, misleading, and

20    deceptive to try and leave that impression with the jury when

21    you know perfectly well that you never asked.  And so explain to

22    me what impression it is that you were trying to leave with the

23    jury about that.

24             MR. MEADOR:  My background and experience in 31 years,

25    I, of course, don't --

1    THE COURT:  You know, I'm not interested in that.  I'm

2  interested in what impression you were trying to leave with the

3  jury by asking those questions, not your background in 31 years

4  of experience.

5    MR. MEADOR:  I was trying --

6    THE COURT:  Because if you want me to report it to the

7  California bar for the first time, I'll be happy to do so if

8  that's what you're suggesting.

9    MR. MEADOR:  No, Your Honor.

10    THE COURT:  I'll be happy to do so because I think you

11  left a false impression with the jury, and then for you to

12  object to me trying to cure in very neutral terms that false

13  impression, you know, that just added to the problem.  So you

14  tell me what impression you were trying to leave with the jury

15  by that questioning.

16    MR. MEADOR:  I was trying to respond.  I was assuming,

17  apparently erroneously, that you just can't get multiple defense

18  medicals of a plaintiff in a --

19    THE COURT:  Is there anything in Rule 35 that says

20  there's a limit to one?

21    MR. MEADOR:  No, just my background and experience

22  with state and federal court.

23    THE COURT:  Did you even ask in this case?

24    MR. MEADOR:  You know, Your Honor, this --

25    THE COURT:  No.  Did you ask?  Did you ask to have

1    Dr. Repsher do an examination of Mr. Kuiper?

2           MR. MEADOR:  Not since we substituted in this case.

3           THE COURT:  Could you have asked that?

4           MR. MEADOR:  Yes, Your Honor.

5           THE COURT:  Okay.  Even if your experience has been in

6    some other courts that a particular judge may or may not limit

7    it to one -- and, you know, I've been around a long time, and

8    I've never, ever heard that before.  Never, never once in my

9    over 35 years in the profession have I ever heard there's a one

10    bite at the apple with regard to an expert witness, particularly

11    in a complex case where there's multiple experts testifying.

12    Never heard that before.  But your experience is obviously

13    different, and I have no reason to doubt that.

14          But are you open to the possibility that maybe through

15    inadvertence that left a false impression with the jury?

16           MR. MEADOR:  Yes, Your Honor, I am open to that

17    concept.

18           THE COURT:  Okay.  Okay.  And I am absolutely willing

19    to give you the benefit of the doubt that it was inadvertent.  I

20    mean, I -- let's just leave it alone; okay?

21           MR. MEADOR:  Thank you, Your Honor.

22           THE COURT:  Thank you.

23          Have you disclosed what your rebuttal's going to be?

24           MR. MCCLAIN:  Yes.

25           THE COURT:  Okay.  How long will it last?

                    MR. MCCLAIN:  No more than an hour.

1                   THE COURT:  So do you want to then take a break before

2  we do the closings?  I said up to two hours.  What do you want?

3  What would the parties like?

4                   Mr. Pagliaro, you're going to be closing?

5                   MR. PAGLIARO:  I am, Your Honor.

6                   THE COURT:  What would you like?

7                   MR. PAGLIARO:  Just thinking about today.  Probably an

8  hour break would be a good idea, Your Honor, just to get our

9  heads --

10                  THE COURT:  Absolutely.

11                  MR. PAGLIARO:  If you wouldn't mind.

12                  THE COURT:  No, I don't mind at all.  I think it's

13  helpful, and I think it helps you give a better closing.  So are

14  you comfortable with an hour?

15                  MR. MCCLAIN:  Sure.

16                  THE COURT:  Okay.  Do you anticipate any problems on

17  the rebuttal?

18                  MR. MCCLAIN:  I don't think so.  I'm assessing how

19  much we need in light of -- I mean, I already put the wheels in

20  motion -- I already put the wheels in motion.  And so I'm trying

21  to assess -- it will be very limited and will be very directed

22  to points that were raised including this last letter that they

23  read in.  But it will be very limited.

24                  THE COURT:  Now, on the hour-and-15-minute closing,

1                   MR. MCCLAIN:  No more than an hour.

2                   THE COURT:  So do you want to then take a break before

3   we do the closings?  I said up to two hours.  What do you want?

4   What would the parties like?

5                   Mr. Pagliaro, you're going to be closing?

6                   MR. PAGLIARO:  I am, Your Honor.

7                   THE COURT:  What would you like?

8                   MR. PAGLIARO:  Just thinking about today.  Probably an

9   hour break would be a good idea, Your Honor, just to get our

10  heads --

11                  THE COURT:  Absolutely.

12                  MR. PAGLIARO:  If you wouldn't mind.

13                  THE COURT:  No, I don't mind at all.  I think it's

14  helpful, and I think it helps you give a better closing.  So are

15  you comfortable with an hour?

16                  MR. MCCLAIN:  Sure.

17                  THE COURT:  Okay.  Do you anticipate any problems on

18  the rebuttal?

19                  MR. MCCLAIN:  I don't think so.  I'm assessing how

20  much we need in light of -- I mean, I already put the wheels in

21  motion -- I already put the wheels in motion.  And so I'm trying

22  to assess -- it will be very limited and will be very directed

23  to points that were raised including this last letter that they

24  read in.  But it will be very limited.

25                  THE COURT:  Now, on the hour-and-15-minute closing,

1    I've already discussed with Mr. Pagliaro that I'm going to give

2    him a heads-up at -- I've got notes on it, so I want to make

3    sure I have my notes right.  I think it was at an hour and then

4    at the 15-minute mark just kind of hopefully gently indicate

5    that it's time to bring it to a close.

6              You're in a little bit different situation,

7    Mr. McClain, because whenever time you don't use up you're going

8    to use in rebuttal.  So how do you want me to structure your

9    warnings?

10             MR. MCCLAIN:  An hour and 15 minutes, Your Honor.

11             THE COURT:  Well, if I --

12             MR. MCCLAIN:  I mean at 55 minutes and then at the

13   hour.

14             THE COURT:  So 55 minutes and then at the hour.

15             MR. MCCLAIN:  Right.

16             THE COURT:  Okay.  Now, Mr. Meador, you have something

17   you'd like to raise.

18             MR. MEADOR:  Yes, Your Honor.  Thank you.  I just

19   wanted -- they are recalling Dr. Egilman as a rebuttal witness,

20   and I just want to ask for an offer of proof on what subject

21   areas he tends to go in as pure rebuttal to ascertain whether I

22   have an objection to it or not because as the Court knows,

23   rebuttal's not a continuation of direct examination.

24             THE COURT:  That's a good point.

25             MR. MEADOR:  And Dr. Egilman has been very broad.  I

1    know it was a long time ago, but he was broad and free ranging

2    and unrestricted.

3          THE COURT:  That is true.  I agree with those

4    characterizations.  Are you sure it's proper rebuttal?

5          MR. MCCLAIN:  Yes.  But that doesn't mean that I'm --

6    because I've said that I'm going to do it tomorrow that I'm

7    confident after I review it that that's what I want to do.  Let

8    me just give you that caveat.

9          THE COURT:  Okay.

10         MR. MCCLAIN:  I want him -- I do think --

11         THE COURT:  Without going into the Q and A, do you

12    mind -- I'd like to not have to send the jury out, so Mr. Meador

13    very wisely is raising this issue.  He understands the scope of

14    rebuttal testimony which is much more limited I think than most

15    lawyers appreciate that it is.  And he's just doing what I've

16    asked all along to do, and that is try and let's see if we have

17    a problem.

18         MR. MCCLAIN:  One issue that I clearly have in mind

19    was this suggestion that Nancy Higley made that they had no more

20    cases of bronchiolitis obliterans coming out of the plant which

21    is not a true statement.  That was emphasized with the last

22    piece of evidence by this letter from this Linz who they hired

23    after they fired everybody else.  They paid him to write this

24    letter; okay?  That's the way he got the business.  He undercut

25    the other guys to do this corporate testing, and you could tell

1  what the -- you could tell what was going on here.

2          But to the extent that they wanted -- they want that

3  to be the last thing left with the jury that they've done

4  everything right, Dr. Egilman can bring the jury up to date in

5  terms of what happened at Givaudan after everyone got fired.

6  That's one point.

7          THE COURT:  Let's just stop there.  That would be

8  proper rebuttal, wouldn't it, with regard to Higley's testimony?

9          MR. MEADOR:  If you're talking about that very narrow

10  area, but in terms of the corporate story, Dr. Egilman already

11  went way past 2001 and talked about our conduct and our failure

12  to update MSDSs, et cetera, et cetera.  But if you're talking

13  about one kernel, I actually --

14          THE COURT:  Actually agree.

15          MR. MEADOR:  I actually agree, Your Honor.

16          THE COURT:  Well, good.  That's okay.

17          MR. MEADOR:  I'm on a roll now.

18          THE COURT:  There you are.  Yes, we are.  Let's find

19  out what the second point is of potential rebuttal.

20          MR. MCCLAIN:  The other point of potential rebuttal is

21  as to whether or not on the X-ray exams you can see evidence of

22  air trapping and whether or not it's required even if you can't

23  see them.  That's the point that was raised today with

24  Dr. Bainbridge and with Dr. Repsher.

25          THE COURT:  Well, didn't he testify in his direct

1  about the air trapping and they put a diagram up and he

2  explained what air trapping was and gave an example of where it

3  exists and where it doesn't exist?  I mean, was that in some

4  false memory that I have about this case because, you know, I

5  dream so much about this case?

6       MR. MCCLAIN:  I'm not sure that Dr. Egilman testified

7  about that, but Dr. Parmet did testify about not needing a

8  mosaic pattern to diagnose it.

9       THE COURT:  Well, virtually everybody's testified

10  about that.

11       MR. MCCLAIN:  Right.

12       THE COURT:  But didn't Egilman actually put up a

13  diagram and explain what air trapping was?

14       MR. MCCLAIN:  Yes, but he didn't put up Mr. Kuiper's

15  X-ray.

16       THE COURT:  He was talking about it in general.

17       MR. MCCLAIN:  Yes.  Yeah, it was an anatomical slide

18  showing BO, not air trapping.  But Dr. -- it was Dr. Repsher who

19  put up those slides on air trapping of other individuals

20  comparing Mr. Kuiper's and Mr. -- comparing a slide of

21  Mr. Kuiper's lung versus a lung which he claimed had a mosaic

22  pattern.  Dr. Egilman could address that issue.

23       THE COURT:  Now, are you actually going to put up --

24  that slide is theirs.  I understand that.

25       MR. MCCLAIN:  Yes.  And also maybe the real CT scans.

1    We're trying to get a reader so we can do that potentially.  So

2    that was another potential area to address since we didn't put

3    those up in our case but they did and they're claiming that you

4    can't see air trapping on the slide.  We agree about the mosaic,

5    but you can see air trapping.

6            THE COURT:  Mr. Meador?

7            MR. MEADOR:  We're all testing our memories here going

8    back to the very first witness in the case.

9            THE COURT:  My memory is historically totally

10   unreliable.  I'd be the first one to concede that.

11           MR. MEADOR:  But one thing since I did his

12   cross-examination, I'm clear -- and we'll, of course, dig out

13   the testimony -- is he testified all about the CT scan.  In

14   fact, what he said was he criticized Dr. Bainbridge and said

15   that it was only an inspiratory CT scan and that was inadequate

16   for ascertaining whether or not that you had the mosaic pattern.

17           And then on cross-examination I pulled out the 2007

18   expiratory CT scan and questioned Dr. Egilman on that, and he

19   confirmed that it was an expiratory CT scan and the results are

20   negative.

21           So they certainly had the full opportunity for -- if

22   he wanted to comment further after my cross-examination on that.

23   So I don't see how this fits in the category of being rebuttal.

24           THE COURT:  And let me qualify it.  I don't have

25   sufficient memory.  I'm saying -- but what I do believe is if

1  what Mr. Meador just represented actually happened -- and we're

2  all just, you know, relying on our memories now, so it's not

3  a -- it's just a case of, you know, how well you can remember.

4  It seems to me it's not proper rebuttal.  And so you tell me why

5  you think it is proper rebuttal.

6          MR. MCCLAIN:  Well, I think he's wrong about that.  I

7  think his recollection is incorrect.  But . . .

8          THE COURT:  Let me ask it this way.  If his

9  recollection is correct, are you willing to concede that it's

10 just a rehash of what you could have done on direct and redirect

11 and it's not proper rebuttal?

12          MR. MCCLAIN:  I have to admit I was asking a question

13 while he was talking to try to make sure that I was mentioning

14 all the issues to you, but as I heard him say it, he said that

15 he raised the issue with Dr. Egilman regarding expiratory views

16 on the CT scan?

17          THE COURT:  CT scan, right.

18          MR. MCCLAIN:  I don't believe that that is accurate.

19 And, therefore, I would say yes, if, in fact, he said that the

20 2007 was an expiratory view, then it would not be proper

21 rebuttal to raise the expiratory view issue as a mosaic pattern.

22 We're not raising that point.  That's not the point to be

23 raised.

24          The point is is that you can find air trapping on the

25 CT scan which is evident even without a mosaic pattern.  That's

1  a different point.

2          THE COURT:  Okay.

3          MR. MEADOR:  And just to respond narrowly to the

4  different point, he put on Dr. Parmet, and Dr. Parmet has made

5  the exact point that he's talking about.  So, I mean, he doesn't

6  need Dr. Egilman to come in when Dr. Parmet -- he had two

7  occupational medicine doctors testify in this case.  So I don't

8  think he's going to bring him in to rebut Dr. Parmet.

9          MR. MCCLAIN:  But that was before you made that the

10 cornerstone of your defense.  I mean, that's your whole emphasis

11 of why this isn't -- why this isn't bronchiolitis obliterans.

12 Now, I cross-examined him I think on the point and made the

13 points, but, you know, it is rebuttal to this issue that this

14 is -- this is the cardinal which is what Dr. -- the cardinal

15 factor in finding the disease.  It just -- it's not so.  It's

16 made up.

17         MR. MEADOR:  Just one last comment on that.

18         THE COURT:  Yes.

19         MR. MEADOR:  We've had prior testimony and

20 Dr. Bainbridge -- we just had him today -- that talked about

21 that issue, so the record is what it is on this point.

22         THE COURT:  Have you been ordering realtime

23 transcripts -- or I'm sorry, daily copy?

24         MR. MEADOR:  Yes, Your Honor.

25         THE COURT:  Okay.  Do you have daily copy?

```
 1              MR. MCCLAIN:  Not all of it.  Oh, I'm sorry.  We do
 2    have all of it.
 3              THE COURT:  Okay.  I wouldn't expect you to really
 4    know what's going on behind the scenes.
 5              MR. MCCLAIN:  I don't.
 6              THE COURT:  Well, I guess -- and so this would have
 7    come up on the cross-examination of Egilman and the redirect if
 8    at all.  Is that what we're talking about?
 9              MR. MCCLAIN:  Yes.
10              MR. MEADOR:  Yes.  Of course, I'll look at his direct.
11              THE COURT:  Okay.  You look at his direct.  I'm not
12    going to.  I'm going to have Shelly print out for me the cross
13    and the redirect.  And then do you think we need to meet a
14    little earlier than eight o'clock to try and resolve this?
15              MR. MEADOR:  That'd be fine, Your Honor.
16              THE COURT:  Yeah.  I've got a very complicated
17    sentencing at three that I need to get in talking to probation
18    about.
19              But, Shelly, let me ask you this.  Can you produce
20    the -- yeah, you can.  I know you can.  Yeah, okay.  So you
21    print off the realtime transcript for me.
22              7:45 give us enough time to get this resolved I think?
23              MR. MEADOR:  That'd be fine, Your Honor.
24              THE COURT:  Okay.  We'll see you all at 7:45 tomorrow
25    morning.  Thank you.
```

1    (The foregoing trial was

2    adjourned at 2:24 p.m.)

3

4

5

6                    CERTIFICATE

7    I certify that the foregoing is a correct transcript

8    from the record of proceedings in the above-entitled matter.

9

10

11    _S/Shelly Semmler_____          4-4-09
12     Shelly Semmler, RMR, CRR            Date

13

14                    **INDEX**

15    **WITNESS:**                          **PAGE:**

16    LAWRENCE REPSHER
         MR. MEADOR                        1341
17       MR. MCCLAIN                       1365
         MR. MEADOR                        1395
18
      CRAIG BAINBRIDGE
19       MR PAGLIARO                       1401
         MR. MCCLAIN                       1425
20       MR. PAGLIARO                      1436

21    JAMES STEWART
         MR. PAGLIARO                      1440
22       MR. MCCLAIN                       1478
         MR. PAGLIARO                      1497
23       MR. MCCLAIN                       1507
         MR. PAGLIARO                      1515

24                    *****

25